Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF GEORGIA

3                GAINSVILLE DIVISION

4     CALLIE D. ROBERTS,

                 Plaintiff

5     vs.

      AAA COOPER TRANSPORTATION,INC.,

6     and MARCUS J. BUSH, Individually      Civil Action No.

      and Jointly,                         2:17-CV-232-RWS

7              Defendant

8

9

10

11

12

13

14

15

16    VIDEOTAPED DEPOSITION OF STEFANOS N. KALES, M.D.

17           WEDNESDAY, SEPTEMBER 25, 2019

18             10:30 A.M. - 1:12 P.M.

19            VERITEXT LEGAL SOLUTIONS

                101 ARCH STREET

20            BOSTON, MASSACHUSETTS

21

22

23    Reported by:  Sandra A. Deschaine, CSR, RPR,

24    CLR, CRA

25    Job No. 3506862

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 2

1                SEPTEMBER 25, 2019

2

3                     10:30 a.m.

4

5            Deposition of Stephanos N. Kales,

6     M.D., held at Veritext Legal Solutions, 101

7     Arch Street, Boston, Massachusetts, pursuant

8     to Notice, before Sandra A. Deschaine, a

9     Shorthand Reporter, Registered Professional

10    Reporter, Certified LiveNote Reporter, and

11    Notary Public in and for the Commonwealth of

12    Massachusetts.

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                                    Page 3

1    A P P E A R A N C E S:

2

3    ON BEHALF OF THE PLAINTIFF:

4    HALL BOOTH SMITH, P.C.

5         Sean Cox, Esquire

6         (telephonic/videoconference)

7         191 Peachtree Street, N.E.

8         Atlanta, Georgia 30303-1775

9         404.954.5000

10        scox@hallboothsmith.com

11   and

12   E. Brian Watkins

13   Attorney at Law

14        E. Brian Watkins

15        191 Roosevelt Street

16        Marietta, Georgia 30060

17        brian@watkinslaw.com

18

19

20

21

22

23

24

25   (Appearances continued.)

EXHIBIT A

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                                    Page 4

1    A P P E A R A N C E S: (continued)

2    ON BEHALF OF THE DEFENDANTS:

3    BEASELY, ALLEN, CROW, METHVIN, PORTIS &

4    MILES, P.C.

5         Christopher Glover, Esquire

6         (telephonic/videoconference)

7         4200 Northside Parkway, NW

8         Building One, Suite 100

9         Atlanta, Georgia 30327

10        800.898.2035

11

12   Also Present:  Bob Giannini, videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 5

1                    I N D E X

2

EXAMINATION                                          PAGE

3
    By Mr. Cox .......................... 8

4

5   EXHIBITS      DESCRIPTION                    PAGE
6   Exhibit 1     Notice to Take Videotaped       5
                  Deposition Upon Oral
7                 Examination
8   Exhibit 2     Letter dated 6/3/19 to          5
                  Christopher Glover
9
    Exhibit 3     Curriculum Vitae of Stefanos    5
10                N. Kales
11  Exhibit 4     FMCSA Medical Review            5
12  Exhibit 5     Nonadherence with              5
                  Employer-Mandated Sleep Apnea
13                Treatment and Increased Risk
                  of Serious Truck
14                Crashes
15  Exhibit 6     Fee Schedule 2017-19           5
16  Exhibit 7     Invoices                       5
17  Exhibit 8     Notice of Intent to Serve      5
                  Subpoena
18
    Exhibit 9     (Retained by Counsel)          5
19
    Exhibit 10    Medical Examiner's             5
20                Certificate
21  Exhibit 11    Letter dated marked 6/4/19 to 5
                  Stefanos N. Kales with
22                attachments
23

24

25

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 6

1   (Exhibit 1, Notice to Take Videotaped

2   Deposition Upon Oral Examination, marked for

3   identification.

4   (Exhibit 2, Letter dated 6/3/19 to

5   Christopher Glover, marked for

6   identification.)

7   (Exhibit 3, Curriculim Vitae of Stefanos N.

8   Kales, marked for identification.)

9   (Exhibit 4, FMCSA Medical Review, marked for

10  identification.)

11  (Exhibit 5, Nonadherence with

12  Employer-Mandated Sleep Apnea Treatment and

13  Increased Risk of Serious Truck Crashes

14  (Exhibit 6, Fee Schedule 2017-19, marked for

15  identification.)

16  (Exhibit 7, Invoices, marked for

17  identification.)

18  (Exhibit 8, Notice of Intent to Serve

19  Subpoena, marked for identification.)

20  (Exhibit 9, marked for identification.)

21  (Exhibit 10, Medical Examiner's Certificate,

22  marked for identification.)

23  (Exhibit 11, Letter dated marked 6/4/19 to

24  Stefanos N. Kales with attachments, for

25  identification.)

Stefanos N. Kales , M.D.                 September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 7

1            P R O C E E D I N G S

2            THE VIDEOGRAPHER:  Good morning.

3       We are on the record.  This is the

4       videographer speaking Bob Giannini, with

5       court reporter Sandra Deschaine, with

6       Veritext Legal Solutions.  Today's date

7       is September 25th, 2019, and the time is

8       10:30 a.m.  We are here at the office of

9       Veritext Boston, located at 101 Arch

10      Street, Boston, Massachusetts, to take

11      the videotaped deposition of

12      Dr. Stefanos N. Kales, in the matter of

13      Callie Roberts versus AAA Cooper

14      Transportation, et al.  This is Civil

15      Action No. 2:17-CV-232-RWS.

16            Will counsel please introduce

17      themselves for the record?

18            MR. GLOVER:  Chris Glover here for

19      the plaintiff.

20            MR. WATKINS:  E. Brian Watkins for

21      the plaintiff.

22            MR. COX:  Sean Cox for the

23      defendant.

24            THE VIDEOGRAPHER:  Thank you.

25      Will the court reporter please swear in

EXHIBIT A

Stefanos N. Kales , M.D.                 September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                                    Page 8

1        the witness?

2              MR. COX:  Before you swear in the

3        witness, I just want to get the

4        stipulations on record so we can get

5        straight in.

6              This deposition is being taken

7        pursuant to agreement of counsel and for

8        all purposes of the Federal Rules.  If

9        everyone agrees, we'll reserve all

10       objections except to form of the

11       question and responses to the answer

12       until first use.

13             MR. GLOVER:  Yes.  Whenever your

14       ready, ma'am.  Thank you.

15             STEFANOS N. KALES, Deponent,

16   having first been satisfactorily identified

17   by the production of his Global entry ID card

18   and duly sworn by the Notary Public, was

19   examined and testified as follows:

20                  EXAMINATION

21   BY MR. COX:

22        Q.   Good morning, Doctor.  How are you

23   today?

24        A.   Good morning.  I'm fine.  How are

25   you?

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 9

1        Q.    Well.  Thank you.

2             I know you've given depositions

3     before, so I won't belabor my instructions,

4     but just to make sure we're operating on the

5     same page, you're up in Boston, and I'm here

6     in Atlanta.

7             Why don't we go through them real

8     quick.  Because we are dealing with a

9     videoconference, it's a little awkward with a

10    delay.  If you would please wait until I

11    finish asking my question before you begin

12    answering, I'll try to give you the same

13    courtesy; and that way, hopefully, we're not

14    missing stuff between the two of us.

15            If you don't understand any of my

16    questions, please let me know, and I'll be

17    happy to restate it, repeat it, or rephrase

18    it.  Whatever you need.  But if you do answer

19    my question, I'm going to understand that you

20    understood it.  Is that fair?

21        A.    Everything sounds great.  I lost

22    the last half of the last sentence.

23        Q.    I'm just saying that if you answer

24    my question, I'm going to assume that you

25    understood it.  Is that fair?

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                                    Page 10

1          A.   Yes, it is.

2          Q.   If you would, please give me your

3     full name for the record.

4          A.   Stefanos, or Stephen, N. Kales,

5     K-a-l-e-s.

6          Q.   How many times have you testified?

7          A.   In deposition or court?

8          Q.   Either.

9          A.   In total, probably -- I would say

10    more than 50 times.

11         Q.   And as part of your report, you

12    provided me a list of your testimony

13    history --

14              THE REPORTER:  Of your what?

15         Counsel, Counsel, can you bring the

16         microphone, maybe, closer to you or

17         something?

18              MR. COX:  Is that better?

19              THE REPORTER:  "A list of your"?

20    BY MR. COX:

21         Q.   Is that list of testimony complete

22    for your career?

23         A.   No.

24         Q.   Based off what you provided, it

25    looks like about 85 percent of your testimony

EXHIBIT A

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 11

1   has been for plaintiffs in the last four

2   years; is that correct?

3        A.   Certainly the majority.  I'd have

4   to do a calculation to give you a percent,

5   but...

6        Q.   Is that same percentage consistent

7   over your entire career or has it changed in

8   the last four years?

9        A.   I wouldn't be able to answer that

10  question off the top of my head.

11       Q.   Do you have any reason to believe

12  that you testified for a higher percentage of

13  defendants previously in your career?

14       A.   No.  I know, though, in the past,

15  I used to do impartial exams for the state of

16  Massachusetts; and so I was -- I would

17  occasionally get deposed, maybe once or twice

18  a year, as an impartial or independent

19  person.  But I couldn't give you -- I don't

20  have a specific reason it may have changed,

21  but I don't want to be tied to an answer when

22  I don't have the data.

23       Q.   How many times have you worked

24  with Mr. Glover?

25       A.   I believe we've worked once

**EXHIBIT A**

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 12

1    together in the past.

2         Q.   How much do you charge for acting

3    as an expert witness?

4         A.   I believe that I've provided you

5    with my fee schedule; so you should have all

6    that information.

7         Q.   What's your hourly rate that you

8    charge to your client?

9         A.   For what service, sir?

10        Q.   For reviewing files, preparing

11   reports, creating your opinions?

12        A.   $750 an hour.

13        Q.   And how much do you charge to

14   provide deposition testimony?

15        A.   $1400 an hour with a two-hour

16   minimum.

17        Q.   Why the difference?

18        A.   It's business.  It's opportunity

19   costs.

20        Q.   I'm sorry?

21        A.   The opportunity costs of business,

22   sir.

23        Q.   What particular opportunity costs?

24        A.   Well, I think it's pretty

25   straightforward, but I'd be happy to

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 13

1    elaborate.

2            If I'm reviewing a document or

3    preparing a report, I can do that on a

4    computer or at a desk just about anywhere, at

5    an office, at my house, while I'm on

6    vacation, if I'm on an airplane, if I'm on a

7    train.

8            If I'm giving a deposition like

9    today, I have to block out all of the day.  I

10   have to come down here.  It takes me a while

11   to get here.  I have to prepare to get here.

12   If I'm doing review work, I can do it in my

13   pajamas or my boxers.  If I come down here, I

14   got to put on my suit, get ready, shave.  I

15   mean, it's -- I'm not in clinic.  I'm not

16   doing research, and I'm not doing all the

17   other things I'm supposed to do.  So it's

18   just, basically, a cost of passing on a cost

19   of doing the business.

20       Q.   Do you charge your hourly rate for

21   preparation for your deposition?

22       A.   Yes.

23       Q.   How much do you charge to testify

24   at trial?

25       A.   I have two rates; so it depends.

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 14

```
 1    If it's local, it's $7500, $7,500 per day or
 2    any portion of that day.  And if it's outside
 3    of 60 miles of Boston, it's $15,000 per day
 4    or portion of the day.
 5         Q.   Have you ever testified live at
 6    trial?
 7         A.   Yes.
 8         Q.   Are those the rates that you've
 9    been charging in this case?
10         A.   Could you repeat that?
11         Q.   The rates that you've given me,
12    both your hourly rate and your deposition
13    rate, are those the rates that you're
14    charging in this case?
15         A.   Yes, sir.
16         Q.   What's the total number of hours
17    that you put into this case to date?
18         A.   I'd have to sit down and total it
19    up.  I believe I've --
20         Q.   Have you done --
21         A.   Go ahead, please.
22         Q.   Sorry.  I didn't mean to interrupt
23    you.  Continue.
24         A.   I believe I submitted to Laura all
25    of the invoices to date, as part of the
```

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 15

1   expert file; so you should have those.  And

2   then, of course, after this deposition, I

3   have to sit down and total up how long we're

4   going to be here, what's been done, and then

5   what I did over the last couple of days to

6   prepare.

7          Q.    How much time have you spent over

8   the last couple of days preparing?

9          A.    I'd say roughly four hours.

10         Q.    And the investigative invoices

11  that have been provided to me looks like --

12              MR. COX:  Well, Madam Court

13          Reporter, if you hand him Exhibit

14          Number 7.

15  BY MR. COX:

16         Q.    Doctor, just let me know when you

17  had a chance to review it.

18         A.    Yes.

19         Q.    Can you tell me what Exhibit

20  Number 7 is?

21         A.    Exhibit 7 is a collection of three

22  separate invoices.

23         Q.    Have you prepared any other

24  invoices other than what's contained in

25  Exhibit 7?

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 16

1          A.    Not yet.  For -- in this matter.

2          Q.    Is there any other matter relative

3     to this lawsuit, or is that just a -- being

4     overly helpful?

5          A.    Well, I just want to answer -- I

6     just want to be specific when I answer a

7     question.  So, obviously, I've prepared many

8     invoices; but in this matter, these are the

9     only invoices that I know I've prepared.

10         Q.    Thank you, Doctor.

11               And according to these invoices,

12    you spent 14 to 75 hours in this case; is

13    that accurate?

14         A.    That would be accurate through

15    June 3rd, 2019.

16         Q.    It's my understanding that you

17    spent approximately another four hours

18    preparing for this deposition since the

19    invoices were prepared?

20         A.    That's correct.  But I believe

21    I've spent other time between June 3rd and

22    yesterday on the case reviewing different

23    documents, or corresponding with counsel, or

24    his assistant, et cetera.

25         Q.    How many hours did you spend prior

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 17

1    to the four hours being -- well, let me go

2    about it in a different way.

3              Between the last time on here,

4    June 1st through 3rd, 2019, and today, what

5    are the total number of hours you spent on

6    this case?

7         A.   I can't answer that off the top of

8    my head.

9         Q.   Have you reviewed any

10   additional -- any new document since you

11   prepared your original report?

12        A.   Are we done with Exhibit 7?  Can I

13   give this back to the court reporter?

14        Q.   I'm sorry?

15        A.   Are we done with Exhibit 7?

16        Q.   We may come back to it so just

17   hold on to it for now.

18        A.   Okay, I'll put it aside then.

19              Let's see.

20        Q.   Do I need to repeat my question?

21        A.   Could you?  I lost the train of

22   thought here.

23        Q.   Sure.

24              MR. COX:  Madam Court Reporter,

25        could yu read it back for me?

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 18

1           THE REPORTER:  You know, I think I

2      have -- I'm not.  I didn't actually get

3      it, and I'm having a really hard time

4      understanding you.  In the beginning of

5      your questions, you're kind of very low;

6      so the beginning is very hard to

7      understand.

8           MR. COX:  Sure.

9  BY MR. COX:

10      Q.   From June 1st to 3rd, 2019, which

11  is the last date identified on the invoices,

12  until today, what are the total number of

13  additional hours you spent on this case?

14      A.   Oh, I believe I answered that

15  question.  I can't tell you off the top of my

16  head.  I'd have to go back and total that up.

17      Q.   And how would you go about

18  determining how many hours you spent on it?

19      A.   I'd have to look at, you know,

20  email records, and phone records, and my

21  calendar.

22      Q.   You don't keep notes of the number

23  of hours that you spent working on something?

24      A.   Not specifically, no.

25      Q.   So every three months you just go

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 19

1    back and try to add up the number of hours

2    based off an estimate?

3          A.    I don't have any specific system

4    for it.

5          Q.    And so you haven't added up any

6    hours that you've worked on this case since

7    June 1st through 3rd of 2019?

8          A.    Only the approximately four hours

9    that I told you that I spent this morning and

10   yesterday.

11         Q.    And any time you spent in the last

12   three and a half months between your last

13   invoices and today, you've done nothing to

14   figure out how many hours that is.

15         A.    Not yet.

16         Q.    When do you plan on doing that?

17         A.    Probably when we're all done with

18   the depo.

19         Q.    What's the total amount you've

20   been paid to date for your opinions in this

21   case?

22         A.    So that would be $5200 plus $2800

23   plus 5862.50.

24         Q.    Have you ever been prohibited by

25   any court or limited from giving any expert

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                               Page 20

1    opinions?

2         A.    Only once based on a technical

3    matter.

4         Q.    What case was that?

5         A.    Kadi, K-a-d-i, versus Massey,

6    M-a-s-s-e-y, Services.

7         Q.    And what were your opinions in

8    that case?

9         A.    In that case, my opinions were

10   related to epidemiologic evidence that

11   associated statistically -- that associated

12   pesticides in a statistically significant

13   fashion with the development of Parkinson's

14   disease.

15        Q.    And your opinion in that case, do

16   you know if they were stricken because -- is

17   it because you were unqualified or that your

18   opinions were unreliable?

19        A.    Neither.

20        Q.    What was the basis for striking

21   your opinions?

22        A.    As I understand it, the basis was

23   a technical matter which had to do with

24   specific causation versus general causation.

25   To explain that to you better, it's simply

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                                        Page 21

1    the literature supports an association

2    between pesticides in general with

3    Parkinson's, but the studies do not bore down

4    and identify specific pesticides, and in this

5    case, the judge required the testimony to

6    relate to a specific pesticide as opposed to

7    pesticides as a general class; so it had

8    nothing to do with qualifications or

9    expertise.

10         Q.   Have you ever seen a copy of that

11   order?

12         A.   I believe I have.

13         Q.   Have you read that order?

14         A.   I believe I did, yes.

15         Q.   And it's your belief your opinions

16   were struck on a technical matter?

17         A.   That's my understanding, sir.

18         Q.   Any other time that a court has

19   limited your ability to give testimony in any

20   way?

21         A.   No, not that I'm aware of.

22              MR. COX:  Madam Court Reporter,

23         would you hand the witness Exhibit 3.

24   BY MR. COX:

25         Q.   And just let me know when you're

**EXHIBIT A**

Page 22

1  ready, Doctor.

2          A.    I'm ready.

3          Q.    Can you tell me what Exhibit 3 is?

4          A.    It is the curriculum vitae that I

5  prepared on September 23rd, 2019.

6          Q.    Is this your most recent CV?

7          A.    No.  I did -- I received a,

8  together with some colleague, a

9  federal grant, we were notified yesterday; so

10  I did update that on the CV on the 24th.  But

11  for the purposes of this matter, I think

12  everything else is, you know, essentially the

13  same.

14          Q.    What was that grant for?

15          A.    It's for a study of cancer in

16  firefighters in the state of Indiana.

17          Q.    It doesn't have anything to do

18  with this case, I assume?

19          A.    No, sir.

20              MR. COX:  Madam Court Reporter, if

21          you could hand him Exhibit 11.

22  BY MR. COX:

23          Q.    Doctor, just tell me when you've

24  had a chance to take a look at it.

25          A.    Okay.

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 23

1          Q.    Doctor, have you ever seen this
2     document before?
3          A.    I do not recall having ever seen
4     this document before.
5          Q.    Have you ever received a subpoena
6     before in any case?
7          A.    Yes.
8          Q.    Do you ever recall seeing a
9     subpoena for your file in this case, or being
10    told there was a subpoena for your file in
11    this case?
12         A.    No, I do not.
13         Q.    Did you have a chance to look at
14    Exhibit A to the subpoena?
15         A.    You'd have to clarify what that --
16    I have multiple pages here, but I don't have
17    anything -- I don't believe I have anything
18    marked as Exhibit A.
19         Q.    Okay.  Do you see a copy of the
20    letter on the front?
21         A.    Yes, sir.
22         Q.    And there's a statement of
23    compliance behind that?
24         A.    Yes, sir.
25         Q.    And there's an affidavit of record

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 24

 1   that's blank?
 2          A.   Okay.
 3          Q.   And there's a subpoena.  Do you
 4   see that?
 5          A.   Yes.
 6          Q.   It says "United States District
 7   Court" at the top?
 8          A.   Yes.
 9          Q.   All right.  And then behind that,
10   there's an Exhibit A?
11          A.   Okay.
12          Q.   Two pages.
13          A.   Okay.
14          Q.   Have you had a chance to review
15   those different topics, those different
16   paragraphs?
17          A.   Okay.
18          Q.   Have you had a chance to take a
19   look at all those?
20          A.   Yes.
21          Q.   Are there any items responsive to
22   any of those paragraphs that you have not
23   provided to plaintiff's counsel to provide to
24   us?
25          A.   Well, could you -- I know exactly

**EXHIBIT A**

Page 25

1    what I gave to Laura.  Could you tell me what

2    else you've received from Laura?

3          Q.    Sure.  So let me --

4          A.    Is there anything that you're

5    missing from this list?

6          Q.    Well, I don't know.  That's the

7    problem.

8          A.    Okay.

9                MR. COX:  Madam Court Reporter,

10         will you hand the witness Exhibits 1

11         through 7.

12   BY MR. COX:

13         Q.    And I know, Doctor, you've already

14   got a couple of those.

15               Have you had a chance to review

16   those?

17         A.    Yes.

18         Q.    Exhibit 1 is a copy of your

19   deposition notice for today?

20         A.    Yes.

21         Q.    Exhibit 2 is a copy of your report

22   and that's dated June 2019, correct?

23         A.    Yes, sir.

24         Q.    Exhibit 4 is a recommendation from

25   the FMCSA Medical Review Board from 2016,

EXHIBIT A

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 26

1    correct?

2          A.    Correct.

3          Q.    Number 5 is a 2016 report that you

4    are one of the authors on, correct?

5          A.    Yes, sir.

6          Q.    I've got Exhibit Number 6, fee

7    schedule?

8          A.    Correct.

9          Q.    And Exhibit Number 7 are your

10   invoices?

11         A.    Yes.

12         Q.    So that is what I was provided by

13   plaintiff's counsel yesterday.

14         A.    Okay.  And I assume, because it's

15   Exhibit 3, you have the CV.

16         Q.    Yeah, I apologize.  It's also your

17   CV.

18         A.    And you have the invoices to date

19   that we discussed earlier this morning?

20         Q.    Yes, that's Exhibit 7.

21         A.    Okay.  And then -- I understood

22   from Laura that she had given you or you

23   already have all the files; in other words,

24   depositions, qualification file, et cetera,

25   that I reviewed in order to write the report?

EXHIBIT A

Stefanos N. Kales , M.D.                 September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 27

1          Q.    I may.  I don't know.  I don't
2    know exactly what you reviewed, but we'll
3    probably talk about that in a little while.
4              But that was provided to me,
5    Exhibit 1 through 7, and purported to be your
6    entire file relating to this case.
7              Other than what's contained in
8    Exhibits 1 through 7, are you aware of any
9    documents that would be in responsive to
10   Exhibit A of your subpoena?
11         A.    Sure.   But they would all be the
12   documents that are referred to in my report
13   on pages 2 and 3.
14         Q.    Anything else?
15         A.    I don't believe so.
16         Q.    Did you prepare any draft reports?
17         A.    No.
18         Q.    And Number 2, is there any
19   correspondence between you and plaintiff's
20   counsel regarding this case?
21         A.    Just whatever emails we've
22   exchanged.
23         Q.    Did you provide those to
24   plaintiff's counsel?
25         A.    No, I wasn't asked to.

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 28

1        Q.    Did you have a retention agreement

2    with plaintiff's counsel?

3        A.    Only the fee schedule.

4        Q.    Have you created any notes in this

5    case?

6        A.    No.

7        Q.    Any affidavits?

8        A.    Only the report of June 3rd.

9        Q.    Other than the materials that you

10   provided in Exhibits 1 through 7, are there

11   any other theses or scientific papers that

12   you rely on in this case?

13       A.    No.

14       Q.    Any type of small statute,

15   regulation, or regulatory guidance that you

16   relied on in this case?

17       A.    Only what would be FMCSA

18   regulations or guidance that are referenced

19   in the report.

20       Q.    I believe the only thing that's

21   referenced in your report is the 2016 FMCSA

22   guide; is that correct?

23       A.    No.

24       Q.    What else am I missing?

25       A.    Page 3 refers twice to 391.45.

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 29

1          Q.    That's actually one of the

2    regulations in the FMCSA article?

3          A.    Correct.  I thought you asked

4    about a law.

5          Q.    I did.

6          A.    Maybe it's my ignor- -- I'm sorry.

7    I don't want to talk over you.

8          Q.    That's completely fine.  You

9    answered my question correctly, and I

10   appreciate that.

11            Is there any other regulatory

12   guidance, other than the 2016 guidance

13   letter, that you sent to us, Exhibits 1

14   through 7, or that particular regulation that

15   you cited to in your report?

16         A.    I don't believe so.

17         Q.    How do you maintain your file in

18   this case?  Is it electronic or a hard copy?

19         A.    How did I maintain my file?

20         Q.    Yes, Doctor.  How do you maintain

21   your file?  Is it an electronic file, or is

22   it the hard file?  How does that work?

23         A.    Electronic.

24         Q.    Do you ever take notes in any of

25   your cases?

EXHIBIT A

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 30

1        A.   I may scribble something from time
2    to time, and then once I'm done with it, you
3    know, I'll transfer it to something
4    electronic, and then I destroy whatever --
5    you know, I have way too much paper around.
6    We're just surrounded by paper; so it helps
7    to keep me organized.  The sooner I can get
8    rid of papers, either by scanning them or
9    noting it somewhere else, then I just get rid
10   of the paper.
11       Q.   And when you transfer that to
12   electronic, do you do that -- do you scan it,
13   or do you transcribe it into a Word document,
14   or how does that work?
15       A.   It depends.  It depends -- I mean,
16   if it's something related to a report, then,
17   obviously, it would be in a Word document and
18   then converted to a PDF.  It might be
19   transferred into -- I guess that would be the
20   most likely way.  But yeah, sometimes I
21   would -- I could scan something.
22       Q.   Doctor, when did you start
23   collecting your file to provide it to me?
24       A.   I'm sorry.  Which file?
25       Q.   Your file in this case.

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 31

1          A.    When was I first retained in the

2    case?

3          Q.    No, Doctor.  I'm sorry if that's

4    what my question sounded like.

5                When did you first start

6    collecting and putting together your file in

7    preparation for today's deposition?

8          A.    You're referring to what I gave to

9    Laura to pass to you?

10         Q.    Yes, Doctor.

11         A.    I did it yesterday at noontime.

12         Q.    When were you first told that you

13   needed to collect your file?

14         A.    I may have -- I probably received

15   an email a few days before that.  I've just

16   had a really busy last two weeks; so I got

17   to -- I spoke with Laura, I think, briefly

18   Monday, and then I emailed her the files that

19   we -- you know, she said that were needed on

20   Tuesday, yesterday, around -- around noon.

21         Q.    What's been provided doesn't

22   include any emails between you and anyone

23   involved in this case.

24         A.    I did not include any emails in

25   the file, no.

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 32

1          Q.    Did you email anyone other than
2     counsel about this case?
3          A.    No.
4          Q.    Did you correspond with anyone
5     else, in any way, other than counsel about
6     this case?
7          A.    Not that I know of, no.
8          Q.    Did anyone help you in forming
9     your opinions in this case?
10         A.    No.
11         Q.    I looked at your history, and you
12    didn't identify whether or not that was a
13    federal court or state court, I don't
14    believe.  If you did, I apologize.
15              Do you know how many times you
16    acted as an expert in federal court?
17         A.    I don't know.
18         Q.    Have you acted as an expert in
19    federal court before?
20         A.    I believe I have; but, you know,
21    as a doctor, I really don't understand the
22    distinctions.  You know, I just stick to
23    providing the expert opinions and let the
24    lawyers worry about the legal stuff.
25         Q.    Are you familiar with the expert

EXHIBIT A

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                              Page 33

1    requirements of federal court?

2          A.   Somewhat.

3          Q.   I'm sorry?

4          A.   Somewhat.

5          Q.   I'm sorry, Doctor.  I couldn't

6    hear you.

7          A.   Somewhat.

8          Q.   Thank you, Doctor.

9               Do you understand that you had to

10   prepare a report in federal court of your

11   opinions?

12         A.   I understand that, yes.

13         Q.   And do you understand that you

14   have to provide all of your opinions,

15   correct?

16         A.   Yes.

17         Q.   And you have to express the bases

18   and the reasons for your opinions and the

19   facts that you rely on, correct?

20         A.   Correct.

21         Q.   Have you done that in this case?

22         A.   Yes, sir.

23         Q.   And is that Exhibit 2?

24         A.   Yes.

25         Q.   Does Exhibit 2 contain the

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 34

1    entirety of your opinions in this case?

2         A.   At this point it does.  Unless

3    there's something new, it does.

4         Q.   Does this include all the bases

5    and reasons for your opinions in this case?

6         A.   Yes, sir.

7         Q.   Does this include all of the facts

8    and data that you've considered in coming to

9    your opinions in this case?

10        A.   Yes, sir.

11        Q.   Sir, do you also understand that

12   if any information you report becomes

13   incomplete or incorrect or even if there's

14   any information that you gave at today's

15   deposition that becomes incomplete or

16   incorrect, that you have to supplement your

17   report?  Are you aware of that?

18        A.   That I have to what my report?

19        Q.   That you need to supplement your

20   report if any information in that report

21   becomes incomplete or incorrect.  Are you

22   aware of that, Doctor?

23        A.   I wasn't aware of it, but it

24   sounds reasonable.

25        Q.   Are you aware that --

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 35

1          THE REPORTER:  Counsel, I didn't
2     get the beginning of that?
3          "Are you aware that"?
4  BY MR. COX:
5          Q.   Are you aware, Doctor, that if any
6  information that you give me in today's
7  deposition becomes incorrect or incomplete,
8  that you have to supplement your report?
9          A.   Okay.
10          Q.   Did you draft Exhibit 2?
11          A.   What do you mean?  Did I write my
12  own report?
13          Q.   Yes, Doctor.
14          A.   Because you already asked me if
15  anyone else helped me, and I told you no,
16  so...  But yes, I did -- I wrote it.
17          Q.   And did you write this report on
18  June 3rd, 2019?
19          A.   Well, I wrote it over several
20  days.  I don't exactly recall.  But I
21  finalized it on June 3rd.
22          Q.   Did you address it to Mr. Glover?
23          A.   Yes.
24          Q.   The first section is titled
25  statement of your expert qualifications.  I'm

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 36

1    not going to belabor too much of that.

2              But can you tell me what your

3    purpose behind Section A is?

4         A.   I'm sorry.  I didn't -- I don't

5    understand that question.

6         Q.   What's your purpose of including

7    Exhibit A in your report?

8         A.   Well, quite simply, whenever

9    attorneys have asked me to prepare this type

10   of report, they've always asked me to include

11   a section on my qualifications; so that was

12   my purpose.

13        Q.   And then if you'll turn to Section

14   B of the report.  Tell me when you're there.

15        A.   Section B?

16        Q.   Yes, Doctor.

17        A.   B as in boy?

18        Q.   Yes, Doctor.

19        A.   There's a lot of noise behind me.

20   I apologize.

21        Q.   No worries, Doctor.

22        A.   Okay.  I'm there.

23        Q.   Have you had a chance to review

24   that?

25        A.   Yes.

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 37

1          Q.    And that's titled "Listing of all
2     documents, tests, facts, and data relied
3     upon," correct?
4          A.    Yes.
5          Q.    And you listed ten different items
6     on here?
7          A.    Yes.
8          Q.    Do these -- are these all of the
9     materials that you relied on in forming your
10    opinions in this case?
11         A.    Yes.
12         Q.    Were you provided any other
13    information from plaintiff's counsel at any
14    point?
15         A.    Well, I received the --
16    subsequently, after submitting the report, I
17    did receive the deposition notice, and a
18    recently received deposition and report from
19    a Mr. Sean Alexander.
20         Q.    Anything else?
21         A.    Not that I'm aware of.
22         Q.    Do you have a list of all of the
23    materials that you --
24         A.    I apologize.  Just one second.
25         Q.    Sure.

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 38

1          A.    Yesterday -- yesterday, I also

2    received a report and deposition from

3    Dr. Curtis Hagenau.  I don't know if I'm

4    pronouncing that right.

5          Q.    Have you reviewed anything else?

6          A.    Not that I'm aware of.

7          Q.    Did you review Dr. -- I'm sorry,

8    Sean Alexander's report and deposition?

9          A.    I briefly reviewed his report.

10         Q.    Did you review his deposition at

11   all?

12         A.    No.

13         Q.    Did anything in his report affect

14   any of your opinions in this case?

15         A.    No.

16         Q.    Did you review Dr. Hagenau's

17   report and/or deposition?

18         A.    I glanced at a few pages of the

19   deposition.

20         Q.    What pages?

21         A.    What pages?  It was a discussion

22   between him and Attorney Glover around

23   circadian rhythms, chronobiology, sleep, and

24   sleepiness.

25         Q.    And why did you review just those

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 39

1    pages?

2         A.    Attorney Glover brought them to my

3    attention.

4         Q.    Did you review any other part of

5    the deposition?

6         A.    No.

7         Q.    Did any of those -- did anything

8    in Dr. Hagenau's report or deposition affect

9    your opinions in this case?

10        A.    No.

11        Q.    Did anything in Dr. Hagenau's

12   report or deposition change your opinions in

13   this case?

14        A.    Isn't that the same question you

15   just asked, or is that -- is it a different

16   question?  I don't understand how it's

17   different.

18        Q.    Well, if you don't think it's

19   different, then I don't think it is either.

20        A.    Okay.  The answer is no.

21        Q.    Are any of the -- did anything you

22   reviewed in Dr. Hagenau's report or

23   deposition, did you find any of that relevant

24   to your opinions in this case?

25        A.    Well, I mean, relevant only that

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 40

1    it -- what he said, generally, is what the

2    science is, as it's understood today.

3         Q.    Did you review any of

4    Dr. Hagenau's opinions or testimony about

5    Ms. Roberts?

6         A.    No.

7         Q.    Have you reviewed anything about

8    Ms. Roberts in this case?

9         A.    No, I have not.  Oh, except her --

10        Q.    Have you reviewed anything about

11   Ms. Roberts?

12        A.    Excuse me.  I did -- I was

13   provided with her deposition but I -- and I

14   don't recall to what extent I -- you know,

15   how detailed I -- how much I read in that.  I

16   just don't recall at this time.

17        Q.    Going briefly through Section 1 --

18   or Section B, the police investigative file,

19   what was included in that?

20        A.    You're going to have to give me a

21   minute because, electronically, I'm not sure

22   if it's labeled the same way.  Okay.  Sir, I

23   believe it's an 86-page PDF from the Georgia

24   State Patrol.

25        Q.    Are you familiar with the term

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 41

1    "Bates stamp"?

2          A.    Yes, sir.

3          Q.    Is that document Bate-stamped?

4          A.    The copy I'm looking at does not

5    appear to have any Bates stamp, but I can

6    give you -- if it makes -- if it helps you,

7    it's Case Number S as in Sam, C as in

8    Charlie, R as in Robert, T as in Tom, B as in

9    boy, -060-15.

10               THE REPORTER:  Counsel, I need to

11         get you.

12               MR. GLOVER:  I made a suggestion

13         that we make as an exhibit all the

14         materials he was provided in the case

15         and put it on a thumb drive.  I was

16         making that suggestion to defense

17         counsel.

18               MR. COX:  That works.

19    BY MR. COX:

20         Q.    Doctor, would you be able to do

21    that before you leave the deposition today?

22    Do you have it all with you?

23         A.    I think it would be better if

24    Laura did it because the documents were not

25    all sent to me.  They were -- there was sort

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 42

1    of a Dropbox and then some were sent.  So

2    there may be documents that I did download

3    here, but they're -- I think it would just be

4    more efficient that way.  And I don't have --

5    I don't have a, you know, empty USB here with

6    me.

7            Q.    Doctor, were you (inaudible)

8    driver's qualification file, Number 3 on the

9    list?

10           A.    Okay.

11           Q.    Tell me what was included in that.

12           A.    That is a collection of various

13   documents related to Mr. Bush, and it's a PDF

14   of 130 pages.

15           Q.    Are those documents Bates-stamped?

16           A.    Yes.  Yes, sir.

17           Q.    Can you tell me the Bate stamp

18   ranges of those documents?

19           A.    Yes.  Page 1 is AAACooper, five

20   zeros, 1, and the last page is

21   AAACooper000130.

22           Q.    And you said the PDF itself is 130

23   pages?

24           A.    Yes, sir.

25           Q.    What particular document in

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 43

1    those -- in the driver's qualification file

2    did you find relevant for your opinions?

3                THE REPORTER:  I'm sorry.  In the

4         what file?

5    BY MR. COX:

6         Q.   In those documents in the driver's

7    qualification file, Doctor, which one of

8    those were relevant to your opinions?

9         A.   You'll have to give me a minute to

10   look through it because it's 130 pages,

11   obviously.

12               So pages 2 through 5 is his CDL

13   medical examination of 4/29/2015.  That's

14   relevant.

15        Q.   Doctor, let me see if I can short

16   circuit this a little bit.

17               Are there any documents in the

18   driver's qualification file relative to your

19   opinion other than his DOT medical

20   examination and medical certification?

21        A.   I don't think so; but, I mean, to

22   be certain, I'd have to look through the file

23   again.

24        Q.   Well, if you feel like you need to

25   take some time to go through it, we can take

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 44

1    a short break.  Would you like that, or you

2    just want to keep going?

3           A.   Sure.  Let's take a break, and

4    I'll look through it.

5                MR. COX:  Thank you, Doctor.

6                THE WITNESS:  Okay.  Thank you.

7                MR. COX:  Let's go off the record

8           for a second.

9                THE VIDEOGRAPHER:  The time is

10          11:26.  We're off the record.

11   (Recess taken at 11:26 a.m. to 11:35 a.m.)

12               THE VIDEOGRAPHER:  Okay.  The time

13          is 11:35.  We're back on the record.

14   BY MR. COX:

15          Q.   Doctor, you had an opportunity to

16   review what you referred to as a DQ file in

17   your report?

18          A.   Yes, sir.

19          Q.   Anything other than the DOT

20   medical exam and medical certifications that

21   are relevant to your opinions containing that

22   DG file?

23          A.   I believe only the CDL medical

24   exam is directly relevant to the opinions,

25   yes.

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 45

1        Q.    Number 4, the scheduling order.  I
2   know we talked about that.  Number 5, the
3   driver's logs.  Are those the hours of
4   service for Mr. Bush?  Is that what you're
5   referring to?
6        A.    That is an eight-page PDF.
7        Q.    Are those Bates-stamped?
8        A.    Yes.
9        Q.    Can you give me those Bate stamps?
10       A.    Yes, sir.  Page 1 of the eight
11   pages is AAACooper000238, and page 8 is
12   AAACooper000245.
13       Q.    Number 6 is a call log - work
14   product.  Tell me what that is.
15       A.    One second, please.
16             That is another eight-page PDF,
17   and there are no Bate stamps.
18       Q.    What is the document?  What does
19   it contain on it?
20       A.    It's, basically, times of --
21   related to Mr. Bush's phone, dates, and times
22   of texting or phone calls from --
23       Q.    Do you know who prepared --
24             THE REPORTER:  Do you know what?
25             MR. COX:  I wanted the doctor to

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 46

1        finish the answer.

2        A.   Okay.   I was going to specify that

3   it contains text and calls from 10:29, 20:15,

4   through the time of the accident,

5   approximately 1:10 a.m. on 10/31/2015.

6   BY MR. COX:

7        Q.   Do you know who prepared that

8   document?

9        A.   I do not know what person prepared

10  the document, no.   It's received from

11  counsel.

12        Q.   Is anything else contained in

13  Number 6?

14        A.   In the call log work product?

15        Q.   Yes, sir.

16        A.   No.

17        Q.   Number 7, add it --

18        A.   Only -- I'm sorry, the only --

19  just to give you the fullest answer possible,

20  it has the dates and times of the text

21  messages.   If it's a phone call as opposed to

22  a text, it provides the length, the duration

23  of the call and -- in number of seconds, and

24  then it gives the identity of the caller or

25  person called as a phone number and a name,

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 47

1    if said name is known.

2          Q.    Anything else?

3          A.    No.

4          Q.    The amended scheduling order, I

5    assume that's a pleading from the Court?  Is

6    that a pleading from the court, Doctor?

7          A.    Let me -- sir, I believe it's

8    simply the order from the Court stating that

9    the expert disclosure date is June 3rd, 2019.

10         Q.    Thank you, Doctor.

11               Number 8, Marcus Bush deposition

12   with exhibits?

13         A.    Yes.

14         Q.    Did you review the entire

15   deposition?

16         A.    Yes.

17         Q.    Were you provided particular areas

18   of the deposition to review?

19         A.    What do you mean?

20         Q.    Well, were there particular areas

21   of the deposition that were pointed out to

22   you for special attention?

23         A.    I don't believe so.  I have a PDF

24   of the whole deposition.

25         Q.    How many times have you

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 48

1    reviewed --

2         A.    I'm sorry.  I was just going to

3    pull up the file.  The version that I'm

4    looking at now, it's 222-page PDF each.  It's

5    the type of deposition where it's not four

6    pages on a single page.  It's one page per

7    page.

8         Q.    And did you review that -- did you

9    read that entire deposition?

10        A.    I read the entire deposition back

11   at the time when I prepared the original

12   report, and then I looked back at a few

13   sections this morning.

14        Q.    Do you remember what sections you

15   looked back at this morning?

16        A.    Yes, sir.  They're generally the

17   ones that are cited in my report.  The pages

18   that are cited in the report.

19        Q.    When you were reviewing that

20   deposition, did you make any notes on the

21   deposition?

22        A.    No.  No, it's just an electronic

23   file.

24        Q.    Did you make any notes about the

25   deposition, other than what's contained in

EXHIBIT A

Page 49

1    the report?

2          A.    Not other than what's in the

3    report.  Just what's in the report.

4          Q.    Number 9, Callie Roberts

5    deposition.  I think we've already addressed

6    this.  Did you review the entirety of that?

7          A.    I don't think so.  At this time, I

8    don't recall exactly what pages I read or

9    didn't read.

10         Q.    Were you provided any particular

11   pages to review of her deposition?

12         A.    No, just, again, a PDF file.

13         Q.    Did you review Steve Aronhalt's

14   deposition, Number 10?

15         A.    I did.  I did, since I noted it

16   there, but I don't recall -- I mean, I have

17   the file here.  That's a 105-page PDF.

18         Q.    Do you know if you read the entire

19   deposition of Mr. Aronhalt?

20         A.    Let me just take a look.

21              Okay.  I'm pretty sure I read

22   through the whole thing.

23         Q.    Were there any particular portions

24   of Mr. Aronhalt's deposition that you were

25   pointed to to review?

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 50

1          A.    No.

2          Q.    In your report, you don't refer to

3    any of your opinions to Mr. Aronhalt's

4    deposition.  Was there anything in his

5    deposition relevant to your opinions in this

6    case?

7          A.    I would -- I didn't use it as a

8    basis for any of the opinions, but I can't

9    say that there's nothing in there that's -- I

10   can't answer the negative, that it's not

11   relevant.  I'd have to go through again.

12         Q.    Was there anything in

13   Mr. Aronhalt's deposition that you relied on

14   for any of your opinions in this case?

15         A.    No.

16         Q.    All right.  If you will turn to

17   Section C, Statement of Expert Opinions and

18   their Basis and Rationale.

19               Tell me when you're there.

20         A.    I'm there.

21         Q.    We've talked about this briefly.

22               Is what's contained in Section C

23   the totality of your opinions in this case?

24         A.    At this point, yes.

25         Q.    And do you understand if you ever

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 51

```
 1   have any additional opinions, you have to

 2   supplement your report, correct?

 3        A.   Understood.

 4        Q.   Do you have any plans on doing

 5   additional work or any areas that you believe

 6   you would provide opinions on about this

 7   case?

 8        A.   I don't have any plans.  If I were

 9   to be given new information, I would consider

10   it, but I don't have any plan.

11        Q.   Other than what's listed in

12   Section C, do you have any other factual

13   bases for your opinions?

14        A.   Well, not -- nothing other than my

15   career, experience and training.

16        Q.   But as far as facts in this case,

17   anything else you're relying on?

18        A.   No, sir.

19        Q.   Thank you, Doctor.

20             Let's jump through the -- I think

21   we can go through them relatively quickly or

22   at least some of them.

23             Opinion Number 1 is that Mr. Bush

24   was operating a tractor-trailer, his ability,

25   alertness through fatigue through --
```

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 52

```
 1              THE REPORTER:  Counsel, I need --
 2              THE VIDEOGRAPHER:  He keeps moving
 3         his knee.  His knee is blocking the mic.
 4              THE REPORTER:  Well, you need to
 5         tell him, Bob, please, because you're
 6         the videographer, and, you have your
 7         head phones in.
 8              THE VIDEOGRAPHER:  Your knee is
 9         blocking the mic.
10              THE REPORTER:  Your knee is
11         blocking the mic.
12              THE VIDEOGRAPHER:  There you go.
13              MR. COX:  Is that better?
14              THE VIDEOGRAPHER:  Yep.
15              THE REPORTER:  Could you please
16         say that over?
17               MR. COX:  Sure.
18    BY MR. COX:
19         Q.   Doctor, Opinion Number 1, is it --
20    can I short circuit that opinion and
21    essentially say your opinion is Mr. Bush was
22    fatigue and he fell asleep?
23         A.   No.
24         Q.   What else is in there that we need
25    to talk about?
```

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 53

1      A.   Well, he was fatigued.  Just that
2  the fact -- without him falling asleep, just
3  being fatigued and/or sleepy, it is unsafe
4  for him to continue or to begin to drive a
5  tractor-trailer as a commercial driver.
6      Q.   Anything else?
7      A.   No.  I mean, I'll rest -- I'll
8  rest on what's written.  I mean, I would,
9  respectfully, say don't short circuit my
10  opinions, just -- my opinions are recorded as
11  they're written in the report.  That's the
12  purpose of the report.
13          If you want to abstract them for
14  your purposes, that's fine, but for the
15  purposes of my deposition, I will stick to
16  the opinions as written, but I'll be happy to
17  answer any questions about them.
18      Q.   We'll make sure we talk about all
19  of them.
20          Doctor, do you have any
21  information to say if Mr. Bush was fatigued
22  or feeling fatigued when he began driving the
23  day of the accident?
24      A.   Yes.
25      Q.   What is that?

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 54

1          A.    Okay.  Well, first of all, we have

2     his call logs; and, as I discussed on pages 3

3     and 4, before that -- before that fatal

4     crash, his phone records show no possible

5     period for consolidated sleep longer than 69

6     minutes.  So there's no way he could have

7     been adequately rested before he began the

8     shift.  That's Number 1.

9              Number 2, there are multiple

10    statements in his deposition testimony.  For

11    example, he admitted that he felt funny

12    before the crash and he should have pulled

13    over but he didn't.  And he also admitted in

14    his deposition it's hard to sleep during the

15    daytime, which is the time he had to sleep

16    because he was driving at night.

17              He also said, quote, he can't

18    sleep any way well, unquote, and that he was

19    still adjusting to the night schedule.  So

20    any -- and he agreed that driving at night

21    was more risky.  So there's a number of

22    reasons why he would not have been well

23    rested and to know that he was fatigued

24    before he actually fell asleep at the wheel.

25          Q.    Doctor, you've reviewed all of

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 55

1    Mr. Bush's deposition.  You would agree with
2    me that Mr. Bush testified that when he began
3    driving the day before the accident, that he
4    felt fine?
5           A.   Do I agree that he felt fine, or
6    do I agree that he said he felt fine?
7           Q.   Do you agree that that's what he
8    testified to repeatedly in his deposition?
9           A.   I don't recall that, but we -- you
10   know, we could go back and look.  But it
11   doesn't -- I mean, it doesn't square with the
12   other statements, and it doesn't square with
13   his activity based on the phone.
14          Q.   In Opinion Number 1, you cited to
15   pages 89 through 90 of Mr. Bush's deposition?
16          A.   Yes, sir.
17          Q.   Did you rely on any other portions
18   of his deposition for Opinion Number 1?
19          A.   Well, I'd have to find the page
20   where he -- I'm not sure if it's on that page
21   that he admitted he fell asleep.
22          Q.   Well, I'm going to say for the
23   record, Doctor, if that's the only other
24   issue, then we all admit that he fell asleep.
25   So that's not what I'm asking you about.  I'm

**EXHIBIT A**

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 56

1    asking you about for your opinions of Number

2    1 -- other than the fact that he fell asleep,

3    are there any other sources of testimony that

4    you're relying on for that opinion?

5          A.    Well, Opinion 1 refers to the

6    time -- I believe five minutes ago we were

7    discussing before he started driving.

8    Opinion 1 is at the time that he was driving,

9    at the time of the crash.  So at the time of

10   the crash, I'm relying on his admission of

11   falling asleep as well as his testimony, on

12   pages 89 to 90, that he felt funny before the

13   crash, and he should have pulled over, but he

14   did not pull over.

15         Q.    The statement that he felt funny

16   before the crash and should have pulled over

17   but did not, is that your testimony or are

18   those your words?

19         A.    That's my paraphrasing of his

20   deposition testimony.

21              MR. COX:   Madam Court Reporter,

22        will you hand the Doctor Exhibit 9.

23   BY MR. COX:

24         Q.    Do you have it, Doctor?

25         A.    Yes, sir.

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 57

1        Q.    Can you review page 89 and 90 that
2    you cited?
3        A.    Yes.
4        Q.    Tell me when you're done reviewing
5    them.
6              THE REPORTER:  We didn't hear
7         that, Counsel.  See how you're sideways,
8         you need to face straight or else the
9         microphone is not picking you up when
10        you turn.
11             Did you hear that, Doctor?
12   BY MR. COX:
13        Q.    Doctor, have you --
14        A.    Yes, sir.
15        Q.    Doctor, have you had a chance to
16   review page 89 and 90 of Mr. Bush's
17   deposition that you cited for Exhibit 1?
18        A.    I'm finishing that now.  I'll let
19   you know when I'm ready.
20        Q.    Thank you, Doctor.
21        A.    Okay.
22        Q.    Doctor, you would agree with me
23   that Mr. Bush testified that once he started
24   feeling funny, he was looking for a safe
25   place to pull over, correct?

EXHIBIT A

Stefanos N. Kales , M.D.                 September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 58

1      A.   He was thinking about it, or he

2  was looking for it.

3      Q.   And then Mr. Bush testified that

4  ones he started feeling funny, he started

5  looking for a safe place to pull over,

6  correct?

7      A.   You'd have to tell me -- you'd

8  have to tell me -- point me to the line, line

9  and page -- page number and line.

10     Q.   I'm just referring to pages 89

11  through 90 that you cited in your report.

12          MR. GLOVER:  I'm going to

13      object.

14     A.   I think I'm a pretty good reader,

15  but I don't see what you're seeing.  Could

16  you -- could you point me to the line?

17  BY MR. COX:

18     Q.   Fair enough, Doctor.  It will be

19  in the record.  I'm not going to belabor the

20  point.

21     A.   It says he was getting ready to go

22  to a football game and tailgate.  I don't see

23  that he was getting ready to pull over.  I

24  see he thought about it.  The only place I

25  see that he said he was looking for an exit

EXHIBIT A

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 59

1    is later on line -- question by Mr. Glover,

2    17 -- line 17, "He felt funny so he started

3    to look for an exit to pull off."  19,

4    "Yeah."

5            Q.   Is that your understanding of what

6    Mr. Bush was doing that night?

7            A.   I'm sorry?  What's the question,

8    whether he was thinking about tailgating?

9    Whether he was thinking about -- what's the

10   question, sir?

11           Q.   That's fine, Doctor, I'm not going

12   to belabor on that.

13                Can you turn to Exhibit -- or

14   Opinion Number 2?

15           A.   Okay.

16           Q.   Opinion Number 2, "Is Mr. Bush was

17   extremely careless to the point of

18   recklessness in continuing to drive after

19   realizing that he was fatigued while driving

20   before the crash."

21                And you cited pages 89 and 90 of

22   Mr. Bush's deposition for that opinion.

23                Any other evidentiary basis for

24   that opinion?

25           A.   Nope.

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 60

```
 1        Q.    What's your definition of
 2   "reckless," Doctor?
 3        A.    Careless.
 4        Q.    Anything else?
 5        A.    I'm sorry?
 6        Q.    Anything else?
 7        A.    Careless.
 8        Q.    I'm sorry?  Could you repeat that?
 9        A.    In my mind, reckless is synonymous
10   with careless.
11        Q.    Is it your opinion that Mr. Bush
12   should have pulled over immediately once he
13   started feeling fatigued?
14        A.    Well, it's my opinion, sir, that
15   Mr. Bush should have never started driving,
16   having not adequately rested.
17        Q.    Opinion Number 2 you cite the fact
18   that Mr. Bush started feeling funny.  That's
19   the basis for Opinion Number 2, correct?
20        A.    Yes.
21        Q.    Once he started feeling funny, is
22   it your opinion that he should have pulled
23   over immediately?
24        A.    Well, I mean, it's more than an
25   opinion.  The regulations prohibit a driver
```

EXHIBIT A

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 61

1    from beginning or continuing to drive if

2    their ability or alertness is impaired by

3    fatigue; therefore he was prohibited from

4    continuing to drive.  It was his duty --

5         Q.   I'm sorry.

6         A.   It was his duty to get off the

7    road, sir.

8         Q.   Once he started feeling funny, is

9    it your opinion he should have pulled over

10   immediately or looked for an exit, or do you

11   have an opinion one way or the other?

12        A.   I don't know the road myself; so

13   I'll defer to someone who is a driving

14   expert.  But he was -- my understanding is at

15   that point he is prohibited from continuing

16   to drive by the federal regulation.

17        Q.   And, sir, you have no opinion on

18   whether or not he should have pulled over on

19   the side of the road or continue to an exit?

20        A.   My opinion is he should have

21   stopped driving as soon as possible.

22        Q.   Should he have just stopped in the

23   travel lane?

24        A.   No.

25        Q.   I'm sorry.  Doctor, did you answer

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                                    Page 62

 1    the question?

 2          A.   I believe I did.

 3          Q.   Okay.  I'm sorry.  I just didn't

 4    hear you, Doctor.

 5               What was your answer?

 6          A.   To which question, sir?

 7          Q.   Should he have stopped in the

 8    travel lane to stop driving immediately?

 9          A.   No, my answer was he should have

10    stopped as soon as possible.  I defer to -- I

11    don't know the road; so I don't know whether

12    he should have -- it would have been better

13    for him to exit or pull over on the shoulder.

14          Q.   Have you ever done any research or

15    know any statistics of state whether or not

16    it's safe to pull over on the side of an

17    interstate?

18          A.   Only an end of one in this case,

19    which wasn't safe for Ms. Roberts.

20               THE REPORTER:  What did you say?

21               THE WITNESS:  Only an end, meaning

22          sample size of one.

23    BY MR. COX:

24          Q.   Doctor, let's go to Number 3.

25    Tell me when you're there.

**EXHIBIT A**

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 63

1       A.   Yes, sir.

2       Q.   Is your definition of reckless the

3   same in this opinion as it was in Opinion

4   Number 2?

5       A.   Yes, sir.

6       Q.   And it's your opinion that

7   Mr. Bush was fatigued when he started driving

8   that day?

9       A.   Absolutely.

10      Q.   And it's based all on the fact

11  that it's your testimony he only slept 69

12  minutes in the day leading after that -- the

13  day of the accident.

14      A.   It's based on everything that's

15  here in the report under Opinion 3 up to

16  Opinion 4.

17      Q.   Is it your opinion that one bad

18  period of sleep makes a driver reckless?

19      A.   I'm sorry?  What exactly are you

20  asking?

21      Q.   One of your opinions that you rely

22  on, Doctor, is that he would have only had 69

23  minutes of uninterrupted sleep prior to the

24  accident, correct?

25      A.   Correct.

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 64

1        Q.    And my question is:  Is it your

2    opinion that one bad period of sleep, where

3    you don't sleep a lot during that period of

4    sleep, would make a driver a reckless driver?

5        A.    Not necessarily.  What I'm -- what

6    I'm saying is if he knows -- he knows it's

7    hard to sleep during the daytime; he knows

8    he's working on the night shift; he knows he

9    doesn't sleep well; he knows it's difficult

10   for him, personally, to sleep during the

11   daytime; and he knows it's more risky to

12   drive at night, and then he only sleeps as

13   much as one hour before beginning a night

14   shift, that's -- that's, basically, the same

15   as having four or five, six beers before

16   starting his shift.  That is reckless.  That

17   is absolutely reckless.

18       Q.    So it's your testimony, the fact

19   that he was only able to sleep approximately

20   an hour of the period before he started

21   driving, was the same as having five to six

22   beers?

23       A.    It could be.  It could be.

24       Q.    Doctor, it could be, or it was in

25   Mr. Bush's case?

EXHIBIT A

Stefanos N. Kales , M.D.                 September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 65

1            THE REPORTER:  Counsel, please put
2        your hand down from your mouth.  That
3        doesn't help.
4   BY MR. COX:
5        Q.   Do I need to repeat my question?
6        A.   Sure.
7        Q.   Doctor, is it could be, or it was
8   in Mr. Bush's case?
9        A.   In this case it was.  He fell
10  asleep at the wheel.  He went off the road,
11  and he killed one person and seriously
12  injured another person.  That's pretty bad.
13       Q.   Sure.  And do you have any idea
14  how Mr. Bush felt before he started driving
15  that day?
16       A.   Well, I know he said it was not
17  safe to drive if he didn't sleep, but he
18  didn't sleep and he drove; so that's
19  reckless.  He knew it was his responsibility
20  not to drive fatigued, but he did.  And I
21  know he couldn't have slept more than 70
22  minutes straight, and I know he felt funny
23  before he crashed, and he didn't pull over.
24  And I know he fell asleep at the wheel, and
25  he admitted that, and I know he crashed.

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                              Page 66

1               MR. COX:   Object to the answer as

2        nonresponsive.

3    BY MR. COX:

4        Q.   Doctor, do you have any idea how

5    Mr. Bush felt before he started driving that

6    day?

7        A.   I believe I've answered the

8    question already.

9        Q.   I disagree with you, Doctor.

10               Do you have any idea how Mr. Bush

11   felt before he began driving the day of the

12   accident?

13       A.   You know, you can say whatever you

14   want.  If you don't sleep more than 70

15   minutes, you're fatigued before beginning a

16   night shift.

17       Q.   Do you have any information,

18   Doctor, of how Mr. Bush felt before he began

19   driving on the day of the accident?

20       A.   Objectively or subjectively?

21       Q.   Objectively, Doctor.

22       A.   I'm sorry?  Did you say

23   objectively or subjectively?

24       Q.   Doctor, do you know if Mr. Burn

25   objectively felt fatigued before he started

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 67

1    driving that day?

2         A.   He would have -- he would have

3    known that he didn't sleep -- if you don't --

4    if you're on your phone and you don't sleep,

5    you know that you didn't sleep; so therefore

6    you can't be rested.  If he says he felt

7    good, he could say he felt good, but he

8    couldn't be rested.

9         Q.   Doctor, you referred to the amount

10   of time that Mr. Bush was on the phone.  Are

11   you relying on the text messages and records

12   of phone calls from the day before?

13        A.   Yes, sir.

14        Q.   And that's where your opinion --

15   the 70 minutes comes from?

16        A.   Yes, sir.

17        Q.   Do you know of which of those

18   calls and text messages he was awake for?

19        A.   Say that again.

20        Q.   The text messages and calls that

21   go into your opinion, do you know which of

22   those he was awake for?

23        A.   I don't know specifically, no.

24        Q.   Do you know how long Mr. Bush was

25   in bed the day prior to the accident?

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 68

1          A.   How -- physically in bed?

2          Q.   Yes, Doctor.

3          A.   No.

4          Q.   Do you know how many hours

5     Mr. Bush had worked that week before the

6     accident?

7          A.   I did look at that, and I would

8     have to look back at his work log.

9          Q.   Go ahead and go back to whatever

10    you need.

11          Do the Federal regulations tell a

12    driver how many hours he's legally allowed to

13    drive a week?

14          A.   Yes.

15          Q.   Does the Federal regulation tell a

16    driver how many hours he's legally allowed to

17    drive a day?

18          A.   Yes.  There is a maximum period

19    for one shift or one day.

20          Q.   Was Mr. Bush within the hours

21    that he was allowed by Federal regulations to

22    drive at the time of the accident?

23          A.   Okay.  As far as I can see, he was

24    compliant with the hours of service.  He was

25    not compliant with the regulation that

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 69

1   prohibits him from beginning or continuing to

2   drive in a fatigued state.

3          Q.   How many hours had he driven the

4   week before the accident -- in the week

5   before the accident?

6          A.   In the entire week?

7          Q.   Yes, Doctor.

8          A.   Well, let's take a break, and I'll

9   total it and then we'll come back.

10         Q.   Sure thing.

11              MR. COX:  We can go off the

12         record.

13           THE VIDEOGRAPHER:  Okay.  The time is

14   12:15, and we're off the record.

15   (Recess taken at 12:15 p.m. to 12:19 p.m.)

16              THE VIDEOGRAPHER:  The time is

17         12:19, and we're back on the record.

18   BY MR. COX:

19         Q.   Doctor, have you had a chance to

20   review Mr. Bush's hours of service log?

21         A.   Yes, I did.  Thank you.

22         Q.   How many hours had he been driving

23   in the week before the accident?

24         A.   I got about roughly 32 hours.

25         Q.   How many hours under Federal

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 70

1  regulations is a driver allowed to drive in a

2  week?

3          A.    I don't recall off the top of my

4  head.

5          Q.    How many hours is a driver allowed

6  under Federal regulations to drive in a day?

7          A.    I believe it could be as high as

8  12 hours in a single day.

9          Q.    How long had Mr. Bush been driving

10  prior to the accident, that day?

11          A.    About three and a half hours.

12          Q.    Thank you, Doctor.

13          If you'll jump to Opinion Number

14  4.  Tell me when you're there.

15          A.    Yep.

16          Q.    It's your opinion that Mr. Bush

17  most likely suffered from untreated

18  obstructive sleep apnea at the time of the

19  crash; that's your opinion?

20          A.    Yes.

21          Q.    And it looks like the basis for

22  that opinion are that the information about

23  his BMI and neck circumference that you

24  obtained from his DOT medical certificate

25  exams, correct?

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 71

1          A.    Correct.  Plus his being a male,

2     which males are more predisposed to sleep

3     apnea, being a middle-aged male, which puts

4     him at a higher risk as well.

5          Q.    Anything else?

6          A.    So if you look at the literature

7     and data underlying the Medical Review

8     Board's recommendations, people meeting those

9     characteristics would generally have a

10    probability of obstructive sleep apnea more

11    than 75 to 80 percent in the truck driver

12    population.

13              THE REPORTER:  In more than what,

14         75 to 80?

15              THE WITNESS:  75 to 80 percent.

16    In excess of 75 to 80  percent.

17    BY MR. COX:

18              And those recommendations you're

19    referring to, those would be 2016 FMCSA

20    recommendations that you provided as part of

21    your file?

22         A.    Yes, sir.

23         Q.    Do you agree with me that you're

24    not aware that Mr. Bush has ever been

25    actually diagnosed with obstructive sleep

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 72

1   apnea, correct?

2          A.    Agreed.

3          Q.    Are you diagnosing Mr. Bush with

4   obstructive sleep apnea?

5          A.    No.  I'm simply giving you the

6   medical probability based on a reasonable

7   degree of certainty medical that he would

8   have said condition.  But I can't --

9   obviously can't diagnose someone without

10  seeing them in person, without performing a

11  sleep study.

12         Q.    Are you aware of anyone that told

13  Mr. Bush that he had obstructive sleep apnea?

14         A.    No.

15         Q.    Are you aware of anyone who's ever

16  told AAA Cooper that Mr. Bush has obstructive

17  sleep apnea?

18                THE REPORTER:  AAA what, Cooper?

19                MR. COX:  Cooper.

20                THE REPORTER:  And then what?

21                THE WITNESS:  Cooper.

22                THE REPORTER:  AAA Cooper?

23  BY MR. COX:

24         Q.    Doctor, are you aware of anyone

25  having ever told AAA Cooper that Mr. Bush has

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 73

1     obstructive sleep apnea?

2            A.    No.

3            Q.    You've referred to the DOT medical

4     exams and medical certificates.  Can you

5     explain what that is?

6            A.    Are you referring -- you're

7     referring to the commercial driver's license

8     medical examination?

9            Q.    Yes, Doctor.

10           A.    Yes.

11           Q.    And what is that?

12           A.    That's a medical examination that

13    all commercial drivers are required to

14    undergo at least every two years under

15    Federal law.  Under the FMCSA.

16           Q.    I don't want to interrupt you,

17    Doctor, so if there's anything else.

18                 Is the purpose of that medical

19    exam to medically certify the tractor-trailer

20    driver?

21           A.    Yes.

22           Q.    Who performs that examination and

23    certification?

24           A.    Who performs them in general, or

25    who performed the last medical exam in

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 74

1    question for Mr. Bush?

2          Q.    In general.

3          A.    Currently it has to be a health

4    care provider who has passed all of the

5    requirements to be a registered examiner in

6    the Federal Motor Carrier Safety

7    Administration's registry of certified

8    examiners.

9          Q.    Is one of the things that goes

10   into the medical certification, one of the

11   things a provider is checking for sleep

12   concerns such as obstructive sleep apnea?

13         A.    They should.

14         Q.    How often does the driver have to

15   get a medical certification?

16         A.    It depends on the driver's medical

17   condition and the results of the preceding

18   examination.  It has to -- the maximum period

19   is every two years, but drivers often receive

20   shorter certifications.  So, in this case,

21   based on his age, his gender, his body mass

22   index, and his neck circumference, he should

23   have been given only three-month or three- to

24   six-month certification condition on getting

25   a sleep study to rule out sleep apnea.

EXHIBIT A

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 75

1       Q.    And whose job would that have been
2    to determine how long the medical
3    certification would have been?
4       A.    The medical examiner determines
5    the length of the certification, and then the
6    carrier needs to review certifications, and
7    they are the ultimate guarantor of whether a
8    driver is to be permitted on the road or not.
9       Q.    Is it your opinion that a trucking
10   company needs to review and determine if a
11   medical examiner was correct?
12      A.    That's probably an awkward way of
13   saying it.  But, you know, my understanding
14   from talking to truck safety experts is that
15   good trucking companies do review the long
16   forms of the exams to make sure, because the
17   quality of many exams is very, very poor,
18   even in the era of the registry, and
19   therefore many people get incorrect
20   certifications or incorrect certification
21   lengths.
22      Q.    Medical examiners have to be
23   approved to perform these examinations,
24   correct?
25      A.    They have to be approved in the

EXHIBIT A

Page 76

1    sense that they have to be -- have to achieve

2    the requirements of the registry and have

3    become -- they're active members of that

4    registry of certified examiners.

5         Q.   And so Federal regulations decide

6    who can do a medical certification, correct?

7         A.   That's correct.  But, I mean,

8    there's no -- there's no guarantee that just

9    because someone is certified, that they are

10   going to render a correct decision.

11        Q.   And is it your opinion that truck

12   drivers or trucking companies, to be

13   reviewing medical certifications, determine

14   if the medical examiner made the correct

15   decision?

16        A.   Well, I would defer to a safety

17   expert as to what each trucking company

18   should do in terms of their exact procedures.

19   But my understanding of the FMCSA

20   recollections are that the medical examiner

21   makes a decision regarding certification, but

22   it is the trucking company that is the

23   ultimate guarantor of the safety of the

24   driver.

25        Q.   Can a driver get a longer

**EXHIBIT A**

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 77

1    certification than two years?

2         A.   No.

3         Q.   Two years would be the highest and

4    best medical clearance a truck driver can

5    get?

6         A.   I would phrase it differently.  I

7    would say two years is the longest period

8    that a driver would be certified for.

9         Q.   And if the medical examiner had

10   any concerns about the driver but still

11   thought they were qualified to drive, the

12   medical examiner can give a shorter length of

13   time for medical certification, correct?

14        A.   That's correct.  That's known as a

15   conditional certification.

16             MR. COX:  Madam Court Reporter, if

17        you would hand the witness Exhibit 10.

18   BY MR. COX:

19        Q.   Let me know when you've had a

20   chance to review it, Doctor.

21        A.   I haven't been given anything yet.

22             MR. COX:  Madam Court Reporter,

23        can you hand the witness Exhibit 10,

24        please?

25             THE WITNESS:  Okay.

EXHIBIT A

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 78

1    BY MR. COX:

2         Q.    Doctor, are these the DOT medical

3    certificate and medical exams that you relied

4    on for your opinions in this case?

5         A.    Yes.

6         Q.    Were there any other DOT medical

7    exams or medical certifications that you're

8    relying on for your opinions in this case?

9         A.    No.

10        Q.    Do you have any other information

11   about Mr. Bush's health history, other than

12   what's contained in Exhibit 10?

13        A.    Only as far as what he said at his

14   deposition about his trouble sleeping and

15   adjusting to the night shift, et cetera.

16        Q.    Anything -- anything other than

17   what's contained in Exhibit 10 that you are

18   making -- in your opinion, that Mr. Bush had

19   obstructive sleep apnea prior to this

20   accident?

21        A.    No.

22        Q.    There are two different medical

23   exams here, correct?

24        A.    Yes, sir.

25        Q.    One is dated April 30, 2013?

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 79

```
 1        A.    Yes.
 2        Q.    And on that date, Mr. Bush was
 3   examined by Mr. Peloquin?
 4        A.    I can't read the name, and I'm --
 5   it looks like MD, but I'm mot sure if it's an
 6   MD.   But it's -- it looks like Dorothy
 7   Peloquin or Pelokin, something like that --
 8        Q.    Do you know anything about --
 9        A.    Dorothy.
10        Q.    I'm sorry?
11        A.    Go ahead.
12        Q.    Do you know anything about the
13   doctor who performed this examination?
14        A.    I don't know -- I do not know the
15   doctor personally.
16        Q.    Do you have any criticisms of her
17   examination?
18        A.    Yes.
19        Q.    What is that?
20        A.    Give me just one second, please.
21             So there's no -- there's no
22   documentation of the driver's neck
23   circumference.  With the examination, based
24   on his height and weight, at that time his
25   body mass index was 35.5, which is Class 2
```

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 80

1   obesity.  We can see on page 3 of the exam

2   that the doctor -- despite him being in the

3   second class of obesity, the doctor fails to

4   recognize that as being overweight.  So under

5   general appearance, she marks everything as

6   normal.

7           And there's no -- he does have

8   protein in his urine, which is a minor

9   finding, but there's no notation, and his

10  blood pressure is okay for the FMCSA

11  standard, but it's elevated in clinical

12  practice.  So there's no notation of what

13  follow-up he should do for the protein urea.

14  And there is no -- again, there's inadequate

15  screening for sleep apnea, according to the

16  literature, based upon his BMI, and there's a

17  failure to record his neck circumference.

18      Q.   Anything other than his BMI or

19  neck circumstance that suggested that he

20  should have a sleep study?

21      A.   No.  But that's like saying, you

22  know, anything other than an animal that's in

23  the cat family that has spots and lives in

24  Africa is a leopard.  I mean, it's --

25  basically, the BMI and the neck circumference

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 81

1    are the two most important factors in

2    diagnosing -- in screening a truck driver for

3    sleep apnea, because they all -- we know from

4    the studies they all deny sleepiness.  For

5    example, the question on page 1, sleep

6    disorders, pauses in breathing while asleep,

7    daytime sleepiness, loud snoring, roughly 80

8    percent of the drivers that turn out to have

9    sleep apnea have answered no to that

10   question.  But if they're tested objectively,

11   they have sleep apnea.

12          So, I mean, it's like saying what

13   is it about the patient or the driver that

14   tells you he has high blood pressure, other

15   than his blood pressure being high.

16          Q.   The BMI and neck circumference

17   doesn't say someone has --

18             THE REPORTER:  Doesn't say someone

19        has to be what?

20   BY MR. COX:

21          Q.   Having a high BMI and having a

22   large neck circumstance doesn't say someone

23   has sleep apnea, but having high pressure,

24   how do you know somebody has high blood

25   pressure?

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 82

1          THE REPORTER:  Did you understand
2      that, Doctor, because I didn't get it?
3          THE WITNESS:  I did hear his
4      question, but if you didn't hear it, he
5      should repeat it.
6  BY MR. COX:
7      Q.   Doctor, it's your testimony that
8  having a high BMI and having a large neck
9  circumference means someone has sleep apnea?
10     A.   No, that's not my testimony.  My
11 testimony is that those are the two most
12 recognizable risk factors and the two most
13 useful parameters to check a screening in the
14 truck driver population.  And yes, based upon
15 if you have a middle-aged male driver and you
16 have a high BMI and a high neck
17 circumference, you can -- you know, based
18 upon the literature and based upon the
19 studies have been done in driver populations,
20 that there is a high probability.
21          So in this case, based upon his
22 age, his sex, his BMI and his neck
23 circumference, he has a probability of sleep
24 apnea that is in excess of 85 to 90 percent.
25 That's what I'm saying.  For example, now --

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 83

1    you asked about blood pressure.  If you have

2    a single high blood pressure reading, yes,

3    that's an elevated blood pressure reading,

4    and it's more likely than not that you may

5    have high blood pressure, but a single

6    reading does not diagnose high blood

7    pressure.  You have to have multiple

8    readings.  So, you know, that's my criticism

9    of the examination.

10        Q.    Doctor, I'm familiar with several

11   flow charts that are used in the DOT arena

12   for medical certification regarding

13   obstructive sleep apnea.  I think one is the

14   EPworth screening.  Are you familiar with

15   that?

16        A.    Yeah, that's a joke for truck

17   drivers.  Well, it's not a flowchart, first

18   of all.  The EPworth is a questionnaire, and

19   it's referred to as ESS or the EPworth

20   sleepiness scale.  We and others have done

21   studies of the EPworth sleepiness scale

22   amongst truck drivers.

23            And, again, it's like the question

24   that the FMCSA has.  Every driver,

25   essentially with a brain, is going to tell

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 84

1    you they're not sleepy because they're trying

2    to get certified for their exam.  The average

3    truck driver gives a lower sleepiness scale

4    than the average college study; yet we know

5    about a third of truck drivers in the U.S.

6    have sleep apnea.  So it's just completely

7    inaccurate tests and -- it's only useful --

8           Let me put it this way:  The vast

9    majority of sleepy truck drivers will give

10   you an answer somewhere between 0 and 4,

11   which is very low on the EPworth sleepiness

12   scale.  So the EPworth is only useful in a

13   driver if, by accident, or by ignorance, or

14   just they're really, really honest, they give

15   you an honest answer, and they give you an

16   abnormal answer, that's -- you know, you got

17   to take that seriously.  But a low EPworth

18   does not rule out sleep apnea in any way.

19           And, in fact, all of the studies

20   that have been done to screen for sleep apnea

21   in trucking populations, they generally show

22   low EPworth scores among the truck drivers

23   with sleep apnea and no difference, really,

24   in the EPworth scores of the drivers who have

25   sleep apnea versus the drivers who don't have

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 85

1    sleep apnea.

2         Q.   Are you familiar with any

3    screening systems that rely just on BMI and

4    neck circumference?

5         A.   I'm not aware of any that rely

6    only on those.  But the majority of the

7    screening protocols in the literature, of

8    which we have studied in detail in our

9    clinic, they rely primarily on BMI and neck

10   circumference, along with blood pressure, and

11   then, you know, gender, other conditions,

12   such as diabetes, et cetera.

13        But the major -- the answer to

14   your question is the major drivers and the

15   major pillars of the truck driver's screening

16   systems are BMI and neck circumference.

17        We can't hear your question.

18        Q.   I'm sorry.  Assuming Dr. Peloquin

19   had found Mr. Bush, after examining him, that

20   he had obstructed sleep apnea, would she have

21   given him a two-year medical certification?

22        A.   Okay.  Well, I mean, you can't --

23   I believe the proper procedure would have

24   been for the doctor to have concluded, based

25   upon his BMI, neck circumference, gender, and

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 86

1   age, and acceptable yet elevated blood

2   pressure, that he was at high risk for sleep

3   apnea.  Given that he denied symptoms, he

4   should have been given a three-month

5   conditional certificate, and he should have

6   been asked to return to the examiner's office

7   with a sleep study; and if the sleep study

8   was indeed positive, then he would have to

9   obtain the proper treatment and show

10  compliance with said treatment in order to

11  receive recertification.

12        Q.    Did Dr. Peloquin do that?

13        A.    No.

14        Q.    Assuming Dr. Peloquin had

15  identified the -- if Dr. Peloquin had

16  identified any risk factors for obstructive

17  sleep apnea, should she have given Mr. Bush a

18  two-year medical certification?

19        A.    No.

20        Q.    But we know she did give him a

21  two-year medical certification, correct?

22        A.    Correct.

23        Q.    If you'll turn to the next medical

24  certification from 2015.  Tell me when you're

25  there.

**EXHIBIT A**

Page 87

1          A.    Yes, sir.

2          Q.    This is about five months before

3     the accident happened, correct?

4          A.    Yes.

5          Q.    After his two-year medical

6     certification, 2013, expired, he went back to

7     get checked out again in 2015, correct?

8          A.    I'm sorry.  Did you say it was

9     after the accident or before the accident?

10          Q.    Before.

11          A.    Okay.  All right.  Agreed.

12          Q.    Did the examiner, in 2015, know

13     anywhere -- anything about obstructive sleep

14     apnea?

15          A.    No.

16          Q.    Did the medical examiner, in 2015,

17     give Mr. Bush a two-year medical

18     certification?

19          A.    Yes.

20          Q.    Assuming that the medical examiner

21     had determined that Mr. Bush had obstructive

22     sleep apnea or had any risk factors of

23     obstructive sleep apnea, should she have

24     given him a two-year medical certification?

25          A.    No.  Well, I mean, again, my

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 88

1    criticisms of this exam are the same as the

2    previous exam, and you can see it's not a

3    very good exam.  Again, the person -- the

4    cutoff for obesity is a BMI of 30; yet she --

5    the examiner, she fails to recognize him as

6    being markedly overweight.  She does -- she

7    or her staff documented the neck

8    circumference; but, again, no action was

9    taken.

10            And unlike the previous -- at

11    least the previous examiner, the physician

12    did document answers to a number of questions

13    that they asked the driver.  This person

14    basically just -- I mean, I wasn't there; so

15    I don't know what they asked or they didn't

16    ask, but they really -- the only note they

17    have is past medical history negative.  They

18    didn't ask specific questions like the other

19    doctor.  So, I mean, it's not a very good

20    exam.

21        Q.   How do you know, Doctor?  Were you

22    there?

23        A.   How do I -- well, again, I've

24    studied these examinations extensively.  I've

25    done hundreds.  I've published on it

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 89

1   extensively, and I can see the data that's

2   right there.  I mean, obviously, the risk

3   factors are there.  It's just that the person

4   is not identifying them.  I don't -- I can't

5   say why because I wasn't there, and I don't

6   know the person.

7        Q.   And is it your opinion that

8   Mr. Bush of AAA Cooper should have second

9   guessed both of the two-year medical

10  certificates given by two different medical

11  professionals?

12       A.   It's my opinion that, you know,

13  the trucking industry has been very familiar

14  with the problem of obstructive sleep apnea

15  since at least 2005.  It's one of the hottest

16  topics in all the trucking magazines and the

17  trucking safety, et cetera.  It been highly

18  debated in trucking about -- because you can

19  see what's happened in these two exams.

20  There's no objective screening protocol

21  that's mandated by the FMCSA; therefore a lot

22  of drivers with sleep apnea are missed.

23            I'd be hard-pressed to believe

24  that people who are in the trucking industry

25  could look at you with a straight face and

**EXHIBIT A**

Stefanos N. Kales , M.D.                 September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 90

1   say they don't know that drivers who are

2   obese are at higher risk for sleep apnea.

3        Q.   In other words, is it your

4   testimony the trucking company should

5   second-guess the medical certificates issued

6   by independent medical examiners?

7        A.   It's my testimony that -- my

8   understanding from trucking safety experts is

9   that trucking companies should review the

10  long forms, and I'm not going to specify what

11  procedures and protocols they should have in

12  place specifically.  I think that's up to a

13  safety expert, but they should have some

14  procedure to look at the long forms.

15            And it's also my understanding

16  that they are -- that yes, the driver may

17  have been certified by a medical examiner but

18  the ultimate guarantor of the driver's safety

19  is the trucking company.

20       Q.   What trucking safety experts have

21  you gotten that information from?

22       A.   That's what I understand from

23  Brooks Rugemer, from several attorneys that

24  work in the trucking industry, and just my

25  reading of the FMCSA regulations, that the

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 91

1    trucking company is the ultimate guarantor.

2         Q.    Are you aware of anywhere in that

3    FMCSA that says the trucking company needs to

4    look at a medical certification and determine

5    if the medical examiner was correct?

6         A.    No, but it's my understanding that

7    there's no -- that trucking companies are

8    allowed to get a copy of the long form, and

9    it's my understanding of best practices that

10   the best companies do that and review them.

11        Q.    And that's based off your

12   discussions with attorneys and trucking

13   safety experts?

14        A.    Yes.

15        Q.    Dr. Kales, you never talked to

16   Mr. Bush, correct?

17        A.    No.

18        Q.    You've never examined Mr. Bush?

19        A.    No.

20        Q.    Have you ever seen a picture or a

21   video of him?

22        A.    I've seen his picture in the --

23   driver's license in his qualification file.

24        Q.    Is that the black-and-white

25   picture that was on his driver's license?

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 92

1          A.    Yes, sir.

2          Q.    Any other pictures or video of

3    him?

4          A.    I don't believe so.

5          Q.    You're not aware of any physician

6    to have actually met with Dr. Bush and

7    examined him and diagnosed him with

8    obstructive sleep apnea, correct?

9          A.    I'm not aware of that.

10         Q.    In your opinion that Mr. Bush

11   should have been sent for additional testing,

12   you cited the letter from the FMCSA Medical

13   Review Board?

14         A.    Yes.

15         Q.    Are you relying on anything else?

16         A.    Well, again, my experience and

17   training, and the literature which underlies

18   the FMCSA letter of 2016 -- the Medical

19   Review Board letter of 2016.

20         Q.    Maybe that was a bad question.

21               Your opinion is that the medical

22   examiner should have sent Mr. Bush to

23   complete testing, correct?

24         A.    Yes.

25         Q.    And that opinion should have --

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 93

1        A.    Well, let me be -- I'm sorry.  Let
2   me be specific.  When you're a medical
3   examiner, you're not a treating physician.
4   So, generally, you cannot send the driver for
5   a sleep study, but you -- when a driver needs
6   anything like more medication for high blood
7   pressure, or they need to be evaluated for
8   diabetes, or you think they need a sleep
9   study, you need to give them instructions,
10  preferably, you know, oral as well as in
11  writing, and tell them to obtain that testing
12  through their doctor.
13       Q.    And I appreciate that
14  clarification, Doctor.
15            As far as your opinion that a
16  medical examiner should only give a limited
17  certification until that sleep study is
18  performed, that that's what they're supposed
19  to do, do you rely on anything other than the
20  Medical Review Board letter that you
21  attached?
22       A.    Again, based on my -- my personal
23  experience and training, the research I've
24  conducted and the literature that underlies
25  the Medical board -- Review Board's reasoning

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 94

1   in that letter.  In other words, what I'm

2   telling you is there's a whole body of

3   literature related to sleep apnea and sleep

4   apnea screening in truck drivers that the

5   Medical Review Board utilized in order to

6   produce those recommendations.  I mean, they

7   didn't just say get five people in a room and

8   say this is what we think because this is

9   what we think.  They base that on

10  evidence-based medicine.

11          Q.   Understand.

12               But as far as the medical examiner

13  and things that were -- well, a medical

14  examiner does their medical examination and

15  certifications based upon things issued by

16  the Medical Review Board, correct?

17          A.   Well, they don't -- there's no one

18  making them do that at this point.  The

19  Medical Review Board gives recommendations to

20  the FMCSA, but those are different than

21  enforced regulations.

22               So what I'm saying is, for

23  example, prior to the 2016 Medical Review

24  Board, there was a 2006 consensus statement

25  of three medical societies; and then, in

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 95

1    2008, the Medical Review Board gave different

2    recommendations, and there have been, you

3    know, a number of research studies that

4    looked at truck driver populations and then

5    they -- those all factored into the 2016

6    guidance.

7           But the knowledge and the -- let's

8    say the standard -- the best stan- -- the

9    best practices that should have been employed

10   in those exams that we discussed, they

11   existed before 2016 and they're -- I believe

12   they're cited in the report.

13          Q.   When did the best practices come

14   about; when were those?

15          A.   Well, again, the first -- in 2006,

16   there was a joint task force of the American

17   College of Occupational and Environmental

18   Medicine, the American College of Chest

19   Physicians, and the National Sleep Foundation

20   that published a review paper as well as

21   guidelines for screening for sleep apnea;

22   simultaneously in the Journal of Occupational

23   and Environmental Medicine as well as in the

24   CHEST Journal of the chest physicians.

25          And those -- since that time,

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 96

1    those have been refined, you know, over the

2    last 13, 14 years based on -- based on

3    additional research and the trucking

4    population.

5             Q.    Have they changed through that

6    period of time?

7             A.    I would say that over time, people

8    are being more aggressive; in other words,

9    they have a lower threshold for sending

10   someone for a sleep study.  But, you know,

11   they're -- the reason I cited the MRB of 2016

12   is I think that's, you know, is, like, a

13   single best summary.

14            Q.    The 2016 recommendation, is that

15   the recommendations you've utilized for your

16   opinions in this case?

17            A.    I did -- I did in this case, but

18   I'm also relying on my own experience, both

19   in the clinic and in research.

20            Q.    Let's jump to BMI.  I know we

21   talked about that a lot.

22                  What is BMI?

23            A.    BMI is body mass index.

24            Q.    And is BMI the risk factor that

25   leads to sleep apnea or is it obesity?

EXHIBIT A

Stefanos N. Kales , M.D.                 September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 97

1          A.    Well, obesity is the risk factor.

2    BMI is simply the most common way to assess

3    whether or not someone is obese.  Everybody

4    has a BMI, but everyone is not obese, if that

5    makes sense.

6          Q.    Sure.  But obesity is the

7    percentage of body fat, correct?

8          A.    Partially correct.  Obesity could

9    be defined in a number of different ways.  So

10   one way would be based on BMI, which would be

11   a BMI -- in an adult, a BMI of 30 or greater.

12   And as the BMI increases, the body fat

13   generally increases, but the BMI is simply a

14   more sophisticated ratio of the weight to

15   height.

16               If you directly estimate or

17   measure body fat, for example, you can use a

18   bioelectrical impedence to estimate body fat.

19   Those are the scales where you go on with

20   bare feet, and they may also have hand bars

21   that you hold, and based on estimation of

22   body water, it estimates body fat.  Then

23   there are things like a DEXA scan or, you

24   know, other sophisticated scans that would

25   actually look at the body and see what's fat

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 98

1    versus not fat.  But if you use a body fat

2    definition in a man, it's a body fat of 25

3    percent or greater.  In women, the

4    definitions are different because the

5    distribution and amount of body fat is

6    different.

7              So BMI is not the -- it's not a

8    direct measure of body fat.

9         Q.   Is the risk factor for obstructive

10   sleep apnea BMI standing alone or a

11   percentage of body fat?

12        A.   It depends.  It's simply how you

13   conduct the study.  So the majority of

14   studies use the BMI alone as a proxy measure

15   for obesity and body fat.  If you want to

16   be -- and that's -- you know, most of them

17   don't use body fat per se.  The more basic

18   research on sleep apnea suggests that it's

19   obesity and particularly visceral fat.  So

20   fat around the organs and fat in the belly,

21   as opposed to just the size of the person.

22        Q.   Someone who is muscular, would

23   they have a high BMI?

24        A.   You can increase your BMI by

25   increasing muscle mass, yes.

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 99

1        Q.    Would having a high BMI due to

2    being muscular, is that a risk factor for

3    obstructive sleep apnea?

4        A.    It can be.  So two caveats of

5    that, for example, people who are

6    bodybuilders, often they could be in the

7    over -- the, quote/unquote, "overweight

8    range" as opposed to the obese range based

9    simply on muscle mass.  Especially in a

10   population of, like, truck drivers, it's more

11   difficult to find someone who is obese simply

12   on body mass, muscle mass alone.

13          But, for example, if you want to

14   look at a group that's very muscular, you can

15   look at NFL players.  There is known to be a

16   high prevalence of sleep apnea in linemen and

17   those types of positions.  So, I mean, those

18   types of people have very high muscle mass,

19   but they also tend to have some extra fat,

20   and they do have -- they do have a high

21   prevalence of sleep apnea.

22       Q.    Doctor, maybe I just missed it.

23   But is there an answer to whether or not BMI

24   standing alone contributes to it, or is there

25   a risk factor of obstructive sleep apnea or

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 100

1   is it actually a percentage of body fat?

2          A.    Well -- are you ready?

3          Q.    Go ahead.  Yeah, go head, Doctor.

4          A.    The majority of studies that look

5   at obesity as a risk factor for sleep apnea

6   simply utilize the BMI as the proxy measure.

7   It's not clear -- you know, it appears from

8   the science that visceral obesity is the most

9   important risk factor, but it's not clear

10  that just having a high BMI alone completely

11  on muscle would not be a risk factor.

12         Q.    The recommendations dated August

13  26th, 2016, from the Medical Review Board,

14  were those ever put into effect by the

15  Federal DOT?

16         A.    When you say "put into effect," do

17  you mean made a rule of law?  I mean, made a

18  requirement?

19         Q.    Yes, Doctor.

20         A.    No, they remained -- they remained

21  guidance.

22         Q.    Are you familiar, generally, with

23  Federal Motor Carrier Safety Regulations?

24         A.    I'm familiar as they relate to the

25  medical exams.

**EXHIBIT A**

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 101

1          Q.    I'm sorry?

2          A.    I'm familiar with many of them,

3    particularly those that relate to the

4    medical -- medical examination of the

5    drivers.

6          Q.    Are you aware of anywhere in the

7    Federal Motor Carrier Safety Regulations

8    where the word "sleep apnea" is mentioned?

9          A.    I believe so, yes.

10              THE REPORTER:   I'm sorry.   What

11         was the beginning of that?

12   BY MR. COX:

13         Q.    It's your testimony that sleep

14   apnea is in the Federal regulation?

15         A.    Well, I don't want to get into the

16   weeds legally.   My understanding is that if

17   you have -- there is not a requirement, other

18   than what is in the actual form in terms of

19   how the medical examiner has to or should

20   screen for sleep apnea.   However, if a --

21   there is a clear, you know, rule, I don't

22   know if it's exactly a regulation, but there

23   is a rule if the driver has untreated sleep

24   apnea, they are prohibited from -- that is

25   one of the conditions which would be a --

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                            Page 102

1    something like a, you know, they call it

2    uncontrolled neurologic or respiratory

3    condition that you're not allowed to drive

4    with until that's remedied, so to speak.

5            Q.   Who's competent to diagnose a

6    truck driver with obstructive sleep apnea?

7            A.   What do you mean?

8            Q.   Does it take a medical

9    professional to diagnose someone with

10   obstructive sleep apnea?

11           A.   Not necessarily.

12           Q.   Who else could do it then?

13           A.   Well, I mean, I don't want to

14   get --

15           Q.   What other training would you need

16   to diagnose someone with obstructive sleep

17   apnea?

18           A.   Well, I mean, it depends what

19   you're -- how you're defining diagnose.  I

20   mean, a lot of the times it's the wife lying

21   next to the guy knows they have obstructive

22   sleep apnea because you know the person is

23   snoring, and chortling, and choking at night,

24   and they can't sleep next to them.

25                You know, and you've probably been

**EXHIBIT A**

Stefanos N. Kales , M.D.                 September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 103

1   on an airplane before where you were next to

2   somebody like that.  I mean, those cases are

3   obvious.  You know, I guess you would -- you

4   could say, if you want to diagnose it, you

5   need to have the person go in a sleep lab.

6   But, I mean, people -- you could give a --

7   you need -- if you want to diagnose it as a

8   gold standard, the answer is you need to do a

9   sleep study overnight in a laboratory.  But

10  if you wanted to come up with a screening

11  protocol based upon three to five factors,

12  you could give that to a person with very

13  little training, and they could accurately

14  screen drivers without having gone to medical

15  school.

16          Q.   Opinion Number 5, "Based upon his

17  a high risk of OSA, Mr. Bush had received a

18  limited time (3 month) certification in 2015,

19  which would have required him to undergo a

20  sleep to exclude OSA, and if OSA were found,

21  would have required him to demonstrate

22  successful treatment and treatment of

23  compliance in order to continue driving with

24  valid medical certification."

25              Is that correct?  Did I read your

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

                                                    Page 104

1    opinion?

2         A.   Yes.

3         Q.   Is that opinion complete?

4         A.   Yes.

5         Q.   Do you list all your bases for

6    that opinion below?

7         A.   Yes.  Again, with the caveat that

8    the Medical Review Board citation is relying

9    on, you know, multiple other studies that

10   have been in the trucking population.

11        Q.   Who made the decision to give

12   Mr. Bush a two-year medical certificate?  Was

13   it Mr. Bush?

14        A.   No.

15        Q.   Was it AAA Cooper?

16        A.   It was the medical examiner.

17        Q.   Opinion Number 5 would be an

18   opinion of the medical examiner, correct?

19        A.   That's correct.

20        Q.   Doctor, I appreciate your time.  I

21   hope it wasn't too painful.

22        A.   No, it was fun.

23        Q.   The other attorney may have some

24   questions for you.

25             MR. GLOVER:  I reserve questions

**EXHIBIT A**

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 105

1      for trial.

2              MR. COX:   Thank you, Doctor.

3              THE WITNESS:   Thank you guys very

4      much.

5              THE VIDEOGRAPHER:   The time is

6      1:12.   That concludes the deposition.

7      We're off the record.

8              MR. COX:   Standing order.

9              THE REPORTER:   Mr. Cox, are you

10     getting the original?

11             MR. COX:   Yes.

12             THE REPORTER:   You're getting the

13     original, Mr. Cox.

14             MR. COX:   Yes.

15   (Deposition concluded at 1:12 p.m.)

16

17

18

19

20

21

22

23

24

25

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

Page 106

1    COMMONWEALTH OF MASSACHUSETTS
2    SUFFOLK SS.
3
4         I, Sandra A. Deschaine, Registered
     Professional Reporter and Notary Public
5    within and for the Commonwealth of
     Massachusetts at large, do hereby certify
6    that the deposition of Stefanos N. Kales,
     M.D., in the matter of Callie Roberts vs. AAA
7    Cooper Transportation, Inc., et al, at
     offices of Veritext Legal Solutions, 101 Arch
8    Street, Boston, Massachusetts, on September
     25, 2019, taken and transcribed by me; that
9    the witness provided satisfactory evidence of
     identification as prescribed by Executive
10   Order 455 (03-13) issued by the Governor of
     the Commonwealth of Massachusetts; that the
11   transcript produced by me is a true record of
     the proceedings to the best of my ability;
12   that the witness is waiving reading and
     signing; that I am neither counsel for,
13   related to, nor employed by any of the
     parties to the action in which this
14   deposition was taken, and further that I am
     not a relative or employee of any attorney or
15   counsel employed by the parties thereto, nor
     financially or otherwise interested in the
16   outcome of the action, on this 5th day of
     October 2019.
17
18
19
                    _Sandra C Deschaine_
20                  Sandra A. Deschaine
21                  Registered Professional Reporter
22
23   My Commission Expires:
     July 5, 2024
24
25

Veritext Legal Solutions
800.808.4958                                        770.343.9696

EXHIBIT A

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[& - aaacooper]                                                    Page 1

| & | |
| --- | --- |
| **&** | 4:3 |

**0**

**0** 84:10
**03-13** 106:10
**060-15** 41:9

**1**

**1** 5:6 6:1 25:10,18
27:5,8 28:10
29:13 40:17 42:19
42:20 45:10 51:23
52:19 54:8 55:14
55:18 56:2,5,8
57:17 81:5
**10** 5:19 6:21 49:14
77:17,23 78:12,17
**10/31/2015** 46:5
**100** 4:8
**101** 1:19 2:6 7:9
106:7
**105** 49:17
**10:29** 46:3
**10:30** 1:18 2:3 7:8
**11** 5:21 6:23 22:21
**11:26** 44:10,11
**11:35** 44:11,13
**12** 70:8
**12:15** 69:14,15
**12:19** 69:15,17
**13** 96:2
**130** 42:14,22 43:10
**14** 16:12 96:2
**1400** 12:15
**15,000** 14:3
**17** 59:2,2
**18755** 106:19
**19** 59:3
**191** 3:7,15
**1:10** 46:5

**1:12** 1:18 105:6,15
**1st** 17:4 18:10 19:7

**2**

**2** 5:8 6:4 25:21
27:13,18 33:23,25
35:10 43:12 54:9
59:14,16 60:17,19
63:4 79:25
**2005** 89:15
**2006** 94:24 95:15
**2008** 95:1
**2013** 78:25 87:6
**2015** 86:24 87:7,12
87:16 103:18
**2016** 25:25 26:3
28:21 29:12 71:19
92:18,19 94:23
95:5,11 96:11,14
100:13
**2017-19** 5:15 6:14
**2019** 1:17 2:1 7:7
16:15 17:4 18:10
19:7 22:5 25:22
35:18 47:9 106:8
106:16
**2024** 106:23
**20:15** 46:3
**222** 48:4
**232** 1:6 7:15
**23rd** 22:5
**24th** 22:10
**25** 1:17 2:1 98:2
106:8
**25th** 7:7
**26th** 100:13
**2800** 19:22
**2:17** 1:6 7:15

**3**

**3** 5:9 6:7 21:23
22:3 26:15 27:13

28:25 42:8 54:2
62:24 63:15 80:1
103:18
**30** 78:25 88:4
97:11
**30060** 3:16
**30303-1775** 3:8
**30327** 4:9
**32** 69:24
**35.5** 79:25
**3506862** 1:25
**391.45.** 28:25
**3rd** 16:15,21 17:4
18:10 19:7 28:8
35:18,21 47:9

**4**

**4** 5:11 6:9 25:24
45:1 54:3 63:16
70:14 84:10
**4/29/2015** 43:13
**404.954.5000** 3:9
**4200** 4:7
**455** 106:10

**5**

**5** 5:6,8,9,11,12,12
5:15,16,17,18,19
5:21 6:11 26:3
43:12 45:2 103:16
104:17 106:23
**50** 10:10
**5200** 19:22
**5862.50.** 19:23
**5th** 106:16

**6**

**6** 5:15 6:14 26:6
45:13 46:13
**6/3/19** 5:8 6:4
**6/4/19** 5:21 6:23
**60** 14:3

**69** 54:5 63:11,22

**7**

**7** 5:16 6:16 15:14
15:20,21,25 17:12
17:15 25:11 26:9
26:20 27:5,8
28:10 29:14 46:17
**7,500** 14:1
**70** 65:21 66:14
67:15
**75** 16:12 71:11,14
71:15,16
**750** 12:12
**7500** 14:1

**8**

**8** 5:3,17 6:18
45:11 47:11
**80** 71:11,14,15,16
81:7
**800.898.2035** 4:10
**85** 10:25 82:24
**86** 40:23
**89** 55:15 56:12
57:1,16 58:10
59:21

**9**

**9** 5:18 6:20 49:4
56:22
**90** 55:15 56:12
57:1,16 58:11
59:21 82:24

**a**

**a.m.** 1:18 2:3 7:8
44:11,11 46:5
**aaa** 1:5 7:13 72:16
72:18,22,25 89:8
104:15 106:6
**aaacooper** 42:19

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[aaacooper000130 - attorney]          Page 2

aaacooper000130
42:21
aaacooper000238
45:11
aaacooper000245
45:12
ability  21:19 51:24
61:2 106:11
able  11:9 41:20
64:19
abnormal  84:16
absolutely  63:9
64:17
abstract  53:13
acceptable  86:1
accident  46:4
53:23 55:3 63:13
63:24 66:12,19
67:25 68:6,22
69:4,5,23 70:10
78:20 84:13 87:3
87:9,9
accurate  16:13,14
accurately  103:13
achieve  76:1
acted  32:16,18
acting  12:2
action  1:6 7:15
88:8 106:13,16
active  76:3
activity  55:13
actual  101:18
add  19:1 46:17
added  19:5
additional  17:10
18:13 51:1,5
92:11 96:3
address  35:22
addressed  49:5
adequately  54:7
60:16

adjusting  54:19
78:15
administration's
74:7
admission  56:10
admit  55:24
admitted  54:11,13
55:21 65:25
adult  97:11
affect  38:13 39:8
affidavit  23:25
affidavits  28:7
africa  80:24
age  74:21 82:22
86:1
aged  71:3 82:15
aggressive  96:8
ago  56:6
agree  55:1,5,6,7
57:22 71:23
agreed  54:20 72:2
87:11
agreement  8:7
28:1
agrees  8:9
ahead  14:21 68:9
79:11 100:3
airplane  13:6
103:1
al  7:14 106:7
alertness  51:25
61:2
alexander  37:19
alexander's  38:8
allen  4:3
allowed  68:12,16
68:21 70:1,5 91:8
102:3
amended  47:4
american  95:16,18

amount  19:19
67:9 98:5
animal  80:22
answer  8:11 9:18
9:23 11:9,21 16:5
16:6 17:7 39:20
46:1,19 50:10
53:17 61:25 62:5
62:9 66:1 84:10
84:15,16 85:13
99:23 103:8
answered  18:14
29:9 66:7 81:9
answering  9:12
answers  88:12
apnea  5:12 6:12
70:18 71:3,10
72:1,4,13,17 73:1
74:12,25 78:19
80:15 81:3,9,11,23
82:9,24 83:13
84:6,18,20,23,25
85:1,20 86:3,17
87:14,22,23 89:14
89:22 90:2 92:8
94:3,4 95:21
96:25 98:10,18
99:3,16,21,25
100:5 101:8,14,20
101:24 102:6,10
102:17,22
apologize  26:16
32:14 36:20 37:24
appear  41:5
appearance  80:5
appearances  3:25
appears  100:7
appreciate  29:10
93:13 104:20
approved  75:23
75:25

approximately
16:17 19:8 46:5
64:19
april  78:25
arch  1:19 2:7 7:9
106:7
areas  47:17,20
51:5
arena  83:11
aronhalt  49:19
aronhalt's  49:13
49:24 50:3,13
article  29:2
aside  17:18
asked  27:25 29:3
35:14 36:9,10
39:15 83:1 86:6
88:13,15
asking  9:11 55:25
56:1 63:20
asleep  52:22 53:2
54:24 55:21,24
56:2,11 65:10,24
81:6
assess  97:2
assistant  16:24
associated  20:11
20:11
association  21:1
assume  9:24 22:18
26:14 47:5
assuming  85:18
86:14 87:20
atlanta  3:8 4:9 9:6
attached  93:21
attachments  5:22
6:24
attention  39:3
47:22
attorney  3:13
38:22 39:2 104:23

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[attorney - caller]                                    Page 3

106:14
**attorneys**  36:9
  90:23 91:12
**august**  100:12
**authors**  26:4
**average**  84:2,4
**awake**  67:18,22
**aware**  21:21 27:8
  34:17,22,23,25
  35:3,5 37:21 38:6
  71:24 72:12,15,24
  85:5 91:2 92:5,9
  101:6
**awkward**  9:9
  75:12

**b**

**b**  36:14,15,17
  40:18 41:8
**back**  17:13,16,25
  18:16 19:1 44:13
  48:10,12,15 55:10
  68:8,9 69:9,17
  87:6
**bad**  63:17 64:2
  65:12 92:20
**bare**  97:20
**bars**  97:20
**base**  94:9
**based**  10:24 19:2
  20:2 55:13 63:10
  63:14 72:6 74:21
  79:23 80:16 82:14
  82:17,18,21 85:24
  91:11 93:22 94:10
  94:15 96:2,2
  97:10,21 99:8
  103:11,16
**bases**  33:17 34:4
  51:13 104:5
**basic**  98:17

**basically**  13:18
  45:20 64:14 80:25
  88:14
**basis**  20:20,22
  50:8,18 59:23
  60:19 70:21
**bate**  41:3 42:17
  45:9,17
**bates**  41:1,5 42:15
  45:7
**beasely**  4:3
**bed**  67:25 68:1
**beers**  64:15,22
**began**  53:22 54:7
  55:2 66:11,18
**beginning**  18:4,6
  35:2 61:1 64:13
  66:15 69:1 101:11
**behalf**  3:3 4:2
**belabor**  9:3 36:1
  58:19 59:12
**belief**  21:15
**believe**  11:11,25
  12:4 14:19,24
  16:20 18:14 21:12
  21:14 23:17 27:15
  28:20 29:16 32:14
  32:20 40:23 44:23
  47:7,23 51:5 56:6
  62:2 66:7 70:7
  85:23 89:23 92:4
  95:11 101:9
**belly**  98:20
**best**  77:4 91:9,10
  95:8,9,13 96:13
  106:11
**better**  10:18 20:25
  41:23 52:13 62:12
**bioelectrical**  97:18
**bit**  43:16

**black**  91:24
**blank**  24:1
**block**  13:9
**blocking**  52:3,9,11
**blood**  80:10 81:14
  81:15,24 83:1,2,3
  83:5,6 85:10 86:1
  93:6
**bmi**  70:23 80:16
  80:18,25 81:16,21
  82:8,16,22 85:3,9
  85:16,25 88:4
  96:20,22,23,24
  97:2,4,10,11,11,12
  97:13 98:7,10,14
  98:23,24 99:1,23
  100:6,10
**board**  25:25 92:13
  92:19 93:20,25
  94:5,16,19,24 95:1
  100:13 104:8
**board's**  71:8 93:25
**bob**  4:12 7:4 52:5
**body**  74:21 79:25
  94:2 96:23 97:7
  97:12,17,18,22,22
  97:25 98:1,2,5,8
  98:11,15,17 99:12
  100:1
**bodybuilders**  99:6
**booth**  3:4
**bore**  21:3
**boston**  1:20 2:7
  7:9,10 9:5 14:3
  106:8
**boxers**  13:13
**boy**  36:17 41:9
**brain**  83:25
**break**  44:1,3 69:8
**breathing**  81:6

**brian**  3:12,14,17
  7:20
**briefly**  31:17 38:9
  40:17 50:21
**bring**  10:15
**brooks**  90:23
**brought**  39:2
**building**  4:8
**burn**  66:24
**bush**  1:6 42:13
  45:4 47:11 51:23
  52:21 53:21 55:2
  57:23 58:3 59:6
  59:16 60:11,15,18
  63:7 65:14 66:5
  66:10,18 67:10,24
  68:5,20 70:9,16
  71:24 72:3,13,16
  72:25 74:1 78:18
  79:2 85:19 86:17
  87:17,21 89:8
  91:16,18 92:6,10
  92:22 103:17
  104:12,13
**bush's**  45:21 55:1
  55:15 57:16 59:22
  64:25 65:8 69:20
  78:11
**business**  12:18,21
  13:19
**busy**  31:16

**c**

**c**  3:1 4:1 7:1 41:7
  50:17,22 51:12
**calculation**  11:4
**calendar**  18:21
**call**  45:13 46:14,21
  46:23 54:2 102:1
**called**  46:25
**caller**  46:24

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[callie - conditional]                                         Page 4

**callie**  1:4 7:13 49:4
  106:6
**calls**  45:22 46:3
  67:12,18,20
**cancer**  22:15
**card**  8:17
**care**  74:4
**career**  10:22 11:7
  11:13 51:15
**careless**  59:17
  60:3,7,10
**carrier**  74:6 75:6
  100:23 101:7
**case**  14:9,14,17
  16:12,22 17:6
  18:13 19:6,21
  20:4,8,9,15 21:5
  22:18 23:6,9,11
  27:6,20 28:5,12,16
  29:18 30:25 31:2
  31:23 32:2,6,9
  33:21 34:1,5,9
  37:10 38:14 39:9
  39:13,24 40:8
  41:7,14 50:6,14,23
  51:7,16 62:18
  64:25 65:8,9
  74:20 78:4,8
  82:21 96:16,17
**cases**  29:25 103:2
**cat**  80:23
**causation**  20:24
  20:24
**caveat**  104:7
**caveats**  99:4
**cdl**  43:12 44:23
**certain**  43:22
**certainly**  11:3
**certainty**  72:7
**certificate**  5:20
  6:21 70:24 78:3

86:5 104:12
**certificates**  73:4
  89:10 90:5
**certification**  43:20
  73:23 74:10,15,24
  75:3,5,20 76:6,21
  77:1,13,15 83:12
  85:21 86:18,21,24
  87:6,18,24 91:4
  93:17 103:18,24
**certifications**
  44:20 74:20 75:6
  75:20 76:13 78:7
  94:15
**certified**  2:10 74:7
  76:4,9 77:8 84:2
  90:17
**certify**  73:19
  106:5
**cetera**  16:24 26:24
  78:15 85:12 89:17
**chance**  15:17
  22:24 23:13 24:14
  24:18 25:15 36:23
  57:15 69:19 77:20
**change**  39:12
**changed**  11:7,20
  96:5
**characteristics**
  71:9
**charge**  12:2,8,13
  13:20,23
**charging**  14:9,14
**charlie**  41:8
**charts**  83:11
**check**  82:13
**checked**  87:7
**checking**  74:11
**chest**  95:18,24,24
**choking**  102:23

**chortling**  102:23
**chris**  7:18
**christopher**  4:5
  5:8 6:5
**chronobiology**
  38:23
**circadian**  38:23
**circuit**  43:16
  52:20 53:9
**circumference**
  70:23 74:22 79:23
  80:17,25 81:16
  82:9,17,23 85:4,10
  85:16,25 88:8
**circumstance**
  80:19 81:22
**citation**  104:8
**cite**  60:17
**cited**  29:15 48:17
  48:18 55:14 57:2
  57:17 58:11 59:21
  92:12 95:12 96:11
**civil**  1:6 7:14
**clarification**  93:14
**clarify**  23:15
**class**  21:7 79:25
  80:3
**clear**  100:7,9
  101:21
**clearance**  77:4
**client**  12:8
**clinic**  13:15 85:9
  96:19
**clinical**  80:11
**closer**  10:16
**clr**  1:24
**colleague**  22:8
**collect**  31:13
**collecting**  30:23
  31:6

**collection**  15:21
  42:12
**college**  84:4 95:17
  95:18
**come**  13:10,13
  17:16 69:9 95:13
  103:10
**comes**  67:15
**coming**  34:8
**commercial**  53:5
  73:7,13
**commission**
  106:23
**common**  97:2
**commonwealth**
  2:11 106:1,5,10
**companies**  75:15
  76:12 90:9 91:7
  91:10
**company**  75:10
  76:17,22 90:4,19
  91:1,3
**competent**  102:5
**complete**  10:21
  92:23 104:3
**completely**  29:8
  84:6 100:10
**compliance**  23:23
  86:10 103:23
**compliant**  68:24
  68:25
**computer**  13:4
**concerns**  74:12
  77:10
**concluded**  85:24
  105:15
**concludes**  105:6
**condition**  72:8
  74:17,24 102:3
**conditional**  77:15
  86:5

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[conditions - deposition]                                          Page 5

**conditions** 85:11
101:25
**conduct** 98:13
**conducted** 93:24
**consensus** 94:24
**consider** 51:9
**considered** 34:8
**consistent** 11:6
**consolidated** 54:5
**contain** 33:25
45:19
**contained** 15:24
27:7 46:12 48:25
50:22 78:12,17
**containing** 44:21
**contains** 46:3
**continue** 14:23
53:4 61:19 103:23
**continued** 3:25 4:1
**continuing** 59:18
61:1,4,15 69:1
**contributes** 99:24
**converted** 30:18
**cooper** 1:5 7:13
72:16,18,19,21,22
72:25 89:8 104:15
106:7
**copy** 21:10 23:19
25:18,21 29:18
41:4 91:8
**correct** 11:2 16:20
25:22 26:1,2,4,8
28:22 29:3 33:15
33:19,20 37:3
51:2 57:25 58:6
60:19 63:24,25
70:25 71:1 72:1
75:11,24 76:6,7,10
76:14 77:13,14
78:23 86:21,22
87:3,7 91:5,16

92:8,23 94:16
97:7,8 103:25
104:18,19
**correctly** 29:9
**correspond** 32:4
**correspondence**
27:19
**corresponding**
16:23
**cost** 13:18,18
**costs** 12:19,21,23
**counsel** 5:18 7:16
8:7 10:15,15
16:23 24:23 26:13
27:20,24 28:2
32:2,5 35:1 37:13
41:10,17 46:11
52:1 57:7 65:1
106:12,15
**couple** 15:5,8
25:14
**course** 15:2
**court** 1:1 7:5,25
10:7 15:12 17:13
17:24 19:25 21:18
21:22 22:20 24:7
25:9 32:13,13,16
32:19 33:1,10
47:5,6,8 56:21
77:16,22
**courtesy** 9:13
**cox** 3:5 5:3 7:22,22
8:2,21 10:18,20
15:12,15 17:24
18:8,9 21:22,24
22:20,22 25:9,12
35:4 41:18,19
43:5 44:5,7,14
45:25 46:6 52:13
52:17,18 56:21,23
57:12 58:17 62:23

65:4 66:1,3 69:11
69:18 71:17 72:19
72:23 77:16,18,22
78:1 81:20 82:6
101:12 105:2,8,9
105:11,13,14
**cra** 1:24
**crash** 54:4,12 56:9
56:10,13,16 59:20
70:19
**crashed** 65:23,25
**crashes** 5:14 6:13
**created** 28:4
**creating** 12:11
**criticism** 83:8
**criticisms** 79:16
88:1
**crow** 4:3
**csr** 1:23
**currently** 74:3
**curriculim** 6:7
**curriculum** 5:9
22:4
**curtis** 38:3
**cutoff** 88:4
**cv** 1:6 7:15 22:6,10
26:15,17

**d**

**d** 1:4 7:1 20:5
**data** 11:22 34:8
37:2 71:7 89:1
**date** 7:6 14:17,25
18:11 19:20 26:18
47:9 79:2
**dated** 5:8,21 6:4
6:23 25:22 78:25
100:12
**dates** 45:21 46:20
**day** 13:9 14:1,2,3
14:4 53:23 55:3
63:8,12,13 65:15

66:6,11,19 67:1,12
67:25 68:17,19
70:6,8,10 106:16
**days** 15:5,8 31:15
35:20
**daytime** 54:15
64:7,11 81:7
**dealing** 9:8
**debated** 89:18
**decide** 76:5
**decision** 76:10,15
76:21 104:11
**defendant** 1:7
7:23
**defendants** 4:2
11:13
**defense** 41:16
**defer** 61:13 62:10
76:16
**defined** 97:9
**defining** 102:19
**definition** 60:1
63:2 98:2
**definitions** 98:4
**degree** 72:7
**delay** 9:10
**demonstrate**
103:21
**denied** 86:3
**deny** 81:4
**depends** 13:25
30:15,15 74:16
98:12 102:18
**depo** 19:18
**deponent** 8:15
**deposed** 11:17
**deposition** 1:16
2:5 5:6 6:2 7:11
8:6 10:7 12:14
13:8,21 14:12
15:2 16:18 25:19

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[deposition - duty]                                        Page 6

| | | | |
|---|---|---|---|
| 31:7 34:15 35:7 | **difference** 12:17 | 64:24 65:7 66:4,9 | 70:1,6 77:11 |
| 37:17,18 38:2,8,10 | 84:23 | 66:18,21,24 67:9 | 102:3 |
| 38:17,19 39:5,8,12 | **different** 16:22 | 68:2 69:7,19 | **driven** 69:3 |
| 39:23 40:13 41:21 | 17:2 24:15,15 | 70:12 72:24 73:9 | **driver** 53:5 60:25 |
| 47:11,15,18,21,24 | 37:5 39:15,17,19 | 73:17 77:20 78:2 | 63:18 64:4,4 |
| 48:5,9,10,20,21,25 | 78:22 89:10 94:20 | 79:13,15 80:2,3 | 68:12,16 70:1,5 |
| 49:5,11,14,19,24 | 95:1 97:9 98:4,6 | 82:2,7 83:10 | 71:11 73:20 74:14 |
| 50:4,5,13 53:15 | **differently** 77:6 | 85:24 88:19,21 | 75:8 76:24,25 |
| 54:10,14 55:1,8,15 | **difficult** 64:9 | 93:12,14 99:22 | 77:4,8,10 81:2,13 |
| 55:18 56:20 57:17 | 99:11 | 100:3,19 104:20 | 82:14,15,19 83:24 |
| 59:22 78:14 105:6 | **direct** 98:8 | 105:2 | 84:3,13 88:13 |
| 105:15 106:6,14 | **directly** 44:24 | **document** 13:2 | 90:16 93:4,5 95:4 |
| **depositions** 9:2 | 97:16 | 17:10 23:2,4 | 101:23 102:6 |
| 26:24 | **disagree** 66:9 | 30:13,17 41:3 | **driver's** 42:8 43:1 |
| **deschaine** 1:23 2:8 | **disclosure** 47:9 | 42:25 45:18 46:8 | 43:6,18 45:3 73:7 |
| 7:5 106:4,20 | **discussed** 26:19 | 46:10 88:12 | 74:16 79:22 85:15 |
| **description** 5:5 | 54:2 95:10 | **documentation** | 90:18 91:23,25 |
| **desk** 13:4 | **discussing** 56:7 | 79:22 | **drivers** 73:13 |
| **despite** 80:2 | **discussion** 38:21 | **documented** 88:7 | 74:19 76:12 81:8 |
| **destroy** 30:4 | **discussions** 91:12 | **documents** 16:23 | 83:17,22 84:5,9,22 |
| **detail** 85:8 | **disease** 20:14 | 27:9,12 37:2 | 84:24,25 85:14 |
| **detailed** 40:15 | **disorders** 81:6 | 41:24 42:2,13,15 | 89:22 90:1 94:4 |
| **determine** 75:2,10 | **distinctions** 32:22 | 42:18 43:6,17 | 99:10 101:5 |
| 76:13 91:4 | **distribution** 98:5 | **doing** 13:12,16,16 | 103:14 |
| **determined** 87:21 | **district** 1:1,2 24:6 | 13:19 19:16 51:4 | **driving** 53:22 |
| **determines** 75:4 | **division** 1:3 | 59:6 | 54:16,20 55:3 |
| **determining** 18:18 | **doctor** 8:22 15:16 | **dorothy** 79:6,9 | 56:7,8 59:19 |
| **development** | 16:10 22:1,23 | **dot** 43:19 44:19 | 60:15 61:13,21 |
| 20:13 | 23:1 25:13 29:20 | 70:24 73:3 78:2,6 | 62:8 63:7 64:21 |
| **dexa** 97:23 | 30:22 31:3,10 | 83:11 100:15 | 65:14 66:5,11,19 |
| **dg** 44:22 | 32:21 33:5,8 | **download** 42:2 | 67:1 69:22 70:9 |
| **diabetes** 85:12 | 34:22 35:5,13 | **dq** 44:16 | 103:23 |
| 93:8 | 36:16,18,21 41:20 | **dr** 7:12 38:3,7,16 | **dropbox** 42:1 |
| **diagnose** 72:9 83:6 | 42:7 43:7,15 44:5 | 39:8,11,22 40:4 | **drove** 65:18 |
| 102:5,9,16,19 | 44:15 45:25 47:6 | 85:18 86:12,14,15 | **due** 99:1 |
| 103:4,7 | 47:10 51:19 52:19 | 91:15 92:6 | **duly** 8:18 |
| **diagnosed** 71:25 | 53:20 54:25 55:23 | **draft** 27:16 35:10 | **duration** 46:22 |
| 92:7 | 56:22,24 57:11,13 | **drive** 41:15 53:4 | **duty** 61:4,6 |
| **diagnosing** 72:3 | 57:15,20,22 58:18 | 59:18 61:1,4,16 | |
| 81:2 | 59:11 60:2 61:25 | 64:12 65:17,20 | |
| | 62:4,24 63:22 | 68:13,17,22 69:2 | |

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[e - far]                                                    Page 7

| e | | | |
|---|---|---|---|

**e**

e   3:1,1,12,14 4:1,1
  7:1,1,20 10:5 20:6
**earlier**  26:19
**effect**  100:14,16
**efficient**  42:4
**eight**  45:6,10,16
**either**  10:8 30:8
  39:19
**elaborate**  13:1
**electronic**  29:18
  29:21,23 30:4,12
  48:22
**electronically**
  40:21
**elevated**  80:11
  83:3 86:1
**email**  18:20 31:15
  32:1
**emailed**  31:18
**emails**  27:21 31:22
  31:24
**employed**  95:9
  106:13,15
**employee**  106:14
**employer**  5:12
  6:12
**empty**  42:5
**enforced**  94:21
**entire**  11:7 27:6
  47:14 48:9,10
  49:18 69:6
**entirety**  34:1 49:6
**entry**  8:17
**environmental**
  95:17,23
**epidemiologic**
  20:10
**epworth**  83:14,18
  83:19,21 84:11,12
  84:17,22,24

**era**  75:18
**especially**  99:9
**esquire**  3:5 4:5
**ess**  83:19
**essentially**  22:12
  52:21 83:25
**estimate**  19:2
  97:16,18
**estimates**  97:22
**estimation**  97:21
**et**  7:14 16:24
  26:24 78:15 85:12
  89:17 106:7
**evaluated**  93:7
**everybody**  97:3
**evidence**  20:10
  94:10 106:9
**evidentiary**  59:23
**exact**  76:18
**exactly**  24:25 27:2
  35:20 49:8 63:19
  101:22
**exam**  44:20,24
  73:19,25 80:1
  84:2 88:1,2,3,20
**examination**  5:2,7
  6:2 8:20 43:13,20
  73:8,12,22 74:18
  79:13,17,23 83:9
  94:14 101:4
**examinations**
  75:23 88:24
**examined**  8:19
  79:3 91:18 92:7
**examiner**  74:5
  75:4,11 76:14,20
  77:9,12 87:12,16
  87:20 88:5,11
  90:17 91:5 92:22
  93:3,16 94:12,14
  101:19 104:16,18

**examiner's**  5:19
  6:21 86:6
**examiners**  74:8
  75:22 76:4 90:6
**examining**  85:19
**example**  54:11
  81:5 82:25 94:23
  97:17 99:5,13
**exams**  11:15 70:25
  73:4 75:16,17
  78:3,7,23 89:19
  95:10 100:25
**excess**  71:16 82:24
**exchanged**  27:22
**exclude**  103:20
**excuse**  40:12
**executive**  106:9
**exhibit**  5:6,8,9,11
  5:12,15,16,17,18
  5:19,21 6:1,4,7,9
  6:11,14,16,18,20
  6:21,23 15:13,19
  15:21,25 17:12,15
  21:23 22:3,21
  23:14,18 24:10
  25:18,21,24 26:6,9
  26:15,20 27:5,10
  33:23,25 35:10
  36:7 41:13 56:22
  57:17 59:13 77:17
  77:23 78:12,17
**exhibits**  5:5 25:10
  27:8 28:10 29:13
  47:12
**existed**  95:11
**exit**  58:25 59:3
  61:10,19 62:13
**experience**  51:15
  92:16 93:23 96:18
**expert**  12:3 15:1
  19:25 32:16,18,23

  32:25 35:25 47:9
  50:17 61:14 76:17
  90:13
**expertise**  21:9
**experts**  75:14 90:8
  90:20 91:13
**expired**  87:6
**expires**  106:23
**explain**  20:25 73:5
**express**  33:17
**extensively**  88:24
  89:1
**extent**  40:14
**extra**  99:19
**extremely**  59:17

| f | | | |
|---|---|---|---|

**f**

**face**  57:8 89:25
**fact**  53:2 56:2
  60:17 63:10 64:18
  84:19
**factor**  96:24 97:1
  98:9 99:2,25
  100:5,9,11
**factored**  95:5
**factors**  81:1 82:12
  86:16 87:22 89:3
  103:11
**facts**  33:19 34:7
  37:2 51:16
**factual**  51:12
**fails**  80:3 88:5
**failure**  80:17
**fair**  9:20,25 58:18
**falling**  53:2 56:11
**familiar**  32:25
  40:25 83:10,14
  85:2 89:13 100:22
  100:24 101:2
**family**  80:23
**far**  51:16 68:23
  78:13 93:15 94:12

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

**fashion** 20:13
**fat** 97:7,12,17,18
  97:22,25 98:1,1,2
  98:5,8,11,15,17,19
  98:20,20 99:19
  100:1
**fatal** 54:3
**fatigue** 51:25
  52:22 61:3
**fatigued** 53:1,3,21
  53:22 54:23 59:19
  60:13 63:7 65:20
  66:15,25 69:2
**federal** 8:8 22:9
  32:13,16,19 33:1
  33:10 61:16 68:11
  68:15,21 69:25
  70:6 73:15 74:6
  76:5 100:15,23
  101:7,14
**fee** 5:15 6:14 12:5
  26:6 28:3
**feel** 43:24
**feeling** 53:22
  57:24 58:4 60:13
  60:18,21 61:8
**feet** 97:20
**fell** 52:22 54:24
  55:21,24 56:2
  65:9,24
**felt** 54:11 55:4,5,6
  56:12,15 59:2
  65:14,22 66:5,11
  66:18,25 67:6,7
**figure** 19:14
**file** 15:1 23:9,10
  26:24 27:6 29:17
  29:19,21,21,22
  30:23,24,25 31:6
  31:13,25 40:18
  42:8 43:1,4,7,18

43:22 44:16,22
  48:3,23 49:12,17
  71:21 91:23
**files** 12:10 26:23
  31:18
**finalized** 35:21
**financially** 106:15
**find** 39:23 43:2
  55:19 99:11
**finding** 80:9
**fine** 8:24 29:8
  53:14 55:4,5,6
  59:11
**finish** 9:11 46:1
**finishing** 57:18
**firefighters** 22:16
**first** 8:12,16 31:1
  31:5,12 35:24
  54:1 83:17 95:15
**five** 42:19 56:6
  64:15,21 87:2
  94:7 103:11
**flow** 83:11
**flowchart** 83:17
**fmcsa** 5:11 6:9
  25:25 28:17,21
  29:2 71:19 73:15
  76:19 80:10 83:24
  89:21 90:25 91:3
  92:12,18 94:20
**follow** 80:13
**follows** 8:19
**football** 58:22
**force** 95:16
**form** 8:10 91:8
  101:18
**forming** 32:8 37:9
**forms** 75:16 90:10
  90:14
**found** 85:19
  103:20

**foundation** 95:19
**four** 11:1,8 15:9
  16:17 17:1 19:8
  48:5 64:15
**front** 23:20
**full** 10:3
**fullest** 46:19
**fun** 104:22
**funny** 54:11 56:12
  56:15 57:24 58:4
  59:2 60:18,21
  61:8 65:22
**further** 106:14

**g**

**g** 7:1
**gainsville** 1:3
**game** 58:22
**gender** 74:21
  85:11,25
**general** 20:24 21:2
  21:7 73:24 74:2
  80:5
**generally** 40:1
  48:16 71:9 84:21
  93:4 97:13 100:22
**georgia** 1:2 3:8,16
  4:9 40:23
**getting** 58:21,23
  74:24 105:10,12
**giannini** 4:12 7:4
**give** 9:12 10:2 11:4
  11:19 17:13 21:19
  35:6 40:20 41:6
  43:9 45:9 46:19
  77:12 79:20 84:9
  84:14,15 86:20
  87:17 93:9,16
  103:6,12 104:11
**given** 9:2 14:11
  26:22 51:9 74:23
  77:21 85:21 86:3

86:4,17 87:24
  89:10
**gives** 46:24 84:3
  94:19
**giving** 13:8 19:25
  72:5
**glanced** 38:18
**global** 8:17
**glover** 4:5 5:8 6:5
  7:18,18 8:13
  11:24 35:22 38:22
  39:2 41:12 58:12
  59:1 104:25
**go** 9:7 14:21 17:1
  18:16,17,25 43:25
  44:7 50:11 51:21
  52:12 55:10 58:21
  62:24 67:21 68:9
  68:9 69:11 79:11
  97:19 100:3,3
  103:5
**goes** 74:9
**going** 9:19,24 15:4
  36:1 40:17,20
  44:2 46:2 48:2
  55:22 58:12,19
  59:11 76:10 83:25
  90:10
**gold** 103:8
**good** 7:2 8:22,24
  58:14 67:7,7
  75:15 88:3,19
**gotten** 90:21
**governor** 106:10
**grant** 22:9,14
**great** 9:21
**greater** 97:11 98:3
**group** 99:14
**guarantee** 76:8
**guarantor** 75:7
  76:23 90:18 91:1

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[guess - june]                                                              Page 9

**guess** 30:19 90:5
  103:3
**guessed** 89:9
**guidance** 28:15,18
  29:12,12 95:6
  100:21
**guide** 28:22
**guidelines** 95:21
**guy** 102:21
**guys** 105:3

### h

**hagenau** 38:3
**hagenau's** 38:16
  39:8,11,22 40:4
**half** 9:22 19:12
  70:11
**hall** 3:4
**hallboothsmith.c...**
  3:10
**hand** 15:13 21:23
  22:21 25:10 56:22
  65:2 77:17,23
  97:20
**happened** 87:3
  89:19
**happy** 9:17 12:25
  53:16
**hard** 18:3,6 29:18
  29:22 54:14 64:7
  89:23
**head** 11:10 17:8
  18:16 52:7 70:4
  100:3
**health** 74:3 78:11
**hear** 33:6 57:6,11
  62:4 82:3,4 85:17
**height** 79:24 97:15
**held** 2:6
**help** 32:8 65:3
**helped** 35:15

**helpful** 16:4
**helps** 30:6 41:6
**high** 70:7 81:14,15
  81:21,23,24 82:8
  82:16,16,20 83:2,5
  83:6 86:2 93:6
  98:23 99:1,16,18
  99:20 100:10
  103:17
**higher** 11:12 71:4
  90:2
**highest** 77:3
**highly** 89:17
**history** 10:13
  32:11 78:11 88:17
**hold** 17:17 97:21
**honest** 84:14,15
**hope** 104:21
**hopefully** 9:13
**hottest** 89:15
**hour** 12:12,15,15
  64:13,20
**hourly** 12:7 13:20
  14:12
**hours** 14:16 15:9
  16:12,17,25 17:1,5
  18:13,18,23 19:1,6
  19:8,14 45:3 68:4
  68:12,16,20,24
  69:3,20,22,24,25
  70:5,8,11
**house** 13:5
**hundreds** 88:25

### i

**idea** 65:13 66:4,10
**identification** 6:3
  6:6,8,10,15,17,19
  6:20,22,25 106:9
**identified** 8:16
  18:11 86:15,16

**identify** 21:4
  32:12
**identifying** 89:4
**identity** 46:24
**ignor** 29:6
**ignorance** 84:13
**immediately** 60:12
  60:23 61:10 62:8
**impaired** 61:2
**impartial** 11:15,18
**impedence** 97:18
**important** 81:1
  100:9
**inaccurate** 84:7
**inadequate** 80:14
**inaudible** 42:7
**include** 31:22,24
  34:4,7 36:10
**included** 40:19
  42:11
**including** 36:6
**incomplete** 34:13
  34:15,21 35:7
**incorrect** 34:13,16
  34:21 35:7 75:19
  75:20
**increase** 98:24
**increased** 5:13
  6:13
**increases** 97:12,13
**increasing** 98:25
**independent** 11:18
  90:6
**index** 5:1 74:22
  79:25 96:23
**indiana** 22:16
**individually** 1:6
**industry** 89:13,24
  90:24
**information** 12:6
  34:12,14,20 35:6

  37:13 51:9 53:21
  66:17 70:22 78:10
  90:21
**injured** 65:12
**instructions** 9:3
  93:9
**intent** 5:17 6:18
**interested** 106:15
**interrupt** 14:22
  73:16
**interstate** 62:17
**introduce** 7:16
**investigative**
  15:10 40:18
**invoices** 5:16 6:16
  14:25 15:10,22,24
  16:8,9,11,19 18:11
  19:13 26:10,18
**involved** 31:23
**issue** 55:24
**issued** 90:5 94:15
  106:10
**items** 24:21 37:5

### j

**j** 1:6
**job** 1:25 75:1
**joint** 95:16
**jointly** 1:6
**joke** 83:16
**journal** 95:22,24
**judge** 21:5
**july** 106:23
**jump** 51:20 70:13
  96:20
**june** 16:15,21 17:4
  18:10 19:7 25:22
  28:8 35:18,21
  47:9

Veritext Legal Solutions

800.808.4958                                                              770.343.9696

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

**k**

**k**  10:5 20:5
**kadi**  20:5
**kales**  1:16 2:5 5:10
  5:21 6:8,24 7:12
  8:15 10:4 91:15
  106:6
**keep**  18:22 30:7
  44:2
**keeps**  52:2
**killed**  65:11
**kind**  18:5
**knee**  52:3,3,8,10
**knew**  65:19
**know**  9:2,16 11:14
  15:16 16:9 18:1
  18:19 20:16 21:25
  22:12 24:25 25:6
  25:13 27:1,2 30:3
  30:5 31:19 32:7
  32:15,17,20,22
  38:3 40:14 42:5
  45:2,23,24 46:7,9
  49:18 54:23 55:10
  57:19 61:12 62:11
  62:11,15 65:16,21
  65:22,24,25 66:13
  66:24 67:5,17,21
  67:23,24 68:4
  75:13 77:19 79:8
  79:12,14,14 80:22
  81:3,24 82:17
  83:8 84:4,16
  85:11 86:20 87:12
  88:15,21 89:6,12
  90:1 93:10 95:3
  96:1,10,12,20
  97:24 98:16 100:7
  101:21,22 102:1
  102:22,25 103:3
  104:9

**knowledge**  95:7
**known**  47:1 67:3
  77:14 99:15
**knows**  64:6,6,7,8,9
  64:11 102:21

**l**

**l**  10:5
**lab**  103:5
**labeled**  40:22
**laboratory**  103:9
**lane**  61:23 62:8
**large**  81:22 82:8
  106:5
**laura**  14:24 25:1,2
  26:22 31:9,17
  41:24
**law**  3:13 29:4
  73:15 100:17
**lawsuit**  16:3
**lawyers**  32:24
**leading**  63:12
**leads**  96:25
**leave**  41:21
**legal**  1:19 2:6 7:6
  32:24 106:7
**legally**  68:12,16
  101:16
**length**  46:22 75:5
  77:12
**lengths**  75:21
**leopard**  80:24
**letter**  5:8,21 6:4
  6:23 23:20 29:13
  92:12,18,19 93:20
  94:1
**license**  73:7 91:23
  91:25
**limited**  19:25
  21:19 93:16
  103:18

**line**  58:8,8,9,16
  59:1,2
**linemen**  99:16
**list**  10:12,19,21
  25:5 37:22 42:9
  104:5
**listed**  37:5 51:11
**listing**  37:1
**literature**  21:1
  71:6 80:16 82:18
  85:7 92:17 93:24
  94:3
**little**  9:9 27:3
  43:16 103:13
**live**  14:5
**livenote**  2:10
**lives**  80:23
**local**  14:1
**located**  7:9
**log**  45:13 46:14
  68:8 69:20
**logs**  45:3 54:2
**long**  15:3 67:24
  70:9 75:2,15
  90:10,14 91:8
**longer**  54:5 76:25
**longest**  77:7
**look**  18:19 22:24
  23:13 24:19 43:10
  43:22 44:4 49:20
  55:10 59:3 68:7,8
  71:6 89:25 90:14
  91:4 97:25 99:14
  99:15 100:4
**looked**  32:11
  48:12,15 61:10
  95:4
**looking**  41:4 48:4
  57:24 58:2,5,25
**looks**  10:25 15:11
  70:21 79:5,6

**lost**  9:21 17:21
**lot**  36:19 64:3
  89:21 96:21
  102:20
**loud**  81:7
**low**  18:5 84:11,17
  84:22
**lower**  84:3 96:9
**lying**  102:20

**m**

**m**  20:6
**m.d.**  1:16 2:6
  106:6
**ma'am**  8:14
**madam**  15:12
  17:24 21:22 22:20
  25:9 56:21 77:16
  77:22
**magazines**  89:16
**maintain**  29:17,19
  29:20
**major**  85:13,14,15
**majority**  11:3 84:9
  85:6 98:13 100:4
**making**  41:16
  78:18 94:18
**male**  71:1,3 82:15
**males**  71:2
**man**  98:2
**mandated**  5:12
  6:12 89:21
**marcus**  1:6 47:11
**marietta**  3:16
**marked**  5:21 6:2,5
  6:8,9,14,16,19,20
  6:22,23 23:18
**markedly**  88:6
**marks**  80:5
**mass**  74:21 79:25
  96:23 98:25 99:9
  99:12,12,18

**EXHIBIT A**

Stefanos N. Kales , M.D.                September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

**massachusetts**
1:20 2:7,12 7:10
11:16 106:1,5,8,10
**massey** 20:5
**materials** 28:9
37:9,23 41:14
**matter** 7:12 16:1,2
16:8 20:3,23
21:16 22:11 106:6
**maximum** 68:18
74:18
**md** 79:5,6
**mean** 13:15 14:22
30:15 35:11 39:25
43:21 47:19 49:16
53:7,8 55:11
60:24 76:7 80:24
81:12 85:22 87:25
88:14,19 89:2
94:6 99:17 100:17
100:17 102:7,13
102:18,20 103:2,6
**meaning** 62:21
**means** 82:9
**measure** 97:17
98:8,14 100:6
**medical** 5:11,19
6:9,21 25:25
43:13,19,20 44:20
44:20,23 70:24
71:7 72:6,7 73:3,4
73:8,12,18,25
74:10,15,16 75:2,4
75:11,22 76:6,13
76:14,20 77:4,9,12
77:13 78:2,3,6,7
78:22 83:12 85:21
86:18,21,23 87:5
87:16,17,20,24
88:17 89:9,10
90:5,6,17 91:4,5

92:12,18,21 93:2
93:16,20,25 94:5
94:12,13,14,16,19
94:23,25 95:1
100:13,25 101:4,4
101:19 102:8
103:14,24 104:8
104:12,16,18
**medically** 73:19
**medication** 93:6
**medicine** 94:10
95:18,23
**meeting** 71:8
**members** 76:3
**mentioned** 101:8
**messages** 46:21
67:11,18,20
**met** 92:6
**methvin** 4:3
**mic** 52:3,9,11
**microphone** 10:16
57:9
**middle** 71:3 82:15
**miles** 4:4 14:3
**mind** 60:9
**minimum** 12:16
**minor** 80:8
**minute** 40:21 43:9
**minutes** 54:6 56:6
63:12,23 65:22
66:15 67:15
**missed** 89:22
99:22
**missing** 9:14 25:5
28:24
**monday** 31:18
**month** 74:23,24
86:4 103:18
**months** 18:25
19:12 87:2

**morning** 7:2 8:22
8:24 19:9 26:19
48:13,15
**mot** 79:5
**motor** 74:6 100:23
101:7
**mouth** 65:2
**moving** 52:2
**mrb** 96:11
**multiple** 23:16
54:9 83:7 104:9
**muscle** 98:25 99:9
99:12,18 100:11
**muscular** 98:22
99:2,14

**n**

**n** 1:16 2:5 3:1 4:1
5:10,21 6:7,24 7:1
7:12 8:15 10:4
106:6
**n.e.** 3:7
**name** 10:3 46:25
47:1 79:4
**national** 95:19
**necessarily** 64:5
102:11
**neck** 70:23 74:22
79:22 80:17,19,25
81:16,22 82:8,16
82:22 85:4,9,16,25
88:7
**need** 9:18 17:20
34:19 41:10 43:24
52:1,4,24 57:8
65:5 68:10 93:7,8
93:9 102:15 103:5
103:7,8
**needed** 31:13,19
**needs** 75:6,10 91:3
93:5

**negative** 50:10
88:17
**neither** 20:19
106:12
**neurologic** 102:2
**never** 60:15 91:15
91:18
**new** 17:10 34:3
51:9
**nfl** 99:15
**night** 54:16,19,20
59:6 64:8,12,13
66:16 78:15
102:23
**noise** 36:19
**nonadherence**
5:12 6:11
**nonresponsive**
66:2
**noon** 31:20
**noontime** 31:11
**nope** 59:25
**normal** 80:6
**northern** 1:2
**northside** 4:7
**notary** 2:11 8:18
106:4
**notation** 80:9,12
**note** 88:16
**noted** 49:15
**notes** 18:22 28:4
29:24 48:20,24
**notice** 2:8 5:6,17
6:1,18 25:19
37:17
**notified** 22:9
**noting** 30:9
**number** 14:16
15:14,20 17:5
18:12,22 19:1
26:3,6,9 27:18

**EXHIBIT A**

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[number - pelokin]                                    Page 12

41:7 42:8 45:1,2
45:13 46:13,17,23
46:25 47:11 49:4
49:14 51:23 52:19
54:8,9,21 55:14,18
56:1 58:9 59:14
59:16 60:17,19
62:24 63:4 70:13
88:12 95:3 97:9
103:16 104:17
**nw** 4:7

**o**

**o** 7:1
**obese** 90:2 97:3,4
99:8,11
**obesity** 80:1,3
88:4 96:25 97:1,6
97:8 98:15,19
100:5,8
**object** 58:13 66:1
**objections** 8:10
**objective** 89:20
**objectively** 66:20
66:21,23,25 81:10
**obstructed** 85:20
**obstructive** 70:18
71:10,25 72:4,13
72:16 73:1 74:12
78:19 83:13 86:16
87:13,21,23 89:14
92:8 98:9 99:3,25
102:6,10,16,21
**obtain** 86:9 93:11
**obtained** 70:24
**obvious** 103:3
**obviously** 16:7
30:17 43:11 72:9
89:2
**occasionally** 11:17
**occupational**
95:17,22

**october** 106:16
**office** 7:8 13:5
86:6
**offices** 106:7
**oh** 18:14 40:9
**okay** 17:18 22:25
23:19 24:2,11,13
24:17 25:8 26:14
26:21 35:9 36:22
39:20 40:22 42:10
44:6,12 46:2
49:21 54:1 57:21
59:15 62:3 68:23
69:13 77:25 80:10
85:22 87:11
**once** 11:17,25 20:2
30:2 57:23 60:12
60:21 61:8
**ones** 48:17 58:4
**operating** 9:4
51:24
**opinion** 20:15
43:19 51:23 52:19
52:20,21 55:14,18
56:4,5,8 59:14,16
59:22,24 60:11,14
60:17,19,22,25
61:9,11,17,20 63:3
63:3,6,15,16,17
64:2 67:14,21
70:13,16,19,22
75:9 76:11 78:18
89:7,12 92:10,21
92:25 93:15
103:16 104:1,3,6
104:17,18
**opinions** 12:11
19:20 20:1,7,9,18
20:21 21:15 32:9
32:23 33:11,14,18
34:1,5,9 37:10

38:14 39:9,12,24
40:4 43:2,8 44:21
44:24 50:3,5,8,14
50:17,23 51:1,6,13
53:10,10,16 56:1
63:21 78:4,8
96:16
**opportunity** 12:18
12:21,23 44:15
**opposed** 21:6
46:21 98:21 99:8
**oral** 5:6 6:2 93:10
**order** 21:11,13
26:25 45:1 47:4,8
86:10 94:5 103:23
105:8 106:10
**organized** 30:7
**organs** 98:20
**original** 17:11
48:11 105:10,13
**osa** 103:17,20,20
**outcome** 106:16
**outside** 14:2
**overly** 16:4
**overnight** 103:9
**overweight** 80:4
88:6 99:7

**p**

**p** 3:1,1 4:1,1 7:1
**p.c.** 3:4 4:4
**p.m.** 1:18 69:15,15
105:15
**page** 5:2,5 9:5
28:25 40:23 42:19
42:20 45:6,10,11
45:16 48:4,6,6,7
49:17 55:19,20
57:1,16 58:9,9
80:1 81:5
**pages** 23:16 24:12
27:13 38:18,20,21

39:1 42:14,23
43:10,12 45:11
48:6,17 49:8,11
54:2 55:15 56:12
58:10 59:21
**paid** 19:20
**painful** 104:21
**pajamas** 13:13
**paper** 30:5,6,10
95:20
**papers** 28:11 30:8
**paragraphs** 24:16
24:22
**parameters** 82:13
**paraphrasing**
56:19
**parkinson's** 20:13
21:3
**parkway** 4:7
**part** 10:11 14:25
39:4 71:20
**partially** 97:8
**particular** 12:23
29:14 42:25 47:17
47:20 49:10,23
**particularly** 98:19
101:3
**parties** 106:13,15
**pass** 31:9
**passed** 74:4
**passing** 13:18
**patient** 81:13
**patrol** 40:24
**pauses** 81:6
**pdf** 30:18 40:23
42:13,22 45:6,16
47:23 48:4 49:12
49:17
**peachtree** 3:7
**pelokin** 79:7

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[peloquin - provided]                                            Page 13

**peloquin** 79:3,7 85:18 86:12,14,15
**people** 71:8 75:19 89:24 94:7 96:7 99:5,18 103:6
**percent** 10:25 11:4 71:11,15,16 81:8 82:24 98:3
**percentage** 11:6 11:12 97:7 98:11 100:1
**perform** 75:23
**performed** 73:25 79:13 93:18
**performing** 72:10
**performs** 73:22,24
**period** 54:5 63:18 64:2,3,20 68:18 74:18 77:7 96:6
**permitted** 75:8
**person** 11:19 46:9 46:25 65:11,12 72:10 88:3,13 89:3,6 98:21 102:22 103:5,12
**personal** 93:22
**personally** 64:10 79:15
**pesticide** 21:6
**pesticides** 20:12 21:2,4,7
**phone** 18:20 45:21 45:22 46:21,25 54:4 55:13 67:4 67:10,12
**phones** 52:7
**phrase** 77:6
**physically** 68:1
**physician** 88:11 92:5 93:3

**physicians** 95:19 95:24
**picking** 57:9
**picture** 91:20,22 91:25
**pictures** 92:2
**pillars** 85:15
**place** 57:25 58:5 58:24 90:12
**plaintiff** 1:4 3:3 7:19,21
**plaintiff's** 24:23 26:13 27:19,24 28:2 37:13
**plaintiffs** 11:1
**plan** 19:16 51:10
**plans** 51:4,8
**players** 99:15
**pleading** 47:5,6
**please** 7:16,25 9:10,16 10:2 14:21 45:15 52:5 52:15 65:1 77:24 79:20
**plus** 19:22,23 71:1
**point** 34:2 37:14 50:24 58:8,16,20 59:17 61:15 94:18
**pointed** 47:21 49:25
**police** 40:18
**poor** 75:17
**population** 71:12 82:14 96:4 99:10 104:10
**populations** 82:19 84:21 95:4
**portion** 14:2,4
**portions** 49:23 55:17

**portis** 4:3
**positions** 99:17
**positive** 86:8
**possible** 46:19 54:4 61:21 62:10
**practice** 80:12
**practices** 91:9 95:9,13
**preceding** 74:17
**predisposed** 71:2
**preferably** 93:10
**preparation** 13:21 31:7
**prepare** 13:11 15:6 27:16 33:10 36:9
**prepared** 15:23 16:7,9,19 17:11 22:5 45:23 46:7,9 48:11
**preparing** 12:10 13:3 15:8 16:18
**prescribed** 106:9
**present** 4:12
**pressed** 89:23
**pressure** 80:10 81:14,15,23,25 83:1,2,3,5,7 85:10 86:2 93:7
**pretty** 12:24 49:21 58:14 65:12
**prevalence** 99:16 99:21
**previous** 88:2,10 88:11
**previously** 11:13
**primarily** 85:9
**prior** 16:25 63:23 67:25 70:10 78:19 94:23

**probability** 71:10 72:6 82:20,23
**probably** 10:9 19:17 27:3 31:14 75:12 102:25
**problem** 25:7 89:14
**procedure** 85:23 90:14
**procedures** 76:18 90:11
**proceedings** 106:11
**produce** 94:6
**produced** 106:11
**product** 45:14 46:14
**production** 8:17
**professional** 2:9 102:9 106:4,21
**professionals** 89:11
**prohibit** 60:25
**prohibited** 19:24 61:3,15 101:24
**prohibits** 69:1
**pronouncing** 38:4
**proper** 85:23 86:9
**protein** 80:8,13
**protocol** 89:20 103:11
**protocols** 85:7 90:11
**provide** 12:14 24:23 27:23 30:23 33:14 51:6
**provided** 10:12,24 12:4 15:11 24:23 26:12 27:4 28:10 31:21 37:12 40:13 41:14 47:17 49:10

Veritext Legal Solutions
800.808.4958                                            770.343.9696
EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[provided - relied]                                        Page 14

71:20 106:9
**provider**  74:4,11
**provides**  46:22
**providing**  32:23
**proxy**  98:14 100:6
**public**  2:11 8:18
  106:4
**published**  88:25
  95:20
**pull**  48:3 56:14
  57:25 58:5,23
  59:3 62:13,16
  65:23
**pulled**  54:12 56:13
  56:16 60:12,22
  61:9,18
**purported**  27:5
**purpose**  36:3,6,12
  53:12 73:18
**purposes**  8:8
  22:11 53:14,15
**pursuant**  2:7 8:7
**put**  13:14 14:17
  17:18 41:15 65:1
  84:8 100:14,16
**puts**  71:3
**putting**  31:6

**q**

**qualification**
  26:24 42:8 43:1,7
  43:18 91:23
**qualifications**  21:8
  35:25 36:11
**qualified**  77:11
**quality**  75:17
**question**  8:11 9:11
  9:19,24 11:10
  16:7 17:20 18:15
  29:9 31:4 36:5
  39:14,16 59:1,7,10
  62:1,6 64:1 65:5

66:8 74:1 81:5,10
  82:4 83:23 85:14
  85:17 92:20
**questionnaire**
  83:18
**questions**  9:16
  18:5 53:17 88:12
  88:18 104:24,25
**quick**  9:8
**quickly**  51:21
**quite**  36:8
**quote**  54:17 99:7

**r**

**r**  3:1 4:1 7:1 41:8
**range**  99:8,8
**ranges**  42:18
**rate**  12:7 13:20
  14:12,13
**rates**  13:25 14:8
  14:11,13
**ratio**  97:14
**rationale**  50:18
**read**  17:25 21:13
  40:15 48:9,10
  49:8,9,18,21 79:4
  103:25
**reader**  58:14
**reading**  83:2,3,6
  90:25 106:12
**readings**  83:8
**ready**  8:14 13:14
  22:1,2 57:19
  58:21,23 100:2
**real**  9:7
**realizing**  59:19
**really**  18:3 31:16
  32:21 84:14,14,23
  88:16
**reason**  11:11,20
  96:11

**reasonable**  34:24
  72:6
**reasoning**  93:25
**reasons**  33:18 34:5
  54:22
**recall**  23:3,8 35:20
  40:14,16 49:8,16
  55:9 70:3
**receive**  37:17
  74:19 86:11
**received**  22:7 23:5
  25:2 31:14 37:15
  37:18 38:2 46:10
  103:17
**recertification**
  86:11
**recess**  44:11 69:15
**reckless**  60:2,9
  63:2,18 64:4,16,17
  65:19
**recklessness**  59:18
**recognizable**
  82:12
**recognize**  80:4
  88:5
**recollections**
  76:20
**recommendation**
  25:24 96:14
**recommendations**
  71:8,18,20 94:6,19
  95:2 96:15 100:12
**record**  7:3,17 8:4
  10:3 23:25 44:7
  44:10,13 55:23
  58:19 69:12,14,17
  80:17 105:7
  106:11
**recorded**  53:10
**records**  18:20,20
  54:4 67:11

**refer**  50:2
**referenced**  28:18
  28:21
**referred**  27:12
  44:16 67:9 73:3
  83:19
**referring**  31:8
  45:5 58:10 71:19
  73:6,7
**refers**  28:25 56:5
**refined**  96:1
**regarding**  27:20
  76:21 83:12
**registered**  2:9
  74:5 106:4,21
**registry**  74:7
  75:18 76:2,4
**regulation**  28:15
  29:14 61:16 68:15
  68:25 101:14,22
**regulations**  28:18
  29:2 60:25 68:11
  68:21 70:1,6 76:5
  90:25 94:21
  100:23 101:7
**regulatory**  28:15
  29:11
**relate**  21:6 100:24
  101:3
**related**  20:10
  30:16 42:13 45:21
  94:3 106:13
**relating**  27:6
**relative**  16:2 43:18
  106:14
**relatively**  51:21
**relevant**  39:23,25
  43:2,8,14 44:21,24
  50:5,11
**relied**  28:16 37:2,9
  50:13 78:3

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

**[rely - scribble]**                                                    Page 15

**rely** 28:12 33:19
  55:17 63:21 85:3
  85:5,9 93:19
**relying** 51:17 56:4
  56:10 67:11 78:8
  92:15 96:18 104:8
**remained** 100:20
  100:20
**remedied** 102:4
**remember** 48:14
**render** 76:10
**repeat** 9:17 14:10
  17:20 60:8 65:5
  82:5
**repeatedly** 55:8
**rephrase** 9:17
**report** 10:11 13:3
  17:11 25:21 26:3
  26:25 27:12 28:8
  28:19,21 29:15
  30:16 33:10 34:12
  34:17,18,20,20
  35:8,12,17 36:7,10
  36:14 37:16,18
  38:2,8,9,13,17
  39:8,12,22 44:17
  48:12,17,18 49:1,3
  49:3 50:2 51:2
  53:11,12 58:11
  63:15 95:12
**reported** 1:23
**reporter** 2:9,10,10
  7:5,25 10:14,19
  15:13 17:13,24
  18:1 21:22 22:20
  25:9 35:1 41:10
  43:3 45:24 52:1,4
  52:10,15 56:21
  57:6 62:20 65:1
  71:13 72:18,20,22
  77:16,22 81:18

82:1 101:10 105:9
  105:12 106:4,21
**reports** 12:11
  27:16
**required** 21:5
  73:13 103:19,21
**requirement**
  100:18 101:17
**requirements** 33:1
  74:5 76:2
**research** 13:16
  62:14 93:23 95:3
  96:3,19 98:18
**reserve** 8:9 104:25
**respectfully** 53:9
**respiratory** 102:2
**responses** 8:11
**responsibility**
  65:19
**responsive** 24:21
  27:9
**rest** 53:7,8
**restate** 9:17
**rested** 54:7,23
  60:16 67:6,8
**results** 74:17
**retained** 5:18 31:1
**retention** 28:1
**return** 86:6
**review** 5:11 6:9
  13:12 15:17 24:14
  25:15,25 36:23
  38:7,10,16,25 39:4
  40:3 44:16 47:14
  47:18 48:8 49:6
  49:11,13,25 57:1
  57:16 69:20 71:7
  75:6,10,15 77:20
  90:9 91:10 92:13
  92:19 93:20,25
  94:5,16,19,23 95:1

95:20 100:13
  104:8
**reviewed** 17:9
  26:25 27:2 38:5,9
  39:22 40:7,10
  48:1 54:25
**reviewing** 12:10
  13:2 16:22 48:19
  57:4 76:13
**rhythms** 38:23
**rid** 30:8,9
**right** 24:9 38:4
  50:16 87:11 89:2
**risk** 5:13 6:13 71:4
  82:12 86:2,16
  87:22 89:2 90:2
  96:24 97:1 98:9
  99:2,25 100:5,9,11
  103:17
**risky** 54:21 64:11
**road** 61:7,12,19
  62:11 65:10 75:8
**robert** 41:8
**roberts** 1:4 7:13
  40:5,8,11 49:4
  62:19 106:6
**room** 94:7
**roosevelt** 3:15
**roughly** 15:9
  69:24 81:7
**rpr** 1:23
**rugemer** 90:23
**rule** 74:25 84:18
  100:17 101:21,23
**rules** 8:8
**rws** 1:6 7:15

---
                    **s**
---

**s** 3:1 4:1 7:1 10:5
  20:6,6 41:7
**safe** 57:24 58:5
  62:16,19 65:17

**safety** 74:6 75:14
  76:16,23 89:17
  90:8,13,18,20
  91:13 100:23
  101:7
**sam** 41:7
**sample** 62:22
**sandra** 1:23 2:8
  7:5 106:4,20
**satisfactorily** 8:16
**satisfactory** 106:9
**saying** 9:23 64:6
  75:13 80:21 81:12
  82:25 94:22
**says** 24:6 58:21
  67:6 91:3
**scale** 83:20,21
  84:3,12
**scales** 97:19
**scan** 30:12,21
  97:23
**scanning** 30:8
**scans** 97:24
**schedule** 5:15 6:14
  12:5 26:7 28:3
  54:19
**scheduling** 45:1
  47:4
**school** 103:15
**science** 40:2 100:8
**scientific** 28:11
**scores** 84:22,24
**scox** 3:10
**screen** 84:20
  101:20 103:14
**screening** 80:15
  81:2 82:13 83:14
  85:3,7,15 89:20
  94:4 95:21 103:10
**scribble** 30:1

**EXHIBIT A**

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[se - stamps]                                                Page 16

se  98:17
sean  3:5 7:22
   37:19 38:8
second  37:24 44:8
   45:15 79:20 80:3
   89:8 90:5
seconds  46:23
section  35:24 36:3
   36:11,13,15 40:17
   40:18 50:17,22
   51:12
sections  48:13,14
see  17:19 23:19
   24:4 43:15 57:7
   58:15,22,24,25
   68:23 80:1 88:2
   89:1,19 97:25
seeing  23:8 58:15
   72:10
seen  21:10 23:1,3
   91:20,22
send  93:4
sending  96:9
sense  76:1 97:5
sent  29:13 41:25
   42:1 92:11,22
sentence  9:22
separate  15:22
september  1:17
   2:1 7:7 22:5 106:8
serious  5:13 6:13
seriously  65:11
   84:17
serve  5:17 6:18
service  12:9 45:4
   68:24 69:20
services  20:6
sex  82:22
shave  13:14
shift  54:8 64:8,14
   64:16 66:16 68:19

78:15
short  43:15 44:1
   52:20 53:9
shorter  74:20
   77:12
shorthand  2:9
shoulder  62:13
show  54:4 84:21
   86:9
side  61:19 62:16
sideways  57:7
signature  106:19
significant  20:12
signing  106:12
simply  20:25 36:8
   47:8 72:5 97:2,13
   98:12 99:9,11
   100:6
simultaneously
   95:22
single  48:6 70:8
   83:2,5 96:13
sir  12:9,22 14:15
   21:17 22:19 23:21
   23:24 25:23 26:5
   33:22 34:6,10,11
   40:22 41:2 42:16
   42:24 44:18 45:10
   46:15 47:7 48:16
   51:18 55:16 56:25
   57:14 59:10 60:14
   61:7,17 62:6 63:1
   63:5 67:13,16
   71:22 78:24 87:1
   92:1
sit  14:18 15:3
six  64:15,21 74:24
size  62:22 98:21
sleep  5:12 6:12
   38:23 54:5,14,15
   54:18 63:18,23

64:2,3,4,7,9,10,19
65:17,18 66:14
67:3,4,5 70:18
71:2,10,25 72:4,11
72:13,17 73:1
74:11,12,25,25
78:19 80:15,20
81:3,5,9,11,23
82:9,23 83:13
84:6,18,20,23,25
85:1,20 86:2,7,7
86:17 87:13,22,23
89:14,22 90:2
92:8 93:5,8,17
94:3,3 95:19,21
96:10,25 98:10,18
99:3,16,21,25
100:5 101:8,13,20
101:23 102:6,10
102:16,22,24
103:5,9,20
sleepiness  38:24
81:4,7 83:20,21
84:3,11
sleeping  78:14
sleeps  64:12
sleepy  53:3 84:1,9
slept  63:11 65:21
small  28:14
smith  3:4
snoring  81:7
102:23
societies  94:25
solutions  1:19 2:6
7:6 106:7
somebody  81:24
103:2
somewhat  33:2,4
33:7
soon  61:21 62:10

sooner  30:7
sophisticated
   97:14,24
sorry  12:20 14:22
   17:14 29:6 30:24
   31:3 33:3,5 36:4
   38:7 43:3 46:18
   48:2 59:7 60:5,8
   61:5,25 62:3
   63:19 66:22 79:10
   85:18 87:8 93:1
   101:1,10
sort  41:25
sounded  31:4
sounds  9:21 34:24
sources  56:3
speak  102:4
speaking  7:4
special  47:22
specific  11:20 16:6
   19:3 20:24 21:4,6
   88:18 93:2
specifically  18:24
   67:23 90:12
specify  46:2 90:10
spend  16:25
spent  15:7 16:12
   16:17,21 17:5
   18:13,18,23 19:9
   19:11
spoke  31:17
spots  80:23
square  55:11,12
ss  106:2
staff  88:7
stamp  41:1,5
   42:17
stamped  41:3
   42:15 45:7
stamps  45:9,17

EXHIBIT A

Stefanos N. Kales , M.D.                    September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[stan - think]                                                    Page 17

**stan**  95:8
**standard**  80:11 95:8 103:8
**standing**  98:10 99:24 105:8
**start**  30:22 31:5
**started**  56:7 57:23 58:4,4 59:2 60:13 60:15,18,21 61:8 63:7 64:20 65:14 66:5,25
**starting**  64:16
**state**  11:15 22:16 32:13 40:24 62:15 69:2
**statement**  23:22 35:25 50:17 56:15 94:24
**statements**  54:10 55:12
**states**  1:1 24:6
**stating**  47:8
**statistically**  20:11 20:12
**statistics**  62:15
**statute**  28:14
**stefanos**  1:16 5:9 5:21 6:7,24 7:12 8:15 10:4 106:6
**stephanos**  2:5
**stephen**  10:4
**steve**  49:13
**stick**  32:22 53:15
**stipulations**  8:4
**stop**  62:8
**stopped**  61:21,22 62:7,10
**straight**  8:5 57:8 65:22 89:25
**straightforward**  12:25

**street**  1:19 2:7 3:7 3:15 7:10 106:8
**stricken**  20:16
**striking**  20:20
**struck**  21:16
**studied**  85:8 88:24
**studies**  21:3 81:4 82:19 83:21 84:19 95:3 98:14 100:4 104:9
**study**  22:15 72:11 74:25 80:20 84:4 86:7,7 93:5,9,17 96:10 98:13 103:9
**stuff**  9:14 32:24
**subjectively**  66:20 66:23
**submitted**  14:24
**submitting**  37:16
**subpoena**  5:17 6:19 23:5,9,10,14 24:3 27:10
**subsequently**  37:16
**successful**  103:22
**suffered**  70:17
**suffolk**  106:2
**suggested**  80:19
**suggestion**  41:12 41:16
**suggests**  98:18
**suit**  13:14
**suite**  4:8
**summary**  96:13
**supplement**  34:16 34:19 35:8 51:2
**supports**  21:1
**supposed**  13:17 93:18
**sure**  9:4 17:23 18:8 25:3 27:11

37:25 40:21 44:3 49:21 52:17 53:18 55:20 65:6,13 69:10 75:16 79:5 97:6
**surrounded**  30:6
**swear**  7:25 8:2
**sworn**  8:18
**symptoms**  86:3
**synonymous**  60:9
**system**  19:3
**systems**  85:3,16

**t**

**t**  41:8
**tailgate**  58:22
**tailgating**  59:8
**take**  5:6 6:1 7:10 22:24 24:18 29:24 43:25,25 44:3 49:20 69:8 84:17 102:8
**taken**  8:6 44:11 69:15 88:9 106:8 106:14
**takes**  13:10
**talk**  27:3 29:7 52:25 53:18
**talked**  45:2 50:21 91:15 96:21
**talking**  75:14
**task**  95:16
**technical**  20:2,23 21:16
**telephonic**  3:6 4:6
**tell**  15:19 18:15 22:3,23 25:1 36:2 36:14 42:11,17 45:14 50:19 52:5 57:4 58:7,8 62:25 68:11,15 70:14 83:25 86:24 93:11

**telling**  94:2
**tells**  81:14
**ten**  37:5
**tend**  99:19
**term**  40:25
**terms**  76:18 101:18
**tested**  81:10
**testified**  8:19 10:6 11:12 14:5 55:2,8 57:23 58:3
**testify**  13:23
**testimony**  10:12 10:21,25 12:14 21:5,19 40:4 54:10 56:3,11,17 56:20 63:11 64:18 82:7,10,11 90:4,7 101:13
**testing**  92:11,23 93:11
**tests**  37:2 84:7
**text**  46:3,20,22 67:11,18,20
**texting**  45:22
**thank**  7:24 8:14 9:1 16:10 33:8 44:5,6 47:10 51:19 57:20 69:21 70:12 105:2,3
**thereto**  106:15
**theses**  28:11
**thing**  28:20 49:22 69:10
**things**  13:17 74:9 74:11 94:13,15 97:23
**think**  12:24 18:1 22:11 31:17 39:18 39:19 41:23 42:3 43:21 49:5,7

EXHIBIT A

Stefanos N. Kales , M.D.          September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[think - videographer]                                    Page 18

51:20 58:14 83:13
90:12 93:8 94:8,9
96:12
**thinking**   58:1 59:8
59:9
**third**   84:5
**thought**   17:22
29:3 58:24 77:11
**three**   15:21 18:25
19:12 70:11 74:23
74:23 86:4 94:25
103:11
**threshold**   96:9
**thumb**   41:15
**tied**   11:21
**time**   7:7 15:7
16:21 17:3 18:3
19:11 21:18 30:1
30:2 40:16 43:25
44:9,12 46:4
48:11 49:7 54:15
56:6,8,9,9 67:10
68:22 69:13,16
70:18 77:13 79:24
95:25 96:6,7
103:18 104:20
105:5
**times**   10:6,10
11:23 32:15 45:20
45:21 46:20 47:25
102:20
**titled**   35:24 37:1
**today**   8:23 13:9
17:4 18:12 19:13
25:19 40:2 41:21
**today's**   7:6 31:7
34:14 35:6
**told**   19:9 23:10
31:12 35:15 72:12
72:16,25

**tom**   41:8
**top**   11:10 17:7
18:15 24:7 70:3
**topics**   24:15 89:16
**total**   10:9 14:16,18
15:3 17:5 18:12
18:16 19:19 69:9
**totality**   50:23
**tractor**   51:24 53:5
73:19
**trailer**   51:24 53:5
73:19
**train**   13:7 17:21
**training**   51:15
92:17 93:23
102:15 103:13
**transcribe**   30:13
**transcribed**   106:8
**transcript**   106:11
**transfer**   30:3,11
**transferred**   30:19
**transportation**   1:5
7:14 106:7
**travel**   61:23 62:8
**treating**   93:3
**treatment**   5:13
6:12 86:9,10
103:22,22
**trial**   13:24 14:6
105:1
**trouble**   78:14
**truck**   5:13 6:13
71:11 75:14 76:11
77:4 81:2 82:14
83:16,22 84:3,5,9
84:22 85:15 94:4
95:4 99:10 102:6
**trucking**   75:9,15
76:12,17,22 84:21
89:13,16,17,18,24
90:4,8,9,19,20,24

91:1,3,7,12 96:3
104:10
**true**   106:11
**try**   9:12 19:1
**trying**   84:1
**tuesday**   31:20
**turn**   36:13 50:16
57:10 59:13 81:8
86:23
**twice**   11:17 28:25
**two**   9:14 12:15
13:25 24:12 31:16
73:14 74:19 77:1
77:3,7 78:22 81:1
82:11,12 85:21
86:18,21 87:5,17
87:24 89:9,10,19
99:4 104:12
**type**   28:14 36:9
48:5
**types**   99:17,18

**u**

**u.s.**   84:5
**ultimate**   75:7
76:23 90:18 91:1
**uncontrolled**
102:2
**undergo**   73:14
103:19
**underlies**   92:17
93:24
**underlying**   71:7
**understand**   9:15
9:19 18:7 20:22
32:21 33:9,12,13
34:11 36:5 39:16
50:25 82:1 90:22
94:11
**understanding**
16:16 18:4 21:17
59:5 61:14 75:13

76:19 90:8,15
91:6,9 101:16
**understood**   9:20
9:25 26:21 40:2
51:3
**uninterrupted**
63:23
**united**   1:1 24:6
**unqualified**   20:17
**unquote**   54:18
99:7
**unreliable**   20:18
**unsafe**   53:3
**untreated**   70:17
101:23
**update**   22:10
**urea**   80:13
**urine**   80:8
**usb**   42:5
**use**   8:12 50:7
97:17 98:1,14,17
**useful**   82:13 84:7
84:12
**utilize**   100:6
**utilized**   94:5 96:15

**v**

**vacation**   13:6
**valid**   103:24
**various**   42:12
**vast**   84:8
**veritext**   1:19 2:6
7:6,9 106:7
**version**   48:3
**versus**   7:13 20:5
20:24 84:25 98:1
**video**   91:21 92:2
**videoconference**
3:6 4:6 9:9
**videographer**   4:12
7:2,4,24 44:9,12
52:2,6,8,12,14

Stefanos N. Kales , M.D.　　　　September 25, 2019
Roberts, Callie D. Vs. AAA Cooper Transportation, Inc., Et Al.

[videographer - zeros]　　　　　　　　　　　　　　　　Page 19

69:13,16 105:5
**videotaped** 1:16
5:6 6:1 7:11
**visceral** 98:19
100:8
**vitae** 5:9 6:7 22:4
**vs** 1:5 106:6

**w**

**wait** 9:10
**waiving** 106:12
**want** 8:3 11:21
16:5,6 29:7 44:2
53:13 66:14 73:16
98:15 99:13
101:15 102:13
103:4,7
**wanted** 45:25
103:10
**water** 97:22
**watkins** 3:12,14
7:20,20
**watkinslaw.com**
3:17
**way** 9:13 17:2
21:20 30:5,20
32:5 40:22 42:4
54:6,18 61:11
75:12 84:8,18
97:2,10
**ways** 97:9
**we've** 11:25 27:21
49:5 50:21
**wednesday** 1:17
**weeds** 101:16
**week** 68:5,13 69:4
69:4,6,23 70:2
**weeks** 31:16
**weight** 79:24
97:14
**went** 65:10 87:6

**wheel** 54:24 65:10
65:24
**white** 91:24
**wife** 102:20
**witness** 8:1,3 12:3
21:23 25:10 44:6
62:21 71:15 72:21
77:17,23,25 82:3
105:3 106:9,12
**women** 98:3
**word** 30:13,17
101:8
**words** 26:23 56:18
90:3 94:1 96:8
**work** 13:12 29:22
30:14 45:13 46:14
51:5 68:8 90:24
**worked** 11:23,25
19:6 68:5
**working** 18:23
64:8
**works** 41:18
**worries** 36:21
**worry** 32:24
**write** 26:25 35:11
35:17
**writing** 93:11
**written** 53:8,11,16
**wrote** 35:16,19

**y**

**y** 20:6
**yeah** 26:16 30:20
59:4 83:16 100:3
**year** 11:18 85:21
86:18,21 87:5,17
87:24 89:9 104:12
**years** 11:2,8 73:14
74:19 77:1,3,7
96:2
**yep** 52:14 70:15

**yesterday** 16:22
19:10 22:9 26:13
31:11,20 38:1,1
**yu** 17:25

**z**

**zeros** 42:20

Veritext Legal Solutions

EXHIBIT A

```
                    Georgia Code

                 Title 9, Chapter 11

               Article 5, Section 9-11-30
```

(e) Review by witness; changes; signing.

If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

EXHIBIT A

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT A

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | |
|---|---|
| **CALLIE D. ROBERTS,** | |
| **PLAINTIFF,** | **CIVIL ACTION FILE NO.** |
| | **2:17-cv-232-RWS** |
| **v.** | |
| **AAA COOPER TRANSPORTATION, INC., and MARCUS J. BUSH, Individually and Jointly,** | |
| **DEFENDANTS.** | |

**NOTICE TO TAKE VIDEOTAPED DEPOSITION
UPON ORAL EXAMINATION**

TO:   Stefanos N. Kales, M.D.
       c/o Christopher D. Glover, Esq.
       Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
       4200 Northside Parkway, NW
       Building One, Suite 100
       Atlanta, Georgia 30327

**YOU ARE HEREBY NOTIFIED** that on, **Wednesday, September 25,**

**2019** beginning at **10:00 A.M.**, counsel for Defendants will take the deposition of

**STEFANOS N. KALES, M.D.** pursuant to the pursuant to the provisions of Rule

30 and 32 of the Federal Rules of Civil Procedure for purpose of discovery and all

other purposes allowed under the Rules for use at trial.



EXHIBIT A

The deposition will be taken at the offices of **Veritext** located at **101 Arch Street, Suite 650, Boston, MA 02110; Telephone: (844) 838-1396** before a court reporter and videographer provided by Defendants. The examination shall include all matters relevant to the subject matter of the litigation, and will continue from day to day until completed.

Respectfully submitted this <u>10th</u> day of September, 2019.

**HALL BOOTH SMITH, P.C.**

SCOTT H. MOULTON
Georgia Bar No. 97423
SEAN B. COX
Georgia Bar No. 664108
*Counsel for Defendants*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1775
Tel: 404-954-5000
Fax: 404-954-5020
smoulton@hallboothsmith.com
scox@hallboothsmith.com

2

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| **CALLIE D. ROBERTS,** | |
| **PLAINTIFF,** | **CIVIL ACTION FILE NO.** |
| | **2:17-cv-232-RWS** |
| **v.** | |
| **AAA COOPER TRANSPORTATION, INC., and MARCUS J. BUSH, Individually and Jointly,** | |
| **DEFENDANTS.** | |

## CERTIFICATE OF SERVICE

This is to certify that I have this date served a copy of the within and foregoing *NOTICE TO TAKE VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION* by depositing same mail in the United States Mail in a properly-addressed envelope with adequate postage thereon to:

Charles D. Graham, Esq.
The Graham Law Firm
3350 Riverwood Pkwy.
Suite 1900
Atlanta, Georgia 30339

3

EXHIBIT A

E. Brian Watkins, Esq.
Resurgens Plaza
945 E. Paces Ferry Road
Suite 2600
Atlanta, Georgia 30326

Christopher D. Glover, Esq.
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
4200 Northside Parkway, NW
Building One, Suite 100
Atlanta, Georgia 30327

Respectfully submitted this 10th day of September, 2019.

**HALL BOOTH SMITH, P.C.**

SCOTT H. MOULTON
Georgia Bar No. 97423
SEAN B. COX
Georgia Bar No. 664108
*Counsel for Defendants*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1775
Tel:  404-954-5000
Fax:  404-954-5020
smoulton@hallboothsmith.com
scox@hallboothsmith.com

4

EXHIBIT A





Stefanos N. Kales, MD, MPH, FACP, FACOEM
Professor of Medicine, Harvard Medical School
Professor & Director, Occupational Medicine Residency,
Harvard TH Chan School of Public Health
Division Chief OEM, Cambridge Health Alliance

CHRISTOPHER D. GLOVER
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
218 Commerce St. (36104)
Post Office Box 4160
Montgomery, AL 36103-4160

03 June 2019

Re: CALLIE D. ROBERTS v. AAA COOPER TRANSPORTATION, INC.;
    and MARCUS J. BUSH, Individually and Jointly

Dear Mr. Glover,

Thank you for requesting an expert report regarding Mr. Bush's fatigue, sleepiness, medical conditions and medical qualification as these related to his ability to drive a commercial vehicle and the fatal accident of October 31, 2015.

**A. Statement of expert qualifications:**
1) My name is Stefanos N. Kales MD, MPH, FACP, FACOEM and I am a Professor of Medicine at Harvard Medical School. I am a graduate of Harvard Medical School and Harvard School of Public Health, and I have formal training in internal medicine, public health and occupational medicine. I am licensed to practice medicine in the Commonwealth of Massachusetts.

2) I am also Professor & Director of the Occupational Medicine Residency at the Harvard School of Public Health. As such, I am responsible for the post-graduate training of physicians in occupational medicine, including the examination of transportation operators such as truck drivers and the performance of commercial driver's license holder medical examinations, as well as education on the effects of shift work, fatigue and sleep disorders on drivers and other workers.

1

Cambridge Hospital • Department of Medicine • Suite 427
1493 Cambridge Street ∘ Cambridge, MA 02139



EXHIBIT A

ROBERTS v AAA COOPER TRANSPORTATION, INC & MARCUS J. BUSH   02 June 2019

3) In addition, I am the Chief of Occupational & Environmental Medicine and Medical Director for Employee Health & Industrial Medicine at the Cambridge Health Alliance, a Harvard-affiliated hospital system.  Our clinic has about 850 external client companies (public and private entities), many of which employ professional drivers.  I supervise resident and staff physicians in the conduct of commercial driver's license holder medical examinations.  I am a Certified Medical Examiner of the National Registry of Certified Medical Examiners of the Federal Motor Carrier Safety Administration since 2014.

4) As a result of my expertise regarding obesity and cardio-metabolic risk factors and leading various scientific investigations related to obstructive sleep apnea (OSA) in transportation, I was invited to join the Harvard Medical School's Division of Sleep Medicine. I currently serve as a member of the Executive Faculty Committee of the Division of Sleep Medicine.

5) I have also lectured extensively at regional, national and international meetings on fatigue and OSA in the trucking industry from the standpoint of occupational health. These include several keynote lectures in Japan and serving as Chair and lecturer in several international sessions on occupational sleep medicine.

6) Overall, I have participated in a wide range of research, advisory and teaching activities in occupational medicine on five continents resulting in over 165 publications and wide recognition nationally and internationally.

7) I serve on the editorial boards of several biomedical journals and participate in Harvard's multidisciplinary Cardiovascular Epidemiology Program.

8) In April 2013, I was presented the Kehoe Award for Excellence in Education and Research in Occupational and Environmental Medicine by the American College of Occupational and Environmental Medicine (ACOEM) for my academic leadership in and contributions to the field of OEM.  In part this was to recognize my contributions to occupational sleep medicine.

9) In December 2014, I received the highest honor of the New England College of Occupational and Environmental Medicine (NECOEM) for my academic and leadership contributions.

10) I recently chaired a Continuing Medical Education program on Sleep Disorders regarding Commercial Drivers for the National Sleep Foundation, which is now available as a video course.

11) Attached is my updated CV for further details of my qualifications, including all publications.

**B. Listing of all documents, tests, facts and data relied upon:**

1) Police investigative file
2) Bush phone records
3) Driver Qualification File

2

**EXHIBIT A**

ROBERTS v AAA COOPER TRANSPORTATION, INC & MARCUS J. BUSH   02 June 2019

4) Consent Scheduling Order
5) Driver's Logs.
6) Call Log – Work Product.
7) Amended Scheduling Order.
8) Marcus Bush deposition (with exhibits)
9) Callie Roberts deposition
10) Steve Aronhalt deposition

**C. Statement of expert opinions and their basis and rationale.  All of my opinions are based on a reasonable degree of medical certainty:**

Opinion 1. On the early morning of October 31, 2015, Mr. Bush was operating the tractor trailer while his ability and alertness were so impaired through fatigue so as to make it unsafe for him to continue to operate the tractor trailer.

Bases: Mr. Bush admitted to the police and in his deposition testimony that he fell asleep at the wheel causing the crash. Moreover, he admitted in his deposition (pp 89-90) that he felt funny before the crash and should have pulled over, but did not.

Opinion 2. Mr. Bush was extremely careless to the point of reckless in continuing to drive after realizing that he was fatigued while driving and before the crash.

Bases: "FMCSA regulations prohibit a driver from beginning or continuing to drive if their ability and/or alertness is impaired by: fatigue, illness, or any cause that makes it unsafe to begin (continue) to drive a commercial vehicle..." 391.45 (https://www.fmcsa.dot.gov/faq/my-medical-certificate-still-valid-am-i-prohibited-operating-cmv-if-i-have-medical-cond ).

Mr. Bush admitted in his deposition (pp 89-90) that he felt funny before the crash and should have pulled over, but did not.

Opinion 3. Mr. Bush was extremely careless to the point of reckless in beginning to drive on a night shift knowing that he did not obtain proper rest before beginning a shift of night driving at 2030 hours on October 30, 2015.

Bases: "FMCSA regulations prohibit a driver from beginning or continuing to drive if their ability and/or alertness is impaired by: fatigue, illness, or any cause that makes it unsafe to begin (continue) to drive a commercial vehicle..." 391.45

Mr. Bush admitted in his deposition (pp 67 and 138) that it is difficult to sleep during the daytime; he agreed that it was his responsibility not to drive fatigued (pp. 69-70); he agreed that he could not be safe if he did not sleep (p. 74); he also admitted that he "can't sleep anyway well" (p.78) and that he was still adjusting to the night schedule (p. 86). He also agreed that

EXHIBIT A

ROBERTS v AAA COOPER TRANSPORTATION, INC & MARCUS J. BUSH   02 June 2019

driving at night was more risky (p. 139); yet, preceding the work-shift when he caused the fatal crash on October 31, 2015, his phone records show no possible period for consolidated sleep longer than 69 minutes (1810-1919) between 0700 on October 30, 2015 when he got off duty and before going on duty at 2030 on October 30, 2015.

Opinion 4. Mr. Bush most likely suffered from untreated obstructive sleep apnea (OSA) at the time of the crash, which would have exacerbated his sleepiness, impairment by acute sleep deficit and increased his preventable crash risk.

Bases: At his last CDL medical examination, Mr. Bush was a 42 year-old male with a body mass index of 34.5 kg/m², and a neck circumference of 17 inches (FMCSA Medical Review Board Recommendations for Conditional Certification). Untreated OSA significantly increases the risk of preventable truck crashes (Burks SV, et al. Non-Adherence with Employer-Mandated Sleep Apnea Treatment and Increased Risk of Serious Truck Crashes. SLEEP 2016).

Opinion 5. Based on his high risk of OSA, Mr. Bush should have received a limited-time (3 month) certification in 2015, which would have required him to undergo a sleep study to exclude OSA, and if OSA were found, would have required him to demonstrated successful treatment and treatment compliance in order to continue driving with valid medical certification.

Bases: At his last CDL medical examination, Mr. Bush was a 42 year-old male with a body mass index of 34.5 kg/m², and a neck circumference of 17 inches (FMCSA Medical Review Board Recommendations for Conditional Certification). Untreated OSA significantly increases the risk of preventable truck crashes (Burks SV, et al. Non-Adherence with Employer-Mandated Sleep Apnea Treatment and Increased Risk of Serious Truck Crashes. SLEEP 2016).

I reserve the right to revise, add to, or delete opinions as additional information becomes available.

**D. List of Expert Testimony, last four years.**

June 10, 2015 Trial testimony in the matter: Breen v Arlmont Fuel Corp. (Defense, Carbon Monoxide)

November 5. 2015 Trial Testimony in the matter Lundborg v. Weiss and K & B Transportation, Inc. (Plaintiff, Truck Crash)

August 15, 2016 Hearing Testimony in the matter Kadi vs. Massey Services (Plaintiff, Toxic Tort)

4

EXHIBIT A

ROBERTS v AAA COOPER TRANSPORTATION, INC & MARCUS J. BUSH   02 June 2019

February 6, 2017 Trial Testimony in the matter MALDONADO-vs- CLARK (Plaintiff, Truck Crash)

August 14, 2015 Deposition testimony in the matter: Wofford v. Swift Transportation and Sanko (Plaintiff, Truck crash)

September 14, 2015 Deposition Testimony in the matter: Kadi vs. Massey Services (Plaintiff, Toxic Tort)

November 18, 2015 Deposition Testimony in the matter: Behija Kahriman v Walmart (Defense, Employment Action)

January 27, 2016 Deposition Testimony in the matter: Estate of Wiley Clark v. Swift Transportation (Plaintiff, Truck crash)

November 3, 2016 Deposition Testimony in the matter: Maldonado v. Clark (Plaintiff, Truck crash)

March 16, 2017 Deposition Testimony in the matter: Bunjaku v. Fluor Daniel Corp. (Plaintiff, Defense Base Compensation)

April 20, 2017 Deposition Testimony in the matter: Abdul H. Waliyar v. MEP (Plaintiff, Defense Base Compensation)

October 30, 2017 Deposition Testimony in the matter: Hannigan v. Construction Technology Group, Inc. (Defense, Alleged lead poisoning)

November 6, 2017 Deposition Testimony in the matter: DAVIS v. NEW PRIME, INC. and ALBERT VILLEARREAL (Plaintiff, Truck Crash)

October 4, 2018 Deposition Testimony in the matter: ALPHA DIALLO, et al. Plaintiffs, v. AAAFORDABLE TRANSPORTATION, LLC, et al. (Plaintiff, Bus Crash)

October 22, 2018 Deposition Testimony in the matter: LACROIX v. TITAN (Plaintiff, Truck Crash)

April 15, 2019 Deposition Testimony in the matter: Clifton Engles v. VECTRUS (Plaintiff, Defense Base Compensation)

**E. Statement of Compensation.**
Please see attached Fee Schedule and invoices to date.

EXHIBIT A

ROBERTS v AAA COOPER TRANSPORTATION, INC & MARCUS J. BUSH   02 June 2019

Sincerely,

_____
    Stefanos N. Kales MD, MPH, FACP, FACOEM

6

**EXHIBIT A**

# HARVARD MEDICAL SCHOOL

## CURRICULUM VITAE

EXHIBIT 3
Kales
9/25/19 SiO
PENGAD 800-631-6989

**Date Prepared:** September 23, 2019

**Name:** Stefanos Nikolaos Kales, M.D., M.P.H., FACP, FACOEM

**Office Address:** Cambridge Hospital
1493 Cambridge Street, Macht Bldg., Suite 427
Cambridge, MA 02139

**Home Address:** 40 Avondale Road
Newton, MA 02459

**Work Phone:** 617-665-1580

**Work E-Mail:** skales@hsph.harvard.edu, skales@challiance.org

**Work FAX:** 617-665-1672

**Place of Birth:** Santa Monica, California

**Education:**

| 1985 | B.S. (Honors) Summa Cum Laude | Biology | Bucknell University |
|------|------|------|------|
| 1989 | M.D. | Medicine | Harvard Medical School |
| 1992 | M.P.H. | Occupational Medicine | Harvard School of Public Health |

**Postdoctoral Training:**

| 07/89 – 06/90 | Intern | Internal Medicine | Cambridge Hospital Harvard Medical School |
|------|------|------|------|
| 07/90 – 06/91 | Resident | Internal Medicine | Cambridge Hospital Harvard Medical School |
| 07/91 – 06/92 | Resident | Occupational Medicine | Harvard School of Public Health |
| 07/92 – 06/93 | Chief Resident | Occupational Medicine | Harvard School of Public Health |
| 07/93 – 06/95 | Clinical Fellow | Environmental Medicine | Agency for Toxic Substance & Disease Registry U.S. Public Health Service |

EXHIBIT A

2

**Please note that the Harvard School of Public Health (HSPH) was officially renamed in January 2015 to the Harvard T.H. Chan School of Public Health, which is acknowledged by date.**

**Faculty Academic Appointments:**

| | | | |
|---|---|---|---|
| 07/92 – 06/96 | Instructor | Medicine | Harvard Medical School |
| 07/96 – 06/09 | Assistant Professor | Medicine | Harvard Medical School |
| 07/97 – 06/09 | Assistant Professor | Environmental Health | Harvard School of Public Health |
| 07/05 – 06/09 | Adjunct Assistant Professor | Occupational Health | Cyprus International Institute for the Environment & Public Health Nicosia, Cyprus |
| 07/09 – 09/17 | Associate Professor | Medicine | Harvard Medical School |
| 07/09 – 10/17 | Associate Professor | Environmental Health | Harvard T.H. Chan School of Public Health |
| 07/09 - 06/13 | Adjunct Associate Professor | Occupational Health | Cyprus International Institute for the Environment & Public Health Nicosia, Cyprus |
| 10/17 – | Professor | Medicine | Harvard Medical School |
| 11/17 – | Professor | Environmental Health | Harvard T.H. Chan School of Public Health |

**Appointments at Hospitals/Affiliated Institutions:**

| | | | |
|---|---|---|---|
| 07/92 – | Active Staff | Medicine | The Cambridge Hospital |
| 07/96 – | Active Staff | Medicine Occupational Medicine | Cambridge Health Alliance/ Somerville Hospital |
| 07/00 – | Attending Physician | Employee & Industrial Medicine | Cambridge Health Alliance |
| 12/2007 | Faculty | Cardiovascular Epidemiology Program | Harvard T.H. Chan School of Public Health |
| 12/2009 | Faculty | Division of Sleep Program | Harvard Medical School |
| 02/10 - 12/11 | Sponsored Research Staff | Sleep Medicine | Brigham and Women's Hospital |

**EXHIBIT A**

3

**Other Professional Positions:**

| | | |
|---|---|---|
| 1993 – | Occupational Medicine Consultant | Massachusetts/Rhode Island Poison Control Center (Affiliated with Children's Hospital) Boston, Massachusetts |
| 1993 – | Environmental Medicine Consultant | Public Health Commission Cambridge, Massachusetts |
| 1993 – 2009 | Impartial Medical Examiner | Massachusetts Department of Industrial Accidents |
| 1996 – 2003 | Occupational Medicine Consultant | Division of Occupational Hygiene Massachusetts Lead Registry |
| 1997 – 2001 | Co-Organizer and Facilitator, Medical Summit on Hazardous Materials Firefighters Surveillance Examinations | Massachusetts Office of Hazardous Materials Response |
| 2006 – 2009 | Comprehensive Medical Examiner | Public Employee Retirement Administration Commission Commonwealth of Massachusetts |
| 2007 – | Occupational Medicine Consultant | Partners HealthCare System |
| 2012 – | Research Collaborator | Canadian Forces Environmental Medicine Establishment (CFEME) / Centre de Médecine Environnementale des Forces Canadiennes (CMEFC) |

**Major Administrative Leadership Positions:**
**Local:**

| | | |
|---|---|---|
| 1996 – 1997 | Director, Clinical Services | Occupational and Environmental Health Center, Cambridge Hospital |
| 1998 – 2010 | Assistant Director | Occupational and Environmental Health Center, Cambridge Hospital |
| 2001 – | Medical Director | Employee Health and Industrial Medicine, Cambridge Health Alliance |
| 2001 – | Co-Director, Introduction to Occupational & Environmental Medicine Course | Harvard School of Public Health |
| 2003 | Co-Director, Chemical Terrorism and Public Health Course | Harvard School of Public Health |

EXHIBIT A

4

| 2005 | Organizer & Co-Director, Fundamentals of Occupational Health Course | Cyprus International Institute/Harvard School of Public Health |
|------|------|------|
| 2006 – | Director, Occupational Medicine Residency Program | Department of Environmental Health, Harvard School of Public Health |
| 2006 – | Director, Occupational Medicine Core | Educational Resource Center, Harvard School of Public Health/National Institute for Occupational Safety & Health |
| 2009 – | Founder and Co-Director | Initiative for Productivity and Health Management Harvard School of Public Health |
| 2010 | Organizer & Co-Director, Leadership for Productivity & Health Management: Issues, Innovations, and Solutions Course | Harvard School of Public Health |
| 2010 – | Chief, Division of Occupational & Environmental Medicine | Cambridge Health Alliance |
| 2011 – | Director, Occupational & Environmental Health Field of Study, Master of Public Health Program | Harvard School of Public Health |
| 2012 | Organizer, Co-Director & Lecturer Leadership for Productivity & Health Management Course, Sleep and Shift Work: Optimizing Productivity and Health Management in the 24/7 Global Economy | Harvard School of Public Health |
| 2013 | Organizer, Director & Lecturer Cardiovascular Physiology & Disease in Firefighting Course | Occupational & Environmental Medicine Cambridge Health Alliance |
| 2014 | Organizer, Co-Chair & Lecturer Leadership for Productivity & Health Management Course, Mediterranean Diet & Workplace Health | Harvard School of Public Health |

EXHIBIT A

**5**

| | | |
|---|---|---|
| 2019 | Organizer, Exploratory Seminar Leader & Presenter, Radcliffe Seminar: Mediterranean Diet: Promotion and Dissemination of Healthy Eating | Radcliffe Institute for Advanced Study, Harvard University |

**Regional:**

| | | |
|---|---|---|
| 2003 – 2006 | Chief Medical Consultant | Division of Occupational Hygiene Commonwealth of Massachusetts Lead Registry |

**International:**

| | | |
|---|---|---|
| 2005 – 2013 | Director, Occupational Health Program | Cyprus International Institute / Harvard Cyprus Program |
| 2007 – 2010 | Co-Director, Occupational & Environmental Health Course | Cyprus International Institute / Harvard Cyprus Program |
| 2011 – 2013 | Director, Occupational & Environmental Health Course | Cyprus International Institute / Harvard Cyprus Program |
| 2014 | Organizer & Co-Chair, Closed Symposium on Obstructive Sleep Apnea and Driving Safety | International Association for Traffic and Safety Sciences (Japan) / Harvard T.H. Chan School of Public Health / Cambridge Health Alliance |
| 2016 | Scientific Chair, Mediterranean Diet Roundtable | Mediterranean Diet Roundtable |
| 2016- | Organizer, Scientific-Chair Mediterranean Diet & Health | Initiative for Productivity & Health Management, Mediterranean Diet Roundtable, The Cooking Odyssey |

**Committee Service:**
**Local:**

| | | |
|---|---|---|
| 1995 – | Occupational & Environmental Medicine Residency Advisory Committee | Harvard School of Public Health |
| 2001 – 2006 | Blood and Body Fluid Exposure Task Force | Cambridge Health Alliance |
| 2001 – | Medical Committee for Emergency Preparedness | Cambridge Health Alliance |
| 2001 – 2006 | Quality Improvement Committee | Cambridge Health Alliance |
| 2001 – | Infection Prevention Committee | Cambridge Health Alliance |

EXHIBIT A

6

| | | |
|---|---|---|
| 2004 – 2006 | Medical Executive Committee | Cambridge Health Alliance |
| 2004 – | Committee on Benefits/Employee Health Insurance | Cambridge Health Alliance |
| 2005 – | Safety Committee | Cambridge Health Alliance |
| 2006 – | Department of Environmental Health Curriculum Committee | Harvard School of Public Health |
| 2009 – | Department of Medicine Promotions Committee | Cambridge Health Alliance |
| 2011 – | Master of Public Health Steering Committee | Harvard School of Public Health |
| 2012 – | Curriculum and Oversight Committee of the Training Program in Sleep, Circadian and Respiratory Neurobiology | Harvard Medical School |
| 2013 – 2014 | Master of Public Health, Transformation Team | Harvard School of Public Health |
| 2013 – | Employee Wellness Executive Steering Committee | Cambridge Health Alliance |
| 2014 – | Dean's Leadership Council | Harvard TH Chan School of Public Health |
| 2015 – | Dean's Leadership Council | Harvard Medical School |
| 2017 – | Faculty Executive Committee | HMS Division of Sleep Medicine |

**Regional:**

| | | |
|---|---|---|
| 2002 | Occupational Advisory Group, Cardiovascular Health Initiative | Massachusetts Department of Public Health |

**National:**

| | | |
|---|---|---|
| 2001 – 2002 | Expert Review Panel | U.S. Agency for Toxic Substances & Disease Registry |
| 2008 | Expert Review Panel | Fire Life Safety Research Center, University of Illinois Fire Service Institute |
| 2008 | Working Group, Database Systems | Federal Emergency Management Agency, Assistance to Firefighters Grants |
| 2010 – 2014 | Examination Committee, Occupational Medicine Subcommittee | America Board of Preventive Medicine |

EXHIBIT A

| 2015 | Expert Working Group, Future Directions in Cardiovascular Research for the U.S. Fire & EMS Service | Federal Emergency Management Agency, National Heart, Lung and Blood Institute; National Fallen Firefighters Foundation |
| --- | --- | --- |
| 2015 - 2016 | Expert Review Panel for the Joint Committee on National Statistics, Board on Human-Systems Integration and Transportation Research Board / Report on Research Methodologies & Statistical Approaches to Understanding Driver Fatigue Factors in Motor Carrier Safety and Driver Health | National Research Council |
| 2015 – | Occupational Medicine (OM) Work Group: Challenges & Opportunities to Strengthen the OM Workforce | National Institute of Occupational Safety and Health |
| 2016 | Expert Working Group, Messaging for Cardiac Health in the Fire Service | National Fallen Firefighters Foundation/ Department of Homeland Security/ FEMA's Grant Program Directorate for Assistance to Firefighters Grant Program – Fire Prevention and Safety Grants |
| 2018 | Expert Working Group for Revision Recommendations of the firefighter medical examination standards (NFPA 1582). | International Association of Fire Fighters (IAFF) Health, Safety & Medicine |

**International:**

| 1998 – 1999 | Working group on the Prevention of Chemical Emergencies and Associated Health Risks | Poison Control Center, Hospital Universitario Antonio Pedro, Universidade Federal Fluminense, Niteroi, Rio de Janeiro, Brazil Advisor |
| --- | --- | --- |
| 1998 – 2000 | Occupational Health Curriculum Development Committee | Department of Hygiene and Epidemiology, University of Athens School of Medicine, Athens, Greece Advisor |
| 2005 | Organizing Committee, Symposium on Health and Safety in the Construction Industry | Cyprus International Institute and Technical Chamber of Commerce of Cyprus Nicosia, Cyprus |
| 2005 | Organizing Committee and Moderator, Workshop on an Occupational and Environmental Health Research Agenda | Cyprus International Institute in collaboration with the Cypriot Ministries of Labour and Health, Nicosia, Cyprus Moderator |

EXHIBIT A

| | | |
|---|---|---|
| 2005 | Invited Expert, WHO Second Technical Meeting on Quantifying Disease from Inadequate Housing, Housing and Health Program | World Health Organization (WHO), Regional Office for Europe, Bonn, Germany |
| 2006 | Curriculum Working Group, European Training for Health Professionals on Rapid Response to Health Threats | European Union (sponsored collaboration) |
| 2006 – 2009 | Working Group, Household Carbon Monoxide Poisoning, Housing and Health Program | World Health Organization (WHO) |
| 2007 | Expert Review Panel, Criteria Document for Carbon Monoxide in Indoor Air | Health Canada |
| 2008 – 2009 | Expert Review Panel, WHO Indoor Air Quality Guidelines | World Health Organization (WHO), Regional Office for Europe, Bonn, Germany |
| 2011 | Expert Review Panel, Cardiovascular Disease Guidelines | Fire & Rescue, New South Wales, Australia |
| 2014 – | Corps of Academic Electors, Occupational/Environmental Medicine and Public Health | Demokritus University Thrace Medical School, Alexandroupolis, Greece International Promotions Evaluator |
| 2014 – 2015 | Working Group on Sleep Apnea and Traffic Accidents | International Association for Traffic and Safety Sciences (IATSS), Tokyo, Japan International Advisor |
| 2015 – | School for Health & Welfare Professionals Registry | Technological Educational Institute Athens, Greece International Promotions Evaluator |
| 2015 – | School of Medicine Registry | National and Kapodistrian University of Athens, Athens, Greece International Promotions Evaluator |
| 2016 – | Invited working group on future challenges in occupational health | SEAT (Spanish subsidiary of Volkswagen), Grupo Ergos, MC Mutual, Centro ITAE, Barcelona, Spain |
| 2016 – | School of Health Sciences Registry | University of Crete, Heraklion, Greece International Promotions Evaluator |
| 2016 | External Reviewer for the Division of Occupational Medicine | Department of Medicine, University of Toronto, Toronto, Canada |

EXHIBIT A

| 2016 | Participant, Transport Canada's Advisory Council on Rail Safety | Transport Canada, Ottawa, Canada |
| 2017 – | Corps of Academic Electors, Occupational/Environmental Medicine and Public Health | University of Thessaly, School of Health Sciences and Medical Faculty, Larissa, Greece, International Promotions Evaluator |
| 2017 – | Department of Medicine Registry | Demokritus University Thrace Medical School, Alexandroupolis, Greece International Promotions Evaluator |
| 2017 – | Department of Medicine Registry | Demokritus University Thrace Medical School, Alexandroupolis, Greece International Promotions Evaluator |
| 2017 – | Department Of Occupational Therapy Registry | Technological Educational Institute Of Athens, Athens, Greece International Promotions Evaluator |
| 2017- | Invited member, Comisión Científica Empresa Saludable de SEAT (Scientific Commission for a Healthy Enterprise) | SEAT Automobiles, Barcelona, Spain |
| 2018 | Member, Scientific Committee, 4th Forum Υγείας (Health) – Diet, Health, Beauty | DYO Forum, Thessaloniki, Greece |

**Professional Societies:**

| 1993 – | American College of Physicians | |
| | 2003 – 2004 | Member, Continuing Medical Education Faculty |
| | 2004 | Peer Reviewer, PIER, Clinical Guideline |
| 1993 – | American College of Occupational and Environmental Medicine | |
| | 2004 – | Member, Academic Medicine Section |
| | 2006 – | Member, National Committee of Occupational & Environmental Medicine Residency Directors |
| | 2010 – | Public Safety Medicine Section |
| | 2016 | Expert Content Reviewer, Presidential Task Force on Fitness-for-Duty Assessments for Industrial Firefighters |

EXHIBIT A

| 1993 – | New England College of Occupational and Environmental Medicine | |
| | 2004 – 2010 | Board Member |
| | 2004 | Chair, Scientific  Program for Annual Conference |
| | 2004 – | Member, Scientific Program Committee |
| | 2006 – 2012 | Chair, Research Session for Annual Conference |
| 1993 – | New England Hellenic Medical and Dental Society | |
| | 1997 – 1998 | Board Member |
| 1996 – | Hellenic Medical Society of New York | |
| 2001 – | National Fire Protection Association | |
| | 2001 – | Member, Research Section |
| 2010 – | American College of Sports Medicine | |
| 2012 – | American Academy of Sleep Medicine | |
| 2013 – 2015 | American Thoracic Society | Member, Ad hoc Committee Public Health Impact of Sleep Disturbance: "The Importance of Health Sleep – Recommendations and Future Priorities" |
| 2014 – | Circle of Hellenic Academics in Boston | |
| 2015 – | Hellenic Bioscientific Association, USA | Member, Scientific Advisory Board |
| 2016 – | Oleocanthal International Society | Scientific Advisory Committee |

2017 –    World Hellenic Bioscientific Association, Senior Faculty Selection Committee for the Stavros Niarchos Foundation Research Training Program in Clinical and Experimental Medicine . This is a $375,000 grant with the aim to train medical graduates of Greek universities in clinical and basic science in the USA; improve their skills and credentials and to successfully place the graduates in top-level US clinical training programs.

2017 –    Scientific/ Medical Advisor, World Olive Center for Health, Athens, Greece. International non-profit center dedicated to promoting the health benefits of olive and olive oil products as essential components of a healthy Mediterranean Diet.

2019 – Chair, Scholarship Committee

EXHIBIT A

**Grant Review Activities:**

| | | |
|---|---|---|
| 2002 | Disease, Disability and Injury Prevention Control | National Institute for Occupational Safety and Health<br>Ad hoc Member, Special Emphasis Panel |
| 2003 | RFP on Cardiovascular Disease in Police, Firefighters and Ambulance Workers | Workers Compensation Board<br>Vancouver, British Columbia, Canada<br>Ad hoc Member, Expert Review Panel |
| 2004; 2005; 2008; 2010; 2011 | Workplace Safety Grants Program | Ontario Workplace Safety and Insurance Board, Research Advisory Council, Toronto, Ontario, Canada<br>Ad hoc Member, External Reviewer |
| 2005 | Pilot Feasibility Projects | Harvard Clinical Research Center<br>Ad hoc Member, Study Section |
| 2005; 2008; 2009; 2011–2013; 2015; 2018 | New England Pilot Research Program | Harvard T.H. Chan School of Public Health-National Institute for Occupational Safety & Health, Educational Resource Center<br>Ad hoc Member, Review Panel |
| 2007 | Innovation Grants | Research Secretariat, Work Safe BC, Vancouver, British Columbia, Canada<br>Ad hoc Member, External Reviewer |
| 2008; 2011 – 2014; 2017 | Research and Development Proposals in the "Assistance to Firefighters Grants" Program | U.S. Department of Homeland Security / Federal Emergency Management Agency, Washington, DC<br>Ad hoc Member Federal Review Panel |
| 2009 | "Bridging the Gap" Grants | Ontario Workplace Safety and Insurance Board, Research Advisory Council, Toronto, Ontario, Canada<br>Ad hoc Member, External Reviewer |
| 2010 | Experimental and Translational Research Program | Chief Scientist Office, Experimental and Translational Research Program, Edinburgh, Scotland, United Kingdom<br>External Referee |

**EXHIBIT A**

12

| 2010; 2013; 2016 | Peer Reviewer, Pilot Program | Harvard School of Public Health-National Institute for Environmental Health Sciences Ad hoc Member |
| 2016-2017 | 'Excellent Young Principal Investigator' Grant Program | European Science Foundation Ad hoc Member, Expert Reviewer |

**Editorial Activities:**
**Ad hoc Reviewer:**
American Journal of Cardiology
American Journal of Industrial Medicine
American Journal of Public Health
Annals of Internal Medicine
Annals of Occupational Hygiene
Arh Hig Rada Toksikol (Archives of Industrial Hygiene and Toxicology, Croatia)
Aspen Publishers (Health Care Reviewer on chapter in Terrorism and Public Health)
Biological Psychology
BMC Health Services Research
BMC Public Health
BMJ Open Diabetes Research & Care
British Journal of Nutrition
British Medical Journal
Case Reports in Neurological Medicine
Circulation
Clinical Chemistry
Clinical Epidemiology
Clinical Neurology and Neurosurgery
Critical Reviews in Toxicology
Environmental Health Perspectives
Environmental Health:  A Global Access Science Source
Environmental International
European Journal of Applied Physiology
European Respiratory Journal
Food and Chemical Toxicology
Indian Journal of Medical Sciences
Industrial Health (Japanese National Institute of Occupational Safety and Health)
International Archives of Occupational and Environmental Health
International Journal of Food Safety, Nutrition and Public Health (IJFSNPH)
International Journal of Occupational and Environmental Health
JAMA Internal Medicine
Journal of Cardiovascular Computed Tomography
Journal of Exposure Science and Environmental Epidemiology
Journal of Obesity
Journal of Occupational & Environmental Hygiene
Journal of Occupational and Environmental Medicine
Journal of Occupational Medicine and Toxicology
Journal of Sleep Research
Journal of the American College of Cardiology
JRSM Open (Companion journal to the Journal of the Royal Society of Medicine)

EXHIBIT A

13

Lancet
Medical Science Monitor
Medicine & Science in Sports & Exercise
Metabolism
Military Behavioral Health
New England Journal of Medicine
Nutrients
Nutrition and Metabolism
Occupational and Environmental Medicine
Pediatrics
PLoS ONE
Police Practice and Research:  An International Journal
Prehospital Emergency Care
Preventive Medicine
Proceedings B (Proceedings of the Royal Society, Biological Sciences)
Regulatory Toxicology and Pharmacology
Science of the Total Environment (STOTEN)
Sleep
Southern Medical Journal
The Spine Journal
Traffic Injury Prevention

**Other Editorial Roles:**

| | | |
|---|---|---|
| 2005 – 2012 | Editorial Review Board | Environmental Health Perspectives |
| 2005 – | Consulting Editor | Archives of Environmental and Occupational Health |
| 2012 – 2016 | Associate Editor | BMC Public Health |
| 2013 – | International Advisory Board | Occupational Medicine (London) |
| 2015 – | International Board | Hygeia@Ergasia, Scientific Edition of Hellenic Society of Occupational and Environmental Medicine (Alexandroupolis, Greece) |

**Honors and Prizes:**

| | | | |
|---|---|---|---|
| 1987 | Paul Dudley White Fellowship | Harvard Medical School | Overseas Research |
| 1991 – 1993 | Scholar, Occupational Physicians Scholarship Fund | American College of Occupational Medicine | Competitive award for full stipend support of Occupational Medicine Residency Training |
| 1996 | KO1 / Special Emphasis Research Career Award | National Institute for Occupational Safety & Health (NIOSH) | Hazmat firefighters: medical and incident surveillance |

**EXHIBIT A**

| | | | |
|---|---|---|---|
| 1999 | Elected to Fellowship | American College of Physicians | |
| 2002 | Invited Speaker and Faculty Panelist | Harvard School of Public Health | Chemical Terrorism Plenary Lecture, Alumni Day |
| 2003 | Elected to Fellowship | American College of Occupational and Environmental Medicine | |
| 2005 | Honorable Mention | Society of Teachers of Family Medicine | Best Research Paper Award |
| 2007 | Teacher of the Year | Harvard School of Public Health | Occupational & Environmental Medicine Residency Program |
| 2010 | Honorable Mention, Best Research Paper Award | Society of Teachers of Family Medicine | As published in JAMA 2008; 300(8):915-923. |
| 2013 | Kehoe Award for Excellence in Education and Research in Occupational and Environmental Medicine (OEM) | The American College of Occupational and Environmental Medicine | Awarded for significant contributions in OEM research (cardiovascular disease in public safety personnel and occupational sleep research) as well as for educational leadership as the Director of the Harvard Occupational Medicine Residency Program. |
| 2013 | Nominee, Outstanding Faculty Mentor Award | Harvard School of Public Health Postdoctoral Association | Harvard School of Public Health |
| 2014 | Harriet Hardy Award | New England College of Occupational and Environmental Medicine (NECOEM) | Lifetime achievement award to an individual who has made outstanding contributions to the field of Occupational and Environmental Medicine. |
| 2015 | Best Paper Award | Michigan Industrial Hygiene Society | Best scientific paper as published in the Journal |

**EXHIBIT A**

15

| Year | Award | Organization | Description |
|---|---|---|---|
| | | | of Occupational and Environmental Hygiene 2014; 11(9):591-603. |
| 2016 | Oficial, Ordem Do Mérito Imperador Dom Pedro II (Officer in the Order of Merit, Emperor Dom Pedro II) | Corps of Military Firefighters, Brazilian Federal District, Brazil | Awarded for more than two decades of research beneficial to the fire service and supporting the Corps' goals of improving firefighters' health and fitness. |
| 2016 | Research Service Award | International Association of Fire Chiefs - Safety, Health & Survival Section | Special recognition of research to improve the well-being of members of the fire service. |
| 2017 | Special Recognition Award, 1st International Symposium on Health and Physical Fitness among Public Safety Workers | University of Brasilia, Department of Physical Education, Brazilian Federal District, Brazil | Recognition of outstanding research on firefighters' cardiovascular risk assessment and strong commitment to fire service health promotion. |
| 2017 | Olympic Commemorative Medal | Olympia Health and Nutrition Awards 2017, European Inter-regional Mediterranean ARISTOIL program & Faculty of Pharmacy, University of Athens, Athens, Greece | Recognition of research and education to introduce Mediterranean Diet to non-Mediterranean populations |
| 2017 | Silver Medal | Best Biomedical/ Health Research, Health Matters Convention, 4th Oleocanthal International Congress, Oleocanthal International Society, Malaga, Spain | Recognition as PI of the Mediterranean Diet Workplace Intervention "Feeding America's Bravest: Survival Mediterranean Style" |
| 2019 | Robert C. Johns Research Partnership Award | Center for Transportation Studies, Univ. of Minnesota presents the award annually to a team of individuals who have collaboratively drawn on their diverse expertise to achieve significant impacts on transportation. | Recognition of collaboration: "Exploring Links Between Medical Conditions and Safety Performance in Tractor Trailer Drivers," which resulted in 2016 paper in *SLEEP* on OSA and crash risk. |

**EXHIBIT A**

## Report of Funded and Unfunded Projects
**Funding Information:**
Past:

| | |
|---|---|
| 1993 – 1995 | Medical Surveillance of Hazardous Materials Response Firefighters<br>PI<br>U.S. Agency for Toxic Substances and Disease Registry / Competitive Post-Doctoral Research Award<br>The study goals were to examine the potential health effects of hazardous materials duty on firefighters through the medical examination and hazardous incident surveillance. |
| 1996 – 1999 | Hazmat Firefighters:  Medical and Incident Surveillance<br>PI<br>KO1 / National Institute for Occupational Safety & Health  / Research Career Award<br>The study goals were to confirm and expand the results of the previous study (see above) regarding the potential health effects of hazardous materials duty prospectively in a much larger cohort of firefighters. |
| 1998 – 2000 | Occupational Risk Assessment and Handling of Occupational Emergences<br>Co-Investigator<br>Greek Ministry of Education / Competitive Training Grant<br>The goals were to create a basic occupational health training program for Greek physicians.  My role was to provide input on curriculum design and to give specific lectures in the classroom. |
| 1999 – 2000 | A Polymorphism in the COL9A2 Gene and Intervertebral Disc Disease<br>Co-Investigator<br>Liberty Mutual / Cooperative Agreement with the Harvard School of Public Health<br>This was a case-control study of gene polymorphisms in intervetebral disc disease in a Mediterranean population (Greece). My roles included study design, data analysis and interpretation and manuscript preparation. |
| 1999 – 2002 | Evidence-Based Medical Examinations for Firefighters<br>PI<br>RO1 / National Institute for Occupational Safety & Health<br>Goals of the study were to examine systematically medical examination results and employment and health outcomes to determine which examination components have evidence-based utility. |
| 2000 – 2006 | NIOSH Educational Resource Center<br>Director and Core Faculty<br>National Institute for Occupational Safety & Health<br>Longstanding grant held at the Harvard School of Public Health for this center of excellence in Occupational Health Academic & Research Training, including: medicine, safety, ergonomics, industrial hygiene and nursing.  My role was to teach/direct core Occupational |

EXHIBIT A

17

medicine courses.

2002 – 2003    Chemical Terrorism:  Development of a Protocol for Empirical Recognition
               PI
               Kresge Center for Environmental Health/CDC/NIEHS
               Developed a syndrome-based protocol for the clinical/empirical recognition of
               "toxidromes" produced by distinct classes of chemical agents whether they are industrial
               or agricultural chemicals or chemical weapons.

2002 – 2003    Community-Based Intervention to Prevent Lead Poisoning in Brazilian-American
               Painters
               PI
               Health Research and Educational Trust
               Goals were to construct a community-based educational intervention in Portuguese for
               educating painters in the Brazilian-American community regarding lead poisoning due
               to house painting and construction and its prevention.

2002 – 2005    Program for Monitoring and Assessment of the Environmental Consequences of the
               Iraqi Aggression in Kuwait
               Co-PI for Medical Monitoring
               Kuwait Public Authority for Assessment of Compensation
               Multi-disciplinary project to assist Kuwait in the assessment of health effects due to the
               Iraqi invasion of Gulf War I.

2004 – 2005    Profile of Massachusetts Firefighters Retiring under Heart Presumption Legislation:
               1997-2003
               PI
               Harvard-NIOSH Education and Research Center
               This pilot epidemiologic study initiated the examination of the characteristics of
               Massachusetts firefighters receiving state disability pensions for cardiovascular diseases.

2004 – 2006    Profile of Massachusetts Firefighters Retiring under Heart Presumption Legislation:
               1997-2003
               PI
               Public Employee Retirement Administration Commission of Massachusetts
               This epidemiologic study fully investigated the characteristics of Massachusetts
               firefighters receiving state disability pensions for cardiovascular diseases started under
               the above pilot project.

2005 – 2010    Capacity building for Molecular Metabolic & Genetic Epidemiology Research
               Co-PI
               Research Promotion Foundation of Cyprus
               The major goals of the study are to examine genetic, hormonal and environmental (i.e.,
               dietary, activity, living conditions) determinants of obesity and metabolic syndrome in
               young adult males.

2006 – 2007    On-Duty CHD Events in Firefighter:  Predictors of Fatal Incidents
               Senior Investigator
               Harvard-NIOSH Education and Research Center

EXHIBIT A

18

Epidemiologic investigation comparing firefighters dying within 24 hours of an on-duty cardiovascular event to those surviving similar events to identify predictors of case-fatality.  My role was to provide study design, case databases, and supervise data analysis, interpretation and manuscript preparation.

2006 – 2009    Firefighters and Cancer
PI
Workplace Safety Insurance Board of Ontario, Canada
The major goal was to perform a updated and expanded, systematic meta-analytic review of epidemiologic studies examining whether firefighters are at increased risk of various cancers as a result of their occupation.

2006 – 2013    NIOSH – Educational Resource Center
Director, Occupational Medicine Core
National Institute for Occupational Safety & Health (NIOSH)
Longstanding grant held at Harvard T.H. Chan School of Publich Health for this center of excellence in Occupational Health Academic & Research Training which includes medicine, safety, ergonomics, industrial hygiene and nursing.  Major goal is to provide education for occupational health and safety professionals.

2007 – 2008    Responder Wireless Physiological Monitoring Device
Consultant
US Department of Homeland Security
Project to examine a wireless device for providing real-time cardiovascular monitoring of emergency responders during incident responses.  My role was to advise Quasar, Inc. regarding the epidemiology of on-duty cardiovascular disease events among firefighters.

2007 – 2008    Obesity and Sleep Apnea in Truck Drivers
Senior Investigator
Harvard-NIOSH Education and Research Center
Examine the efficacy of obesity-driven criteria as tools for screening for obstructive sleep apnea among professional drivers. My role was to provide study design, access to subjects, and supervise data collection and analysis, interpretation and manuscript preparation.

2007 – 2009    Sleep Apnea Screening and Psychomotor Vigilance Testing in Truck Drivers
Senior Co-Investigator
American College of Occupational & Environmental Medicine and the Federal Motor Carrier Safety Administration
Major goals were to examine the results of screening commercial truck drivers for obstructive sleep apnea at federally-regulated medical exams for driver certification. My role as the senior mentor and research group leader was to oversee study design, data collection and data analysis and provide other supervision and resources.

2007 – 2011    Predicting Cardiovascular Risk and Fitness in Firefighters
PI
US Department of Homeland Security
Examines and stratifies cardiovascular risk among a cohort of firefighters recruited from several different states undergoing comprehensive examinations. The major goals

EXHIBIT A

19

are to determine baseline predictors of exercise stress test, and how exercise testing results predict future health and employment consequences.

2008 – 2009     Guidelines for Prevention of Obesity at the Workplace
Consultant
European Union
Program to develop obesity prevention strategies within European workplaces. My role was to provide expert advice regarding obesity and its potential interaction with fitness for duty in various jobs.

2008 – 2009     Survey of Occupational Physicians on Recommendations for Obstructive Sleep Apnea (OSA) Screening in Commercial Motor Vehicle Operators
PI
Respironics, Inc.
The project surveyed American College of Occupational and Environmental Medicine (ACOEM) members' regarding new consensus guidelines for OSA screening in truck drivers. The goals were to determine knowledge about, compliance with, and obstacles to implementing the guidelines in practice.

2008 – 2010     Fire-Service Health Surveillance System
Consultant
US Department of Homeland Security
The study examined health behaviors and risks as determinants of firefighter health in states across the Missouri valley. My role is to provide guidance regarding cardiovascular disease epidemiology.

2008 – 2011     Operation Healthy Sleep
Consultant
US Department of Homeland Security
This study examined comprehensively fatigue, shift work and sleep disorders among firefighters. My roles were to provide expertise regarding cardiovascular epidemiology in firefighters and to analyze cardiovascular and metabolic parameters in firefighters in association with information regarding their sleep hygiene.

2010 – 2011     Impact of a Company-Based Sleep Apnea Screening, Diagnostic and Treatment Program on Truckers' Health and Safety
PI
Harvard Catalyst/The Harvard Clinical and Translational Science Center (NIH Award #UL1 RR 025758 and financial contributions from Harvard University and its affiliated academic health care centers.
This pilot study rigorously examined a large trucking company's program for mandated Obstructive Sleep Apnea (OSA) screening, diagnosis, and treatment among professional drivers. The specific aims were to investigate the effects of OSA diagnosis and treatment compliance monitoring on crash risk; healthcare outcomes and costs; and to refine OSA screening parameters for driver populations.

2010 – 2011     Obstructive Sleep Apnea (OSA) and Commercial Motor Vehicle Operators – A Cross-Sectional Analysis of Driver-Simulator Performance and Diagnosis of OSA
Senior Investigator

EXHIBIT A

20

|  | Harvard-NIOSH Education and Research Center |
|---|---|

Harvard-NIOSH Education and Research Center
This cross-sectional pilot study assesses the utility of using driver simulator as a potential in-clinic method to identify commercial vehicle operators who are at a high risk for OSA and road crashes.

2010 -2013     The Impact of the Nutrition Environment in the Fire Service on Health & Safety
Consultant
US Department of Homeland Security
This study will fill this important gap in the public health literature. Using a longitudinal cohort design, we will examine dietary intake and the food environment among 1,000 firefighters housed in 60 fire stations within 20 fire department across the nation.

2010 – 2014    Exercise Tolerance as a Predictor of Firefighters' Future Risks
PI
US Department of Homeland Security
The grant built on the prior DHS award to Kales' group and examined cardio-respiratory fitness as a prognostic indicator of firefighters' future health and employment outcomes. The ultimate goal of the research is to establish guidelines for firefighters' physical fitness requirements that when implemented reduce the burden of illness and injuries in America's emergency responders.

2011 – 2014    Risk Factors for Crashes in a Retrospective Cohort Study of Commercial Truck Drivers
Mentor
KO1 / National Institute for Occupational Safety & Research
The goals for this grant were to quantify individual occupational and non-occupational risk factors of commercial truck drivers involved in non-fatal and fatal crashes in a large retrospective cohort study of over 90,000 drivers.

2012 – 2013    Sudden Cardiac Death in Relation to Law Enforcement Duties
Senior Investigator
Harvard-NIOSH Education and Research Center
Working with co-investigators to determine whether specific law enforcement duties are associated with more perceived stress than others and whether they convey a higher risk of sudden cardiac death in police officers.

2013 – 2014    Entry Fitness Levels and Subsequent Academy Performance Outcomes in Massachusetts Police Recruits
Senior Investigator
Harvard-NIOSH Education and Research Center
Pilot Award for above fully-funded study to assess police academy students' entry fitness levels as predictors of subsequent performance in the academy.

2012 – 2016    Non-Invasive Identification of LVH/Cardiomegaly in Firefighters
US Department of Homeland Security
PI
This grant built on the prior DHS awards to Kales' group. Cardiovascular disease (CVD) causes 45% of firefighters' on-duty deaths. LVH/cardiomegaly increase the risks of arrhythmia, myocardial infarction, stroke and death. Autopsies demonstrate

**EXHIBIT A**

LVH/cardiomegaly in most firefighter CVD fatalities. The grant 1) determined the prevalence of left ventricular hypertrophy (LVH) and cardiomegaly among firefighters; 2) quantified major risk factors for LVH/cardiomegaly; 3) developed prediction models/screening algorithms; 4) validated the models/screening algorithms.

| | |
|---|---|
| 2015 – 2017 | Department of Transportation Medical Examiners and Sleep Disorders Continuing Medical Education Module / National Sleep Foundation |

PI

Commercial drivers are subject to federally-regulated medical examinations at least every two years. Fatigue and excessive daytime sleepiness are recognized causes of large truck and bus crashes. This grant sponsors my team to create a CME module for Department of Transportation (DOT) Medical Examiners on Sleep Disorders in collaboration with the National Sleep Foundation.

| | |
|---|---|
| 2013 – 2017 | Entry Fitness Levels and Subsequent Academy Performance Outcomes in Massachusetts Police Recruits |

Massachusetts Municipal Police Training Committee Competitive Research Award, Commonwealth of Massachusetts / MPTC 2014-1
PI ($79,586.00)
The purpose of these retrospective and prospective cohort studies are to assess police academy students' entry fitness levels as predictors of subsequent performance in the academy. Aim1: Categorize recruit officers' entry fitness levels as determined by Cooper Assessments and describe the distribution of various fitness attributes (Body Mass Index, body fat, aerobic capacity, strength) across this population.  Aim 2: Statistically examine the association of entry fitness levels with subsequent performance in the academy (academic achievement on written tests, attendance, incidence of disciplinary actions, training injuries, academy withdrawals and graduation rates).  Aim 3: Estimate, from the above evidence, the minimum fitness requirements predicting successful completion of a Municipal Police training academy.

| | |
|---|---|
| 2014 – 2017 | Understanding and Preventing SCD in the Fire Service |

US Department of Homeland Security / EMW-2013-FP-00749
Co-Investigator, Site PI for Harvard ($259,363.00 to HSPH)
This grant builds on the prior DHS awards to Smith's and Kales' groups. The purpose of this study is to retrospectively analyze the most complete set of firefighter autopsies and accompanying medical records ever made available in order to evaluate the pathoanatomic (medical) causes of sudden cardiac death (SCD) and the underlying medical conditions of the victims, and to identify the most effective preventive strategies.

| | |
|---|---|
| 2014 – 2017 | Physical Activity, Sedentary Behavior, Cardiac Autonomic Function and Associated Factors among Brazilian Military Firefighters |

Ministry of Science, Technology and Innovation, National Council for Scientific and Technological Development (CNPq), Brazil
Co-Investigator
This grant is part of an international collaboration with Dr. Luiz Porto at the Brasilia University, Brazil. Firefighters' activities expose them to intense stressors, which alter cardiac autonomic function (CAF). Despite the crucial role of CAF in regulating stress response, little is known about firefighters' on-duty CAF and the effects of firefighting

EXHIBIT A

on the CAF. This grant will 1) evaluate resting on-duty CAF of male firefighters and its association with cardiorespiratory fitness, physical activity level and sedentary behavior; 3) evaluate the effects of a 12-hour period of routine fire service duty on CAF.

| | |
|---|---|
| 2016-2017 | Food Frequency Questionnaire Analysis for Feeding America's Bravest: Mediterranean Diet-Based Interventions to Change Firefighters' Eating Habits<br>Sub Award from: NIDDK/ Boston Medical Center, Boston Obesity Center (Administrative Core)<br>Site-PI at Harvard ($3,000) |

## Past Unfunded Projects:

| | |
|---|---|
| 2004 – 2009 | Contamination of Ayurvedic Herbal Products with Heavy Metals<br>Collaborative efforts with Dr. Robert Saper of Boston University, a former student, to determine the extent of heavy metal contamination in various Ayurvedic products and the resulting health effects among users of these medications. These projects led to two original reports in *JAMA* and a number of other peer-reviewed publications. |
| 2007 – 2009 | Blood Pressure in Public Safety Officers/Emergency Responders<br>Examination of the prevalence, correlates and adverse outcomes associated with uncontrolled hypertension in this group of workers which constitute about 1.5% of the total US workforce. This project culminated in a "State of the Art" review in the *American Journal of Hypertension*. |
| 2009 – 2010 | Road Ready Study<br>Preliminary study of crash risk in over 60,000 truck drivers as a function of driver BMI and other characteristics. This work led to KO1 career award for Matt Thiese of the University of Utah on which I was a senior mentor. |
| 2009 – 2012 | BMI and Crash Risk at Major Trucking Firm<br>Working with co-investigators from University of Minnesota-Morris on analyses of crash risk as a function of truck driver BMI controlling for various occupational exposures. The preliminary work led to an HMS Catalyst on which I was the PI related to sleep apnea and crash risk among commercial drivers. |
| 2010 – 2012 | Sudden Cardiac Death in Relation to Law Enforcement Duties<br>Working with co-investigators to determine whether specific law enforcement duties are associated with a higher risk of sudden cardiac death (SCD) in police officers. These initial efforts allowed our team to receive pilot funding from NIOSH and ultimately culminated in an original report in the British Medical Journal documenting duty-related risks of SCD among police officers. |

## Current:

| | |
|---|---|
| 2013 – 2018 | NIOSH – Educational Resource Center<br>National Institute for Occupational Safety & Health (NIOSH) / T42OH008416<br>Director, Occupational Medicine Core ($885,590.00 to OM Core)<br>Renewal of longstanding grant held at Harvard T.H. Chan School of Public Health for |

23

this center of excellence in Occupational Health Academic & Research Training including: medicine, safety, ergonomics, industrial hygiene and nursing. Major goal is to provide education for occupational health and safety professionals.

2015 – 2018    Feeding America's Bravest: Mediterranean Diet-Based Interventions to Change Firefighters' Eating Habits and Improve Cardiovascular Risk Profiles
US Department of Homeland Security / EMW-2014-FP-00612
PI ($1,578,936.00)
Nutrition and medical experts agree that following a Mediterranean-style diet improves health. However, the health system has had very limited effectiveness in changing Americans' eating and other lifestyle behaviors, while limited evidence suggests that workplace-based nutrition interventions can be beneficial. Building on prior work with firefighters and the above, our proposal seeks to establish the effectiveness of behavioral change strategies in the fire service to modify the existing food culture. We aim to motivate firefighters and their families to incorporate Mediterranean diet principles at work and home through education, participation and incentives. The ultimate purpose of the study is to lower firefighters' risks for cardiovascular and cancer by successfully getting more firefighters and their families to adopt and incorporate the healthy eating principles behind the Mediterranean diet.

2017-2018    Medical Evaluations and Cardiovascular Risk Factor Reduction / International Association of Fire Fighters (IAFF)
Co-PI ($100,000)
There is considerable enthusiasm for improving firefighter health and safety and an increasing recognition of the vital role that medical evaluations play in achieving this goal. While the efforts to increase the number of firefighters who are getting an annual medical evaluation are beneficial, it is also crucial that the health care providers who provide these evaluations fully understand the physical and psychological demands and physiological consequences of firefighting. Additionally, it is important that firefighters act on actionable information regarding risk factors that are assessed as part of these examination. Therefore, we will develop and provide content to IAFF to deliver online course modules for firefighters and healthcare providers to increase knowledge about, (a) CVD progression and its impact in the fire service, (b) risk associated with each of the cardiovascular disease risk factors, especially in the context of firefighting, (c) the importance of annual medical evaluations and additional medical testing (when warranted) in the identification of and stratification of CVD risk, and (d) effective strategies to reduce cardiovascular disease risk factors.

2017-2018    Mediterranean Diet-Based Interventions to Change Firefighters' Eating Habits: A Pilot Study of Adherence Biomarkers / Ohio University, Research Innovation Grant
(Co-Investigator)
This will be a nested study within our FEMA-funded study of Mediterranean lifestyle/behavioral change, which seeks to examine the measurable effects on biomarkers of a Mediterranean-style diet. This study will also help cross-validate our modified Mediterranean diet scale.

EXHIBIT A

24

| 2018-2019 | Mediterranean Diet-Based Interventions to Change Firefighters' Eating Habits: A Pilot Study of Metabolomic/ 2018 SECIM Pilot and Feasibility program, Southeast Center for Integrated Metabolomics, University of Florida (Co-Investigator). This is another nested study within our FEMA-funded study of Mediterranean lifestyle/behavioral change, which seeks to identify additional biomarkers of a Mediterranean-style diet. |

## Report of Local Teaching and Training
### Teaching of Students in Courses:

| 1993 – 1995 | Introduction to Clinical Medicine<br>2nd year medical students | Harvard Medical School<br>32 hours over eight weeks |
| 1993 – | Clinical Experience in Occupational Medicine<br>3rd and 4th year medical students | Harvard Medical School<br>Forty hours per year |
| 1994 – 1995 | Practice of Occupational Health<br>Public health students | Harvard School of Public Health<br>Two hour lecture per year |
| 1996 – 2001 | Introduction to Occupational & Environmental Medicine<br>Public health students | Harvard School of Public Health<br>Two hour lecture per year |
| 2001– | Introduction to Occupational & Environmental Medicine, Course Co-Director and Lecturer<br>Public health students | Harvard School of Public Health<br>Organize and supervise course<br>Eight hours of lecture per year |
| 1999 – 2008 | Patient-Doctor II<br>2nd year medical students | Harvard Medical School<br>Two hour lecture per year |
| 2002 – 2005; | Toxicology | Harvard School of Public Health |
| 2007 – 2009 | Public health students | Two hour lecture per year |
| 2007 – 2013 | Occupational Health<br>Public health students | Cyprus International Institute<br>Average of 18 hours over one to two weeks |

## Formal Teaching of Residents, Clinical Fellows and Research Fellows (post-docs):

| 1993 – 2002 | Occupational/Environmental Medicine Conferences<br>2nd and 3rd year medical residents | The Cambridge Hospital<br>One hour lectures each quarter |
| 1998 – 1999 | Allergy/Immunology Board Review Session | The Cambridge Hospital |

EXHIBIT A

| | Internal Medicine medical residents | Two hour sessions per year |
|---|---|---|
| 2002 | Occupational Medicine<br>Primary Care medical residents | Massachusetts General Hospital<br>One hour lecture |
| 2006 | Independent Medical Examinations<br>Physiatry residents | Spaulding Rehabilitation<br>Hospital<br>One hour lecture |
| 2006 – | Career and other seminars<br>Occupational Medicine residents | Harvard School of Public Health<br>One hour sessions, each |
| 2012 | Introduction to Occupational & Environmental<br>Medicine<br>Physiatry residents | Spaulding Rehabilitation<br>Hospital<br>One hour lecture |
| 2018 | Occupational Sleep Medicine: Focus on OSA<br>T32 Training Grant-Sleep Trainees | Brigham & Women's Hospital/<br>HMS Division of Sleep Medicine<br>One hour lecture and discussion |

**Clinical Supervisory and Training Responsibilities:**

| | | |
|---|---|---|
| 1993–1996; 1998 | Primary Care<br>Preceptor / Harvard Medical School | Ten hours per year |
| 1993 – 1997 | Internal Medicine Morning Report<br>Attending / The Cambridge Hospital | One hour per week |
| 1993 – 1998 | Inpatient Medicine Rounds<br>Attending / Cambridge Hospital | One month per year |
| 1993 – | Occupational Medical Consultation Clinic<br>Preceptor / Cambridge Health Alliance | Four sessions per month<br>(1993 – 2010)<br>Two sessions per month<br>(2010 – ) |
| 2001 | Introduction to Clinical Medicine<br>Preceptor / Boston University School of Medicine | Five sessions |
| 2001 – | Employee Health & Industrial Medicine Clinic<br>Preceptor / Cambridge Health Alliance | Two sessions per week |
| 2012 – | Training Program in Sleep, Circadian and<br>Respiratory Neurobiology<br>Preceptor / Harvard Medical School | Ten to twenty hours per year<br>Mentorship and Supervision |

**Laboratory and Other Research Supervisory and Training Responsibilities:**

EXHIBIT A

26

| 1995 | Advisor for a Community Medicine Research Project for a medical student from Mount Sinai School of Medicine | Daily mentorship for one month |
| 2001 | Preceptor for January Research Program / Colby College | Daily mentorship for one month |
| 2002 – 2006; 2014 | Preceptor for public health research experiences for Human Physiology students / Sargent College, Boston University | Twice weekly mentorship throughout semester |
| 2001 – | Advisor for Occupational Medicine Residency Research Projects / Harvard School of Public Health | Twice weekly mentorship for one year |
| 2003 – 2005; 2011 – | Advisor for doctoral theses / Harvard T.H. Chan School of Public Health | Regular mentorship throughout doctoral studies |
| 2005 – 2006 | Research Advisor for International Dermatology Program / Massachusetts General Hospital | Twice monthly mentorship for one year |
| 2006 – 2007 | Master Thesis Advisor / Boston University School of Medicine | Twice weekly mentorship for six months |
| 2007 – | Supervisor for Post-Doctoral Research for 1 – 3 fellows / Harvard T.H. Chan School of Public Health / Cambridge Health Alliance | Twice weekly mentorship |

**Formally Supervised Trainees and Faculty:**

| 1995 – 2000 | Gerry Polyhronopoulos, M.D., FRCS(C) / Surgical attending, Ville-Marie Medical Center, Montreal, Canada
As a research trainee, co-authored nine papers and gained admission to McGill University Medical School. Building on his research training in our group, as a surgical resident, he performed an extra research year working in Experimental Surgery and received the award for best paper in basic science from the Canadian Association of General Surgeons. |
| 1995 – 1996 | Julia Liu, M.D. / Internal Medicine Resident, Cambridge Hospital
As a research trainee won the 1996 Best Abstract Award in the Associates Research Competition from the American College of Physicians for her study of methanol poisoning that was subsequently published and highly cited in the *Journal of Toxicology and Clinical Toxicology*. |
| 1996 – 1998 | Michael Levine, M.D., M.P.H. / Private practice in Occupational Medicine, Williamsburg, Virginia
Mentored longitudinally as a medical resident in occupational medicine then accepted to the Johns Hopkins Occupational Medicine residency with an Occupational Physicians Scholarship Award. |

## EXHIBIT A

1997 – 1999    Jon M. Aldrich, M.D. / Associate Professor of Anesthesiology, University of California
at San Francisco
As a research trainee, co-authored six papers and gained admission to Stanford Medical
School.

1998 – 1999    Angela Pinzon Rondon, M.D., M.P.H. / Associate Professor, Universidad del Rosario,
School of Medicine and Health Sciences, Bogota, Columbia
As a public health trainee, mastered statistical concepts and software and gained
admission to Harvard School of Public Health.

1999 – 2001    Pierre Mendoza, M.D. / Medical Director, Urologic Robotic Surgery, Ocean Medical
Center, Brick, New Jersey
As a research trainee, co-authored one paper and gained admission to Boston University
School of Medicine.

2001 – 2002    Stavros Christoudias, M.D. / Private practice in surgery, Teaneck, New Jersey
As a research trainee, co-authored three papers and gained admission to University of
Medicine and Dentistry of New Jersey.

2001 – 2002    Scott Tucker, M.D. / Tulane University School of Medicine, Class of 2008
As a research trainee, co-authored two papers and gained admission to Tulane University
School of Medicine.

2001 – 2004    J.C. Chen, M.D., Sc.D. / Associate Professor of Preventive Medicine, Environmental
Health, USC, Keck School of Medicine
Formally supervised as a teaching assistant in my Occupational Medicine course.

2001 – 2005    Elpidoforos Soteriades, M.D., M.Sc., Sc.D. / Visiting Scientist, Harvard School of
Public Health; Assistant Professor at the Institute of Public Health, College of Medicine
and Health Sciences at the United Arab Emirates University.
Formally supervised as OM resident and Doctoral Student. Thesis: Obesity in
Firefighters.  As a trainee, published four papers, co-authored two others and won a
national resident research award from the American College of Occupational and
Environmental Medicine (ACOEM).

2002 – 2003    Marcelo Targino, M.D. /Chief Health Officer & Corporate Medical Director, Johnson &
Johnson
Mentored longitudinally as a medical resident in occupational medicine, then accepted to
the HSPH Occupational Medicine residency with an Occupational Physicians
Scholarship Award.

2002 – 2003    Robert B. Saper, M.D., M.P.H. / Associate Professor & Director of Integrative Medicine,
Boston University School of Medicine and School of Public Health, Co-Editor in Chief,
Global Advances in Health and Medicine
MPH student and research advisee whose research project culminated in a 2004 *JAMA*
publication. Our collaboration later produced a second paper in *JAMA* (2008) and a

EXHIBIT A

28

number of others related to heavy metal contamination of Ayurvedic (traditional Indian) medications.

| | |
|---|---|
| 2003 | Robert Nordness, M.D., M.P.H. / Executive Director Pharmacovigilance Operations at Alexion Pharmaceuticals, Inc., New Haven, Connecticut<br>Occupational medicine trainee, co-authored Massachusetts portion of an *MMWR* report. |
| 2003 | Shannon L. Muller, M.P.H. / Epidemiologist, UBC Corporation, Lexington, Massachusetts<br>As a public health trainee, mastered statistical software and concepts and gained admission to Emory University's Rollins School of Public Health. |
| 2003; 2006; 2007 | Aaron Kenney, B.S., M.S. / University of Vermont College of Medicine, Class of 2012<br>As a research trainee, co-authored one paper and gained admission to a Masters of Biological Science at Drexel University College of Medicine and subsequently to medical school at the University of Vermont. |
| 2003 – 2004 | Erik Won, D.O., M.P.H. / President, Newport Brain Research Laboratory<br>Occupational medicine clinical trainee, co-authored a Disease-based module for the American College of Physicians. He went on to become the Chief Physician in the Southern California Region for the Boeing Company. |
| 2003 – 2004 | Ernest Lee, M.D., M.P.H. / Senior Medical Officer, Occupational Health Detachment, Marine Corps Logistics Base, Barstow, California<br>Occupational medicine trainee, co-authored case series in *Journal of Occupational & Environmental Medicine* and later chapters on chemical weapons. |
| 2004 – 2006 | Jonathan Holder, D.O., M.P.H. / Staff Occupational Medicine Physician, Quadrant, Beverly, Massachusetts<br>Clinical and research trainee, received a national resident research award, lead author on one paper and co-authored a second regarding cardiovascular disease in firefighters. |
| 2004 – 2006 | Ibe Mbanu, M.D., M.P.H., M.B.A. / Senior Medical Director, Advocate Health Care, Downers Grove, Illinois<br>Clinical and research trainee, who published his residency research in Chronobiology. |
| 2005 | Sachin Kapoor, D.O., M.B.A., M.P.H. / Chief, Occupational Medicine and Professional Education, The Permanente Medical Group, Antioch, California<br>Formally supervised as a resident and teaching assistant in my occupational medicine course. |
| 2005 – 2006 | Leonard Stallings, B.S. / Fellow Department of Critical Medicine, Vidant Medical Center, East Carolina University<br>As a research trainee, co-authored two papers and gained admission to Loyola's Medical School. |
| 2005 – 2007 | Karen Huyck, M.D., M.P.H. / Assistant Professor of Medicine, Geisel School of Medicine at Dartmouth, Lebanon, New Hampshire<br>Clinical and research trainee, co-authored one paper and won the Occupational |

EXHIBIT A

Physicians Scholarship Award.

| | |
|---|---|
| 2006;<br>2008 – 2009 | Saeher Muzzafer, M.D. / Chief of the Hazard Evaluation System and Information Service, Occupational Health Branch, California Department of Public Health<br>Clinical trainee who published a review on pneumoconiosis surveillance and received a national resident research award. Completed her Pulmonary Fellowship at University of Pennsylvania School of Medicine concurrently with Occupational and Environmental Medicine Residency. |
| 2006 – 2007 | Jesse Geibe, M.D., M.P.H. / US Navy/DoD Occupational Medicine Liaison, US Centers for Disease Control<br>Clinical and research trainee who published his residency research in *American Journal of Cardiology* and received a national resident research award. |
| 2006 – 2007 | Belayneh Abeije, M.D., M.P.H. / Clinical Professor of Medicine and Medical Director, Employee Health Services, University of California at San Francisco, Fresno, California<br>Clinical and research trainee, he published a review in Environmental Health Perspectives and also received a national resident research award.  The latter research was subsequently accepted for publication in *Journal Occupational Medicine & Toxicology.* |
| 2006 – 2008 | Philip Parks, M.D., M.P.H. / Visiting Scientist, Harvard School of Public Health; Senior Director, Medical Affairs Exact Sciences, Boston, Massachusetts<br>Clinical and research trainee, winner of an Occupational Physicians Scholarship Fund award from the American College of Occupational and Environmental Medicine (ACOEM).  Later, his residency research won awards from Federal Motor Carrier Safety Administration and ACOEM and was published in *Journal of Occupational & Environmental Medicine.* |
| 2006 – 2008 | Ken Spaeth, M.D., M.P.H. / Assistant Professor of Medicine, Hofstra North Shore-LIJ School of Medicine; Director, Occupational and Environmental Medicine Center; Director of Education, Department of Population Health, North Shore University Hospital, Manhasset, New York<br>Clinical trainee, lead author of clinical handbook on neurotoxicity of metals. |
| 2006 – 2009 | Jae Young Kim, M.D., M.P.H. / Assistant Professor of Preventive Medicine, Keimyung University, College of Medicine, Daegu, South Korea<br>Post-doctoral research fellow, lead author of a monograph summarizing a comprehensive meta-analysis of cancer and firefighting after receiving her ScD as a Graduate of the Harvard School of Public Health. |
| 2006 – 2011 | Antonios Tsismenakis, M.D., M.A. / Fellow, Joint Surgery, Hospital for Special Surgery, New York University, NYC, NY<br>Supervised master's thesis at BUSM, which was received with honors. Gained admission to Boston University School of Medicine and subsequently orthopedics residency; co-authored six papers and a handbook, also presented at international hypertension & obesity meetings. |
| 2007 – 2008 | Aaron Thompson, M.D., M.P.H., FRCPC (Occ. Med.) / Assistant Professor, Faculty of |

EXHIBIT A

Medicine, University of Toronto; Director, Occupational Medicine Residency Program, St. Michael's Hospital, Toronto, Ontario, Canada
Clinical trainee, lead author of a lung disease chapter and received national resident research award.

2007 – 2009     Peter Lee, M.D., M.P.H. / Assistant Clinical Professor, Yale University School of Medicine; Global Medical Director, Health Services and Global Occupational Health & Wellness Program Leader, General Electric, Fairfield, Connecticut
Clinical trainee and teaching assistant, winner of a national quality award and two resident research awards.

2007 – 2010     Gerardo Durand, M.D., M.P.H. / Medical Director, Occupational Medicine, 3M Corporation, Saint Paul, Minnesota
Clinical and research trainee, co-authored three articles on sleep apnea in professional drivers. Recipient of National Resident Research Award from the American College of Occupational and Environmental Medicine (ACOEM) in 2010 for research on firefighters, which was then published as a full-length original research article in *Medicine & Science in Sports Exercise*.

2008            Suphagaphan Tarn Ratanamaneechat, M.D. / Instructor in Preventive and Social Medicine, Mahidol University, Siriraj Hospital, Bangkok, Thailand
At the request of the University of Pittsburgh where Dr. Ratanamaneechat had taken academic courses, I designed and supervised a several month clinical mentorship to prepare her to work in a leadership role in occupational health at her home university in Thailand.

2008 – 2009     Tejaswini Kulkarni, M.D., M.P.H. / Faculty, Division of Pulmonary, Allergy and Critical Care Medicine, University of Alabama at Birmingham
Mentored as public health school trainee in Occupational and Environmental Health Curriculum and supervised in an Occupational and Environmental Medicine observership in my clinic. Under my mentorship, gained US-based residency training in internal medicine. After completing her fellowship, she has become junior faculty.

2008 – 2012     Chunbai Zhang, M.D., M.P.H. / Occupational Health Services, University of Washington Valley Medical Center, Renton, Washington
Clinical and research trainee, winner of an Occupational Physicians Scholarship Fund award from the American College of Occupational and Environmental Medicine (ACOEM).  He was a co-author of a state of the science review on emergency responders in the *American Journal of Hypertension*. Later served as Chief Resident (2009-10) and then became our first trainee to pursue occupational sleep medicine formally by combining clinical and research training in internal, occupational and sleep medicine.  Awarded a NIOSH Pilot grant 2010-2011 under joint mentorship between myself and Atul Malhotra (then of the HMS/BWH Sleep Division) to examine driving simulators as potential occupational screening for sleep disorders and excess daytime sleepiness. He published/co-authored several original papers, two chapters and a review related to sleep apnea in commercial drivers and made two presentations at Sleep meetings.

EXHIBIT A

31

| | |
|---|---|
| 2008 – 2012 | Adi Leiba, M.D., M.P.A., FACP / Head, Academy and Research Branch, Israeli Defense Forces, Tel Aviv, Israel; Clinical Assistant Professor, Tel Aviv University; Instructor in Medicine, Harvard Medical School; Hospitalist, Mount Auburn Hospital, Cambridge, Massachusetts.<br>Clinical and research trainee. Co-authored a case-report; presented original research at two international hypertension meetings; and co-authored two original research reports. |
| 2009 – 2010 | Eric Amster, M.D., M.P.H. / Associate Medical Director, Institute of Occupational and Environmental Medicine, Israel; Faculty, Dept. Environmental Health, Haifa University School of Public Health & Technion Center for Excellence in Environment Health, Haifa, Israel.<br>Clinical trainee and teaching assistant, winner of a national resident research award from the American College of Occupational and Environmental Medicine (ACOEM) and a Fulbright Scholarship. |
| 2010 – 2011 | Stasia Muhlner, M.D., M.P.H. / Occupational Medicine Staff, Kaiser Permanente, San Francisco, California<br>Clinical trainee and teaching assistant, winner of a national resident research award from the American College of Occupational and Environmental Medicine (ACOEM). |
| 2010 – 2011 | Anne McDonough, M.D., M.P.H. / Occupational/Environmental Medicine, US Navy, Norfolk, Virginia<br>Clinical trainee, winner of a national resident research award from the American College of Occupational and Environmental Medicine (ACOEM). |
| 2010 – 2011 | Yolanta Petrofsky, M.D., M.P.H. / Occupational Medicine, North Bay Healthcare, Fairfield, California.<br>Clinical trainee, winner of an Occupational Physicians Scholarship Fund Award from the American College of Occupational and Environmental Medicine (ACOEM). |
| 2010 – 2012 | Dorothee Baur, M.D., M.Sc. / Endocrine Practice, Munich-area, Germany<br>Masters Student and Research trainee in Occupational and Cardiovascular Epidemiology and Clinical Research. Co-authored seven peer-reviewed publications and then continued to collaborate as an HSPH Visiting Scientist until 2016. |
| 2010 – 2012 | Albert Rielly, M.D., M.P.H. / Visiting Scientist, Harvard School of Public Health; Instructor in Medicine, Part-Time, Harvard Medical School; Occupational/ Environmental Medicine, Cambridge Health Alliance, Cambridge, Massachusetts; Medical Director of Employee Health, Massachusetts General Hospital, Boston, Massachusetts<br>Clinical and research trainee and Occupational Medicine Chief Resident. Co-authored one research article and the revision of a heart disease manual for the firefighters' union (IAFF) of the US/Canada while a trainee. |
| 2010 -2012 | Paul Medrek, M.D., M.P.H. / Occupational Medicine Attending, Partners Healthcare; Medical Office, Eastman Chemical Company, Indian Orchard, Massachusetts<br>Clinical and research trainee and OM Resident. First trainee to graduate and become Occupational Medicine board-certified under the American Board of Preventive Medicine's "Complementary Pathway". |

EXHIBIT A

2010 -2012   Denise Gaughan, Sc.D. / Assistant Professor, Preventive Medicine, Institute of
Translational Epidemiology, Ichan School of Medicine at Mount Sinai, New York,
New York
Doctoral student committee member. Dr. Gaughan's thesis studied cardiovascular,
pulmonary and other health effects in "wildland" firefighters (fight forest and brush
fires) versus structural firefighters. Published three papers from this work, one of which
won the Michigan Industrial Hygiene Society"s Best Scientific Paper.

2010 –   Vasileia Varvarigou, M.D. / Visiting Scientist, Harvard School of Public Health;
Community Primary Care Practice, Boston, Massachusetts
Research trainee in Occupational and Cardiovascular Epidemiology and Clinical
Research. Has co-authored seven publications. In the spring of 2012, she won a national
resident research award from the American College of Occupational and Environmental
Medicine (ACOEM); was chosen as a finalist in the HSPH Cardiovascular
Epidemiology Program's Post-Doctoral Fellows research competition; and a Cambridge
Health Alliance trainee research poster competition. This research on sudden cardiac
death among police officers went on to be published with her as the lead author in the
BMJ in 2014. She completed internal medicine training at Tufts (St. Elizabeth's) while
continuing to be mentored in research. She collaborates with our group as a Visiting
Scientist at HSPH and hopes to continue her academic career in OM after completing US
visa-obligations through her current primary care work.

2011 – 2013   Kevin Johnson, D.O., M.P.H. / Medical Director, US Navy, Bremerton, Washington
Clinical and research trainee and OM Chief Resident. Performing research on sleep
hygiene and self-reported accident risk in transportation workers. In the spring of 2013,
he was selected for a national resident research award from the American College of
Occupational and Environmental Medicine (ACOEM) for the above research. The paper
was subsequently accepted in the *Journal of Occupational and Environmental Medicine*.

2011 – 2013   Salma Batool-Anwar, MD, MPH / Clinical Practice. Pulmonary and Sleep Medicine
Joint research trainee with Dr. Atul Malhotra working on sleep apnea and driving safety.
Published one paper in *Nature and Science of Sleep* and two abstracts.

2011 – 2013   Dennis Teehan, M.D., M.P.H. / Medical Director, Boston Fire Department
Clinical and research trainee, OM Resident and winner of an Occupational Physicians
Scholarship Fund award from the American College of Occupational and Environmental
Medicine (ACOEM). Performed research on sudden cardiac death in young firefighters.
In the spring of 2013, he was selected for a national resident research award from
ACOEM for the above research and the work was published in the *American Journal of
Cardiology*.

2011 – 2014   Eleni Christoforidou, M.Sc., Ph.D. / Post-Doctoral Researcher, University of
Thessaloniki Medical School, Thessaloniki, Greece
Served on her three member doctoral committee at the University of Athens. She
studied the effect of environmental exposure to heavy metals – chromium included – on
mortality of the general population of Oinofita region of Greece. She published several
papers from her thesis and successfully defended her Ph.D. dissertation in June 2014.

**EXHIBIT A**

| | |
|---|---|
| 2011 – 2014 | Matthew S. Thiese, Ph.D., M.S.P.H. / Assistant Professor, University of Utah; Rocky Mount Center for Environmental/Occupational Health, Salt Lake City, Utah I served as a faculty mentor on Matthew's KO1 Career Award from NIOSH on medical issues and risk factors for crashes among commercial drivers. The award led to three published papers, several more in preparation and an R21 proposal that has been submitted. |
| 2012 – 2013 | Josée L. Pilon, M.D., M.P.H., CCFP, CCBOM / National Medical Advisor, Royal Canadian Mounted Police (RCMP), Adjunct Associate Professor, University of Ottawa, Faculty of Medicine, Ottawa, Canada Post Doctoral, public health MPH trainee in Occupational Health. Upon return to Canada, successfully certified as member of the Canadian Board of Occupational Medicine by passing written and oral exams. She took a leadership position in occupational health with the Canadian federal government and after one year, this led to a second high-ranking post with the Royal Canadian Mounted Police. |
| 2012 – 2013 | Shu-Yi Liao, M.D., M.P.H., Sc.D. / Fellow, Pulmonary and Critical Care Medicine, University of California, Davis Special Clinical Fellow in Occupation Medicine – clinical trainee while finishing his doctoral studies at HSPH. After our mentorship gained a US clinical internal medicine residency position in the UC-system and is now in a pulmonary fellowship. |
| 2012 – 2014 | Michael Shusko, M.D. / Director, Occupational Medicine/Public Health, US Navy, Okinawa, Japan Clinical and research trainee and OM Resident/Chief Resident. Research on police recruit fitness funded by NIOSH ERC pilot grant and a competitive contract from the Commonwealth of Massachusetts. He won a 2014 CHA trainee research poster competition for clinical research, presented a poster also at ACOEM and submitted the paper for publication. |
| 2012 – 2014 | Sharon Lee, M.D., M.P.H. / Assistant Professor, Icahn School of Medicine at Mount Sinai; Practice in Occupational Medicine, Selikoff Centers for Occupational Health, New York, New York Clinical trainee and OM Resident. Her research won a national ACOEM resident research award. |
| 2012 – 2014 | Diane Chen, M.D., M.P.H. /  Occupational Medicine Attending, Reliant Medical Group, Worcester, Massachusetts Clinical and research trainee and OM Resident. Performing research on driving simulator performance in commercial drivers and risk of obstructive sleep apnea. |
| 2012 – | Justin (Chih Chao) Yang, M.D., M.P.H. / Occupational Medicine Resident In 2012, Justin became a Post-Doctoral Research trainee in Occupational and Cardiovascular Epidemiology and Clinical Research. Finalist and winner of a 2013 Cambridge Health Alliance trainee research poster competition for clinical research. Has published ten peer-reviewed papers, was accepted at St. Elizabeth's/Tufts for Internal Medicine Residency. In 2015, he won a Massachusetts ACP Resident Research Runner up award, and in 2017, his research was recognized at St. Elizabeth's research day. He completed his IM in 2017 and was been accepted for July 2017 to join our OM |

EXHIBIT A

residency. He has board-certified in IM and been selected as a recipient of various awards at the 2018 and 2019 AOHC conferences of ACOEM.

2012 –  Maria Korre, ScD, M.Sc. / Visiting Scientist, Harvard T.H. Chan School of Public Health, Visiting Assistant Professor, Public Health, Skidmore College, Saratoga Springs, New York
Originally my MSc student in Cyprus, Maria worked with me to gain admission to our Doctoral program in occupational health. I served as her curriculum and thesis advisor, and now as her post-doctoral mentor. Dr. Korre is studying cardiovascular disease issues among police and firefighters. She has led/contributed to authorship to ten published articles with several others in preparation or submitted. She won the 2016 award for the Best Student Poster at the Harvard Chan School Poster Day and has presented at several regional and national conferences. She was the winner of the 2017 Public Safety Medicine Scholarship from the Public Safety Medicine Section of the American College of Occupational & Environmental Medicine. In August, she accepted a faculty position at Skidmore College.

2013 – 2015  Laurent Benedetti, M.D., M.P.H. / Medical Director, Employee Health, Beth Israel Deaconess Medical Center, Boston, Massachusetts
Clinical and research trainee and OM Resident. Performed research on public safety worker fitness resulting in a monograph and a paper accepted for publication.

2013 – 2015  Mason Harrell, M.D. / Medical Director, Occupational Medicine, U.S. Navy, San Diego, California
Clinical trainee and OM Resident. His research won a national the American College of Occupational and Environmental Medicine (ACOEM) resident research award, and was then published in the Journal of Occupational & Environmental Medicine.

2013 – 2015  Alix LaCoste, Ph.D. / IBM Watson Project
Doctoral Candidate, Molecular Biology, Harvard. Curriculum advisor for HMS Sleep Medicine T-32 training grant which sponsored Dr. LaCoste. She successfully defended her thesis and has joined the IBM Watson project.

2013 – 2016  Andrea Farioli, M.D., Ph.D. / Research Associate, University of Bologna, Bologna, Italy; Visiting Scientist, Harvard T.H. Chan School of Public Health
Sponsored and funded by the University of Bologna to train for 12 months in my group and programs as an HSPH Visiting Scientist. Dr. Farioli collaborated on research and served as a clinical observer. He was accepted to complete a PhD at University of Bologna under my research supervision and returned there as a salaried Research Associate, where he successfully defended his doctoral work. He has published 11 papers with our group.

2013 –16  Erin Teeple, M.D. / Post-Doctoral Fellow, Liberty Mutual/UMass Lowell
Clinical and research trainee and OM Resident. First joint trainee with Brigham and Women's Center for Orthopedic and Arthritis Outcomes Research (J. Katz, PI). Erin graduated and has now joined the Liberty Mutual Disability Research Institute as a Post-Doctoral Fellow.

2014  Konstantina Sampani, M.D. / Medical Graduate, Democritus University of Thrace,

EXHIBIT A

Alexandroupoli, Greece; Post-Doc, Harvard School of Public Health
Visiting Physician Researcher/Observer in Occupational Medicine at CHA/HSPH.
Collaborated on a study of anthropometrics and driving simulator performance.

2014 – 2015     Soni Matthew, M.D. / Occupational Medicine Director, General Electric, Lynn,
Massachusetts
Clinical trainee and OM Resident. Our second trainee to graduate under the American
Board of Preventive Medicine's "Complementary Pathway".

2014 – 2015     Paula Carpintero Perez, M.D. / Physical and Rehabilitation Specialist, Henares Hospital,
Madrid, Spain
Visiting Occupational Medicine Resident at HSPH, clinic observation and mentorship
for one year. Afterwards was able to obtain a staff physiatry position in Madrid.

2014 – 2015     Elpida Frantzekou, M.D., Ph.D. / Occupational Medicine Staff Physician, Evangelismos
Hospital, Athens, Greece
Visiting OM Resident for five weeks as HSPH and then longitudinally mentored and
supervised her OM residency thesis regarding the practice of Occupational Medicine in
the US, which was successfully defended in 2015.

2014 – 2017     Stephanie Susser, M.D., M.Sc., M.P.H. / Chief Occupational/ Environmental Service,
Department of Public Health, Laval, Quebec, Canada
I supervised Dr. Susser for two months in our OM clinic as a visiting resident from the
Universite de Montreal and then continued to serve as one of her mentors in the HSPH
MPH in Epidemiology-Online and on campus from which she graduated in May 2017.
With my support she was able to successfully write the American Board of Preventive
Medicine Exam in Occupational Medicine in 2017.

2014 – 2016     Sam Turner, M.D. / Occupational Medicine Director, US Navy, Yokohama, Japan
Clinical and research trainee and Occupational Medicine resident. Performed research on
Police officer stress with a paper in preparation.

2014 – 2016     Kevin Loh, D.O. / Occupational Medicine Physician, Wilford Hall Medical Center, San
Antonio, US Air Force
Clinical and research trainee and OM Resident. Performed prospective research on
recruit fitness and police academy graduation rates funded by the Commonwealth of
Massachusetts.  Winner of the 2016 Public Safety Medicine Scholarship from the Public
Safety Medicine Section of the American College of Occupational & Environmental
Medicine.

2014 – 2016     Jeffrey Vogel, M.D., M.P.H. / Instructor in Medicine, Harvard Medical School,
Occupational Medicine Staff Physician, CHA, CEO and Founder of RecoverMe
Clinical trainee and OM Resident. Winner of an Occupational Physicians Scholarship
Fund award from the American College of Occupational and Environmental Medicine
(ACOEM) as a competitive travel scholarship. During his training, Jeff founded a start-
up company which has created a smartphone app to facilitate recovery from workplace
injuries. The company has attracted significant investment and has its application in
beta-testing

EXHIBIT A

36

2014 – 2017    Shane Journeay, M.D., Ph.D. / Assistant Professor, University of Toronto
Originally mentored as a medical student, Shane then became a clinical trainee and OM Resident. In joint training with University of Toronto, Physiatry Residency Program, he finished the Physiatry portion and successfully wrote the Royal College and ABMS exam in this discipline. He then finished requirements for OM and also passed the ABPM board exam for US certification.

2014 – 2016    Konstantina Sampani, M.D. / Post-Doctoral Fellow, Joslin Clinic
Post-doctoral research trainee in Occupational and Cardiovascular Epidemiology and Clinical Research. Co-authored three papers to date and helped to draft a CME module for the National Sleep Foundation.

2015 – 2016    Patthrarawalai Phichalai, M.D., M.P.H. / Attending Physician, King Chulalongkorn Memorial Hospital; Clinical Instructor, Department of Preventive and Social Medicine, Faculty of Medicine, Chulalongkorn University, Bangkok, Thailand
Special Clinical Fellow in Occupational Medicine.  Clinical trainee for 12 months under the sponsorship of her university hospital in Thailand.

2015 –    Emily Eshleman, M.Sc / Research Assistant, Medical Student at Philadelphia College of Osteopathic Medicine, Philadelphia, PA.
Emily did a two-year masters at Harvard Chan and after spending some time visiting our clinic, she began to assist us with several police and fire studies. Emily is a co-author on a manuscript and continues to assist us with several online health surveys and other research projects.

2015 – 2017    Luiz Guilherme Grossi Porto, M.Sc., Ph.D. / Visiting Scientist, Harvard T.H. Chan School of Public Health, Professor of Physical Education, University of Brasilia
Visiting Scientist in Cardiovascular Epidemiology; Professor, Cardiovascular Laboratory Faculty of Medicine, Adjunct Professor of Public Health, Faculty of Physical Education, Universidade de Brasilia.  Dr. Porto was awarded a competitive scholarship from the Brazilian government to work at HSPH under my supervision and we are continuing to collaborate on several grants from Brazil and the US. He has published several papers, presented at several international meetings and his 2016 poster submission to the Endocrine Society was selected for the Annual Presidential competition.

2016 – 2017    Mercedes Sotos-Prieto, Ph.D. / Assistant Professor, Food and Nutrition Science, Ohio University and Visiting Scientist, Harvard T.H. Chan School of Public Health
A former Post-Doc with Prof. Frank Hu in Nutrition at Harvard T.H. Chan School of Public Health whose doctoral work was done within the Spanish PREDIMED trial, she came to work full-time on our federally-funded Mediterranean Diet Nutritional Intervention within the US Fire Service as a Research Associate. We have already co-authored one review, one invited commentary and one original paper together.  She was recently recruited to a new faculty position at Ohio, where she will continue to collaborate with our group on Mediterranean nutrition workplace interventions as a Visiting Scientist.

2016 –2017    John Clarke MD / Occupational Medicine Director, Cornell University, Ithaca, NY
As a clinical trainee, John was our third mid-career, complementary pathway resident.

**EXHIBIT A**

He came as a Board-Certified Family Physician and Medical Director for ConEdison, NY. As a result of his ongoing training with us, he was able land the more complex job of overseeing occupational medical services for Cornell University and its laboratories. He began this job concurrent with the remainder of his training, which he finished in December 2017.

| | |
|---|---|
| 2016 | Fabianne Bonnet MD / Occupational, Legal, Forensic and Traffic Medicine Residency Preceptor, University of Sao Paulo, Brazil<br>Supervised occupational medicine training of this Brazilian resident at Harvard as a culminating experience of her Brazilian residency and in preparation to assume her current teaching role at the program. |
| 2016 – 2018 | David Rainey MD, MPH / Occupational Medicine Resident, Instructor in Medicine, HMS, Occupational Medicine Attending, Cambridge Health Alliance, Visiting Scientist and Assistant Residency Program Director, Harvard T.H. Chan School of Public Health<br>Clinical and research trainee and OM Resident. Performing prospective research on an open-online Mediterranean Nutrition Intervention among Volunteer Firefighters. Winner of a 2018 Public Safety Medicine Scholarship and the 2018 Medical Center Occupational Health Scholarship both from the American College of Occupational & Environmental Medicine. |
| 2016 – 2018 | Michael Chin MD, MPH / Occupational Medicine Chief Resident, Assistant Professor of Medicine & Assistant Director of Occupational Health, Vanderbilt University<br>Clinical and research trainee and OM Resident. Performed original research on stress and resiliency, which was awarded a NIOSH Pilot grant as well as a pilot from NIEHS after winning a flash-funding competition. Michael has co-authored a textbook chapter and has won a 2018 Public Safety Medicine Scholarship from the American College of Occupational & Environmental Medicine. He also published two papers from his residency research. |
| 2016- 2018 | Clifton Wilcox MD, MPH / Occupational Medicine Resident, Occupational Medicine Department Head, Naval Hospital, US Navy, Jacksonville Florida<br>Clinical and research trainee and OM Resident. Performed original research on sleep apnea screening in commercial drivers, which was awarded a 2018 Resident Research Award from the American College of Occupational & Environmental Medicine. |
| 2017 | Berenice Luna Garcia MD / Visiting Scientist, Harvard T.H. Chan School of Public Health, Health Sciences Master Program (Occupational Health), School of Medicine, Universidad Nacional Autónoma de México, Mexico City, Mexico.<br>Awarded a scholarship from her university to spend three months in my group doing occupational sleep medicine research. She analyzed data collected on Mexican security officers under my supervision, as well as leading data extraction for a study of sleep and fatigue as factors in transport accidents investigated by the US National Transportation Safety Board. |
| 2017 – | Vladimir Ivkovic, PhD / Director, Laboratory for Neuroimaging and Integrative Physiology, Mass General Hospital<br>Scientific Advisory Board for Dr. Vladimir Ivkovic's NIH Mentored Research Scientist Development Award (K01) proposal "Validating Multimodality Brain and |

EXHIBIT A

Psychophysiological Monitoring for Assessment and Prediction of Post-Traumatic Stress in First Responders".

2017-        Maria Romanidou / PhD Candidate, University of Alexandroupolis, Greece
             Member of Maria's Thesis committee. She was previously a volunteer researcher in our group in 2017. She returned to Greece to finish her Master's degree in nutrition and will now pursue a doctorate in Greece using data from our study of Mediterranean Nutrition intervention among firefighters. Maria has already presented at several international conferences.

2017-        Fan-Yun Lun MD / PhD Candidate, Harvard T.H. Chan School of Public Health.
             Primary advisor for Dr. Lun's PhD studies.

2017-19      Leslie Cadet MD, MPH / Occupational Medicine Chief Resident, Occupational Medicine Attending at Loma Linda University
             Clinical trainee and OM Resident. Performed and published original research on air quality for airline pilots, which was awarded a 2018 Resident Research Award from the American College of Occupational & Environmental Medicine.

2017-19      Jacob Ankeny MD, MPH / Occupational Medicine Resident, Division Officer Occupational & Environmental Medicine and Director OEM Fundamental Course Navy & Marine Corps Public Health Center, Portsmouth VA
             Clinical and research trainee and OM Resident. Performing research on firefighter recruit health as well as a systematic review of novel cardiovascular risk markers.

2017-19      Jeff Kiser MD, MPH / Occupational Medicine Resident, Flight Commander-Occupational Medicine Services, Robins Air Force Base, Georgia
             Clinical and research trainee and OM Resident. Performing research on firefighter recruit health as well as a systematic review of coronary calcium scores as a screening test.

2018-        Christopher Scheibler MD, MPH / Occupational Medicine Chief Resident (2019-20)
             Clinical and research trainee and OM Resident. Performing research on firefighter recruit health.

2018-        Nathan Jones MD, MPH / Occupational Medicine Resident
             Clinical trainee and OM Resident.

2018-        Robert Filler MD, MPH / Occupational Medicine Resident
             Clinical trainee and OM Resident.  Performing research on sleep apnea screening in commercial drivers,

2018-        Hussam Kurdi MD, MPH / Occupational Medicine Resident
             Clinical and research trainee and OM Resident. Performing research on toxicology of nano-particle exposures in the photocopying industry.

2018-        Michael Parenteau MD, JD, MPH / Occupational Medicine Resident
             Clinical trainee and OM Resident. He is analyzing data for a study of sleep and fatigue as factors in transport accidents investigated by the US National Transportation Safety

EXHIBIT A

Board.

| 2019- | Andria Christodoulou / PhD Candidate, Cyprus University of Technology – Cyprus International Institute for Environmental and Public Health, Member of Doctoral Committee |
| 2019- | Richard Abbitria MD / Occupational Medicine Resident<br>Clinical trainee and OM Resident. |
| 2018- | Stephen Kasteler MD / Occupational Medicine Resident<br>Clinical trainee and OM Resident. |
| 2018- | Gabe Gaviola MD / Occupational Medicine Resident<br>Clinical and research trainee and OM Resident. |
| 2018- | Glen Cheng MD, JD / Occupational Medicine Resident<br>Clinical trainee and OM Resident. |

**Formal Teaching of Peers (e.g., CME and other continuing education courses):**
Those presentations below sponsored by outside entities are so noted and the sponsor is identified.

| 1994 | Solvents; Metals<br>Fundamental of Industrial Hygiene, Harvard School of Public Health | Two Plenary Lectures<br>Boston |
| 1997 – 2003; 2005 | Lung Disease due to Organic and Inorganic Dusts, Fundamentals of Industrial Hygiene, Harvard School of Public Health | Plenary Lecture<br>Boston |
| 2003 | Clinical Recognition of Chemical Toxidromes<br>Chemical Terrorism and Public Health:  Recognize, Prepare and Respond, Harvard School of Public Health | Plenary Lecture<br>Boston |
| 2003; 2005 | Introduction – Why This Training is Important<br>Emergency Medical Services Response to Hazardous Materials Incidents or Acts of Terrorism, Harvard School of Public Health | Plenary Lecture<br>Boston |
| 2005 | Metal Fumes and Dusts; Chemical Emergencies Including Pesticide Poisoning<br>Fundamentals of Occupational Health, Cyprus International Institute and Harvard T.H. Chan School of Public Health | Two Plenary Lectures<br>Nicosia, Cyprus |
| 2006 – 2008 | Medical Monitoring of Asbestos-Exposed Workers<br>Current Concepts in Asbestos-Related Lung Disease, Harvard Medical School | Plenary Lecture<br>Boston |

**EXHIBIT A**

| 2010 | Framing Achievements and Challenges in Productivity & Health Management<br>Leadership for Productivity & Health Management, Harvard School of Public Health/Novartis, Whole Foods, Harvard Pilgrim, Healthways, Wellpoint | Plenary Lecture<br>Boston |
|------|------|------|
| 2012 | Screening Transportation Operators for Obstructive Sleep Apnea<br>Leadership for Productivity & Health Management: Sleep and Shift Work, Harvard School of Public Health/ Occupational & Environmental Health Network | Plenary Lecture<br>Boston |
| 2014 | Challenges: Diabesity & Contemporary Nutrition<br>Leadership for Productivity & Health Management: Mediterranean Diet & Workplace Health 2014, Harvard School of Public/FAGE USA | Plenary Lecture<br>Boston |

**Local Invited Presentations:**
Those presentations below sponsored by outside entities are so noted and the sponsor is identified.

| 1993 | Occupational Medicine / Grand Rounds<br>Department of Medicine, Harvard University Health Services |
|------|------|
| 1994 | Treatment of Chemical Burns / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 1995 | Case Discussion: A 55 Year Old Disabled Construction Worker with Increasing Dyspnea and Abnormal Chest Radiographs / Clinicopathological Conference<br>Department of Pathology, Massachusetts General Hospital (New England Journal of Medicine |
| 1995 | Silicosis and Related Diseases / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 1995 | Pneumoconioses / Seminar<br>Poison Control Center, Toxicology Fellowship, Children's Hospital |
| 1996 | Hypersensitivity Pneumonitis / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 1997 | Carbon Monoxide Poisoning / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 1997 | Occupational and Environmental Lung Disease / Adult Provider Conference<br>Department of Medicine, Cambridge Health Alliance |
| 1998 | Accelerated Silicosis and Silica-Related Diseases / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |

EXHIBIT A

| 1998 | Methanol Poisoning (Prognostic Factors) / Grand Rounds/Morbidity and Mortality<br>Department of Medicine, Cambridge Health Alliance |
|---|---|
| 1998 | Firefighting Medical Requirements – The Science Behind NFPA 1582 / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 1999 | Latex Allergy:  Diagnostic and Laboratory Considerations / Grand Rounds<br>Department of Medicine, Cambridge Health Alliance |
| 1999 | Methylene Chloride Intoxication / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 1999 | Latex Allergy / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2000 | Idiopathic Environmental Intolerance / Grand Rounds<br>Department of Medicine, Cambridge Health Alliance |
| 2001 | Biological Testing for Mercury / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2002 | Chemical Terrorism / Faculty Panel<br>Alumni Day, Harvard School of Public Health |
| 2002 | Clinical Approach to the Mercury-Exposed Patient / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2003 | Lead, Seizures and 'Guglu':  The Hidden Dangers of Ayurvedic Medicine / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2003 | An Indian Immigrant with Lead Poisoning and Seizures – Dangers of Traditional Medicines /<br>Grand Rounds<br>Department of Medicine, Cambridge Health Alliance |
| 2003 | Latex Allergy and Pseudo-Latex Allergy / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2004 | Chemical Emergencies / Grand Rounds<br>Department of Medicine, Cambridge Health Alliance |
| 2004 | Abdominal Pain in a Young Man (Lead Toxicity) / Grand Rounds/Morbidity and Mortality<br>Conference<br>Department of Medicine, Cambridge Health Alliance |
| 2004 | Lead Toxicity Among Brazilian Painters / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2005 | Profile of Massachusetts Firefighters Retiring Under Heart Presumption Legislation: |

**EXHIBIT A**

**42**

| | |
|---|---|
| | 1997 – 2004 / Pilot Project Symposium<br>Department of Environmental Health, Harvard School of Public Health, Harvard-NIOSH Educational Resource Center |
| 2005 | Mercury and the General Population / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2006 | Carbon Monoxide Poisoning / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2007 | Asbestos-Related Pericarditis / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2007 | On-Duty Coronary Heart Disease Events in Firefighters:  Predictors of Fatality / Pilot Project Symposium<br>Department of Environmental Health, Harvard School of Public Health, Harvard-NIOSH Educational Resource Center |
| 2007 | Hypertension in Emergency Responders / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2007 | Ayurvedic Lead Poisoning / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2008 | Hypertension in Police, Firefighters and Other Emergency Responders / Hypertension Conference<br>Department of Medicine, Brigham and Women's Hospital |
| 2008 | Screening for Obstructive Sleep Apnea at Commercial Driver Examination / Pilot Project Symposium<br>Department of Environmental Health, Harvard School of Public Health, Harvard-NIOSH Educational Resource Center |
| 2008 | Obstructive Sleep Apnea and Commercial Motor Vehicle Drivers / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2009 | Coronary Heart Disease in Firefighters:  State of the Science / Grand Rounds<br>Department of Medicine, Cambridge Health Alliance |
| 2009 | Cardiovascular Disease in Firefighters / Grand Rounds<br>Department of Family Medicine, Cambridge Health Alliance |
| 2009 | A Motor Vehicle Accident Due to Obstructive Sleep Apnea / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2009 | The Obesity Epidemic and Obstructive Sleep Apnea in Transportation Workers / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |

EXHIBIT A

| | |
|---|---|
| 2010 | Workers Compensation:  The Initial Care of Occupational Injuries / Conference<br>Department of Emergency Medicine, Cambridge Health Alliance |
| 2010 | Elevated Urine Mercury Levels / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2011 | High Risk Groups – Untreated Sleep Disorders, Non-Standard Work Hours, Commercial<br>Vehicle Drivers / Invited Faculty – Discussant and<br>Drowsy Driving:  Translating Sleep Research to the Real World:  Developing a Regulatory<br>Framework for Drowsy Driving and Exploring the Challenges of Physiologically Based<br>Modeling / Invited Faculty – Participant<br>Internal Leadership Seminar, Radcliffe Institute for Advanced Study, Harvard University |
| 2011 | Disaster Response:  Lessons Learned Since 9/11 / Expert Panel Member<br>Live and On-Demand Webcast, The Forum at Harvard School of Public Health (Reuters) |
| 2011 | Recognizing and Managing Cardiovascular Risk in Firefighters / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2011 | Alleged Arsenic Poisoning:  Was it Attempted Murder? / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2012 | Motor Vehicle Crash in a Commercial Driver with Obstructive Sleep Apnea / Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2012 | Cardiomegaly, Left Ventricular Hypertrophy and Sudden Cardiac Death in Firefighters /<br>Grand Rounds<br>Department of Environmental Health, Harvard School of Public Health |
| 2014 | Occupational Sleep Medicine:  Obstructive Sleep Apnea in Commercial Drivers /<br>Grand Rounds<br>Division of Sleep Medicine, Harvard Medical School and Brigham and Women's Hospital |
| 2015 | Cardiovascular Disease in a Police Officer / Grand Rounds<br>Department of Environmental Health, Harvard T.H. Chan School of Public Health |
| 2016 | A Preventable Truck Crash in a Commercial Driver with Obstructive Sleep Apnea /<br>Grand Rounds<br>Department of Environmental Health, Harvard T.H. Chan School of Public Health |
| 2016 | Indoor Air Quality, "Chemical Sensitivity" and Mold - Facts and Fiction /<br>Morning Conference, Invited Speaker<br>Division of Allergy & Immunology, Brigham and Women's Hospital, Harvard Medical<br>School |
| 2016 | Asymptomatic Elevation of Blood Mercury/ Grand Rounds<br>Department of Environmental Health, Harvard T.H. Chan School of Public Health |

EXHIBIT A

44

| 2016 | Progressive Lung Disease in a Sausage Maker: a Case of Salami Brusher's Disease/ Grand Rounds |
| | Department of Environmental Health, Harvard T.H. Chan School of Public Health |

| 2016 | Sudden Cardiac Death in a Corrections Officer/ Grand Rounds |
| | Department of Environmental Health, Harvard T.H. Chan School of Public Health |

| 2017 | Utility Worker Fatalities in a Manhole: Toxicology and Prevention of Confined Space Hazards due to Sewer Gas/Hydrogen Sulfide / Grand Rounds |
| | Department of Environmental Health, Harvard T.H. Chan School of Public Health |

| 2017 | Introduction to the Greek Diet: and Evening with the Renowned Chef Maria Loi. Initiative for Productivity and Health Management, Harvard T.H. Chan School of Public Health |

| 2018 | Latex Allergy and Pseudo-Latex Allergy/ Grand Rounds |
| | Department of Environmental Health, Harvard T.H. Chan School of Public Health |

| 2018 | Wi-Fi Makes my Head Hurt, A Case of Environmental Intolerances/ Grand Rounds |
| | Department of Environmental Health, Harvard T.H. Chan School of Public Health |

| 2018 | Sudden Cardiac Death in a Volunteer Fire Chief/ Grand Rounds |
| | Department of Environmental Health, Harvard T.H. Chan School of Public Health |

| 2019 | Mercury Exposure in Seafood and Freshwater Fish – Reason to Worry? / Grand Rounds |
| | Department of Environmental Health, Harvard T.H. Chan School of Public Health |

| 2019 | Lead Lead Toxicity Among Painters: Still Here, But Are We Doing Better ? / Grand Rounds |
| | Department of Environmental Health, Harvard T.H. Chan School of Public Health |

| 2019 | Welcome, Introduction and Overview / Mediterranean Diet: Promotion and Dissemination of Healthy Eating, Exploratory Seminar at the Radcliffe Institute for Advanced Study, Harvard University |

**Report of Regional, National and International Invited Teaching and Presentation**

**Regional:**
Those presentations below sponsored by outside entities are so noted and the sponsor is identified.

| 1992 | Occupational Medicine / Grand Rounds |
| | St. Anne's Hospital, Fall River, Massachusetts (Commonwealth of Massachusetts SENSOR Program) |

| 1993 | Occupational Medicine / Grand Rounds |
| | St. Luke's Hospital, New Bedford, Massachusetts (Commonwealth of Massachusetts SENSOR Program) |

**EXHIBIT A**

45

1993          Occupational Medicine / Grand Rounds
              Arlington Hospital, Arlington, Massachusetts (Commonwealth of Massachusetts SENSOR
              Program)

1994          The Hazmat Response / Plenary Talk – Airborne Toxins Conference
              Baystate Medical Center, Springfield, Massachusetts (Massachusetts Poison Control
              Center)

1994          The Hazmat Response / Plenary Talk – Airborne Toxins Conference
              Wellesley College, Wellesley, Massachusetts (Massachusetts Poison Control Center)

1996          Hazardous Materials Incidents / Plenary Talk
              First Annual Northeast Regional All-Hazard Conference, Boston, Massachusetts
              (Massachusetts Emergency Management Association)

2002          Medical Examinations of Firefighters:  Issues in Medical Surveillance & Fitness for Duty /
              Seminar – Invited Faculty
              University of Connecticut Health Center, Farmington, Connecticut

2003          On-Duty Coronary Heart Disease Deaths in Firefighters / Plenary Talk
              New England College of Occupational & Environmental Medicine Conference,
              Bedford, Massachusetts

2005          Chemical Emergencies / Visiting Professor
              Occupational Health Colloquium, University of Connecticut, Farmington, Connecticut

2005          Mercury and Human Health / **Keynote Speaker**
              **7th Annual Research Symposium, New England Hellenic Medical and Dental Society,**
              Boston, Massachusetts

2005          Lead Poisoning from Ayurvedic (Traditional Indian) Medications / Research Presentation
              New England College of Occupational & Environmental Medicine Annual Conference,
              Bedford, Massachusetts (Environmental Research Center, Harvard School of Public Health)

2006          Heart Disease in Firefighters:  From Risk Factors to On-Duty Death / Visiting Professor
              Occupational Health Colloquium, University of Connecticut, Farmington, Connecticut

2007          Emergency Duties and Heart Disease Deaths in Firefighters / Research Presentation
              New England College of Occupational & Environmental Medicine Annual Conference,
              Bedford, Massachusetts (Environmental Research Center, Harvard School of Public Health)

2008          Cardiovascular Disease in Firefighters:  State of the Science / Plenary Talk and
              How to Decrease Cardiovascular Mortality in your Fire Department / Panelist
              New England College of Occupational & Environmental Medicine and the Occupational &
              Environmental Medicine Association of Connecticut, Sturbridge, Massachusetts

2008          Obstructive Sleep Apnea Screenings at Department of Transportation Medical
              Examinations:  An Update / Research Presentation

EXHIBIT A

|  | New England College of Occupational & Environmental Medicine Annual Conference, Bedford, Massachusetts (Environmental Research Center, Harvard School of Public Health) |
|---|---|
| 2009 | The Obesity Epidemic and Obstructive Sleep Apnea in Truck, Bus and Train Operators / Visiting Professor Presentation<br>Yale University School of Medicine, New Haven, Connecticut |
| 2010 | Dealing with Sleepiness in Transportation Workers / Plenary Lecture<br>Northeast Sleep Society Annual Conference, Newton, Massachusetts (Sleep Health Centers) |
| 2010 | Obstructive Sleep Apnea in Commercial Drivers:  Present and Future / Invited Speaker<br>New Hampshire Association of Occupational Health Nurses, Bedford, New Hampshire |
| 2010 | Cardiovascular Disease in the US Fire Service: Past, Present & Future / Invited Speaker<br>New England College of Occupational & Environmental Medicine, Newton, Massachusetts |
| 2010 | Occupational & Environmental Medicine / Professor Rounds<br>Internal Medicine Residency Program, Metrowest Medical Center, Framingham, Massachusetts |
| 2010; 2011; 2012 | Clinical Research Track / Session Moderator<br>New England College of Occupational & Environmental Medicine Annual Conference, Newton, Massachusetts (Environmental Research Center, Harvard School of Public Health) |
| 2011 | On-Site Clinics / Session Moderator<br>New England College of Occupational & Environmental Medicine Annual Conference, Newton, Massachusetts (Environmental Research Center, Harvard School of Public Health) |
| 2012 | The Growing Interface Between Occupational Health and Sleep Medicine / Invited Speaker<br>Massachusetts Sleep Society Spring Meeting, Boston, Massachusetts |
| 2012 | Left Ventricular Hypertrophy & Cardiomegaly in Firefighter Sudden Death / Research Presentation<br>New England College of Occupational & Environmental Medicine Annual Conference, Newton, Massachusetts (Environmental Research Center, Harvard School of Public Health) |
| 2012 | Sleep Disorders and Commercial Drivers / Invited Speaker<br>Commercial Driver Medical Examiner Training, New England College of Occupational & Environmental Medicine, Newton, Massachusetts |
| 2013 | Leadership in Medicine:  Occupational Medicine as a Career Path Combining Academics, Administration and Consulting / Invited Speaker<br>Boston University School of Medicine, Boston, Massachusetts (Medicine and Business Association) |
| 2013 | Workers Compensation Case as Viewed by Various Stakeholders / Invited Panelist<br>Work-Related Injuries:  New Challenges and New Solutions Conference, Waltham, Massachusetts (Boston University School of Medicine and the Lou Millender Foundation) |

EXHIBIT A

| | |
|---|---|
| 2014 | Cardiovascular Disease and Sudden Cardiac Death in Law Enforcement and Fire Personnel / Visiting Professor<br>Occupational Health Colloquium, University of Connecticut, Farmington, Connecticut |
| 2014 | Work Causation in Cardiovascular Cases / Panelist and Case Discussant<br>Work-Related Injuries:  New Challenges and New Solutions Conference, Waltham, Massachusetts (Occupational and Environmental Health Network and the Lou Millender Foundation) |
| 2014 | Maximal Medical Improvement / Session Moderator<br>Work-Related Injuries:  New Challenges and New Solutions Conference, Waltham, Massachusetts (Occupational and Environmental Health Network and the Lou Millender Foundation) |
| 2014 | Cardiovascular Disease in Firefighting and Law Enforcement:  Journey from Resident Project to State of the Science / **Keynote Address-Harriet Hardy Award**<br>**New England College of Occupational & Environmental Medicine Annual Conference**, Newton, Massachusetts |
| 2017 | Mediterranean Diet, Workplace Health Promotion and the "Feeding America's Bravest" Trial.<br>Special Invited Seminar, Yale Occupational and Environmental Medicine Program, Yale School of Medicine, New Haven, Connecticut. |
| 2017 | Mediterranean Diet for Cardiovascular and Workplace Health Promotion<br>Invited Wellness Seminar, Vertex Pharmaceuticals, Boston, Massachusetts |
| 2017 | Sleep and Transportation Accidents / Invited Speaker<br>New England College of Occupational & Environmental Medicine Annual Conference, Newton, Massachusetts |
| 2018 | Sudden Cardiac Death among Firefighters and Police Officers.<br>Special Invited Seminar, Yale Occupational and Environmental Medicine Program, Yale School of Medicine, New Haven, Connecticut. |
| 2018 | Traditional Greek Diet: Benefits, Applications to Workplaces and Outreach  /<br>Invited Speaker, New England Hellenic Medical and Dental Society, Under the Aegis of the Consul General of Greece in Boston. Boston, Massachusetts |
| 2018 | Feeding America's Bravest:  Survival Mediterranean Style in the Fire Service /<br>Visiting Professor, Occupational Health Colloquium,<br>University of Connecticut School of Medicine, Farmington, Connecticut |
| 2019 | Employee Health and Heart Disease- The Power of Teaching Kitchens / Invited Introduction<br>New England College of Occupational & Environmental Medicine Webinar, MaineGeneral Hospital, Maine |

EXHIBIT A

**National:**
Those presentations below sponsored by outside entities are so noted and the sponsor is identified.

| | |
|---|---|
| 1998 | Firefighting Medical Requirements - The Science Behind NFPA 1582 / Invited Speaker - Medical Session<br>National Fire Protection Association Fall Meeting, Atlanta, Georgia (NFPA) |
| 1999 | Fitness for Duty in Firefighters: Some of the Issues Occupational Medicine /  Visiting Professor Grand Rounds<br>Center for Occupational and Environmental Health, University of California at Irvine, Irvine, California |
| 2001 | Evidence-Based Medical Examinations for Hazardous Materials Firefighters / Expert Workshop Presentation<br>Best Practices in Workplace Surveillance Workshop, National Institute for Occupational Safety and Health, Cincinnati, Ohio (NIOSH) |
| 2002 | Occupational Hazards of Firefighters: From the Fire Ground to the Clinic-Where can the Occupational Doc make a Difference? / Plenary Talk<br>National Annual Providers' Meeting, Merrimack, New Hampshire (Occupational Health + Rehabilitation, Inc.) |
| 2003 | Chemical Terrorism: Empiric Recognition & Management / Invited Speaker<br>"Meet the Professor" Session, American College of Physicians Annual Meeting, San Diego, California (ACP) |
| 2003 | Occupational Risk Factors for On-Duty Coronary Heart Disease Deaths In Firefighters / Invited Research Presentation<br>American Occupational Health Conference, American College of Occupational & Environmental Medicine, Atlanta, Georgia |
| 2004 | Acute Chemical Emergencies: Syndrome-Based Recognition & Empiric Management / Invited Speaker<br>"Meet the Professor" Session, American College of Physicians Annual Meeting, New Orleans, Louisiana (ACP) |
| 2004 | Obesity and Cardiovascular Disease Risk Factors in Firefighters: A Prospective Study / Invited Research Presentation<br>American Occupational Health Conference, American College of Occupational & Environmental Medicine, Kansas City, Missouri |
| 2004 | Essential Job Duties: Making Recommendations for Appropriate Accommodations/ Modified Duties / Invited Speaker<br>2004 National Workers' Compensation and Occupational Medicine Seminar, Hyannis, Massachusetts (SEAK, Inc. [Skills, Education, Achievement, Knowledge]) |
| 2006 | Hematopoietic Toxicity from Lead-Containing Ayurvedic Medications / Invited Research Presentation |

American Occupational Health Conference, American College of Occupational & Environmental Medicine, Los Angeles, California

2007      Cardiovascular Disease in Firefighters / Visiting Professor
Occupational Health Speaker Series, University of Michigan School of Public Health, Ann Arbor, Michigan

2007      Public Safety Workers: the Case for Improved Blood Pressure Control / Invited Speaker
Worklife 2007: Protecting and Promoting Worker Health: A National Symposium, National Institute for Occupational Safety and Health/Centers for Disease Control, Bethesda, Maryland (NIOSH/CDC)

2007      Environmental Intolerances: Crossroads of Toxicology and Psychiatry / Invited Speaker
Center for Forensic Psychiatry of Michigan & Forensic Psychiatry Fellowship Program, University of Michigan Medical School, Ann Arbor, Michigan

2007      Heart Disease in Firefighters / Visiting Professor
Division of Occupational & Environmental Medicine, Wayne State University School of Medicine, Detroit, Michigan

2008      Update in Cardiovascular Epidemiology / Special Invited Presentation and
Cardiovascular Risk Stratification in Firefighters / Principal Investigator Presentation
Annual Principal Investigators Meeting, Research & Development Grants, Department of Homeland Security/Federal Emergency Management Agency, Washington, District of Columbia (Department of Homeland Security)

2008      The Obesity Epidemic and Future Emergency Responders / Research Presentation and
Cardiovascular Disease In Emergency Responders / Invited Speaker and Session Chair, State of the Science Review
American Occupational Health Conference, American College of Occupational & Environmental Medicine, New York, New York

2009      Cardiovascular Risk Stratification in Firefighters by Cardio-Respiratory Fitness / Principal Investigator Presentation
Annual Principal Investigators Meeting, Research & Development Grants, Department of Homeland Security/Federal Emergency Management Agency, Washington, District of Columbia (Department of Homeland Security)

2010      Emergency Duties and Heart Disease Deaths in US Firefighters / Visiting Professor
Departments of Epidemiology and Environmental Health Sciences, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland

2010      Cardiovascular Disease in the Fire Service: State of the Science / Visiting Professor
Department of Preventive Medicine Seminar, Mount Sinai School of Medicine, New York, New York

2010      Exercise Tolerance as a Predictor of Firefighters' Future Risks / Principal Investigator Presentation
Annual Principal Investigators Meeting, Research & Development Grants, Department of

EXHIBIT A

50

Homeland Security/Federal Emergency Management Agency, Chicago, Illinois
(Department of Homeland Security)

2010 Cardiovascular Disease in the US Fire Service: Current Epidemiology & the Future Role of
Fitness Testing / Plenary Lecture
Via video link, Firefighter Cardiovascular Health & Safety Research Summit 2010,
Champaign, Illinois (Illinois Fire Service Institute, University of Illinois)

2010 The Role of the Occupational Medicine Physician in Evaluating Sleep and Sleep Disorders /
Plenary Lecture
The Future of Clinical Sleep Medicine, Dedham, Massachusetts (Sleep Health Centers)

2011 Cardiovascular Disease in Firefighters and Law Enforcement: State of the Scientific
Research and Clinical Implications / Invited Faculty
Scientific Course Session, American Occupational Health Conference, American College of
Occupational & Environmental Medicine, Washington, District of Columbia

2011 Physical Fitness and Cardiovascular Risk / Featured Research Presentation
Annual Principal Investigators Meeting, Research & Development Grants, Department of
Homeland Security/Federal Emergency Management Agency, New York, New York
(Department of Homeland Security)

2011 Obstructive Sleep Apnea Detection Strategies in Transportation Operators / Plenary Lecture
Sleep Apnea & Multi-Modal Transportation Conference 2011, Baltimore, Maryland
(American Sleep Apnea Association, US Dept. of Transportation)

2011 Cardiovascular Disease / "Showcase" Research Presentation, Plenary Lecture
2nd National Fire Service Research Agenda Symposium, National Fallen Firefighters
Foundation, U.S. Fire Academy (U.S. Department of Homeland Security)

2012 Obstructive Sleep Apnea Detection Strategies in Transportation Operators: Potential In-
Clinic Tests for Sleepiness / Invited Research Presentation
Commercial Driver Medical Examiner Update, American Occupational Health Conference,
American College of Occupational & Environmental Medicine, Los Angeles, California

2012 Survival of the Fittest? Exercise Tolerance & Longitudinal Outcomes / Principal
Investigator Presentation
Annual Principal Investigators Meeting, Research & Development Grants, Department of
Homeland Security/Federal Emergency Management Agency, Denver, Colorado
(Department of Homeland Security)

2013 Screening for Obstructive Sleep Apnea among Truck Drivers / Invited Speaker and
Health, Obstructive Sleep Apnea, and Accident Risk among Truckers Session / Panelist
Transportation Research Board 92nd Annual Meeting, Washington, District of Columbia
(Transportation Research Board of the National Academies)

2013 Translating Firefighting Cardiovascular Epidemiology into Clinical Evaluations / Plenary
Lecture

EXHIBIT A

Cardiovascular Physiology & Disease in Firefighting: Translating Recent Research to Clinical Practice Symposium, Cambridge Health Alliance, Orlando, Florida (Cambridge Health Alliance, Cambridge Medical Care Foundation, Harvard School of Public Health, International Association of Fire Fighters, International Association of Fire Chiefs, National Fallen Firefighters Foundation, Public Safety Medical, Masimo Corporation)

2013 Chemical Asphyxiants in the Workplace / Plenary Lecture & Panelist
Medical Surveillance and On-Site Testing - The Next Generation of Occupational Health and Safety, Orlando, Florida (Masimo Corporation)

2013 Cardiorespiratory Fitness & Longitudinal Health and Employment Outcomes / Principal Investigator Presentation
Annual Principal Investigators Meeting, Research & Development Grants, Department of Homeland Security/Federal Emergency Management Agency, Denver, Colorado (US Department of Homeland Security)

2013 Non-invasive Detection of Left Ventricular Hypertrophy/Cardiomegaly in Firefighters / Principal Investigator Presentation
Annual Principal Investigators Meeting, Research & Development Grants, Department of Homeland Security/Federal Emergency Management Agency, Denver, Colorado (US Department of Homeland Security)

2014 Causation of On-Duty Cardiovascular Events Among Firefighters and Law Enforcement Officers / Invited Speaker
Public Safety Session, American Occupational Health Conference, American College of Occupational & Environmental Medicine, San Antonio, Texas (Public Safety Medicine Section of ACOEM)

2014 Understanding Cardiovascular Disease and Sudden Cardiac Death in the Fire Service / Visiting Professor
Special Seminar, Krannert Institute of Cardiology, Indianapolis, Indiana (Indiana Health/Indiana University)

2014 Non-invasive Detection of Left Ventricular Hypertrophy/Cardiomegaly in Firefighters / Principal Investigator Presentation
Annual Principal Investigators Meeting, Research & Development Grants, Department of Homeland Security/Federal Emergency Management Agency, Dallas, Texas (US Department of Homeland Security)

2015 Cardiovascular Poster Session / Invited Faculty
Discussion Group Leader, Cardiovascular Health and Disease: Occupational and Environmental Factors Conference, University of California San Francisco, California

2015 Cardiovascular Disease and Sudden Cardiac Death in Law Enforcement and Firefighting: from Epidemiology to Risk Stratification and Fitness for Duty / Plenary Lecture
Cardiovascular Health and Disease: Occupational and Environmental Factors Conference, University of California, San Francisco, California

2015 Cardiovascular Disease and Sudden Cardiac Death in Law Enforcement and Firefighting /

EXHIBIT A

52

Visiting Professor
Occupational & Environmental Medicine Grand Rounds, Northwest Center for
Occupational Health & Safety, University of Washington, School of Public Health, Seattle,
Washington

2015        Non-invasive Detection of Left Ventricular Hypertrophy/Cardiomegaly in Firefighters /
            Principal Investigator Presentation
            Annual Principal Investigators Meeting, Research & Development Grants, Department of
            Homeland Security/Federal Emergency Management Agency, National Harbor, Maryland
            (US Department of Homeland Security)

2015        Mediterranean-Diet-Based Interventions to Change Firefighters' Eating Habits and Improve
            Cardiovascular Profiles / Principal Investigator Presentation
            Annual Principal Investigators Meeting, Research & Development Grants, Department of
            Homeland Security/Federal Emergency Management Agency, National Harbor, Maryland
            (US Department of Homeland Security)

2015        Current State of the Sciences: Medical Evaluations and Testing, Department Standards,
            Shift Work / Invited Speaker
            Future Directions in Cardiovascular Research for the U.S. Fire & EMS Service,
            Washington, District of Columbia (Federal Emergency Management Agency, National
            Heart, Lung and Blood Institute, National Fallen Firefighters Foundation)

2015        State of Science 2: Cardiovascular Health of Firefighters:  Cardiovascular Risk Factors and
            Associated Risk / Invited Speaker
            Physicals, Screening Mechanisms, and Development of a Fire Service Toolkit / Panelist
            Heart to Heart: Strategizing an Evidence-Based Approach to Reduce Cardiac Disease and
            Death in the Fire Service, Washington, District of Columbia (National Institute for
            Occupational Safety and Health, National Fallen Firefighters Foundation)

2016        Occupational Medicine Training Pipeline: Experience, Challenges and Solutions /
            Invited Speaker
            National Meeting of Occupational and Environmental Medicine Residency Directors
            Association, Chicago, Illinois

2016        Occupational Sleep Medicine, Session Moderator and Director and
            Obstructive Sleep Apnea in Occupational Settings / Invited Speaker
            American Occupational Health Conference, American College of Occupational and
            Environmental Medicine, Chicago, Illinois.

2016        Final Report: Non-invasive Detection of Left Ventricular Hypertrophy/Cardiomegaly in
            Firefighters / Principal Investigator Presentation
            Annual Principal Investigators Meeting, Research & Development Grants, Department of
            Homeland Security/Federal Emergency Management Agency, San Antonio, Texas,
            (US Department of Homeland Security)

2016        Update: Mediterranean-Diet-Based Interventions to Change Firefighters' Eating Habits and
            Improve Cardiovascular Profiles / Principal Investigator Presentation
            Annual Principal Investigators Meeting, Research & Development Grants, Department of

EXHIBIT A

Homeland Security/Federal Emergency Management Agency, San Antonio, Texas (US Department of Homeland Security)

2016        Mediterranean Diet for Workplace Health Promotion: "Feeding America's Bravest" Trial. Special Invited Seminar, Center for Occupational and Environmental Health, Division of Occupational & Environmental Medicine, University of California at Irvine, Irvine, California.

2017        Left Ventricular Hypertrophy and Cardiac Enlargement in Public Safety Personnel. Invited Presentation, Public Safety Medicine Section, American College of Occupational Medicine, American Occupational Health Conference, Denver, Colorado.

2018        Survival Mediterranean Style: A Cluster-Randomized Trial in the US Fire Service. Invited Webinar, Society for Nutrition Education and Behavior, Indianapolis.

2018        Applied Public Health: Lifestyle Changes to Improve the Health of the US Fire Service. Invited Visiting Professor Lecture in HP131: Introduction to Public Health, Skidmore College, Saratoga Springs, NY.

**International:**
Those presentations below sponsored by outside entities are so noted and the sponsor is identified.

1995        Occupational Lung Diseases / Visiting Professor
Fundacao Oswaldo Cruz, National School of Public Health, Rio De Janeiro, Brazil (Poison Control Center, Niteroi, Rio De Janeiro, Brazil)

1995        Immunotoxicology of Occupational Lung Disease / Grand Rounds
Department of Pathology, Hospital Universitario Antonio Pedro, Universidade Federal Fluminense, Niteroi, Rio De Janeiro, Brazil (Poison Control Center, Niteroi, Rio De Janeiro, Brazil)

1996        Indoor Air Quality and Multiple Chemical Sensitivities / Visiting Professor
Special Seminar, Aristotelian University of Thessaloniki and the AHEPA Hospital, Thessaloniki, Macedonia, Greece

1997        Occupational and Environmental Lung Disease: Changing Epidemiology & Advances in Diagnosis / Plenary Talk
Medical Developments for the New Millennium, Hellenic Medical Society of New York, Rhodes, Greece

1998        Occupational Asthma and Extrinsic Allergic Alveolitis (Hypersensitivity Pneumonitis) / Plenary Talk and
Lung Cancer and Occupational Risk Factors in Greece / Plenary Talk
Advances in Medicine and Surgery, Hellenic Medical Association of Quebec, First International Symposium, Zakynthos, Greece

1998        Multiple Chemical Sensitivities / Research Presentation
5th World Hellenic Biomedical Conference Program, New York, New York

**EXHIBIT A**

54

| | |
|---|---|
| 1998-1999 | Occupational Lung Diseases; Latex Allergy and the Workplace; Methylene Chloride Poisoning; Multiple Chemical Sensitivities / Visiting Professor<br>Presented the above seminars, University of Athens, School of Medicine, Athens, Greece |
| 1999 | Occupational Diseases, The Present Situation and Future Outlook / Invited Panelist<br>Round Table Discussion, 25th Annual Pan Hellenic Medical Conference (Medical Society for all of Greece), Athens, Greece |
| 1999 | Environmental Concentrations and Personal Exposure to Benzene in Central Athens / Research Presentation<br>International Society for Environmental Epidemiology/International Society of Exposure Analysis Joint Conference 1999, Athens, Greece |
| 2002 | Mercury in Dental Fillings, Seafood and Vaccines: the Health Issues in Perspective / Plenary Talk<br>Advances in Clinical Medicine Symposium, Hellenic Medical Society of New York and Hellenic Medical Society of Quebec, Montreal, Canada |
| 2006 | Risk Assessment for Heavy Metal Exposure / Visiting Professor and<br>Heart Disease in Firefighters / Visiting Professor<br>University of Athens School of Medicine, Athens, Greece |
| 2006 | Estimated Burden of Disease from Household Carbon Monoxide Poisonings in Europe / Invited Presentation and Workshop Participant<br>WHO Second Technical Meeting on Quantifying Disease from Inadequate Housing, WHO Regional Office for Europe, Bonn, Germany (WHO) |
| 2007 | Clinical Syndrome-Based Recognition of Chemical Hazards / Plenary Talk<br>European Union Training for Health Professionals on Rapid Response to Health Threats: Pilot Course, Athens, Greece (European Union, Prolepsis) |
| 2009 | Barriers to the Diagnosis and Treatment of Obstructive Sleep Apnea in Commercial Drivers / Invited Presentation<br>International Conference on Fatigue Management in Transportation Operations, Boston, Massachusetts (U.S. Department of Transportation) |
| 2009 | Epidemic Obstructive Sleep Apnea among Commercial Drivers: Dangerous Consequence of the Obesity Epidemic / Plenary Talk and<br>The Obesity Epidemic and U.S. Emergency Responders / Plenary Talk<br>Guidelines for the Prevention of Obesity in the Workplace Workshop, Larnaca, Cyprus (European Union) |
| 2009 | Cardiovascular Disease in the Fire Service: State of the Science / Plenary Talk<br>International Association of Fire Fighters, John P. Redmond Foundation Symposium on the Occupational Health and Hazards of the Fire Service, Los Angeles, California [International Association of Fire Fighters (IAFF)] |
| 2010 | Sleep and Work/Health / Invited Presentation |

EXHIBIT A

55

The AFA Insurance Advisory Committee on Research and Development Trip to Boston and New York, HSPH, Boston [AFA Insurance (Confederation of Swedish Enterprise, Swedish Trade Union Confederation and Swedish Federation of Salaried Employees and Services)]

2010    Developing a Wellness Program in a Police Department (Given with the Holden, Massachusetts Police Department)
Fitness & Law Enforcement: "The Good, the Bad & the Health Benefits" / Invited Presentation, Police Physicians Section
IACP 2010- The Annual Meeting of the International Association of Chiefs of Police, Orlando, Florida (Police Physicians Section/IACP)

2011    Cardiovascular Disease in Firefighters: Scientific Approaches to Causality and Prevention / Visiting Professor Occupational Medicine Grand Rounds
St. Michael's Hospital, Gage Occupational Health Unit, University of Toronto, Toronto, Ontario, Canada (Ontario Telemedicine Network (OTN) Education Program)

2011    Migration, Health & Social Care / Session Chair & Moderator
Pan-European Conference on the Integration of Immigrants: Good Practices in the Sectors of Health, Welfare & Social Security, Athens, Greece (European Union and the Hellenic Republic, Ministry of Interior)

2011    Cardiovascular Disease in the Fire Service / Invited Presentation
Occupational Diseases Workshop, Health, Safety and EMS Conference, International Association of Fire Fighters, New York, New York (International Association of Fire Fighters (IAFF), John P. Redmond Foundation)

2012    Occupational Medicine at Harvard: Past, Present and Future Challenges / Visiting Professor
Department of Environmental and Occupational Health, Universite de Montreal, School of Public Health, Faculty of Medicine, Montreal, Quebec, Canada

2013    Excessive Daytime Drowsiness: Screening for Occupational Drivers / Plenary Lecture
Excessive Daytime Sleepiness, Work and Road Safety: Medicine and the Automotive Industry Meet to Improve Prevention Strategies, Bologna, Italy (University of Bologna, Ducati, Lamborghini, Guggiaro, Italian Ministry for the Environment, Land and Sea)

2013    Preview Summary: "Obstructive Sleep Apnea in North American Commercial Drivers" / Invited Speaker
Special Lecture.  Closed seminar on Sleep Disordered Breathing in Occupational Health, Matsuyama, Japan (Japan Society for Occupational Health, Japan Sleep Society)

2013    Obstructive Sleep Apnea in North American Commercial Drivers: Screening Strategies; Effects on Crash Risk; and Other Benefits of Driver Treatment / **Keynote Lecture**
**86th Annual Meeting of the Japan Society for Occupational Health Japan Society for Occupational Health**, Matsuyama, Japan (Japan Society for Occupational Health, Ehime University School of Public Health)

2013    Preventing Accidents in North American Commercial Drivers with Obstructive Sleep Apnea / **Keynote Lecture**
**International Association for Traffic Safety and Sciences (IATSS)**, Tokyo, Japan

EXHIBIT A

56

| 2013 | Innovative Solutions at the Intersection of Sleep Medicine and Occupational Medicine / Invited Speaker<br>Sleep Medicine in Occupational Settings, half-day Postgraduate Course, Sleep 2013, 27th Annual Meeting of the Associate Professional Sleep Societies, Baltimore, Maryland (APSS) |
|---|---|
| 2013 | Heart Disease in the Fire Service / Invited Presentation<br>Pathways to Success. International Association of Fire Fighters, Health, Safety and EMS Conference, Denver, Colorado (International Association of Fire Fighters (IAFF), John P. Redmond Foundation) |
| 2013 | Law Enforcement Duties: Relationship to Stress Levels & Sudden Cardiac Death / Invited Presentation<br>Police Physicians Section Meeting, Benefits of Implementing a Police Wellness Program, 120th Annual IACP Conference and Law Enforcement Education Exposition, Philadelphia, Pennsylvania [International Association of Chiefs of Police (IACP)] |
| 2014 | Occupational Sleep Medicine / Session Chair and<br>Sleep Disorders in Occupational Settings / Invited Speaker<br>Occupational Sleep Medicine, Sleep 2014, 28th Annual Meeting of the Associated Professional Sleep Societies, Minneapolis, Minnesota (APSS) |
| 2014 | Putting Your Heart into Your Work (Cardiovascular Outcomes and Work) / Plenary Lecture<br>Primary Occupational Healthcare Conference 2014, Dalhousie Medical School, St. John, New Brunswick, Canada |
| 2014 | Extreme Values, Extreme Situations: Hypertension in Firefighting & Law Enforcement / Invited Speaker<br>Israeli Society of Hypertension, Annual Winter Meeting, Dan Panorama, Tel Aviv, Israel (Israeli Society of Hypertension, Israeli Family Physicians Association) |
| 2015 | Sleep Apnea Screening in North American Commercial Drivers / Visiting Professor<br>Graduate School of Medicine, Juntendo University, Tokyo, Japan (International Association for Traffic Safety Sciences) |
| 2015 | Cardiovascular Disease & Health Among First Responders / Invited Seminar<br>Teikyo University Graduate School of Public Health, Tokyo, Japan |
| 2015 | Interventions and Case Studies at the Intersection of Occupational and Sleep Medicine / Invited Speaker<br>Occupational Medicine and Sleep, half-day Postgraduate Course, Sleep 2015, 29th Annual Meeting of the Associated Professional Sleep Societies, Seattle, Washington (APSS) |
| 2015 | Cardiovascular Disease and Health Among Firefighters / Invited Presentation, Working to Death: Occupational Diseases<br>Commitment to Excellence. International Association of Fire Fighters, Health, Safety and EMS Conference, National Harbor, Maryland (International Association of Fire Fighters (IAFF), John P. Redmond Foundation) |

EXHIBIT A

| 2015 | Survival Mediterranean Style – Health Benefits of a Mediterranean Diet / Invited Presentation, Nutrition for the Emergency Responder Commitment to Excellence. International Association of Fire Fighters, Health, Safety and EMS Conference, National Harbor, Maryland (International Association of Fire Fighters (IAFF), John P. Redmond Foundation) |

2015 — Cardiac Deaths in Law Enforcement: A Call for Departmental Wellness / Invited Presentation
Police Physicians Section Meeting, IACP-2015, 122nd Annual International Association of Chiefs of Police Conference and Law Enforcement Education and Technology Exposition, Chicago, Illinois (IACP)

2016 — Harvard Special Session 2016: Introduction to Occupational Health / Visiting Professor, Course Director and Sole Lecturer for the 2016 Harvard Special Session on Occupational Health. Taught graduate-level short-course to 19 students from Japan, the Philippines, China, Taiwan, Viet Nam and Thailand at Teikyo University in Tokyo, Japan (Teikyo University, Graduate School of Public Health)

2016 — Scientific Session Chair and Panel Moderator,
Invited Speaker, Introduction and Mediterranean Diet in the Workplace,
Mediterranean Diet Roundtable, Beverly Hills, California (Accent Public Relations, Barilla Pasta, Italian-American Chamber of Commerce).

2016 — Invited Lecture, Obstructive Sleep Apnea in Occupational Settings
Given in Spanish to automobile executives, engineers and company occupational health and safety personnel, as well as regional occupational health clinicians, academics and transportation officials. Martorell, Spain (SEAT).

2016 — Invited workshop presentation, Applying Mediterranean Ways of Eating to the Workplace
Given in Spanish to automobile executives, corporate and contracted occupational health and safety personnel to potentially apply these principles to SEAT's more than 10,000 employees. Barcelona, Spain (SEAT, Grupo Ergos, MC Mutual, Centro ITAE).

2016 — Mediterranean Diet Epidemiological Studies in the Workplace/ Invited Plenary Lecture
Oleocanthal International Society Conference & Awards 2016, Olympia, Greece.

2016 — Occupational Risk in Sudden Cardiac Death in EMS Providers, Fire Fighters, and First Responders/ Invited Visiting Professor Lecture, Seoul National University Medical School, Seoul, South Korea

2016 — Burns in US firefighters: Trends and Prevention/ **Keynote Lecture, Korean Burn Society** Annual Conference, Seoul, South Korea

2016 — Acute Chemical Emergencies/ Visiting Professor Lecture, Forum on Public Health Planning Disasters and Emergencies, Seoul National University Graduate School of Public Health, Seoul, South Korea

EXHIBIT A

58

| | |
|---|---|
| 2016 | A review of cardiovascular disease and sudden cardiac death among firefighters and police/ **Keynote Speaker, Symposium on Emergency Service Workers' Safety and Health,** Seoul National University Graduate School of Public Health, Seoul, South Korea |
| 2016 | Obstructive Sleep Apnea and the Trucking Industry/ Invited Speaker, Session on Fatigue, Transport Canada's Advisory Council on Rail Safety, Transport Canada, Ottawa, Canada |
| 2016 | Cardiovascular Disease and Sudden Cardiac Death in Law Enforcement and Firefighting/ Plenary Speaker, Occupational Medicine Specialists of Canada (OMSOC), 2016 OMSOC Annual Scientific Conference, Newton, MA |
| 2017 | Epidemiology of cardiovascular risk associated with firefighting and law enforcement, and their association with physical fitness / **Keynote Presentation Day 1, First International Symposium on Health and Physical Fitness among Public Safety Workers**, University of Brasilia, Department of Physical Education, Brazilian Federal District, Brazil |
| 2017 | Minimum entry level physical fitness to improve health and job performance among police officer recruits / **Keynote Presentation Day 2, First International Symposium on Health and Physical Fitness among Public Safety Workers**, University of Brasilia, Department of Physical Education, Brazilian Federal District, Brazil |
| 2017 | Cardiovascular Disease and Sudden Cardiac Death in Firefighting and Law Enforcement / **Keynote Lecture, Tenth Annual Day in Occupational Medicine**, Ontario Medical Association, Toronto, Canada |
| 2017 | Introducing Olive Oil to Americans through Workplace Interventions / Invited Plenary Speaker, Olympia Health and Nutrition Awards 2017, European Inter-regional Mediterranean ARISTOIL program & Faculty of Pharmacy, Department of Pharmacognosy, & Natural Products Chemistry, University of Athens, Athens, Greece |
| 2017 | Mediterranean Diet Intervention in US Firefighters: "Feeding America's Bravest-Survival Mediterranean Style" / Invited Plenary Speaker. Health Matters Convention, 4th Oleocanthal International Congress, Oleocanthal International Society, Malaga, Spain. |
| 2017 | Intervención Mediterránea en Bomberos Estadounidenses (Mediterranean Intervention in US Firefighters) / Visiting Professor Conference Given in Spanish. Institut de Recerca en Nutrició i Seguretat Alimentària (Institute for Nutrition Research and Food Safety), Natural Anti-Oxidants Group, School of Pharmacy, University of Barcelona, Barcelona, Spain. |
| 2017 | Facing Emergencies: US Firefighters Surviving Mediterranean Style / TEDx Talk, TEDx Rhodes, St. George Castle, Old City of Rhodes, Rhodes, Greece. |
| 2017 | Diabesity and Current Challenges / Plenary Talk. Mediterranean Diet & Health. Initiative for Productivity & Health Management, Mediterranean Diet Roundtable, The Cooking Odyssey, Halkidiki, Greece. |
| 2017 | "Feeding America's Bravest-Survival Mediterranean Style," A Randomized Cluster Trial of Mediterranean Diet Intervention in US Firefighters. Plenary Talk, Mediterranean Diet & |

EXHIBIT A

Health. Initiative for Productivity & Health Management, Mediterranean Diet Roundtable, The Cooking Odyssey, Halkidiki, Greece.

2018    Survival Mediterranean Style: Year One of a Mediterranean Nutrition Intervention in US Firefighters/ Invited Plenary Speaker, Olympia Health and Nutrition Awards 2018, World Olive Council for Health, European Inter-regional Mediterranean ARISTOIL program & Faculty of Pharmacy, Department of Pharmacognosy, & Natural Products Chemistry, University of Athens, Athens, Greece.

2018    Sudden Cardiac Death in Firefighters and Police Officers: Epidemiology & Pathophysiology. Invited Seminar, Dipartimento Interdisciplinare di Medicina Sezione di Scienze e Tecnologia di Medicina di Laboratorio, Faculty of Medicine, Universita degli Studi di Bari Aldo Moro, Bari, Italy.

2018    Γιατί η Ελληνική Μεσογειακή Διατροφή είναι η πλέον Υγιεινή (Why is the Greek Mediterranean Diet Healthy?). **Invited Speaker (Session Keynote),** Fourth FORUM Υγείας (Health): Diet, Health, Beauty. DYO Forum, Hellenic Ministries of Tourism, Interior, Region of Central Macedonia, Pan-Hellenic Medical Society, University of Macedonia, Thessaloniki, Greece.

2019    Biomarkers of Olive Oil and Mediterranean Diet in the "Feeding America's Bravest" study. Invited Plenary Speaker, Olympia Health and Nutrition Awards 2019, World Olive Council for Health, European Inter-regional Mediterranean ARISTOIL program & Faculty of Pharmacy, Department of Pharmacognosy, & Natural Products Chemistry, University of Athens, Athens, Greece.

2019    Introduction to Epidemiology. Invited Professor Presentation, 8th World Hellenic Bioscientific Association, Summer School in Medical & Biosciences Research & Management, Neo Itilo, Mani, Greece.

2019    Survival Mediterranean Style – Lifestyle Countermeasures for Firefighters / Invited Plenary Presentation, 2019 John P. Redmond Symposium & Dominick F. Barbera EMS Conference. International Association of Fire Fighters, Nashville, Tennessee (International Association of Fire Fighters (IAFF), John P. Redmond Foundation)

2019    Cardiovascular Disease in the Fire Service / Invited Presentation, 2019 John P. Redmond Symposium & Dominick F. Barbera EMS Conference. International Association of Fire Fighters, Nashville, Tennessee (International Association of Fire Fighters (IAFF), John P. Redmond Foundation)

## **Report of Clinical Activities and Innovations**

**Current Licensure and Certification:**

1990    Massachusetts Medical License

EXHIBIT A

| | |
|---|---|
| 1990 | Diplomate, National Board of Medical Examiners |
| 1992 | American Board of Internal Medicine<br>Recertified 2002 |
| 1995 | American Board of Preventive Medicine, Occupational Medicine |
| 2001 | Certified Medical Review Officer, Medical Review Officer Certification Council<br>Recertified 2007; 2013; 2019 |
| 2014 | Certified Medical Examiner, National Registry of Certified Medical Examiners, Federal<br>Motor Carrier Safety Administration |

**Practice Activities:**

| | | | |
|---|---|---|---|
| 1992 – 1993 | Outpatient Clinic | Internal Medicine, East Cambridge Health Center, Cambridge Hospital | Two sessions per week |
| 1992 – 2000 | Inpatient Service | Internal Medicine, Cambridge Health Alliance | Daily rounds as needed |
| 1993 – 2000 | Outpatient Clinic | Internal Medicine, East Cambridge Health Center, Cambridge Hospital | Four sessions per week |
| 1993 – 2012 | Outpatient Consultation Clinic | Occupational & Environmental Medicine, Cambridge Health Alliance | One session per week |
| 2000 – 2010 | Outpatient Clinic | Employee Health & Industrial Medicine, Cambridge Health Alliance | Four sessions per week |
| 2010 – | Outpatient Clinic | Employee Health & Industrial Medicine, Cambridge Health Alliance | Two sessions per week |
| 2012 – | Outpatient Consultation Clinic | Occupational & Environmental Medicine, Cambridge Health Alliance | Two sessions per month |

EXHIBIT A

61

**Clinical Innovations:**

As a leading clinical innovator in Occupational and Environmental Medicine (OEM), I have been quite productive in several different areas within the field, including: the health of public safety personnel; clinical toxicology and occupational sleep medicine. While OEM is often viewed as a niche field, I have succeeded in bringing wide attention and greater interest to our specialty by publishing our most important findings in high-impact general medical and medical specialty journals outside of OEM.

| | |
|---|---|
| **First Responders' Health and Cardiovascular Disease** (1993 – ) | My work with first responders began with a post-doctoral fellowship focused on a special cohort of firefighters serving on a hazardous materials team. This led to a NIOSH KO1-Career Award, and then an RO1, which allowed our group to conduct cross-sectional and longitudinal studies of firefighters' health. |
| Epidemiology of On-Duty CVD Events among Firefighters | Our investigations began to focus on cardiovascular risk and eventually the clinical epidemiology of cardiovascular disease (CVD) events in firefighters and police officers, in particular sudden cardiac death (SCD). In approaching the then, three-decade old question- Why does SCD cause nearly half of on-duty deaths among US firefighters- rather than attempt yet another cohort mortality study, we created a design using statistical odds to compare the relative probabilities of SCD across different types of firefighter job duties. This design would allow us to investigate the hypothesis that stressful work events could trigger for SCD. We demonstrated and replicated the first definitive statistical associations between strenuous job tasks and on-duty SCD and cardiovascular events (2003 and 2006). Then, in a much larger, decade-long study of all US firefighter, on-duty deaths due to coronary heart disease (CHD), we were able to show across various sensitivity analyses that the risk of sudden cardiac death (SCD) was 10- to over 100-fold higher while putting out a fire as compared to the risk of SCD during non-emergency duties (NEJM 2007). |
| Epidemiology of On-Duty SCD among Law Enforcement Officers | Later, by performing original surveys of police officers regarding their annual working time across various law enforcement tasks and comparing these to a database of national police SCD cases we compiled, we were able to extend and cross-validate the firefighter findings to the risk of SCD among police. Thus, we demonstrated that SCD risk was significantly higher in a variety of stressful police duties compared to routine ones, including 30- to 70-fold excess risk of SCD during suspect pursuits and altercations (BMJ 2014).<br><br>In terms of clinical and public health prevention, however, it was essential for us to determine which first responders were most susceptible to on-duty SCD and other CVD events. Therefore, using the large amounts of medical data we had collected on healthy working firefighters and the SCD autopsy and CVD retirement databases we assembled, we performed various case-control and case-fatality investigations. |
| CVD risk factors and Susceptibility to Strenuous Job Duties in Public Safety | These epidemiologic studies identified robust associations between well-recognized CVD risk factors (e.g. smoking, obesity and uncontrolled hypertension and prior CVD events) and the risk of on-duty CVD events, particularly SCD. Although the results were expected, the US fire service had largely ignored medical risk factors, instead focusing heavily on heat stress and dehydration as explanations for CVD among firefighters. |

**EXHIBIT A**

| | |
|---|---|
| Evidence-based Models of CVD and SCD in Public Safety Personnel | Our epidemiologic findings regarding CVD risk factors coupled with our studies of duty-related risk revealed an overall conceptual model illustrating how personal risk factors interact with occupational ones to increase individual responders' susceptibility to CVD and SCD. In addition, we have highlighted the important pathologic roles that left ventricular hypertrophy and cardiomegaly play, with and without obstructive CHD, as major underlying causes of SCD among public safety personnel, just as they are in the general population. |
| Influence on Medical Standards and Translation of Research Findings to Preventive Medicine Policy | We have combined our epidemiologic findings with those of Prof. Denise Smith, an exercise physiologist, who has extensively studied the physiologic changes and strain of firefighting duties to develop evidence-based models of CVD and SCD among public safety personnel. Through numerous presentations (regional to international), state of the art reviews, white papers, monographs and invited editorials, we have translated our original investigations to cardiologists, occupational medicine physicians and directly to police and fire services. As a result, we have greatly influenced preventive recommendations and practices regarding wellness and fitness for duty among emergency responders/public safety workers, including improved risk factor control. |
| Cardiovascular Prevention, including primary prevention with Mediterranean lifestyle programs | Our most recent grant awards have built upon previous results, and are now heavily focused on cardiovascular prevention, including the non-invasive detection of left ventricular hypertrophy, as well as the novel approach of broadly reducing cardiovascular risk among firefighters through workplace-based Mediterranean diet nutritional changes and other lifestyle interventions such as increased physical activity and improved sleep hygiene. We are now expanding the unique workplace approach of using Mediterranean nutrition principles to the fire service nationally as well as to other occupations in the US and abroad, including law enforcement and auto manufacturing in Spain. |
| **Clinical Toxicology (2001 – )** | Building on my early work with carbon monoxide exposures, hazardous materials technicians and chemical accidents; after September 11, 2001, I initiated the development of a Chemical Terrorism Guide for the American College of Physicians. I was also invited to deliver "Meet the Professor" presentations at two of their annual meetings on this syndrome-based recognition of classes of chemical toxins via "toxidromes" in the setting of emergencies, where the identity of the agent may be unknown. |
| Empiric approaches to Chemical Emergencies and Chemical Terrorism | The above clinical approach of toxidromes is applicable regardless of the source of the chemical (i.e., transportation or industrial accidents, chemical terrorism or chemical warfare). This framework was further developed, refined and eventually summarized as a "Current Concepts" review in the NEJM (2004). |
| Lead Poisoning from Traditional Medications | Another area of my toxicology work which has had wide public health impact is related to lead exposure from traditional Indian (Ayurvedic) medications. This focus of research grew out of my consultation practice where I evaluated three cases of occult lead poisoning in patients originally from India and Nepal. Tracing the patients' poisoning to high levels of lead in their Ayurvedic remedies, we contributed the cases to a national report from the Center for Disease Control (MMWR 2004). |

**EXHIBIT A**

| Prevalence of Heavy Metals in Ayurvedic Medications | Based on the sentinel clinical cases, together with a former HSPH student who is now a national academic leader in alternative medicine, Dr. Robert Saper, we sought to further understand the extent of the problem and developed a study of the prevalence of toxic heavy metals among Ayurvedic remedies sold in ethnic markets in the Boston area eventually published in JAMA (2004). The follow-up study looked at Ayurvedic medications available via the internet (JAMA 2008). |

We went on to publish additional reviews, case series and an invited editorial that have emphasized the serious, yet, insidious clinical presentation of this source of lead poisoning and its widespread, international character. This body of work has led to increased recognition of this hazard, as well as greater regulatory scrutiny of these folk remedies within India and beyond.

**Common Heavy Metal Exposures in Primary and Specialty Care**

As a further extension of my consultation clinic, we have also published a number of clinical series and reviews illustrating common heavy metal exposure scenarios that often challenge primary care physicians. These include methylmercury over-exposure from frequent consumption of predator fish (e.g., swordfish and shark); patients who are needlessly worried about high total arsenic in the urine (almost always resulting from benign forms of organic arsenates naturally occurring in fish and shellfish); and the misguided use of "commercial" heavy metals tests by unconventional practitioners (e.g. in hair, or urine after provocative chelation) that are usually of questionable reliability and validity.

I eventually developed this clinical experience and research into a handbook in 2010 for clinicians to manage common heavy metal scenarios, and I continue to publish reviews of these topics, including a 2016 invited "Decisions" paper for CMAJ.

**Occupational Sleep Medicine** (2007 – )

A more recent focus of clinical innovation regards the mitigation of fatigue in transportation and other safety-sensitive occupations and grows out of my industrial medicine practice and research expertise on obesity and cardio-metabolic risk.

**Clinical Screening for Obstructive Sleep Apnea (OSA) among Commercial Drivers**

My research in occupational sleep medicine, started in 2007, with screening for sleep-disordered breathing/ obstructive sleep apnea (OSA) among commercial drivers and other safety sensitive workers. As the clinic's medical director, I was an early adopter of 2006 consensus guidelines for objectively screening commercial drivers for OSA during their federally-mandated medical certification exams. Our published research documents a significant prevalence of OSA among commercial drivers and that under current regulations most of these cases remain undiagnosed and untreated and continue to drive professionally at great hazard to themselves and the general public.

Additionally, we have examined psychomotor vigilance testing via a handheld device and driving simulation in relationship to body mass index (BMI) and adiposity and OSA diagnoses, as potential future "in clinic" tools for detecting impairment from fatigue/sleep disorders in the occupational health setting.

EXHIBIT A

64

| | |
|---|---|
| Education of Physicians on Sleep Disorders among Commercial Drivers | Given my innovations and expertise in this area, I was chosen by the National Sleep Foundation (NSF) and awarded an NSF contract through Harvard to direct a continuing medical education course (2015-17) on sleep disorders in the context of federally-regulated medical certification examinations of professional drivers. |
| OSA and Preventable Accident Risk among Commercial Drivers | In 2016, we published the first study demonstrating the results of a large, employer-mandated OSA screening, diagnosis and treatment compliance monitoring program in the journal SLEEP. Our work demonstrated that drivers with OSA who did not adhere to treatment had a rate of preventable crashes five-fold greater than that of the control group which had similar driving experience. We also found that drivers with OSA who were fully compliant with the company-mandated treatment had a crash rate no different than that of the control group. Ours was the first large-scale work to confirm previous findings regarding increased crash risk and OSA among passenger car drivers. |
| Regulatory Policy regarding OSA in Transportation | Thus, our work is strongly impacting the more than decade-old debate as to whether screening drivers and other transportation operators for OSA should be mandated by federal regulations. For example, I have been asked to share my expertise in this area with the Chief of Prevention at the Catalan Railways in Spain (Ferrocarrils de la Generalitat de Catalunya) and the Canadian Advisory Council on Railway Safety. |
| Occupational Sleep Medicine as a multi-disciplinary field | In a larger context, I am a leading contributor of clinical and research expertise to the development of a new field- "Occupational Sleep Medicine"- where sleep medicine, chronobiology and occupational health intersect around our "24/7" society which promotes fatigue and chronic partial sleep deprivation through challenging schedules and conflicting time demands, as well as medical problems including sleep disorders.

My expertise in this area has been further disseminated with invited participation in Occupational Sleep Medicine courses at the international Associated Professional Sleep Societies (APSS) meetings, the 2016 American Occupational Health Conference (ACOEM) and invited publications. For example, from 2013-15, I was part of an ad hoc committee for the American Thoracic Society (ATS) on the public health impacts of sleep, which lead to an official ATS Statement, "The Importance of Healthy Sleep", published in 2015 in the society's journal. |

EXHIBIT A

## Report of Education of Patients and Service to the Community

**Activities:**
Those activities below sponsored by outside entities are so noted and the sponsor(s) is (are) identified.

**Local:**

| | |
|---|---|
| 1993 – 1995 | City of Cambridge, Massachusetts / Emergency Planning Committee for Hazardous Materials Incidents |
| 2001 – | During my tenure as Medical Director of Employee Health, Cambridge Health Alliance has adopted many important policy changes with respect to the health of its employees. These include a system-wide, transitional return to work policy, becoming a tobacco-free campus and developing a significant employee wellness program. Our wellness program has been recognized by the American Heart Association, the *Boston Business Journal* and the Worksite Wellness Council of Massachusetts with awards. |

**Regional:**

| | |
|---|---|
| 1993 – 1995 | University of Massachusetts Boston / Advisor and Preceptor "Doctor for a Day" introduced University of Massachusetts Boston pre-medical students to clinical medicine. |
| 1996 | Massachusetts Association of Hazardous Materials Technicians / Invited Speaker "Medical Surveillance." Annual Seminar. |
| 1998 | Pollard Middle School, Needham Public Schools / Invited Speaker "Respiratory Aspects of Indoor Air Quality" |
| 2000 | Massachusetts Hazardous Materials Technicians / Invited Speaker "Epidemiology of Massachusetts Hazmat Incidents 1990-1996, and Medical Surveillance of Hazmat Firefighters 1993-1998." Annual Conference. |
| 2000 | Massachusetts Coalition for Occupational Safety and Health / Invited Faculty Designing an Occupational Health Protocol for Primary Care Physicians Workshop. |
| 2001 | Massachusetts Department of Public Health Southeast Region / Invited Interview "Lead poisoning and its Prevention." Live radio broadcast in Portuguese. |
| 2003 | Massachusetts Association of Portuguese Speakers / Invited Speaker – Plenary Talk Lead Toxicity in Portuguese Speaking Workers Healthy Mind, Healthy Body II: Conference on the Health of Portuguese-Speaking Immigrants, Boston, Massachusetts |
| 2003 – 2006 | Massachusetts Medical Schools / Mentor Hispanic Medical Students Mentorship Program |

EXHIBIT A

| | |
|---|---|
| 2004; 2006 | Public Employee Retirement Administration Commission, Commonwealth of Boston / Invited Speaker<br>"Coronary Heart Disease in Firefighters" |
| 2005 | Jim Pillsbury Show, Comcast Television / Invited Guest<br>Toxic Metals in Herbal Remedies |
| 2005 | Public Employee Retirement Administration Commission, Commonwealth of Boston / Invited Speaker<br>"Disability in Firefighters: Lessons for Prevention." Public Employee Retirement Administration Commission of Massachusetts' Emerging Issues Forum 2005. |
| 2006 | Graphic Arts Compensation Corporation (consortium of Boston-area printing companies) / Invited Speaker<br>"The Value of Occupational Health Partnerships" |
| 2006 | Meadowbrook Insurance and consortium of Boston-area construction companies / Invited Speaker<br>"Workplace Drug Testing, Pre-placement Examinations and Management of Workers Compensation Costs" |
| 2008 | Basic Bioscience for Community Representatives of Institutional Bio-safety Committees, Safety Partners/Eagleson Institute/Cambridge Department of Public Health / Invited Speaker<br>Occupational Health, Basic Bioscience for Community Representatives of Institutional Bio-safety Committees |
| 2008 – 2009 | Cambridge Chamber of Commerce / Member<br>Wellness Initiative |
| 2010 | Professional Firefighters of Massachusetts / Invited Speaker<br>"Cardiovascular Disease in Firefighters" |
| 2011 | Massachusetts Municipal Managers Association / Invited Speaker and Panelist<br>Creating a Wellness Program for a Police Department |
| 2012 | Cambridge Health Alliance and Occupational & Environmental Health Network / Plenary Speaker and Expert Panelist<br>"Worker's Compensation Risk Management in the Life Sciences." Life Sciences and Employee Health Seminar. We provided a free seminar to Boston-area Life Sciences companies and University Biosafety Personnel to help them with occupational health issues of various types common to pharmaceutical, biotechnology and health-related researchers. |
| 2012 | Cambridge Health Alliance and Sargent & Associates / Director, Moderator and Plenary Speaker<br>"Cardiovascular Disease in Public Safety Personnel – State of the Science." Health & Wellness Symposium for Public Safety Personnel Program. We provided a free symposium to Massachusetts Police, Fire and Ambulance Personnel and their |

EXHIBIT A

departments to better understand the cardiovascular and other hazards they face due to interactions of personal characteristics, lifestyle choices and occupational exposures and circumstances.  Problems were approached in a multi-disciplinary fashion with medical, nursing, wellness and physical fitness strategies.

2012          Boston Fire Department / Plenary Talk
              "Heart Disease in the US Fire Service."  Annual Health Fair.

2015          Massachusetts Municipal Police Training Committee / Invited Presentation
              Baseline Physical Fitness in Police Recruits and Subsequent Performance in
              Massachusetts Police Academies.

2015 –        Massachusetts Association of Portuguese Speakers / Co-Founder and Selection
              Committee Member
              Dr. Edward O. Leitao Memorial Scholarship Award.  This new fund provides
              scholarships to individuals of Portuguese descent pursuing medical studies in memory of
              Dr. Leitao, a Portuguese-American physician, who served the communities around
              Cambridge and Somerville for many years.

2016          A. Michael Mullane  Health and Safety Symposium / Plenary Presentation
              "Cardiovascular Disease in the Fire Service" given with Drs. Denise Smith and Gavin
              Horn. Presentation given to New England firefighters to help understand the
              cardiovascular stressors they encounter and how these interact with personal
              health/fitness and lifestyle in order to decrease their risk profiles. Boston Fire
              Department, Local 718 and the International Association of Fire Fighters.

2018          American Hellenic Educational and Progressive Association (AHEPA), Boston Chapter/
              Invited Lecture,
              "The Benefits of the Traditional Greek Diet"

2019          Workplace Wellness Council of Massachusetts (WWCMA)/
              Invited Keynote Presentation and Panelist,
              "Sleep, Health and Workplace Wellness"

2019          Metropolis of Boston (Greek Orthodox Diocese of Boston) / Invited Presentation with
              Chef Maria Loi: "The Greek Diet", St. Demetrios Greek Orthodox Church, Weston MA.

2019          Michael Mullane Health and Safety Symposium / **Keynote Presentation**
              **"Survival Mediterranean Style: Lifestyle Countermeasures for Fire Fighters"**.
              Boston Fire Department, Local 718 and the International Association of Fire Fighters.

**National:**

2006          Office of Congresswoman Carolyn Maloney of New York / Ad hoc, Medical Advisor
              Provided *pro bono* expertise regarding Autopsy Guidelines for Individuals Dying after
              Environmental Exposures related to September 11, 2001.

**EXHIBIT A**

68

2007       United States Fire Academy / Invited Speaker
Special Lecture – "Heart Disease in Firefighters." During any given week, the Academy is attended by hundreds of veteran volunteer and career firefighters from across the country and I was able to educate several hundred of them. Emmitsburg, Maryland.

2009       Multiple Chemical Sensitivity: Fact or Fiction / Plenary Talk
National Pesticide Inspector Residential Training, Wakefield, Massachusetts (Massachusetts Pesticide Bureau)

2011       United States Fire Academy / Plenary Lecture and Symposium Participant
2nd National Fire Service Research Agenda Symposium, National Fallen Firefighters Foundation, Emmitsburg, Maryland. The National Fallen Firefighters Foundation is a fire service organization working to decrease line of duty deaths and injuries in the fire service. The Foundation's symposium seeks to identify and prioritize research needs that will ultimately lead to a safer and healthier fire service.

2013       Sudden Cardiac Death in the Fire Service: Risk Factors, Causes and Unanswered Questions / Invited Presentation with Dr. Denise Smith
International Association of Fire Chiefs, Volunteer and Combination Officers Section, Clearwater Beach, Florida (National Fallen Firefighters Foundation)

2013       Brownsburg Fire Territory / Plenary Lecture
Cardiovascular Health in the Fire Service. Annual Joint Wellness-Fitness Symposium of the Indiana Fire Chiefs Association and the Professional Fire Fighters Union of Indiana which brought several hundred firefighters from Indiana, Ohio and Illinois. Brownsburg, Indiana.

2014       National Fallen Firefighters Foundation / Invited Faculty
Workshop participant for medical and health issues, Tampa2, 10th Anniversary of the 16 Firefighter Life Safety Initiatives and the "Everyone Goes Home Program," National Fallen Firefighters Foundation. All major US fire service organizations were represented.

2015       International Association of Fire Chiefs / Lead Speaker
"Survival Mediterranean Style." Along with two veteran fire Chiefs, led a national webinar on the benefits of Mediterranean-style diets for improving risk factor profiles, health and quality of living in the US fire service.

2015       Yale-New Haven Health System / Plenary Talk
"Cardiovascular Health in Firefighters and Law Enforcement." Wellness Symposium for fire, police and EMS officials for fire and law enforcement officials from throughout the state of Connecticut. Trumbull, Connecticut.

2015       Indiana Association of Chiefs of Police and the National Institute for Public Safety Health / Plenary Talk
"Fitness and Cardiovascular Health in Law Enforcement." Inaugural Law Enforcement Wellness-Fitness Symposium for Police and Law Enforcement, Indianapolis, Indiana.

2016       International Association of Fire Chiefs (IAFC) / Expert Reviewer
Pro Bono content reviewer of the IAFC's "Physician's Guide to Firefighter Physicals"

EXHIBIT A

2016        Florida Justice Association / Plenary Talk
"Obstructive Sleep Apnea in the Trucking Industry."  Florida Justice Association, Continuing Legal Education, Masters of Justice Program, Orlando, Florida.

2017        Indianapolis Professional Firefighters Union Local 416
"Survival Mediterranean Style: Cancer Prevention with Nutrition." Local 416, Cancer Summit: The Science of Cancer in the Fire Service: Prevention to Survivorship, Indianapolis, Indiana

2017        Indiana Association of Chiefs of Police and the National Institute for Public Safety Health / Plenary Talk
"Feeding America's Finest: Re-thinking Nutrition to Improve the Health of your Department." Law Enforcement Wellness-Fitness Symposium for Police and Law Enforcement, Indianapolis, Indiana.

2019        The Healthy Aging show with Dr. Michael Perskin, on Doctor Radio, SIRIUS XM- NYU Langone Health. Guest segment to discuss the paper, "Association Between Push-up Exercise Capacity and Future Cardiovascular Events Among Active Adult Men."

## International:

2005        Radiotelephonic Foundation of Cyprus / Invited Guest
Live television show in Greek on "Occupational Health," Nicosia, Cyprus.

2005        Lead and Other Metal Hazards in Construction / Plenary Talk
Symposium on Health and Safety in the Construction Industry, Technical Chamber of Commerce of Cyprus and Cyprus International Institute, Nicosia, Cyprus (Cyprus International Institute)

2007        Hellenic Fire Academy / Plenary Talk
"On-Duty Heart Disease in the Fire Service."  First Annual Symposium on Health and Safety in the Workplace, Athens, Greece.

2009        International Association of Fire Fighters, John P. Redmond Foundation / Workshop Moderator and Invited Faculty
Cardiovascular Disease Workshop and "Ask the Doctor" Roundtable.  Symposium on the Occupational Health and Hazards of the Fire Service, Los Angeles, California.

2011        Ontario Association of Fire Chiefs / Plenary Talk
"Heart Disease in the Fire Service:  Interacting Roles of Strenuous Duty, Aging, Lifestyle & Fitness."  Annual Conference, Toronto, Ontario, Canada.

2015        Greek Economic Forum / Plenary Talk
"Capitalizing on the Traditional Greek Diet:  Ideas for Development & Entrepreneurship." A Modern Greece, Economic Forum, Cambridge, Massachusetts.

## EXHIBIT A

| 2016 | South Korean Firefighters / Question and Answer Session and Luncheon regarding Occupational Injuries and Illness.<br>Emergency Services Workers Symposium, Seoul National University, Graduate School of Public Health, Seoul, South Korea |
|------|------|
| 2016 | National Research Council (NRC) of Canada / Ad hoc, Expert Medical Advisor<br>Provided *pro bono* expertise regarding the Medical Surveillance Program for NRC employees working in NRC fire test laboratories. |
| 2017 | International Association of Fire Fighters, Vincent J. Bolton, Affiliate Leadership Training Summit / Workshop Invited Speaker to US and Canadian firefighter union leaders, "Cardiovascular Disease in the Fire Service", Anaheim, California. |
| 2018 | International Association of Fire Fighters, Vincent J. Bolton, Affiliate Leadership Training Summit / Workshop Invited Speaker to US and Canadian firefighter union leaders, "Cardiovascular Disease in the Fire Service", Orlando, Florida. |
| 2018 | Region of Puglia: Apulian Lifestyle Conference (Stili Di Vita E Sicurezza Alimentare Nella Promozione Della Blue Growth - Crescita Blu) / Invited Plenary Presentation, to members of the public and the media "Apulian Lifestyle: Your Past is Your Future", Taranto Italy. |
| 2019 | World Happiness Summit / Invited Presentation with Chef Maria Loi: "Achieving Happiness with the Greek Diet", University of Miami, Miami, Florida. |

**Recognition:**

| 2000 | Keynote Speaker, Annual Conference | Massachusetts Hazardous Materials Technicians |
|------|------|------|
| 2003 – 2006;<br>2009 – 2013 | America's Top Physicians | Consumer Research Council of America/ SLD Industries |
| 2007 | Who's Who Among American Teachers & Educators | Who's Who |
| 2007 | Keynote Speaker, First Annual Symposium on Health and Safety | Hellenic Fire Academy, Athens, Greece |
| 2011 | "Showcase" Research Presentation One of three PI's selected to present "major subject areas and noteworthy accomplishments" | U.S. Department of Homeland Security, Assistance to Firefighters Grant Program |
| 2013 | Keynote Speaker, Annual Joint Wellness-Fitness Symposium | Indiana Fire Chiefs Association & Professional Fire Fighters Union of Indiana |

EXHIBIT A

71

| 2015 | Keynote Speaker, First Responders Lecture Series and Panel Discussion | Yale-New Haven Health, Occupational Medicine Services |
| --- | --- | --- |
| 2015 | Keynote Speaker, Entrepreneurship Panel, Greek Economic Forum | Harvard Hellenic Society |
| 2015 | Keynote Speaker, Inaugural Law Enforcement Wellness-Fitness Symposium | Indiana Association of Chiefs of Police and the National Institute for Public Safety Health |
| 2016 | Certificate of Appreciation, Sioux Falls Fire Rescue Training Center Team | Sioux Falls Fire Rescue, Sioux Falls, South Dakota |
| 2017 | Recognition Award for Firefighter Education | Corps of Military Firefighters, Brazilian Federal District, Brazil |

EXHIBIT A

72

## Report of Scholarship

**Peer-Reviewed Publication in print or other media:**
**Research investigations:**

1. Mattison RE, Humphrey FJ 2nd, **Kales SN**, Handford HA, Finkenbinder RL, Hernit RC.   Psychiatric Background and Diagnoses of Children Evaluated for Special Class Placement.  Journal of the American Academy of Child Psychiatry 1986; 25(4):514-520.

2. Mattison RE, Humphrey FJ 2nd, **Kales SN**, Wallace DJ.   An Objective Evaluation of Special Class Placement of Elementary Schoolboys with Behavior Problems.  Journal of Abnormal Child Psychology 1986; 14(2):251-262.

3. Ramos Platon MJ, Vela Bueno A, Espinar Sierra J, **Kales SN**.  Hypnopolygraphic Alteration in Attention Deficit Disorder (ADD) Children.  International Journal of Neuroscience 1990; 53(2-4):87-101.

4. **Kales SN**.  Smoking Restrictions at Boston-Area Hospitals 1990-1992: A Serial Survey. CHEST 1993; 104(5):1589-1591.

5. **Kales SN**, Feldman J, Pepper L, Fish SS, Christiani DC, Ozonoff D.  Carboxyhemoglobin Levels in Patients with Cocaine-Related Chest Pain.  CHEST 1994; 106(1):147-150.

6. **Kales SN**, Pentiuc F, Christiani DC.  Pseudoelevation of Carboxyhemoglobin Levels in Firefighters. Journal of Occupational Medicine 1994; 36(7):752-776.

7. Marshall MD, **Kales SN**, Christiani DC, Goldman RH.  Are Reference Intervals for Carboxyhemoglobin Appropriate? A Survey of Boston Area Laboratories.  Clinical Chemistry 1995; 41(10):1434-1438.

8. **Kales SN**, Castro M, Christiani DC.  Epidemiology of Hazardous Materials Responses by Massachusetts District Hazmat Teams.  Journal of Occupational and Environmental Medicine 1996; 38(4):394-400.

9. **Kales SN**, Polyhronopoulos GN, Christiani DC.  Medical Surveillance of Hazardous Materials Response Firefighters: A Two-Year Prospective Study. Journal of Occupational and Environmental Medicine 1997; 39(3):238-247.

10. **Kales SN**, Polyhronopoulos GN, Castro MJ, Goldman RH, Christiani DC.  Injuries Caused by Hazardous Materials Accidents.  Annals of Emergency Medicine 1997; 30(5):598-603.

11. **Kales SN**, Polyhronopoulos GN, Castro MJ, Goldman RH, Christiani DC.  Mechanisms of and Facility Types Involved in Hazardous Materials Accidents.  Environmental Health Perspectives 1997; 105(5):998-1001.

12. Liu JJ, Daya MR, Carrasquillo O, **Kales SN**.  Prognostic Factors in Methanol Poisoning.  Journal of Toxicology. Clinical Toxicology 1998; 36(3):175-181.

13. **Kales SN**, Aldrich JM, Polhronopoulos GN, Artzerounian D, Gassert T, Hu H, Kelsey K, Sweet C, Christiani DC. Fitness for Duty Evaluations in Hazardous Materials Firefighters. Journal of Occupational and Environmental Medicine 1998; 40(10):925-931.

**EXHIBIT A**

73

14. **Kales SN**, Polyhronopoulos GN, Aldrich JM, Dimitriadis EA, Christiani DC.   Interlaboratory Comparisons of Red Blood Cell Cholinesterase Activity.   Journal of Environmental Medicine 1999; 1(1):19-26.

15. Chatzis C, Danaka G, Linos A, **Kales SN**, Christiani DC.  Lung Cancer and Occupational Risk Factors in Greece.  Journal of Occupational and Environmental Medicine 1999; 41(1):29-35.

16. **Kales SN**, Polyhronopoulos GN, Aldrich JM, Leitao ED, Christiani DC.  Correlates of Body Mass Index in Hazardous Materials Firefighters. Journal of Occupational and Environmental Medicine 1999; 41(7):589-595.

17. **Kales SN**, Aldrich JM, Polyhronopoulos GN, Leitao EO, Artzerounian D, Gassert TH, Hu H, Kelsey KT, Sweet C, Christiani DC.  Correlates of Fitness for Duty in Hazardous Materials Firefighters. American Journal of Industrial Medicine 1999; 36(6): 618-629.

18. **Kales SN**, Polyhronopoulos GN, Aldrich JM, Mendoza PJ, Suh JH, Christiani DC. A Prospective Study of Hepatic, Renal, and Haematologic Surveillance in Hazardous Material Firefighters.  Occupational and Environmental Medicine 2001; 58(2):87-94.

19. **Kales SN**, Freyman RL, Hill JM, Polyhronopoulos GN, Aldrich JM, Christiani DC. Firefighters' Hearing: A Comparison with Population Databases from the International Standards Organization. Journal of Occupational and Environmental Medicine 2001; 43(7):650-656.

20. **Kales SN**, Mendoza PJ, Hill JM, Christiani DC. Spirometric Surveillance in Hazardous Materials Firefighters: Does Hazardous Materials Duty Affect Lung Function? Journal of Occupational and Environmental Medicine 2001; 43(12):1114-1120.

21. **Kales SN**, Goldman RH. Mercury Exposure: Current Concepts, Controversies and a Clinic's Experience. Journal of Occupational and Environmental Medicine 2002; 44(2):143-154.

22. **Kales SN**, Soteriades ES, Christoudias SG, Tucker S, Nicolaou M, Christiani DC.  Firefighters' Blood Pressure and Employment Status on Hazardous Materials Teams in   Massachusetts: A Prospective Study. Journal of Occupational and Environmental Medicine 2002; 44(7):669-676.

23. Soteriades ES, **Kales SN**, Christoudias, SG, Tucker S, Liarokapis D, Christiani, DC. The Lipid Profile of Firefighters Over Time: Opportunities for Prevention. Journal of Occupational and Environmental Medicine 2002; 44(9):840-846.

24. Soteriades ES, **Kales SN**, Liarokapis D, Christiani, DC. Prospective Surveillance of Hypertension in Firefighters. Journal of Clinical Hypertension 2003; 5(5):315-320.

25. **Kales SN**, Soteriades ES, Christoudias SG, Christiani DC. Firefighters and On-Duty Deaths from Coronary Heart Disease: a Case Control Study. Environmental Health: A Global Access Science Source 2003; 2(1):14.

26. **Kales SN**, Linos A, Chatzis C, Sai Y, Halla M, Nasioulas G, Christiani DC. The Role of Collagen IX Tryptophan Polymorphisms in Symptomatic Intervertebral Disc Disease in Southern European Patients. Spine 2004; 29(11):1266-1270.

EXHIBIT A

27. Saper RB, **Kales SN**, Paquin J, Burns MJ, Eisenberg, DM, Davis RB, Phillips RS. The Heavy Metal Content of Ayurvedic Herbal Medicine Products. Journal of the American Medical Association (JAMA) 2004; 292(23):2868-2873.

28. Soteriades ES, Hauser R, Kawachi I, Liarokapis D, Christiani DC, Kales SN. Obesity and Cardiovascular Disease Risk Factors in Firefighters: A Prospective Cohort Study. Obesity Research 2005; 13(10):1756-1763.

29. **Kales SN**, Huyck KL, Goldman RH. Elevated Urine Arsenic: Un-Speciated Results Lead to Unnecessary Concern and Further Evaluations. Journal of Analytical Toxicology 2006; 30(2):80-85.

30. Holder JD, Stallings L, Peeples L, Burress JW, **Kales SN**. Firefighter Heart Presumption Retirements in Massachusetts: 1997-2004. Journal of Occupational and Environmental Medicine 2006; 48(10):1047-1053.

31. **Kales SN**, Soteriades ES, Christophi CA, Christiani DC. Emergency Duties and Deaths from Heart Disease among Firefighters in the United States. New England Journal of Medicine 2007; 356(12):1207-1215.

32. Mbanu I, Wellenius GA, Mittleman MA, Peeples L, Stallings LA, **Kales SN**. Seasonality and Coronary Heart Disease Deaths in United States Firefighters. Chronobiology International 2007; 24(4):715–726.

33. **Kales SN**, Christophi CA, Saper RB. Hematopoietic Toxicity from Lead-Containing Ayurvedic Medications. Medical Science Monitor 2007; 13(7):CR295-CR298.

34. Soteriades ES, Hauser R, Kawachi I, Liarokapis D, Christiani DC, **Kales SN**. Obesity and Risk of Job Disability in Male Firefighters. Occupational Medicine (London) 2008; 58(4):245-250. Epub 2008 January 18.

35. Geibe JR, Holder J, Peeples L, Kinney AM, Burress JW, **Kales SN**. Predictors of On-Duty Coronary Events in the United States. American Journal of Cardiology 2008; 101(5):585–589. Epub 2007 December 21.

36. Saper RB, Phillips RS, Sehgal A, Khouri N, Davis RB, Paquin J, Thuppil V, **Kales SN.** Lead, Mercury, and Arsenic in U.S.- and Indian-Manufactured Ayurvedic Medicines Sold via the Internet. JAMA 2008; 300(8):915-923. Erratum in: JAMA 2008; 300(14):1652.

37. Parks PD, Durand G, Tsismenakis AJ, Vela-Bueno A, **Kales SN**. Screening for Obstructive Sleep Apnea during Commercial Driver Medical Examinations. Journal of Occupational and Environmental Medicine 2009; 51(3):275-282.

38. Tsismenakis AJ, Christophi CA, Burress JW, Kinney AM, M Kim, **Kales SN**. The Obesity Epidemic and Future Emergency Responders. Obesity 2009; 17(8):1648-1650. Epub 2009 March 19.

39. Durand G, **Kales SN**. Obstructive Sleep Apnea Screening during Commercial Driver Medical Examinations: A Survey of ACOEM Members. Journal of Occupational and Environmental Medicine 2009; 51(10):1220–1226.

EXHIBIT A

40. Abejie BA, **Kales SN**, Christiani DC. Patterns of Pulmonary Dysfunction in Asbestos Workers: A Cross-Sectional Study. Journal of Occupational Medicine and Toxicology 2010; 5:12.

41. Baur DM,  Klotsche J, Hamnvik OR, Sievers C, Pieper L, Wittchen HU, Stalla GK, Schmid RM, **Kales SN**, Mantzoros CS. Type 2 Diabetes mellitus and Medications for Type 2 Diabetes mellitus are Associated with Risk for and Mortality from Cancer in a German Primary Care Cohort.  Metabolism 2011; 60(10):1363-1371.  Epub 2010 November 16.

42. Hamnvik OP, Liu X, Petrou M, Gong H, Chamberland JP, Kim EH, Christophi CA, **Kales SN**, Christiani DC, Mantzoros CS. Soluble Leptin Receptor and Leptin are Associated with Baseline Adiposity and Metabolic Risk Factors, and Predict Adiposity, Metabolic Syndrome, and Glucose Levels at 2-Year Follow-Up: The Cyprus Metabolism Prospective Cohort Study. Metabolism 2011; 60(7):987-993.  Epub 2010 November 5.

43. Poston WS, Haddock CK, Jahnke SA, Jitnarin N, Tuley BC, **Kales SN**. The Prevalence of Overweight, Obesity, and Substandard Fitness in a Population-Based Firefighter Cohort. Journal of Occupational and Environmental Medicine 2011; 53(3):266-274.

44. Durand G, Tsismenakis AJ, Jahnke SA, Baur DM, Christophi CA, **Kales SN**. Firefighters' Physical Activity: Relation to Fitness and Cardiovascular Disease Risk. Medicine and Science in Sports and Exercise 2011; 43(9):1752–1759.

45. Soteriades ES, Targino MC, Talias MA, Hauser R, Kawachi I, Christiani DC, **Kales SN**. Obesity and Risk of LVH and EKG Abnormalities in US Firefighters. Journal of Occupational and Environmental Medicine 2011; 53(8):867-871.

46. Zhang C, Varvarigou V, Parks PD, Gautam S, Vela Bueno A, Malhotra A, **Kales SN**. Psychomotor Vigilance Testing of Professional Drivers in the Occupational Health Clinic: A Potential Objective Screen for Daytime Sleepiness. Journal of Occupational and Environmental Medicine 2012; 54(3):296-302.

47. Baur DM, Christophi CA, Tsismenakis AJ, Cook EF, **Kales SN**. Cardio-Respiratory Fitness Predicts Cardiovascular Risk Profiles in Career Firefighters. Journal of Occupational and Environmental Medicine 2011; 53(10):1155-1160.

48. Liu X, Hamnvik OP, Petrou M, Gong H, Chamberland JP, Kim EH, Christophi CA, **Kales SN**, Christiani DC, Mantzoros CS. Circulating Lipocalin-2 is Associated with Body Fat Distribution at Baseline, but is not an Independent Predictor of Insulin Resistance: The Prospective Cyprus Metabolism Study.  European Journal of Endocrinology 2011; 165(5):805-812.  Epub 2011 September 1.

49. Baur DM, Christophi CA, **Kales SN**. Metabolic Syndrome is Inversely Related to Cardio-Respiratory Fitness in Male Career Firefighters. Journal of Strength and Conditioning Research 2012; 26(9):2331-2337.

50. Berger MB, Varvarigou V, Rielly A, Czeisler CA, Malhotra A, **Kales SN**. Employer-Mandated Sleep Apnea Screening and Diagnosis in Commercial Drivers. Journal of Occupational and Environmental Medicine 2012; 54(8):1017-1025.

EXHIBIT A

76

51. Anderson JE, Govada M, Steffen TK, Thorne CP, Varvarigou V, **Kales SN**, Burks SV. Obesity is Associated with the Future Risk of Heavy Truck Crashes among Newly Recruited Commercial Drivers. Accident Analysis and Prevention 2012; 49:378-384. Epub 2012 April 10.

52. Baur DM, Christophi CA, Cook EF, **Kales SN**. Age-Related Decline in Cardio-Respiratory Fitness among Career Firefighters: Modification by Physical Activity and Adiposity. Journal of Obesity 2012; 2012:710903. doi: 10.1155/2012/710903. Epub 2012 May 14.

53. Baur DM, Leiba A, Christophi CA, **Kales SN**. Low Fitness Is Associated With Exercise Abnormalities among Asymptomatic Firefighters. Occupational Medicine (London) 2012; 62(7):566-569. Epub 2012 July 23.

54. Baur DM, Christophi CA, Tsismenakis AJ, Jahnke SA, **Kales SN**. Weight-Perception in Male Career Firefighters and its Association with Cardiovascular Risk Factors. BMC (BioMed Central) Public Health 2012; 12:480.

55. Kouroutou P, **Kales SN**, Chatzistavrou K, Linou A. Influence of occupational exposure to heavy metals on morbidity and mortality (Επίδραση της   επαγγελματικής έκθεσης σε βαρέα μέταλλα στη νοσηρότητα και στη θνησιμότητα. Αρχεία Ελληνικής Ιατρικής). Archives of Hellenic Medicine 2012, 29 (1): 70-73 .

56. Leiba A, Baur DM, **Kales SN**. Exercise Induced Hypertension among Healthy Firefighters- A Comparison between Two Different Definitions. Journal of the American Society of Hypertension 2013; 7(1):40-45. Epub 2012 December 17.

57. Soteriades ES, Talias MA, Harmon KT, Schumann SC, **Kales SN**. Electronic Medical Record Use among US Occupational Medicine Physicians: A National Survey. Journal of Occupational and Environmental Medicine 2013; 55(10):1191-1196.

58. Gaughan DM, Christiani DC, Hughes MD, Baur DM, Kobzik L, Wagner GR, **Kales SN**. High hsCRP is Associated with Reduced Lung Function in Structural Firefighters. American Journal of Industrial Medicine 2014; 57(1):31-37. Epub 2013 September 20.

59. Yang J, Teehan D, Farioli A, Baur DM, Smith D, **Kales SN**. Sudden Cardiac Death among Firefighters ≤45 Years of Age in the United States. American Journal of Cardiology 2013; 112(12):1962-1967. Epub 2013 September 28.

60. Vamvini MT, Aronis KN, Panagiotou G, Huh JY, Chamberland JP, Brinkoetter MT, Petrou M, Christophi CA, **Kales SN**, Christiani DC, Mantzoros CS. Irisin mRNA and Circulating Levels in Relation to Other Myokines in Healthy and Morbidly Obese Humans. European Journal of Endocrinology 2013; 169(6):829-834.

61. Yang J, Farioli A, Korre M, **Kales SN**. Modified Mediterranean Diet Score and Cardiovascular Risk in a North American Working Population. PLoS ONE 2014; 9:e87539. doi: 10.1371/journal.pone.0087539.

EXHIBIT A

62. Korre M, Farioli A, Varvarigou V, Sato S, **Kales SN**. A Survey of Stress Levels and Time Spent across Law Enforcement Duties: Police Chief and Officer Agreement. Policing: A Journal of Policy and Practice 2014; 8(2):109-122. Epub 2014 February 28.

63. Batool-Anwar S, **Kales SN**, Patel SR, Varvarigou V, DeYoung PN, Malhotra A. Obstructive Sleep Apnea and Psychomotor Vigilance Task Performance. Nature and Science of Sleep 2014; 6:65-71. doi:10.2147/NSS.S53721. eCollection 2014.

64. Johnson KD, Patel SR, Baur DM, Edens E, Sherry P, Malhotra A, **Kales SN**. Association of Sleep Habits with Accidents and Near Misses in United States Transportation Operators. Journal of Occupational and Environmental Medicine 2014; 56(5):510-515.

65. Gaughan DM, Piacitelli CA, Chen BT, Law BF, M. Virji MA, Edwards NT, Enright PL, Schwegler-Berry DE, Leonard SS, Wagner GR, Kobzik L, **Kales SN**, Hughes MD, Christiani DC, Siegel PD, Cox-Ganser JM, Hoover MD. Exposures and Cross-Shift Lung Function Declines in Wildland Firefighters. Journal of Occupational and Environmental Hygiene 2014; 11(9):591-603.

66. Farioli A, Yang J, Teehan D, Baur D, Smith DL, **Kales SN**. Duty-Related Sudden Cardiac Death among Young U.S. Firefighters: A Longitudinal Analysis of Two National Databases. Occupational Medicine (London) 2014; 64(6):428-435. Epub 2014 August 7.

67. Liu X, Hamnvik OPR, Chamberland JP, Petrou M, Gong H, Christophi CA, Christiani DC, **Kales SN**, Mantzoros CM. Circulating Alanine Transaminase (ALT) and γ-Glutamyl Transferase(GGT), but not Fetuin-A, are Associated with Metabolic Risk Factors, at Baseline and at Two-Year Follow-Up: The Prospective Cyprus Metabolism Study. Metabolism - Clinical and Experimental 2014; 63(6):773-782. Epub 2014 March 15.

68. Gaughan DM, Hughes MD, Siegel PD, Chang CY, Law BF, Campbell CR, Richards JC, **Kales SN**, Chertok M, Kobzik L, Nguyen P, Wagner GR, O'Donnell CR, Kiefer M, Christiani DC. Arterial Stiffness, Oxidative Stress and Smoke Exposure in Wildland Firefighters. American Journal of Industrial Medicine 2014; 57(7):748-756. Epub 2014 June 6.

69. Varvarigou V, Farioli A, Korre M, Sato S, Dahabreh I. **Kales SN**. Law Enforcement Duties and Sudden Cardiac Death among Police Officers in the United States. British Medical Journal 2014; 349:g6534.

70. Thiese MS, Moffitt G, Hanowski RJ, **Kales SN**, Porter RJ, Hegmann KT. Commercial Driver Medical Exams: Prevalence of Obesity, Co-Morbidities and Certification Outcomes. Journal of Occupational and Environmental Medicine 2015; 57(6):659-665.

71. Yang J, Farioli A, Korre M, **Kales SN**. Dietary Preferences and Nutritional Information Needs among Career Firefighters in the United States. Global Advances in Health and Medicine. 2015; 4(4):16-23.

72. Farioli A, Costas A Christophi, CA, Quarta CC, **Kales SN**. Incidence of Sudden Cardiac Death in a Young Active Population. Journal of the American Heart Association 2015; 4(6):e001818. doi: 10.1161/JAHA.115.001818.

73. Thiese MS, Moffitt G, Hanowski RJ, **Kales SN**, Porter RJ, Hegmann KT. Repeated Cross-Sectional Assessment of Commercial Truck Driver Health. Journal of Occupational and Environmental Medicine 2015; 57(9):1022-1027.

EXHIBIT A

74. Grosso G, Marventano S, Yang J, Micek A, Pajak A, Scalfi L, Galvano F, **Kales SN**. A Comprehensive Meta-Analysis on Evidence of Mediterranean Diet and Cardiovascular Disease: Are Individual Components Equal? Critical Reviews in Food Science and Nutrition 2016.  Epub ahead of print 2015 November 3. doi: 10.1080/10408398.2015.1107021.

75. Burks SV, Anderson JE, Bombyk M, Haider R, Ganzhorn D, Jiao X, Lewis C, Lexvold A, Liu H, Ning J, Toll A, Hickman JS, Mabry E, Berger M, Malhotra A. Czeisler CA, **Kales SN**. Non-Compliance with Employer-Mandated Sleep Apnea Treatment and Increased Risk of Serious Truck Crashes. SLEEP 2016;39:967-975.

76. Porto LG, Nogueira RM, Nogueira EC, Molina GE, Farioli A, Junqueira LF, **Kales SN**. Agreement between BMI and body fat obesity definitions in a physically active population. Arch Endocrinol Metab. 2016;60:515-525. doi: 10.1590/2359-3997000000220.

77. Korre M, Sampani K, Porto LGG, Farioli A, Yang J, Christiani DC, Christophi CA, Lombardi DA, Kovacs RJ, Mastouri R, Abbasi S, Steigner M, Moffatt S, Smith DL, **Kales SN**. Cardiac Enlargement in US Firefighters: Prevalence estimates by Echocardiography, Cardiac Magnetic Resonance and Autopsies. J Clin Exp Cardiolog 2016, 7:7, DOI: 10.4172/2155-9880.1000459

78. Korre M, Sampani K, Porto LGG, Farioli A, Yang J, Christiani DC, Christophi CA, Lombardi DA , Kovacs RJ, Mastouri R, Abbasi S, Steigner M, Moffatt S, Smith DL, **Kales SN**. Effect of Body Mass Index on Left Ventricular Mass in Career Male Firefighters. Am J Cardiol. 2016;118:1769-1773. doi: 10.1016/j.amjcard.2016.08.058.

79. Thiese MS, Moffitt G, Hanowski RJ, **Kales SN**, Porter RJ, Hu N, Hegmann KT.  Multiple Conditions Increase Preventable Crash Risks among Truck Drivers in a Cohort Study. Journal of Occupational and Environmental Medicine. 2017;59(2):205-211. doi: 10.1097/JOM.0000000000000937

80. Sotos-Prieto M, Cash SB, Christophi CA, Folta S, Moffatt S, Muegge C, Korre M, Mozaffarian D, **Kales SN**. Rationale and design of Feeding America's Bravest: Mediterranean Diet-Based Intervention to change Firefighters' Eating Habits and Improve Cardiovascular Risk Profiles. Contemporary Clinical Trials. Contemp Clin Trials. 2017 Jul 11. pii: S1551-7144(17)30199-4. doi: 10.1016/j.cct.2017.07.010. [Epub ahead of print] PMID: 28710052

81. Benedetti L, Shusko M, Korre M, Eshleman EJ, Farioli A, Christophi CA, **Kales SN**. Recruit Fitness as a Predictor of Police Academy Graduation. Occupational Medicine (London) 2017: 67: 555–561.

82. Thiese MS, Moffitt G, **Kales SN**, Porter RJ, Hu N, Hartenbaum N, Hegmann KT.  A Retrospective Analysis of Cardiometabolic Health in a Large Cohort of Truck Drivers Compared to the American working Population. Am J Ind Med 2018 2018;61:103-110.

83. Porto LG, Bernardes Schmidt SC; de Souza JM, Nogueira RM, Fontana KE, Molina GE, Korre M, Smith DL, Junqueira LF, **Kales SN**. Firefighters' basal cardiac autonomic function and its associations with cardiorespiratory fitness. WORK. 2019;62(3):485-495. doi: 10.3233/WOR-192883.

84. Smith DL; Haller JM, Korre M, Fehling PC, Sampani K, Porto LG, Christophi CA, **Kales SN**. Pathoanatomic Findings Associated with Duty-Related Cardiac Death in U.S. Firefighters: a Case-Control Study. J Am Heart Assoc. 2018;7:e009446. DOI: 10.1161/JAHA.118.009446.

EXHIBIT A

85. Smith DL; Haller JM, Korre M, Sampani K, Porto LG, Fehling PC, Christophi CA, **Kales SN**. Emergency Duties and Pathoanatomic Substrates Associated with Cardiac Death Among U.S. Firefighters. American Journal of Cardiology. 2019;123:736-741. doi: 10.1016/j.amjcard.2018.11.049.

86. Muegge CM, Kleinschmidt VM, Johnson KA, Sotos-Prieto M., Moffatt SM, Beverly EA, Korre M, **Kales SN.** Focus groups to inform a nutrition intervention for career firefighters. Clin Nutr Metab 2018;1:1-5. doi: 10.15761/CNM.1000108

87. Garralda-Del-Villar M, Carlos-Chilleron S, Diaz-Gutierrez J, Ruiz-Canela M, Gea A, Martinez-Gonzalez MA, Bes-Rastrollo M, Ruiz L, **Kales SN**, Fernandez-Montero A. Healthy Lifestyle and incidence of metabolic syndrome in the SUN cohort. Nutrients 2018, 11, 65; doi:10.3390/nu11010065

88. Yang J, Christophi CA, Farioli A, Baur DM, Moffatt S, Zollinger TW, **Kales SN**. Association Between Push-up Exercise Capacity and Future Cardiovascular Events Among Active Adult Men. JAMA Netw Open. 2019 Feb 1;2(2):e188341. doi: 10.1001/jamanetworkopen.2018.8341.

89. Sotos-Prieto M, Jin Q, Rainey D, Coyle M, **Kales SN**. Barriers and Solutions to Improving Nutrition among Fire Academy Recruits: A Qualitative Assessment. International Journal of Food Sciences and Nutrition. Int J Food Sci Nutr. 2019; 70:771-779. doi: 10.1080/09637486.2019.1570087.

90. Ikeda A, Charvat H, Shigemura J, **Kales SN**, Tanigawa T. Longitudinal trends in disaster-related insomnia among Fukushima nuclear plant workers: The Fukushima NEWS project study. SLEEP. 2019 May 1;42(5). pii: zsz043. doi: 10.1093/sleep/zsz043.

91. Fernandez-Montero A, García-Ros D, Sánchez-Tainta A, Rodríguez Mourille A, Vela Bueno A, **Kales SN**. Burnout syndrome and increased insulin resistance. JOEM 2019 Jul 2. doi: 10.1097/JOM.0000000000001645. [Epub ahead of print]

92. Chin MC, **Kales SN**. Understanding Mind-Body Disciplines: A Pilot Study of Breathing and Dynamic Muscle Contraction on Autonomic Nervous System Reactivity. Stress and Health 2019 Jul 26. doi: 10.1002/smi.2887 [Epub ahead of print].

93. Korre M, Loh, K, Eshleman E, Lessa F, Porto L, Christophi Costas A, **Kales SN**. Recruit Fitness and Police Academy Performance - A Prospective Validation Study. Occupational Medicine (London) 2019 Aug 19. pii: kqz110. doi: 10.1093/occmed/kqz110. [Epub ahead of print].

94. Chin MS, **Kales SN.** Is there an optimal autonomic state for enhanced flow and executive task performance? Frontiers in Psychology-Performance Science. 2019. doi: 10.3389/fpsyg.2019.01716 [Epub ahead of print].

95. Burks SV, Anderson J, Panda B, Haider R, Ginader T, Sandback N, Pokutnaya D, Toso D, Hughes N, Haider H, Brockman R, Toll A, Solberg N, Eklund J, Cagle M, Hickman J, Mabry E, Berger M, Czeisler CA, **Kales SN**. Employer-Mandated Obstructive Sleep Apnea Treatment and Healthcare Cost Savings among Truckers. SLEEP [in press].

96. Sotos-Prieto M, Christophi CA, Black A, Furtado JD, Song Y, Magiatis P, Papakonstantinou A, Melliou E, Moffatt S, **Kales SN.** Assessing Validity of Self-Reported Dietary Intake and Intervention Compliance in a Mediterranean Diet Cluster Randomized Controlled Trial Among U.S Firefighters. Nutrients [in press].

EXHIBIT A

**Other peer-reviewed publications:**

1. **Kales SN**. Carbon Monoxide Intoxication. American Family Physician 1993; 48(6):1100-1104.

2. **Kales SN**, Christiani DC. Progression of Chronic Obstructive Pulmonary Disease after Multiple Episodes of an Occupational Inhalation Fever. Journal of Occupational Medicine 1994; 36(1):75-78.

3. Goldman RH, White R, **Kales SN**, Hu H. Lead Poisoning from Mobilization of Bone Stores during Thyrotoxicosis. American Journal of Industrial Medicine 1994; 25(3):417-424.

4. **Kales SN**, Dinklage D, Dickey J, Goldman RH. Paranoid Psychosis Following Cyanide Exposure. Archives of Environmental Health 1997; 52(3):245-246.

5. **Kales SN**, Christiani DC. Acute Chemical Emergencies. New England Journal of Medicine 2004; 350(8):800-808. Review.

6. **Kales SN**, Lee EC. Pseudo-Latex Allergy Associated with "Latex" Paint Exposure: A Potential Cause of Iatrogenic Disability. Journal of Occupational and Environmental Medicine 2006; 48(1):83-88.

7. Karri SK, Saper RB, **Kales SN**. Lead Encephalopathy Due to Traditional Medicines. Current Drug Safety 2008; 3(1):54-59. Review.

8. **Kales SN**, Tsismenakis AJ, Zhang C, Soteriades ES. State of the Art. Blood Pressure in Firefighters, Police Officers, and Other Emergency Responders. American Journal of Hypertension 2009; 22(1):11-20. Epub 2008 October 16. Review.

9. Varvarigou V, Dahabreh IJ, Malhotra A, **Kales SN**. A Review of Genetic Association Studies of Obstructive Sleep Apnea: Field Synopsis and Meta-Analysis. SLEEP 2011; 34(11):1461-1468. Review.

10. Soteriades ES, Smith DL, Tsismenakis AJ, Baur DM, **Kales SN**. Cardiovascular Disease in U.S. Firefighters: A Systematic Review. Cardiology in Review 2011; 19(4):202-215. Review.

11. Zhang C, Berger M, Malhotra A, **Kales SN**. Portable Diagnostic Devices for Identifying Obstructive Sleep Apnea among Commercial Motor Vehicle Drivers: Considerations and Unanswered Questions. SLEEP 2012; 35(11):1481-1489. Review.

12. Smith DL, Barr DA, **Kales SN**. Extreme Sacrifice: Sudden Cardiac Death in the US Fire Service. Extreme Physiology & Medicine 2013; 2(1):6 (9 pages in total). Review.

13. Christoforidou EP, Riza E, **Kales SN**, Hadjistavrou K, Stoltidi M, .Kastania AN, Linos A. Bladder Cancer and Arsenic Through Drinking Water: A Systematic Review of Epidemiologic Evidence. Journal of Environmental Science and Health, Part A Toxic/Hazardous Substances and Environmental Engineering. 2013; 48(14):1764-1775. Review.

14. **Kales SN**, Straubel M. Obstructive Sleep Apnea in North American Commercial Drivers. Industrial Health 2014; 52(1):13-24. Invited Review.

EXHIBIT A

15. Felton DJ, **Kales SN,** Goldman RH. An Update and Review of Unconventional Metals Testing and Treatment. Toxics 2014; 2(3):403-416.  Review.

16. Korre M, Tsoukas MA, Frantzeskou E, Yang J, **Kales SN.** Mediterranean Diet and Workplace Health Promotion. Current Cardiovascular Risk Reports 2014; 8(12):416 (7 pages in total).  Epub 2014 October 10.  Review.

17. Korre M, Kalogerakou T, Sotos-Prieto M, **Kales SN.** What is the Mediterranean Diet and How can it be Used to Promote Workplace Health?  Journal of Occupational and Environmental Medicine 2016; 58(3):e111-e113.  Invited Review.

18. Grosso G, Yang J, Marventano S, Micek A, Galvano F, **Kales SN**. Nut Consumption on Mortality Risk: A Systematic Review and Meta-Analysis of Epidemiological Studies. American Journal of Clinical Nutrition 2015; 101(4):783-793. Epub 2015 February 4.  Review.

19. **Kales SN**, Thompson AMS. A Young Woman Concerned about Mercury. Canadian Medical Association Journal 2016; 188(2):133-134.  Epub 2015 December 7.  Invited Decisions Paper.

20. Smith DL, DeBlois JP, **Kales SN,** Horn GP.  Cardiovascular Strain of Firefighting and the Risk of Sudden Cardiac Events.  Exercise and Sport Sciences Reviews. Epub 2016 April 22.  Review.

21. Korre M, Christiani DC, Christophi CA, Lombardi DA, Kovacs RJ, Mastouri R, Abbasi S, Steigner M, Moffatt S, Smith DL, **Kales SN**. A review of left ventricular mass and heart weight assessment by cardiac MRI, echo, and autopsies in normal and diseased hearts. Journal of Integrative Cardiology. 2016;2(6): 432-440. doi: 10.15761/JIC.1000193 Review.

22. Korre M, Sotos-Prieto M, **Kales SN**. Survival Mediterranean Style: Lifestyle Changes to Improve the Health of the US Fire Service. Frontiers in Public Health. 2017 Dec 18;5:331. doi: 10.3389/fpubh.2017.00331. eCollection 2017.

23. Lidoriki I, Sotos-Prieto M, Smith DL, **Kales SN.** Firefighting-Associated Cancers: Can Healthier Body Weight and Eating be Potential Countermeasures? Journal of Occupational and Environmental Medicine 2019; 61: e69-e71.  Review.

24. Jin Q, Black A, **Kales SN**, Vattem D, Ruiz-Canela M, Sotos-Prieto M. Metabolomics and Microbiome as potential tools to evaluate the effects of Mediterranean Diet. Nutrients 2019, 11, 207; doi:10.3390/nu11010207. Review.

25. Rainey D, Parenteau MA, **Kales SN.** Sleep and transportation safety: Role of the employer. In: Sleep and Transportation, McNicholas W (ed). Sleep Medicine Clinics (in press).

**Research publications without named authorship:**

1. CDC\*. Lead Poisoning in Adults Associated with Use of Ayurvedic Medications–5 States, 2000-2003. MMWR 2004; 53(26):582-584.  (\*I led the Massachusetts group of authors and contributed the patients from Massachusetts.)

EXHIBIT A

82

**Non-peer reviewed scientific or medical publication/materials in print or other media:**

**Proceedings of meetings or other non-peer reviewed research publications:**

1. **Kales SN.** Cardiovascular Disease in Firefighters: An Update. NECOEM Reporter (New England College of Occupational and Environmental Medicine) 2008; 2(24):1, 4-6.

2. **Kales SN**, Kim M, Islam T. Household Carbon Monoxide Poisoning. In : Braubach M, Jacods DE, Ormandy D) eds.). Environmental Burden of Disease Associated with Inadequate Housing: A Method Guide to the Quantification of Health Impacts of Selected Housing Risks in the WHO European Region. Copenhagen: WHO Regional Office of Europe, 2011. http://www.euro.who.int/__data/assets/pdf_file/0003/142077/e95004.pdf.

3. Smith DL, DeBlois JP, **Kales SN**. Combating Sudden Cardiac Death (SCD) in the United States (US) Fire Service. International Fire Service Journal of Leadership and Management 2014; 8:23-30.

4. Smith DL, Jahnke S, Moffatt S, Roche K, **Kales SN**. Heart to Heart: Strategizing an Evidence-based Approach to Reduce Cardiac Death in the Fire Service. White Paper: Findings and Recommendations from the Heart to Heart Conference 2015. National Fallen Firefighters Foundation, Emmitsburg, Maryland. 2016. http://www.everyonegoeshome.com/wp-content/uploads/sites/2/2016/06/Heart-to-Heart-WP2016.pdf

5. Korre M, Smith DL, Moffatt S, **Kales SN**. Cardiac Enlargement in US Firefighters. White Paper: Findings and Recommendations from Non-Invasive Identification of Left Ventricular Hypertrophy/ Cardiomegaly in Firefighters FEMA **Award Number:** EMW-2011-FP-00663 (Kales SN, PI). National Fallen Firefighters Foundation, Emmitsburg, Maryland. 2017. http://www.everyonegoeshome.com/wp-content/uploads/sites/2/2017/07/cardiac-wp-2017-FINAL.pdf

6. Smith DL, Horn GP, **Kales SN**. Cardiac Health: Understanding Cardiovascular Strain and Heart Disease in Firefighters. National Fallen Firefighters Foundation, Emmitsburg, Maryland. 2018 (in press).


**Reviews, chapters, monographs and editorials:**

1. **Kales SN**, Hu H.  Other Physical Hazards and Their Effects.  In: Levy BS, Wegman DH (eds.). Occupational Health: Recognizing Preventing Work-Related Disease. Third Edition. Boston: Little Brown, 1995.

2. **Kales SN**. La Importancia de la Salud Ocupacional (The Importance of Occupational Health. Rev Ciencias de la Salud/Bogota (Colombia) 2004; 2:5-7.  Invited Editorial.

3. **Kales SN**, Christiani DC. Hair and Metal Toxicity. In:  Tobin DJ (ed.). Hair in Toxicology: An Important Bio-Monitor.  Cambridge: The Royal Society of Chemistry, 2005.

4. Lee EC, **Kales SN**. Chemical Weapons and Public Health. In: Levy BS, Sidel V (eds.).  War and Public Health.  Second Edition.  New York: Oxford University Press, 2007.

5. Karri S, Saper RB, **Kales SN.** Encephalopathies Related to Unconventional Therapies. In: Sechi GP (ed.).

**EXHIBIT A**

83

Drug Related Encephalopathies.  New York: Nova Science Inc., 2008.

6.   **Kales SN,** Saper RB.  Ayurvedic Lead Poisoning: An Under-Recognized, International Problem.  Indian Journal of Medical Sciences 2009; 63(9):379-381.  Invited Editorial.

7.   Kim JY, Christophi CA, Soteriades ES, **Kales SN.**  The Occupation of Firefighting and Cancer Risk: An Updated Review and Meta-Analysis of the Available Evidence.  Prepared for the Workplace Safety and Insurance Board (WSIB) of Ontario, Canada, 2009.  Monograph.

8.   Thompson A, **Kales SN.**  Occupational Lung Disease in Police, Firefighters and the Military. In: Tarlo SM, Cullinan P, Nemery B (eds.). Occupational and Environmental Lung Disease. Diseases from Work, Home, Outdoor and Other Exposures.  Oxford: Wiley Blackwell, 2010.

9.   Christoforidou EP, **Kales SN,** Hatzistavrou K, Linou A. The Pollution from Heavy Metals of Drinking Water Sources in Oinofyta Region (Η περιοχή των Οινοφύτων και η ρύπανση των πηγών πόσιμου νερού από βαρέα μέταλλα. Ιατρική). Iatriki 2011; 100(5-6):281-287.  Review (Greek).

10.  Lee EC, **Kales SN.**  Genetic, Molecular, Neuroanatomic, and Electrophysiologic Mechanisms of Chemically Induced Seizures. In: Tang FR (ed.). Chemical-Induced Seizures: Mechanism, Consequences and Treatment.  Bentham e-books. Bentham Science Publishers, 2011:3-16.

11.  Lee EC, Bleek PC, **Kales SN.**  Chemical Weapons. In: Levy BS, Sidel V (eds.).  Terrorism and Public Health. Second Edition.  New York: Oxford University Press, 2011.

12.  **Kales SN,** Kim M, Islam T.  Household Carbon Monoxide Poisoning. In:  Braubach M, Jacods DE, Ormandy D (eds.).  Environmental Burden of Disease Associated with Inadequate Housing: A Method Guide to the Quantification of Health Impacts of Selected Housing Risks in the WHO European Region. Bonn: WHO Regional Office of Europe, 2011; pp. 238. http://www.euro.who.int/_data/assets/pdf_file/003/142077/e95004.pdf

13.  Zhang C, **Kales SN,** Malhotra A.   Diagnosis of Sleep Apnea, Polysomnography, and Portable Monitoring". In: Badr, MS (ed.). Essentials of Sleep Medicine: An Approach for Clinical Pulmonology. New York: Springer, 2012.

14.  Christoforidou EP, **Kales SN,** Hadjistavrou K, Linos A. Geographic Information Systems (GIS) and Heavy Metals in Drinking Water: A Review of Literature (Συστήματα γεωγραφικών πληροφοριών (GIS) και βαρέα μέταλλα στο πόσιμο νερό: Ανασκόπηση της βιβλιογραφίας).  Iatriki 2013; 102(5–6):336-345. (Greek)

15.  Christoforidou EP, **Kales SN,** Hatzistavrou K, Linou A. Cancer and Chromium in Drinking Water, a Systematic Literature Review (Καρκίνος και χρώμιο στο πόσιμο νερό μια συστηματική ανασκόπηση της βιβλιογραφίας.). Iatriki 2013; 102(4):269-280.  (Greek)

16.  Christoforidou EP, **Kales SN,** Hatzistavrou K, Linou A. Liver Cancer and Arsenic through Drinking Water. A Systematic Review of Literature (ΚΑΡΚΙΝΟΣ ΗΠΑΤΟΣ ΚΑΙ ΑΡΣΕΝΙΚΟ ΣΤΟ ΠΟΣΙΜΟ ΝΕΡΟ: Ανασκόπηση της βιβλιογραφίας). Iatriki 2013; 102(3):206-223.  (Greek)

17.  **Kales SN.** Preventing Accidents in North American Commercial Drivers with Obstructive Sleep Apnea. Summary of Remarks. Transport Safety Public Symposium in Tokyo, Sleep-Disordered Breathing and

EXHIBIT A

84

Transport Safety. International Association of Traffic and Safety Sciences, Tokyo, Japan, 2013.  Invited Monograph.

18. **Kales SN**, Smith DL. Sudden Cardiac Death in the Fire Service.  Occupational Medicine (London) 2014: 64(4):228-230.  Invited Editorial.

19. Shusko M, Benedetti L, Korre M, Boyd S, Farioli A, Christophi CA, **Kales SN**. **Kales SN** (ed.). Entry Level Physical Fitness and the Probability of Subsequent Police Academy Graduation among Massachusetts Police Recruits. Prepared for the Commonwealth of Massachusetts Police Training Committee, 2015.  Monograph.

20. Sampani K, Frantzeskou E, **Kales SN**.   Workplace Health and Safety in the USA (ΥΓΕΙΑ ΚΑΙ ΑΣΦΑΛΕΙΑ ΣΤΗΝ ΕΡΓΑΣΙΑ ΣΤΙΣ ΗΝΩΜΕΝΕΣ ΠΟΛΙΤΕΙΕΣ ΤΗΣ ΑΜΕΡΙΚΗΣ).   Hygeia@Ergasia 2015; 6(2):135-138.  Invited Editorial.  (Greek)

21. Christoforidou EP, Linou A, **Kales SN**, Chatzistavrou K.  Bladder Cancer and Arsenic in Drinking Water: A Literature Review in the Festschrift in Honor of Prof. Alkibiadis Kostakis (*Καρκίνος ουροδόχου κύστεως και αρσενικό στο πόσιμο νερό: μια συστηματική ανασκόπηση της βιβλιογραφίας* τιμητικός τόμος για τον Καθηγητή Αλκιβιάδη Ι. Κωστάκη) 2015:190-211 (Greek).

22. Lightfoot N, Soteriades ES, **Kales SN**. Cardiovascular Risks of Firefighting.  In: Guidotti, T et al (eds.). In the Line of Duty: Health Risks and Fair Compensation in the Fire Service.  New York: Springer, 2016.

23. Zhang C, Berger M, Rielly A, Malhotra A, **Kales SN**. Obstructive Sleep Apnea in the Workplace. In: Kryger M, Roth T, Dement WC (eds.).  Principles and Practice of Sleep Medicine. Philadelphia: Elsevier, 2017.

24. **Kales SN**, Czeisler CA. Obstructive Sleep Apnea and Work Accidents: Time for Action. SLEEP 2016;39(6):1171–1173. Invited Commentary.

25. Prieto MS, **Kales SN**. Dietary, Lifestyle Behaviors and Obesity: towards Modern Science. J Obes Eat Disord. 2016;2: 4. doi:10.21767/2471-8203.100021  Invited Editorial.

26. **Kales SN**, Smith DL. Firefighting and the Heart: Implications for Prevention. Circulation. 2017;135:1296–1299. DOI: 10.1161/CIRCULATIONAHA.117.027018  Invited Editorial.

27. Chin MS, **Kales SN**. Protecting and Promoting Health in the Workplace. In: Kawchi I (ed.). Oxford Textbook of Public Health Practice, 4th ed. Oxford: Oxford University Press (in press 2018).

28. Korre M, Smith DL, **Kales SN**. Obesity and Health in the North-American Fire-Service: Research Points the Way to Positive Culture Change. Occupational Medicine (London) 2018 May 17;68(3):160-162. doi: 10.1093/occmed/kqy019. Invited Editorial.

29. Smith DL, **Kales SN.** Understanding and Reducing Cardiovascular Disease in the Fire Service. In: LeDuc T (ed.). Surviving the Fire Service. Tulsa, OK: PennWell (in press 2018).

**Books/Textbooks for the medical or scientific community:**

EXHIBIT A

85

1.   Spaeth K, Tsismenakis AJ, **Kales SN** (eds.).  Heavy Metals:  A Rapid Clinical Guide to Neurotoxicity and Other Common Concerns.  New York: Nova Science Inc. 2010.

2.   Rielly A and **Kales SN** (eds.).  A Guide to the Recognition and Prevention of Occupational Heart Disease for the Fire and Emergency Medical Services.  Fourth Edition.  Washington, DC: International Association of Fire Fighters 2013.


**Case Reports:**

1.   **Kales SN**, Mark EJ.  Case Records of the Massachusetts General Hospital:  Case 35-1995 – A 55 Year Old Disabled Construction Worker with Increasing Dyspnea and Abnormal Chest Radiographs.  New England Journal of Medicine 1995; 333(20):1340-1346.  Correction – New England Journal of Medicine 1996; 334(11):743.

2.   Mahmud M, **Kales SN**.  Methylene Chloride Poisoning in a Cabinet Worker.  Environmental Health Perspectives 1999; 107(9):769-772.

3.   Abejie BA, Chung EH, Nesto RW, **Kales SN**.  Grand Rounds: Asbestos-Related Pericarditis in a Boiler Operator.  Environmental Health Perspectives 2008; 116(1):86–89.  Epub 2007 September 11.

4.   Muzaffar S, **Kales SN**.  Occupational Medicine Forum: What Are the Major Points and Emerging Issues in Radiologic Imaging for Pneumoconiosis Surveillance and Diagnosis?  Journal of Occupational and Environmental Medicine 2008; 50(1):101-104.

5.   Durand G, Parks PD, **Kales SN**.  Occupational Medicine Forum: Alleged Daytime Somnolence in a Professional Driver: Approaching the Fitness for Duty Determination. Journal of Occupational and Environmental Medicine 2008; 50(9):1086-1088.

6.   Leiba A, Hu H, Zheng A, **Kales SN**.  A Safe Strategy to Decrease Fetal Lead Exposure, in a Woman with Chronic Intoxication. Journal of Maternal-Fetal & Neonatal Medicine 2010; 23(8):932-934.

7.   Parks, PD, Pransky GS, **Kales SN.**  Iatrogenic Disability and Narcotics Addiction after Lumbar Fusion in a Worker's Compensation Claimant.  Spine 2010; 35(12):E549-452.


**Letters to the Editor:**

1.   **Kales SN**.  Methylene Chloride, Carboxyhemoglobin and Cardiac Risk.  Journal of Occupational and Environmental Medicine 1997; 39(1):11-12.

2.   **Kales SN**, Christiani DC.   Medical Surveillance of Hazmat Response Firefighters. Journal of Occupational and Environmental Medicine 1997; 39(12):1135-1136.  Reply.

3.   **Kales SN**, Christiani DC.  Fitness for Duty Evaluations of Firefighters. Journal of Occupational and Environmental Medicine 1999; 41(4):214-215.  Reply.

4.   **Kales SN**, Christiani DC.   Cardiovascular Fitness in Firefighters.   Journal of Occupational and Environmental Medicine 2000; 42(5): 467-468.

EXHIBIT A

5. **Kales SN**, Christiani DC. Acute Chemical Emergencies. New England Journal of Medicine 2004; 350(20): 2102-2104. Reply.

6. **Kales SN**, Soteriades ES, Christiani DC. Heart Disease Deaths among Firefighters. New England Journal of Medicine 2007; 356(24): 2536-2537. Reply

7. Saper RB, **Kales SN**, Thuppil V. Metal Content in Ayurvedic Medicines - Reply. JAMA 2009; 301(3):272.

8. **Kales SN**, Tsismenakis AJ. Response to "Obesity and Treadmill Exercise Duration in Hazmat Candidates" Obesity 2009; 17(11):1981.

9. Orphanos G, Charalambous C, Vrezas I, **Kales SN**, Haralambous H, Katodritis N, Christodoulides G, Maimaris M, Soteriades ES. Mesothelioma in Cyprus: A Case Series (1997-2007). Hematology/Oncology and Stem Cell Therapy 2011; 4(4):193-194.

10. Zhang C, Berger M, Malhotra A, **Kales SN**. Portable Diagnostic Devices and Commercial Motor Vehicle Drivers. SLEEP 2013; 36(8):1263-1264.

11. **Kales SN**, Baur DM, Hostler D, Smith DL. Cardiac Rehabilitation in Firefighters. Baylor University Medical Center Proceedings 2013; 26(4):429–431.

**Professional Educational Materials or Reports, in print or other media:**

1. Maguire P. "The Chemical Agents Every Doctor Should Recognize." Based on a presentation given by **Kales SN** at the American College of Physicians, Annual Session, San Diego, California, and featured in the May 2003, ACP Observer. Maintained on the American College of Physicians' online Bioterrorism Resources for internists. (http://www.acponline.org/bioterro/?hp#bio).

2. **Kales SN**, Won E, Christiani DC. Organophosphorus Pesticide Poisoning. American College of Physicians-PIER, Disease-Based Module, 2004. Subscriber-based educational modules for internists. (http://pier.acponline.org/physicians/diseases/d1076/d1076.html)

3. Stewart-Patterson C, **Kales SN**. Assessing Medical Fitness to Return to Work. Harvard Medical School, On-line CME. 2010. (http://cmeonline.med.harvard.edu/course_descriptions.asp?Course_id=138).

4. **Kales SN**, Sampani K, Vogel JE. Principles of Sleep Health for Medical Examiners. A four-segment video CME for Medical Examiners of Commercial Drivers (Sleep Health and Safety; Role of the Medical Examiner; Obstructive Sleep Apnea ; and Other Sleep Disorders and Common Sleep Medicine). Content author and Course Director. National Sleep Foundation (https://education.sleepfoundation.org/content/principles-sleep-health-medical-examiners#group-tabs-node-course-default2).

**Clinical Guidelines and Reports:**

EXHIBIT A

1. **Kales SN**, Soteriades ES, Christiani DC.  Guide to Chemical Terrorism Identification.  Chemical Terrorism Pocket Guide.  Commissioned by the American College of Physicians in 2003.  It was subsequently mailed to all ACP members and maintained within the American College of Physicians' online Bioterrorism resources (http://www.acponline.org/bioterro/?hp#bio).

2. Mukherjee S, Patel SR, **Kales SN**, Ayas N, Strohl K, Gozal D, Malhotra A; on behalf of the American Thoracic Society ad hoc Committee on Healthy Sleep. An Official American Thoracic Society Statement: The Importance of Healthy Sleep.  Recommendations and Future Priorities.  American Journal of Respiratory and Critical Care Medicine 2015; 191(12):1450-1458.

**Abstracts, Poster Presentations and Exhibits Presented at Professional Meetings:**

1. Korre M, Sampani K, Christiani D, Christophi C, Lombardi D, Smith D, **Kales SN**.  Left Ventricular Hypertrophy and Cardiomegaly by Echocardiography and CMR, Cardiovascular Outcomes and Medical Practice. Cambridge Health Alliance Academic Poster Session, Cambridge, Massachusetts, April 2015.

2. Sampani K, Korre M, **Kales SN**.  Dietary Habits and Preferences of United States Volunteer Firefighters. Cambridge Health Alliance Academic Poster Session, Cambridge, Massachusetts, April 2015.

3. Korre M, **Kales SN**. Mediterranean Diet and Workplace Health Promotion. Work Organization and Policy. Future of Occupational Health Symposium 2015, University of Washington, School of Public Health, Seattle, Washington, June 24-25, 2015.

4. Porto LGG, Schmidt ACB, Souza JM, Nogueira RM, Korre M, Fontana KE, Molina GE, Junqueira, Jr. LF, **Kales SN**. Firefighters' basal on-duty cardiac autonomic function and its association with cardiorespiratory fitness. New England College of Occupational and Environmental Medicine/Massachusetts Association of Occupational Health Nurses (NECOEM/MaAOHN) 2015 Annual Conference, Newton, Massachusetts, December 3-4, 2015.

5. Porto LGG, Korre M, Moffatt S, **Kales SN**. Muscle Strength Is a Better Predictor of Impaired Heart Rate Recovery than BMI Among Firefighters. The Endocrine Society Annual Meeting, Boston, MA, April 1-4, 2016 (Invited to compete in the Endocrine Society's Presidential Poster Competition).

6. Porto LGG, Korre M, Moffatt S, **Kales SN**. Physical Fitness and Heart Rate During Exercise Testing as Predictors of Cardiac Autonomic Impairment among Firefighters. 2271 Board #2 June 2, 3: 15 PM - 5: 15 PM. American College of Sports Medicine Annual Meeting, Boston, MA, May 31-June 4, 2016. Med Sci Sports Exerc. 2016 May;48 (5S Suppl 1):631.

7. Barbosa, W., Fontana, K.E., Molina, G.E., Korre, M., Lofrano Porto, A., **Kales, S.N.**, Porto, L.G.G. Descriptive epidemiology of physical activity, body composition and quality of life among Brazilian military police officers. 21st Annual Congress of the European College of Sport Science, 6-9 July 2016, Vienna Austria.

EXHIBIT A

## Narrative Report

I have engaged in occupational/environmental health activities on five continents as a clinical expert, investigator, educator and leader; making continuous academic contributions with over 170 publications, regular editorial work and stimulating trainees to conduct and publish research. My current efforts include: clinical occupational/environmental medicine (OEM); directing the Harvard T.H. Chan School of Public Health (HSPH) Occupational Medicine Residency and other teaching; hospital administration; and funded research. I am also consulted regularly by government agencies and colleagues throughout North America and beyond regarding the health of emergency responders, fatigue and sleep disorders in safety-sensitive occupations, carbon monoxide poisoning, and other toxicology and workplace issues.

As a **clinical innovator and researcher**, I have been quite productive in several areas within the field of OEM. First Responder Cardiovascular Health and Disease: Our group has performed the most extensive collection of epidemiologic studies regarding cardiovascular disease (CVD) among first responders, including seminal contributions on the risk of on-duty cardiovascular events. By applying a novel approach to a previously unsolved, three-decade old question- Why are almost half of on-duty deaths among US firefighters due to sudden cardiac death (SCD)?- we demonstrated the first definitive statistical associations between strenuous job tasks and SCD (2003). We then re-confirmed these findings in a much larger, landmark study in the *New England Journal of Medicine* (2007). In 2014, in the *British Medical Journal*, we extended and cross-validated these findings to the risk of SCD in the course of policing. We have also identified lifestyle risk factors (e.g. smoking, obesity and uncontrolled hypertension) which interact with occupational exposures and the workplace environment to increase individual responders' susceptibility to CVD. Moreover, we have demonstrated that in addition to obstructive coronary artery disease, left ventricular hypertrophy and cardiomegaly are major underlying causes of SCD in these populations.

Our body of work has greatly influenced national and international thinking regarding fitness for duty among public safety workers, and the need for improved wellness programs and risk factor control. We published a "state of the art review" on blood pressure and emergency responders in the *American Journal of Hypertension* (2009), which along with previous work has begun to change occupational blood pressure standards for public safety personnel. Additionally, we have published several other "state of the science" reviews. Our paper in *Cardiology in Review* (2011) has become the standard reference on this topic, and a 2015 NIH-sponsored translational meeting, used this article to organize its agenda. This publication track record, ongoing competitive Federal grants and frequent speaking engagements at US and international events have made me the world's foremost expert on cardiovascular disease and its prevention among police and fire personnel. Accordingly, I was recently invited to contribute an editorial on this topic by *Circulation*.

Clinical Toxicology: After 9/11/2001, I led the development of a Chemical Terrorism Guide and other materials for the American College of Physicians. We expanded this "toxidrome-based" approach (syndrome-based recognition of chemical toxins) with a 2004 *New England Journal of Medicine* review on Chemical Emergencies. As an extension of my work in this area, I was invited by the World Health Organization to assist in determining the impact of household carbon monoxide poisonings in Europe and in setting carbon monoxide indoor air quality guidelines.

Another important toxicology focus is heavy metal exposure. After diagnosing several "sentinel" cases of lead intoxication due to Ayurvedic (traditional Indian) remedies, we contributed to a national series in the Center for Disease Control's *Morbidity Mortality Weekly Report* (2004). This led us to direct investigations of heavy metal prevalence in Ayurvedic medications in the US marketplace producing two original articles in *JAMA* (2004 and 2008), and an invited editorial in a leading Indian medical journal which triggered regulatory changes by the Indian and Canadian governments and various local US health departments.

I have also published on common clinical scenarios such as: methylmercury over-exposure from frequent consumption of predator fish (e.g., swordfish and tuna); referrals for elevated urine arsenic that almost always result from harmless seafood-related forms of organic arsenates; and the ill-advised use of unconventional

"commercial" heavy metals tests by alternative medicine practitioners.  My expertise in this area led to a recent invited "Decisions" review in the *Canadian Medical Association Journal* (2016).

<u>Occupational Sleep Medicine</u>: As one of the first occupational medicine clinic directors to implement objectively-based screening of commercial drivers for obstructive sleep apnea (OSA) in the context of federally-regulated medical certification examinations, our publications have demonstrated significant gaps in current regulations that allow operators with undiagnosed and or untreated OSA to continue to drive, constituting a significant risk to themselves and the general public.  I have lectured at regional, national and international meetings on this subject, and am a recognized international leader regarding occupational OSA screening, including keynote lectures at the Japan Society of Occupational Health; joint activities with the International Association for Traffic Safety Sciences and as the invited senior author of a chapter on OSA in the workplace for foremost sleep medicine textbook, <u>The Principles and Practice of Sleep Medicine</u>. In 2015, I was awarded and completed a National Sleep Foundation contract through Harvard to create a continuing medical education video course on sleep disorders for commercial driver medical examiners and sleep clinicians.  Most recently, I was the senior author of the largest and most rigorous study to date of OSA and truck crash risk among commercial drivers (SLEEP 2016). We demonstrated that drivers who were non-compliant with OSA treatment had a rate of preventable crashes five-fold greater than control drivers matched for driving experience.  We also found that fully-treatment-compliant drivers with OSA had a crash rate no different than that of the controls. These new findings and a separate invited commentary in *SLEEP* (2016) are influencing the national debate on federally-mandating the screening of drivers and other transportation operators for OSA.

**Education**: I supervise Harvard Chan occupational medicine residents, HMS toxicology, pediatric environmental medicine and contact dermatology fellows, HMS and visiting residents and medical students; participate in several Harvard courses; CME commitments; and speak/teach frequently at the local, national and international level. In 2006, I was selected to lead the HSPH Occupational Environmental Medicine (OEM) Residency, Harvard's only preventive medicine residency and a premier US program. In the face of constant budgetary challenges, I have been able to attract high-caliber candidates; maintain one of the largest civilian OEM residencies in the US; and have had unprecedented success as a fundraiser, attracting grants and over $2.0 million in endowed and other gifts (including bequests) to support training. Since 2006, our trainees have received over 20 national awards, publish frequently and have achieved many leadership positions here and abroad.  I also founded an Initiative for Productivity & Health Management to educate the residents about maximizing workforce health to benefit both employees and employers. In collaboration with the residency, my hospital division is an internationally recognized center of excellence.  Since 2008, I have hosted over 15 trainees from ten countries. My achievements as a scientist and educator are recognized with prestigious honors: the Kehoe Award (2013, American College of Occupational & Environmental Medicine) and the Harriet Hardy Award (2014, New England College of Occupational & Environmental Medicine).

**Administration**: My hospital leadership as Division Chief, Occupational & Environmental Medicine, and Medical Director of Employee Health is another significant supporting activity. Our division coordinates occupational health services for some 4,000 Cambridge Health Alliance employees and external clients. The latter have rapidly grown under my leadership from 60 to roughly 850 entities ranging from municipalities to life sciences companies. We provide high quality care to injured workers; maintain workers compensation costs below the industry benchmark; determine the ability of employees with illness/impairment to engage in safety-sensitive functions; and provide expert consultation to human resources and senior administration.

In summary, I have a strong record of clinical innovation, as well as clinical/epidemiologic research expertise, while teaching frequently- locally to internationally- and establishing myself as the leader of important research grants, residency/educational programs and clinical services.  I have demonstrated my productivity consistently through publications, sponsored research, editorial work, educational activities, trainee achievements and clinical leadership.

EXHIBIT A



**MEDICAL REVIEW BOARD**
C/O: Federal Motor Carrier Safety Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

August 26, 2016

T.F. Scott Darling, III
Administrator
Federal Motor Carrier Safety Administration
1200 New Jersey Avenue, SE
Washington, DC  20590

Dear Administrator Darling:

On August 22-23, 2016, the Medical Review Board (MRB) met in public meetings to deliberate on *Medical Review Board Task 16-1* regarding public comments from medical professionals and associations on the Federal Motor Carrier Safety Administration's (FMCSA's) and Federal Railroad Administration's (FRA's) Advanced Notice of Proposed Rulemaking (ANPRM) on obstructive sleep apnea.  FMCSA tasked the MRB with reviewing and analyzing all ANPRM comments from medical professionals and associations and identify factors the Agency should consider regarding making a decision about the next step in the OSA rulemaking.  FMCSA also requested that the MRB review the previous 2012 report on OSA from the MRB and Motor Carrier Safety Advisory Committee (MCSAC).

The attached report includes all of the MRB's recommendations related to MRB Task 16-1.  In addition, and related to the Agency's implementation of a future OSA rulemaking, the MRB recommends that FMCSA initiate an educational initiative to ensure that all relevant stakeholders are adequately informed of OSA symptoms, health consequences, risk factors, diagnosis, and treatment costs and benefits.  FMCSA should solicit the help of sleep experts and associations to refer Certified Medical Examiners (CMEs), drivers, and motor carriers to educational materials appropriately tailored to each group's needs.

On behalf of the MRB, I respectfully submit this report to FMCSA for its consideration.

Sincerely,

//signed//

Gina C. Pervall, MD
Chairman, Medical Review Board

Enclosure



EXHIBIT A

**Introduction**

The Medical Review Board (MRB) developed and discussed several key questions and the 2012 joint Motor Carrier Safety Advisory Committee (MCSAC)-MRB recommendations in considering the comments from medical professionals and associations on the March 2016 Federal Motor Carrier Safety Administration (FMCSA)-Federal Railroad Administration (FRA) Advanced Notice of Proposed Rulemaking (ANPRM), as the Agency requested in Task 16-1. The following list of questions address factors that FMCSA should consider in making a decision about the next stop in the obstructive sleep apnea (OSA) rulemaking.

- Are individuals with OSA at an increased risk for a motor vehicle crash when compared to comparable individuals who do not have OSA?
- What disease-related factors are associated with an increased motor vehicle crash risk among individuals with OSA?
- Are individuals with OSA unaware of the presence of the factors that appear to be associated with an increased motor vehicle crash risk?
- Are there screening/diagnostic tests available that will enable examiners to identify those individuals with OSA who are at an increased risk for a motor vehicle crash?
- Which treatments have been shown to effectively reduce crash risk among individuals with OSA?
- What is the length of time required following initiation of an effective treatment for individuals with OSA to reach a degree of improvement that would permit safe driving?
- How soon following cessation of treatment will individuals with OSA demonstrate reduced driver safety (i.e., as a consequence of non-compliance)?

In response to *Medical Review Board Task 16-1*, discussion of the above questions, the March 2016 ANPRM comments from medical professionals and associations, the 2012 joint MCSAC-MRB recommendations, and most current medical standards and practice formed the basis of the following recommendations for consideration by FMCSA when determining the next step in an OSA rulemaking. The MRB recommendations are summarized below.

## I.  General Recommendations Regarding OSA

A. Certified Medical Examiners (CMEs) must screen drivers presenting for medical certification for OSA diagnostic testing in accordance with Section III.B.

B. CMEs cannot issue a medical card for more than 1 year to a driver with an established diagnosis of OSA, regardless of severity.

C. A CME may certify a driver with an OSA diagnosis if the driver is being treated effectively (see Sections V through IX).

1

EXHIBIT A

D. For certification purposes, "effective treatment" or "treated effectively" is defined as the resolution of moderate to severe OSA to mild OSA or better, as determined by a board-certified sleep specialist.

## II.   Immediate Disqualification

A. Drivers should be disqualified immediately and referred for OSA diagnostic testing if any of the following conditions exist:
   1. Individuals who have admitted fatigue or sleepiness during the wake period.
   2. Individuals who have been involved in a sleep-related motor vehicle crash or accident or near crash.
B. Drivers found non-compliant with treatment per Sections V through IX should be disqualified immediately until evaluated and treated effectively.
C. The CME should have the discretion to disqualify any driver who appears to be at extremely high risk.
D. Drivers disqualified for any of the above reasons must remain disqualified until evaluated and treated effectively.

## III.   Conditional Certification

A. Conditional certification should include the following elements:
   1. A driver determined to be at risk for OSA based on Body Mass Index (BMI) (with or without risk factors) may be certified for 90 days pending sleep study and treatment (if the driver is diagnosed with OSA).
   2. Within 90 days, if a driver being treated with OSA is compliant with treatment (per Sections V through IX), the driver may be certified for no more than 1 year. Drivers with a diagnosis of moderate to severe OSA should be re-certified based on documented effective treatment and compliance (see Sections V through IX).

B. Referral to OSA Diagnostic Testing Based on Screening (i.e., identifying individuals with undiagnosed OSA)
   1. <u>MRB Recommendation</u>: Individuals with the following should be referred for diagnostic sleep evaluations:
      a. Individuals with a BMI $\geq$ 40 mg/kg$^2$.
      b. Individuals with a BMI $\geq$ 33 and < 40 mg/kg$^2$ in addition to and at least 3 or more of the following (For – 3; Against – 1):
         i. Hypertension (treated or untreated);
         ii. Type 2 diabetes (treated or untreated);
         iii. History of stroke, coronary artery disease, or arrhythmias;
         iv. Micrognathia or retrognathia;
         v. Loud snoring;
         vi. Witnessed apneas;
         vii. Small airway (Mallampati Classification of Class III or IV – see photos of Mallampati Classification below);

2

**EXHIBIT A**

      viii.  Neck size > 17 inches (male), 15.5 inches (female);
      ix.  Hypothyroidism (untreated);
      x.  Age 42 and above; or
      xi.  Male or post-menopausal female.

  c.  Note: One MRB member (B. Morris) thought that there should be at least 4 of other risk factors in addition to BMI ≥ 33 and < 40 mg/kg$^2$ instead of 3.

  d.  Sample images show what Mallampati Classification Classes I through IV throat look like[1]:



Class I    Class II    Class III    Class IV

Figure 1

2. **Rationale**: Based on public comments that other factors should be considered in addition to BMI, MRB recommends increasing the BMI threshold for recommending a sleep study based on BMI alone to 40, but add factors that in combination (e.g., having 3 or more) could trigger a sleep study recommendation, with a BMI between 33 and 39.

  a.  Self-reported sleepiness during major wake periods or history of a fatigue-related crash should also be standalone triggers that require a CME to require a sleep study.

  b.  However, the MRB removed the single-vehicle crash from the list of risk factors above because members expressed concern that CMEs would not have access to crash information except for instances of self-reporting or a referral from an employer.

  c.  Subjective sleepiness questionnaires would not be helpful because of unlikelihood of truthfulness.

  d.  Note, craniofacial abnormalities and Mallampati Classification may be difficult for some CMEs to assess.

  e.  The MRB replaced the "small or recessed jaw" risk factor with "micrognathia or retrognathia" because those terms are more clinical and objective.

3. Frequency of OSA Diagnostic Testing

  a.  **MRB Recommendation**: If a driver has had a sleep evaluation study in the past that returned a negative diagnosis for sleep apnea or a diagnosis of mild sleep apnea, indications that would warrant a recommendation for a new sleep study would be the appearance of one or more additional risk factors beyond those that required the original sleep study or a 10 percent increase in weight.

---

[1] Image is borrowed from Sleep Journal, http://www.journalsleep.org/Articles/290707.pdf (last accessed Aug. 23, 2016).

3

**EXHIBIT A**

       i. Caveat: If age of 42 is the only additional risk factor that has changed, there should be a 3-year period between the prior sleep study and a newly recommended sleep study.

       ii. B. Morris expressed concerns that not enough evidence exists regarding retesting. For this reason, he would recommend that requirement for retesting should be left at the discretion of the CME.

   b. <u>Rationale</u>: Some public comments expressed concern with the situation where a driver was sent for a sleep study due to risk factors in the CME guidelines, the study came back negative for sleep apnea, and the driver gets referred for another sleep study the next time he/she is examined because the same risk factors are still present. It could be an unnecessary cost imposed on these drivers.

## IV. Method of Diagnosis and Severity

A. Methods of diagnosis include in-laboratory polysomnography (which is preferred), as well as at-home sleep apnea testing that ensures chain of custody.

   1. In-laboratory polysomnography should be considered when the clinician suspects:

      a. Another medical disorder occurring during sleep (e.g., a seizure disorder, restless leg syndrome, narcolepsy, central sleep apnea), <u>and/or</u>

      b. The individual has significant co-morbidities (e.g., neuromuscular disorder or chronic obstructive pulmonary disease [COPD]).

   2. All sleep studies must be interpreted by a board-certified sleep specialist.

   3. New OSA screening technologies will likely emerge.

B. The driver should be tested while on usual chronic medications.

C. If the CME, in consultation with the sleep specialist, determines that the in-home sleep study is inadequate, then an in-laboratory test must be performed.

## V. Treatment:  Positive Airway Pressure (PAP)

A. Based on the available medical literature, PAP therapy is the preferred OSA treatment.

B. Adequate PAP pressure should be established through one of the following methods:

   1. Titration study with polysomnography.

   2. Auto-titration system.

C. A driver may be certified initially for up to 1 year (per Section III.A) if the following conditions are met:

   1. The driver must document PAP use for a time period no less than 30 consecutive days (minimum records requirement – initial certification), <u>and</u>

   2. The driver's PAP use records must demonstrate at least 4 hours per night use on 70 percent of nights (minimum compliance standard), <u>and</u>

4

**EXHIBIT A**

    3.  The driver does not report excessive sleepiness during the major wake period.

D.  A driver may be re-certified for up to 1 year (per Section III.A) if the following conditions are met:

    1.  The driver must document PAP use for a time period no less than the number of days between the expiration of the driver's previous medical card and the time at which they receive their medical exam (minimum records requirement – re-certification), and

    2.  The driver's PAP use records must demonstrate at least 4 hours per night use on 70 percent of nights (minimum compliance standard), and

    3.  The driver does not report excessive sleepiness during the major wake period.

E.  If a driver fails to meet compliance standards, the CME may provide a 30-day certification to allow the driver to produce 30 days of consecutive PAP use data that meets the minimum compliance standard.

    1.  After the driver demonstrates compliance with 30 days of PAP use data, the CME may issue a 60-day certification to allow the driver to produce 60 days of consecutive PAP use data that meets the minimum compliance standard.

    2.  After the driver demonstrates compliance with 60 days of PAP use data, the CME may issue a 90-day certification to allow the driver to produce 90 days of consecutive PAP use data that meets the minimum compliance standard.

    3.  After the driver demonstrates compliance with 90 days of PAP use data, the CME may issue a 1-year certification.

    4.  If the driver cannot produce 30 days of consecutive PAP use data, the driver must be disqualified and cannot be re-certified until he or she is able to provide 30 days of compliant PAP use data.

## VI.  Treatment:  Oral appliance

A.  <u>MRB Recommendation</u>:  A driver with a diagnosis of moderate to severe OSA should try PAP therapy before oral appliance therapy, unless a board-certified sleep specialist has determined that an alternative therapy such as PAP is intolerable for a driver, in which case the driver should have the option to pursue oral appliance therapy to treat OSA.

    1.  <u>Rationale</u>: Based on the available medical literature, drivers with a diagnosis of moderate to severe OSA are less likely to achieve resolution of moderate to severe OSA with an oral appliance than with PAP therapy.

    2.  There is limited data regarding compliance and long-term efficacy of oral appliances.

B.  A driver may be certified or re-certified for up to 1 year (per Section III.A) if the following conditions are met:

    1.  A repeat sleep study shows resolution of moderate to severe OSA, and

    2.  The driver has been cleared by the treating clinician, and

    3.  c, and

    4.  The driver does not report excessive sleepiness during the major wake period.

EXHIBIT A

**VII.    Treatment: Bariatric surgery**

A. Post-op, first 6 months:  A driver with an established diagnosis of moderate to severe OSA may be certified if he/she:
    1.  Has been cleared by the treating clinician, <u>and</u>
    2.  Is able to provide evidence of compliance with PAP or oral device OSA therapy (see Sections V and VI).

B. Post-op, after 6 months:  After 6 months have passed since surgery, a driver may be certified, provided that:
    1.  A repeat sleep study shows that the driver no longer has a moderate to severe OSA diagnosis, <u>and</u>
    2.  The driver does not report excessive sleepiness during the major wake period.

C. Annual recertification
    1.  If clinically indicated, repeat the sleep study.


**VIII.    Treatment: Oropharyngeal surgery, Facial bone surgery**

A. Post-op, less than 1 month:  A driver with an established diagnosis of moderate to severe OSA may be certified if he/she:
    1.  Has been cleared by the treating clinician, <u>and</u>
    2.  Is able to provide evidence of compliance with PAP or oral device OSA therapy (see Sections V and VI).

B. Post-op, after 1 month:  After 1 month has passed since surgery, a driver may be certified, provided that:
    1.  A repeat sleep study shows that the driver no longer has a moderate to severe OSA diagnosis, <u>and</u>
    2.  The driver does not report excessive sleepiness during the major wake period.

C. Annual recertification
    1.  If clinically indicated, repeat the sleep study.


**IX.    Treatment: Tracheostomy**

A. Post-op, less than 1 month:  A driver with an established diagnosis of moderate to severe OSA may be certified if he/she:
    1.  Has been cleared by the treating clinician, <u>and</u>
    2.  Is able to provide evidence of compliance with PAP or oral device OSA therapy (see Sections V and VI).

B. Post-op, after 1 month:  After 1 month has passed since surgery, a driver may be certified, provided that:

EXHIBIT A

MRB Task 16-01 Report

    1. A repeat sleep study shows that the driver no longer has a moderate to severe OSA diagnosis, <u>and</u>
    2. The driver does not report excessive sleepiness during the major wake period.

C. Annual recertification
    1. If clinically indicated, repeat the sleep study.

7

**EXHIBIT A**

pii: sp-00674-15

EXHIBIT 5

Kales
7/25/19 2D

http://dx.doi.org/10.5665/sleep.5734

## SLEEP DISORDERED BREATHING

# Nonadherence with Employer-Mandated Sleep Apnea Treatment and Increased Risk of Serious Truck Crashes

Stephen V. Burks, PhD[1,3,4]; Jon E. Anderson, PhD[2]; Matthew Bombyk, MS[1]; Rebecca Haider, BA[1]; Derek Ganzhorn, JD[1]; Xueyang Jiao, MS[1]; Connor Lewis[2]; Andrew Lexvold, BA[2]; Hong Liu, BA[1]; Jiachen Ning, BA[1]; Alice Toll, BA[2]; Jeffrey S. Hickman, PhD[5]; Erin Mabry, PhD[5]; Mark Berger, MD, FCCP[6]; Atul Malhotra, MD[7]; Charles A. Czeisler, MD, PhD[8,9]; Stefanos N. Kales, MD, MPH[10,11]

[1]Division of Social Science, University of Minnesota, Morris, MN; [2]Division of Science and Math, University of Minnesota, Morris, MN; [3]Center for Transportation Studies, University of Minnesota[1]; [4]Institute for the Study of Labor (IZA), Bonn, DE; [5]Virginia Tech Transportation Institute, Blacksburg, VA; [6]Precision Pulmonary Diagnostics, Houston, TX; [7]Division of Pulmonary and Critical Care Medicine, School of Medicine, University of California, San Diego, San Diego, CA; [8]Division of Sleep Medicine and Circadian Disorders, Department of Medicine and Neurology, Brigham and Women's Hospital, Boston, MA; [9]Division of Sleep Medicine, Harvard Medical School, Boston, MA; [10]Department of Environmental and Occupational Medicine and Epidemiology, Harvard TH Chan School of Public Health, Boston, MA; [11]Occupational Medicine, Cambridge Health Alliance, Harvard Medical School, Cambridge, MA

**Study Objectives:** To evaluate the effect of an employer-mandated obstructive sleep apnea (OSA) program on the risk of serious preventable truck crashes.
**Methods:** Data are from the first large-scale, employer-mandated program to screen, diagnose, and monitor OSA treatment adherence in the US trucking industry. A retrospective analysis of cohorts was constructed: polysomnogram-diagnosed drivers (OSA positive n = 1,613, OSA negative n = 403) were matched to control drivers unlikely to have OSA (n = 2,016) on two factors affecting crash risk, experience-at-hire and length of job tenure; tenure was matched on the date of each diagnosed driver's polysomnogram. Auto-adjusting positive airway pressure (APAP) treatment was provided to all cases (i.e. OSA positive drivers); treatment adherence was objectively monitored. Cases were grouped by treatment adherence: "Full Adherence" (n = 682), "Partial Adherence" (n = 571), or "No Adherence" (n = 360). Preventable Department-of-Transportation-reportable crashes/100,000 miles were compared across study subgroups. Robustness was assessed.
**Results:** After the matching date, "No Adherence" cases had a preventable Department of Transportation-reportable crash rate that was fivefold greater (incidence rate ratio = 4.97, 95% confidence interval: 2.09, 10.63) than that of matched controls (0.070 versus 0.014 per 100,000 miles). The crash rate of "Full Adherence" cases was statistically similar to controls (incidence rate ratio = 1.02, 95% confidence interval: 0.48, 2.04; 0.014 per 100,000 miles).
**Conclusions:** Nontreatment-adherent OSA-positive drivers had a fivefold greater risk of serious preventable crashes, but were discharged or quit rapidly, being retained only one-third as long as other subjects. Thus, the mandated program removed risky nontreatment-adherent drivers and retained adherent drivers at the study firm. Current regulations allow nonadherent OSA cases to drive at another firm by keeping their diagnosis private.
**Commentary:** A commentary on this article appears in this issue on page 961.
**Keywords:** APAP, commercial motor vehicle operator, CPAP, motor carrier, obstructive sleep apnea, OSA, preventable crash, PSG, screening, truckload
**Citation:** Burks SV, Anderson JE, Bombyk M, Haider R, Ganzhorn D, Jiao X, Lewis C, Lexvold A, Liu H, Ning J, Toll A, Hickman JS, Mabry E, Berger M, Malhotra A, Czeisler CA, Kales SN. Nonadherence with employer-mandated sleep apnea treatment and increased risk of serious truck crashes. *SLEEP* 2016;39(5):967–975.

---

**Significance**

Limited data from commercial drivers is a major reason for the US Federal Motor Carrier Safety Administration's failure to require screening for obstructive sleep apnea (OSA). We present the results of the first large-scale, employer program to screen, diagnose, and monitor OSA treatment adherence in the US trucking industry. Among drivers in whom OSA was diagnosed through the program, those adherent with employer-provided positive airway pressure treatment had crash risks similar to controls, whereas nonadherent drivers had a fivefold greater preventable crash risk after adjustment for miles driven and driving experience. Therefore, our results strongly support federal OSA regulations for commercial drivers. Future research should improve the calibration of criteria and thresholds for OSA treatment success.

---

## INTRODUCTION

Experts estimate that between 7%[1] and 20%[2] of all large truck crashes are due to drowsy/fatigued driving. Therefore, in the United States, from 2004 to 2013, 3,133 to 8,952 deaths and 77,000 to 220,000 serious injuries (mostly among the traveling public) are likely attributable to fatigued/sleepy commercial motor vehicle (CMV) drivers.[3,4] Obstructive sleep apnea (OSA) is the most common medical cause of excessive daytime sleepiness or fatigue[5] and has been linked with specific neurocognitive deficits in attention/working memory, vigilance, and executive functioning.[6–8] Untreated OSA increases the risk of motor vehicle crashes among noncommercial drivers by 1.2- to 4.9-fold,[9,10] whereas effective treatment with positive airway pressure (PAP) significantly reduces this excess crash risk.[11] Among the estimated 1.7 to 3.9 million active US commercial drivers,[4,12] 17% to 28% or 0.29–1.1 million are expected to have OSA based on prevalence studies conducted within the trucking industry.[13–17] Most of these drivers are thought to be undiagnosed and untreated.[13,18]

Commercial vehicle operators undergo a biennial examination to determine their medical fitness to safely operate a vehicle. Although the possibility of OSA may be evaluated by the commercial driver medical examiner (CDME), the US Federal Motor Carrier Safety Administration (FMCSA) has not established any mandatory standard for OSA screening or diagnosis, in part due to the absence of large-scale studies evaluating the crash risk of commercial drivers in whom OSA has been diagnosed. A 2011 FMCSA medical evidence report observed that although OSA is a clear risk factor for non-CMV drivers, the evidence for this relationship in CMV drivers was "minimally acceptable" and concluded that the effect sizes could not be estimated, nor could disease-related risk factors be identified.[19] Two more recent studies have mixed results and methodological limitations.[20–22]

**EXHIBIT A**

Recent legislation prohibits the FMCSA from offering "regulatory guidance" (which identifies best clinical practices in the absence of a mandatory standard) on how carriers should address the potential existence of OSA among their drivers without a full, formal rulemaking.[23,24] Some in the trucking industry have gone so far as to argue that CDMEs "are prohibited from requiring a sleep study for any driver."[25] The FMCSA has issued a recent advisory that, while still allowing for CDME clinical judgment, makes the absence of mandatory standards explicit. Thus, it is critical to discover whether a mandated OSA program can reduce crash risk.

Because treatment for OSA has been proven to be effective and substantial evidence already exists that untreated OSA increases the risk of crashes, a randomized prospective controlled trial of the degree of commercial driver crash risk associated with untreated OSA is neither ethically nor legally feasible. Therefore, this retrospective study analyzes preventable truck crashes experienced by commercial drivers in the context of an employer-mandated OSA program that includes screening, diagnosis, auto-adjusting positive airway pressure (APAP) treatment, and APAP treatment adherence monitoring.[13,26] It is hypothesized that drivers with diagnosed OSA who are nontreatment adherent will have an elevated rate of serious preventable truck crashes and exit the firm faster than controls who screen at low likelihood of having OSA, whereas those with OSA who are treatment adherent will have similar crash and retention rates to controls.

## METHODS

### Study Firm Clinical Protocol

#### Screening and Diagnosis

The OSA screening, diagnosis, and treatment program was implemented by Schneider National, Inc., a major North American trucking firm.[27] Following a small pilot in 2005, implementation rollout began in April 2006.[13,26] The SomniSage screening questionnaire used assigns drivers to one of four classes ranging from one ("High Priority") to four ("Low-Priority"), for receiving polysomnogram (PSG) diagnostic testing.[26] Due to the startup process in the presence of turnover, about one-half (n = 17,098) of the drivers employed from 2006 onward were screened. The study firm chose who to refer from those screened as High Priority for overnight, multi-channel, laboratory, technician-attended PSGs ("Type 1" PSGs as defined by the American Academy of Sleep Medicine)[28] at a national network of sleep laboratories. PSG records show 5 tests in 2005, 493 in 2006, 370 in 2007, 632 in 2008, and 662 in 2009. Referral was based on several factors, such as the driver's schedule, route, continuing employment, and sleep laboratory availability. Diagnosis and treatment were covered without co-pays as preventive medicine for drivers carrying the firm's voluntary medical insurance plan.

#### Disease Management

PSGs were interpreted immediately using standard criteria with diagnostic clinical evaluations the morning after the overnight tests.[28] Drivers with an apnea-hypopnea index (AHI) $\geq 5$

received a diagnosis of "positive" for OSA, and first-line treatment was given: an APAP machine, heated humidifier, and mask interface. This equipment operates with AC or DC power and is usable both in the truck sleeper berth while on the road and at home. For the first 14 to 90 days, and longer if necessary, drivers' adherence to APAP therapy and treatment efficacy was monitored using wireless data transmission to the disease management team from the drivers' PAP machines. During this initial treatment period, the disease management team intervened to assist drivers in becoming adherent, providing frequent phone and sometimes face-to-face contacts with each treated driver to assist with ongoing PAP troubleshooting, education, and adherence monitoring.

After initial APAP adherence was demonstrated, monitoring continued from periodic (quarterly) batch downloads from the APAP machine's internal adherence memory ("adherence chip"). Adherence troubleshooting, education, and monitoring using phone and face-to-face contacts continued as necessary. When medically indicated, formal titration studies and the option of a possible change to bilevel PAP therapy were available and used in order to improve drivers' tolerance of therapy and treatment adherence. Drivers with OSA who remained nonadherent as demonstrated by objective APAP adherence monitoring despite this multifaceted process of remediation were eventually terminated after the process of remediation failed.

### Retrospective Cohort Approach With Case-Control Matching Determines Study Sub-groups

#### Methodology and the Study Context

Two contextual factors determine the methodology. First, the study firm engages in long distance for-hire trucking in which driver turnover rates are very high (typically $\geq 80\%$ annually),[27,29] whereas some drivers stay for considerable durations, and many join and depart from the firm in a continuous process.[27,30] Turnover at the study firm ranged from 34% to 76% over the course of the study period. Crash rates, especially among new drivers, are strongly associated with driving experience and firm tenure[31,32] due both to the improvement of driving skill with practice and to the discharge of those who accumulate unacceptable crash records (the latter is analogous to a "healthy worker survival effect"[33]). The safety selection effect is strong. During the study period the baseline hazard of being discharged in a given specific week was raised by approximately 30-fold if the driver had a preventable Department of Transportation (DOT)-reportable crash during the prior or current week. Second, the existence of a gold standard treatment for OSA (APAP) ethically precludes assigning drivers with OSA to receive no treatment (due to medical risk to the patient and potential crash risk for patients and the motoring public). Therefore, analysis of an actual employer-based OSA program with mandated screening, diagnosis, and treatment was performed using a retrospective cohort approach with case-control matching.

Cases were matched to controls on experience-at-hire and also, using the date of each case's PSG, on job tenure. This accounts for differences across subjects in crash risk due to the variations in past and current experience, and for variations

**EXHIBIT A**

in the length of exposure to the chance of safety selection, i.e. of having been discharged due to having a serious preventable crash (which would have prevented the subject from entering the study; further statistical details are provided in the supplemental material).

### Study Subgroup Construction

Each OSA-diagnosed driver (n = 2,225), was matched to a randomly drawn control driver from those screened as Low Priority for a PSG (i.e. unlikely to have OSA; n = 3,732) who had the same level of experience (at hire) and job tenure (measured at the calendar week of the diagnosed driver's PSG, called the "matching date" for the control). This randomized matching process led to the following study subgroups.

1. Controls: drivers screened as Low Priority for a PSG (i.e. unlikely to have OSA; matched n = 2,016). Random selection (with replacement) was used when multiple low priority matches were available for a given OSA-diagnosed driver.
2. Negatives: drivers with an AHI < 5, diagnosed as "negative" for OSA (n = 403).
3. Cases: OSA-diagnosed drivers whose PSG showed AHI ≥ 5 (matched n = 1,613), who were provided with APAP and instructed in its use, with the requirement of treatment adherence as a condition of employment. OSA Cases were further classified by their adherence with PAP treatment after diagnosis.
   a. Full Adherence: cases who always met or exceeded the consensus minimum standard of 4 h/night mean APAP use for ≥ 70% of nights[34] (matched n = 682).
   b. Partial Adherence: cases whose recorded treatment, but who did not reach the standard for Full Adherence (matched n = 571).
   c. No Adherence: cases who never recorded any adherence with APAP (matched n = 360).

### Crash Outcomes Assessment and Data Synthesis

Using relevant US DOT guidelines, firms in the trucking industry standardly categorize crashes in which driver behavior was a relevant causal factor as either "preventable," which roughly means that the commercial driver could have and should have taken actions that would have prevented the crash (whatever the proximate cause of the crash may have been), or "not preventable," if such actions were not possible under the circumstances.[35] The study firm provided this characterization, and additionally among preventable crashes identified crashes that were serious insofar as they were required to be reported to the DOT. A crash is "DOT-reportable" if an involved vehicle must be towed from the crash scene, or someone involved requires medical attention away from the scene, or there is a fatality. Selecting "preventable DOT-reportable crashes" is a standard way of identifying crashes that are of managerial and public policy interest in commercial vehicle operations when such internal administrative records are available,[27] so this is our primary outcome measure. As robustness checks, all DOT-reportable crashes (whether preventable or not) were also considered, as this more closely tracks what can be observed in governmental crash records.

Existing data from the study firm provided driver demographics, such as age, sex, racial or ethnic category, hiring date, experience level at hire, separation date, and type (if applicable). These were merged with week-by-week operational data that provided information on crashes and crash risk exposure (e.g. weekly miles, job type); then records from the sleep medicine services provider, including the results of the Somni-Sage screening questionnaire and, when applicable, PSG results and APAP adherence data were merged.

### Statistical Analysis

To adjust for driving exposure, crashes/100,000 miles driven are reported as incidence rate ratios (IRR) for each study subgroup. The matched comparison approach also accounts for variation in initial crash risk (experience at hire), in learning through experience and the chance of safety selection (job tenure), by ensuring cases and controls are similar with regard to these characteristics. The subgroup comparisons focus on the period after the PSG/matching date, when all crash outcomes are contained in the data. This is because safety selection removed many drivers with a bad preventable crash record from the potential study population during the period before the PSG/matching date, so comparisons during this period are missing many of the relevant crash events and the drivers who had them, who because of their discharges never became study subjects.

Because assignment to treatment adherence groups was self-assigned, there are likely to be differences across study subgroups in factors that may independently affect crash risk, and that are not directly captured in the case-control matching process. To account for this possibility a second analysis was performed on a panel version of the data (one observation per driver per week) with an Andersen-Gill multivariate model. This model is similar to the perhaps more familiar Cox proportional hazards model of patient survival, the primary difference being that it permits multiple "failure events" (i.e., crashes) per driver.[36] The model included age, sex, job type, experience at hire, trip segments per week, miles per week, season (spring, summer, fall, winter), and year of observation as predictor variables; these are all items that potentially affect either crash risk directly, or crash risk indirectly through differences in exposure that not fully captured in miles driven. This analysis provides hazard ratio (HR) estimates in parallel to the IRRs obtained for each study subgroup.

Two additional robustness checks were created by running variations of the original Andersen-Gill multivariate model. First, the crash risk was compared across study subgroups utilizing the higher threshold of AHI ≥ 15 as the criterion for a positive OSA diagnosis (instead of the AHI ≥ 5 criterion actually used in the treatment protocol), in order to observe whether a more stringent definition of a positive diagnosis would change results. Second, crash risk was compared across study subgroups using the alternative crash definition of all DOT-reportable crashes as the dependent variable, instead of restricting attention to only preventable DOT-reportable crashes. This makes the analysis more directly comparable to studies that utilize government crash data, in which information on the contribution of driver behavior to a crash captured in the designation of a crash as "preventable" is not available.

**EXHIBIT A**

**Table 1**—Demographic and job characteristics of study subgroups.

| Category | Controls n | Controls % | Negative n | Negative % | Fully Adh n | Fully Adh % | Partial Adh n | Partial Adh % | No Adh n | No Adh % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Sex** | | | | | | | | | | |
| Female | 179 | 8.9% | 38 | 9.4% | 37 | 5.7% | 24 | 4.2% | 16 | 4.4% |
| Other (male + missing data) | 1,837 | 91.1% | 365 | 90.6% | 645 | 94.3% | 547 | 95.8% | 344 | 95.6% |
| **Age (y)** | | | | | | | | | | |
| 21–40 | 788 | 39.1% | 169 | 41.9% | 187 | 27.4% | 187 | 32.8% | 149 | 41.4% |
| 41–50 | 676 | 33.4% | 108 | 26.8% | 228 | 33.4% | 184 | 32.2% | 131 | 36.4% |
| 51+ | 552 | 27.4% | 126 | 31.3% | 267 | 39.2% | 200 | 35.0% | 80 | 22.2% |
| **Race** | | | | | | | | | | |
| White | 1,437 | 71.3% | 320 | 79.4% | 558 | 81.8% | 418 | 73.2% | 269 | 74.7% |
| African-American | 276 | 13.7% | 43 | 10.7% | 61 | 8.9% | 100 | 17.5% | 44 | 12.2% |
| Other | 303 | 15.0% | 40 | 9.9% | 63 | 9.2% | 53 | 9.3% | 47 | 13.1% |
| **Experience level at hire** | | | | | | | | | | |
| Experienced | 637 | 31.6% | 120 | 29.8% | 215 | 31.5% | 179 | 31.4% | 128 | 35.6% |
| Inexperienced | 1,110 | 55.1% | 257 | 63.8% | 381 | 55.9% | 324 | 56.7% | 203 | 56.4% |
| Other | 269 | 13.3% | 26 | 6.5% | 86 | 12.6% | 68 | 11.9% | 29 | 8.1% |
| **Job type** | | | | | | | | | | |
| System solo | 677 | 33.6% | 168 | 41.7% | 302 | 44.3% | 247 | 43.3% | 205 | 56.9% |
| Dedicated | 800 | 39.7% | 115 | 28.5% | 211 | 30.9% | 168 | 29.4% | 66 | 18.3% |
| Other | 539 | 26.7% | 120 | 29.8% | 169 | 24.8% | 156 | 27.3% | 89 | 24.7% |
| **Miles per week** | | | | | | | | | | |
| 0–1,500 | 676 | 33.5% | 163 | 40.5% | 248 | 36.4% | 229 | 40.1% | 155 | 43.1% |
| 1,500–2,500 | 857 | 42.5% | 160 | 39.7% | 326 | 47.8% | 250 | 43.8% | 145 | 40.3% |
| Over 2,500 | 483 | 24.0% | 80 | 19.9% | 108 | 15.8% | 92 | 16.1% | 60 | 16.7% |
| **Trip segments per week** | | | | | | | | | | |
| 0–5 | 642 | 31.9% | 134 | 33.3% | 220 | 32.4% | 201 | 35.2% | 140 | 38.9% |
| 6–10 | 525 | 26.0% | 190 | 47.2% | 314 | 46.0% | 248 | 43.4% | 173 | 13.1% |
| 11 and higher | 849 | 42.1% | 79 | 19.6% | 148 | 21.7% | 122 | 21.4% | 47 | 48.1% |

Controls were selected from those members of the reference population that had been screened by Somni-Sage as Low Priority for OSA diagnosis (i.e., unlikely to have OSA). For the case-control study subgroups, demographics are from the week containing a driver's PSG (cases) or matching (controls) date. Operational variables (e.g., miles per week) are constructed as an average over the weeks each driver is observed (further details on demographic and operational variables may be found in the supplemental material, Section 2a). Adh, adherence.

The data synthesis and analysis were performed by the University of Minnesota, Morris Truckers & Turnover Project (S. Burks, Principal Investigator, J. Anderson, Co-Investigator). Retrospective analysis of individually identified protected health information was approved by the Institutional Review Board B of the University of Minnesota. Stata Version 12 software was utilized. (For the interested reader, additional details of the statistical methodology, robustness checks, and the like, are presented in the supplemental material.)

RESULTS

**Driver Characteristics**

The demographic profile, experience levels, exposure, and job characteristics of the reference population, the matched cases, and controls are broadly similar, but not identical (Table 1). This suggests that, in addition to the primary case-control statistical comparisons across subgroups, robustness checks, such

as those using the multivariate Andersen-Gill model, are appropriate to examine.

**Primary Results: Crash Rates as a Function of PAP Adherence**

After the matching dates, drivers nonadherent with PAP ("No Adherence" subgroup) had a crash rate for preventable DOT-reportable crashes of 0.070/100,000 miles, or nearly five-fold more (IRR of 4.97; 95% confidence interval [CI]: 2.09, 10.63; $P < 0.001$) than the 0.014/100,000 miles for matched controls. Crash rates for OSA-diagnosed drivers in the Full Adherence (0.014/100,000 miles) and Partial Adherence (0.021/100,000 miles) subgroups showed no statistical difference from matched controls ($P = 0.92$ and $P = 0.19$, respectively). See Figure 1A.

In addition, Table 2 exhibits exposure measures and mean AHI at diagnosis (for diagnosed drivers) by study subgroup. The mean AHI varies statistically across the study subgroups; Full Adherence drivers have the highest AHI (mean AHI = 36.3, 95% CI: 34.2, 38.5), No Adherence are lower (mean AHI = 31.3, 95% CI: 28.6, 34.0), and Partial Adherence are lowest (mean

EXHIBIT A



**Figure 1**—Incidence rate ratios and hazard ratios by study subgroup. **(A)** Primary results, the rate of preventable crashes in each study subgroup per 100,000 miles driven compared to that of matched controls. **(B)** Results of the first of the three robustness tests, the hazard ratio for each study subgroup compared with that of matched controls in a multivariate Andersen-Gill time-to-event model on week-by-week data that controls for multiple factors affecting the risk of a crash such as miles per week, trips per week, and demographics. The interval covered is all weeks in which the subject is observed after the polysomnogram date (cases) or matching date (controls). Error bars are 95% confidence intervals. Significant differences between the control group and obstructive sleep apnea study subgroups are denoted as *P < 0·001.

**Table 2**—Measures of exposure to crash risk and the number of preventable Department of Transportation-reportable crashes after the polysomnogram/ matching date, and apnea-hypopnea index characteristics at diagnosis, by study subgroup.

| | Number of drivers | Avg. miles per driver | Avg. weeks per driver | Avg. miles per driver-week | Preventable DOT crashes | Avg. AHI at diagnosis | 95% CI for Avg. AHI | % AHI ≥ 15 |
|---|---|---|---|---|---|---|---|---|
| Control | 2,016 | 116,988 | 64 | 1,817 | 33 | n/a | n/a | n/a |
| Negative | 403 | 106,270 | 57 | 1,853 | 8 | 1.9 | 1.8, 2.1 | n/a |
| Full Adh | 682 | 122,747 | 65 | 1,893 | 12 | 36.3[a,b] | 34.2, 38.5 | 76.7%[a,b] |
| Partial Adh | 571 | 132,807 | 73 | 1,825 | 16 | 29.6[a] | 27.5, 31.6 | 69.5%[a] |
| No Adh | 360 | 35,916 | 21 | 1,699 | 9 | 31.3[b] | 28.6, 34.0 | 66.9%[b] |

Data is in one-observation-per-driver-per-week format. Drivers are observed from the diagnosis/-matching date until exit from the firm or study end, whichever is first. AHI is measured at diagnosis. Average AHI values and proportions of AHI ≥ 15 with the same superscript (e.g. both have "a" or both have "b") are statistically different at P < 0.01. Other AHI entries are not statistically different from each other. Adh, adherence; AHI, apnea-hypopnea index; CI, confidence interval; DOT, Department of Transportation.

AHI = 29.6, 95% CI: 27.5, 31.6). The Partial and No Adherence groups are not statistically different in mean AHI, whereas both are lower that Full Adherence at a P < 0.01. However, all subgroups have mean AHI levels either at the top of the range associated with a diagnosis of moderate sleep apnea (from AHI = 15 to AHI = 30),[37] or above this boundary and therefore in the "severe" sleep apnea range.

### Robustness Checks

As described in the Methods section, three complementary checks of the robustness of these primary results were performed. First, variations across study subgroups in potentially confounding factors not captured in the case-control matching process were accounted for using a multivariate Andersen-Gill time-to-crash regression model. This produced qualitatively similar findings to the primary results (Figure 1B). Drivers in the "No Adherence" group had a nearly fourfold increased risk for preventable DOT-reportable crashes (HR of 3.79; 95% CI:

1.80, 8.00; P < 0.001), whereas crash risk for drivers in the Full Adherence and Partial Adherence subgroups were not statistically different from matched controls.

Second, a variation of the multivariate Andersen-Gill analysis was run that used "all DOT-reportable" crashes as the outcome instead of restricting attention to preventable crashes, to make the analysis more parallel to studies that utilize government crash data, in which information on preventability is not available. Adding crashes that were judged not to be preventable by the commercial driver doubled the crash count of No Adherence drivers from 9 to 20, but increased that of the controls by almost fivefold (63 to 163). Because exposure (miles) for both groups stayed the same, this increased the control group's crash rate more than that of the No Adherence drivers, and lowered the point estimate of their excess crash risk over that of controls by about 40% (HR = 2.21, 95% CI: 1.41–3.48).

Third, a final variation of the multivariate Andersen-Gill analysis was run using a criterion of AHI ≥ 15 as a higher

EXHIBIT A



**Figure 2**—Predicted cumulative hazard of a preventable DOT-reportable crash by study sub-group. The predicted cumulative risk of having a preventable DOT-reportable crash as a function of job tenure. For drivers who were inexperienced-at-hire and had a PSG/matching date at 26 weeks of tenure, broken out by treatment compliance sub-groups for cases. Predictions are from the first robustness test model, the multivariate Andersen-Gill time-to-crash model on driver-week data.



**Figure 3**—Exit status during study period by study subgroup. Percentage of each subgroup in each status. "Still Employed" drivers remained at work as of the study end date of December 31, 2009. No Adherence drivers who failed in remediation were subject to eventual discharge, but some who received a diagnosis near the end of the study remain employed at study end because their remediation process was still underway. A higher proportion of No Adherence drivers quit than did drivers in other study subgroups (P < 0.001).

threshold for a positive OSA diagnosis (the control group was not affected by this change). Despite the resulting decreases in the number of No Adherence drivers (from 360 to 241) and in their preventable DOT-reportable crashes (21 to 19), the point estimate of their excess risk compared to controls increased slightly from the initial Andersen-Gill result (HR = 4.54, 95%

CI: 2.54–10.32), and moved closer to the primary result provided by the simple comparison of crash rates across study subgroups.

In all of these robustness checks the results follow a similar pattern across study subgroups. Figure 2 illustrates this consistent pattern of the differences in serious preventable crash risk across subgroups in the form of a predicted cumulative hazard of a preventable DOT-reportable crash over 2 years of job tenure. Figure 2 is generated from the first Andersen-Gill multivariate model previously mentioned, which accounts for potential confounding factors, uses AHI ≥ 5 as the criterion for a diagnosis of OSA and considers only preventable DOT-reportable crashes.

### Effectiveness of the Employer's Program for Removing Nonadherent Drivers

Although study carrier policy required the discharge of drivers failing to adhere to treatment, the process of adherence evaluation and remediation took some time (in some cases several months). As a result, during the study period most No Adherence drivers (57.5%) quit before being discharged. At study end, 68.8% of controls were still employed, as were 73.6% of Full Adherence and 68.6% of Partial Adherence drivers. However, only 17.2% of No Adherence drivers were still employed (these were primarily drivers who received a diagnosis near the end of the study period, and whose remediation process had not been completed; see Figure 3). The proportion of No Adherence drivers retained is different from that of controls, Full Adherence, and Partial Adherence drivers, all at P < 0.001. (For the interested reader, full statistical details, including the complete specification of the multivariate models and the robustness checks employed, are presented in the supplemental material.)

### DISCUSSION

#### The Primary Findings are Substantive and Robust
In the largest and most comprehensive study of crash risk and OSA among CMV drivers, drivers in whom OSA was diagnosed and who subsequently drove without PAP treatment due to nonadherence had a fivefold increase in the risk of preventable DOT-reportable heavy truck crashes compared to matched controls. Drivers with OSA who were fully or partially adherent with PAP treatment were statistically similar to controls. These findings for commercial drivers operating tractor-trailers are consistent with previous studies of noncommercial drivers showing a markedly increased crash risk for untreated OSA and crash rates approximating those of controls after successful treatment.[9-11]

The current study has several advantages over prior work. It is a retrospective analysis of the crash risk of tractor-trailer drivers at the industry's first large-scale mandatory employer-based program to screen and diagnose drivers for OSA, and to require treatment if indicated, covered with no out-of-pocket cost for drivers enrolled in the study firm's voluntary insurance

**EXHIBIT A**

program. OSA was defined using the gold-standard overnight PSG diagnostic procedure.[30] Also in contrast to many previous studies, objective quantitative evidence of treatment adherence is used, and internal study firm operational data provides the ability to control for multiple covariates that affect crash risk in week-by-week observational data on driving performance. Moreover, the most policy-relevant type of crashes are analyzed: DOT-reportable crashes that are preventable, thus clearly involving driver behavior as a causal factor, as defined by the guidelines of the National Safety Council.[35]

The results are robust despite the fact that No Adherence drivers remain employed and under observation at the study firm one-third as long as other groups, which reduced the chance of finding statistically significant results. In three distinct robustness tests, No Adherence drivers have statistically different and substantially higher risk than controls, whereas Partial and Full Adherence drivers are always statistically similar to controls.

First, a multivariate analysis that controlled for differences in demographic and risk exposure characteristics across study groups found Partial and Full Adherence groups similar to controls, and a 3.8-fold increase in risk for the No Adherence group relative to controls. Second, a multivariate reanalysis that used a more stringent threshold of AHI $\geq 15$ as the criterion for a diagnosis of OSA (compared to the actual protocol of AHI $\geq 5$) found the same pattern, with a 4.7-fold increase in risk for the No Adherence group. Third, a final multivariate reanalysis that changed the outcome variable to "all DOT-reportable crashes" found a similar crash risk pattern across subgroups and controls.

The last result, using all DOT-reportable crashes, suggests the findings are not due to the fact that there are only a modest number of preventable DOT-reportable crashes. In addition, using all DOT-reportable crashes makes the analysis more comparable to studies using governmental crash data, in which all crashes must be included because information on the contribution of driver behavior to crash causation is not available. Thus, it should be noted that although this third reanalysis replicated the pattern of risk comparisons across study groups, it also reduced the estimated excess crash risk for No Adherence drivers by about two-fifths (to 2.2-fold). This is because control drivers experienced a much greater proportion of crashes they could not prevent than did No Adherence drivers, and adding these crashes raised the control driver crash rate used as the basis for the identification of excess risk by much more than it raised the crash rate of the No Adherence subgroup. The fact that the estimated excess crash risk for No Adherence drivers decreased when nonpreventable crashes were added suggests that studies using governmental crash data to compare a test group to controls when the test group has higher risk of preventable crashes may follow the same pattern and thus underestimate the excess crash risk.

**Limitations of This Study**
The limitations of the current study are different from those of prior work. The existence of a gold standard treatment ethically precludes a clinical trial in which drivers with OSA are randomly assigned to a no-treatment condition in order to study their crash risk (their medical condition and the highway safety of both the drivers and the motoring public would be at risk). In the current study, an actual employer's OSA program is examined using a retrospective cohort of cases and controls.

There may be a significant issue with data from an employer's OSA program in that drivers received a diagnosis only after attaining sufficient tenure. Thus, safety selection, due to the discharge of drivers who accumulated unacceptable preventable crash histories early in their tenure, prevented many of those with relevant crashes from ever being screened for or receiving a diagnosis of OSA. The construction of the retrospective cohort comparison through the randomized matching of each driver with OSA to a control unlikely to have OSA, but who had similar experience at hire and job tenure, makes cases and controls comparable in total experience level, which is important because driving safety performance improves with practice. It also makes them comparable in the degree of exposure to safety selection.

If there were no safety selection, but only the effect of experience on driving safety to be considered, the natural focus for a retrospective study of cases and controls matched on experience would be their crash risk *before* diagnosis (or matching). This approach would be similar in conception to a "waitlist control" design for the study of an untreated disease: controls without the disease would be compared to individuals with the disease who are observed in an untreated condition while they wait for treatment, which is unable to be provided immediately to all patients, to begin. However, because the firm's safety program does create a safety selection effect, the drivers who had preventable DOT-reportable crashes early in their tenure are missing from both the case and control groups, and thus the potential differences in crash risk across study groups in the period *before* the diagnosis/matching date have been eliminated. Therefore, our analysis focuses on crash risk in the interval *after* diagnosis.

The primary limitation of the study is the fact that under a mandated treatment regimen, the division into treatment adherence groups after a positive diagnosis was, of necessity, self-selected and not randomly assigned. Thus, although the known pathophysiologic effects of OSA, and past studies associating untreated OSA (before and after diagnosis) with an increased risk of vehicular accidents, all suggest that the increased crash risk in the after-PSG interval for drivers who do not comply with mandatory treatment may be due to the effects of untreated OSA,[9–11] the current study cannot determine the relative contributions of untreated OSA versus factors such as a more general disregard of safety rules that leads to both nonadherence and unsafe driving habits.

**Safety and Policy Implications**
Although the study limitations preclude us from assigning untreated OSA as the sole cause of the excess crash risk of No Adherence drivers, they do not alter important policy conclusions. This is because the findings provide clear evidence of the effects on safety of the study firm's OSA program.

First, among the study firm's drivers in whom OSA was diagnosed, drivers with OSA who were treatment adherent and had risk comparable to controls were retained in employment

**EXHIBIT A**

at the same level as were controls, whereas nontreatment-adherent OSA-diagnosed drivers who had a fivefold greater serious preventable crash risk than controls were removed (through quitting or mandatory discharge; see Figure 3). Thus, the firm's program to screen and diagnose their drivers, and especially, mandate treatment adherence for drivers found to have OSA, lowered the crash risk in its work force.

Second, the risk differences found among study subgroups are meaningful in terms of managerial and public policy safety concerns. For a fleet of 1,000 drivers each operating 1 year (about 100,000 miles[27]), the observed crash rates translate to a difference between 70 preventable DOT-reportable crashes for No Adherence drivers and 14 such crashes for both Full Adherence and controls. Thus, No Adherence drivers are substantially more dangerous to themselves and the motoring public.

Third, in the absence of federally mandated procedures other than the currently required self-report during a biennial medical examination, drivers who have diagnosed OSA but are non-adherent with treatment can simply choose to quit working for a motor carrier that knows their diagnosis (as did nearly 60% of those in the current study). They can instead seek employment—without revealing their OSA diagnosis—with a different firm that does not have an OSA program.

The FMCSA has not yet acted on the recommendations of its own Medical Expert Panel (in 2007) and Medical Review Board (in 2008 and 2011), the Motor Carrier Safety Advisory Committee (in 2011), and that of the National Transportation Safety Board (in 2009), that safety regulations should require comprehensive OSA screening and diagnosis of commercial drivers,[38,39] in part due to limited commercial driver data. In the context of this record a 2016 National Academies of Science report on commercial driver fatigue cited OSA as a serious safety concern and called for more research. The current study addresses this research need.[40] Moreover, our statistical results clearly support specific public health policy-relevant findings: among commercial drivers in whom OSA was diagnosed, drivers with OSA who were treatment-adherent and had risk comparable to controls were more likely to be retained, whereas non-adherent OSA-diagnosed drivers had a fivefold greater preventable crash risk than controls were differentially removed (through quitting or mandatory discharge). Therefore, our results strongly support federal regulations that would mandate OSA screening, diagnosis, and monitoring drivers' treatment adherence for all commercial drivers.

## REFERENCES

1. FMCSA & ICF. Regulatory Impact Analysis for Hours of Service Options. 2007; FMCSA-2004-19608-2529.
2. Akerstedt T. Consensus statement: fatigue and accidents in transport operations. J Sleep Res 2000;9:395.
3. FMCSA. Commercial Motor Vehicle Facts - March 2013. Washington, DC: Federal Motor Carrier Safety Administration, 2013.
4. FMCSA. 2015 Pocket Guide to Large Truck and Bus Statistics. Washington, DC: Federal Motor Carrier Safety Administration, April 2015.
5. Colten HR, Altevogt BM. Sleep disorders and sleep deprivation: an unmet public health problem. Washington, DC: Institute of Medicine Committee on Sleep Medicine Research, National Academies Press, 2006.
6. Lal C, Strange C, Bachman D. Neurocognitive impairment in obstructive sleep apnea. Chest 2012;141:1601–10.
7. Naismith S, Winter V, Gotsopoulos H, Hickie I, Cistulli P. Neurobehavioral functioning in obstructive sleep apnea: differential effects of sleep quality, hypoxemia and subjective sleepiness. J Clin Exp Neuropsychol 2004;26:43–54.
8. Wong KK, Grunstein RR, Bartlett DJ, Gordon E. Brain function in obstructive sleep apnea: results from the Brain Resource International Database. J Integr Neurosci 2006;5:111–21.
9. Ellen RL, Marshall SC, Palayew M, Molnar FJ, Wilson KG, Man-Son-Hing M. Systematic review of motor vehicle crash risk in persons with sleep apnea. J Clin Sleep Med 2006;2:193–200.
10. Tregear S, Reston J, Schoelles K, Phillips B. Obstructive sleep apnea and risk of motor vehicle crash: systematic review and meta-analysis. J Clin Sleep Med 2009;5:573–81.
11. Tregear S, Reston J, Schoelles K, Phillips B. Continuous positive airway pressure reduces risk of motor vehicle crash among drivers with obstructive sleep apnea: systematic review and meta-analysis. Sleep 2010;33:1373–80.
12. Bureau of Labor Statistics. Occupational Employment and Wages, May 2014: 53-3032 Heavy and Tractor-Trailer Truck Drivers. Occupational Employment Statistics May 2015. Accessed September 14, 2015. Available from: http://www.bls.gov/oes/current/oes533032.htm.
13. Berger M, Varvarigou V, Rielly A, Czeisler CA, Malhotra A, Kales SN. Employer-mandated sleep apnea screening and diagnosis in commercial drivers. J Occup Environ Med 2012;54:1017–25.
14. Gurubhagavatula I, Maislin G, Nkwuo JE, Pack AI. Occupational screening for obstructive sleep apnea in commercial drivers. Am J Respir Crit Care Med 2004;170:371–6.
15. Howard ME, Desai AV, Grunstein RR, et al. Sleepiness, sleep-disordered breathing, and accident risk factors in commercial vehicle drivers. Am J Respir Crit Care Med 2004;170:1014–21.
16. Moreno CR, Carvalho FA, Lorenzi C, et al. High risk for obstructive sleep apnea in truck drivers estimated by the Berlin questionnaire: prevalence and associated factors. Chronobiol Int 2004;21:871–9.
17. Talmage JB, Hudson TB, Hegmann KT, Thiese MS. Consensus criteria for screening commercial drivers for obstructive sleep apnea: evidence of efficacy. J Occup Environ Med 2008;50:324–9.
18. Parks P, Durand G, Tsismenakis AJ, Vela-Bueno A, Kales S. Screening for obstructive sleep apnea during commercial driver medical examinations. J Occup Environ Med 2009;51:275–82.
19. Williams JR, Amana A, Tregear S. Evidence report-obstructive sleep apnea and commercial motor vehicle driver safety: updated review. Washington, DC: Federal Motor Carrier Safety Administration, 2011.
20. Meuleners L, Fraser ML, Govorko MH, Stevenson MR. Obstructive sleep apnea, health-related factors, and long distance heavy vehicle crashes in Western australia: a case control study. J Clin Sleep Med 2015;11:413–8.
21. Phillips B, Stanton B. Commercial drivers with sleep apnea: it's still hit or miss. J Clin Sleep Med 2015;11:409–10.
22. Stevenson MR, Elkington J, Sharwood L, et al. The role of sleepiness, sleep disorders, and the work environment on heavy-vehicle crashes in 2 Australian states. Am J Epidemiol 2014;179:594–601.
23. A bill to ensure that any new or revised requirement providing for the screening, testing, or treatment of individuals operating commercial motor vehicles for sleep disorders is adopted pursuant to a rulemaking proceeding. 49 USCA. 113th Congress of the United States of America, 1st Session, 2013.
24. Jaillet J. President signs bill forbidding FMCSA to use sleep apnea 'guidance'. In: Commercial Carrier Journal - Fleet Management: CCJDigital, 2013.
25. Editorial Staff. Supplement on Sleep Disorders. ACOEM Commercial Driver Medical Examiner Review 2014:1–8.
26. Mabry JE, Hickman J, Hanowski R. Case Study on the Impact of Treating Sleep Apnea in Commercial Motor Vehicle Drivers--Sleep Apnea Programs from Two Leading U.S. Carriers and Focus Group Findings. Blacksburg, VA: Virginia Tech Transportation Institute, 2012.

EXHIBIT A

27. Burks SV, Belzer M, Kwan Q, Pratt S, Shackelford S. Trucking 101: an industry primer. In: Transportation Research Circular Number E-C146. Washington, DC: Transportation Research Board, 2010.

28. Epstein LJ, Kristo D, Strollo PJ, Jr., et al. Clinical guideline for the evaluation, management and long-term care of obstructive sleep apnea in adults. J Clin Sleep Med 2009;5:263–76.

29. Transport Topics. March 20, 2006: Driver Turnover Rate at Large Truckload Carriers Rises to 136%. Accessed August 8, 2013. Available from: http://www.ttnews.com/articles/basetemplate. aspx?storyid=15004.

30. Burks SV, Carpenter J, Götte L, Rustichini A. Cognitive skills affect economic preferences, social awareness, and job attachment. Proc Natl Acad Sci 2009;106:7745–50.

31. Guest M, Boggess MM, Duke JM. Age related annual crash incidence rate ratios in professional drivers of heavy goods vehicles. Transportation Research: Part A: Policy and Practice 2014;65:1–8.

32. Rodriguez DA, Targa F, Belzer MH. Pay incentives and truck driver safety: a case study. Industrial and Labor Relations Review 2006;59:205–25.

33. Arrighi HM, Hertz-Picciotto I. The evolving concept of the healthy worker survivor effect. Epidemiology 1994;5:189–96.

34. Kribbs NB, Pack AI, Kline LR, et al. Objective measurement of patterns of nasal CPAP use by patients with obstructive sleep apnea. Am Rev Respir Dis 1993;147:887–95.

35. NSC Staff, 2011. Guide to Determine Motor Vehicle Collision Preventability. National Safety Council, Itasca, IL.

36. Therneau TM, Grambsch PM. Modeling survival data: extending the cox model. New York, NY: Springer, 2000.

37. American Academy of Sleep Medicine. Fact Sheet: Obstructive Sleep Apnea. Accessed January 10, 2016. Available from: http://www. aasmnet.org/resources/factsheets/sleepapnea.pdf.

38. FMCSA. Summary–Federal Motor Carrier Safety Administration Medical Review Board Meeting. Accessed February 24, 2010. Available from: http://www.mrb.fmcsa.dot.gov/documents/Final_ Meeting_Revised_Updated_93008.pdf.

39. Hersman DAP, Hart CA, Sumwalt RL. Safety Recommendations H-09-015 &-016 to the Federal Motor Carrier Safety Administration Regarding Obstructive Sleep Apnea in Commercial Drivers. Washington, DC: National Transportation Safety Board, 2009.

40. Panel on Research Methodologies and Statistical Approaches to Understanding Driver Fatigue Factors in Motor Carrier Safety and Driver Health. Commercial Motor Vehicle Driver Fatigue, Long-Term Health, and Highway Safety: Research Needs. Washington, DC: National Academies Press, 2016.

## ACKNOWLEDGMENTS

The authors gratefully acknowledge the assistance of the executives and staff of the study firm, Schneider National, Inc. (SNI) in acquiring operational and medical data utilized, as well as financial assistance to UMM's Truckers & Turnover Project from SNI, the Roadway Safety Institute (the USDOT Region 5 University Transportation Center, which is funded by the USDOT Office of the Assistant Secretary for Research and Technology), the MacArthur Foundation's Research Network on the Origins of Norms and Preferences, the Sloan Foundation, and the University of Minnesota, Morris. The research received support from Harvard Catalyst, The Harvard Clinical and Translational Science Center (NIH Award #UL1 RR 025758, financial contributions from Harvard University and its affiliated academic health care centers), and support from National Surface Transportation Safety Center for Excellence (Project# 12-UI-017). The content is solely the responsibility of the authors and does not necessarily represent the official views of any of the research sponsors.

## SUBMISSION & CORRESPONDENCE INFORMATION

Submitted for publication November, 2015
Submitted in final revised form February, 2016
Accepted for publication February, 2016
Address correspondence to: Stephen V. Burks, PhD, University of Minnesota, Morris, Division of Social Sciences, 600 East 4th Street Morris, MN 56267-2134; svburks@morris.umn.edu; Tel: (320) 589-6191.

## DISCLOSURE STATEMENT

This was not an industry-supported study. Dr. Berger is the President of Precision Pulmonary Diagnostics, LLC; PPD has received fees for providing sleep apnea-related services to the study firm, and royalty payments for the use of the Somni-Sage questionnaire. Dr. Czeisler has received consulting fees from or served as a paid member of scientific advisory boards for: Bose Corporation; Boston Red Sox; Cleveland Browns; Institute of Digital Media and Child Development; Merck Sharpe and Dohme; Purdue Pharma; Quest Diagnostics; Samsung Electronics; Teva Pharmaceutical Industries Ltd.; Koninklijke Philips Electronics, N.V.; Novartis; and Vanda Pharmaceuticals, Inc. Dr. Czeisler owns an equity interest in Somnus Therapeutics, Inc. and Vanda Pharmaceuticals, Inc. and received royalties from McGraw Hill, Penguin Press/Houghton Mifflin Harcourt, and from Philips Respironics, Inc. for the Actiwatch-2 and Actiwatch-Spectrum devices; and has received research/education support from Mary Ann and Stanley Snider through Combined Jewish Philanthropies, National Football League Charities, Optum, ResMed, Philips Respironics and the San Francisco Bar Pilots, Simmons, Schneider, Inc., and Sysco. Dr. Czeisler's interests were reviewed and are managed by Brigham & Women's Hospital and Partners HealthCare in accordance with their conflict of interest policies. The Harvard Medical School Division of Sleep Medicine (HMS/DSM), which Dr. Czeisler directs, has received unrestricted research and educational gifts and endowment funds from: Boehringer Ingelheim Pharmaceuticals, Inc., Cephalon, Inc., GlaxoSmithKline, Jazz Pharmaceuticals, Merck & Co., Inc., Pfizer, ResMed, Philips Respironics, Inc., Sanofi-Aventis, Inc., Sealy, Inc., Sepracor, Inc., Simmons, Spring Aire, Takeda Pharmaceuticals, Tempur-Pedic, Walmart, Proctor and Gamble, Optum and has received Educational Grant funding from Apria Healthcare, Cephalon, Inc., Jazz Pharmaceuticals, Philips Respironics, Takeda Pharmaceuticals, ResMed Foundation, Sanofi-Aventis, Inc., Sepracor, Inc., Teva Pharmaceutical Industries Ltd and Wake Up Narcolepsy. Dr. Czeisler is the incumbent of an endowed professorship provided to Harvard University by Cephalon, Inc. and holds a number of process patents in the field of sleep/circadian rhythms (e.g., photic resetting of the human circadian pacemaker). Since 1985, Dr. Czeisler has also served as an expert witness on various legal cases related to sleep and/ or circadian rhythms, including matters related to Bombardier, Citgo, HG Energy, Michael Jackson's mother and children, Purdue Pharma, Stric Lan LLC, Valero and matters related to commercial drivers employed by Celadon, Crete Carrier Corporation, FedEx, United Parcel Service, and other commercial carriers. Dr. Hickman has served as an expert witness on cases involving commercial drivers. Dr. Kales has served as a medicolegal consultant and expert witness on cases involving commercial drivers and has consulted with Circadies. Dr. Malhotra has relinquished all outside personal income since May 2012. The other authors have indicated no financial conflicts of interest.

EXHIBIT A

**Diplomate, American Board of Internal Medicine 1992-2012**
**Diplomate, American Board of Preventive Medicine (Occupational Medicine)**
**Certified Medical Review Officer, MROCC**


Stefanos N. Kales, MD, MPH, FACP, FACOEM
Occupational Medicine Consultant
40 Avondale Road
Newton, MA 02459


Current Fee Schedule: Effective 01 January 2017 in USD

Record Review, IME time, Report and other Preparation, Teleconference and Meeting Time: $750/hour

Deposition and Video-Deposition Time: $1400/hour (2-hours minimum)

Court Appearance (local): $7500/day or any portion of day

Court Appearance (outside 60 miles): $15,000/day or any portion of day

All fees are exclusive of travel and other necessary expenses if incurred or required by the above work, and subject to change.



EXHIBIT 6
Kales
9/25/19

EXHIBIT A

**Diplomate, American Board of Internal Medicine (1992-2012)**
**Diplomate, American Board of Preventive Medicine**

Stefanos N. Kales, MD, MPH, FACP, FACOEM
Occupational Medicine Consultant
40 Avondale Road
Newton, MA 02459

**INVOICE for Expert Retainer**

BEASLEY ALLEN, c/o
Ms. Laura Reaves
Laura.Reaves@BeasleyAllen.com

February 10, 2019

**RE:   CALLIE D. ROBERTS v. AAA COOPER TRANSPORTATION INC.,
and, MARCUS J. BUSH**

7 hours x $750/hour = $ 5200.

**Total Due on receipt:**          $ 5200.

**Please remit to:**

Stefanos N. Kales, MD
Occupational Medicine Consultant
40 Avondale Road
Newton, MA 02459

Thank you in advance for your attention to this matter.

Stefanos N. Kales MD, MPH
Occupational Medicine Consultant



EXHIBIT A

**Diplomate, American Board of Internal Medicine (1992-2012)**
**Diplomate, American Board of Preventive Medicine**

Stefanos N. Kales, MD, MPH, FACP, FACOEM
Occupational Medicine Consultant
40 Avondale Road
Newton, MA 02459

## INVOICE for Expert Work- Deposition Pre-Pay

BEASLEY ALLEN, c/o
Ms. Laura Reaves
Laura.Reaves@BeasleyAllen.com

August 26, 2019

RE:  **CALLIE D. ROBERTS v. AAA COOPER TRANSPORTATION INC., and, MARCUS J. BUSH**

| | | |
|---|---|---|
| September 6, 2019 | 2.0 hours (minimum, pre-paid) | |
| Subtotal | 2.0 hours x $1400/hour = $2800 | |
| **Total Due on receipt:** | | **$ 2,800.** |

**Please remit to:**

Stefanos N. Kales, MD
Occupational Medicine Consultant
40 Avondale Road
Newton, MA 02459

Thank you in advance for your attention to this matter.

Stefanos N. Kales MD, MPH
Occupational Medicine Consultant

## EXHIBIT A

**Diplomate, American Board of Internal Medicine (1992-2012)**
**Diplomate, American Board of Preventive Medicine**

Stefanos N. Kales, MD, MPH, FACP, FACOEM
Occupational Medicine Consultant
40 Avondale Road
Newton, MA 02459

**INVOICE for Expert Work**

BEASLEY ALLEN, c/o
Ms. Laura Reaves
Laura.Reaves@BeasleyAllen.com

June 3, 2019

    **RE:**    **CALLIE D. ROBERTS v. AAA COOPER TRANSPORTATION INC.,**
             **and, MARCUS J. BUSH**

| February 2019 | 3.0 hours |
| May 2019 | 2.5 hours |
| June 1-3, 2019 | 9.25 hours |

| Subtotal | 14.75 hours x $750/hour = $ 11,062.50 |
| Minus Retainer | $ 5,200. |
| **Total Due on receipt:** | **$ 5,862.50.** |

**Please remit to:**

Stefanos N. Kales, MD
Occupational Medicine Consultant
40 Avondale Road
Newton, MA 02459

Thank you in advance for your attention to this matter.

Stefanos N. Kales MD, MPH
Occupational Medicine Consultant

**EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| **CALLIE D. ROBERTS,** | |
| **PLAINTIFF,** | **CIVIL ACTION FILE NO.** |
| | **2:17-cv-00232-RWS** |
| **v.** | |
| **AAA COOPER TRANSPORTATION, INC., and MARCUS J. BUSH, Individually and Jointly,** | |
| **DEFENDANTS.** | |

## NOTICE OF INTENT TO SERVE SUBPOENA

I HEREBY CERTIFY to the Clerk of Court that on this day I have filed the foregoing *Notice of Intent to Serve Subpoena* with the Clerk and that I have served a true copy of the following:

- Non-Party Request for Production of Documents and Subpoena to A. Frank Adams, III, Ph.D. – Adams Economic Consulting, LLC, Mike McCord, MS, CRC, CCM, CLCP, D/ABVE, and Stefanos Nikolaos Kales, MD, MPH, FACP, FACOEM

in the U.S. Mail, proper postage prepaid, addressed to counsel of record as follows:



EXHIBIT 8
Kales
9/25/19

## EXHIBIT A

Charles D. Graham, Esq.
The Graham Law Firm
191 Roswell Street, Suite 200
Marietta, Georgia 30060

E. Brian Watkins, Esq.
191 Roswell Street, Suite 200
Marietta, Georgia 30060

Christopher D. Glover, Esq.
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
4200 Northside Parkway, NW
Building One, Suite 100
Atlanta, Georgia 30327

Respectfully submitted this <u>4th</u> day of June, 2019.

**HALL BOOTH SMITH, P.C.**

*/s/ Sean B. Cox*
SCOTT H. MOULTON
Georgia State Bar No. 974237
SEAN B. COX
Georgia State Bar No. 664108
*Counsel for Defendants*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, Georgia 30303
Tel: 404-954-5000
Fax: 404-954-5020
smoulton@hallboothsmith.com
scox@hallboothsmith.com

2

**EXHIBIT A**



Deposition of:

**Marcus J. Bush**

*April 23, 2019*

In the Matter of:

**Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al**

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696



**EXHIBIT A**

Page 1

1               THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF GEORGIA
2                      GAINESVILLE DIVISION
3
    CALLIE D. ROBERTS,            )
4                                 )
              Plaintiff,          )
5                                 )   CIVIL ACTION FILE
         vs.                      )
6                                 )   NO. 2:17-CV-00232-RWS
    AAA COOPER                    )
7   TRANSPORTATION, INC.;         )
    and MARCUS J. BUSH,           )
8   Individually and             )
    Jointly,                     )
9                                 )
              Defendants.         )
10  _____)
11
12
13            VIDEOTAPED DEPOSITION OF
14                MARCUS J. BUSH
15
16              April 23, 2019
              12:59 p.m. - 5:29 p.m.
17
18
              4 George C. Wilson Court
19                Augusta, Georgia
20
21        Rhonda L. Burback, RPR, CCR, CRR
22
23
24
25

**EXHIBIT A**

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 2

1   APPEARANCES OF COUNSEL
2
    On behalf of the Plaintiff:
3
    CHRISTOPHER D. GLOVER, Esq.
4   Beasley, Allen, Crow, Methvin,
    Portis & Miles, P.C.
5   4200 Northside Parkway NW
    Building 1, Suite 100
6   Atlanta, Georgia 30327
    404.751.1162
7   chris.glover@beasleyallen.com
8   CHARLES D. GRAHAM, Esq.
    The Graham Law Firm
9   191 Roswell Street
    Suite 200
10  Marietta, Georgia 30060
    404.526.9955
11  charles.graham@grahamlawga.com
12  E. BRIAN WATKINS, Esq.
    945 East Paces Ferry Road
13  Suite 2600
    Atlanta, Georgia 30326
14  404.355.3620
    brian@ebrianwatkinslaw.com
15
    On behalf of the Defendants:
16
    SEAN B. COX, Esq.
17  Hall, Booth & Smith, P.C.
    191 Peachtree Street NE
18  Suite 2900
    Atlanta, Georgia 30303
19  404.954.5000
    scox@hallboothsmith.com
20
21
    Also Present: Victoria Tam, Videographer
22          Take-One Productions
23
24
25

Page 3

1         INDEX TO EXAMINATIONS
2   Examination                          Page
3   Cross-Examination By Mr. Glover        6
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1         INDEX TO EXHIBITS
2
    Plaintiff's
3   Exhibit      Description          Page
4
    Exhibit 1   Photograph           113
5
    Exhibit 2   Logbooks             124
6
    Exhibit 3   Text Records         143
7
    Exhibit 4   AAA Cooper Records       151
8
    Exhibit 5   Driver File          155
9
    Exhibit 6A  Training Records         160
10
    Exhibit 6B  Phone Records            169
11
12
13
14
15
16
17
18  (Original Exhibits 1 through 6B have been
    attached to the original transcript.)
19
20
21
22
23
24
25

Page 5

1              P R O C E E D I N G S
2         THE VIDEOGRAPHER:  We are on the
3   record at 12:59.  Today's date is
4   April 23rd, 2019.  This is the beginning of
5   disk number 1 in the deposition of Marcus
6   Bush in the matter of Callie Roberts versus
7   AAA Cooper Transportation, Inc., et al,
8   filed in the U.S. District Court Northern
9   Division of Georgia Gainesville Division;
10  Case 2:17-CV-00232-RWS.
11        This deposition is being held at 4
12  George C. Wilson Court, Augusta, Georgia.
13  My name is Victoria Tam, and I'm the
14  videographer.  The court reporter is Rhonda
15  Burback.
16        Counsel, please state your appearance
17  including who you represent beginning with
18  the plaintiff's counsel.
19        MR. GLOVER:  Chris Glover here for
20  Callie Roberts.
21        MR. WATKINS:  E. Brian Watkins here
22  also for the plaintiff.
23        MR. GRAHAM:  Charles Graham for the
24  plaintiff, Callie Roberts.
25        MR. COX:  Sean Cox for Mr. Bush and

2 (Pages 2 - 5)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 6

1  AAA Transportation.
2       THE VIDEOGRAPHER: Will the court
3  reporter please swear in the witness.
4           MARCUS J. BUSH,
5  having been first duly sworn, was examined and
6  testified as follows:
7           CROSS-EXAMINATION
8  BY MR. GLOVER:
9  Q.  Sir, my name is Chris Glover. I represent
10 Callie Roberts in this matter. I would ask if you
11 please could -- could give us your full name.
12 A.  Marcus Jon Suelo Bush.
13 Q.  Mr. Bush, are where you from?
14 A.  North Augusta, South Carolina.
15 Q.  And how long have you lived in North
16 Augusta?
17 A.  I moved there from a small town called
18 Johnston, South Carolina when I was 5 years old.
19 Graduated from North Augusta in '92. Attended
20 Charleston Southern University -- North Greenville
21 University, Charleston Southern University. Came
22 back and graduated from Augusta Tech.
23 Q.  And I -- I'm going to get into that a
24 little bit -- detail later.
25      Give me your -- you say you were in

Page 7

1  Augusta?
2  A.  Excuse me, North Augusta.
3  Q.  North Augusta, Georgia --
4  A.  South Carolina.
5  Q.  -- I mean, excuse me, South Carolina?
6  A.  Yes, sir.
7  Q.  Have you ever lived in the state of
8  Georgia?
9  A  Yeah. I -- in '95, I came over here
10 because I was taking my CDL test. And a lady I was
11 seeing had a residence, and it was easier to do my
12 testing that way.
13 Q.  Okay. Did you originally get your CDL
14 license in the state of Georgia?
15 A.  It was kind of confusing. I was working
16 in Georgia, going to school when I was living in
17 South Carolina. I can't remember how it went down --
18 I got my first permit in South Carolina.
19 Q.  CDL permit?
20 A.  Yes.
21 Q.  Did you go to school --
22 A.  Yes.
23 Q.  -- in Georgia?
24 A.  Yes.
25 Q.  And did you -- where did you sit and take

Page 8

1  the -- your CDL test?
2  A.  Georgia.
3  Q.  Georgia?
4  A.  The final one. I took the first permit in
5  South Carolina.
6  Q.  Okay. So you -- is it accurate that you
7  took a C -- a written CDL test in Georgia and South
8  Carolina?
9  A.  No.
10 Q.  Okay. Tell me, did you take a written
11 test in Georgia?
12 A.  I took what was required to get a license
13 in Georgia. I originally -- when I first started
14 driving, I just studied for the test by myself, and I
15 got it in South Carolina. Then a very good friend of
16 mine owned the school, and I went to that school in
17 Georgia.
18 Q.  Yeah.
19 A  And -- and they did a testing at the
20 school, instead of driving all the way to McCormick
21 to do the test, it's easier for me to do it in
22 Georgia.
23 Q.  Okay.
24 A.  And I was seeing a person in Georgia.
25 Q.  So South Carolina was first?

Page 9

1  A.  Yes.
2  Q.  What year was that?
3  A.  I'm not sure exactly because I was talking
4  about getting a CDL for a long time. It could be
5  anywhere from '94 to '96, somewhere in between there
6  when I first got my permit.
7  Q  Permit. What do you mean by "permit"?
8  A  Well, you get a permit first, then you can
9  drive with someone, and then you take the road test.
10 Q.  How long did you operate with a permit?
11 A.  I never operated with a permit. I just
12 had a permit.
13 Q.  Okay. And you say you studied the
14 materials in South Carolina on your own before you
15 went to school?
16 A.  Yeah. I just wanted to be educated.
17 Q.  And what do you recall, what did you
18 study?
19 A.  Safety.
20 Q  I mean, what -- do you recall the
21 materials that you studied?
22 A.  South Carolina Department of Motor
23 Vehicles Handbook.
24 Q.  The CDL manual?
25 A.  Yes, sir.

3 (Pages 6 - 9)

**EXHIBIT A**

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 10

1    Q.   And that's the one put out by the state of
2 South Carolina?
3    A.   I'm assuming it is.  It's at the
4 Department.
5    Q.   And then you -- at some point you go to
6 Georgia, and you take -- and you take a class or you
7 go to school, correct?
8    A.   I go to school, yes.
9    Q.   Do you remember the name of the school
10 that you went to?
11   A.   CDT.  CD -- Commercial Driving Training
12 School.
13   Q.   Is that in Augusta?
14   A.   Yes, it is.
15   Q.   And do you recall what year that you
16 attended CDT?
17   A.   '96.
18   Q.   Did you sit for the CDL test in Georgia
19 and take the test?
20   A.   Yes, I took -- I took the test.
21   Q.   Did you study for that test?
22   A.   Yes.
23   Q.   Did you also study the CDL manual for that
24 test?
25   A.   Yes.

Page 11

1    Q.   And that was the one put out by the state
2 of Georgia?
3    A.   Yes.  It required by class.
4    Q.   How old are you, sir?
5    A.   46.
6    Q.   And what's your date of birth?
7    A.   4-7-73.
8    Q.   Are you married?
9    A.   No.
10   Q.   Have you ever been married?
11   A.   Yes.
12   Q.   How many times?
13   A.   Once.
14   Q.   And what was your former spouse's name?
15   A.   Jerrilyn Gray.  That was in Texas.
16   Q.   Did you ever live in Texas?
17   A.   Yes.
18   Q.   Okay.  I want to make sure I understand
19 your residences.
20       So you were -- where were you born?
21   A.   Edgefield County Hospital.
22   Q.   In where -- in -- where?
23   A.   South Carolina.
24   Q.   South Carolina.
25       And did you ever live outside of the state

Page 12

1 of South Carolina during your youth before you turned
2 18?
3    A.   No.
4    Q.   Okay.  So after 18, talk to me about where
5 all you lived as an adult.
6    A.   I lived in Tigerville, South Carolina.
7 And North Greenville Junior College.
8    Q.   Okay.
9    A.   My first year in college.
10   Q.   What year was that?
11   A.   1992. '93.
12   Q.   All right.
13   A.   And then I transferred to Charleston
14 Southern University.
15   Q.   All right.  What year was that?
16   A.   Following year.
17   Q.   '93/'94?
18   A.   Yes, sir.
19   Q.   All right.  What was your studies at
20 Charleston?
21   A.   CRV, Christian Related Vocational.
22       COURT REPORTER:  I'm sorry, what?
23       THE WITNESS:  Christian Related
24 Vocational.
25   Q.   (By Mr. Glover)  All right.  And then were

Page 13

1 you there -- did you obtain a degree?
2    A.   No. I got a degree back home at Augusta.
3    Q.   All right.  After '94, where did you go?
4    A.   Augusta Tech.
5    Q.   Augusta Tech?  And what was your studies
6 at Augusta Tech?
7    A.   Printing graphics.
8    Q.   Did you get a degree in printing graphics?
9    A.   I got an associate's thing after that in
10 printing graphics.
11   Q.   All right.  And would that have been,
12 like, '94/'95?
13   A.   Yeah. I think, yeah.  Well, it may -- it
14 may -- yeah.  Somewhere -- in between '96.  Because I
15 was going to school and working.  I didn't like what
16 I was doing.  So I started going to truck driving
17 school at nighttime -- in the morning, yeah.
18   Q.   All right.  And tell us what you do after
19 Augusta Tech?
20   A.   I worked for a job I had all through high
21 school in college.  It's a printing place, and I
22 worked there from the time I was in the eleventh
23 grade until, like, third year in college.  And then I
24 -- was up to a management at Thermal Ceramics, so --
25 'cause I -- 'cause I had a degree, they was going to

Veritext Legal Solutions

800.808.4958                                      770.343.9696

EXHIBIT A

Marcus J. Bush                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 14

1  move me up to management quickly. And I went there
2  for a year, and I didn't like it.
3      Q.  Okay. What year was that when you were
4  manager at Thermal Ceramics?
5      A.  I was training for manager. 95/'96. It
6  was during the process of driving a truck.
7      Q.  All right. And then what did you do after
8  Thermal Ceramics?
9      A.  I started driving a truck. I went to
10  school -- I went to class from 8:00 to 4:00, worked
11  from 4:30 to 12:00 every day until I finished school.
12      Q.  Is that when you went to --
13      A.  Driving school.
14      Q.  -- the school in Georgia?
15      A.  Right.
16      Q.  All right. Did you ever live in Georgia
17  during this timeframe?
18      A.  I had a lady friend that had a residence
19  here, and it was easier for me to -- well, I lived
20  there because I was driving a truck and I was living
21  there. I was coming through there.
22      Q.  All right. After you go to trucking
23  school, do you continue to -- where do you live,
24  then, after that?
25      A.  My residence was Georgia, but I was

Page 15

1  driving a truck all -- all over the country.
2      Q.  All right. And what was that timeframe
3  and who did you work for?
4      A.  My first job was -- I mean, KLLM in
5  Jackson, Mississippi.
6      Q.  And did you -- was your residence South
7  Carolina during that time?
8      A.  It -- I think -- did me and her split up
9  or something -- was I still at the house? I think I
10  moved -- I think I moved my residence back over to
11  South Carolina at some point between '98 back then
12  because I never had a high phone bill and my mom
13  wouldn't kill me.
14      Q.  What do you mean you moved back to South
15  Carolina? Did you live somewhere else in Georgia?
16      A.  I left home at 13 -- 15 years old, so I
17  was living house to house and people from my church
18  and my community. I was very blessed that they took
19  care of me. And I was able to go to college and
20  graduate and do things. So I never really had a
21  residence, so I -- so I never really pictured being
22  anywhere, so.
23      Q.  All right. So you were at KLLM, Jackson,
24  Mississippi --
25      A.  Yeah, I was --

Page 16

1      Q.  -- Trucking, but you lived -- you -- your
2  mom's --
3      A.  I was -- my mail was getting sent back to
4  South Carolina.
5      Q.  Okay.
6      A.  I never -- I didn't live in -- I was just
7  driving, enjoying life. Then I was -- I was a
8  trainer there.
9      Q.  Okay. And then what -- what happened
10  after that, where did you work?
11      A.  I was a driver/trainer there. I came to
12  Atlanta, Georgia, and I started working for J.B.
13  Hunt, and I was doing Walmart.
14      Q.  Did you live in Atlanta?
15      A.  Yeah, I got a residence in Atlanta and
16  drove Morrow -- Morrow, Georgia.
17      Q.  Do you recall what year that was?
18      A.  I was with KLLM two years, almost exactly,
19  because I went up two years to get experience so I
20  could be able to get a job anywhere I wanted.
21      Q.  So you were K -- KLLM at '96/'98?
22      A.  Yeah, I think that's correct. Well, I --
23      Q.  Approximately.
24      A.  Approximately.
25      Q.  All right. And then you went to J.B.

Page 17

1  Hunt, what, '98?
2      A.  Yeah, I worked there for, I don't -- I
3  don't think quite a year because Saia called me --
4  well, everybody called me, not just Saia.
5          COURT REPORTER:  I'm sorry, who?
6      Q.  (By Mr. Glover)  Siger?
7      A.  Saia Truck company, S-a-i-a. Worked for
8  them in Atlanta for a month, and then they got
9  transferred to Augusta and worked for them a couple
10  of months. Then they laid me off for one day, I
11  transferred to Austin, Texas.
12      Q.  Okay. All right. And then what happened
13  at -- from Austin, where did you go?
14      A.  I went -- I went to -- did I come back
15  here? Oh, went to -- went to Austin, and then Austin
16  was great, and I worked there, I can't remember how
17  many -- how long. Maybe two years. Then I bought my
18  own truck and drove for Greatwide for eight years.
19      Q.  Great White?
20      A.  Greatwide for eight years.
21      Q.  Okay. And then what happened after
22  Great -- where did you live while you worked at
23  Greatwide?
24      A.  Pflugerville, Texas.
25      Q.  That was in Texas, also?

5 (Pages 14 - 17)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 18

1    A.  Yeah, for 12 years.
2    Q.  All right.  Then what after Greatwide?
3    A.  After my wife got my money, I came back to
4  South Carolina.
5    Q.  When you say your wife got your money,
6  what do you mean?
7    A.  Well, I mean, I was making a couple
8  hundred thousand dollars a year, and I was -- she was
9  pretty, and she spend and gave up her job, and at
10  that time I was paying $2,000 a month bills, so I
11  just couldn't take it anymore.
12       My truck caught on fire April 5th in west
13  Texas, and I just -- it was too -- too much.  Driving
14  was too much for me to handle.  And she was doing
15  things while I was working, so.
16    Q.  All right.  So after Greatwide, what did
17  you do?
18    A.  Came back to South Carolina and went back
19  to Saia.
20    Q.  Okay.
21    A.  Then I left Saia and went to -- I went to
22  a chemical plant, but it was also -- I was so bored,
23  so I just quit.  I couldn't take it.  And I went --
24  then I went to Cooper.
25    Q.  Which -- was the chemical plant a

Page 19

1  commercial drive job where you drove a CDL?
2    A.  They -- actually they -- because I had a
3  CDL, and because of that, they wanted me to drive for
4  less money, and I couldn't do it.  So I was going to
5  be -- I was going to use it.
6    Q.  What was the name of that place?
7    A.  Cytec Chemical Plant.
8    Q.  Cytec?
9    A.  Yes.
10    Q.  S-c-i?
11    A.  Yeah, the name has changed now.  But it
12  was on Revco Road in North Augusta.
13    Q   What's it called now?
14    A   I can't remember.
15    Q.  And then after Cytec, what did you do?
16    A.  Then Cooper.
17    Q.  All right.  If I understand it, you've
18  worked for KLLM, J.B. Hunt, Saia, Greatwide, come
19  back to Saia, Cytec, and then AAA Cooper.
20       Have you ever driven a commercial motor
21  vehicle for any other company other than the ones I
22  just named?
23    A.  General -- general -- oh, yeah, yeah,
24  yeah, yeah, yeah, yeah, yeah.  This -- just a second.
25  It's -- at Kimberly-Clark, they did hauling --

Page 20

1  hauling -- moving trailers around.  I wasn't there
2  for very long, and then -- who called me?  I went
3  there -- it was a cheap-paying job, that's why I
4  forgot.  I put them -- I was waiting on -- oh, I
5  know, I was waiting on Cooper to do something to --
6  spot open back up or something.  Yeah.
7    Q.  Where was Kimberly-Clark located?
8    A.  In Beech Island, South Carolina.
9    Q.  And -- okay.  When you add -- we've added
10  Kimberly-Clark.  Any others?
11    A.  Yeah.  I was going to work for this
12  company, but I -- what's that -- it's -- the new
13  20 -- it's coming out about your numbers, like, for
14  warnings.  I forgot what it's called.  It's a thing
15  that -- that they started in 2000-something, that all
16  your warnings you got, it's going to count against
17  you.  Your -- I can't remember the terminology, but
18  it affects your driving record.
19    Q.  Okay.  So if you got a warning while
20  driving a commercial vehicle, then it counted against
21  your record?
22    A.  It -- it affected a certain kind of score.
23    Q.  Yeah.
24    A.  And -- and I was hired on -- I was going
25  to do some oil -- oil stuff, and -- but they were

Page 21

1  going to hire me, but my -- my -- what's it called --
2  the score I had, I had little tickets, but it
3  affected -- affected my driving.  It wasn't good,
4  'cause I got warnings for small things.
5    Q.  Okay.  And who was that with?
6    A.  I can't even -- what's the name of that
7  company?  It was -- it was during the recession where
8  they were doing crude oil.  I was supposed to get
9  crude oil and move the crude oil.
10    Q.  You were declined a job because of your
11  driving record?
12    A.  No, it's because of my -- it wasn't
13  because of my driving record.  It's because of my --
14  what was it called?  It's a score you get -- a score
15  you get for -- for any warnings against you, it
16  affects the driver.  What's it called -- the name of
17  it's called --
18    Q.  What year was that?
19    A.  Maybe '11 or '12 -- '10, '11, '12, around
20  there.
21    Q.  Was that before AAA Cooper?
22    A.  Yeah, yeah, yeah, yeah.  But I -- they
23  didn't -- didn't want to talk about.  It's called --
24  I got the name of it.  Something -- what it was
25  called.  I can't remember -- but it was a score card

6 (Pages 18 - 21)

EXHIBIT A

Marcus J. Bush                                          April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 22

1  'cause I got a lot of warnings. One ticket is
2  warnings. It affects your insurance coverage.
3       Q.  Did you have -- did you have any other
4  jobs that you applied for that you didn't get because
5  of your driver record or the warnings ratings, or
6  were the ratings based on warnings?
7       A.  No, no, no. I got -- trying to think what
8  the name of that's called. Dang. It was very
9  surprising. But then I came to South Carolina, and
10 it was zero. It was -- it was a high score, then it
11 was zero. I don't know what's wrong, but -- it's
12 called a -- a score.
13      Q.  Is it your Safe score, S-a-f-e?
14      A.  No.
15      Q.  Basic?
16      A.  No.
17      Q.  Is it your basic score?
18      A.  Something they just started. Oh, what's
19 it called? It's -- it covers -- it covers everything
20 that you ever done even if you had warnings. I got a
21 bunch of warnings.
22      Q.  So you had -- you had a high score, and
23 then you moved to South Carolina, and you were able
24 to get the job at AAA?
25      A.  No, I took six months. No, I worked for

Page 23

1  -- I worked for three or four months in a car lot.
2       Q.  Okay.
3       A.  Then it cleared -- it cleared up. You get
4  so many points back every -- so many quarters.
5       Q.  Okay. Were there any other jobs other
6  than the -- the one at the driving for the oil --
7  crude oil?
8       A.  What the heck --
9       Q.  Was that in Texas?
10      A   Yeah.
11      Q.  Okay. Any other jobs back in Texas before
12 you moved to South Carolina that you applied for that
13 you were -- weren't able to get?
14      A.  At that same score -- the same score, that
15 food company. It was -- what's the name of that
16 dadgum score? This is the first year they ever used
17 it.
18      Q.  If you learn -- if you think about it
19 later, let us know. We'll move on.
20          Is it -- you said there was a food company
21 that you --
22      A.  It's Sys --
23      Q.  Who is they?
24      A.  Oh, no, no, no, no, no, no.
25      Q.  Sysco?

Page 24

1       A.  They didn't -- no, they didn't hire me
2  because I didn't have a lot of hand truck experience.
3       Q.  Okay. They -- your -- had nothing to do
4  with your record?
5       A.  Ung-ugh.
6       Q.  What was the name of that company?
7       A.  Sytco.
8       Q.  Sysco?
9       A.  Sysco, yeah.
10      Q.  Sysco Foods?
11      A.  Yeah.
12      Q.  And that was in, where, Texas, Austin?
13      A.  Yeah.
14      Q.  Any other jobs that you applied for that
15 you didn't get before AAA Cooper as a commercial
16 truck driver?
17      A.  Oh, I worked for this part time for a
18 movie company to make ends meet when I first got
19 married. But I worked there, but I quit. Is it
20 something else? Oh, I did -- oh, I drove for this --
21 for a little short period of time in Texas, a rich
22 part of Texas where you had to get water delivered.
23 It wasn't even a commercial vehicle, it was like a
24 freight truck, but it was -- but I drove. And the
25 guy was bad. I didn't want to deal with him. I

Page 25

1  mean, he didn't like me. I delivered water to
2  residents in the -- in the -- Sonny Booth, her house,
3  her friends' house. A lot of celebrities lived down
4  there, and they bring their own water in.
5       Q.  Have you ever been declined a job because
6  of your driving record other than the oil company?
7       A.  When I was driving for American Freight in
8  South Carolina, I got a ticket for careless driving.
9  In South Carolina, careless driving, a slap on the
10 wrist. In Georgia, it's a punch in the face.
11         So they didn't -- they couldn't hire me
12 because of the way I looked, but J.B. Hunt did it the
13 right way.
14      Q.  When was American Freight?
15      A.  It was when I moved -- when I came home
16 from AAA Cooper -- I mean, KLLM. I moved to Atlanta
17 and I applied for several jobs, and I -- everybody
18 hired me until that one thing was -- careless driving
19 in South Carolina, it's a slap on the wrist.
20 Careless driving in Georgia is a bad thing. But I
21 got a careless driving in South Carolina ticket, but
22 it looked bad on Georgia.
23      Q.  What year was the careless driving ticket?
24      A.  It's before -- before I started driving a
25 truck.

7 (Pages 22 - 25)

EXHIBIT A

Marcus J. Bush                                      April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 26

1   Q.   So any other jobs besides American Freight
2   and the oil company that you were declined because of
3   the driving record?
4       A.   Well, I would say that they just -- the
5   guy didn't put the effort to see a difference in the
6   state, but J.B. Hunt did.
7       Q.   Okay.  Any other jobs that you've been
8   declined because of driving?
9       A.   I never been -- I was hired one place,
10  American Freight and --
11      Q.   The oil company?
12      A.   Yeah, because of that -- I can't think of
13  what that stupid score is called.
14      Q.   What was the -- okay.  Let me ask you a
15  different question.
16          Have you ever been let go of a job that
17  you had because of driving records or the score that
18  you've been talking about?
19      A.   Oh.  I worked at -- I worked at Saia in
20  Texas, I ran downtown Austin, and they didn't -- they
21  didn't let me go.  I just decided to buy my own truck
22  because I -- this one place downtown, I kept scraping
23  my mirror.  I scraped my mirror twice.  And my
24  supervisor at that time was a straight-by-the-book
25  guy, and I said I'm sick of it.  So just scraping

Page 27

1   everything -- incident get reported.  I reported it
2   honestly, and it was two incidents.  And I was going
3   to go to this class thing.  I just bought my own
4   truck.
5       Q.   So they were going to go make you go take
6   a class on the scrape -- when you scraped the mirror?
7       A.   I did it twice, and I was just -- I was
8   working downtown Austin.  I'm from a small town, it
9   was just a brand new truck.  Like, the old truck
10  would've been fine.  It was just too much of a pain
11  in the butt.
12      Q.   And you left that job because of those two
13  window -- the incidents related --
14      A.   I was running downtown Austin.  I'm from
15  -- I'm from South Carolina.  Austin is a big city,
16  and it was just difficult.  It was stress things.  I
17  went back to Saia how many years later?
18      Q.   So any other jobs besides the Saia job
19  that you left or was let go because of a driving
20  related incident, scores or your driving record?
21      A.   I don't think there's any other things.  I
22  don't think -- trying to think if I had anything
23  else, if I worked for anybody else.
24      Q.   The moving company or where you delivered
25  water, any of those have anything to do with

Page 28

1   incidents?
2       A.   No, that guy was an idiot.  We just didn't
3   get along.
4       Q.   Which guy?
5       A.   The guy with the -- with the --
6       Q.   The water?
7       A.   Yeah.  Because I --
8       Q.   What was the nature of the conflict
9   between you and him?
10      A.   Because I learn from everybody I talk to,
11  and I made some suggestions about things, and he --
12  the person that day he was working with was a person
13  he met in rehab that couldn't drive, that -- and
14  limited resources.  And I had -- I was just making
15  comments about doing something, and he felt like I
16  was going to come in his territory and demand.  But
17  that wasn't what I wanted to do.
18      Q.   Do you have any family in the state of
19  Georgia?
20      A.   Did I -- let me see.  Trying to think.
21  Stepsister.
22      Q.   Where does she live?
23      A.   Somewhere -- right here in Hephzibah, I
24  think.
25      Q.   In the Augusta area?

Page 29

1       A.   Uh-hum.
2       Q.   All right.  Anybody else other than --
3   what's her name?
4       A.   My dad's ex-wife's daughter.  Brain fart.
5   Childs.
6       Q.   Her last name is Childs?
7       A.   Childs, yes.
8       Q.   Anybody other than Ms. Child's?
9       A.   My -- I have a legitimate son that -- he's
10  not -- he -- long story.  I didn't sign the birth
11  certificate, but mine when I was 27.  He lives in
12  Atlanta.
13      Q.   He lives in Atlanta area?
14      A.   Now he does.
15      Q.   How old is he now?
16      A.   26.
17      Q.   So he's an adult?
18      A.   Yeah.
19      Q.   And what is his name?
20      A.   Kalon Brown.
21      Q.   Kalon brown?
22      A.   (Nodding head.)
23      Q.   Okay.  And what's his mother's name?
24      A.   Larissa Brown.  Unless he got married, I
25  can't remember what the boy's name is now.

8 (Pages 26 - 29)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 30

1     Q.   Anybody other than in the Atlanta area
2  other than those two individuals?
3     A.   Not that I think I can recall. I may --
4  oh, I think I have a -- my cousin just graduated law
5  school. And he wanted to go to Atlanta. I don't
6  know if he go yet, but he was talking about going to
7  Atlanta. He's Abney.
8         COURT REPORTER: He's what?
9         THE WITNESS: Abney. I can't
10 remember his first name. But when I talked
11 to my uncle, he's a pastor, said he wanted
12 to move to Atlanta. He's got his law
13 degree.
14    Q.   (By Mr. Glover) All right. I understand
15 you've been arrested in the past, correct?
16    A.   Yes.
17    Q.   All right. When was -- tell me each time
18 you've been arrested in your life beginning with the
19 first time moving to the last.
20    A.   My first time when I was -- high school
21 was camping. I don't remember if I got a ticket -- a
22 ticket -- oh, I was at the lake, and a buddy of mine
23 riding my motorcycle, and he rode it in Georgia
24 without a helmet and got a ticket. And it was a
25 ticket for allowing him to drive without a license

Page 31

1  because his girl wanted to ride it.
2         And a ticket for -- throw me in jail for a
3  disorderly conduct.
4     Q.   And how old were you when that happened?
5     A.   17.
6     Q.   All right. Was that the first time?
7     A.   (Nodding head.)
8     Q.   Okay. What was the next time?
9     A.   I got in a fight at a bar with ten
10 Caucasian guys. And I had to get out of the parking
11 lot, and they was -- they was jumping on me, and I
12 knocked a couple guys out, then the cops cited me and
13 took me to jail in the parking lot and arrested for
14 DUI. It was reduced. It got threw out after I got
15 to court, but I was arrested though.
16    Q.   How old were you when that happened?
17    A.   21  I was 21. After I think I did -- I
18 think I was 20 -- I turned 21.
19    Q.   And do you recall about what year that
20 was? That would have been 26 years ago if you're 46.
21    A.   Yeah. I guess.
22    Q.   So after you got in the fight in the bar,
23 what was the next?
24    A.   Myrtle Beach, spring break. Spring break,
25 running nude across beach. A couple of -- a couple

Page 32

1  of -- just getting wild for spring break kind of
2  stuff.
3     Q.   All right. About how old were you when
4  that happened?
5     A.   Early 20s.
6     Q.   Do you know what year that was?
7     A.   In '96, I got arrested in Myrtle -- in
8  Daytona Beach for running down the beach -- the
9  street naked.
10    Q.   Okay. That was '96.
11    A.   Yeah.
12    Q.   All right. What was the next time?
13    A.   Oh, a guy pushed me, and I knocked him out
14 one time in Texas in 2000 -- I don't know what year
15 it was.
16    Q.   Do you recall early 2000?
17    A.   After my divorce, so it was probably '10
18 maybe.
19    Q.   2010?
20    A.   Yeah, maybe.
21    Q.   Okay. All right. Anything after that?
22    A.   Then I got -- 2012, got pulled over for
23 driving under influence in Augusta.
24    Q.   You got charged with DUI in 2012?
25    A.   No, I got charged with reckless driving.

Page 33

1     Q.   You got -- what did you get arrested for?
2     A.   Driving under the influence.
3     Q.   And you were -- were you ultimately
4  convicted of reckless driving?
5     A.   Reckless -- it was reckless driving. I
6  didn't know I was that bad.
7     Q.   You say that was in 2012?
8     A.   I'm thinking it was '12.
9     Q.   Was the arrest in 2012 or the conviction,
10 or both?
11    A.   The conviction wasn't -- it went out for
12 some years.
13    Q.   It went on for several years?
14    A.   Yeah.
15    Q.   All right. After the DUI, when was the
16 next time you were arrested? Did you -- oh, let me
17 ask you real quick, did you have an attorney for
18 that?
19    A.   Yes.
20    Q.   And you say that was in Texas?
21    A.   No.
22    Q.   Where was that?
23    A.   Here. In Texas I got arrested for
24 punching somebody, knocking a guy out.
25    Q.   By "here," you mean Augusta, Georgia?

9 (Pages 30 - 33)

EXHIBIT A

Marcus J. Bush                                     April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 34

1    A.   Yeah, it was Augusta. Yeah.
2    Q.   All right. After the Augusta, Georgia DUI
3    being in 2012, when was the next time you were
4    arrested?
5    A.   Excuse me. Oh, I cursed a girl out by
6    text message, and I got arrested for unlawful
7    communication. Don't curse in text messages. You'll
8    go to jail.
9    Q.   All right. So unlawful text message.
10   A.   Unlawful use of the phone -- unlawful
11   communication.
12   Q.   Communication.
13   A.   If you curse somebody out in a text
14   message, you will go to jail.
15   Q.   All right. And what year was that?
16   A.   It was right at the exact time of this
17   accident about. It wasn't far -- it wasn't apart.
18   Q.   So 2015?
19   A.   Yeah, that's when my life was crazy.
20   Q    All right. What was next?
21   A.   What did I do this time? I got something
22   before that. I think -- did I say '12 in Georgia for
23   the DUI?
24   Q.   Yeah, you said the 2012 in Augusta,
25   Georgia.

Page 35

1    A.   Yeah, yeah, yeah. Unlawful communication.
2    Oh, I got pulled over for -- I was in my -- in my
3    driveway and got pulled over for supposedly busted
4    taillight, and I had an open container of margarita.
5    And the cop took me to jail for open container. And
6    it was thrown out because -- the judge even said
7    don't even know why he did it, but he was just kind
8    of hitting at me, I guess.
9    Q.   What year was that?
10   A.   That was last year. It wasn't that long
11   ago.
12   Q.   2018?
13   A.   Yeah, yeah, yeah, for open container.
14   Q.   All right.
15   A.   In my driveway.
16   Q.   Anything else?
17   A.   I don't think so. I don't think I -- not
18   that I can think of at the moment.
19   Q.   All right. Let's go back on these. The
20   disorderly conduct. Were you -- did you plead or
21   were you convicted of anything on that offense?
22   A.   Disorderly conduct?
23   Q.   The one when you were 17.
24   A.   Oh, I got community service and stuff
25   where that happened to be --

Page 36

1    Q.   So you pled --
2    A    Yeah, yeah.
3    Q    -- and were sentenced to community
4    service?
5    A.   Yeah, yeah, yeah, community service.
6    Q.   All right. The fight in the bar, you were
7    sitting in a bar -- or you got in a fight in a bar
8    when you were around 20 years old?
9    A.   I got in a fight in the parking lot.
10   Q.   Okay. Fight in a parking lot around
11   20 years old. Were you convicted or did you plea
12   anything on that offense?
13   A.   I got it reduced. It got thrown -- that
14   same judge that gave me that warning, that ticket for
15   when I was 20, he represented me and threw that whole
16   -- it wasn't seen on my record. He got it thrown out
17   because knew I messed up.
18   Q.   How about the Myrtle Beach incident in
19   '96, did you have any conviction or plead for that?
20   A.   Oh, they just -- I gave 50 bucks, and it
21   was cool. The judge was cool. And I don't know if
22   the record's out, but he had a bunch of us in a -- in
23   a corner thing.
24   Q.   Do you know if you pled guilty to that?
25   A.   I gave 50 bucks, and then they laughed at

Page 37

1    me, and it ended, all I remember.
2    Q.   All right. The 2010 fight in Texas, did
3    you plead or were you found guilty of anything in
4    that regard?
5    A.   I don't remember. I was fighting
6    professional boxing, and he was a friend of mine. It
7    was for a title, and I don't remember much going on
8    about that. Each -- I just -- and I meet the guy,
9    and that's it. I went to jail; they let me out the
10   next day.
11   Q.   And you never had to pay a fine or get put
12   on community service, nothing?
13   A.   No community, no nothing. No. I remember
14   everything.
15   Q.   All right. The DUI in 2012, you told us
16   that you, I think, pled to reckless driving on that
17   one?
18   A.   Yep.
19   Q.   Was there a car crash or anything involved
20   in that? What caused you to be pulled over?
21   A    Oh, just no accident, just driving -- Man,
22   I think I cruised through a stop sign or something
23   like that. I'm thinking. But it was the lowest --
24   the lowest, just barely over the limit.
25   Q.   Do you recall what you blew?

10 (Pages 34 - 37)

EXHIBIT A

Marcus J. Bush                          April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 38

1   A   Yeah, I blew. It was -- that's why it
2   didn't go because it was so, so low. Say again.
3   Q   Do you recall what you blew, the level?
4   A   Just -- a enough, for .08.
5   Q   .08?
6   A   Yeah.
7   Q   All right. Then the unlawful
8   communication in 2015, was there any kind of plead or
9   conviction with regard to that?
10   A   Man, yes. The judge -- the girl -- it's a
11   girl that I was friends with, and often around her
12   friends, and she decided to ruin my life.
13       COURT REPORTER: She decided to what?
14       THE WITNESS: She was trying to ruin
15   my life because I didn't sleep with her
16   with all her friends. And she didn't help
17   it. And she knew the -- she knew -- sh
18   knew the judge, Judge Weeks, and she walked
19   in the courtroom with undocumented
20   documents, and he allowed it.
21       I didn't know the law. I was
22   expecting it to be fair, but it wasn't
23   fair. And then he gave me -- after
24   researching the charges, he gave me double
25   the fines. And then what else? And that's

Page 39

1   it there.
2   Q   (By Mr. Glover) What was the person's
3   name that --
4   A   Jacqueline Griffin McCarthy.
5   Q   All right. And then you had an open
6   container in 2018 arrest. What was -- was there a
7   conviction or a plea in that regard?
8   A   What did they do about that? I mean, I
9   paid it. Everything I got, they reduced everything.
10   I mean -- I got it reduced. I can't
11   remember exactly, but reduced everything.
12   Q   So you paid some fine with that?
13   A   Yeah. I mean, like a hundred bucks.
14   Q   All right. You told us earlier that you
15   had -- you went to school at -- what was the first
16   college you went to? What was --
17   A   North Greenville Junior College.
18   Q   North Greenville. And then you went to
19   Charleston?
20   A   Southern.
21   Q   Southern. And then Augusta Tech, and then
22   you went to truck driving school. Any other
23   schooling that you've been to after high school
24   except for those four?
25   A   I -- I think that's about it, I think.

Page 40

1   Q   Okay. You can't remember any other
2   schooling that you've gone to?
3   A   I don't -- I don't think -- I don't think
4   there's anything else. I've taken some training
5   courses and different things, I guess, but -- at
6   different places.
7   Q   KLLM, did you leave that job because of
8   any performance-related issue or because of your
9   driving record?
10   A   They didn't let me. They wouldn't take me
11   back anymore.
12   Q   At J.B. Hunt, did you leave that job
13   because of any performance or driving record?
14   A   No. They'd take me back tomorrow.
15   Q   Saia, the first time you told us
16   the mirror scrapes, correct?
17   A   Yeah, yeah, yeah. Yep, yep, yep, yep,
18   yep. I did that wrong, but I had to go over that. I
19   didn't want to deal with it. But go ahead, I'm
20   sorry.
21   Q   Greatwide Trucking, did you leave that
22   because of performance or driving record?
23   A   They let me -- they let me know it was
24   great.
25   Q   When you went back to Saia, did you leave

Page 41

1   that because of performance or driving record?
2   A   I would say that they -- it was cut back,
3   and I was last to get hired and -- I hate to say, I
4   had some misfortunate performance when I -- when I
5   took the wrong turn to Atlanta in that -- one time.
6   It was -- numbers were -- I was dyslexic, like 1188,
7   it was 1187, and that kind of stuff. And then
8   somebody had to go -- and that was -- took the wrong
9   turn.
10       COURT REPORTER: I'm sorry?
11       THE WITNESS: I took the wrong turn
12   to Atlanta, where you hook up, and nobody
13   was there, and I took the wrong one, and
14   that -- yeah.
15   Q   (By Mr. Glover) How about the Cytec, did
16   you leave that job because of --
17   A   Oh, they -- I left there at the time, they
18   was just not right for me.
19   Q   That was not a performance or
20   driving-related issue?
21   A   No.
22   Q   Okay. AAA Cooper, you left that job at
23   the end of December of 2015, correct?
24   A   Yes.
25   Q   We'll get into it more related later. But

11 (Pages 38 - 41)

**EXHIBIT A**

Marcus J. Bush                                           April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 42

1    was it -- it all related to the incident we're here
2    about today?
3        A.   I really don't want to be near a truck, a
4    big truck. It's just uncomfortable looking at one.
5        Q.   Were you fired or terminated, or did you
6    quit?
7        A.   No, I just -- I just -- I can't be near a
8    truck. Or in a truck.
9        Q.   How about Kimberly-Clark?
10       A.   I don't want to go -- that was just an
11   in-between job. Left on good terms, I think.
12       Q.   That was nothing to do with performance or
13   driving?
14       A.   No.
15       Q.   You said you drove for a movie company and
16   delivered water. Anything to do with performance or
17   driving in either of those jobs?
18       A.   No, that guy is -- we had -- he didn't
19   like me, and I can't...
20       Q.   Who is Health Master Home Health Care.
21       A.   Oh, that was a job -- it was a printing
22   place. It was Health Master Home Health Care, but I
23   worked for the printing department for them. That's
24   the same thing -- I worked there from the time I was
25   in high school all the way through school.

Page 43

1        Q.   November 17th, 1990, did you get a
2    violation for speeding in South Carolina?
3        A.   I got some speeding -- I don't know. I
4    got --
5        MR. COX:   Did you say 1990?
6        MR. GLOVER:   Correct.
7        MR. COX:   You can answer it, if you
8    can.
9        THE WITNESS:   1990, oh, yeah, yeah,
10   yeah. It was same -- 280 ZX? Yeah.
11       Q.   (By Mr. Glover)   Then in May 30th, 1992,
12   do you recall if you got a speeding ticket in South
13   Carolina?
14       A.   '92?
15       Q.   Correct.
16       A.   I was still in high school. I can't
17   remember.
18       Q.   Okay.
19       A.   Oh, that was in Myrtle Beach.
20       Q.   Okay.
21       A.   That's the one in Myrtle Beach. Sorry.
22   Sorry about that.
23       Q.   Then later that year, November 13th, '92,
24   speeding ticket?
25       A.   I don't remember exactly every ticket,

Page 44

1    Man, but it's a possibility.
2        Q.   Okay. How about in October 8th of '94, an
3    accident when you were charged with careless and
4    negligent driving in South Carolina. Do you recall
5    that incident?
6        A.   Oh, Man. That was at -- that was --
7    pulled out at Bi-Lo. Yeah, I remember that, yeah.
8    That was the one that affected my -- affected my
9    ticket I told you about, affected my job at American
10   Freight with FedEx, because of -- it was careless
11   driving. It was careless driving, yeah.
12       Q.   Is FedEx and American Freight the same
13   thing?
14       A.   Yeah. Uh-hum.
15       Q.   All right. And that was -- you got a
16   conviction of careless driving on that one?
17       A.   Is that what you said?
18       Q.   Correct.
19       A.   Yeah, yeah.
20       Q.   All right. Then you go to work with
21   Thermal Ceramics in between June of' 96 and June of
22   '97, correct?
23       A.   Yeah.
24       Q.   And November 11th of '96, you have another
25   accident, and you were convicted of careless and

Page 45

1    negligent driving in South Carolina; do you recall
2    that?
3        A.   I don't remember, but what -- they gave me
4    careless driving in South Carolina, it's like the
5    lowest of the lowest. Somebody I knew there gave me
6    a break. But in Georgia, it's bad. You can look it
7    up on the -- the driving DMV thing, it's kind of
8    crazy.
9        Q.   On January 6th, '98, you were involved in
10   a preventible accident at KLLM making a right turn
11   and tire went in the grass?
12       A.   Oh.
13       Q.   Tell me about that.
14       A.   Exactly what it says. The -- jumped the
15   curb, and made an indention in the grass. Yep.
16       Q.   Is that in addition to the two mirror
17   scrape events you talked about?
18       A.   That wasn't with -- that was different
19   companies.
20       Q.   Okay. All right. That was different
21   companies.
22            All right. The --
23       A.   And that wasn't -- it wasn't any
24   charged -- they didn't charge me. That accident cost
25   me a lot of money, but it ended up getting -- turning

12 (Pages 42 - 45)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 46

1   my record -- if you -- I remember now. If you read
2   the whole thing, it explains in there that the guy
3   eventually let it go. Because sometimes -- so many
4   jobs, they did not read the whole entire sentence,
5   for some reason. And then when they read the
6   sentence, they started -- the guy -- the guy said it
7   was okay. I remember that.
8       Q.   Did you go -- undergo any additional
9   training or --
10      A.   I was -- -
11      Q.   -- written up or anything like that at
12  KLLM?
13      A.   I was a trainer then because I was one of
14  the top trainers there. I received every award that
15  they -- ever was awarded in training and as a driver
16  at KLLM.
17      Q.   What happened to you when you got that
18  preventible accident at KLLM?
19      A.   Oh, nothing, because the guy -- the guy --
20  the person that wrote it up wrote it up wrong. They
21  didn't -- I'll never forget this, that they didn't
22  write -- they wrote up the first part, then went
23  back, ended up saying that the guy said it was okay,
24  need to let it go, and that was it.
25      Q.   Do you dispute that it was preventible?

Page 47

1       A.   Everything's preventible. I was driving
2   for six months, and I run up on a curb. And the guy
3   was upset for a minute, and then he -- and he said in
4   the statement, because I remember -- I remember
5   literally a $2,000 bonus on that, and somebody read
6   the rest of the whole sentence.
7       Q.   Then you go to J.B. Hunt in January of
8   2000, correct?
9       A.   Yeah.
10      Q.   Did you have any kind of incidents at J.B.
11  Hunt?
12      A.   I don't remember it much. I mean, it was
13  -- I don't remember. I don't think I did, but who
14  knows? I don't know. I was running -- now, J.B.
15  Hunt, that deal was not very cool because we were
16  working our butts off. But I don't remember having
17  anything. I don't think I did. I don't think I did.
18      Q.   Were you accurate when you applied for
19  J.B. Hunt with regard to your prior driving record?
20      A.   Yes, because he was the first person that
21  -- that -- that looked at the careless driving in two
22  different states.
23      Q.   And what did -- what did he have to say
24  about it?
25      A    He said he looked at it real hard, you're

Page 48

1   okay.
2       Q.   Then you go to Howell's Motor Freight.
3       A.   Oh, yeah, yeah, yeah, they're cool. I
4   like that.
5       Q.   All right. That was in -- in February of
6   2000, right?
7       A.   Yeah. Yeah.
8       Q.   All right. What happened at Howell's
9   Motor Freight?
10      A.   That was when Saia called.
11      Q.   All right. Did you get let go of Howell's
12  Motor Freight?
13      A.   No, they were great people. I wish I'd
14  stayed with them.
15      Q.   Have any incidents?
16      A.   No. Never.
17      Q.   Then you go to Saia, correct, in March of
18  2000 -- March 14th, 2000?
19      A.   I don't know exact dates, but I'm sure you
20  have everything -- anything you need to know, you
21  just tell me what.
22      Q.   In April of 2004, you got failure to obey
23  a traffic control device in Austin, Texas; do you
24  recall that?
25      A.   I got a bunch of -- bunch of tons of

Page 49

1   warnings.
2       Q.   Okay.
3       A.   I got -- in that -- what's the name of
4   that -- that score thing? That affects your -- I
5   would think -- it started a new thing, it affects
6   your driving record as far as the company hiring you.
7            MR. COX:  We'll figure it out. For
8   now just focus on his questions.
9            THE WITNESS:  Well, I am focusing on
10  the questions. He's saying -- it affected
11  my license.
12           MR. COX:  I understand.
13      Q.   (By Mr. Glover) Did you get where you
14  convicted or plead in any way with regard to the
15  failure to obey the traffic control device on
16  May 27th, 2004 in Austin, Texas?
17      A.   What was that -- what was I driving, was
18  it my car?
19           COURT REPORTER:  Was it what?
20           THE WITNESS:  I don't...
21      Q    (By Mr. Glover) Do you recall what kind
22  of vehicle you were driving?
23      A.   I can't remember. I mean, I can't
24  remember that. It's so long ago.
25      Q.   Greatwide Dedicated Transport was next at

13 (Pages 46 - 49)

**EXHIBIT A**

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 50

1  June 2004, correct, and you worked there till April
2  of 2011?
3      A.   Yeah.
4      Q.   July of 2000 -- 28, 2004, did you get a
5  speeding ticket in Texas, 10 miles per hour or less
6  over the speed limit?
7      A.   Was it in Mission, Texas, McAllen? What
8  was that? They give you a city?
9      Q.   I don't have a city.
10         MR. COX:  What year was it?
11         MR. GLOVER:  This was July 28, 2004,
12  in Texas.
13         THE WITNESS:  Oh, oh, oh, oh, oh, oh,
14  oh, yeah.  I was coming -- I was looking
15  for an address, and they was -- they was
16  doing a check, and I was looking -- coming
17  up on a hill, yeah.
18     Q.   (By Mr. Glover)  Were you in a commercial
19  vehicle?
20     A.   Yeah.  And I was going up -- I was going
21  up a hill, I'll never forget that.  To that cop.
22     Q.   In April 15, 2006, violation, operating
23  vehicle with improper brakes in Texas.  Do you recall
24  that?
25     A.   I may have, but I don't remember

Page 51

1  everything I got.  But I did get a lot of those -- a
2  lot of that -- what is it.
3      Q.   Next, I got a June 7, 2007, accident in
4  backing an occupied vehicle?
5      A.   Doesn't the back -- what do you say again
6  now?
7      Q.   This is going to be 2007 while you were
8  working for Greatwide.
9      A.   Whew, don't -- I don't remember that.  I
10  really don't.  What happened -- I ain't backed
11  nowhere.  Don't remember that.
12     Q.   Later that year, November 11th, 2007, a
13  violation, failure to yield the right of way in
14  Texas.
15     A.   I don't remember -- where was I driving?
16  I can't remember.
17     Q.   In March 12th, 2009, do you recall a
18  violation in Pflugerville, Texas, inspection
19  violation?
20     A.   It's possible, but -- it's possible.
21     Q.   May 1st, 2009, a violation for operating a
22  vehicle with improper brakes.
23     A.   Yeah.  That's -- that's -- it can be --
24  not adjusted right when they give you a full
25  inspection.  Was that a warning?  What was that?

Page 52

1      Q.   These were violations.
2      A.   Oh, okay.
3      Q.   And in --
4      A.   Oh, I'm sorry.
5      Q.   In June 15th, 2010, you had a seatbelt not
6  properly used in Texas.  Do you recall that one?
7      A.   I remember that, yeah.  Very expensive.
8  Yeah.
9         COURT REPORTER:  That was what?
10         THE WITNESS:  Very expensive.  Sorry,
11  very expensive.
12     Q.   (By Mr. Glover)  In August 17th of 2010,
13  you had an overweight over 34,000 pounds tandem
14  axle --
15     A.   Yeah.
16     Q.   -- in Texas?
17     A.   Yeah.
18     Q.   Do you recall that one?
19     A.   (Nodding head.)
20     Q.   Did you answer that one?  I didn't hear
21  you.
22     A.   Oh, yeah, yeah, yeah.
23     Q.   April 26, 2011, there's an inspection
24  violation in Pflugerville, Texas again.  Do you
25  recall that one?

Page 53

1      A.   I can't recall that exactly, but I was --
2  I was in a truck, yeah, something was wrong.
3      Q.   You left the trucking business, and you
4  were employed by Barrett Auto Sales?
5      A.   Oh -- oh, God, yes.  Yeah.
6      Q.   Why did you leave the trucking business in
7  2011 -- September of 2011?
8      A.   That's when I moved to South Carolina --
9  from Georgia to South Carolina -- I mean, from Texas
10  back to South Carolina.
11     Q.   Okay.
12     A.   My first day -- my first day home, I had
13  my cowboy boots on, and I slipped on some steps and
14  blew me out.
15     Q.   And that's when you had to sit out for a
16  while because of the scores thing?
17     A.   Well, I thought it was going to be
18  forever, but I didn't know how the scores thing
19  works.  How long at Barrett's?  How long was that
20  there?
21     Q.   September 11th to December 11th, same
22  year.
23     A.   So -- and then I applied several places,
24  and everybody hired me after that at my office job.
25         MR. COX:  Let's take a break real

14 (Pages 50 - 53)

**EXHIBIT A**

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 54

1  quick. We've been going about an hour --
2  or a little bit over an hour.
3      THE VIDEOGRAPHER: We are off the
4  record at 1:01 -- I'm sorry, 1:00 [sic].
5      (Recess from 2:00 until 2:10 p.m.)
6      THE VIDEOGRAPHER: We went off the
7  record at 1400. We're back on the record
8  at 1410.
9      Q.   (By Mr. Glover) Did you -- where is
10 Edgefield County?
11     A.   It's -- it borders North Augusta.
12     Q.   And did you have a case in December 2011
13 pending in Edgefield County?
14     A.   For what?
15     Q.   Anything.
16     A.   I got the ticket for open -- open
17 container.
18     Q.   Okay.
19     A.   I went to jail. Yeah.
20     Q.   All right. And that was December of 2011?
21     A.   '11. Oh, what happened in '11? Was I
22 even home then? 2011? Edgefield County.
23     MR. COX: Mr. Bush, if you don't
24 know, don't guess.
25     THE WITNESS: I don't -- I don't

Page 55

1  know.
2      Q.   (By Mr. Glover) It was the end of your
3  Barrett Auto Sales job, right around the time you
4  ended that job.
5      A.   Really.
6      Q.   You don't have any memory of that?
7      A.   I don't -- Edgefield County. I don't
8  remember anything.
9      Q.   In October of 2012, you told us about the
10 DUI, failure to obey assigned traffic control device.
11 Is that the one you told us about where you pled
12 guilty to reckless driving in Georgia?
13     A.   Yeah, yeah. I think so.
14     Q.   And then you go to work with AAA Cooper,
15 correct?
16     A.   Yes.
17     Q.   Did you tell AAA Cooper about the reckless
18 driving?
19     A.   Did I tell them about the reckless
20 driving?
21     Q.   Yes.
22     A.   It was -- It was -- I wasn't convicted
23 then.
24     Q.   Okay.
25     A.   It was pending, so I didn't feel the need.

Page 56

1      Q.   So you didn't tell them?
2      A.   I wasn't convicted then.
3      Q.   Did you tell them you had been arrested
4  for DUI?
5      A.   No. No. I didn't tell them. Because it
6  was pending, and I was -- I didn't feel I needed --
7  it was pending.
8      Q.   When it became a conviction, did you tell
9  them about the reckless driving?
10     A.   I think that -- I should have, but it -- I
11 think we're required every year to do that -- the
12 report thing. And I didn't -- I should have, but I
13 didn't.
14     Q.   In June 20th of 2016, got a preventible
15 accident, backed into a parked vehicle while making a
16 delivery in Georgia at AAA Cooper. Do you recall
17 that incident?
18     A.   No. When was that?
19     MR. COX: 2016?
20     Q.   (By Mr. Glover) 2013.
21     A.   In Georgia?
22     Q.   Correct. Backed into a parked vehicle
23 while making a delivery.
24     A.   I mean, it's possible. I don't remember
25 that.

Page 57

1      Q.   You don't remember?
2      A.   No.
3      Q.   All right. In January 7th of 2014,
4  preventible accident, attempted to cross railroad
5  tracks in Augusta.
6      A.   Oh, yeah, yeah, yeah, yeah, yeah. That
7  was -- it was a bad area, and I was at an angle, and
8  it got my tandem stuck.
9      Q.   And then March 31, 2014, preventible
10 accident in Georgia at AAA Cooper. Do you recall
11 anything about that?
12     A.   No. No. I -- what was it? What was it?
13     Q.   The date was March 31, 2014, preventible
14 accident while at Saia -- I mean, excuse me, while at
15 AAA Cooper.
16     A.   I don't know what.
17     Q.   You don't recall that?
18     A.   No, I don't recall that.
19     Q.   All right. A month later, April 22nd,
20 2014, a preventible accident while at AAA Cooper.
21     A.   I didn't know about that. I think, that's
22 three, like, in the time, I should've been fired if
23 that happened.
24     Q.   Do you know whether you had four
25 preventible accidents while at --

15 (Pages 54 - 57)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 58

1   A.  I don't remember --
2   Q.  -- AAA Cooper?
3   A.  I don't remember any -- the only thing I
4   remember at AAA Cooper, something -- something in
5   Columbia -- in Columbia.  I don't remember
6   anything -- anything else like that.
7   Q.  Did you say if you had all of those you
8   should have been fired?
9   A.  Well, I mean, how much time is in between
10  that?
11  Q.  You were working there from May of '13 to
12  December of '15, correct?
13  A.  I can't remember the dates on that.
14  Q.  Did you get -- in October 14th of 2014,
15  did you get another reckless driving in Georgia?
16  A.  Another -- another -- no, I don't -- I
17  don't -- '14, another -- no, no, I don't remember.  I
18  don't remember that.  I don't remember.
19  Q.  Was that when your conviction occurred?
20  A   It may -- may have been then, yeah.  Yeah.
21  I think -- I think something about -- something's
22  crossed over somewhere, but I don't remember.  I
23  don't remember much happening at AAA Cooper.
24  Q.  In Feb -- February of 21, 2015, you had an
25  incident, unlawful communications?

Page 59

1   A.  Yes.
2   Q.  Telephone calls, obscene, harassing.
3   States, Harassed another individual because she tried
4   to stop her friend from having an affair with Bush.
5   A.  I got -- I got arrested because I cussed
6   her out on a text message, yeah.
7   Q.  That occurred in February of 2015?
8   A.  Yeah, yeah, yeah, yeah, yeah, yeah, yeah.
9   Q.  Was -- was AAA Cooper aware of this
10  incident?
11  A.  Yeah, they investigated to make sure there
12  wasn't no terrorist threat or anything.  It wasn't
13  that.  It was just -- I just texted her and called
14  her names.  And I didn't want to sleep with her
15  anymore, and she got mad.
16  Q.  How did AAA Cooper become aware of this
17  incident?
18  A.  I called them and told them that I had got
19  arrested for a text message, unlawful communication.
20  And they checked it out and made sure it wasn't
21  anything like a terrorist threat, and it wasn't.
22  Q.  Do you know if either one of these ladies
23  attempted to contact AAA Cooper?
24  A.  Oh, I'm sure one of them did.  She's --
25  she was trying to do anything.  Matter of fact, she

Page 60

1   came to my house and begged for forgiveness and act
2   crazy every day.
3   Q.  Do you know if one of those two ladies
4   told AAA Cooper that you were texting while driving?
5   A.  I wouldn't doubt it.  That girl say
6   anything bad about me, Jacqueline Griffin McCarthy.
7   Q.  Have you ever texted while driving --
8   while you were on duty driving?
9   A.  Driving?  No.  No.
10  Q.  You've never texted --
11  A.  While --
12  Q.  -- while on duty driving in a commercial
13  vehicle?
14  A.  I -- I -- I -- AAA Cooper, it -- I seen
15  those safety videos, and it is bad.  And it's bad.
16  Q   In March 26, 2015, did you get a speeding
17  ticket in Spartanburg?
18  A.  Yeah.
19  Q.  61 in a 45?
20  A.  Yep.  I was trying to get home.  In my
21  vehicle, I think.  My personal vehicle.
22      COURT REPORTER:  Whose vehicle?
23      THE WITNESS:  My personal vehicle.
24  Q   (By Mr. Glover)  Was -- did you let AAA
25  Cooper know about the March 26th, 2015 incident?

Page 61

1   A.  Uh-hum.
2   Q   When?
3   A.  I think when I did the annual thing you
4   write down.  Once a year you write down the ticket
5   that you got.  If I -- I should have -- I don't talk
6   about it because -- when you add the points up and
7   the distance in it, so I think I remember talking --
8   discussing that.
9   Q   You told them about it after it happened?
10  A.  I told -- I informed them very quickly
11  after -- in the appropriate time you have to do that.
12  And I think I got a copy reducing it to something.
13  Q.  In April 21, 2015, you get another
14  violation, unlawful use of telephone.  What's that
15  one about?
16  A.  That's that -- I -- they threw that thing
17  out.  That girl -- that same crazy girl just -- when
18  you have -- when you -- your dad knows the judge and
19  stuff like that, it works out good for them.  And she
20  falsified things, that's -- falsified things towards
21  me, and that's why the judge, he's dealing with that
22  now.
23  Q   Have you ever received a conviction
24  related to unlawful communications, or pled guilty?
25  A.  Oh, that -- the very first one, when I

16 (Pages 58 - 61)

EXHIBIT A

Marcus J. Bush
April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 62

1 went to court, I didn't know what unlawful
2 communications was, and I did curse her out pretty
3 good. And then they -- and they tried -- they're
4 still trying.
5  Q. In September 21, 2015, there's another
6 harassment violation?
7  A. She -- yes. She tried to get a
8 restraining order for some reason and went to court
9 and lied under oath, and the judge threw it out.
10 Then she went to another part -- the other person she
11 was messing around with, and they -- I guess the
12 judge signed up in that, and the judge called -- they
13 tried to call me, and then my lawyer called down
14 there, and then they threw it out.
15  Q. What was it that they thought they were
16 saying you were texting them?
17  A. I -- they -- it was during the -- the
18 split-up, and I wasn't texting in my vehicle.
19  Q. Who was it that you were texting?
20  A. When -- on the unlawful communication?
21  Q. Yeah. Who was it that got the text that
22 you got the three incidents related about?
23  A. It was Jacqueline Griffin McCarthy.
24  Q. Only Jacqueline?
25  A. No. I was -- I texted her -- Nancy, the

Page 63

1 girl I was dating at the time, and...
2  Q. Okay. And did you -- did Nancy complain
3 about your text?
4  A. The -- yeah, the first time, yeah. Yeah.
5  Q. What's Nancy's last name?
6  A. Buck.
7  Q. B-u-c-k?
8  A. Yes, sir.
9  Q. Anybody else between -- besides Nancy Buck
10 and Jacqueline McCarthy?
11  A. No, no, no, no, no, no, no, no.
12  Q. All right. And then this incident
13 occurred October 31st, 2015, you were -- you were
14 arrested for this event, correct?
15  A. I got arrested for -- because I -- well,
16 one time, yeah, they did.
17  Q. Did you receive a plea or a conviction
18 related to this event?
19  A. Oh, yeah. He threw the book at me.
20  Q. Did you plead guilty to this event?
21  A. I got thousand dollar fines, I notice I
22 did that. I was in complete shock. I didn't know
23 what was going to happen to me.
24  Q. You got $1,000 fine? $11,000 [sic] fine?
25  A. $1100 fine. I went there to cash some

Page 64

1 money in so I can -- the judge that worked for her
2 father, and then she came back and befriended me and
3 both of them at my -- they -- I'm sorry.
4  Q. I think we're talking about two different
5 events.
6  MR. COX: We're talking about --
7 yeah.
8  THE WITNESS: No, no, it's the same
9 girl.
10  MR. COX: No, we're talking about two
11 different things. He's asking you about
12 the accident we're here about today.
13  THE WITNESS: What now?
14  Q. (By Mr. Glover) The accident we're here
15 about today, you were charged by homicide by vehicle?
16  A. Yes.
17  Q. What was your -- what was your ultimate
18 result of the homicide by vehicle charge related to
19 the incident that we're here about today --
20  A. The ultimate --
21  Q. -- the truck wreck crash?
22  A. The ultimate --
23  Q. How did it turn out in court? What
24 happened?
25  MR. COX: Did you plead guilty?

Page 65

1  THE WITNESS: I fell asleep. I pled
2 guilty.
3  MR. COX: So he's asking you the
4 charges that are raised out of this
5 accident, did you plead guilty to those?
6  THE WITNESS: Yes.
7  MR. COX: Okay.
8  Q. (By Mr. Glover) What did you plead guilty
9 to?
10  A. It was vehicle -- was it vehicle? Vehicle
11 homicide thing, something of that nature.
12  Q. What was your sentence?
13  A. I received -- I'm paying a lot of money
14 this month, fines -- fines and -- and house arrest
15 and -- oh, I -- probation -- probation -- probation
16 and fines.
17  Q. Are you still on probation?
18  A. Yes. Yeah.
19  Q. In 2018, you got arrested for open
20 container?
21  A. Yeah. No -- yeah, that was in my
22 driveway, yeah.
23  Q. You pled to that, correct?
24  A. Yeah. Yeah.
25  Q. Did you plead guilty to that before you

17 (Pages 62 - 65)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 66

1  pled guilty to the homicide by vehicle, or after?
2      A.   I don't remember. Whatever the date says,
3  that will give you --
4      Q.   Well, you told me 2018.
5      A    No, no, no, no, no, no. I remember -- I
6  remember talking to the -- the judge, 'cause I think
7  before I was up against him, he said he didn't know
8  why they arrested me. I said I got bigger problems
9  than this; I don't need to be dealing with this.
10 Because the cop was being a good ol' boy, and that
11 was in my driveway.
12     Q.   Had you been driving before you pulled in
13 the driveway?
14     A.   I was coming home from fixing my -- from
15 fixing my pickup truck. And I turned on my street,
16 dirt road in the country, and cop went out on that
17 road, and he come running behind me and pulled me
18 over. And I told him -- he wasn't looking for no
19 alcohol. I said, Do what you got to do, Man. And
20 then he -- he's a nice guy.
21     Q.   You fell asleep in the accident that
22 caused this crash, correct?
23     A.   Yes, sir.
24     Q.   Would you agree with me that you were
25 impaired by fatigue?

Page 67

1      A.   No.
2      Q.   You were not impaired by fatigue?
3      A.   I was -- I -- it just happened.
4      Q.   Couldn't -- nothing you could have done to
5  prevent it from happening?
6      A.   Well, I had plenty of hours laid in my
7  bed, and it happened -- it happened -- now -- it
8  happened.
9      Q.   You said laid in your bed. Were you
10 sleeping?
11     A.   I slept -- and I slept -- I know --
12 because I went and I got called at 5:30, because I
13 had a lot of time because it got slow down -- it was
14 slow.
15     Q.   You were -- you slept most of the time,
16 some of the time?
17     A.   Most of the time.
18     Q.   Most of the time you were asleep?
19     A.   (Nodding head.)
20     Q.   Of the time you were off duty, you slept
21 most of the time?
22     A.   Yeah, I try -- yes. But I sleep kind of
23 funny because it -- it's hard -- your body's not made
24 to sleep -- not made to sleep in the daytime.
25     Q.   Have you had any other traffic-related

Page 68

1  incidents, tickets, arrests, anything since the wreck
2  that you were here -- that we're here about, the one
3  where the --
4      A.   I think you -- I think you discussed
5  everything.
6      Q.   The open container?
7      A.   Yeah.
8      Q.   I want to talk about your job as a truck
9  driver.
10          You used to train people, correct?
11     A.   Yes.
12     Q.   What did you use to train -- what
13 materials did you use?
14     A.   The Smith System.
15          COURT REPORTER:  I'm sorry?
16          THE WITNESS:  The Smith System.
17     Q.   (By Mr. Glover) Does the Smith System
18 address fatigue driving?
19     A.   Yes.
20     Q.   Does it dismiss -- you agree that the CDL
21 manual --
22     A.   Yes.
23     Q.   -- that you studied addresses fatigue
24 driving?
25     A.   Yes.

Page 69

1      Q.   And it discusses the dangers associated
2  with fatigue driving?
3      A.   Yes, it does.
4      Q.   And you agree with me that as a truck
5  driver you have a responsibility to keep a lookout
6  for dangers ahead of you on the roadway?
7      A.   Yes, it's called -- it's called far and
8  ahead. It's a thing you do as a driver even -- even
9  in a vehicle.
10     Q.   You agree that you've got a responsibility
11 to manage the space ahead of you?
12     A.   Yes, I do.
13     Q.   And that's a job that you, as the truck
14 driver, have for your vehicle?
15     A.   Yes, I do.
16     Q.   One of the things that you have to look
17 out for are vehicles on the roadway, correct?
18     A.   Yes.
19     Q.   And vehicles off the roadway?
20     A    Yes, exactly.
21     Q.   You agree with me that it is your
22 responsibility to drive rested?
23     A.   Yes.
24     Q.   You agree with me that it is your
25 responsibility as a truck driver to not drive tired?

18 (Pages 66 - 69)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 70

1    A.   Exactly. All my responsibility.
2    Q.   You agree with me that it's your
3  responsibility as a truck diver to get plenty of
4  sleep during your off duty hours?
5    A.   Exactly. As a professional, it's my
6  responsibility to do all those things.
7    Q.   If you don't get plenty of sleep during
8  your off duty hours, you agree that you would be
9  responsible for harm you caused?
10    A.   Yes. Yes, anything that caused harm, I'm
11  responsible for.
12    Q.   You agree that before this accident ever
13  happened, you knew how important it was to get sleep
14  during your off duty hours?
15    A.   Yes.
16    Q.   You had trained other people --
17    A   Yes.
18    Q   -- on that very issue?
19    A   Yes.
20    Q.   And you had studied that when you were in
21  school?
22    A.   Yes.
23    Q.   You had studied that in your CDL manual?
24    A.   Yes.
25    Q.   And so you were aware of the -- how

Page 71

1  important it was to sleep during your off duty hours?
2    A.   Yes.
3    Q.   You agree with me it defeats the purpose
4  of being off duty if you don't actually sleep and get
5  rest?
6    A.   I believe in that. Do the right thing,
7  yeah.
8    Q.   Tell me why it's important when you're
9  tired to immediately pull over.
10    A.   Because you don't know when your body --
11  how your body's going to react. Because the body
12  will shut down when it's tired, regardless. Your
13  body needs its rest, it's going to shut down whenever
14  it's going to shut down, and you've got no control
15  over it.
16    Q.   Does -- did AAA Cooper expect you to pull
17  over when you got tired?
18    A.   Yes.
19    Q.   Why is that important for them?
20    A.   Because they -- they want everybody to be
21  safe.
22    Q.   Do -- do you understand what the danger is
23  associated if you don't do that?
24    A.   Yes.
25    Q.   What is that danger?

Page 72

1    A.   Of changing lives like I've changed lives.
2    Q.   And you've known that since you were
3  training to become a truck driver, correct?
4    A.   Yes. That's why I planned that trip, and
5  you don't find you're tired until -- you don't find
6  you're tired until that first nod. That's when it
7  wakes up.
8    Q.   Why is it important that you sleep when
9  you're off duty?
10    A.   So you can protect others. When you're a
11  professional driver, you're supposed to be the one to
12  leave the road.
13    Q.   When your off duty hours, that's called
14  your hours of service, correct?
15        MR. COX: I'm going to object that,
16    but --
17        MR. GLOVER: Okay.
18        MR. COX: -- you can answer it if you
19    can.
20        MR. GLOVER: Sure. That's a bad
21    question.
22    Q.   (By Mr. Glover) Are you familiar with the
23  issue of hours of service for a commercial truck
24  driver?
25    A.   Very familiar with it.

Page 73

1    Q.   Okay. Is it your understanding that there
2  are times when the law mandates that commercial truck
3  drivers stop driving and go off duty?
4    A.   Yes.
5    Q.   Why is that important?
6    A   Safety comes first.
7    Q.   And what can happen if you don't go off
8  duty?
9    A.   If you don't go off duty, you can get
10  violated on several -- a lot of things can happen.
11    Q.   What's the purpose of going off duty?
12    A.   To prepare yourself to be able to get back
13  in position to be safe.
14    Q   And why do you need to be prepared? Is it
15  to get rested? Is that a reason?
16    A.   Well, you can go off duty at different
17  times. Your body changes. And mine changed. I
18  planned that whole trip out. I knew what exit I was
19  going to get off at, and I dozed off. I have to deal
20  with that every day of my life.
21    Q   When you -- when you go off duty, is a
22  purpose of going off duty to get rested?
23        MR. COX: I'm going to object to
24    form, but you can answer that if you can.
25        THE WITNESS: My responsibility as a

19 (Pages 70 - 73)

EXHIBIT A

Marcus J. Bush                                April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 74

1  truck driver is to be safe and -- and be
2  smarter than the -- than the rest of -- the
3  average driver because I've been to school,
4  I've gone through it. I did that.
5      I'm a Christian. I can go to heaven
6  tomorrow. They can take my life any day.
7  This world is nothing but a temporary home.
8  Do you think I want to be here? No. I'm
9  just trying to get my son in retirement.
10 Every day of my life I see this.
11 Q.  (By Mr. Glover) Sir, I'm trying to
12 understand what is the purpose, as you understand it,
13 for going off duty during the hours of service?
14 A.  It's to prepare yourself to be able to go,
15 and I planned that.
16 Q.  Is that to get rested?
17 A.  It's to prepare yourself to be safe. You
18 want to be -- you want to do everything you can do to
19 be safe.
20 Q.  Can you be safe if you don't sleep?
21 A.  No.
22 Q.  And, again, that's something you've known
23 since you --
24 A.  Very clearly.
25 Q.  -- since you began driving trucks?

Page 75

1  A.  Yep.
2  Q.  And that is something that AAA Cooper
3  expected you to do?
4  A.  Yes.
5  Q.  I want to talk about the day of the wreck.
6  It happened about what time?
7  A.  I think 1:44, something like that.
8  Q.  What's the -- you'd only been -- so it had
9  only been an hour and forty-four minutes into the
10 day. Tell me everything that happened that day.
11 A.  I got up that morning, and I -- I went to
12 the gym.
13     MR. COX: Wait a second. Are you
14     asking about that --
15 Q.  (By Mr. Glover) You're talking about the
16 day before now, right?
17 A.  Well, the accident happened at midnight.
18 I got -- I started driving in Augusta at 8:30.
19 Q.  Okay. All right. So talk to me about --
20 the wreck happened on -- let's talk about October the
21 30th. The wreck happened on October 31st, correct?
22 A.  Yes.
23 Q.  All right. What's the very first thing
24 you remember on October 30th, the day before the
25 wreck?

Page 76

1  A.  Calling -- them calling me at 5:00 telling
2  me to come in at 8:00, something like that.
3  Q.  That's 5:00 in the morning?
4  A.  No, 5:00 in the evening.
5  Q.  Okay. You got called at 5:00 in the
6  evening on the 30th?
7  A.  Yeah.
8  Q.  And they wanted you to come in on the 8th
9  -- I mean, at 8:00?
10 A.  Yeah. To come in -- I got to sleep
11 because I was -- usually I go in at 6:00.
12 Q.  All right. What do you recall about the
13 day before they called you at 5:00?
14 A.  That I was -- it was slow, and I was -- it
15 would give me an hour, so I had plenty of time.
16 Q.  Where were you that day?
17 A.  The 30th?
18 Q.  Where did you wake up on the 30th?
19 A.  In North Augusta. I wake up as far as --
20 I was home every day and got up.
21     COURT REPORTER: I'm sorry?
22     THE WITNESS: I was home every day
23     and got up, so.
24 Q.  (By Mr. Glover) Did you sleep in your bed
25 the night -- the night of the 29th, morning of the

Page 77

1  30th?
2  A.  Yeah, I slept in my bed that night, yeah.
3  Q.  All right. What did you do first thing
4  that morning?
5  A.  I come in -- I come in from the work in
6  the morning, and I -- either I went to the gym or I
7  came back home. Yeah.
8  Q.  Okay.
9  A.  After a little while I go home and I eat
10 something. And I stayed in bed because nothing going
11 on. And my room was dark, I remember that.
12 Q.  And you were at home at 5:00 when you got
13 the phone call to come in to work at 8:00?
14 A.  Yeah.
15 Q.  How long had you been at home when you got
16 that phone call?
17 A.  At least -- at least by 12:00 because I
18 went to the gym, I be home by lunchtime. If I -- I
19 know -- it was about 11:00 or 12:00. I came back, I
20 can't recall the exact time, but...
21 Q.  So you were at the gym until around 12:00
22 around lunchtime?
23 A.  No, not -- no, I got -- I go to the gym.
24 I got there maybe 8:00, leave at 10:00, 11:00.
25 Depends on what's going on.

20 (Pages 74 - 77)

EXHIBIT A

Marcus J. Bush                                   April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 78

1    Q.   Okay.  So say 10:00 to 11:00.  All right.
2  What do you do at 10:00 to 11:00?  What do you do
3  after that?
4    A.   Go home.
5    Q.   Okay.  So from 10:00 to 11:00, what do you
6  do at home?
7    A.   In my room.
8    Q.   What are you doing, sleeping?
9    A.   Yeah, I sleep.  And I got the TV on when I
10  sleep even now.
11    Q.   What did you say?
12    A.   I keep the TV on when I sleep because I
13  like the noise.
14    Q.   You have trouble sleeping at night?
15    A.   Since the accident, yes.  But before that,
16  I didn't.
17    Q.   Okay.  So you had your TV on, but you were
18  sleeping?
19    A.   Yeah, after this because I can't...
20    Q.   How long did you sleep, from when to when?
21    A.   I got in the car -- I got in the car at
22  5:30, and I laid in bed till -- I slept off and on
23  because I didn't sleep -- I can't sleep anyway well.
24  So I stayed in the bed at 7:30.
25    Q.   So did you sleep any between 10:00 and

Page 79

1  11:00 when you got home and went to your room and you
2  got the phone call at 5:30?
3    A.   Yes.
4    Q.   You did?
5    A.   Probably an hour, but I know I was in my
6  bed.  I was in a sleeping position, but I don't know
7  the exact amount of hours I slept, but I slept.
8    Q.   You slept.  Did you sleep the majority of
9  that time?
10    A.   Yes.  But I was in a sleeping position.
11    Q.   All right.  And then 5:30 to 7:30, did you
12  sleep at all during that period of time?
13    A.   Yeah.
14    Q.   How much did you sleep then?
15    A.   About an hour, but I was sleeping.
16    Q.   I notice you're yawning right now.
17    A.   Yeah, because I work 12 hours a day.
18    Q.   Do you suffer from daytime sleepiness?
19    A.   No.
20    Q.   Have you ever told a doctor that you
21  suffer from daytime sleepiness?
22    A.   I -- when I applied for the job at Cytec,
23  I -- he wanted to get me on high blood pressure pills
24  because I was heavy, so I dropped 15 pounds, and that
25  was good, so.

Page 80

1    Q.   But did you tell him you suffer from
2  daytime sleepiness?
3    A.   I didn't suffer from daytime sleepiness.
4    Q.   Okay.
5    A.   He said that because my neck was big, that
6  I -- he may -- he would consider me being on some
7  high blood pressure pills.  So I lost weight and got
8  back straight.  Because I heard about that the neck
9  thing or something.
10    Q.   So I'm -- so I don't know that -- I think
11  you answered, but I want to be sure because I didn't
12  hear it.
13         Have you ever told a doctor that you
14  suffer from daytime sleepiness?
15    A.   No.  A doctor never told me I suffered
16  from that, no.
17    Q.   Okay.  All right.  From 5:30 to 7:30 on
18  the 30th, did you sleep the majority of those
19  two hours?
20    A.   Yes.
21    Q.   All right.  Did you sleep any between 7:30
22  and the wreck, or were you at work the whole time?
23    A.   No, I didn't -- I got to work at 8:00,
24  then I checked in after.
25    Q.   All right.  Let's go back a day before,

Page 81

1  that would be the 29th --
2    A.   Uh-hum.
3    Q.   -- okay?
4         Let me ask you this:  How many -- how many
5  hours of sleep do you believe you had?  I understand
6  you didn't have a clock, but approximately how much
7  sleep hours-wise did you have on the 30th before the
8  wreck?
9    A.   I mean, I know -- I know I was -- I was in
10  the bed probably nine -- nine hours.  I might have
11  slept probably seven and a half of them.
12    Q.   All right.  Now, tell me about the 29th.
13  What was your -- what was your -- what was your day
14  like, the 29th?  That's just the two days before the
15  crash.
16    A.   The whole week was a pretty easy week.  I
17  think I got to work at 8:00 -- 8:00, 7:00, because it
18  was slow, and I kind of enjoyed it.  I went to
19  Atlanta, I can work the dock long hours.  But I think
20  it got slow, so I slept, like, four hours at that
21  time, and I worked three hours.
22    Q.   So you worked about four hours?
23    A.   I slept four hours and worked three hours.
24    Q.   When did you sleep, when to when?
25    A.   From 10:00 to 2:00, something.

21 (Pages 78 - 81)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 82

1    Q.   10:00 to 2:00 on the 29th, and then what
2   did you do at 2:00?
3    A.   I worked till about -- worked from 2:00 to
4   about 6:00.
5    Q.   So you worked --
6    A.   Or 5:00, whatever.  A couple of hours till
7   my load got ready.
8    Q.   So from 2:00 to -- 2:00 to 6:00 -- wait,
9   what did you say?  I'm not trying to confuse you.  I
10  didn't write it down.
11   A.   I understand you got a job to do, Man.
12  2:00 till my load was ready.
13       COURT REPORTER:  I'm sorry.
14       THE WITNESS:  2:00 till my load was ready.
15   Q.   (By Mr. Glover)  2:00 till the load.  Do
16  you know about what time that was?
17   A.   I'm guessing maybe 6:00, because I usually
18  get home about 8:00, so I'm guessing 6:00.
19   Q.   Okay.  6:00.  So you were working from
20  2:00 to 6:00?
21   A.   Yeah.
22   Q.   So that's four hours of work?
23   A.   Because I took a nap.
24   Q.   And what do you do at 6:00?
25   A.   I hook my trailer up and head back -- head back

Page 83

1   to Augusta.
2    Q.   Okay.  So what time do you get to Augusta?
3    A.   Takes like two hours.
4    Q.   Okay.  So you're in Augusta at 8:00 and --
5    A.   And pulled up.
6    Q.   What do you do after that?
7    A.   Drop my trailer and clock out -- pre-,
8   post-inspection, you know, paper --
9    Q.   And then do you go home after that?
10   A.   (Nodding head.)
11   Q.   What time do you get home?
12   A.   9:00.
13   Q.   And do you go to sleep on the 29th?  And
14  this -- 9:00, are you talking about 9:00 p.m. at
15  night or 9:00 in the morning?
16   A.   A.m.
17   Q.   9:00 a.m. in the morning.
18   A.   (Nodding head.)
19   Q.   All right.  What do you do at 9:00 a.m. in
20  the morning?
21   A.   Depends.  I may go to the gym or I may go
22  to the gym at -- when I sleep to 12:00, I go to
23  12:00.  It depends on how I'm feeling.
24   Q.   Okay.  Do you recall that day what you
25  did, the 29th, if you went to the gym or stayed home?

Page 84

1    A.   I don't remember.  I don't remember, but
2   it's a possibility I went to the gym.  And thinking,
3   I probably would go around 12:00 because that's when
4   it's more -- I came there at 12:00, so I think I
5   would go about 12:00.
6    Q.   Okay.  So gym?
7    A.   I would go home and sleep 9:00 -- 9:00 to
8   12:00, then to the gym maybe 12:00 to 1:30 and go
9   back home and go to sleep.
10   Q.   So 9:00 to 12:00 you slept?
11   A.   Yeah, it's a possibility.
12   Q.   And then 12:00 you go to the gym.  And
13  then how long do you stay at the gym?
14   A.   Maybe an hour.
15   Q.   Couple of hours, an hour?
16   A.   Yeah, it takes me 30 minutes to get a
17  workout.
18   Q.   So 12:00 to 1:00-ish.  All right.  What do
19  you do at 1:00?
20   A.   I'll eat something -- eat in the bed and
21  go to sleep.  Go back to sleep after I eat.
22   Q.   All right.  So you got some food, and then
23  go to sleep.  How long do you sleep on the 29th, when
24  to when?
25   A.   From 1:00 to 7:30.

Page 85

1    Q.   1:00 to 7:30?
2    A.   Well, I'm sorry, 5:30, then I got a call
3   and went back to sleep.
4    Q.   So 1:00 to 5:30, then you get the call,
5   and then go back to sleep till 7:30?
6    A.   Uh-hum.
7    Q.   Between 1:00 and 5:00 to 7:30, which the
8   exception of the phone call, are you asleep the
9   majority of that time?
10   A.   Yeah.  Yeah, yeah.
11   Q.   And then what happens at 7:30, same, you
12  go back to work?
13   A.   Yeah, I go back to work, just kind of plan
14  things.
15   Q.   You work overnight mostly, correct, in the
16  night hours?
17   A.   In that particular -- yeah.
18   Q.   How long had you been working those night
19  hours when the wreck happened?
20   A.   How long I been doing that particular job?
21  That --
22   Q.   Well, were you -- how long was it your
23  primary hours of work when you were working
24  overnight?
25   A.   I hadn't been to work five hours.

22 (Pages 82 - 85)

Veritext Legal Solutions

800.808.4958                                    770.343.9696

**EXHIBIT A**

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 86

1    Q.    Let me ask you a different question.
2          How -- had you just started working at
3    nighttime?
4    A.    I started 8:30 that night.
5          MR. COX:  How long had you been doing
6    that shift at night?
7          THE WITNESS:  That was a fairly new
8    shift.
9    Q    (By Mr. Glover)  Okay.  That was a new
10   shift for you?
11   A.    It was -- I was getting used to it.
12   Q.    Did the shift change your day routine, the
13   way you did things during the daytime?
14   A.    Yes.  When you change, you change.
15   Q.    Okay.  So you had to start learning to
16   sleep during the daytime because you were working at
17   night?
18   A.    Yes.  I've experienced it before, but I
19   don't know the timing, but it's the way it happened,
20   I guess.  I wouldn't -- don't know what time.  I'm
21   sure I was on schedule, but I know it was new.
22   Q.    Do you recall about how long you'd been
23   doing it?  I know it was new, but was it days, was it
24   weeks?
25   A.    Weeks.  Not -- it wasn't much.  It was

Page 87

1    weeks.
2    Q.    At the time of the wreck, you were a
3    driver for AAA Cooper, correct?
4    A.    Yes.  Yes, I'm sorry.
5    Q.    At the time of the wreck, were you an
6    employee driver, were you an independent contractor,
7    were you a --
8    A.    I was an employee driver.
9    Q.    Employee driver.  Were you operating under
10   their DOT number?
11   A.    I'm assuming I was.  I had one before,
12   but...
13   Q.    You were a -- I think you told us earlier
14   you were -- considered yourself a professional truck
15   driver for AAA Cooper?
16   A.    Yes.
17   Q.    All right.  Wreck happens on I-85,
18   correct?
19   A.    Yes.
20   Q.    How long had you been on I-85 that night?
21   A.    I can't remember exactly how long I'd been
22   on 85 because it's been four years ago.  But I
23   remember -- I remember having my Bluetooth thing in.
24   I think I had it in.
25         COURT REPORTER:  Your what?

Page 88

1          THE WITNESS:  My Bluetooth.
2    A.    And I was -- I talked to a buddy of mine
3    about a football game.  And then I hung up with him,
4    and I was doing -- started headed going that way, and
5    then that's when it happened, just like that.
6    Q.    Describe I-85 at -- that night.  Is it
7    dark?
8          MR. COX:  At that location?
9    Q.    (By Mr. Glover)  Well, the roadway where
10   -- you're driving on I-85 for some time leading up to
11   the crash, correct?
12   A.    Yeah.  85 is -- I know which way from
13   Clemson there, and I did that way before, and I --
14   it's -- it gets some black holes in it, you know.
15   Well, I call it black holes, dark spots.
16   Q.    If you -- were you on the road before the
17   accident happened on I-85 30 minutes, 45, an hour,
18   two hours, do you know?
19   A.    It wasn't two hours because I had been --
20   it was a short period of time, maybe -- I guess it's
21   about 40 minutes.  Well, 85 is long, so if I got on
22   that to 85, the distance from where I was, probably
23   maybe -- I guess it's about 40 miles.  I'm assuming.
24   Q.    Is it mostly dark?
25   A.    It gets -- it gets dark right -- right --

Page 89

1    right there about where I was when it starts getting
2    dark.
3    Q.    Is it mostly straight?
4    A.    Yeah.  From where -- yeah, I recall it
5    being straight.  I had been there a while.
6    Q.    Are you -- do you have any knowledge about
7    what traffic was like that night at any point?
8    A.    I remember -- I just remember seeing -- I
9    remember seeing things that I don't want to talk
10   about, I don't want to see again.
11   Q.    Do you remember anything before the crash
12   happened, your driving and all?
13   A.    Yeah, I remember I was going to get ready
14   for a football game and was tailgating.
15   Q.    When was that?
16   A.    We was going to tailgate the next day, you
17   know, I was going to the game.
18   Q.    Anything else you recall about that night?
19   A.    It's just -- well, I seen what I saw.
20   Q.    What about -- I'm talking about before the
21   crash.  Did you remember anything about -- about
22   before the crash happened?
23   A.    I'm going to pull up in a minute because I
24   getting -- I felt a little funny, and I think I
25   remember thinking about pulling over or something.

23 (Pages 86 - 89)

**EXHIBIT A**

Marcus J. Bush                                     April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 90

1 Because I had to take 15 minutes right by the thing
2 on my head, then I'd done it before many times
3 18 years driving.
4    Q.    But you didn't pull over?
5    A.    No, I was going to.  It was -- got to have
6 an exit, you know, got to exit.
7    Q.    Did you have your triangles with you?
8    A    Oh, yeah, yeah, yeah.  Yeah.
9    Q.    Was I-85 capable of holding a tractor
10 trailer on the shoulder?
11       MR. COX:  I'm going to object to
12 form.  It's argumentative.
13       THE WITNESS:  I -- I -- I think
14 that -- it should be, but for the temporary
15 places.  But, no -- it should be, it should
16 be temporary.  It should be.  It should be.
17    Q.    (By Mr. Glover)  And so you felt funny,
18 and you started to look for an exit to pull off?
19    A.    Yeah.
20    Q.    And was the purpose of that to rest?
21    A.    Yeah.  I felt like, okay, well, let me get
22 something, you know, to drink.  I always do a fresh
23 start when that happens.  At first, though...
24    Q.    How long did -- between when you felt
25 funny and you began looking for an exit before the

Page 91

1 wreck happened?
2    A.    When I felt funny I was looking for an
3 exit.  If you feel funny, you start looking for an
4 exit.
5    Q.    But how long did that go before the wreck
6 happened, was it 5 miles, 10 miles, 20 minutes?
7    A.    If I knew that, I wouldn't have had the
8 accident.  I don't know.  If I knew how much time it
9 was, I would have prevented it.  But I was -- I
10 remember looking.
11    Q.    You didn't stop immediately, though,
12 correct?
13    A.    I started looking.  And then -- it's
14 dangerous on the side of the road.  I couldn't see
15 what happened.
16    Q.    I mean, you say you started looking.  You
17 were looking to stop, but you hadn't stopped yet,
18 correct?  Is that accurate?
19    A.    (Nodding head.)  Yes.
20    Q.    She's writing it down.
21       Did you ever see Ms. Roberts' vehicle or
22 the first responder vehicle that was helping her with
23 her motoring assistance?
24    A.    No.  No.  I -- no, no.
25    Q.    How long were you asleep prior to the

Page 92

1 crash happening?
2    A.    I have no idea.
3    Q.    Would you have been asleep for -- well,
4 let me ask it -- you never recall seeing that
5 vehicle, correct?
6    A.    (Shaking head.)  That was -- that was --
7 no.
8    Q.    Did you have your cruise control on?
9    A.    I thought I did.  I don't remember
10 exactly, but I don't think I would have it on if I
11 was looking for somewhere to -- at the time when --
12 because that's good that the cruise if you're not in
13 control, so I wouldn't do that.
14    Q.    Okay.  You would or would not have cruise
15 control on?
16    A.    I would not have -- I would not have
17 cruise control, but -- no.
18    Q.    Did you ever -- do you recall ever
19 swerving on the roadway leading up -- leading up to
20 the crash?
21    A.    Well, I'm assuming if I felt --
22       MR. COX:  He doesn't want you to
23 guess.  Just what you know.
24       THE WITNESS:  The driver down --
25 behind me, he told me I swerved.  He

Page 93

1 talking about -- he told me.
2    Q.    (By Mr. Glover)  You didn't dispute that
3 when he told you, did you?
4    A.    I didn't -- I was -- I was about to go
5 crazy.  I see this beautiful girl on the ground.  I...
6    Q.    But you didn't dispute that when he told
7 you that you had swerved?
8    A.    I didn't dispute it because I -- in order
9 for me to be feeling uncomfortable, I let something
10 like that happen.
11       COURT REPORTER:  In order -- I'm sorry.
12       THE WITNESS:  In order for me to feel
13 like something -- look for an exit, that
14 it's a cause and effect to ration things.
15 So I was responding to my body, so I was
16 looking for somewhere to stop.
17    Q.    (By Mr. Glover)  So that would be --
18 swerving would be consistent with how you felt about
19 wanting to stop?
20    A.    You know what?  I didn't --
21       MR. COX:  Object to the form.
22       Can you clarify what you're talking
23 about swerving?
24       THE WITNESS:  I was told that -- that
25 I swerved.  I felt like I needed to find

24 (Pages 90 - 93)

EXHIBIT A

Marcus J. Bush                                              April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 94

1   somewhere -- that's what I --
2       COURT REPORTER: You felt like...
3       THE WITNESS: So I was -- I was told
4   that I swerved. I felt like it was time
5   for me to pull over, and I started looking
6   for that.
7       Q.  (By Mr. Glover) All the driving you've
8   done, I'm sure you've seen people who looked tired
9   out on the roadway, correct?
10      A.  Yeah, I seen it. Yeah.
11      Q.  And you've seen -- you've trained other
12  drivers --
13      A.  Uh-hum.
14      Q.  -- about looking for the signs of fatigue,
15  correct?
16      A.  Uh-hum.
17      Q.  So you know that swerving is a sign of a
18  tired driver, correct?
19      A.  Yes, very clearly. The first thing it
20  says is to find a safe place to pull over, and I was
21  tired when I decided to pull over.
22      Q.  Did you drive for a mile looking for a
23  safe place, 5 miles, 10 miles?
24      A.  I don't recall how far -- how far I drove.
25  I don't remember.

Page 95

1       Q.  Were you surprised that you were tired?
2       A.  Yeah, I -- because I was -- I was -- I was
3   actually saying -- I was off a long time.
4       Q.  You had gotten a lot of sleep the day
5   before?
6       A.  It was my slowest week. That's why I felt
7   so bad. It was my slowest week. I mean, I -- I was
8   15 hours less than what I made, my slowest week.
9   That's why I don't get it.
10      Q.  What stopped your vehicle, do you know?
11      A.  The -- the impact.
12      Q.  What's the first thing you remember?
13      A.  Man, it -- it's awful, Man. It's awful.
14  It's -- it's crazy. It's an awful feeling. Awful.
15  Awful.
16      Q.  Is it a sight that you saw? Is it a sound
17  that you heard? Was it a feeling? A jolt? What was
18  the first thing --
19      A.  It was lights, Man, lights -- lights and
20  things, Man. It's just something wasn't right.
21      Q.  Were you already -- was your vehicle
22  already come to complete stop when you realized you
23  were in a wreck?
24      A.  I -- no, no. I was awake when that thing
25  happened, and I was like -- I can't imagine -- I was

Page 96

1   seeing things.
2       Q.  So some interstates have rumble strips; do
3   you know what those are?
4       A.  Yeah. I don't think that this -- I don't
5   think -- I don't know. But it was just, boom, and
6   things flying.
7       Q.  So the first thing you remember is the
8   boom?
9       A.  Yes.
10      Q.  Do you remember the lights?
11      A.  The worst thing I ever seen in my life,
12  Man.
13      Q.  The lights were?
14      A.  All of it. When you're in an 18-wheeler
15  and you go on the side of the road and hit something,
16  it's something you think about every day and you go
17  through every day. I live it every day of my life.
18      Q.  Were you awake when your vehicle came to a
19  stop?
20      A.  Oh, yeah, yeah, yeah. The impact hit me
21  and then -- and then -- yeah.
22      Q.  Okay. So -- and I know that you -- we all
23  know what you just did. But when you -- the impact,
24  and you kind of made the face like you alerted; is
25  that accurate?

Page 97

1       A.  It was impacting a lot of stuff going up.
2       Q.  You saw all of the stuff going in the sky?
3       A.  I didn't -- I couldn't identify what I was
4   seeing, but it was -- it's devastating.
5       Q.  Did you ever apply your brakes prior to
6   impact?
7       A.  I remember -- I remember -- I remember I
8   had myself think -- yeah, I stopped because it would
9   have went further.
10      Q.  Do you remember or recall trying to steer
11  a little bit before impact away from the crash?
12      A.  No, I don't remember anything like that,
13  but, no.
14      Q.  Do you agree with me that a tired or a
15  fatigued driver is less able to respond to emergency
16  situations?
17      A.  Yes.
18      Q.  You agree that failing to get adequate
19  sleep makes you more likely to become tired?
20      A.  Yes.
21      Q.  And this is all stuff you've known since
22  the beginning of your training as a truck driver?
23      A.  Yes. And that particular day I got more
24  rest and more time than I ever got ever with AAA
25  Cooper. And I don't understand what happened.

25 (Pages 94 - 97)

EXHIBIT A

Marcus J. Bush                                      April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 98

1    Q.    You agree with me that you can be tired
2  even if you're within your hours of service?
3    A.    Yes.  Yes, definitely.
4    Q.    I mean, if you -- you cannot be driving
5  and be off duty, but doing stuff and not sleep, and
6  that -- you'd be tired if you did that, right?
7    A.    Yeah.
8        THE VIDEOGRAPHER:  Got about
9  four minutes left on the disk.
10       MR. GLOVER:  Let's stop now.
11       MR. COX:  Get up, take your
12  microphone off.
13       THE VIDEOGRAPHER:  This is the end of
14  disk number 1 in the deposition of Marcus
15  Bush.
16       We are off the record at 1503.
17       (Recess from 3:03 until 3:20 p.m.)
18       THE VIDEOGRAPHER:  This is the
19  beginning of disk number 2 in the
20  deposition of Marcus Bush.
21       We're on the record at 1520.
22    Q.    (By Mr. Glover)  I want to go back to I
23  guess the 28th, the day -- two days before the crash
24  -- or the 29th, excuse me.  The 29th.  Did you have a
25  cell phone at that time, a personal cell phone?

Page 99

1    A.    Yeah.
2    Q.    Did you have a work cell phone?
3    A.    No.
4    Q.    What was the phone number that you had at
5  that time?
6    A    I had -- really -- really don't know.  If
7  it's the same like -- I don't know, was it the same?
8  I don't.  Because I leave my phones all the time.
9    Q.    Who was your service with?
10   A.    I think it was Verizon.
11   Q.    I assume -- do you recall what kind of
12  phone you had back in '15?  Was it a smartphone?
13   A.    I had several phones, that person that
14  gave me hers, when I got home from Texas.  iPhone,
15  just all kind of phones.
16   Q.    Was it an iPhone?
17   A.    It could be iPhones in between the
18  process.  I lost a lot of phones.
19       COURT REPORTER:  I'm sorry?
20       THE WITNESS:  I lost a lot of phones.
21   Q.    (By Mr. Glover)  iPhones, did it have text
22  messaging ability?
23   A.    Yes, yes, yes.
24   Q.    Did it have -- I know it can call, but can
25  it call -- you can make a phone call with it?

Page 100

1    A.    Yes.  Yes.
2    Q.    Did it have apps on it?  Do you know what
3  I mean by apps?
4    A.    Yeah.  Yes, the iPhone it did -- it did.
5    Q    Did it have, like, Safari, the Internet?
6    A.    Uh-hum.
7    Q.    And you had the ability to do all that on
8  the -- on the phone?
9    A.    Yeah.  Yeah.
10   Q.    And it had camera?
11   A.    Yeah.
12   Q.    iPhone had GPS?  You could put in
13  directions and all that in it?
14   A.    Yeah.  Yeah.
15   Q.    On the 29th before the crash happened, did
16  you use your phone that day at all; do you recall?
17   A.    I'm sure I did.
18   Q.    Do you recall if you made phone calls?
19   A.    I remember that day I didn't use the phone
20  very often.  So I'm assuming I did.
21   Q.    Did you text?
22   A.    Yeah, I'm assuming I did.  I mean...
23   Q.    During your off hours, when you were doing
24  off duty, did -- would you have used your phone and
25  text during those periods of time?

Page 101

1    A.    I get -- I check it spontaneously as I
2  wake up throughout the day.
3    Q.    When you were -- you told us those hours
4  that you slept on the 29th and the 30th.  Would you
5  have been using your phone during those time periods?
6    A.    I check it periodically throughout the
7  time I wake up here and there.
8    Q.    Did you put it up long enough to get some
9  sleep?
10   A.    Yeah, I never put it up.  I just laid --
11  laid it beside me.
12   Q    Did you look at it and send texts or make
13  calls?
14   A    During that time?  Yeah, I did.
15   Q.    You did?
16   A.    Yeah, I'm -- if I heard it or if I woke up
17  doing something, yeah.
18   Q.    Well, talk to me about how you did that.
19  Did you -- if you were asleep, how did -- I mean, did
20  you wake up and do it or did you just --
21   A.    I got more sleep that time because my --
22  the girls I was dating were with me.  I had them at
23  my house.  If it -- before that, it would have been
24  different.  I mean, it's true.  I had lady friends, a
25  lot of lady friends, and then they were gone.

26 (Pages 98 - 101)

EXHIBIT A

Marcus J. Bush                         April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 102

1    Q.   You agree with me you can't get adequate
2  sleep if you're sending a text?
3    A.   Yes.  Yes.  I mean, you can't -- you can't
4  get adequate sleep if you're not getting adequate
5  sleep.  If you're doing too much of something, then
6  it's taking up your time with one thing, it's not
7  going to be appropriate.
8    Q.   You told us that at one point somebody
9  said something about your neck size?
10   A.   Yes.
11   Q.   Tell me about -- how much did you weigh?
12   A.   I --
13     MR. COX:  When?
14   Q.   (By Mr. Glover)  When the guy told you
15 about the neck size, how much did you weigh?
16   A.   It was before I came to Cooper.  I was at
17 Cytec.
18   Q.   How much did you weigh at the time he told
19 you that?
20   A.   I can't remember, but -- but the time of
21 my accident, I was cut like a bag of dope.  I was
22 chiseled.  I was working out regularly.  I was
23 talking about my body.
24   Q.   Do you recall what you weighed at the time
25 of the wreck?

Page 103

1    A.   I -- I probably maybe -- maybe eight
2  pounds heavier now -- not too far off from where I
3  was, but I was -- I was pretty confident in myself.
4    Q.   Have you ever had a doctor suggest to you
5  that you should be tested for sleep apnea?
6    A.   No, I had for -- I had -- told me I needed
7  to lose weight or be a diabetic or something like
8  that.
9    Q.   Who told you that?
10   A.   The doctor I went to for that physical.  I
11 went through this very difficult physical with Cytec.
12 It was a long process, very expensive physical.  And
13 that's when I decided that -- to eat better and so...
14   Q.   And what city was Cytec in?
15   A.   It was South Carolina.  I went through
16 that test somewhere in Augusta.  Matter of fact,
17 right down the road here to the left.  Yeah.
18   Q.   You said so it's close to where we're at
19 today in Augusta?
20   A.   Yeah.
21   Q.   Do you recall the name of the doctor's
22 office?
23   A.   No, but I know it was a pretty building on
24 Peach Orchard Road right behind Applebee's.  I
25 remember being there because it was a nice building.

Page 104

1  And the lady gave that me the physical from my church
2  because I had to take my shirt off and run and stuff.
3  At that time I wasn't in that good of shape.
4    Q.   What is -- what's your height?
5    A.   5'7".
6    Q.   Had you ever gotten sleepy behind the
7  wheel of a commercial truck before this incident?
8    A.   In 18 years?  Yes, I have.
9    Q.   Had you ever fallen asleep in a commercial
10 truck before this incident?
11   A.   Yeah.
12   Q.   Have you ever had to pull over and rest
13 because you got tired?
14   A.   Uh-hum.
15   Q.   All right.  How often would you say that
16 you got tired as a commercial truck driver before
17 this crash?
18   A.   Often?
19   Q.   Yeah.  10 percent of the time, 20 percent
20 of the time?
21   A.   I -- only time I remember getting tired
22 was back when I was doing long hours.  I mean, I was
23 -- because I was pushing it driving for KLLM when I
24 was young and stupid.  And with Cooper, he always
25 said be always prepared, you know, pretty much all

Page 105

1  the time.  It was pretty easy.  Ain't nowhere to
2  drive, you know.  It's one bad day.
3    Q.   Have you seen the drivecam video that was
4  on your vehicle?
5    A.   No.
6      MR. COX:  Are you planning on showing
7    it to him?
8      MR. GLOVER:  Yes.
9      MR. COX:  Let me pull him out and
10   talk to him for a minute.
11     MR. GLOVER:  I mean, after I ask the
12   question.
13     MR. COX:  Okay.  You can ask the
14   question, but before you show it to him, I
15   think it's -- it would be better if I
16   talked to him.  And I'm not going to tell
17   him what to say, that's not what I'm trying
18   to get at.
19     MR. GLOVER:  I object to -- I get to
20   ask this line of questioning before we take
21   a break.
22     MR. COX:  Well, I mean, ask your
23   questions, and I'll tell you --
24     MR. GLOVER:  No, because that's the
25   issue.

27 (Pages 102 - 105)

**EXHIBIT A**

Marcus J. Bush      April 23, 2019

Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 106

1   MR. COX: Okay.
2     MR. GLOVER: I mean, you -- you find
3 out what the line of questioning is, and
4 then you stop. I mean, the standard is --
5 we just took a break minutes ago.
6     MR. COX: Sure. I mean -- I -- I've
7 talked to him about this before, about how
8 -- the video and how it's going to affect
9 him. So I'm going to talk to him about
10 that just as an emotional issue. I'm not
11 talking about -- about what you're going to
12 ask.
13     If you want to, you can ask him what
14 I -- specifically what I tell him out
15 there. That's going to be the only time
16 I'm okay with it, but...
17     MR. GLOVER: I'm not going -- I don't
18 want to know what -- what y'all talk about.
19     MR. COX: Yeah.
20     MR. GLOVER: All right. Y'all go
21 take a break and we'll...
22     THE VIDEOGRAPHER: We're off the
23 record at 1529 -- 1530.
24     (Recess from 3:30 until 3:32 p.m.)
25     THE VIDEOGRAPHER: We're on the

Page 107

1 record at 1532.
2   Q. (By Mr. Glover) Sir, your vehicle was
3 equipped with a drivecam camera, correct?
4   A. Yes, sir.
5   Q. And that was a -- you had two cameras, a
6 forward facing camera and a cab camera?
7   A. I'm not positive about it. But I know
8 there's cameras in there. I don't remember exactly
9 where they were. I don't.
10   Q. Okay. You didn't know where the came --
11 cameras were in your vehicle?
12   A. Been almost four years ago. I don't
13 remember where the cameras were.
14   Q. At the time of the crash, did you know
15 where your cameras were?
16   A. I -- I mean, I know that the camera was
17 looking at me. It's -- because that's what the
18 purpose is, it's to protect the driver, because
19 people lie on drivers so -- they take tests.
20     (Playing video.)
21   Q. The forward facing camera on your drivecam
22 was looking forward. I want to watch this video with
23 you, and I want to stop it here.
24     (Stopped video.)
25     Can you see -- can you see this -- I can

Page 108

1 get it -- it's -- it might be small on this screen
2 from where you're sitting.
3     (Playing video.)
4   A. Yeah.
5   Q. But can you see it?
6   A. Yeah.
7   Q. All right. Then we're looking at the top
8 one. There's a road sign to the right; do you see
9 that in this area here?
10   A. Yeah. Yeah.
11   Q. All right. And then in front of the road
12 sign, there is a vehicle off to the right side of the
13 roadway. Do you see that?
14   A. Uh-hum.
15     (Stopped video.)
16   Q. Did you ever see that road sign that night
17 before the crash happened?
18   A. I don't -- I don't remember. Because
19 we're supposed -- you're trained to look far and
20 ahead and identify things.
21   Q. At the time that this was -- this still
22 shot, if we -- if we -- let's back it up to the
23 beginning.
24     At the time that this still -- that when
25 it first began recording on this drivecam on the top

Page 109

1 video, would you have been awake at that time?
2   A. When I'm driving it straight, I've been
3 trained to look -- I forgot the words you use. It's
4 far and beyond looking ahead, coming back, you've got
5 to identify things. So we're trained to do that. So
6 if I was driving, I would see that.
7   Q. So you -- would you have been awake at the
8 time that we're looking at now when this video is
9 being shot, or were you already asleep?
10   A. I don't -- I don't remember.
11   Q. Okay.
12   A. I mean, I don't remember it.
13   Q. All right. You don't know if you're awake
14 or asleep at this point?
15   A. All I remember -- I remember horrible
16 things that happened and the repercussions and think
17 what I had done. My life changed. I remember that.
18   Q. Okay. Now, you see this flashing light
19 coming into view here?
20   A. Uh-hum.
21   Q. And I'll represent to you that's that
22 emergency vehicle that was helping Ms. Roberts?
23   A. Uh-hum.
24   Q. All right. Did you ever see that?
25   A. If I was driving it, I'm trained to see

28 (Pages 106 - 109)

**EXHIBIT A**

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 110

1 that.
2    Q.   Okay.  So at this point -- I mean, you
3 held the vehicle in -- on the roadway up until the
4 crash; you agree with that, don't you?
5    A.   If I'm in the middle of the road, I'm
6 doing my job.  I'm trying to do my job now.  And at
7 some point, things changed.
8    Q.   If you're -- at this point in time, do you
9 know if you're awake or asleep?
10   A.   I don't remember.  I remember the impact
11 happened, how difficult that was and my life after
12 that.
13   Q.   All right.  At this point now you see the
14 lights here?
15   A.   Uh-hum.
16   Q.   All right.  You're still moving towards
17 this sign, correct, the road sign, and you can see
18 the bright light coming more into play, correct?  Do
19 you ever remember seeing this sign -- this view?
20   A.   I don't remember much about that.  I just
21 remember the -- the impact.
22   Q.   Okay.  At this point now right before
23 impact, you're asleep; you don't remember any of
24 this, do you?
25   A.   I remember just -- I think after this, I

Page 111

1 think.
2    Q.   And then your vehicle comes to a stop
3 here.  And so we don't know if you're awake or asleep
4 at any point during this time, do we?
5    A.   I know when the impact, I remember -- I
6 remember seeing things.  I mean...
7    Q.   At impact?
8    A.   Yeah.
9    Q.   At any time before impact, we don't know
10 if you're awake or asleep, do we?
11   A.   Well, it looks like -- it looks like I --
12 like I was awake, and it looks like something -- it's
13 just recall.  I mean, I don't -- I remember it's just
14 an impact and looking for -- looking ahead, looking
15 for something to park.
16   Q.   I guess -- I'm not talking about the
17 impact.  Remember, we looked at the video on back the
18 road, we saw the street sign, you could see the light
19 coming into play, you're approaching it when the
20 video starts?  At any point in that point, we don't
21 know if you're awake or asleep, do we?
22   A    Do we know that?  I mean, I don't -- I
23 don't remember much about -- I don't remember much
24 about -- I remember the impact, it's taken -- but
25 I'll be trained to -- and I -- to look far and ahead.

Page 112

1 And I was looking for somewhere to park, so...
2    Q.   So if you were awake, you would have saw
3 that vehicle, right?
4    A.   Yeah.  I mean, I thought -- I was trained
5 to do -- I'm trained to be prepared to look for
6 things.
7    Q.   Okay.  And you don't ever remember seeing
8 it?
9    A    I don't -- no, I don't remember seeing
10 that.  No, I don't remember seeing it.  No.  No.  I
11 remember the parts that came after that.
12   Q.   And you're trained to look ahead, but we
13 -- we don't know one way or the other if you're awake
14 or asleep?
15   A.   We don't know.
16   Q    All right.  There's another camera in this
17 car, correct -- or in this truck?
18   A.   There's several cameras in there, yeah.
19   Q.   And that's the -- that's the one that's
20 down at the bottom.  Do you know -- do you know why
21 that's gray?
22   A.   I don't know why that's gray.
23   Q.   The camera view.
24   A    The bottom.
25   Q    The bottom view here on this video.  When

Page 113

1 we're playing this video, look and see here, the
2 bottom view is gray.
3    A.   Okay.
4    Q.   Do you know why that's gray?
5    A.   No.
6    Q.   You don't know why?
7    A.   It's --
8    Q.   We should be able to see in the cab of the
9 truck, correct?
10   A.   That's why cameras in there, yeah.
11       COURT REPORTER:  I'm sorry?
12       THE WITNESS:  That's why they put
13   cameras in the truck, to protect the
14   drivers, see what's going on because people
15   say -- people lie to the drivers.
16       (Plaintiff's Exhibit 1 was marked for
17   identification.)
18   Q.   (By Mr. Glover)  The camera that was in
19 the cab of your truck -- let me show you what I'll
20 mark as Plaintiff's Exhibit 1.  Is that the camera
21 that was facing in the interior of your truck?
22   A.   Oh, yeah, that camera, yeah.
23   Q.   And you see that there is a visor above
24 that?
25   A.   Yeah.

29 (Pages 110 - 113)

Veritext Legal Solutions

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 114

1    Q.   All right. Did you turn the visor down to
2  block that camera view?
3    A.   No.
4    Q.   Did you know that the cam -- are you aware
5  now that the -- it was blocked?
6    A.   Yeah, I'm aware now that it was blocked,
7  yeah.
8    Q.   Do you agree with me that the blocking of
9  the camera view prohibits us from knowing whether
10  you're awake or asleep?
11    A.   Yes, now -- yes.
12    Q.   When that -- the whole purpose of that
13  camera was for whoever, after the fact, to know what
14  was going on in the cab of the truck, correct?
15    A.   The camera, yes, is to protect the driver,
16  yeah.
17    Q.   And when you turn down that visor, that's
18  gone forever; we can't ever know?
19        MR. COX: Object. Misstates prior
20        testimony. He said he didn't put it down.
21    Q.   (By Mr. Glover) You agree with me when
22  that visor's down we can't know what happens in that
23  truck?
24    A.   If -- yeah, you can't -- if it's blocked,
25  you can't -- you can't see what's going on.

Page 115

1    Q.   It was -- did you ever have a passenger in
2  your vehicle?
3    A.   No.
4    Q.   Did -- was it daylight when you were
5  driving?
6    A.   In the -- in the morning time.
7    Q.   Was it daylight at the time of the wreck?
8    A.   No.
9    Q.   Was there any reason to have the visor
10  down at the time of the wreck?
11    A.   I know in the morning time coming in over
12  the hill, it's -- the sun beats down coming home from
13  Thompson.
14    Q.   Your company put that -- that visor --
15  that camera in that truck, correct?
16    A.   Yes.
17    Q.   And they did so that they would know
18  what was going on in the truck in the event something
19  happened?
20    A.   Yes. Correct.
21    Q.   You think it would be important for us to
22  know when you fell asleep?
23    A.   Yes. Yes, definitely.
24    Q.   And we would know if we had a camera that
25  was looking at you, wouldn't we?

Page 116

1    A.   Yeah.
2    Q.   When -- did you talk to any -- who was the
3  first person you talked to after the crash?
4    A.   The driver behind me. Because he called
5  911.
6    Q.   Who was he?
7    A.   I can't remember. It was a super, kind
8  gentleman is all I remember.
9    Q.   Do you recall what he was driving?
10    A.   I think he was with Cooper, I think. I
11  remember he was a super, kind guy. I mean, everybody
12  been -- been real nice.
13    Q.   He was with AAA Cooper?
14    A.   I'm thinking -- I'm thinking -- I'm
15  thinking. While I'm thinking that -- I'm thinking
16  that for some reason.
17    Q.   And he was another truck driver?
18    A.   (Nodding head.) Yeah, yeah, yeah, yeah.
19    Q.   Is that the same gentleman that said he
20  saw you swerving?
21    A.   When I talked to him, it was him and the
22  cop. Yeah, that's him.
23    Q.   What did you talk to him about?
24    A.   I was looking at what happened, and he
25  grabbed me and said, Go over here.

Page 117

1    Q.   And where did he take you?
2    A.   He backed me away from the scene because I
3  saw her, and I -- first thing I saw was kids' toys,
4  and that's when I -- that was bad, and -- that's when
5  I heard -- heard her. Then he grabbed me and put me
6  for a walk.
7    Q.   Talk to me about what you saw out there
8  and who -- who you talked to after you saw that
9  gentleman. What was going on?
10    A.   I was looking around, and I saw her, and
11  she was crying and she kept moving out, and just
12  broke down and he -- and he walked me away, and the
13  cops pulled up and sat me in the car.
14    Q.   How long before the cops arrived?
15    A.   I don't know. I know I -- I don't know.
16  I don't know.
17    Q.   Did you ever talk to anyone else besides
18  the gentleman you think worked for AAA Cooper?
19    A.   People came and talked to me while I was
20  in the cop car, asking questions.
21    Q.   Were they policemen?
22    A.   One said she was a lawyer -- an inspector
23  or something. And I was -- I was just -- it's awful.
24    Q.   You had a lawyer --
25    A.   I thought --

30 (Pages 114 - 117)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 118

1   Q.   -- before you ever left the scene,
2   correct?
3   A.   I don't know if it was a lawyer. I think
4   he was an accident inspector? Something to do with
5   -- something to do with the accident or something.
6   Q.   He was associated with a law firm,
7   correct?
8   A.   No. I think it was a lady, I think.
9   Q.   Okay. She was associated with a law firm?
10  A.   She was a -- the statement -- something
11  like statement or something of that nature.
12  Q.   Okay. Investigator?
13  A.   Something that -- something to do with
14  accidents. I don't know exact what she is.
15  Q.   Do you know who had her go out there?
16  A.   I don't know who called who. All I know,
17  that a lady was there. And then people -- a lot of
18  questions and -- and I was mostly hurt. It was
19  terrible.
20  Q.   You talked to the AAA Cooper person, that
21  you think's with AAA Cooper, you talked to police
22  officers, correct? Anybody else?
23  A.   I -- it was -- it was just -- all I could
24  think about was what happened.
25  Q.   Did you ever tell anybody what happened

Page 119

1   out there that night?
2   A.   Yeah, I told the truth. I fell asleep.
3   Q.   Okay. Is that what you told police?
4   A.   Yes. I mean, I didn't deliberately do it,
5   and I didn't swerve from anything. I fell asleep.
6   And I was -- and it was the slowest week ever. It
7   wasn't supposed to happen, Man.
8   Q.   You -- you did everything you could to be
9   rested?
10  A.   I put myself in the position -- position
11  out there, I had more time than ever. I was like --
12  it was the slowest week. Look at my logs. This
13  wasn't supposed to happen, Man. It wasn't supposed
14  to happen. I mean, what happened before that, I was
15  working my butt off? Yes.
16  Q.   You agree with me -- how much sleep do you
17  need to be well rested at night?
18  A.   Standard, you need at least six hours for
19  a human being -- the body to functionally move.
20  Q.   That's the minimum to be functioning?
21  A.   That's the minimum for your body to
22  develop any kind of muscle -- you go to work out,
23  you've got to sleep and all that stuff. You have to
24  have so much sleep to grow everything. All that
25  stuff means something.

Page 120

1   Q.   And --
2   A.   And what you drink, all that stuff makes
3   your body function.
4   Q.   And that's something that you learned as a
5   truck driver, learning how to drive a truck, or did
6   you know that from somewhere else?
7   A.   I'm just -- I'm 46 years old. I'm a world
8   champion pilot there. I know -- I just know. I'm
9   upset because I -- I was, like, enjoying not working
10  that much, the first week of not working that much.
11  It got slow. We have the hub account. I got a lot
12  of sleep. Before that, we working, like, we
13  were working, I would have been upset.
14  Q.   Did you have any health conditions at the
15  time of the wreck?
16  A.   I am 46 years old, and I can bench 400
17  pounds. I'm in great shape, Man. I was in great
18  shape then.
19  Q.   You had no health problems at the time of
20  the wreck?
21  A.   The only problem I got now is a hernia. I
22  can't afford -- I can't afford to get insurance on,
23  and I have to work with that.
24  Q.   What about high blood pressure, do you
25  have high blood pressure?

Page 121

1   A.   Remember when I told you when I went to
2   that thing at Cytec, when that -- when that doctor
3   said he'll put me on pills, that's why I lost weight.
4   Q.   Were you taking any medication at the time
5   of the crash?
6   A.   No.
7   Q.   Taking any kind of illegal drugs?
8   A.   No. No.
9   Q.   Were you taking anything to help you stay
10  awake?
11  A.   No.
12  Q.   Were you taking anything to help you fall
13  asleep during the daytime when you were sleeping?
14  A.   No.
15  Q.   You didn't take melatonin or anything,
16  even something legit?
17  A.   No. I mean -- if I eat -- if I eat carbs,
18  but then I didn't want to gain weight. But carbs
19  used to put me down.
20  Q.   Did you drink alcohol back at the time of
21  the crash? Not on the day of the crash, but is that
22  something you did when you -- socially?
23  A.   Oh, yeah. Yeah.
24  Q.   All right. When was the last time that
25  you had alcohol before the crash?

31 (Pages 118 - 121)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 122

1     A.   Oh, I -- it was -- it was Sunday, or
2  Saturday.  Yeah, Saturday and Sunday, the weekends.
3  I don't drink liquor because I -- it doesn't do
4  nothing for me because I behave badly.
5     Q.   Where are you working now?
6     A.   I own Tiger Paw Custom Lawn Care.
7     Q.   Are you off today?
8     A.   No, I -- I'm -- I was texting them, but I
9  got to go do some greens and build up -- make up
10 part -- I've got to work today.
11    Q.   What is your -- so tell me what your,
12 like, schedule is last couple days.
13    A.   Right now, because I'm putting in a
14 kitchen for a friend -- a friend of mine, and I was
15 -- I was out late last night.  And I like to do my
16 maintenance -- well, my body changes when the
17 weather's about to get hot.  So I go in early.  Not
18 now.  I start in about 7:00 to about 12:00 to go from
19 -- stay till about 4:00 and go back, because I don't
20 like being in the dead heat.
21    Q.   And did -- how much -- you say you were at
22 a friend's house late last night?
23    A.   Yeah.  Yeah.  Yeah.  I like to -- because
24 it's evening time, I can do it in the evening because
25 it don't get dark till 9:00.

Page 123

1     Q.   How much did you sleep last night?
2     A.   I had sex a couple of times last night, so
3  I didn't get up.  I had somebody come by at 10:00 and
4  a girl came by at 2:00.  They just pop up sometimes.
5     Q    So did you sleep three or four or
6  five hours, six hours?
7     A.   I got up at -- well, I was first got home
8  at dark time, so I got home about 9:00 -- no, 8:00.
9  7:00, I slept about an hour, and a girl came by.  And
10 then I slept, and 2:00, 2:30 this girl called and
11 wanted to come by, and I slept about 3:00, and -- and
12 I woke up at 7:00 something and let the dog out, and
13 I -- and I don't know why I didn't -- I wasn't
14 thinking about how long this was going to last.
15    Q.   That's fine.  I was just wondered about
16 how much you slept overnight last night, how many
17 hours.  I'll add all that up.
18    A.   I mean, what did the -- from 9:00 or
19 10:00, then from 11:00 to 2:00, and from 11:00 to
20 3:00, then 3:00 to 7:00.  So six, seven hours.
21    Q.   Okay.  I just notice you're tired today.
22 I notice you've yawned several times.  You agree?
23    A.   Yeah, I'm sitting here.  I'm --
24 emotionally -- emotionally -- I'm emotionally tired.
25 Emotionally tired.

Page 124

1     Q.   You're -- one of the things that you
2  have -- your company had provided us in discovery are
3  your logbooks.  Have you seen your logbooks since
4  this wreck happened?
5     A.   No.
6          (Plaintiff's Exhibit 2 was marked for
7     identification.)
8     Q.   (By Mr. Glover)  I'm going to show you
9  what I'll mark as Exhibit 2 to your deposition and
10 ask you if you could tell me if those look to be your
11 logbooks.
12         MR. COX:  Are you asking specifically
13    if these are his logs?  I doubt he's ever
14    seen them like this.
15         MR. GLOVER:  Yeah.
16    Q.   (By Mr. Glover)  Are those -- do you know
17 if those are the log -- your logbooks for the day of
18 the wreck and the few -- two or three days leading up
19 to it?
20    A.   My log said -- I was about to say, the
21 only thing could be different is from 11:00 -- about
22 11:00 to 2:00, I took a break, and then I'll go --
23 I'll go work on the dock.  This -- the only thing
24 difference is I ran an extra route for somebody that
25 took a day off.

Page 125

1          COURT REPORTER:  I'm sorry you ran
2     what now?
3     Q.   (By Mr. Glover)  On -- is that in your
4  logbooks?
5     A.   I'm wondering why y'all -- you haven't
6  seen this.  The whole difference in the whole
7  situation is that a guy took off work, and I ran his
8  shift.
9     Q.   What day?
10    A.   Friday, that day.
11    Q.   The day of the crash?
12    A.   (Nodding head.)
13    Q.   There was a shift that you were on
14 supposed to be somebody else's?
15    A.   He -- yeah.  He took a day off, and they
16 had me run it.
17    Q.   Okay.  So --
18    A.   So --
19    Q.   -- let's look at this together here.  I
20 only got one copy.
21    A.   Basically, but basically --
22    Q.   If we talk about -- and I want you to
23 explain it to me.  So if we look at here, this is the
24 way I read this, this is the date here is --
25    A.   I'll make it very quick for you, Man.  My

32 (Pages 122 - 125)

EXHIBIT A

Marcus J. Bush                                      April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 126

1 route consists of going to Atlanta, working a dock,
2 take a break, and come back home. The other route
3 consists of going -- all right.
4      My -- my normal route started -- started
5 at 6:00. The guy that ran the other route started at
6 9:00. And he ran to Atlanta, then to Charlotte. He
7 took that Friday off. Since I came in at 8:30, I ran
8 that route. I was going to Charlotte. That's not --
9 if you got -- is there anything you want to run with,
10 with everything, that's the difference in the whole
11 thing, I ran -- I ran that route.
12     Q.   Is that why you were tired?
13     A.   That's not why I was tired. It -- it's
14 just -- that's the only difference in that -- in the
15 day. I know what I was going to do about it, it was
16 just that difference. It's a difference in -- that's
17 why -- that's why it hurts me so bad, that different
18 things. I was paying for it, but that's the change
19 in the whole behavior.
20     Q.   Was it more driving than you were used to
21 doing -- or not used to doing, but more driving than
22 you usually do?
23     A.   Driving -- the driving -- my driving,
24 about five hours a day, that's all it was.
25 Five hours. It's easy, you know, but -- and it's

Page 127

1 that -- it's that one day. That's -- that's --
2 that's the difference.
3      Q.   So you drove more this day than normally?
4      A.   I -- I wasn't driving the same -- I
5 drove -- I was driving a little more, yeah. Yeah.
6 So that's -- that' the difference.
7      Q.   Yeah.
8      A.   The whole difference and everything.
9      Q.   And you were on a new schedule working at
10 -- you'd been doing this a few weeks, at nighttime?
11     A.   The schedule was -- it was newer. It
12 wasn't brand new, but it was newer.
13     Q.   So the day of the wreck, if I can
14 understand, this is October 31, 2015. And if we look
15 at these logs, you've got different periods of time.
16 And it shows here you've got on duty, and on duty
17 driving, and it looks like for October 31, because of
18 the -- because of the time of the crash --
19     A.   I thought y'all saw that it was simple.
20 My schedule is the same thing every day. And that
21 one day, Friday, it changed.
22     Q.   Right.
23     A.   That's it.
24     Q.   All right.
25     A.   Every day -- every day was the same, just

Page 128

1 about. But on that Friday, it changed.
2      Q.   You would have been on duty the whole time
3 of the 31st, correct, from midnight till the time of
4 the crash at 1:44?
5      A.   I started -- the only thing, I started
6 two hours later because it got slow.
7      Q.   Uh-hum.
8      A.   I would start at 6:00, working -- loading
9 trucks up. But I started at 8:30. So because I
10 didn't have any dock hours, and he took a day off
11 and, they had me running the next -- the next route.
12 It's only -- it's a difference. It's a difference,
13 but it's a difference in -- everything else to be
14 about the same. It's a difference. But the rest was
15 there, but it's a difference.
16     Q.   Let's go with the -- the day before,
17 October 30th, 2015. You see that?
18     A.   Yes.
19     Q.   All right. Okay. So this is the day you
20 told me that you went -- you worked in the morning,
21 then you went to the gym, and you come home and
22 slept, right?
23     A.   Yeah, that's my normal routine.
24     Q.   All right. So if you look here, it looks
25 like you're on duty driving when the day starts for

Page 129

1 14 minutes, and then you got -- and then you're on
2 duty not driving from 14 minutes till -- till the end
3 of the hour there. Then you got till about 6 -- 6
4 minutes -- or 14 seconds until -- so you're barely
5 doing anything. And then it's got you off duty here
6 from 20 minutes till 3 hours and 57 minutes into the
7 day; is that right? Is that when you went off duty?
8      A.   In the a.m.?
9           MR. COX: And so just we're clear so
10 we're not talking about -- the second one
11 is duration.
12          MR. GLOVER: Sure.
13          MR. COX: It's not from time to time.
14 So here he was off duty for 3 hours and
15 57 minutes.
16          MR. GLOVER: Sure.
17          MR. COX: Okay. I just want to make
18 sure. Yeah.
19          MR. GLOVER: So when you're looking
20 at it right here -- because it starts at
21 zero in the day, though.
22          MR. COX: Well, I just want to make
23 sure you're not saying from 14 to 6 or from
24 -- so, like, this is the start time of the
25 new event, and this is the duration of that

33 (Pages 126 - 129)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 130

1    event.
2    Q.   (By Mr. Glover)  Right.  And if we carry
3    it out up here, we can see what time that was, right?
4    A.   Listen, that week was the slowest week
5    ever.
6         MR. COX:  Just listen to his
7    questions, answer his questions.
8    Q.   (By Mr. Glover)  Yeah.  I'm not trying to
9    trip you up.  I'm just trying to ask you --
10   A.   But I'm just -- I'm just getting -- I'm
11   telling you, if there's something that you want to
12   run with -- to run with, it's a change in the
13   schedule in one day.  That's the total -- the total
14   truth.
15   Q.   Let me ask you this, what time were --
16   what time were you off duty that day?  What -- when
17   was this 20 to 3 hours and 57 minutes?  When was --
18   when did it happen?  You were off duty the first
19   time --
20   A.   I was off at 3:00, because it was 3:00 in
21   the morning.
22   Q.   Okay.
23   A.   When I get -- when I get there, I will
24   take a nap.  The difference -- the difference is in
25   the whole thing is, at the time of the accident, I

Page 131

1    would have been sleeping in Atlanta on my normal
2    break or working the dock.
3         So the whole thing is, it's a change in
4    the schedule.  That's the whole -- that's what you
5    can take and run with.
6    Q.   Who changed your schedule?
7    A.   Dispatch or somebody, they were telling
8    me.  But I was still prepared for -- I still could
9    prepare at that time.  But I'm just telling you the
10   truth, if you need something to show a case on and to
11   blame things, is right there.  I had plenty of hours
12   that week of rest, plenty of hours, Man.  But that
13   schedule, that one day, that Friday, it changed.  And
14   you know what?  Your body changes.  I had got plenty
15   of rest, but it changed things.
16   Q.   I'm just trying to understand when you
17   were off, that's -- you know, I'm not trying to find
18   out what you were doing.  I just want to know when
19   were you off duty on the 30th?  And I can see here
20   off duty --
21   A    Off duty -- off duty from that morning
22   when I got in.
23   Q.   What time?
24   A.   Well, 6:30 or 7:00, whatever, till I had
25   to go in at 8:30 each night.

Page 132

1    Q.   So I got an off duty here from 7:06,
2    that's a.m.?
3    A.   Should be --
4    Q.   1339, which would be, what, 8:49, 8:39?
5    A.   13 is 1:00, isn't it?
6    Q.   1:39; is that right?
7    A.   I shouldn't be no -- I shouldn't be
8    nowhere at 1:39 in the p.m.
9         MR. COX:  Again, that's --
10   Q.   (By Mr. Glover)  I'm just trying to
11   understand here.  When were you off work --
12   A.   I --
13        MR. COX:  Let me just stop real
14   quick.  Just -- just so we're all on the
15   same page.
16        I mean, I understand what you're
17   saying, Chris, and I know -- if you want to
18   ask your questions this way, that's fine.
19   I can clean it up later.  But, again, this
20   is not from 7:06 to 1339.  This starts at
21   1706 [sic], and then this is the duration
22   till the next thing.
23        MR. GLOVER:  Sure.
24        MR. COX:  So 7:06 to 2045 is
25   13-and-a-half hours.

Page 133

1    Q.   (By Mr. Glover)  Right.  So if you look
2    at -- so 7:06 to 2045 -- so 7:06, 2045 is, what,
3    8:45?
4    A.   Yeah.  8:00.
5    Q.   All right.  So you were 7:06 -- is that
6    a.m. or p.m.?
7    A.   A.m.
8    Q.   All right.  So a.m. -- 7:06 a.m. to 8:45
9    p.m., you were off duty?
10   A.   Most of that week.
11   Q.   And from -- on your off duty here, earlier
12   in the day you were off from, what, 12:20 a.m. to
13   4:17 a.m.?
14   A.   I was off duty -- I -- I should be off
15   duty about 8:00 every day.  I don't know what that --
16   what -- I went to work at 12:00 noon unless I did
17   something else.  I don't remember doing anything
18   else.
19   Q.   But I'm just saying, that's the only two
20   times it shows you off duty in this 24-hour period,
21   correct?
22   A.   I should be off duty from the morning till
23   the nighttime.
24   Q.   And what you're talking about, your off
25   duty period, you're talking about this 7:06 to 8:45

34 (Pages 130 - 133)

EXHIBIT A

Marcus J. Bush                                       April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 134

1  period?
2      A.   That's my off time.  My normal off time
3  from 8:00 in the morning to -- to 6:00 in the
4  evening.
5      Q.   And it was in this period of time when you
6  got that sleep you told us about, 7:06 to 8:45?
7      A.   That was a.m.  Yeah, that's -- I was in
8  plenty of time to sleep.  The only thing difference,
9  I ran a different route that day.
10     Q.   All right.  Then if you go back to the day
11 before, you're off from --
12     A.   Then I went to Atlanta -- I went to
13 Atlanta at -- I got there, about, what, 11:00.  Then
14 I went to sleep from 11:00 to 2:00 to 3:00.
15     Q.   That day, your off -- your two off duty
16 times are from, like, 10 after 12:00 a.m. till
17 4:22 a.m.?
18     A.   Yeah, yeah, yeah.
19     Q.   And then again from 7:22 a.m. to 8:50
20 p.m.?
21     A.   Yeah, yeah.
22     Q.   All right.
23     A.   So that was -- that was a really slow
24 week.  It was cool, because before that, it was wide
25 open.

Page 135

1      Q.   And it was that 7:22 a.m. to 8:50 p.m. is
2  the time when you got sleep, right?  Sleep you told
3  us about?
4      A.   Yeah, between those hours, yes.  That
5  morning to the evening, yeah.
6      Q.   We go back to the 28th, would your sleep
7  have been -- looks like you got a 6:00 a.m. to 8:49,
8  you're off duty --
9      A.   That week --
10     Q.   -- 14 hours, 49 minutes.
11     A.   -- about the same thing, like I said, that
12 week --
13     Q.   Every day.
14     A.   That week, that was a slow week.  If you
15 go back the week before that, it's a lot different.
16     Q.   And it would have been those period of
17 times that you got all -- that you got the -- all the
18 sleep that you were talking about, that you were --
19 that you -- got rested?
20     A.   I got -- I got more -- more available time
21 that -- that ---particular week.  The only thing
22 difference, Man, is that I ran a different route.
23     Q.   Is that a yes?
24     A.   I got sleep.
25     Q.   You agree with me that four hours of

Page 136

1  sleep's not enough?
2      A.   It's not -- it's not appropriate, yeah.
3      Q.   As a commercial truck driver, did you --
4  were you aware that you had a responsibility under
5  the law to remove yourself if your ability or
6  alertness is impaired --
7      A.   Yes.
8      Q.   -- due to fatigue?
9      A.   Yes.
10     Q.   I want to talk to you about the -- some of
11 the things that you were aware of due to your
12 training.
13          I think you told us you studied the
14 commercial driver's license manual, the South
15 Carolina driver's license manual?
16     A.   Yes, sir.
17     Q.   All right.  There's a commercial driver's
18 license manual that was issued in April of 2015 at
19 the time of the wreck.  It was for South Carolina.
20 And I want to ask you if you agree with some of the
21 items that are contained in this -- some of the
22 statements contained in them, okay?
23     A.   Uh-hum.
24     Q.   In the section, Fatigue and Lack of
25 Alertness, it says, "Fatigue is physical or mental

Page 137

1  tiredness that can be caused by physical or mental
2  strain, repetitive tasks, illness or lack of sleep."
3          Do you agree with that?
4      A.   Yeah.
5      Q.   And you've known that since you became a
6  truck driver?
7      A.   Yes.
8      Q.   And it says, "Just like alcohol and drugs,
9  it impairs your vision and judgment."
10          Do you agree with that?
11     A.   (Nodding head.)  Oh, yes.
12     Q.   It says, "Fatigue causes errors related to
13 speed and distance, increases your risk of being in a
14 crash, causes you not to see and react to hazards as
15 quickly, and affects your ability to make critical
16 decisions."
17          Do you agree with that?
18     A.   (Nodding head.)  Yes.  Yes.
19     Q.   I'm sorry, she has to write it down.
20     A.   I understand you got a job to do, Man.
21     Q.   And you've known that since you began
22 being a truck driver?
23     A.   Yes, sir.
24     Q.   "When you're fatigued, you could fall
25 asleep behind the wheel and crash injuring or killing

35 (Pages 134 - 137)

EXHIBIT A

Marcus J. Bush                          April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 138

1  yourself or others."
2        Do you agree with that?
3     A.  I definitely agree with that.
4     Q   And you've known that since you began
5  being a truck driver?
6     A.  I live it.
7     Q   Is that a yes?
8     A.  Yes.
9     Q   It says of At Risk Groups, "The risk of
10  having a crash due to drowsy" driving -- "driving is
11  not uniformly distributed across the population.
12  Crashes tend to occur at times when sleepiness is
13  most pronounced, for example, during the night and in
14  the mid-afternoon. Most people are less alert at
15  night, especially at midnight."
16        Do you agree with that?
17     A   I don't think God made our body to sleep
18  in the daytime.
19     Q.  And this crash happened after midnight?
20     A.  Yes, yes, yes, yes, yes, yes.
21     Q.  It asks you here. Are you at risk?  It
22  says, "Before you drive consider whether you are
23  sleep deprived or fatigued." It says, "Six hours of
24  sleep or less triples your risk."
25        Do you agree with that?

Page 139

1     A   Yeah, yeah. And I feel like I was okay.
2     Q.  All right. And that's something you've
3  known since you became being a truck driver?
4     A.  Yes, sir. Yes, yes, yes, yes.
5     Q.  It says, "Suffering from sleep loss,
6  insomnia, poor quality sleep or sleep debt puts you
7  at risk."
8        Do you agree with that?
9     A.  Yes.
10     Q.  You've known that?
11     A.  Yes.
12     Q.  It says, "Driving through the night,
13  mid-afternoon, or when you would normally be asleep,
14  many heavy motor vehicle accidents occur between
15  midnight and 6:00 a.m."
16        That's something that you've known,
17  correct?
18     A.  Yes, yes, yes, yes, yes.
19     Q.  And it says, "Driving alone on a long
20  rural, dark or boring road" is something that puts
21  you at risk.
22        And that's something you've also known,
23  correct?
24     A.  Yes.
25     Q   It says here, Preventing Drowsiness,

Page 140

1  before the trip. It says, "Get adequate sleep.
2  Adults need eight to nine hours of sleep to maintain
3  alertness."
4        Do you agree with that?
5     A.  Yes.
6     Q.  It says, "Consult your physician if you
7  suffer from daytime sleepiness, have difficulty
8  sleeping at night or take frequent naps."
9        Do you agree with that?
10     A.  Yes.
11     Q.  It says, "Maintaining alertness while
12  driving is what you're supposed to do. So stop
13  driving, get some rest or take a nap."
14        Do you agree with that?
15     A.  Yes.
16     Q.  Was your phone number 803-624-3673?
17     A.  I'm -- I'm not sure whether it's that same
18  number or not.
19     Q.  You don't recall the number?
20     A.  I go through phones like none other.
21     Q.  Do you know someone that has an email
22  address volleystrawberry2751@hotmail.com?
23     A.  I -- I -- I may. I know somebody that --
24  several people I meet online. I put a picture of
25  myself on -- for calling me up.

Page 141

1     Q.  I think you told us that this wreck
2  happened about 1:44 on --
3     A.  I don't know exactly what time it was.
4     Q.  Did you send any texts after the crash
5  happened?
6     A.  Yeah, I send -- the -- the girl I dated,
7  yeah.
8     Q.  And was her number 803-480-5448?
9     A.  I have no idea of her number. Matter of
10  fact, you know what? That -- that phone was -- that
11  phone was in that girl's -- the girl that they had
12  arrested, she gave me -- she -- it was in her name
13  after I changed it over. I got business. That's how
14  close we were. I didn't think about that.
15     Q.  What was her name?
16     A.  Jacqueline Griffin McCarthy. She -- one
17  of the investigators took pictures of me in my house,
18  like, in the yard. I got a letter -- then she gave
19  me a letter three weeks ago. You want to see the
20  copy of the letter?
21        MR. COX: I think they sent the
22  letter, so I think they have it.
23        THE WITNESS: She is at my house,
24  spent the night a couple of nights. And
25  she -- to see the documents -- she sent --

36 (Pages 138 - 141)

**EXHIBIT A**

Marcus J. Bush                                      April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 142

1  she brought in documents. But she changed.
2  She did -- I don't...
3      MR. COX:  Sit up. Face forward.
4      Q.  (By Mr. Glover)  Do you know a Kevin
5  Hayes?
6      A.  I'm really bad with names, but -- I didn't
7  think about that. That phone was in her name.
8      MR. COX:  Hold up.
9      Are these people y'all have
10 identified in discovery?
11     MR. GLOVER:  I don't know who they
12 are.
13     THE WITNESS:  The lawyer that
14 investigator talked to...
15     Q.  (By Mr. Glover)  Who was your -- who was
16 your girlfriend at the time of the crash?
17     A.  I have a different --
18     Q.  Who were you seeing?
19     A.  Both of them had just caught me.
20     COURT REPORTER:  I'm sorry?
21     THE WITNESS:  Both of them had
22 just -- well, I couldn't -- we call each
23 other, messing around. I was just trying
24 to do my thing, and...
25     Q.  (By Mr. Glover)  What was her name?

Page 143

1      A.  It was -- it was Nancy Buck, yeah.
2      Q   Nancy Buck?
3      A   Yeah.
4      Q.  And do you have her phone number?
5      A.  No. But she -- she's done good. She's at
6  peace with her life. She's not hard to find, I don't
7  think.
8      (Plaintiff's Exhibit 3 was marked for
9  identification.)
10     Q.  (By Mr. Glover)  I want to show you what
11 I'll mark as Exhibit 3 to your deposition. This is a
12 response to a subpoena issued by Slover, Prieto,
13 Marigliano & Holbert firm on June 16th, 2016 to
14 Verizon for telephone number 803-624-3673.
15     You can't remember whether that's your
16 number or not?
17     A   I mean, I -- it may be. I'm not positive,
18 Man, because it's been a long time.
19     Q.  I want to look at your off duty time on
20 the 30th. You were off duty between 7:06 and 8:45 on
21 your logbooks in Exhibit 2, correct?
22     A.  Yeah, everything it says here.
23     Q.  You went off duty at -- you went back on
24 duty at 2045. Would you be surprised that these are
25 the text messages you had while you were off duty,

Page 144

1  what's highlighted here on -- between 10-30-2015 at
2  2044? You've got three pages worth of text messages
3  that go during that period where you were supposed to
4  be asleep at 10:00 -- to back to 7:00 - 11:00 a.m. on
5  10-30-2015. Isn't it true you really never went to
6  sleep, did you?
7      A.  No, I mean, I -- if -- that's -- if I went
8  to sleep and my phone right beside me.
9      Q.  Do you know we can tell if you sent a
10 message on here?
11     A.  I'm sure you can, Man. That's why it's
12 there where I put it.
13     Q.  Would you be surprised that you were
14 sending texts throughout that time period?
15     A.  I sent texts, yes. Yep.
16     Q   If you go back to the day before on the
17 29th during your break, it would be the same. Would
18 that surprise you?
19     A.  No, that wouldn't surprise me. But some
20 texts don't come through at certain times. It can
21 come through once -- at one time. So that's --
22 happens. And I sleep throughout the day.
23     Q.  You agree with me that texting while
24 you're supposed to be asleep could leave you
25 fatigued?

Page 145

1      A.  Yes. And -- yes, exactly. And text
2  messages come through at different times. I've had
3  texts...
4      Q.  What happened to that cell phone?
5      A.  I have no idea, Man. I go through cell
6  phones left and right. Truly, Man. I wish I
7  had several because I've got pictures from my work
8  that I like to show.
9      Q.  When did you lose that cell phone after
10 the crash?
11     A.  I have no idea. I lose cell -- I -- I
12 bought another one just a couple of weeks ago.
13     Q.  Do you have a different phone number today
14 than you did then, cell phone number?
15     A.  I -- I mean, I'm not positive. It wasn't
16 that important to me, though. I mean, I can't...
17     Q.  What is your cell phone number today?
18     A.  3673.
19     Q.  So it's the same number that's --
20     A.  Yeah, yeah, yeah. Same as I had, yes.
21     Q.  The -- did you keep that phone after the
22 crash for some period of time?
23     A.  I mean, I'm sure I did. But I started
24 doing landscaping right after that, and that's why I
25 lost all those phones I ever had.

37 (Pages 142 - 145)

**EXHIBIT A**

Marcus J. Bush                                April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 146

1    Q.   Did you keep it while you worked at -- you
2  worked at AAA till the end of December 2015, correct?
3    A.   Yeah, yeah, yeah, yeah.
4    Q    Did you have that same phone while you
5  worked there?
6    A.   I've had several phones. I go through
7  phones, Man. I mean, I just don't -- I work the
8  dock. I'm bad on phones.
9    Q    Did you buy a new phone at some point?
10   A    I bought -- I bought ten new phones in --
11 I bought three this year.
12   Q.   When were the records going to show you
13 got a new phone after the crash, is it going to be --
14   A.   I don't know.
15   Q.   -- a week later, a month later, six
16 months?
17   A.   I can't -- honest to God, I cannot tell
18 you when.
19   Q.   Did you have the phone, the same phone
20 when you left your job at AAA Cooper a month and a
21 half later?
22   A.   I -- I know for a while, I don't think I
23 had a phone for a month.
24   Q.   You didn't have a phone at all?
25   A.   I mean, I -- I lost them so much. I break

Page 147

1  them, I've dropped them in cement or something. I
2  was doing physical work. I worked at the dock a lot,
3  and I got in trouble because I was working the dock
4  on the phone. And I broke it and dropped it. I was
5  single that week.
6    Q.   Were you ever told that you needed to keep
7  that phone by AAA Cooper?
8    A.   No, I -- nobody told me -- I mean, I --
9  no, nothing. No. Because I think -- I think that --
10 I think my lawyer had it, yeah.
11       MR. COX: Wait. Wait.
12       THE WITNESS: Sorry. I'm sorry.
13       MR. COX: Don't say anything about
14   what you told me or what anybody in my
15   office has told you, okay?
16   Q.   (By Mr. Glover) I don't want to know what
17 -- I don't want to know what anybody told you to do,
18 but did you give your phone to anyone?
19   A.   I don't remember that far, and I don't --
20 I don't remember any reason to hold on to it because
21 it was a piece of -- the phone was jacked up --
22 anyway, because my phones usually get wore out pretty
23 quick. And I break phones a lot. And at that time I
24 had plenty of money.
25   Q.   Did you remember giving that phone to

Page 148

1  anybody?
2    A.   I don't think I would want them in my own
3  phones.
4    Q.   Were you ever made aware from AAA Cooper
5  that you needed to keep the phone?
6        MR. COX: And again, nothing that you
7    talked about with either me or anybody in
8    my office.
9        THE WITNESS: All I remember is
10   somebody taking me -- telling me to get the
11   -- pick this up.
12   Q    (By Mr. Glover) You were at AAA Cooper
13 for approximately two months after this crash,
14 correct?
15   A.   I didn't -- I didn't go on the property.
16   Q.   Okay. But you just -- but you didn't
17 officially get -- I mean, their paperwork says end of
18 December 2015.
19   A    I didn't -- I didn't -- I hugged my guy
20 when I got home, and they told me they loved me, and
21 I went home. I ain't been nowhere -- I don't go
22 anywhere near the truck.
23   Q.   What was the phone you got after this one,
24 the one that we've been talking about you had at the
25 time of the crash?

Page 149

1    A.   Man...
2        MR. COX: Are you talking about the
3    phone after that one?
4        MR. GLOVER: Yeah.
5    Q.   (By Mr. Glover) What was -- what kind of
6  phone was it?
7    A.   I have no idea. People give me phones --
8  I finally bought so many when my money was tight, you
9  know. I spent my last $10,000 on furniture --
10 equipment for my room, sold my hotrod, everything I
11 had.
12   Q.   When was that?
13   A.   That guy ripped me off on the hotrod. I
14 sold everything. I have nothing available right now.
15   Q.   Did you ever have anything besides an
16 iPhone?
17   A    Oh, I've had -- I had junk -- I had junk
18 phones, all kinds of phones, but it wasn't important
19 to me because, I mean, I didn't want -- I didn't want
20 to talk to anybody. I just got that phone
21 three weeks ago. The other one, I couldn't talk on
22 it. My life pretty much was -- has been hell since
23 that day.
24       MR. COX: Just wait for a question.
25       THE WITNESS: I'm sorry.

38 (Pages 146 - 149)

EXHIBIT A

Marcus J. Bush                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 150

1      MR. COX: All right. You're doing
2  good.
3      Q   (By Mr. Glover) How do you pay for your
4  phones?
5      A.  How do I pay for my phones?
6      Q.  Uh-hum.
7      A.  I started my business -- I got accounts
8  that pay me.
9      Q.  Well, I'm talking about when you go in to
10 get a new phone from Verizon after this wreck, how
11 did you pay for it?
12     A.  I changed different companies because
13 Verizon was robbing me.
14     Q.  So was this the last phone that you had at
15 Verizon, the one you had at the crash?
16     A.  I think, yeah. Yeah, it should've been.
17 No, I might have both. I can't remember. I changed
18 that. I got one changed over. I know my phone was
19 high at that time.
20     Q.  What was the next company that you went
21 with?
22     A.  Who am I -- the one I'm with now, I think
23 -- who am I with now? Where my phone at. Hey, is it
24 Pace Plus, Man? A buddy of mine owns the business,
25 when you get things cheaper.

Page 151

1      Q   Pace Plus is who you're now?
2      A.  Yeah, yeah.
3      Q.  But you had the same phone number you had.
4  803 -- the 3673 number?
5      A.  Uh-hum.
6      Q.  So Pace Plus would be able to tell us when
7  you started with them?
8      A.  Yeah, yeah, yeah, yeah, yeah, yeah.
9          (Plaintiff's Exhibit 4 was marked for
10 identification.)
11     Q.  (By Mr. Glover) I want to show you what
12 I'll mark as Exhibit 4 to your deposition. And if I
13 could point your attention to -- well, you can look
14 at it all if you want to, but we'll just be looking
15 at these two pages.
16         Those are records that were produced to us
17 in this case from AAA Cooper. And if I could get you
18 to turn to that first tab. Again, that's Plaintiff's
19 Exhibit 4.
20     MR. COX: Talking about the email?
21     MR. GLOVER: Yeah.
22     Q   (By Mr. Glover) It's got a termination
23 date of -- what's the date there I've got
24 highlighted? December 31st? Was that the day that
25 you understood you were terminated from --

Page 152

1      A.  I don't remember -- I don't remember
2  anything after that termination, you know.
3      Q.  Okay. Do you know why you were
4  terminated?
5      A.  No, I -- I wasn't -- I walked away.
6      MR. GLOVER: Can I see that? I'll
7      give it back.
8      Q.  (By Mr. Glover) It states job abandonment
9  as the basis for termination. Is that your
10 understanding, you just didn't come back?
11     A.  Man, I dont want to be near the truck,
12 Man.
13     Q.  The hiring guidelines back here in the
14 back for AAA Cooper, it's got a section on Criminal
15 Background. Were you aware that they said "Strong
16 consideration will be given to any record of criminal
17 activity" by any -- "by an applicant, including but
18 not limited to the following," and it's got three
19 categories you're welcome to read. But were you
20 aware that criminal background was a strong
21 consideration of your employment with AAA Cooper?
22     A.  Yeah, I think it would be with anybody,
23 you know.
24     Q.  The next is your driving record. It's
25 got -- states, "When considering applicants who may

Page 153

1  be subject to drive, AAA Cooper will strive to exceed
2  the minimum standards prescribed by DOT using the
3  following guidelines." And it states here, "An
4  applicant must list on his application all traffic
5  convictions and accidents within the last
6  three years; an applicant should have no record of"
7  con -- "conviction for more than four motor vehicle
8  violations during the previous three years; no more
9  than two of these may be within the last 12 months.
10 An applicant should have no record of involvement in
11 more than two at-fault traffic accidents during the
12 previous three years. An applicant should have no
13 record of DUI for the previous three years."
14         Were you aware that that was the
15 guidelines at AAA Cooper?
16     A   I mean, I didn't -- did I sign something?
17 Like, if I signed something, I must have been aware.
18 But I have my record, I wasn't convicted of anything
19 of -- other than -- I applied at -- I did -- didn't
20 put down the -- the pending because it was pending.
21 Other than that, that's -- that's all I know.
22     Q.  And you didn't tell them about that later,
23 correct?
24     A.  I should have, but I didn't. Didn't.
25 Yeah, again, I may have because I added -- had a

39 (Pages 150 - 153)

Veritext Legal Solutions

800.808.4958                                770.343.9696

EXHIBIT A

Marcus J. Bush                                            April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 154

1  point added, it talks about a point, if I'm not
2  positive, but I'll probably say I didn't, but I
3  know...
4     Q.   You know that driving records are
5  important, though, as a truck --
6     A.   Yes.
7     Q.   You've been in the trucking business for a
8  long time?
9     A.   Yes, yes, yes.
10    Q.   That's -- that's the most important thing
11 when you're trying to apply for a job, isn't it?
12    A.   Yes. It's hard to get a job myself,
13 anyway.
14    Q.   You were working for AAA Cooper in April
15 of 2013, correct?
16    A.   I think -- I think so. I don't know exact
17 dates. No, I -- I shouldn't have to -- I got -- I
18 got here in 12. I don't think I'd been with them
19 working.
20    Q    It's got -- it said -- I got you started
21 at May 13th, 2013, and then working there until
22 December 30th, 2013 -- '15. Does that sound right?
23    A.   About right, I guess. I think so.
24    Q.   Did you go get a medical exam in April of
25 2013 -- April 30th, 2013, prior to going to work for

Page 155

1  AAA Cooper?
2     A.   A medical exam?
3     Q.   Yeah.
4     A   For who?
5     Q.   For your -- for your medical exam report,
6  for your driver -- medical card?
7     A.   Yeah, yeah, yeah, yeah, had to get a
8  physical.
9     Q.   Did you go get one before you started at
10 AAA Cooper?
11    A.   Yeah, yeah. By the road here.
12       (Plaintiff's Exhibit 5 was marked for
13    identification.)
14    Q.   (By Mr. Glover) Going to show you what
15 I've got marked as Exhibit 5. Your driver file.
16 Going to show you page 2.
17       MR. COX: Are you making this whole
18    thing an exhibit?
19       MR. GLOVER: I marked the whole thing
20    as an exhibit, yeah.
21    Q.   (By Mr. Glover) You see at the bottom of
22 that page where it says, Positive daytime sleepiness?
23       MR. COX: Just for the record, this
24    is AAA Cooper 0002.
25       THE WITNESS: Okay. And --

Page 156

1        MR. COX: I'm going to object because
2  I disagree that's what that says, but...
3        THE WITNESS: I don't understand.
4     Q    (By Mr. Glover) Do you -- do you -- do
5  you disagree that you told that doctor that you had
6  daytime sleepiness?
7     A.   I don't -- I don't understand the
8  question.
9     Q.   Okay. Do you disagree that --
10       MR. COX: Just answer his question.
11       THE WITNESS: Okay.
12    Q    (By Mr. Glover) Do you disagree that you
13 told the doctor who made that medical record that you
14 had daytime sleepiness?
15    A.   I had daytime sleepiness, I don't remember
16 saying that. But I don't remember -- daytime
17 sleepiness. I wouldn't want to talk about that, you
18 know. I don't remember.
19    Q.   You don't remember one way or the other?
20    A.   I don't remember talking about daytime
21 sleepiness. But I know my schedule changed. I did a
22 lot of things with AAA Cooper. I drove -- I was -- I
23 traveled all over the country. My schedule changed
24 all the time.
25    Q    Prior to that, you were selling cars,

Page 157

1  though, right?
2     A   No, I -- well, I was doing whatever -- it
3  was not -- well -- it was not good. In the
4  summertime I blew my knee out, and I couldn't work.
5  And this guy had me out for a while, and then I
6  applied for a job. I've got it in my thing here,
7  almost had it. My score was clear.
8     Q.   You don't know one way or the other
9  whether you told him that, is that --
10       MR. COX: I'm going to object. That
11    misstates his testimony.
12    Q.   (By Mr. Glover) Is it accurate that you
13 don't know?
14    A.   I don't know. I don't know why it would
15 say that.
16    Q.   Okay.
17    A.   I mean...
18       MR. GLOVER: Can I?
19       MR. COX: Sure.
20    Q.   (By Mr. Glover) There is a record from,
21 looks like, dated April 29, 2015, medical card that
22 you were 67 and 3/4 inches and 232 pounds, does that
23 sound right, back in April of 2015?
24    A.   215? 232? Good Lord Almighty.
25    Q    I'll let you look at it.

40 (Pages 154 - 157)

EXHIBIT A

Marcus J. Bush
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

April 23, 2019

Page 158

1   A.   That's pretty -- was that the same date
2   when I first started with Cooper?
3   Q.   No, that was in 2015.  April of 2015.
4   That's the date.  There's a 4-29-15.  You've got to
5   look at the actual card that goes with it --
6        MR. COX:  That's the expiration date.
7   Q.   (By Mr. Glover)  It's dated 4-2015.
8   A.   Absolutely.  I tell you, when I got home
9   from Texas, whenever it was, I was -- I looked in the
10  mirror, and I looked bad, and I -- when I went to
11  Cooper --
12  Q.   You're right, it's '13.  You go back to
13  the beginning page, it's the same record we've been
14  looking at, 4-30-13.  And then you flip forward in
15  the -- and 232.
16  A.   It must have because I -- I had a six-pack
17  at Cooper part time.
18  Q.   All right.
19       MR. COX:  So just for clarification,
20  he's asking you about in 2013.
21       THE WITNESS:  213?  213?  I seen -- I
22  don't remember being that -- I remember
23  being chunky when I first got home, it was
24  ugly, from Texas.
25  Q.   (By Mr. Glover)  Earlier you were talking

Page 159

1   about that you had to fill out a form regarding your
2   traffic accidents, correct, each year?
3   A.   Yeah.
4   Q.   They review your record?
5   A.   Yeah.
6   Q.   There's an example of one here on Bates
7   AAA Cooper 000089, and it states, "I certify that the
8   following is a true and complete list of traffic
9   violations other than parking violations for which I
10  had been convicted or forfeited bond or collateral
11  during the past 12 months."
12      You understood that when you provided this
13  information to AAA Cooper, it was a certification?
14  A.   Yeah, yeah, yeah, yeah.  Yep.
15  Q.   And you had to sign that document each
16  year when you turned it in?
17  A.   Yeah, that's anywhere.  Everywhere.
18  Q.   And you excluded the reckless driving
19  conviction that you had?
20  A.   I -- it wasn't a conviction at the time, I
21  wasn't sure.
22  Q.   You excluded it when it -- when you were
23  convicted, correct?
24  A.   I don't -- I didn't -- I didn't mean to,
25  but I don't think I did that.  I don't think the

Page 160

1   date's on there about that because I wasn't convicted
2   it.
3   Q.   You never told --
4   A.   I never wrote down something I wasn't
5   convicted of.  If I wasn't convicted for it, I didn't
6   write it down.
7        MR. COX:  Chris, is now a good
8   stopping point?
9        MR. GLOVER:  Let's see here.  I think
10  so  Yeah, we can break now.
11       MR. COX:  Okay.  We can go off the
12  record.
13       THE VIDEOGRAPHER:  We're off the
14  record at 1643.
15       (Recess from 4:43 until 4:52 p.m.)
16       THE VIDEOGRAPHER:  We are on the
17  record at 1652.
18       (Plaintiff's Exhibit 6A was marked
19  for identification.)
20  Q.   (By Mr. Glover)  I want to show you the
21  continuation of Exhibit 3, I've marked as Exhibit 6.
22  Exhibit 3 was the text records.  These are the phone
23  records from telephone number 803-624-3673.  And
24  looking at these phone records, there was a 17-minute
25  phone call that began about 1:05 a.m. and to a phone

Page 161

1   number 803-634-8279, 17 minutes.  Who was that to?
2   A.   Principal Baskett.  His son plays
3   football, and I was -- I was talking about playing
4   for the -- tailgating to the ball game.
5   Q.   Yeah.  That was the guy you were talking
6   about that you were -- you were planning the tailgate
7   for the next day?
8   A.   Yeah.
9   Q.   Saturday.
10  A.   We were best friends at that time.  It's
11  cool, though.
12  Q.   That was -- ended a little bit before the
13  crash occurred, right?
14  A.   According to that timeline, yeah.
15  Q.   Well, do you know when you -- you said you
16  started feeling funny and getting tired.  Was it
17  before that phone call or after that phone call?
18  A.   If I made a phone call usually -- it is
19  smart -- caused by -- funny, you know.  But I don't
20  remember why I called him -- well, I called him
21  because he was at the game, and I can't remember
22  exactly what time, but I don't know the exact time.
23  I can't give you an accurate time.
24  Q   But do you know if it was after the call
25  or before the call?

41 (Pages 158 - 161)

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 162

1      A.   I -- I -- it was somewhere in between
2   that time.  I don't know exactly before or after.  I
3   can't tell you if it was before or not.
4      Q.   It could have been before?
5      A.   It could have been after.  It could have
6   been either.
7      Q.   Either one?
8      A.   Yeah.
9      Q.   If you go back to the day before and you
10  look at that time period, 7:43 to 8:40 when you were
11  sleeping.  You see the phone calls that you had made,
12  you were surprised to see the number of phone calls
13  during that period of time when you were off duty?
14     A.   Yeah.  Was I surprised, the phone calls
15  made -- it comes in different times, Man.
16     Q.   You agree that you can't get sleep when
17  you're talking on the phone?
18     A.   Yep, yep, yep.  Can't.
19     Q.   If you go back to the day before that,
20  looking at the off duty period of time again, there
21  were periods of time you were talking on the phone
22  when you were --
23     A.   I agree.
24     Q.   All right.  And you can't get sleep when
25  you're talking on the phone?

Page 163

1      A    When I was talking on the phone in those
2   times.
3      Q.   Yeah.
4      A.   Yeah.  I know I slept -- the texts could
5   come in any of the times, that kind of thing.
6      Q.   And that might be a good explanation why
7   you were tired, right?
8      A.   I'm tired for all reasons.  It's awful,
9   Man.
10     Q.   And you agree that those -- all that
11  talking on the phone and texting may be a reason you
12  were tired at the time of the crash?
13     A.   No, I don't believe that.  I don't know
14  was I on the phone those times because I -- you get
15  messages at different times, I don't -- my phone --
16  the lady said I play with it, and I sleep weird, you
17  know.  And so I couldn't say that those -- those
18  happened at that particular time.  But I did talk on
19  the phone and it did -- I -- it makes my time,
20  definitely.
21     Q.   There was a record from the AAA Cooper
22  files, stated that you had a corrective action for
23  excessive tardiness.  Do you recall that?
24     A.   Yeah, yeah, yeah, yeah.
25     Q.   What was that about?

Page 164

1      A.   I had girls come over, and I was trying to
2   get some before I went to work.
3      Q.   Says you called about your well being when
4   you stated you forgot to set your clock.  Did you
5   sleep late?
6      A.   I slept late -- and at the time, that's
7   when I was taking care of two women, and it's kind of
8   hard.
9      Q.   And that was in February of 2015?
10     A.   Yeah.  At the time of the accident I had
11  nobody.  And probably that next --
12     Q.   What do you mean by taking care of two
13  women?  You mean you were up at night late with them?
14     A    No, they come out and -- you know, and I
15  had to do things.
16     Q.   And there's a record from May 5th, 2014
17  concerning an accident on April 22nd, 2014, says
18  there's a preventible accident.  Do you recall a
19  preventible accident on April 22nd, 2014?
20     A.   I -- I don't remember.  You got a lot of
21  accidents I don't remember.  You know, I don't know
22  what happened with all this.  Been so long ago, too.
23     Q.   You don't know anything about what
24  happened?
25     A.   I don't.

Page 165

1      Q.   Okay.
2      A.   I just can't remember all that what was
3   going on.
4      Q.   There's an April 3rd, 2014, AAA Cooper
5   document concerning an accident of March 31, 2014,
6   they determined to be preventible.  Do you know
7   anything about that crash?
8      A.   I have that on my mind, and I don't...
9      Q.   Don't remember?  There's a February 4th,
10  2014 letter concerning a January 7, 2014 accident
11  they determined to be preventible.  Do you know
12  anything about that?
13     A.   That's a lot of things going on.  I don't
14  know.  I don't know under -- I don't remember,
15  honestly, all that stuff.  I mean, that don't sound
16  like somebody who would be asleep.
17     Q.   Then there's a June 28th, 2013, AAA Cooper
18  letter concerning an accident on June 20, 2013.  Do
19  you remember that one?
20     A.   I don't -- you got a lot of things going
21  on that I don't remember, and I -- I don't -- the way
22  that sounds, that was authorized when I worked for
23  the company with that stuff going on.  It could be
24  something standing or something non-commercial, I
25  don't know what that is.

42 (Pages 162 - 165)

Veritext Legal Solutions

800.808.4958                                     770.343.9696

**EXHIBIT A**

Marcus J. Bush                                        April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 166

1  Q.  You agree that's a lot of acts?
2  A.  I totally agree there's something going
3  on, it should be done with.  And that's -- I don't
4  remember those things like that.  I don't think they
5  liked me that much.
6  Q.  What do you mean you don't think they
7  liked you that much?  What do you mean by that?
8  A.  I mean, they liked me because I was -- I
9  did things that nobody wanted to do, you know what
10  I'm saying?  It must have been something
11  documented -- something -- if something happened, and
12  they might have documented it and investigated it or
13  something.  Because that doesn't sound like a company
14  would keep somebody with those accidents were proven
15  to be whatever, you know.  So they been good to me.
16  They were a good company.  Now, I feel bad about what
17  happened.  Feel very, very bad about what happened.
18  Q.  Do you think Ms. Roberts did anything
19  wrong?
20  A.  It's my fault, Man.
21  Q.  Do you agree that what happened was --
22  falling asleep at the wheel is extremely dangerous?
23  A.  It's my fault, Man.  It ain't no question
24  about it.  It's my fault.  I got to deal with it.
25  And God forgave me, and I'm not going to lie because

Page 167

1  Jesus Christ forgives.  That's what he done.  I will
2  praise his name till the day I die.  I'm very
3  grateful that that young lady prayed for me and
4  forgave me.  I pray the wife of that gentleman, I
5  pray she can forgive me for all her soul.  I lose
6  every day.  I can die tomorrow because my soul is
7  right.  Me and God is cool.  I know I wouldn't be
8  here.  I know what I did was wrong, and I -- I do it
9  back, I done -- I mean, I did the proper procedure,
10  but things happen.  And if you look at the situation,
11  it's -- it changed, Man.
12  Q.  Are you term -- familiar with the term
13  preventible accident?
14  A.  Yes, sir.
15  Q.  Do you know if there was ever any kind of
16  preventability analysis done on this crash by AAA
17  Cooper?
18  A.  I did -- I was aware of and put -- if they
19  put in progress, it happened.
20  Q.  Do you think they did an analysis?
21  A.  I think they did what they were supposed
22  to done.  I mean, if that --
23  Q.  Did you ever see if they did a
24  preventability analysis on this crash?  Have you ever
25  seen it, a report or a piece of paper that says we've

Page 168

1  determined this crash to be preventible or
2  unpreventable?
3  A.  Well, it don't take a rocket scientist to
4  see that -- I mean, I never heard of an accident
5  being -- I mean, have you -- have you seen anybody
6  charged with one, not preventible?  Nothing
7  unpreventable.  It's a cause and effect.
8  Q.  I'm just asking if you know if they did it
9  or not.
10  A.  No positive there, I don't know, because I
11  just haven't...
12  Q.  What kind of training did you get from AAA
13  Cooper regarding --
14  A.  AAA Cooper did their job as far as I'm
15  concerned.  I was negligent that I fell asleep.  And
16  I was in the process of doing the right thing, and it
17  didn't work out for me.  And it was the slowest week.
18  And it's my fault, and I got to deal with it.  I've
19  got to face God with this.
20  Q.  Do you know if Triple -- tell me the
21  training you got at AAA Cooper, what classes did you
22  take?
23  A.  They just started dismissing some
24  training, which I thought was great, because I
25  learned that 20 years ago, and it was a really good

Page 169

1  thing there.  Just ease on my son.
2  Q.  So they use the Smith system?
3  A.  I think they just started -- it just
4  started more -- more training because they -- they
5  set the game up a little bit right prior to that.  I
6  had just taken one class -- a bunch of those crazy
7  test things.
8  Q.  You took tests?
9  A.  Yeah, there's testing they did.
10  Q.  Did you watch videos?
11  A.  Yes.
12  MR. GLOVER:  We're on 6; is that right?
13  COURT REPORTER:  Yes.
14  (Plaintiff's Exhibit 6B was marked
15  for identification.)
16  Q.  (By Mr. Glover)  Did you do any online
17  classes, like computer?
18  A.  Yeah.
19  Q.  Y'all did that at AAA Cooper?
20  A.  It was computer stuff.  I think it was a
21  new program because it was long.  I remember it being
22  long.
23  Q.  Did it address the issues of driving
24  fatigued?
25  A.  I was prepared for what was going on.

43 (Pages 166 - 169)

Veritext Legal Solutions

800.808.4958                                               770.343.9696

**EXHIBIT A**

Marcus J. Bush                                              April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 170

1    Q.   Did it address the issue of -- well, is
2  that a yes? Did it address the issue of driving
3  fatigued?
4    A.   It addressed issues of being a
5  professional driver, yeah, I think.
6       COURT REPORTER:  Addressed the issue
7  of what?
8       THE WITNESS:  Duties of being a
9  professional driver.  So it could cover
10  everything.  The thing is, I knew that.
11  It's just a bad situation.
12    Q.   (By Mr. Glover)  Did you attend any safety
13  meetings?
14    A.   Yes.
15    Q.   Did they address the issue of fatigue
16  driving?
17    A.   We just had a safety guy come in town --
18  come in town.  It's been so long.  I know that --
19  that their guidelines had gotten better on things.
20    Q.   What did the -- how did you get the Smith
21  System training?  How did they give that to you at
22  AAA Cooper?
23    A.   Well, I did it, and I taught it to my
24  students when I did it, and I -- it's a good system
25  to work with.  Very good.

Page 171

1    Q.   I mean, but how did they do it?  Do they
2  do it in a classroom, did you do it on a --
3    A.   Yeah, you do it in a classroom.  He went
4  over it very thoroughly.  It's a while, but it's very
5  effective.
6    Q.   Were there any handouts that went with it?
7    A.   I can't say totally, but I think so.
8    Q.   How about videos?
9    A.   Yeah, they showed videos of different
10  things, yeah.  I seen Smith Systems on several
11  different companies.
12       (Off the record.)
13    Q.   I'm going to show you what I've marked as
14  Plaintiff's Exhibit 6, and there's a -- beginning on
15  Bates AAA Cooper 322.  There's a document called
16  Professional Driving Course.  Do you recall seeing --
17  taking the professional driving course at AAA Cooper?
18    A.   I don't remember exactly it being that
19  name, but I remember -- I don't remember it exactly
20  being that name.
21    Q.   Was there something other than that you
22  that took with AAA Cooper?
23    A    I remember -- it's testing that I had to
24  -- we had to go through, that everybody had to -- it
25  was a long time, but I can't remember exactly.  But I

Page 172

1  done went through...
2    Q.   Do you know if there was more than --
3  there's -- looks like there's AAA 322 -- AAA 322
4  through 339.  So approximately 20 pages of -- do you
5  know if there was more than 20 pages of things that
6  you --
7    A.   I don't remember.
8    Q.   -- had at AAA Cooper?
9    A.   I don't totally remember.
10    Q.   Could that be all that you got?
11    A.   No, they -- they use -- we had more the
12  last part of the year than we ever did.  They was --
13  they was tighten -- just tightening things up.
14    Q.   Anybody ever talk to you about the need to
15  sleep during off duty hours at AAA Cooper?
16       MR. COX:  Marcus, put it away.  Focus
17  on what's going on.
18       THE WITNESS:  They talk to us about
19  being safe.  And I know the -- I know our
20  responsibility of being safe being -- in
21  driving.
22    Q.   (By Mr. Glover)  Was it specific to
23  sleeping?  There's a lot of ways to be safe.  Was it
24  specific to sleeping?
25    A.   Well, you need to sure you get the proper

Page 173

1  hours.
2    Q.   Was that all?
3    A.   I -- I -- I think the sleeping, I mean, I
4  don't think there's much more you can get through
5  that, effects of sleeping.
6    Q    Well, it's important to sleep when you're
7  off hours, too, though, not just being off, right?
8    A.   Exactly.  Exactly.  Very important.
9    Q.   Anybody in the house with you that when
10  you were -- anybody live with you when you were --
11  that day before the crash, two days before the crash?
12    A.   (Nodding head.)
13    Q.   Who was living with you?
14    A.   I was at -- at the time I had a lot of
15  girls living with me.
16    Q.   Were there the day before the crash
17  -- in the two days before the crash?
18    A.   They were in and out.  They -- I was -- I
19  wasn't the person that I should have been.  I was --
20  and unfortunately this accident saved my life.
21    Q    What do you mean by that, wasn't the
22  person you should have been?
23    A.   I was a liar and arrogant and not
24  forgiving.  I wasn't forgiving and understanding and
25  loving as I am now.  I forgave my mother and forgave

44 (Pages 170 - 173)

EXHIBIT A

Marcus J. Bush                     April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 174

1  my father and forgave everybody that hurt me. I
2  don't want to deal with this person ever again. And
3  I've left with every single person on this earth, and
4  unfortunately things that I struggle with is behind
5  me now. That's what bothers me that it saved me and
6  it hurts me the most that it saved my soul. Because
7  I thought I was a Christian, but I wasn't.
8     Q.   I think what I was trying to understand
9  was what is it about the two -- I think you had some
10 people in and out that -- that made you feel like you
11 weren't the person you should have been?
12    A.   I wasn't -- I wasn't -- I was basically a
13 hypocrite. I wasn't living the life like -- I mean,
14 I was sleeping with all of the girls in my house, and
15 that's not right. And I was -- I wasn't living
16 right. Now I live by myself, and I -- and I -- and I
17 try to hang out with people that's positive and do
18 the right thing.
19    Q.   Were they -- was it two or more?
20    A.   Well, they weren't responsible people.
21 They were just pretty girls to get my attention, and
22 they was available, and they -- it was irresponsible
23 and did stupid things.
24    Q.   Do you recall their names?
25    A.   Yeah, yeah, I did because they -- they

Page 175

1  were -- they were people -- I was stupid.
2     Q.   Who are they?
3     A.   Who was that, Bushay, and what's that
4  other girl's name? What's her name? I dated her
5  sister. What is her last -- yeah, it have to be --
6  pardon me --
7        COURT REPORTER: What did you say?
8        THE WITNESS: Her -- she was bringing
9     bad guys, and they stole my stuff, my
10    equipment, my kegs. It was awful.
11    Q.   (By Mr. Glover) Do you remember Bushay's
12 last name?
13    A.   Tis Bushay, that's her name.
14    Q.   Tis Bushay?
15    A.   Yeah. Her name is Bushay. I mean, she's
16 -- I ain't saw her -- I ain't saw her in a while.
17 She was there, yes. Was there anybody else? I had a
18 lot of girls go through there, Man. But nobody with
19 me now.
20    Q.   Is that -- Tis Bushay her legal name?
21    A.   No, no, Nikki Bushay.
22    Q.   Nikki Bushay, that's her real name?
23    A.   Yeah, yeah, yeah. She lives in North
24 Augusta. I ain't -- I haven't seen her in a while,
25 but...

Page 176

1        MR. GLOVER: Let me take a break and
2     talk to these guys and see.
3        MR. COX: Okay.
4        THE VIDEOGRAPHER: We are off the
5     record at 1714.
6        (Recess from 5:14 until 5:22 p.m.)
7        THE VIDEOGRAPHER: We are on the
8     record at 1722.
9     Q.   (By Mr. Glover) When you left the scene
10 of the crash, you left in a patrol car, correct?
11    A.   (Nodding head.)
12    Q.   And where did they take you?
13    A    To the hospital.
14    Q.   Which hospital did you go to?
15    A.   I don't -- I don't remember.
16    Q.   Which city were you in?
17    A.   I -- I -- I don't -- I don't remember.
18    Q.   What did they do at the hospital?
19    A    All I remember, I was upset. I remember
20 him being in the bathroom with me, why -- why did he
21 use the bathroom.
22    Q.   The police officer?
23    A.   Yeah.
24    Q.   And he did a urine test?
25    A.   Yeah. And it was uncomfortable because I

Page 177

1  was...
2     Q    Have you ever seen the results of the
3  urine test?
4     A.   No.
5     Q.   Have you ever been made aware of the
6  results of the urine test?
7     A.   It was good because -- I mean, I know it's
8  good.
9        COURT REPORTER: What now?
10       THE WITNESS: It's -- I mean, I'm
11    assuming I'm fine, and I am fine.
12    Q.   (By Mr. Glover) What was the -- what else
13 -- what else did they do there, anything else? Did
14 they take blood?
15    A.   No, I don't -- I don't think they took
16 blood, but -- I just remember -- I remember -- I just
17 remember him being in the bathroom with me and all
18 that kind of stuff and feel like.
19    Q.   And after you left the hospital, where did
20 you go?
21    A.   Went to jail.
22    Q.   Did you stay there overnight?
23    A.   Yeah, I was there -- it was the weekend.
24    Q    How long -- how far was your house from
25 the terminal?

45 (Pages 174 - 177)

**EXHIBIT A**

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 178

1    A.   10 miles, 12 miles, 10 miles.
2    Q.   And did you drive from home to the
3  terminal each day to work, that's where you were --
4  isn't that where you kept your truck?
5    A.   Yeah.
6    Q.   And you say it's 10 miles?
7    A.   I'm guessing.
8    Q.   Who is -- where does Nancy Buck live?
9    A.   She's in Lynhurst.  It's called Lynhurst.
10   Q.   Were you still seeing Lance -- Nancy
11  Buck --
12   A.   No, no.
13   Q.   -- around the time of the crash?
14   A.   No, no.
15   Q.   How about Jackie McCarthy, have you ever
16  seen her before?
17   A.   Jacqueline -- Jacqueline McCarthy, that's
18  an old friend that -- it all mixed together.  A whole
19  nightmare together.
20   Q.   Were you still seeing her around the time
21  of the crash?
22   A.   I was -- I was seeing Nancy and Jacqueline
23  between a friend that was hating them, the situation,
24  started worrying about his life.  You pull it up,
25  you'll see.

Page 179

1    Q.   But you weren't seeing either one of them
2  at the time of the crash, or you were?
3    A.   No.  I was -- all of my ladies' friends
4  are mad at me.
5    Q.   All right.  You say you had -- was it
6  Nikki Bushay?
7    A.   Yeah.
8    Q.   How does she spell Bushay?
9    A.   I don't know.
10   Q.   Who's the other girl, there was another --
11  you said Nikki and another girl?
12   A.   Polis.  Linda Polis.
13   Q.   Linda?
14   A.   Yes.  She's the one that -- that her
15  boyfriend's taking my stuff.
16        COURT REPORTER:  Her boyfriend what?
17        THE WITNESS:  They was -- she brought
18  bad guys in my house.  I said, Don't bring
19  any guys in my house.  Go to the house, and
20  she...
21   Q.   (By Mr. Glover)  What was Linda's last
22  name?
23   A.   Polis.
24   Q.   P-o-l-i-s?
25   A.   I...

Page 180

1    Q.   Polis.
2    A.   There's other girls that came through
3  there, but...
4        MR. GLOVER:  I think that's all of
5  the questions I have.
6        MR. COX:  No questions for me.  While
7  we're still on the record -- well, you can
8  go off the video record.
9        THE VIDEOGRAPHER:  This concludes the
10  deposition of Marcus Bush.
11        We are off the record at 1727.
12        MR. COX:  I'll just object to the use
13  of any of the exhibits that weren't
14  identified if they are put in evidence
15  based off the deposition.
16        (Off the record.)
17        MR. GLOVER:  During the course of the
18  deposition, we marked two Exhibit 6s.  One
19  of them being the training records among
20  other things that we discussed as
21  Plaintiff's Exhibit 6.
22        The second being the telephone
23  records, and we have now marked the
24  telephone records as Exhibit 6B.
25        MR. COX:  There will be no offense to

Page 181

1  your skills, but I ask that he read and
2  sign.
3        THE WITNESS:  No, that's fine.
4  That's good.
5        MR. COX:  You can put it to my
6  attention.
7        COURT REPORTER:  Okay.  And do you
8  want just an Etran?
9        MR. COX:  Yes.
10        COURT REPORTER:  And do you want an
11  Etran?
12        MR. GLOVER:  Yes.
13        COURT REPORTER:  Hard copy as well?
14        MR. GLOVER:  Yes.
15        (The reading and signing of the
16  deposition by the witness was reserved.)

46 (Pages 178 - 181)

**EXHIBIT A**

Marcus J. Bush                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

Page 182

1    DISCLOSURE
2    DEPONENT: MARCUS BUSH
3    STATE OF GEORGIA
4    COUNTY OF RICHMOND
5    Pursuant to Article 10.B. of the Rules and
     Regulations of the Board of Court Reporting of the
6    Judicial Council of Georgia, I make the following
     disclosure:
7
     I am a Georgia Certified Court Reporter. I am
8    here as a representative of Augusta Scribes Court
     Reporters, LLC.
9
     Augusta Scribes Court Reporters, LLC, was
10   contacted by the offices of Tiffany Alley/Veritext to
     provide court reporting services for this deposition.
11   Augusta Scribes Court Reporters, LLC, will not be
     taking this deposition under any contract that is
12   prohibited by O.C.G.A. Sec. 15-14-37(a) and (b).
13   Augusta Scribes Court Reporters, LLC, has no
     contract/agreement to provide reporting services with
14   any party to the case, any counsel in the case, or
     any reporter or reporting agency from whom a referral
15   might have been made to cover this deposition.
     Augusta Scribes Court Reporters, LLC, will charge its
16   usual and customary rates to all parties in the case,
     and a financial discount will not be given to any
17   party to this litigation.
18
19
20
21
22   Dated: 04/23/2019. Rhonda L. Burback, RPR, CCR, CRR
23
24
25

Page 183

1          C E R T I F I C A T E
2    STATE OF GEORGIA:
3    COUNTY OF RICHMOND:
4         I hereby certify that the foregoing transcript
5    was taken down, as stated in the caption, and the
6    colloquy, questions, and answers thereto were reduced
7    to typewriting under my direction; that the foregoing
8    pages 1 through 181 represent a true, complete, and
9    correct transcript of the evidence given.
10        The above certification is expressly withdrawn
11   and denied upon the disassembly or photocopying of
12   the foregoing transcript, unless said disassembly or
13   photocopying is done under the auspices of Augusta
14   Scribes Court Reporters, LLC, and the signature and
15   original seal is attached thereto.
16        I further certify that I am not related to or
17   are of counsel to the parties in the case; am not in
18   the regular employ of counsel for any of said
19   parties; nor am I in any way interested in the result
20   of said case.
21        This, the 5th day of May, 2019.
22
23
24
25   RHONDA L. BURBACK, RPR, CCR, CRR

Page 184

1    TO: Sean B. Cox
2    Re: Signature of Deponent Marcus J. Bush
3    Date Errata due back at our offices:  6/6/2019
4
5    Greetings:
6    The deponent has reserved the right to read and sign.
     Please have the deponent review the attached PDF
7    transcript, noting any changes or corrections on the
     attached PDF Errata. The deponent may fill out the
8    Errata electronically or print and fill out manually.
9
     Once the Errata is signed by the deponent and notarized,
10   please mail it to the offices of Veritext (below).
11
     When the signed Errata is returned to us, we will seal
12   and forward to the taking attorney to file with the
     original transcript. We will also send copies of the
13   Errata to all ordering parties.
14
     If the signed Errata is not returned within the time
15   above, the original transcript may be filed with the
     court without the signature of the deponent.
16
17
18   Please send completed Errata to:
19   Veritext Production Facility
20   20 Mansell Court
21   Suite 300
22   Roswell, GA 30076
23   (770) 343-9696
24
25

Page 185

1    ERRATA for ASSIGNMENT #3229164
2    I, the undersigned, do hereby certify that I have read the
     transcript of my testimony, and that
3
4    ___ There are no changes noted.
5    ___ The following changes are noted:
6
     Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
7    Procedure and/or OCGA 9-11-30(e), any changes in form or
     substance which you desire to make to your testimony shall
8    be entered upon the deposition with a statement of the
     reasons given for making them. To assist you in making any
9    such corrections, please use the form below. If additional
     pages are necessary, please furnish same and attach.
10
11   Page _____ Line _____ Change _____
12   _____
13   Reason for change _____
14   Page _____ Line _____ Change _____
15   _____
16   Reason for change _____
17   Page _____ Line _____ Change _____
18   _____
19   Reason for change _____
20   Page _____ Line _____ Change _____
21   _____
22   Reason for change _____
23   Page _____ Line _____ Change _____
24   _____
25   Reason for change _____

47 (Pages 182 - 185)

Veritext Legal Solutions

800.808.4958                                    770.343.9696

**EXHIBIT A**

Marcus J. Bush
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

April 23, 2019

Page 186

1 Page _____ Line _____ Change _____
2 _____
3 Reason for change _____
4 Page _____ Line _____ Change _____
5 _____
6 Reason for change _____
7 Page _____ Line _____ Change _____
8 _____
9 Reason for change _____
10 Page _____ Line _____ Change _____
11 _____
12 Reason for change _____
13 Page _____ Line _____ Change _____
14 _____
15 Reason for change _____
16 Page _____ Line _____ Change _____
17 _____
18 Reason for change _____
19
20 _____
            DEPONENT'S SIGNATURE
21
      Sworn to and subscribed before me this ___ day of
22 _____
23
      _____
24 NOTARY PUBLIC
25 My Commission Expires:_____

Veritext Legal Solutions

800.808.4958                                                      770.343.9696

EXHIBIT A

Marcus J. Bush                                   April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[& - 23]                                                    Page 1

| & | | | |
|---|---|---|---|
| **&**  2:4,17 143:13 | **11th**  44:24 51:12 | **1714**  176:5 | **2010**  32:19 37:2 |
| **0** | 53:21,21 | **1722**  176:8 | 52:5,12 |
| **000089**  159:7 | **12**  18:1 21:19,19 | **1727**  180:11 | **2011**  50:2 52:23 |
| **0002**  155:24 | 33:8 34:22 79:17 | **17th**  43:1 52:12 | 53:7,7 54:12,20,22 |
| **00232**  1:6 5:10 | 153:9 154:18 | **18**  12:2,4 90:3 | **2012**  32:22,24 33:7 |
| **04/23/2019**  182:22 | 159:11 178:1 | 96:14 104:8 | 33:9 34:3,24 |
| **08**  38:4,5 | **124**  4:5 | **181**  183:8 | 37:15 55:9 |
| **1** | **12:20**  133:12 | **191**  2:9,17 | **2013**  56:20 154:15 |
| **1**  2:5 4:4,18 5:5 | **12:59**  1:16 5:3 | **1990**  43:1,5,9 | 154:21,22,25,25 |
| 98:14 113:16,20 | **12th**  51:17 | **1992**  12:11 43:11 | 158:20 165:17,18 |
| 183:8 | **13**  15:16 58:11 | **1:00**  54:4 84:18,19 | **2014**  57:3,9,13,20 |
| **1,000**  63:24 | 132:5,25 158:12 | 84:25 85:1,4,7 | 58:14 164:16,17 |
| **10**  21:19 32:17 | **1339**  132:4,20 | 132:5 | 164:19 165:4,5,10 |
| 50:5 91:6 94:23 | **13th**  43:23 154:21 | **1:01**  54:4 | 165:10 |
| 104:19 134:16 | **14**  58:17 129:1,2,4 | **1:05**  160:25 | **2015**  34:18 38:8 |
| 178:1,1,6 | 129:23 135:10 | **1:30**  84:8 | 41:23 58:24 59:7 |
| **10,000**  149:9 | **1400**  54:7 | **1:39**  132:6,8 | 60:16,25 61:13 |
| **10-30-2015**  144:1 | **1410**  54:8 | **1:44**  75:7 128:4 | 62:5 63:13 127:14 |
| 144:5 | **143**  4:6 | 141:2 | 128:17 136:18 |
| **10.b.**  182:5 | **14th**  48:18 58:14 | **1st**  51:21 | 146:2 148:18 |
| **100**  2:5 | **15**  15:16 50:22 | **2** | 157:21,23 158:3,3 |
| **10:00**  77:24 78:1,2 | 58:12 79:24 90:1 | **2**  4:5 98:19 124:6 | 164:9 |
| 78:5,25 81:25 | 95:8 99:12 154:22 | 124:9 143:21 | **2016**  56:14,19 |
| 82:1 123:3,19 | **15-14-37**  182:12 | 155:16 | 143:13 |
| 144:4 | **1503**  98:16 | **2,000**  18:10 47:5 | **2018**  35:12 39:6 |
| **11**  21:19,19 54:21 | **151**  4:7 | **20**  20:13 31:18 | 65:19 66:4 |
| 54:21 | **1520**  98:21 | 36:8,11,15 91:6 | **2019**  1:16 5:4 |
| **11,000**  63:24 | **1529**  106:23 | 104:19 129:6 | 183:21 |
| **1100**  63:25 | **1530**  106:23 | 130:17 165:18 | **2044**  144:2 |
| **113**  4:4 | **1532**  107:1 | 168:25 172:4,5 | **2045**  132:24 133:2 |
| **11637**  182:21 | **155**  4:8 | 184:20 | 133:2 143:24 |
| 183:24 | **15th**  52:5 | **200**  2:9 | **20s**  32:5 |
| **1187**  41:7 | **160**  4:9 | **2000**  20:15 32:14 | **20th**  56:14 |
| **1188**  41:6 | **1643**  160:14 | 32:16 47:8 48:6 | **21**  31:17,17,18 |
| **11:00**  77:19,24 | **1652**  160:17 | 48:18,18 50:4 | 58:24 61:13 62:5 |
| 78:1,2,5 79:1 | **169**  4:10 | **2004**  48:22 49:16 | **213**  158:21,21 |
| 123:19,19 124:21 | **16th**  143:13 | 50:1,4,11 | **215**  157:24 |
| 124:22 134:13,14 | **17**  31:5 35:23 | **2006**  50:22 | **22nd**  57:19 164:17 |
| 144:4 | 160:24 161:1 | **2007**  51:3,7,12 | 164:19 |
| | **1706**  132:21 | **2009**  51:17,21 | **23**  1:16 |

EXHIBIT A

Marcus J. Bush
April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[232 - 8:40]
Page 2

| | | | |
|---|---|---|---|
| **232** 157:22,24 | **30326** 2:13 | **46** 11:5 31:20 | **6b** 4:10,18 169:14 |
| 158:15 | **30327** 2:6 | 120:7,16 | 180:24 |
| **23rd** 5:4 | **30th** 43:11 75:21 | **49** 135:10 | **6s** 180:18 |
| **24** 133:20 | 75:24 76:6,17,18 | **4:00** 14:10 122:19 | **6th** 45:9 |
| **26** 29:16 31:20 | 77:1 80:18 81:7 | **4:17** 133:13 | |
| 52:23 60:16 | 101:4 128:17 | **4:22** 134:17 | **7** |
| **2600** 2:13 | 131:19 143:20 | **4:30** 14:11 | **7** 51:3 165:10 |
| **26th** 60:25 | 154:22,25 | **4:43** 160:15 | 185:6 |
| **27** 29:11 | **31** 57:9,13 127:14 | **4:52** 160:15 | **770** 184:23 |
| **27th** 49:16 | 127:17 165:5 | **4th** 165:9 | **7:00** 81:17 122:18 |
| **28** 50:4,11 | **31st** 63:13 75:21 | | 123:9,12,20 |
| **280** 43:10 | 128:3 151:24 | **5** | 131:24 144:4 |
| **28th** 98:23 135:6 | **322** 171:15 172:3,3 | **5** 4:8 6:18 91:6 | **7:06** 132:1,20,24 |
| 165:17 | **3229164** 185:1 | 94:23 155:12,15 | 133:2,5,8,25 |
| **29** 157:21 | **339** 172:4 | **5'7** 104:5 | 134:6 143:20 |
| **2900** 2:18 | **34,000** 52:13 | **50** 36:20,25 | **7:22** 134:19 135:1 |
| **29th** 76:25 81:1,12 | **343-9696** 184:23 | **57** 129:6,15 130:17 | **7:43** 162:10 |
| 81:14 82:1 83:13 | **3673** 145:18 151:4 | **5:00** 76:1,3,4,5,13 | **7th** 57:3 |
| 83:25 84:23 98:24 | **3:00** 123:11,20,20 | 77:12 82:6 85:7 | |
| 98:24 100:15 | 130:20,20 134:14 | **5:14** 176:6 | **8** |
| 101:4 144:17 | **3:03** 98:17 | **5:22** 176:6 | **803** 151:4 |
| **2:00** 54:5 81:25 | **3:20** 98:17 | **5:29** 1:16 | **803-480-5448** |
| 82:1,2,3,8,8,12,14 | **3:30** 106:24 | **5:30** 67:12 78:22 | 141:8 |
| 82:15,20 123:4,10 | **3:32** 106:24 | 79:2,11 80:17 | **803-624-3673** |
| 123:19 124:22 | **3rd** 165:4 | 85:2,4 | 140:16 143:14 |
| 134:14 | | **5th** 18:12 164:16 | 160:23 |
| **2:10** 54:5 | **4** | 183:21 | **803-634-8279** |
| **2:17** 1:6 5:10 | **4** 1:18 4:7 5:11 | | 161:1 |
| **2:30** 123:10 | 151:9,12,19 | **6** | **85** 87:17,20,22 |
| | **4-2015** 158:7 | **6** 3:3 129:3,3,23 | 88:6,10,12,17,21 |
| **3** | **4-29-15** 158:4 | 160:21 169:12 | 88:22 90:9 |
| **3** 4:6 129:6,14 | **4-30-13** 158:14 | 171:14 180:21 | **8:00** 14:10 76:2,9 |
| 130:17 143:8,11 | **4-7-73** 11:7 | **6/6/2019** 184:3 | 77:13,24 80:23 |
| 160:21,22 | **40** 88:21,23 | **61** 60:19 | 81:17,17 82:18 |
| **3/4** 157:22 | **400** 120:16 | **67** 157:22 | 83:4 123:8 133:4 |
| **30** 84:16 88:17 | **404.355.3620** 2:14 | **6:00** 76:11 82:4,8 | 133:15 134:3 |
| 185:6 | **404.526.9955** 2:10 | 82:17,18,19,20,24 | **8:30** 75:18 86:4 |
| **300** 184:21 | **404.751.1162** 2:6 | 126:5 128:8 134:3 | 126:7 128:9 |
| **30060** 2:10 | **404.954.5000** 2:19 | 135:7 139:15 | 131:25 |
| **30076** 184:22 | **4200** 2:5 | **6:30** 131:24 | **8:39** 132:4 |
| **30303** 2:18 | **45** 60:19 88:17 | **6a** 4:9 160:18 | **8:40** 162:10 |

Veritext Legal Solutions

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

**[8:49 - answers]**                                    Page 3

| | | | |
|---|---|---|---|
| **8:49** 132:4 135:7 | 148:4,12 151:17 | **accurate** 8:6 47:18 | 114:21 119:16 |
| **8th** 44:2 76:8 | 152:14,21 153:1 | 91:18 96:25 | 123:22 135:25 |
| **9** | 153:15 154:14 | 157:12 161:23 | 136:20 137:3,10 |
| | 155:1,10,24 | **act** 60:1 | 137:17 138:2,3,16 |
| **9-11-30** 185:7 | 156:22 159:7,13 | **action** 1:5 163:22 | 138:25 139:8 |
| **911** 116:5 | 163:21 165:4,17 | **activity** 152:17 | 140:4,9,14 144:23 |
| **92** 6:19 43:14,23 | 167:16 168:12,14 | **acts** 166:1 | 162:16,23 163:10 |
| **93** 12:11,17 | 168:21 169:19 | **actual** 158:5 | 166:1,2,21 |
| **94** 9:5 12:17 13:3 | 170:22 171:15,17 | **add** 20:9 61:6 | **agreement** 182:13 |
| 13:12 44:2 | 171:22 172:3,3,8 | 123:17 | **ahead** 40:19 69:6 |
| **945** 2:12 | 172:15 | **added** 20:9 153:25 | 69:8,11 108:20 |
| **95** 7:9 13:12 14:5 | **abandonment** | 154:1 | 109:4 111:14,25 |
| **96** 9:5 10:17 13:14 | 152:8 | **addition** 45:16 | 112:12 |
| 14:5 16:21 32:7 | **ability** 99:22 100:7 | **additional** 46:8 | **ain't** 51:10 105:1 |
| 32:10 36:19 44:21 | 136:5 137:15 | 185:9 | 148:21 166:23 |
| 44:24 | **able** 15:19 16:20 | **address** 50:15 | 175:16,16,24 |
| **97** 44:22 | 22:23 23:13 73:12 | 68:18 140:22 | **al** 5:7 |
| **98** 15:11 16:21 | 74:14 97:15 113:8 | 169:23 170:1,2,15 | **alcohol** 66:19 |
| 17:1 45:9 | 151:6 | **addressed** 170:4,6 | 121:20,25 137:8 |
| **9:00** 83:12,14,14 | **abney** 30:7,9 | **addresses** 68:23 | **alert** 138:14 |
| 83:15,17,19 84:7,7 | **absolutely** 158:8 | **adequate** 97:18 | **alerted** 96:24 |
| 84:10 122:25 | **accident** 34:17 | 102:1,4,4 140:1 | **alertness** 136:6,25 |
| 123:8,18 126:6 | 37:21 44:3,25 | **adjusted** 51:24 | 140:3,11 |
| **a** | 45:10,24 46:18 | **adult** 12:5 29:17 | **allen** 2:4 |
| | 51:3 56:15 57:4 | **adults** 140:2 | **alley** 182:10 |
| **a.m.** 83:16,17,19 | 57:10,14,20 64:12 | **affair** 59:4 | **allowed** 38:20 |
| 129:8 132:2 133:6 | 64:14 65:5 66:21 | **affect** 106:8 | **allowing** 30:25 |
| 133:7,8,8,12,13 | 70:12 75:17 78:15 | **afford** 120:22,22 | **almighty** 157:24 |
| 134:7,16,17,19 | 88:17 91:8 102:21 | **afternoon** 138:14 | **american** 25:7,14 |
| 135:1,7 139:15 | 118:4,5 130:25 | 139:13 | 26:1,10 44:9,12 |
| 144:4 160:25 | 164:10,17,18,19 | **agency** 182:14 | **amount** 79:7 |
| **aaa** 1:6 4:7 5:7 6:1 | 165:5,10,18 | **ago** 31:20 35:11 | **analysis** 167:16,20 |
| 19:19 21:21 22:24 | 167:13 168:4 | 49:24 87:22 106:5 | 167:24 |
| 24:15 25:16 41:22 | 173:20 | 107:12 141:19 | **angle** 57:7 |
| 55:14,17 56:16 | **accidents** 57:25 | 145:12 149:21 | **annual** 61:3 |
| 57:10,15,20 58:2,4 | 118:14 139:14 | 164:22 168:25 | **answer** 43:7 52:20 |
| 58:23 59:9,16,23 | 153:5,11 159:2 | **agree** 66:24 68:20 | 72:18 73:24 130:7 |
| 60:4,14,24 71:16 | 164:21 166:14 | 69:4,10,21,24 70:2 | 156:10 |
| 75:2 87:3,15 | **account** 120:11 | 70:8,12 71:3 | **answered** 80:11 |
| 97:24 116:13 | **accounts** 150:7 | 97:14,18 98:1 | **answers** 183:6 |
| 117:18 118:20,21 | | 102:1 110:4 114:8 | |
| 146:2,20 147:7 | | | |

EXHIBIT A

Marcus J. Bush                                        April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[anybody - back]                                              Page 4

| | | | |
|---|---|---|---|
| **anybody** 27:23 | **area** 28:25 29:13 | **assuming** 10:3 | **auto** 53:4 55:3 |
| 29:2,8 30:1 63:9 | 30:1 57:7 108:9 | 87:11 88:23 92:21 | **available** 135:20 |
| 118:22,25 147:14 | **argumentative** | 100:20,22 177:11 | 149:14 174:22 |
| 147:17 148:1,7 | 90:12 | **atlanta** 2:6,13,18 | **average** 74:3 |
| 149:20 152:22 | **arrest** 33:9 39:6 | 16:12,14,15 17:8 | **awake** 95:24 96:18 |
| 168:5 172:14 | 65:14 | 25:16 29:12,13 | 109:1,7,13 110:9 |
| 173:9,10 175:17 | **arrested** 30:15,18 | 30:1,5,7,12 41:5 | 111:3,10,12,21 |
| **anymore** 18:11 | 31:13,15 32:7 | 41:12 81:19 126:1 | 112:2,13 114:10 |
| 40:11 59:15 | 33:1,16,23 34:4,6 | 126:6 131:1 | 121:10 |
| **anyway** 78:23 | 56:3 59:5,19 | 134:12,13 | **award** 46:14 |
| 147:22 154:13 | 63:14,15 65:19 | **attach** 185:9 | **awarded** 46:15 |
| **apart** 34:17 | 66:8 141:12 | **attached** 4:18 | **aware** 59:9,16 |
| **apnea** 103:5 | **arrests** 68:1 | 183:15 184:6,7 | 70:25 114:4,6 |
| **appearance** 5:16 | **arrived** 117:14 | **attempted** 57:4 | 136:4,11 148:4 |
| **appearances** 2:1 | **arrogant** 173:23 | 59:23 | 152:15,20 153:14 |
| **applebee's** 103:24 | **article** 182:5 | **attend** 170:12 | 153:17 167:18 |
| **applicant** 152:17 | **asking** 64:11 65:3 | **attended** 6:19 | 177:5 |
| 153:4,6,10,12 | 75:14 117:20 | 10:16 | **awful** 95:13,13,14 |
| **applicants** 152:25 | 124:12 158:20 | **attention** 151:13 | 95:14,15 117:23 |
| **application** 153:4 | 168:8 | 174:21 181:6 | 163:8 175:10 |
| **applied** 22:4 23:12 | **asks** 138:21 | **attorney** 33:17 | **axle** 52:14 |
| 24:14 25:17 47:18 | **asleep** 65:1 66:21 | 184:12 | |
| 53:23 79:22 | 67:18 85:8 91:25 | **august** 52:12 | **b** |
| 153:19 157:6 | 92:3 101:19 104:9 | **augusta** 1:19 5:12 | |
| **apply** 97:5 154:11 | 109:9,14 110:9,23 | 6:14,16,19,22 7:1 | **b** 2:16 63:7 182:12 |
| **approaching** | 111:3,10,21 | 7:2,3 10:13 13:2,4 | 184:1 |
| 111:19 | 112:14 114:10 | 13:5,6,19 17:9 | **back** 6:22 13:2 |
| **appropriate** 61:11 | 115:22 119:2,5 | 19:12 28:25 33:25 | 15:10,11,14 16:3 |
| 102:7 136:2 | 121:13 137:25 | 34:1,2,24 39:21 | 17:14 18:3,18,18 |
| **approximately** | 139:13 144:4,24 | 54:11 57:5 75:18 | 19:19 20:6 23:4 |
| 16:23,24 81:6 | 165:16 166:22 | 76:19 83:1,2,4 | 23:11 27:17 35:19 |
| 148:13 172:4 | 168:15 | 103:16,19 175:24 | 40:11,14,25 41:2 |
| **apps** 100:2,3 | **assigned** 55:10 | 182:8,9,11,13,15 | 46:23 51:5 53:10 |
| **april** 1:16 5:4 | **assignment** 185:1 | 183:13 | 54:7 64:2 73:12 |
| 18:12 48:22 50:1 | **assist** 185:8 | **auspices** 183:13 | 77:7,19 80:8,25 |
| 50:22 52:23 57:19 | **assistance** 91:23 | **austin** 17:11,13,15 | 82:25 84:9,21 |
| 61:13 136:18 | **associate's** 13:9 | 17:15 24:12 26:20 | 85:3,5,12,13 98:22 |
| 154:14,24,25 | **associated** 69:1 | 27:8,14,15 48:23 | 99:12 104:22 |
| 157:21,23 158:3 | 71:23 118:6,9 | 49:16 | 108:22 109:4 |
| 164:17,19 165:4 | **assume** 99:11 | **authorized** 165:22 | 111:17 121:20 |
| | | | 122:19 126:2 |
| | | | 134:10 135:6,15 |
| | | | 143:23 144:4,16 |

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[back - bushay]                                              Page 5

152:7,10,13,14
  157:23 158:12
  162:9,19 167:9
  184:3
backed  51:10
  56:15,22 117:2
background
  152:15,20
backing  51:4
bad  24:25 25:20
  25:22 33:6 45:6
  57:7 60:6,15,15
  72:20 95:7 105:2
  117:4 126:17
  142:6 146:8
  158:10 166:16,17
  170:11 175:9
  179:18
badly  122:4
bag  102:21
ball  161:4
bar  31:9,22 36:6,7
  36:7
barely  37:24 129:4
barrett  53:4 55:3
barrett's  53:19
based  22:6 180:15
basic  22:15,17
basically  125:21
  125:21 174:12
basis  152:9
baskett  161:2
bates  159:6 171:15
bathroom  176:20
  176:21 177:17
beach  31:24,25
  32:8,8 36:18
  43:19,21
beasley  2:4
beasleyallen.com
  2:7

beats  115:12
beautiful  93:5
bed  67:7,9 76:24
  77:2,10 78:22,24
  79:6 81:10 84:20
beech  20:8
befriended  64:2
began  74:25 90:25
  108:25 137:21
  138:4 160:25
begged  60:1
beginning  5:4,17
  30:18 97:22 98:19
  108:23 158:13
  171:14
behalf  2:2,15
behave  122:4
behavior  126:19
believe  71:6 81:5
  163:13
bench  120:16
best  161:10
better  103:13
  105:15 170:19
beyond  109:4
bi  44:7
big  27:15 42:4
  80:5
bigger  66:8
bill  15:12
bills  18:10
birth  11:6 29:10
bit  6:24 54:2 97:11
  161:12 169:5
black  88:14,15
blame  131:11
blessed  15:18
blew  37:25 38:1,3
  53:14 157:4
block  114:2

blocked  114:5,6
  114:24
blocking  114:8
blood  79:23 80:7
  120:24,25 177:14
  177:16
bluetooth  87:23
  88:1
board  182:5
body  71:10,11,13
  73:17 93:15
  102:23 119:19,21
  120:3 122:16
  131:14 138:17
body's  67:23
  71:11
bond  159:10
bonus  47:5
book  26:24 63:19
boom  96:5,8
booth  2:17 25:2
boots  53:13
borders  54:11
bored  18:22
boring  139:20
born  11:20
bothers  174:5
bottom  112:20,24
  112:25 113:2
  155:21
bought  17:17 27:3
  145:12 146:10,10
  146:11 149:8
boxing  37:6
boy  66:10
boy's  29:25
boyfriend  179:16
boyfriend's
  179:15
brain  29:4

brakes  50:23
  51:22 97:5
brand  27:9 127:12
break  31:24,24
  32:1 45:6 53:25
  105:21 106:5,21
  124:22 126:2
  131:2 144:17
  146:25 147:23
  160:10 176:1
brian  2:12,14 5:21
bright  110:18
bring  25:4 179:18
bringing  175:8
broke  117:12
  147:4
brought  142:1
  179:17
brown  29:20,21
  29:24
buck  63:6,9 143:1
  143:2 178:8,11
bucks  36:20,25
  39:13
buddy  30:22 88:2
  150:24
build  122:9
building  2:5
  103:23,25
bunch  22:21 36:22
  48:25,25 169:6
burback  1:21 5:15
  182:22 183:25
bush  1:7,14 5:6,25
  6:4,12,13 54:23
  59:4 98:15,20
  180:10 182:2
  184:2
bushay  175:3,13
  175:14,15,20,21
  175:22 179:6,8

EXHIBIT A

Marcus J. Bush                                  April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[bushay's - chris]                                      Page 6

bushay's 175:11
business 53:3,6
  141:13 150:7,24
  154:7
busted 35:3
butt 27:11 119:15
butts 47:16
buy 26:21 146:9

**c**

c 1:18 5:1,12 8:7
  19:10 63:7 183:1
  183:1
cab 107:6 113:8,19
  114:14
call 62:13 77:13,16
  79:2 85:2,4,8
  88:15 99:24,25,25
  142:22 160:25
  161:17,17,18,24
  161:25
called 6:17 17:3,4
  19:13 20:2,14
  21:1,14,16,17,23
  21:25 22:8,12,19
  26:13 48:10 59:13
  59:18 62:12,13
  67:12 69:7,7
  72:13 76:5,13
  116:4 118:16
  123:10 161:20,20
  164:3 171:15
  178:9
callie 1:3 5:6,20,24
  6:10
calling 76:1,1
  140:25
calls 59:2 100:18
  101:13 162:11,12
  162:14
cam 114:4

camera 100:10
  107:3,6,6,16,21
  112:16,23 113:18
  113:20,22 114:2,9
  114:13,15 115:15
  115:24
cameras 107:5,8
  107:11,13,15
  112:18 113:10,13
camping 30:21
capable 90:9
caption 183:5
car 23:1 37:19
  49:18 78:21,21
  112:17 117:13,20
  176:10
carbs 121:17,18
card 21:25 155:6
  157:21 158:5
care 15:19 42:20
  42:22 122:6 164:7
  164:12
careless 25:8,9,18
  25:20,21,23 44:3
  44:10,11,16,25
  45:4 47:21
carolina 6:14,18
  7:4,5,17,18 8:5,8
  8:15,25 9:14,22
  10:2 11:23,24
  12:1,6 15:7,11,15
  16:4 18:4,18 20:8
  22:9,23 23:12
  25:8,9,19,21 27:15
  43:2,13 44:4 45:1
  45:4 53:8,9,10
  103:15 136:15,19
carry 130:2
cars 156:25
case 5:10 54:12
  131:10 151:17

182:14,14,16
  183:17,20
cash 63:25
categories 152:19
caucasian 31:10
caught 18:12
  142:19
cause 13:25,25
  21:4 22:1 66:6
  93:14 168:7
caused 37:20
  66:22 70:9,10
  137:1 161:19
causes 137:12,14
ccr 1:21 182:22
  183:25
cd 10:11
cdl 7:10,13,19 8:1
  8:7 9:4,24 10:18
  10:23 19:1,3
  68:20 70:23
cdt 10:11,16
celebrities 25:3
cell 98:25,25 99:2
  145:4,5,9,11,14,17
cement 147:1
ceramics 13:24
  14:4,8 44:21
certain 20:22
  144:20
certificate 29:11
certification
  159:13 183:10
certified 182:7
certify 159:7
  183:4,16 185:2
champion 120:8
change 86:12,14
  86:14 126:18
  130:12 131:3
  185:11,13,14,16

185:17,19,20,22
  185:23,25 186:1,3
  186:4,6,7,9,10,12
  186:13,15,16,18
changed 19:11
  72:1 73:17 109:17
  110:7 127:21
  128:1 131:6,13,15
  141:13 142:1
  150:12,17,18
  156:21,23 167:11
changes 73:17
  122:16 131:14
  184:7 185:4,5,7
changing 72:1
charge 45:24
  64:18 182:15
charged 32:24,25
  44:3 45:24 64:15
  168:6
charges 38:24
  65:4
charles 2:8 5:23
charles.graham
  2:11
charleston 6:20,21
  12:13,20 39:19
charlotte 126:6,8
cheap 20:3
cheaper 150:25
check 50:16 101:1
  101:6
checked 59:20
  80:24
chemical 18:22,25
  19:7
child's 29:8
childs 29:5,6,7
chiseled 102:22
chris 5:19 6:9
  132:17 160:7

EXHIBIT A

Marcus J. Bush                          April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[chris.glover - cooper]                                   Page 7

| | | | |
|---|---|---|---|
| **chris.glover** 2:7 | 76:8,10 77:5,5,13 | 166:13,16 | **contractor** 87:6 |
| **christ** 167:1 | 95:22 123:3,11 | **complain** 63:2 | **control** 48:23 |
| **christian** 12:21,23 | 126:2 128:21 | **complete** 63:22 | 49:15 55:10 71:14 |
| 74:5 174:7 | 144:20,21 145:2 | 95:22 159:8 183:8 | 92:8,13,15,17 |
| **christopher** 2:3 | 152:10 163:5 | **completed** 184:18 | **convicted** 33:4 |
| **chunky** 158:23 | 164:1,14 170:17 | **computer** 169:17 | 35:21 36:11 44:25 |
| **church** 15:17 | 170:18 | 169:20 | 49:14 55:22 56:2 |
| 104:1 | **comes** 73:6 111:2 | **con** 153:7 | 153:18 159:10,23 |
| **cited** 31:12 | 162:15 | **concerned** 168:15 | 160:1,5,5 |
| **city** 27:15 50:8,9 | **coming** 14:21 | **concerning** 164:17 | **conviction** 33:9,11 |
| 103:14 176:16 | 20:13 50:14,16 | 165:5,10,18 | 36:19 38:9 39:7 |
| **civil** 1:5 185:6 | 66:14 109:4,19 | **concludes** 180:9 | 44:16 56:8 58:19 |
| **clarification** | 110:18 111:19 | **conditions** 120:14 | 61:23 63:17 153:7 |
| 158:19 | 115:11,12 | **conduct** 31:3 | 159:19,20 |
| **clarify** 93:22 | **comments** 28:15 | 35:20,22 | **convictions** 153:5 |
| **clark** 19:25 20:7 | **commercial** 10:11 | **confident** 103:3 | **cool** 36:21,21 |
| 20:10 42:9 | 19:1,20 20:20 | **conflict** 28:8 | 47:15 48:3 134:24 |
| **class** 10:6 11:3 | 24:15,23 50:18 | **confuse** 82:9 | 161:11 167:7 |
| 14:10 27:3,6 | 60:12 72:23 73:2 | **confusing** 7:15 | **cooper** 1:6 4:7 5:7 |
| 169:6 | 104:7,9,16 136:3 | **consider** 80:6 | 18:24 19:16,19 |
| **classes** 168:21 | 136:14,17 165:24 | 138:22 | 20:5 21:21 24:15 |
| 169:17 | **commission** | **consideration** | 25:16 41:22 55:14 |
| **classroom** 171:2,3 | 186:25 | 152:16,21 | 55:17 56:16 57:10 |
| **clean** 132:19 | **communication** | **considered** 87:14 | 57:15,20 58:2,4,23 |
| **clear** 129:9 157:7 | 34:7,11,12 35:1 | **considering** | 59:9,16,23 60:4,14 |
| **cleared** 23:3,3 | 38:8 59:19 62:20 | 152:25 | 60:25 71:16 75:2 |
| **clearly** 74:24 | **communications** | **consistent** 93:18 | 87:3,15 97:25 |
| 94:19 | 58:25 61:24 62:2 | **consists** 126:1,3 | 102:16 104:24 |
| **clemson** 88:13 | **community** 15:18 | **consult** 140:6 | 116:10,13 117:18 |
| **clock** 81:6 83:7 | 35:24 36:3,5 | **contact** 59:23 | 118:20,21 146:20 |
| 164:4 | 37:12,13 | **contacted** 182:10 | 147:7 148:4,12 |
| **close** 103:18 | **companies** 45:19 | **contained** 136:21 | 151:17 152:14,21 |
| 141:14 | 45:21 150:12 | 136:22 | 153:1,15 154:14 |
| **collateral** 159:10 | 171:11 | **container** 35:4,5 | 155:1,10,24 |
| **college** 12:7,9 | **company** 17:7 | 35:13 39:6 54:17 | 156:22 158:2,11 |
| 13:21,23 15:19 | 19:21 20:12 21:7 | 65:20 68:6 | 158:17 159:7,13 |
| 39:16,17 | 23:15,20 24:6,18 | **continuation** | 163:21 165:4,17 |
| **colloquy** 183:6 | 25:6 26:2,11 | 160:21 | 167:17 168:13,14 |
| **columbia** 58:5,5 | 27:24 42:15 49:6 | **continue** 14:23 | 168:21 169:19 |
| **come** 17:14 19:18 | 115:14 124:2 | **contract** 182:11 | 170:22 171:15,17 |
| 28:16 66:17 76:2 | 150:20 165:23 | 182:13 | 171:22 172:8,15 |

EXHIBIT A

Marcus J. Bush                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[cop - date]                                        Page 8

**cop** 35:5 50:21
66:10,16 116:22
117:20
**copies** 184:12
**cops** 31:12 117:13
117:14
**copy** 61:12 125:20
141:20 181:13
**corner** 36:23
**correct** 10:7 16:22
30:15 40:16 41:23
43:6,15 44:18,22
47:8 48:17 50:1
55:15 56:22 58:12
63:14 65:23 66:22
68:10 69:17 72:3
72:14 75:21 85:15
87:3,18 88:11
91:12,18 92:5
94:9,15,18 107:3
110:17,18 112:17
113:9 114:14
115:15,20 118:2,7
118:22 128:3
133:21 139:17,23
143:21 146:2
148:14 153:23
154:15 159:2,23
176:10 183:9
**corrections** 184:7
185:9
**corrective** 163:22
**cost** 45:24
**council** 182:6
**counsel** 2:1 5:16
5:18 182:14
183:17,18
**count** 20:16
**counted** 20:20
**country** 15:1
66:16 156:23

**county** 11:21
54:10,13,22 55:7
182:4 183:3
**couple** 17:9 18:7
31:12,25,25 82:6
84:15 122:12
123:2 141:24
145:12
**course** 171:16,17
180:17
**courses** 40:5
**court** 1:1,18 5:8
5:12,14 6:2 12:22
17:5 30:8 31:15
38:13 41:10 49:19
52:9 60:22 62:1,8
64:23 68:15 76:21
82:13 87:25 93:11
94:2 99:19 113:11
125:1 142:20
169:13 170:6
175:7 177:9
179:16 181:7,10
181:13 182:5,7,8,9
182:10,11,13,15
183:14 184:15,20
**courtroom** 38:19
**cousin** 30:4
**cover** 170:9
182:15
**coverage** 22:2
**covers** 22:19,19
**cowboy** 53:13
**cox** 2:16 5:25,25
43:5,7 49:7,12
50:10 53:25 54:23
56:19 64:6,10,25
65:3,7 72:15,18
73:23 75:13 86:5
88:8 90:11 92:22
93:21 98:11

102:13 105:6,9,13
105:22 106:1,6,19
114:19 124:12
129:9,13,17,22
130:6 132:9,13,24
141:21 142:3,8
147:11,13 148:6
149:2,24 150:1
151:20 155:17,23
156:1,10 157:10
157:19 158:6,19
160:7,11 172:16
176:3 180:6,12,25
181:5,9 184:1
**crash** 37:19 64:21
66:22 81:15 88:11
89:11,21,22 92:1
92:20 97:11 98:23
100:15 104:17
107:14 108:17
110:4 116:3 121:5
121:21,21,25
125:11 127:18
128:4 137:14,25
138:10,19 141:4
142:16 145:10,22
146:13 148:13,25
150:15 161:13
163:12 165:7
167:16,24 168:1
173:11,11,16,17
176:10 178:13,21
179:2
**crashes** 138:12
**crazy** 34:19 45:8
60:2 61:17 93:5
95:14 169:6
**criminal** 152:14
152:16,20
**critical** 137:15

**cross** 3:3 6:7 57:4
**crossed** 58:22
**crow** 2:4
**crr** 1:21 182:22
183:25
**crude** 21:8,9,9
23:7
**cruise** 92:8,12,14
92:17
**cruised** 37:22
**crv** 12:21
**crying** 117:11
**curb** 45:15 47:2
**curse** 34:7,13 62:2
**cursed** 34:5
**cussed** 59:5
**custom** 122:6
**customary** 182:16
**cut** 41:2 102:21
**cv** 1:6 5:10
**cytec** 19:7,8,15,19
41:15 79:22
102:17 103:11,14
121:2

**d**

**d** 1:3 2:3,8 5:1
**dad** 61:18
**dad's** 29:4
**dadgum** 23:16
**dang** 22:8
**danger** 71:22,25
**dangerous** 91:14
166:22
**dangers** 69:1,6
**dark** 77:11 88:7
88:15,24,25 89:2
122:25 123:8
139:20
**date** 5:3 11:6
57:13 66:2 125:24
151:23,23 158:1,4

EXHIBIT A

Marcus J. Bush                                        April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[date - dock]                                                  Page 9

| | | | |
|---|---|---|---|
| 158:6 184:3 | 86:13,16 121:13 | depends 77:25 | 171:9,11 |
| date's 160:1 | 138:18 140:7 | 83:21,23 | difficult 27:16 |
| dated 141:6 | 155:22 156:6,14 | deponent 182:2 | 103:11 110:11 |
| 157:21 158:7 | 156:15,16,20 | 184:2,6,6,7,9,15 | difficulty 140:7 |
| 175:4 182:22 | daytona 32:8 | deponent's 186:20 | direction 183:7 |
| dates 48:19 58:13 | dead 122:20 | deposition 1:13 | directions 100:13 |
| 154:17 | deal 24:25 40:19 | 5:5,11 98:14,20 | dirt 66:16 |
| dating 63:1 101:22 | 47:15 73:19 | 124:9 143:11 | disagree 156:2,5,9 |
| daughter 29:4 | 166:24 168:18 | 151:12 180:10,15 | 156:12 |
| day 14:11 17:10 | 174:2 | 180:18 181:16 | disassembly |
| 28:12 37:10 53:12 | dealing 61:21 66:9 | 182:10,11,15 | 183:11,12 |
| 53:12 60:2 73:20 | debt 139:6 | 185:8 | disclosure 182:1,6 |
| 74:6,10 75:5,10,10 | december 41:23 | deprived 138:23 | discount 182:16 |
| 75:16,24 76:13,16 | 53:21 54:12,20 | describe 88:6 | discovery 124:2 |
| 76:20,22 79:17 | 58:12 146:2 | description 4:3 | 142:10 |
| 80:25 81:13 83:24 | 148:18 151:24 | desire 185:7 | discussed 68:4 |
| 86:12 89:16 95:4 | 154:22 | detail 6:24 | 180:20 |
| 96:16,17,17 97:23 | decided 26:21 | determined 165:6 | discusses 69:1 |
| 98:23 100:16,19 | 38:12,13 94:21 | 165:11 168:1 | discussing 61:8 |
| 101:2 105:2 | 103:13 | devastating 97:4 | disk 5:5 98:9,14 |
| 121:21 124:17,25 | decisions 137:16 | develop 119:22 | 98:19 |
| 125:9,10,11,15 | declined 21:10 | device 48:23 49:15 | dismiss 68:20 |
| 126:15,24 127:1,3 | 25:5 26:2,8 | 55:10 | dismissing 168:23 |
| 127:13,20,21,25 | dedicated 49:25 | diabetic 103:7 | disorderly 31:3 |
| 127:25 128:10,16 | defeats 71:3 | die 167:2,6 | 35:20,22 |
| 128:19,25 129:7 | defendants 1:9 | difference 26:5 | dispatch 131:7 |
| 129:21 130:13,16 | 2:15 | 124:24 125:6 | dispute 46:25 93:2 |
| 131:13 133:12,15 | definitely 98:3 | 126:10,14,16,16 | 93:6,8 |
| 134:9,10,15 | 115:23 138:3 | 127:2,6,8 128:12 | distance 61:7 |
| 135:13 144:16,22 | 163:20 | 128:12,13,14,15 | 88:22 137:13 |
| 149:23 151:24 | degree 13:1,2,8,25 | 130:24,24 134:8 | distributed 138:11 |
| 161:7 162:9,19 | 30:13 | 135:22 | district 1:1,1 5:8 |
| 167:2,6 173:11,16 | deliberately 119:4 | different 26:15 | diver 70:3 |
| 178:3 183:21 | delivered 24:22 | 40:5,6 45:18,20 | division 1:2 5:9,9 |
| 186:21 | 25:1 27:24 42:16 | 47:22 64:4,11 | divorce 32:17 |
| daylight 115:4,7 | delivery 56:16,23 | 73:16 86:1 101:24 | dmv 45:7 |
| days 81:14 86:23 | demand 28:16 | 124:21 126:17 | dock 81:19 124:23 |
| 98:23 122:12 | denied 183:11 | 127:15 134:9 | 126:1 128:10 |
| 124:18 173:11,17 | department 9:22 | 135:15,22 142:17 | 131:2 146:8 147:2 |
| daytime 67:24 | 10:4 42:23 | 145:2,13 150:12 | 147:3 |
| 79:18,21 80:2,3,14 | | 162:15 163:15 | |

EXHIBIT A

Marcus J. Bush                                      April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[doctor - electronically]                              Page 10

**doctor**  79:20
80:13,15 103:4,10
121:2 156:5,13
**doctor's**  103:21
**document**  159:15
165:5 171:15
**documented**
166:11,12
**documents**  38:20
141:25 142:1
**dog**  123:12
**doing**  13:16 16:13
18:14 21:8 28:15
50:16 78:8 85:20
86:5,23 88:4 98:5
100:23 101:17
102:5 104:22
110:6 126:21,21
127:10 129:5
131:18 133:17
145:24 147:2
150:1 157:2
168:16
**dollar**  63:21
**dollars**  18:8
**dope**  102:21
**dot**  87:10 153:2
**double**  38:24
**doubt**  60:5 124:13
**downtown**  26:20
26:22 27:8,14
**dozed**  73:19
**drink**  90:22 120:2
121:20 122:3
**drive**  9:9 19:1,3
28:13 30:25 69:22
69:25 94:22 105:2
120:5 138:22
153:1 178:2
**drivecam**  105:3
107:3,21 108:25

**driven**  19:20
**driver**  4:8 16:11
21:16 22:5 24:16
46:15 68:9 69:5,8
69:14,25 72:3,11
72:24 74:1,3 87:3
87:6,8,9,15 92:24
94:18 97:15,22
104:16 107:18
114:15 116:4,17
120:5 136:3 137:6
137:22 138:5
139:3 155:6,15
170:5,9
**driver's**  136:14,15
136:17
**drivers**  73:3 94:12
107:19 113:14,15
**driveway**  35:3,15
65:22 66:11,13
**driving**  8:14,20
10:11 13:16 14:6
14:9,13,20 15:1
16:7 18:13 20:18
20:20 21:3,11,13
23:6 25:6,7,8,9,18
25:20,21,23,24
26:3,8,17 27:19,20
32:23,23,25 33:2,4
33:5 37:16,21
39:22 40:9,13,22
41:1,20 42:13,17
44:4,11,11,16 45:1
45:4,7 47:1,19,21
49:6,17,22 51:15
55:12,18,20 56:9
58:15 60:4,7,8,9
60:12 66:12 68:18
68:24 69:2 73:3
74:25 75:18 88:10
89:12 90:3 94:7

98:4 104:23 109:2
109:6,25 115:5
116:9 126:20,21
126:23,23,23
127:4,5,17 128:25
129:2 138:10,10
139:12,19 140:12
140:13 152:24
154:4 159:18
169:23 170:2,16
171:16,17 172:21
**drop**  83:7
**dropped**  79:24
147:1,4
**drove**  16:16 17:18
19:1 24:20,24
42:15 94:24 127:3
127:5 156:22
**drowsiness**  139:25
**drowsy**  138:10
**drugs**  121:7 137:8
**due**  136:8,11
138:10 184:3
**dui**  31:14 32:24
33:15 34:2,23
37:15 55:10 56:4
153:13
**duly**  6:5
**duration**  129:11
129:25 132:21
**duties**  170:8
**duty**  60:8,12 67:20
70:4,8,14 71:1,4
72:9,13 73:3,8,9
73:11,16,21,22
74:13 98:5 100:24
127:16,16 128:2
128:25 129:2,5,7
129:14 130:16,18
131:19,20,21,21
132:1 133:9,11,14

133:15,20,22,25
134:15 135:8
143:19,20,23,24
143:25 162:13,20
172:15
**dyslexic**  41:6

**e**

**e**  2:12 5:1,1,21
22:13 183:1,1
185:6,7
**earlier**  39:14
87:13 133:11
158:25
**early**  32:5,16
122:17
**earth**  174:3
**ease**  169:1
**easier**  7:11 8:21
14:19
**east**  2:12
**easy**  81:16 105:1
126:25
**eat**  77:9 84:20,20
84:21 103:13
121:17,17
**ebrianwatkinsla...**
2:14
**edgefield**  11:21
54:10,13,22 55:7
**educated**  9:16
**effect**  93:14 168:7
**effective**  171:5
**effects**  173:5
**effort**  26:5
**eight**  17:18,20
103:1 140:2
**either**  42:17 59:22
77:6 148:7 162:6
162:7 179:1
**electronically**
184:8

EXHIBIT A

Marcus J. Bush
April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[eleventh - felt]
Page 11

eleventh 13:22
else's 125:14
email 140:21
  151:20
emergency 97:15
  109:22
emotional 106:10
emotionally
  123:24,24,24,25
employ 183:18
employed 53:4
employee 87:6,8,9
employment
  152:21
ended 37:1 45:25
  46:23 55:4 161:12
ends 24:18
enjoyed 81:18
enjoying 16:7
  120:9
entered 185:8
entire 46:4
equipment 149:10
  175:10
equipped 107:3
errata 184:3,7,8,9
  184:11,13,14,18
  185:1
errors 137:12
especially 138:15
esq 2:3,8,12,16
et 5:7
etran 181:8,11
evening 76:4,6
  122:24,24 134:4
  135:5
event 63:14,18,20
  115:18 129:25
  130:1
events 45:17 64:5

eventually 46:3
everybody 17:4
  25:17 28:10 53:24
  71:20 116:11
  171:24 174:1
everything's 47:1
evidence 180:14
  183:9
ex 29:4
exact 34:16 48:19
  77:20 79:7 118:14
  154:16 161:22
exactly 9:3 16:18
  39:11 43:25 45:14
  53:1 69:20 70:1,5
  87:21 92:10 107:8
  141:3 145:1
  161:22 162:2
  171:18,19,25
  173:8,8
exam 154:24
  155:2,5
examination 3:2,3
  6:7
examinations 3:1
examined 6:5
example 138:13
  159:6
exceed 153:1
exception 85:8
excessive 163:23
excluded 159:18
  159:22
excuse 7:2,5 34:5
  57:14 98:24
exhibit 4:3,4,5,6,7
  4:8,9,10 113:16,20
  124:6,9 143:8,11
  143:21 151:9,12
  151:19 155:12,15
  155:18,20 160:18

160:21,21,22
  169:14 171:14
  180:18,21,24
exhibits 4:1,18
  180:13
exit 73:18 90:6,6
  90:18,25 91:3,4
  93:13
expect 71:16
expected 75:3
expecting 38:22
expensive 52:7,10
  52:11 103:12
experience 16:19
  24:2
experienced 86:18
expiration 158:6
expires 186:25
explain 125:23
explains 46:2
explanation 163:6
expressly 183:10
extra 124:24
extremely 166:22

f

f 22:13 183:1
face 25:10 96:24
  142:3 168:19
facility 184:19
facing 107:6,21
  113:21
fact 59:25 103:16
  114:13 141:10
failing 97:18
failure 48:22
  49:15 51:13 55:10
fair 38:22,23
fairly 86:7
fall 121:12 137:24
fallen 104:9

falling 166:22
falsified 61:20,20
familiar 72:22,25
  167:12
family 28:18
far 34:17 49:6
  69:7 76:19 94:24
  94:24 103:2
  108:19 109:4
  111:25 147:19
  168:14 177:24
fart 29:4
father 64:2 174:1
fatigue 66:25 67:2
  68:18,23 69:2
  94:14 136:8,24,25
  137:12 170:15
fatigued 97:15
  137:24 138:23
  144:25 169:24
  170:3
fault 153:11
  166:20,23,24
  168:18
feb 58:24
february 48:5
  58:24 59:7 164:9
  165:9
federal 185:6
fedex 44:10,12
feel 55:25 56:6
  91:3 93:12 139:1
  166:16,17 174:10
feeling 83:23 93:9
  95:14,17 161:16
fell 65:1 66:21
  115:22 119:2,5
  168:15
felt 28:15 89:24
  90:17,21,24 91:2
  92:21 93:18,25

EXHIBIT A

Marcus J. Bush                                        April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[felt - girls]                                                Page 12

| | | | |
|---|---|---|---|
| 94:2,4 95:6 | 123:7 130:18 | forward 107:6,21 | **g** |
| **ferry** 2:12 | 151:18 158:2,23 | 107:22 142:3 | |
| **fight** 31:9,22 36:6 | **five** 85:25 123:6 | 158:14 184:12 | g 5:1 |
| 36:7,9,10 37:2 | 126:24,25 | **found** 37:3 | ga 184:22 |
| **fighting** 37:5 | **fixing** 66:14,15 | **four** 23:1 39:24 | gain 121:18 |
| **figure** 49:7 | **flashing** 109:18 | 57:24 75:9 81:20 | gainesville 1:2 5:9 |
| **file** 1:5 4:8 155:15 | **flip** 158:14 | 81:22,23 82:22 | game 88:3 89:14 |
| 184:12 | **flying** 96:6 | 87:22 98:9 107:12 | 89:17 161:4,21 |
| **filed** 5:8 184:15 | **focus** 49:8 172:16 | 123:5 135:25 | 169:5 |
| **files** 163:22 | **focusing** 49:9 | 153:7 | general 19:23,23 |
| **fill** 159:1 184:7,8 | **following** 12:16 | **freight** 24:24 25:7 | gentleman 116:8 |
| **final** 8:4 | 152:18 153:3 | 25:14 26:1,10 | 116:19 117:9,18 |
| **finally** 149:8 | 159:8 182:6 185:5 | 44:10,12 48:2,9,12 | 167:4 |
| **financial** 182:16 | **follows** 6:6 | **frequent** 140:8 | george 1:18 5:12 |
| **find** 72:5,5 93:25 | **food** 23:15,20 | **fresh** 90:22 | georgia 1:1,19 2:6 |
| 94:20 106:2 | 84:22 | **friday** 125:10 | 2:10,13,18 5:9,12 |
| 131:17 143:6 | **foods** 24:10 | 126:7 127:21 | 7:3,8,14,16,23 8:2 |
| **fine** 27:10 37:11 | **football** 88:3 | 128:1 131:13 | 8:3,7,11,13,17,22 |
| 39:12 63:24,24,25 | 89:14 161:3 | **friend** 8:15 14:18 | 8:24 10:6,18 11:2 |
| 123:15 132:18 | **foregoing** 183:4,7 | 37:6 59:4 122:14 | 14:14,16,25 15:15 |
| 177:11,11 181:3 | 183:12 | 122:14 178:18,23 | 16:12,16 25:10,20 |
| **fines** 38:25 63:21 | **forever** 53:18 | **friend's** 122:22 | 25:22 28:19 30:23 |
| 65:14,14,16 | 114:18 | **friends** 25:3 38:11 | 33:25 34:2,22,25 |
| **finished** 14:11 | **forfeited** 159:10 | 38:12,16 101:24 | 45:6 53:9 55:12 |
| **fire** 18:12 | **forgave** 166:25 | 101:25 161:10 | 56:16,21 57:10 |
| **fired** 42:5 57:22 | 167:4 173:25,25 | 179:3 | 58:15 182:3,6,7 |
| 58:8 | 174:1 | **front** 108:11 | 183:2 |
| **firm** 2:8 118:6,9 | **forget** 46:21 50:21 | **full** 6:11 51:24 | getting 9:4 16:3 |
| 143:13 | **forgive** 167:5 | **function** 120:3 | 32:1 45:25 86:11 |
| **first** 6:5 7:18 8:4 | **forgiveness** 60:1 | **functionally** | 89:1,24 102:4 |
| 8:13,25 9:6,8 12:9 | **forgives** 167:1 | 119:19 | 104:21 130:10 |
| 15:4 23:16 24:18 | **forgiving** 173:24 | **functioning** | 161:16 |
| 30:10,19,20 31:6 | 173:24 | 119:20 | girl 31:1 34:5 |
| 39:15 40:15 46:22 | **forgot** 20:4,14 | **funny** 67:23 89:24 | 38:10,11 60:5 |
| 47:20 53:12,12 | 109:3 164:4 | 90:17,25 91:2,3 | 61:17,17 63:1 |
| 61:25 63:4 72:6 | **form** 73:24 90:12 | 161:16,19 | 64:9 93:5 123:4,9 |
| 73:6 75:23 77:3 | 93:21 159:1 185:7 | **furnish** 185:9 | 123:10 141:6,11 |
| 90:23 91:22 94:19 | 185:9 | **furniture** 149:9 | 179:10,11 |
| 95:12,18 96:7 | **former** 11:14 | **further** 97:9 | girl's 141:11 175:4 |
| 108:25 116:3 | **forty** 75:9 | 183:16 | girlfriend 142:16 |
| 117:3 120:10 | | | girls 101:22 164:1 |
| | | | 173:15 174:14,21 |

EXHIBIT A

Marcus J. Bush
April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[girls - guy]
Page 13

| | | | |
|---|---|---|---|
| 175:18 180:2 | 176:1,9 177:12 | 20:11,16,24 21:1 | grahamlawga.com |
| **give** 6:11,25 50:8 | 179:21 180:4,17 | 27:2,5 28:16 30:6 | 2:11 |
| 51:24 66:3 76:15 | 181:12,14 | 37:7 50:20,20 | **graphics** 13:7,8,10 |
| 147:18 149:7 | **go** 7:21 10:5,7,8 | 51:7 53:17 54:1 | **grass** 45:11,15 |
| 152:7 161:23 | 13:3 14:22 15:19 | 63:23 71:11,13,14 | **grateful** 167:3 |
| 170:21 | 17:13 26:16,21 | 72:15 73:11,19,22 | **gray** 11:15 112:21 |
| **given** 152:16 | 27:3,5,5,19 30:5,6 | 73:23 74:13 77:10 | 112:22 113:2,4 |
| 182:16 183:9 | 34:8,14 35:19 | 77:25 88:4 89:13 | **great** 17:16,19,22 |
| 185:8 | 38:2 40:18,19 | 89:16,17,23 90:5 | 40:24 48:13 |
| **giving** 147:25 | 41:8 42:10 44:20 | 90:11 97:1,2 | 120:17,17 168:24 |
| **glover** 2:3 3:3 5:19 | 46:3,8,24 47:7 | 102:7 105:16 | **greatwide** 17:18 |
| 5:19 6:8,9 12:25 | 48:2,11,17 55:14 | 106:8,9,11,15,17 | 17:20,23 18:2,16 |
| 17:6 30:14 39:2 | 73:3,7,9,16,21 | 113:14 114:14,25 | 19:18 40:21 49:25 |
| 41:15 43:6,11 | 74:5,14 76:11 | 115:18 117:9 | 51:8 |
| 49:13,21 50:11,18 | 77:9,23 78:4 | 123:14 124:8 | **greens** 122:9 |
| 52:12 54:9 55:2 | 80:25 83:9,13,21 | 126:1,3,8,15 | **greenville** 6:20 |
| 56:20 60:24 64:14 | 83:21,22 84:3,5,7 | 146:12,13 154:25 | 12:7 39:17,18 |
| 65:8 68:17 72:17 | 84:8,9,12,21,21,23 | 155:14,16 156:1 | **greetings** 184:5 |
| 72:20,22 74:11 | 85:5,12,13 91:5 | 157:10 165:3,13 | **griffin** 39:4 60:6 |
| 75:15 76:24 82:15 | 93:4 96:15,16 | 165:20,23 166:2 | 62:23 141:16 |
| 86:9 88:9 90:17 | 98:22 106:20 | 166:25 169:25 | **ground** 93:5 |
| 93:2,17 94:7 | 116:25 118:15 | 171:13 172:17 | **groups** 138:9 |
| 98:10,22 99:21 | 119:22 122:9,17 | **good** 8:15 21:3 | **grow** 119:24 |
| 102:14 105:8,11 | 122:18,19 124:22 | 42:11 61:19 62:3 | **guess** 31:21 35:8 |
| 105:19,24 106:2 | 124:23 128:16 | 66:10 79:25 92:12 | 40:5 54:24 62:11 |
| 106:17,20 107:2 | 131:25 134:10 | 104:3 143:5 150:2 | 86:20 88:20,23 |
| 113:18 114:21 | 135:6,15 140:20 | 157:3,24 160:7 | 92:23 98:23 |
| 124:8,15,16 125:3 | 144:3,16 145:5 | 163:6 166:15,16 | 111:16 154:23 |
| 129:12,16,19 | 146:6 148:15,21 | 168:25 170:24,25 | **guessing** 82:17,18 |
| 130:2,8 132:10,23 | 150:9 154:24 | 177:7,8 181:4 | 178:7 |
| 133:1 142:4,11,15 | 155:9 158:12 | **gotten** 95:4 104:6 | **guidelines** 152:13 |
| 142:25 143:10 | 160:11 162:9,19 | 170:19 | 153:3,15 170:19 |
| 147:16 148:12 | 171:24 175:18 | **gps** 100:12 | **guilty** 36:24 37:3 |
| 149:4,5 150:3 | 176:14 177:20 | **grabbed** 116:25 | 55:12 61:24 63:20 |
| 151:11,21,22 | 179:19 180:8 | 117:5 | 64:25 65:2,5,8,25 |
| 152:6,8 155:14,19 | **god** 53:5 138:17 | **grade** 13:23 | 66:1 |
| 155:21 156:4,12 | 146:17 166:25 | **graduate** 15:20 | **guy** 24:25 26:5,25 |
| 157:12,18,20 | 167:7 168:19 | **graduated** 6:19,22 | 28:2,4,5 32:13 |
| 158:7,25 160:9,20 | **goes** 158:5 | 30:4 | 33:24 37:8 42:18 |
| 169:12,16 170:12 | **going** 6:23 7:16 | **graham** 2:8,8 5:23 | 46:2,6,6,19,19,23 |
| 172:22 175:11 | 13:15,16,25 19:4,5 | 5:23 | 47:2 66:20 102:14 |

EXHIBIT A

Marcus J. Bush
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

April 23, 2019

[guy - hours]

Page 14

116:11 125:7
126:5 148:19
149:13 157:5
161:5 170:17
**guys** 31:10,12
175:9 176:2
179:18,19
**gym** 75:12 77:6,18
77:21,23 83:21,22
83:25 84:2,6,8,12
84:13 128:21

**h**

**half** 81:11 132:25
146:21
**hall** 2:17
**hallboothsmith.c...**
2:19
**hand** 24:2
**handbook** 9:23
**handle** 18:14
**handouts** 171:6
**hang** 174:17
**happen** 63:23 73:7
73:10 93:10 119:7
119:13,14 130:18
167:10
**happened** 16:9
17:12,21 31:4,16
32:4 35:25 46:17
48:8 51:10 54:21
57:23 61:9 64:24
67:3,7,7,8 70:13
75:6,10,17,20,21
85:19 86:19 88:5
88:17 89:12,22
91:1,6,15 95:25
97:25 100:15
108:17 109:16
110:11 115:19
116:24 118:24,25
119:14 124:4

138:19 141:2,5
145:4 163:18
164:22,24 166:11
166:17,17,21
167:19
**happening** 58:23
67:5 92:1
**happens** 85:11
87:17 90:23
114:22 144:22
**harassed** 59:3
**harassing** 59:2
**harassment** 62:6
**hard** 47:25 67:23
143:6 154:12
164:8 181:13
**harm** 70:9,10
**hate** 41:3
**hating** 178:23
**hauling** 19:25 20:1
**hayes** 142:5
**hazards** 137:14
**he'll** 121:3
**head** 29:22 31:7
52:19 67:19 82:25
82:25 83:10,18
90:2 91:19 92:6
116:18 125:12
137:11,18 173:12
176:11
**headed** 88:4
**health** 42:20,20,22
42:22 120:14,19
**hear** 52:20 80:12
**heard** 80:8 95:17
101:16 117:5,5
168:4
**heat** 122:20
**heaven** 74:5
**heavier** 103:2

**heavy** 79:24
139:14
**heck** 23:8
**height** 104:4
**held** 5:11 110:3
**hell** 149:22
**helmet** 30:24
**help** 38:16 121:9
121:12
**helping** 91:22
109:22
**hephzibah** 28:23
**hernia** 120:21
**hey** 150:23
**high** 13:20 15:12
22:10,22 30:20
39:23 42:25 43:16
79:23 80:7 120:24
120:25 150:19
**highlighted** 144:1
151:24
**hill** 50:17,21
115:12
**hire** 21:1 24:1
25:11
**hired** 20:24 25:18
26:9 41:3 53:24
**hiring** 49:6 152:13
**hit** 96:15,20
**hitting** 35:8
**holbert** 143:13
**hold** 142:8 147:20
**holding** 90:9
**holes** 88:14,15
**home** 13:2 15:16
25:15 42:20,22
53:12 54:22 60:20
66:14 74:7 76:20
76:22 77:7,9,12,15
77:18 78:4,6 79:1
82:18 83:9,11,25

84:7,9 99:14
115:12 122:18
123:7,8 126:2
128:21 148:20,21
158:8,23 178:2
**homicide** 64:15,18
65:11 66:1
**honest** 146:17
**honestly** 27:2
165:15
**hook** 41:12 82:25
**horrible** 109:15
**hospital** 11:21
176:13,14,18
177:19
**hot** 122:17
**hotmail.com**
140:22
**hotrod** 149:10,13
**hour** 50:5 54:1,2
75:9 76:15 79:5
79:15 84:14,15
88:17 123:9 129:3
133:20
**hours** 67:6 70:4,8
70:14 71:1 72:13
72:14,23 74:13
79:7,17 80:19
81:5,7,10,19,20,21
81:22,23,23 82:6
82:22 83:3 84:15
85:16,19,23,25
88:18,19 95:8
98:2 100:23 101:3
104:22 119:18
123:6,6,17,20
126:24,25 128:6
128:10 129:6,14
130:17 131:11,12
132:25 135:4,10
135:25 138:23

EXHIBIT A

Marcus J. Bush                                         April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

140:2 172:15
173:1,7
**house** 15:9,17,17
25:2,3 60:1 65:14
101:23 122:22
141:17,23 173:9
174:14 177:24
179:18,19,19
**howell's** 48:2,8,11
**hub** 120:11
**hugged** 148:19
**hum** 29:1 44:14
61:1 81:2 85:6
94:13,16 100:6
104:14 108:14
109:20,23 110:15
128:7 136:23
150:6 151:5
**human** 119:19
**hundred** 18:8
39:13
**hung** 88:3
**hunt** 16:13 17:1
19:18 25:12 26:6
40:12 47:7,11,15
47:19
**hurt** 118:18 174:1
**hurts** 126:17
174:6
**hypocrite** 174:13

**i**

**idea** 92:2 141:9
145:5,11 149:7
**identification**
113:17 124:7
143:9 151:10
155:13 160:19
169:15
**identified** 142:10
180:14

**identify** 97:3
108:20 109:5
**idiot** 28:2
**illegal** 121:7
**illness** 137:2
**imagine** 95:25
**immediately** 71:9
91:11
**impact** 95:11
96:20,23 97:6,11
110:10,21,23
111:5,7,9,14,17,24
**impacting** 97:1
**impaired** 66:25
67:2 136:6
**impairs** 137:9
**important** 70:13
71:1,8,19 72:8
73:5 115:21
145:16 149:18
154:5,10 173:6,8
**improper** 50:23
51:22
**inches** 157:22
**incident** 27:1,20
36:18 42:1 44:5
56:17 58:25 59:10
59:17 60:25 63:12
64:19 104:7,10
**incidents** 27:2,13
28:1 47:10 48:15
62:22 68:1
**including** 5:17
152:17
**increases** 137:13
**indention** 45:15
**independent** 87:6
**index** 3:1 4:1
**individual** 59:3
**individually** 1:8

**individuals** 30:2
**influence** 32:23
33:2
**information**
159:13
**informed** 61:10
**injuring** 137:25
**insomnia** 139:6
**inspection** 51:18
51:25 52:23 83:8
**inspector** 117:22
118:4
**insurance** 22:2
120:22
**interested** 183:19
**interior** 113:21
**internet** 100:5
**interstates** 96:2
**investigated** 59:11
166:12
**investigator**
118:12 142:14
**investigators**
141:17
**involved** 37:19
45:9
**involvement**
153:10
**iphone** 99:14,16
100:4,12 149:16
**iphones** 99:17,21
**irresponsible**
174:22
**ish** 84:18
**island** 20:8
**issue** 40:8 41:20
70:18 72:23
105:25 106:10
170:1,2,6,15
**issued** 136:18
143:12

**issues** 169:23
170:4
**items** 136:21

**j**

**j** 1:7,14 6:4 184:2
**j.b.** 16:12,25 19:18
25:12 26:6 40:12
47:7,10,14,19
**jacked** 147:21
**jackie** 178:15
**jackson** 15:5,23
**jacqueline** 39:4
60:6 62:23,24
63:10 141:16
178:17,17,22
**jail** 31:2,13 34:8
34:14 35:5 37:9
54:19 177:21
**january** 45:9 47:7
57:3 165:10
**jerrilyn** 11:15
**jesus** 167:1
**job** 13:20 15:4
16:20 18:9 19:1
20:3 21:10 22:24
25:5 26:16 27:12
27:18 40:7,12
41:16,22 42:11,21
44:9 53:24 55:3,4
68:8 69:13 79:22
82:11 85:20 110:6
110:6 137:20
146:20 152:8
154:11,12 157:6
168:14
**jobs** 22:4 23:5,11
24:14 25:17 26:1
26:7 27:18 42:17
46:4
**johnston** 6:18

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[jointly - legitimate]                                    Page 16

| | | | |
|---|---|---|---|
| **jointly** 1:8 | 167:15 168:12 | 112:22 113:4,6 | 118:8,17 163:16 |
| **jolt** 95:17 | 177:18 | 114:4,13,18,22 | 167:3 |
| **jon** 6:12 | **kinds** 149:18 | 115:11,17,22,24 | **laid** 17:10 67:6,9 |
| **judge** 35:6 36:14 | **kitchen** 122:14 | 117:15,15,15,16 | 78:22 101:10,11 |
| 36:21 38:10,18,18 | **kllm** 15:4,23 16:18 | 118:3,14,15,16,16 | **lake** 30:22 |
| 61:18,21 62:9,12 | 16:21 19:18 25:16 | 120:6,8,8 123:13 | **lance** 178:10 |
| 62:12 64:1 66:6 | 40:7 45:10 46:12 | 124:16 126:15,25 | **landscaping** |
| **judgment** 137:9 | 46:16,18 104:23 | 131:14,17,18 | 145:24 |
| **judicial** 182:6 | **knee** 157:4 | 132:17 133:15 | **larissa** 29:24 |
| **july** 50:4,11 | **knew** 36:17 38:17 | 140:21,23 141:3 | **late** 122:15,22 |
| **jumped** 45:14 | 38:17,18 45:5 | 141:10 142:4,11 | 164:5,6,13 |
| **jumping** 31:11 | 70:13 73:18 91:7 | 144:9 146:14,22 | **laughed** 36:25 |
| **june** 44:21,21 50:1 | 91:8 170:10 | 147:16,17 149:9 | **law** 2:8 30:4,12 |
| 51:3 52:5 56:14 | **knocked** 31:12 | 150:18 152:2,3,23 | 38:21 73:2 118:6 |
| 143:13 165:17,18 | 32:13 | 153:21 154:3,4,16 | 118:9 136:5 |
| **junior** 12:7 39:17 | **knocking** 33:24 | 156:18,21 157:8 | **lawn** 122:6 |
| **junk** 149:17,17 | **know** 20:5 22:11 | 157:13,14,14 | **lawyer** 62:13 |
| | 23:19 30:6 32:6 | 161:15,19,22,24 | 117:22,24 118:3 |
| **k** | 32:14 33:6 35:7 | 162:2 163:4,13,17 | 142:13 147:10 |
| **k** 16:21 63:7 | 36:21,24 38:21 | 164:14,21,21,23 | **leading** 88:10 |
| **kalon** 29:20,21 | 40:23 43:3 47:14 | 165:6,11,14,14,25 | 92:19,19 124:18 |
| **keep** 69:5 78:12 | 48:19,20 53:18 | 166:9,15 167:7,8 | **learn** 23:18 28:10 |
| 145:21 146:1 | 54:24 55:1 57:16 | 167:15 168:8,10 | **learned** 120:4 |
| 147:6 148:5 | 57:21,24 59:22 | 168:20 170:18 | 168:25 |
| 166:14 | 60:3,25 62:1 | 172:2,5,19,19 | **learning** 86:15 |
| **kegs** 175:10 | 63:22 66:7 67:1 | 177:7 179:9 | 120:5 |
| **kept** 26:22 117:11 | 71:10 77:19 79:5 | **knowing** 114:9 | **leave** 40:7,12,21 |
| 178:4 | 79:6 80:10 81:9,9 | **knowledge** 89:6 | 40:25 41:16 53:6 |
| **kevin** 142:4 | 82:16 83:8 86:19 | **known** 72:2 74:22 | 72:12 77:24 99:8 |
| **kids** 117:3 | 86:20,21,23 88:12 | 97:21 137:5,21 | 144:24 |
| **kill** 15:13 | 88:14,18 89:17 | 138:4 139:3,10,16 | **left** 15:16 18:21 |
| **killing** 137:25 | 90:6,22 91:8 | 139:22 | 27:12,19 40:15 |
| **kimberly** 19:25 | 92:23 93:20 94:17 | **knows** 47:14 61:18 | 41:17,22 42:11 |
| 20:7,10 42:9 | 95:10 96:3,5,22,23 | | 53:3 98:9 103:17 |
| **kind** 7:15 20:22 | 99:6,7,24 100:2 | **l** | 118:1 145:6 |
| 32:1 35:7 38:8 | 103:23 104:25 | **l** 1:21 179:24 | 146:20 174:3 |
| 41:7 45:7 47:10 | 105:2 106:18 | 182:22 183:25 | 176:9,10 177:19 |
| 49:21 67:22 81:18 | 107:7,10,14,16 | **lack** 136:24 137:2 | **legal** 175:20 |
| 85:13 96:24 99:11 | 109:13 110:9 | **ladies** 59:22 60:3 | **legit** 121:16 |
| 99:15 116:7,11 | 111:3,5,9,21,22 | 179:3 | **legitimate** 29:9 |
| 119:22 121:7 | 112:13,15,20,20 | **lady** 7:10 14:18 | |
| 149:5 163:5 164:7 | | 101:24,25 104:1 | |

**EXHIBIT A**

Marcus J. Bush                          April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

**letter**  141:18,19,20
    141:22 165:10,18
**level**  38:3
**liar**  173:23
**license**  7:14 8:12
    30:25 49:11
    136:14,15,18
**lie**  107:19 113:15
    166:25
**lied**  62:9
**life**  16:7 30:18
    34:19 38:12,15
    73:20 74:6,10
    96:11,17 109:17
    110:11 143:6
    149:22 173:20
    174:13 178:24
**light**  109:18
    110:18 111:18
**lights**  95:19,19,19
    96:10,13 110:14
**liked**  166:5,7,8
**limit**  37:24 50:6
**limited**  28:14
    152:18
**linda**  179:12,13
**linda's**  179:21
**line**  105:20 106:3
    185:11,14,17,20
    185:23 186:1,4,7
    186:10,13,16
**liquor**  122:3
**list**  153:4 159:8
**listen**  130:4,6
**literally**  47:5
**litigation**  182:17
**little**  6:24 21:2
    24:21 54:2 77:9
    89:24 97:11 127:5
    161:12 169:5

**live**  11:16,25 14:16
    14:23 15:15 16:6
    16:14 17:22 28:22
    96:17 138:6
    173:10 174:16
    178:8
**lived**  6:15 7:7 12:5
    12:6 14:19 16:1
    25:3
**lives**  29:11,13 72:1
    72:1 175:23
**living**  7:16 14:20
    15:17 173:13,15
    174:13,15
**llc**  182:8,9,11,13
    182:15 183:14
**lo**  44:7
**load**  82:7,12,14,15
**loading**  128:8
**located**  20:7
**location**  88:8
**log**  124:17,20
**logbooks**  4:5
    124:3,3,11,17
    125:4 143:21
**logs**  119:12 124:13
    127:15
**long**  6:15 9:4,10
    17:17 20:2 29:10
    35:10 49:24 53:19
    53:19 77:15 78:20
    81:19 84:13,23
    85:18,20,22 86:5
    86:22 87:20,21
    88:21 90:24 91:5
    91:25 95:3 101:8
    103:12 104:22
    117:14 123:14
    139:19 143:18
    154:8 164:22
    169:21,22 170:18

    171:25 177:24
**look**  45:6 69:16
    90:18 93:13
    101:12 108:19
    109:3 111:25
    112:5,12 113:1
    119:12 124:10
    125:19,23 127:14
    128:24 133:1
    143:19 151:13
    157:25 158:5
    162:10 167:10
**looked**  25:12,22
    47:21,25 94:8
    111:17 158:9,10
**looking**  42:4 50:14
    50:16 66:18 90:25
    91:2,3,10,13,16,17
    92:11 93:16 94:5
    94:14,22 107:17
    107:22 108:7
    109:4,8 111:14,14
    111:14 112:1
    115:25 116:24
    117:10 129:19
    151:14 158:14
    160:24 162:20
**lookout**  69:5
**looks**  111:11,11,12
    127:17 128:24
    135:7 157:21
    172:3
**lord**  157:24
**lose**  103:7 145:9
    145:11 167:5
**loss**  139:5
**lost**  80:7 99:18,20
    121:3 145:25
    146:25
**lot**  22:1 23:1 24:2
    25:3 31:11,13

    36:9,10 45:25
    51:1,2 65:13
    67:13 73:10 95:4
    97:1 99:18,20
    101:25 118:17
    120:11 135:15
    147:2,23 156:22
    164:20 165:13,20
    166:1 172:23
    173:14 175:18
**loved**  148:20
**loving**  173:25
**low**  38:2
**lowest**  37:23,24
    45:5,5
**lunchtime**  77:18
    77:22
**lynhurst**  178:9,9

|   m   |
|---|

**mad**  59:15 179:4
**mail**  16:3 184:10
**maintain**  140:2
**maintaining**
    140:11
**maintenance**
    122:16
**majority**  79:8
    80:18 85:9
**making**  18:7 28:14
    45:10 56:15,23
    155:17 185:8,8
**man**  37:21 38:10
    44:1,6 66:19
    82:11 95:13,13,19
    95:20 96:12 119:7
    119:13 120:17
    125:25 131:12
    135:22 137:20
    143:18 144:11
    145:5,6 146:7
    149:1 150:24

EXHIBIT A

Marcus J. Bush                                     April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[man - moved]                                              Page 18

| | | | |
|---|---|---|---|
| 152:11,12 162:15 | mccarthy 39:4 | mental 136:25 | 158:10 |
| 163:9 166:20,23 | 60:6 62:23 63:10 | 137:1 | misfortunate 41:4 |
| 167:11 175:18 | 141:16 178:15,17 | message 34:6,9,14 | mission 50:7 |
| manage 69:11 | mccormick 8:20 | 59:6,19 144:10 | mississippi 15:5 |
| management | mean 7:5 9:7,20 | messages 34:7 | 15:24 |
| 13:24 14:1 | 15:4,14 18:6,7 | 143:25 144:2 | misstates 114:19 |
| manager 14:4,5 | 25:1,16 33:25 | 145:2 163:15 | 157:11 |
| mandates 73:2 | 39:8,10,13 47:12 | messaging 99:22 | mixed 178:18 |
| mansell 184:20 | 49:23 53:9 56:24 | messed 36:17 | mom 15:12 |
| manual 9:24 10:23 | 57:14 58:9 76:9 | messing 62:11 | mom's 16:2 |
| 68:21 70:23 | 81:9 91:16 95:7 | 142:23 | moment 35:18 |
| 136:14,15,18 | 98:4 100:3,22 | met 28:13 | money 18:3,5 19:4 |
| manually 184:8 | 101:19,24 102:3 | methvin 2:4 | 45:25 64:1 65:13 |
| march 48:17,18 | 104:22 105:11,22 | microphone 98:12 | 147:24 149:8 |
| 51:17 57:9,13 | 106:2,4 107:16 | mid 138:14 139:13 | month 17:8 18:10 |
| 60:16,25 165:5 | 109:12 110:2 | middle 110:5 | 57:19 65:14 |
| marcus 1:7,14 5:5 | 111:6,13,22 112:4 | midnight 75:17 | 146:15,20,23 |
| 6:4,12 98:14,20 | 116:11 119:4,14 | 128:3 138:15,19 | months 17:10 |
| 172:16 180:10 | 121:17 123:18 | 139:15 | 22:25 23:1 47:2 |
| 182:2 184:2 | 132:16 143:17 | mile 94:22 | 146:16 148:13 |
| margarita 35:4 | 144:7 145:15,16 | miles 2:4 50:5 | 153:9 159:11 |
| marietta 2:10 | 145:23 146:7,25 | 88:23 91:6,6 | morning 13:17 |
| marigliano 143:13 | 147:8 148:17 | 94:23,23 178:1,1,1 | 75:11 76:3,25 |
| mark 113:20 | 149:19 153:16 | 178:6 | 77:4,6 83:15,17,20 |
| 124:9 143:11 | 157:17 159:24 | mind 165:8 | 115:6,11 128:20 |
| 151:12 | 164:12,13 165:15 | mine 8:16 29:11 | 130:21 131:21 |
| marked 113:16 | 166:6,7,8 167:9,22 | 30:22 37:6 73:17 | 133:22 134:3 |
| 124:6 143:8 151:9 | 168:4,5 171:1 | 88:2 122:14 | 135:5 |
| 155:12,15,19 | 173:3,21 174:13 | 150:24 | morrow 16:16,16 |
| 160:18,21 169:14 | 175:15 177:7,10 | minimum 119:20 | mother 173:25 |
| 171:13 180:18,23 | means 119:25 | 119:21 153:2 | mother's 29:23 |
| married 11:8,10 | medical 154:24 | minute 47:3 89:23 | motor 9:22 19:20 |
| 24:19 29:24 | 155:2,5,6 156:13 | 105:10 160:24 | 48:2,9,12 139:14 |
| master 42:20,22 | 157:21 | minutes 75:9 | 153:7 |
| materials 9:14,21 | medication 121:4 | 84:16 88:17,21 | motorcycle 30:23 |
| 68:13 | meet 24:18 37:8 | 90:1 91:6 98:9 | motoring 91:23 |
| matter 5:6 6:10 | 140:24 | 106:5 129:1,2,4,6 | move 14:1 21:9 |
| 59:25 103:16 | meetings 170:13 | 129:6,15 130:17 | 23:19 30:12 |
| 141:9 | melatonin 121:15 | 135:10 161:1 | 119:19 |
| mcallen 50:7 | memory 55:6 | mirror 26:23,23 | moved 6:17 15:10 |
| | | 27:6 40:16 45:16 | 15:10,14 22:23 |

EXHIBIT A

Marcus J. Bush                                          April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[moved - oh]                                                    Page 19

| | | | |
|---|---|---|---|
| 23:12 25:15,16 53:8 | neck  80:5,8 102:9 102:15 | nikki  175:21,22 179:6,11 | 160:23 161:1 162:12 |
| movie  24:18 42:15 | need  46:24 48:20 | nine  81:10,10 | numbers  20:13 |
| moving  20:1 27:24 | 55:25 66:9 73:14 | 140:2 | 41:6 |
| 30:19 110:16 | 119:17,18 131:10 | nod  72:6 | nw  2:5 |
| 117:11 | 140:2 172:14,25 | nodding  29:22 | **o** |
| muscle  119:22 | needed  56:6 93:25 | 31:7 52:19 67:19 | o  5:1 179:24 |
| myrtle  31:24 32:7 | 103:6 147:6 148:5 | 83:10,18 91:19 | o.c.g.a.  182:12 |
| 36:18 43:19,21 | needs  71:13 | 116:18 125:12 | oath  62:9 |
| **n** | negligent  44:4 | 137:11,18 173:12 | obey  48:22 49:15 |
| n  5:1 | 45:1 168:15 | 176:11 | 55:10 |
| naked  32:9 | never  9:11 15:12 | noise  78:13 | object  72:15 73:23 |
| name  5:13 6:9,11 | 15:20,21 16:6 | non  165:24 | 90:11 93:21 |
| 10:9 11:14 19:6 | 26:9 37:11 46:21 | noon  133:16 | 105:19 114:19 |
| 19:11 21:6,16,24 | 48:16 50:21 60:10 | normal  126:4 | 156:1 157:10 |
| 22:8 23:15 24:6 | 80:15 92:4 101:10 | 128:23 131:1 | 180:12 |
| 29:3,6,19,23,25 | 144:5 160:3,4 | 134:2 | obscene  59:2 |
| 30:10 39:3 49:3 | 168:4 | normally  127:3 | obtain  13:1 |
| 63:5 103:21 | new  20:12 27:9 | 139:13 | occupied  51:4 |
| 141:12,15 142:7 | 49:5 86:7,9,21,23 | north  6:14,15,19 | occur  138:12 |
| 142:25 167:2 | 127:9,12 129:25 | 6:20 7:2,3 12:7 | 139:14 |
| 171:19,20 175:4,4 | 146:9,10,13 | 19:12 39:17,18 | occurred  58:19 |
| 175:12,13,15,20 | 150:10 169:21 | 54:11 76:19 | 59:7 63:13 161:13 |
| 175:22 179:22 | newer  127:11,12 | 175:23 | ocga  185:7 |
| named  19:22 | nice  66:20 103:25 | northern  1:1 5:8 | october  44:2 55:9 |
| names  59:14 142:6 | 116:12 | northside  2:5 | 58:14 63:13 75:20 |
| 174:24 | night  76:25,25 | notarized  184:9 | 75:21,24 127:14 |
| nancy  62:25 63:2 | 77:2 78:14 83:15 | notary  186:24 | 127:17 128:17 |
| 63:9 143:1,2 | 85:16,18 86:4,6,17 | noted  185:4,5 | offense  35:21 |
| 178:8,10,22 | 87:20 88:6 89:7 | notice  63:21 79:16 | 36:12 180:25 |
| nancy's  63:5 | 89:18 108:16 | 123:21,22 | office  53:24 |
| nap  82:23 130:24 | 119:1,17 122:15 | noting  184:7 | 103:22 147:15 |
| 140:13 | 122:22 123:1,2,16 | november  43:1,23 | 148:8 |
| naps  140:8 | 131:25 138:13,15 | 44:24 51:12 | officer  176:22 |
| nature  28:8 65:11 | 139:12 140:8 | nude  31:25 | officers  118:22 |
| 118:11 | 141:24 164:13 | number  5:5 87:10 | offices  182:10 |
| ne  2:17 | nightmare  178:19 | 98:14,19 99:4 | 184:3,10 |
| near  42:3,7 148:22 | nights  141:24 | 140:16,18,19 | officially  148:17 |
| 152:11 | nighttime  13:17 | 141:8,9 143:4,14 | oh  17:15 19:23 |
| necessary  185:9 | 86:3 127:10 | 143:16 145:13,14 | 20:4 22:18 23:24 |
| | 133:23 | 145:17,19 151:3,4 | 24:17,20,20 26:19 |

Veritext Legal Solutions

EXHIBIT A

Marcus J. Bush                                   April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[oh - periods]                                        Page 20

30:4,22 32:13
33:16 34:5 35:2
35:24 36:20 37:21
41:17 42:21 43:9
43:19 44:6 45:12
46:19 48:3 50:13
50:13,13,13,13,13
50:14 52:2,4,22
53:5,5 54:21 57:6
59:24 61:25 63:19
65:15 90:8 96:20
113:22 121:23
122:1 137:11
149:17
**oil** 20:25,25 21:8,9
21:9 23:6,7 25:6
26:2,11
**okay** 7:13 8:6,10
8:23 9:13 11:18
12:4,8 14:3 16:5,9
17:12,21 18:20
20:9,19 21:5 23:2
23:5,11 24:3 26:7
26:14 29:23 31:8
32:10,21 36:10
40:1 41:22 43:18
43:20 44:2 45:20
46:7,23 48:1 49:2
52:2 53:11 54:18
55:24 63:2 65:7
72:17 73:1 75:19
76:5 77:8 78:1,5
78:17 80:4,17
81:3 82:19 83:2,4
83:24 84:6 86:9
86:15 90:21 92:14
96:22 105:13
106:1,16 107:10
109:11,18 110:2
110:22 112:7
113:3 118:9,12

119:3 123:21
125:17 128:19
129:17 130:22
136:22 139:1
147:15 148:16
152:3 155:25
156:9,11 157:16
160:11 165:1
176:3 181:7
**ol** 66:10
**old** 6:18 11:4
15:16 27:9 29:15
31:4,16 32:3 36:8
36:11 120:7,16
178:18
**once** 11:13 61:4
144:21 184:9
**ones** 19:21
**online** 140:24
169:16
**open** 20:6 35:4,5
35:13 39:5 54:16
54:16 65:19 68:6
134:25
**operate** 9:10
**operated** 9:11
**operating** 50:22
51:21 87:9
**orchard** 103:24
**order** 62:8 93:8,11
93:12
**ordering** 184:13
**original** 4:18,18
183:15 184:12,15
**originally** 7:13
8:13
**outside** 11:25
**overnight** 85:15
85:24 123:16
177:22

**overweight** 52:13
**owned** 8:16
**owns** 150:24

**p**

**p** 5:1 179:24
**p.c.** 2:4,17
**p.m.** 1:16,16 54:5
83:14 98:17
106:24 132:8
133:6,9 134:20
135:1 160:15
176:6
**pace** 150:24 151:1
151:6
**paces** 2:12
**pack** 158:16
**page** 3:2 4:3
132:15 155:16,22
158:13 185:11,14
185:17,20,23
186:1,4,7,10,13,16
**pages** 144:2
151:15 172:4,5
183:8 185:9
**paid** 39:9,12
**pain** 27:10
**paper** 83:8 167:25
**paperwork** 148:17
**pardon** 175:6
**park** 111:15 112:1
**parked** 56:15,22
**parking** 31:10,13
36:9,10 159:9
**parkway** 2:5
**part** 24:17,22
46:22 62:10
122:10 158:17
172:12
**particular** 85:17
85:20 97:23
135:21 163:18

**parties** 182:16
183:17,19 184:13
**parts** 112:11
**party** 182:14,17
**passenger** 115:1
**pastor** 30:11
**patrol** 176:10
**paw** 122:6
**pay** 37:11 150:3,5
150:8,11
**paying** 18:10 20:3
65:13 126:18
**pdf** 184:6,7
**peace** 143:6
**peach** 103:24
**peachtree** 2:17
**pending** 54:13
55:25 56:6,7
153:20,20
**people** 15:17
48:13 68:10 70:16
94:8 107:19
113:14,15 117:19
118:17 138:14
140:24 142:9
149:7 174:10,17
174:20 175:1
**percent** 104:19,19
**performance** 40:8
40:13,22 41:1,4,19
42:12,16
**period** 24:21
79:12 88:20
133:20,25 134:1,5
135:16 144:3,14
145:22 162:10,13
162:20
**periodically** 101:6
**periods** 100:25
101:5 127:15
162:21

EXHIBIT A

Marcus J. Bush                                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

**permit** 7:18,19 8:4
  9:6,7,7,8,10,11,12
**person** 8:24 28:12
  28:12 46:20 47:20
  62:10 99:13 116:3
  118:20 173:19,22
  174:2,3,11
**person's** 39:2
**personal** 60:21,23
  98:25
**pflugerville** 17:24
  51:18 52:24
**phone** 4:10 15:12
  34:10 77:13,16
  79:2 85:8 98:25
  98:25 99:2,4,12,25
  100:8,16,18,19,24
  101:5 140:16
  141:10,11 142:7
  143:4 144:8 145:4
  145:9,13,14,17,21
  146:4,9,13,19,19
  146:23,24 147:4,7
  147:18,21,25
  148:5,23 149:3,6
  149:20 150:10,14
  150:18,23 151:3
  160:22,24,25,25
  161:17,17,18
  162:11,12,14,17
  162:21,25 163:1
  163:11,14,15,19
**phones** 99:8,13,15
  99:18,20 140:20
  145:6,25 146:6,7,8
  146:10 147:22,23
  148:3 149:7,18,18
  150:4,5
**photocopying**
  183:11,13

**photograph** 4:4
**physical** 103:10,11
  103:12 104:1
  136:25 137:1
  147:2 155:8
**physician** 140:6
**pick** 148:11
**pickup** 66:15
**picture** 140:24
**pictured** 15:21
**pictures** 141:17
  145:7
**piece** 147:21
  167:25
**pills** 79:23 80:7
  121:3
**pilot** 120:8
**place** 13:21 19:6
  26:9,22 42:22
  94:20,23
**places** 40:6 53:23
  90:15
**plaintiff** 1:4 2:2
  5:22,24
**plaintiff's** 4:2 5:18
  113:16,20 124:6
  143:8 151:9,18
  155:12 160:18
  169:14 171:14
  180:21
**plan** 85:13
**planned** 72:4
  73:18 74:15
**planning** 105:6
  161:6
**plant** 18:22,25
  19:7
**play** 110:18
  111:19 163:16
**playing** 107:20
  108:3 113:1 161:3

**plays** 161:2
**plea** 36:11 39:7
  63:17
**plead** 35:20 36:19
  37:3 38:8 49:14
  63:20 64:25 65:5
  65:8,25
**please** 5:16 6:3,11
  184:6,10,18 185:9
  185:9
**pled** 36:1,24 37:16
  55:11 61:24 65:1
  65:23 66:1
**plenty** 67:6 70:3,7
  76:15 131:11,12
  131:14 134:8
  147:24
**plus** 150:24 151:1
  151:6
**point** 10:5 15:11
  89:7 102:8 109:14
  110:2,7,8,13,22
  111:4,20,20 146:9
  151:13 154:1,1
  160:8
**points** 23:4 61:6
**police** 118:21
  119:3 176:22
**policemen** 117:21
**polis** 179:12,12,23
  180:1
**poor** 139:6
**pop** 123:4
**population** 138:11
**portis** 2:4
**position** 73:13
  79:6,10 119:10,10
**positive** 107:7
  143:17 145:15
  154:2 155:22
  168:10 174:17

**possibility** 44:1
  84:2,11
**possible** 51:20,20
  56:24
**post** 83:8
**pounds** 52:13
  79:24 103:2
  120:17 157:22
**praise** 167:2
**pray** 167:4,5
**prayed** 167:3
**pre** 83:7
**prepare** 73:12
  74:14,17 131:9
**prepared** 73:14
  104:25 112:5
  131:8 169:25
**prescribed** 153:2
**present** 2:21
**pressure** 79:23
  80:7 120:24,25
**pretty** 18:9 62:2
  81:16 103:3,23
  104:25 105:1
  147:22 149:22
  158:1 174:21
**prevent** 67:5
**preventability**
  167:16,24
**prevented** 91:9
**preventible** 45:10
  46:18,25 47:1
  56:14 57:4,9,13,20
  57:25 164:18,19
  165:6,11 167:13
  168:1,6
**preventing** 139:25
**previous** 153:8,12
  153:13
**prieto** 143:12

EXHIBIT A

Marcus J. Bush                                April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[primary - record]                                         Page 22

primary  85:23
principal  161:2
print  184:8
printing  13:7,8,10
  13:21 42:21,23
prior  47:19 91:25
  97:5 114:19
  154:25 156:25
  169:5
probably  32:17
  79:5 81:10,11
  84:3 88:22 103:1
  154:2 164:11
probation  65:15
  65:15,15,17
problem  120:21
problems  66:8
  120:19
procedure  167:9
  185:7
process  14:6 99:18
  103:12 168:16
produced  151:16
production  184:19
productions  2:22
professional  37:6
  70:5 72:11 87:14
  170:5,9 171:16,17
program  169:21
progress  167:19
prohibited  182:12
prohibits  114:9
pronounced
  138:13
proper  167:9
  172:25
properly  52:6
property  148:15
protect  72:10
  107:18 113:13
  114:15

proven  166:14
provide  182:10,13
provided  124:2
  159:12
public  186:24
pull  71:9,16 89:23
  90:4,18 94:5,20,21
  104:12 105:9
  178:24
pulled  32:22 35:2
  35:3 37:20 44:7
  66:12,17 83:5
  117:13
pulling  89:25
punch  25:10
punching  33:24
purpose  71:3
  73:11,22 74:12
  90:20 107:18
  114:12
pursuant  182:5
  185:6
pushed  32:13
pushing  104:23
put  10:1 11:1 20:4
  26:5 37:11 100:12
  101:8,10 113:12
  114:20 115:14
  117:5 119:10
  121:3,19 140:24
  144:12 153:20
  167:18,19 172:16
  180:14 181:5
puts  139:6,20
putting  122:13

**q**

quality  139:6
quarters  23:4
question  26:15
  72:21 86:1 105:12
  105:14 149:24

156:8,10 166:23
questioning
  105:20 106:3
questions  49:8,10
  105:23 117:20
  118:18 130:7,7
  132:18 180:5,6
  183:6
quick  33:17 54:1
  125:25 132:14
  147:23
quickly  14:1 61:10
  137:15
quit  18:23 24:19
  42:6
quite  17:3

**r**

r  5:1 183:1
railroad  57:4
raised  65:4
ran  26:20 124:24
  125:1,7 126:5,6,7
  126:11,11 134:9
  135:22
rates  182:16
ratings  22:5,6
ration  93:14
react  71:11 137:14
read  46:1,4,5 47:5
  125:24 152:19
  181:1 184:6 185:2
reading  181:15
ready  82:7,12,14
  89:13
real  33:17 47:25
  53:25 116:12
  132:13 175:22
realized  95:22
really  15:20,21
  42:3 51:10 55:5
  99:6,6 134:23

142:6 144:5
  168:25
reason  46:5 62:8
  73:15 115:9
  116:16 147:20
  163:11 185:13,16
  185:19,22,25
  186:3,6,9,12,15,18
reasons  163:8
  185:8
recall  9:17,20
  10:15 16:17 30:3
  31:19 32:16 37:25
  38:3 43:12 44:4
  45:1 48:24 49:21
  50:23 51:17 52:6
  52:18,25 53:1
  56:16 57:10,17,18
  76:12 77:20 83:24
  86:22 89:4,18
  92:4,18 94:24
  97:10 99:11
  100:16,18 102:24
  103:21 111:13
  116:9 140:19
  163:23 164:18
  171:16 174:24
receive  63:17
received  46:14
  61:23 65:13
recess  54:5 98:17
  106:24 160:15
  176:6
recession  21:7
reckless  32:25
  33:4,5,5 37:16
  55:12,17,19 56:9
  58:15 159:18
record  5:3 20:18
  20:21 21:11,13
  22:5 24:4 25:6

EXHIBIT A

Marcus J. Bush                                   April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[record - right]                                           Page 23

| | | | |
|---|---|---|---|
| 26:3 27:20 36:16 | remember 7:17 | 171:25 172:7,9 | residences 11:19 |
| 40:9,13,22 41:1 | 10:9 17:16 19:14 | 175:11 176:15,17 | residents 25:2 |
| 46:1 47:19 49:6 | 20:17 21:25 29:25 | 176:19,19 177:16 | resources 28:14 |
| 54:4,7,7 98:16,21 | 30:10,21 37:1,5,7 | 177:16,17 | respond 97:15 |
| 106:23 107:1 | 37:13 39:11 40:1 | remove 136:5 | responder 91:22 |
| 152:16,24 153:6 | 43:17,25 44:7 | repercussions | responding 93:15 |
| 153:10,13,18 | 45:3 46:1,7 47:4,4 | 109:16 | response 143:12 |
| 155:23 156:13 | 47:12,13,16 49:23 | repetitive 137:2 | responsibility |
| 157:20 158:13 | 49:24 50:25 51:9 | report 56:12 155:5 | 69:5,10,22,25 70:1 |
| 159:4 160:12,14 | 51:11,15,16 52:7 | 167:25 | 70:3,6 73:25 |
| 160:17 163:21 | 55:8 56:24 57:1 | reported 27:1,1 | 136:4 172:20 |
| 164:16 171:12 | 58:1,3,4,5,13,17 | reporter 5:14 6:3 | responsible 70:9 |
| 176:5,8 180:7,8,11 | 58:18,18,22,23 | 12:22 17:5 30:8 | 70:11 174:20 |
| 180:16 | 61:7 66:2,5,6 | 38:13 41:10 49:19 | rest 47:6 71:5,13 |
| record's 36:22 | 75:24 77:11 84:1 | 52:9 60:22 68:15 | 74:2 90:20 97:24 |
| recording 108:25 | 84:1 87:21,23,23 | 76:21 82:13 87:25 | 104:12 128:14 |
| records 4:6,7,9,10 | 89:8,8,9,11,13,21 | 93:11 94:2 99:19 | 131:12,15 140:13 |
| 26:17 146:12 | 89:25 91:10 92:9 | 113:11 125:1 | rested 69:22 73:15 |
| 151:16 154:4 | 94:25 95:12 96:7 | 142:20 169:13 | 73:22 74:16 119:9 |
| 160:22,23,24 | 96:10 97:7,7,10 | 170:6 175:7 177:9 | 119:17 135:19 |
| 180:19,23,24 | 97:12 100:19 | 179:16 181:7,10 | restraining 62:8 |
| reduced 31:14 | 102:20 103:25 | 181:13 182:7,14 | result 64:18 |
| 36:13 39:9,10,11 | 104:21 107:8,13 | reporters 182:8,9 | 183:19 |
| 183:6 | 108:18 109:10,12 | 182:11,13,15 | results 177:2,6 |
| reducing 61:12 | 109:15,15,17 | 183:14 | retirement 74:9 |
| referral 182:14 | 110:10,10,19,20 | reporting 182:5 | returned 184:11 |
| regard 37:4 38:9 | 110:21,23,25 | 182:10,13,14 | 184:14 |
| 39:7 47:19 49:14 | 111:5,6,13,17,23 | represent 5:17 6:9 | revco 19:12 |
| regarding 159:1 | 111:23,24 112:7,9 | 109:21 183:8 | review 159:4 |
| 168:13 | 112:10,11 116:7,8 | representative | 184:6 |
| regardless 71:12 | 116:11 121:1 | 182:8 | rhonda 1:21 5:14 |
| regular 183:18 | 133:17 143:15 | represented 36:15 | 182:22 183:25 |
| regularly 102:22 | 147:19,20,25 | required 8:12 11:3 | rich 24:21 |
| regulations 182:5 | 148:9 150:17 | 56:11 | richmond 182:4 |
| rehab 28:13 | 152:1,1 156:15,16 | researching 38:24 | 183:3 |
| related 12:21,23 | 156:18,19,20 | reserved 181:16 | ride 31:1 |
| 27:13,20 40:8 | 158:22,22 161:20 | 184:6 | riding 30:23 |
| 41:20,25 42:1 | 161:21 164:20,21 | residence 7:11 | right 12:12,15,19 |
| 61:24 62:22 63:18 | 165:2,9,14,19,21 | 14:18,25 15:6,10 | 12:25 13:3,11,18 |
| 64:18 67:25 | 166:4 169:21 | 15:21 16:15 | 14:7,15,16,22 15:2 |
| 137:12 183:16 | 171:18,19,19,23 | | 15:23 16:25 17:12 |

EXHIBIT A

Marcus J. Bush                         April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[right - sec]                                    Page 24

| | | | |
|---|---|---|---|
| 18:2,16 19:17 | 184:6 | 66:17 128:11 | 167:25 |
| 25:13 28:23 29:2 | **ripped** 149:13 | **rural** 139:20 | **scene** 117:2 118:1 |
| 30:14,17 31:6 | **risk** 137:13 138:9 | **rws** 1:6 5:10 | 176:9 |
| 32:3,12,21 33:15 | 138:9,21,24 139:7 | | **schedule** 86:21 |
| 34:2,9,15,16,20 | 139:21 | **s** | 122:12 127:9,11 |
| 35:14,19 36:6 | **road** 2:12 9:9 | **s** 5:1 17:7 19:10 | 127:20 130:13 |
| 37:2,15 38:7 39:5 | 19:12 66:16,17 | 22:13 179:24 | 131:4,6,13 156:21 |
| 39:14 41:18 44:15 | 72:12 88:16 91:14 | **safari** 100:5 | 156:23 |
| 44:20 45:10,20,22 | 96:15 103:17,24 | **safe** 22:13 71:21 | **school** 7:16,21 |
| 48:5,6,8,11 51:13 | 108:8,11,16 110:5 | 73:13 74:1,17,19 | 8:16,16,20 9:15 |
| 51:24 54:20 55:3 | 110:17 111:18 | 74:20 94:20,23 | 10:7,8,9,12 13:15 |
| 57:3,19 63:12 | 139:20 155:11 | 172:19,20,23 | 13:17,21 14:10,11 |
| 71:6 75:16,19,23 | **roadway** 69:6,17 | **safety** 9:19 60:15 | 14:13,14,23 30:5 |
| 76:12 77:3 78:1 | 69:19 88:9 92:19 | 73:6 170:12,17 | 30:20 39:15,22,23 |
| 79:11,16 80:17,21 | 94:9 108:13 110:3 | **saia** 17:3,4,7 18:19 | 42:25,25 43:16 |
| 80:25 81:12 83:19 | **robbing** 150:13 | 18:21 19:18,19 | 70:21 74:3 |
| 84:18,22 87:17 | **roberts** 1:3 5:6,20 | 26:19 27:17,18 | **schooling** 39:23 |
| 88:25,25 89:1 | 5:24 6:10 91:21 | 40:15,25 48:10,17 | 40:2 |
| 90:1 95:20 98:6 | 109:22 166:18 | 57:14 | **scientist** 168:3 |
| 103:17,24 104:15 | **rocket** 168:3 | **sales** 53:4 55:3 | **score** 20:22 21:2 |
| 106:20 108:7,8,11 | **rode** 30:23 | **sat** 117:13 | 21:14,14,25 22:10 |
| 108:12 109:13,24 | **room** 77:11 78:7 | **saturday** 122:2,2 | 22:12,13,17,22 |
| 110:13,16,22 | 79:1 149:10 | 161:9 | 23:14,14,16 26:13 |
| 112:3,16 114:1 | **roswell** 2:9 184:22 | **saved** 173:20 | 26:17 49:4 157:7 |
| 121:24 122:13 | **route** 124:24 | 174:5,6 | **scores** 27:20 53:16 |
| 126:3 127:22,24 | 126:1,2,4,5,8,11 | **saw** 89:19 95:16 | 53:18 |
| 128:19,22,24 | 128:11 134:9 | 97:2 111:18 112:2 | **scox** 2:19 |
| 129:7,20 130:2,3 | 135:22 | 116:20 117:3,3,7,8 | **scrape** 27:6 45:17 |
| 131:11 132:6 | **routine** 86:12 | 117:10 127:19 | **scraped** 26:23 |
| 133:1,5,8 134:10 | 128:23 | 175:16,16 | 27:6 |
| 134:22 135:2 | **rpr** 1:21 182:22 | **saying** 46:23 49:10 | **scrapes** 40:16 |
| 136:17 139:2 | 183:25 | 62:16 95:3 129:23 | **scraping** 26:22,25 |
| 144:8 145:6,24 | **ruin** 38:12,14 | 132:17 133:19 | **screen** 108:1 |
| 149:14 150:1 | **rule** 185:6 | 156:16 166:10 | **scribes** 182:8,9,11 |
| 154:22,23 157:1 | **rules** 182:5 185:6 | **says** 45:14 66:2 | 182:13,15 183:14 |
| 157:23 158:12,18 | **rumble** 96:2 | 94:20 136:25 | **seal** 183:15 184:11 |
| 161:13 162:24 | **run** 47:2 104:2 | 137:8,12 138:9,22 | **sean** 2:16 5:25 |
| 163:7 167:7 | 125:16 126:9 | 138:23 139:5,12 | 184:1 |
| 168:16 169:5,12 | 130:12,12 131:5 | 139:19,25 140:1,6 | **seatbelt** 52:5 |
| 173:7 174:15,16 | **running** 27:14 | 140:11 143:22 | **sec** 182:12 |
| 174:18 179:5 | 31:25 32:8 47:14 | 148:17 155:22 | |
| | | 156:2 164:3,17 | |

EXHIBIT A

Marcus J. Bush                          April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[second - sleepy]                                      Page 25

| | | | |
|---|---|---|---|
| **second** 19:24 | **sent** 16:3 141:21 | **sic** 54:4 63:24 | 158:16 |
| 75:13 129:10 | 141:25 144:9,15 | 132:21 | **size** 102:9,15 |
| 180:22 | **sentence** 46:4,6 | **sick** 26:25 | **skills** 181:1 |
| **seconds** 129:4 | 47:6 65:12 | **side** 91:14 96:15 | **sky** 97:2 |
| **section** 136:24 | **sentenced** 36:3 | 108:12 | **slap** 25:9,19 |
| 152:14 | **september** 53:7,21 | **siger** 17:6 | **sleep** 38:15 59:14 |
| **see** 26:5 28:20 | 62:5 | **sight** 95:16 | 67:22,24,24 70:4,7 |
| 74:10 89:10 91:14 | **service** 35:24 36:4 | **sign** 29:10 37:22 | 70:13 71:1,4 72:8 |
| 91:21 93:5 107:25 | 36:5 37:12 72:14 | 94:17 108:8,12,16 | 74:20 76:10,24 |
| 107:25 108:5,8,13 | 72:23 74:13 98:2 | 110:17,17,19 | 78:9,10,12,20,23 |
| 108:16 109:6,18 | 99:9 | 111:18 153:16 | 78:23,25 79:8,12 |
| 109:24,25 110:13 | **services** 182:10,13 | 159:15 181:2 | 79:14 80:18,21 |
| 110:17 111:18 | **set** 164:4 169:5 | 184:6 | 81:5,7,24 83:13,22 |
| 113:1,8,14,23 | **seven** 81:11 | **signature** 182:21 | 84:7,9,21,21,23,23 |
| 114:25 128:17 | 123:20 | 183:14,24 184:2 | 85:3,5 86:16 95:4 |
| 130:3 131:19 | **sex** 123:2 | 184:15 186:20 | 97:19 98:5 101:9 |
| 137:14 141:19,25 | **sh** 38:17 | **signed** 62:12 | 101:21 102:2,4,5 |
| 152:6 155:21 | **shaking** 92:6 | 153:17 184:9,11 | 103:5 119:16,23 |
| 160:9 162:11,12 | **shape** 104:3 | 184:14 | 119:24 120:12 |
| 167:23 168:4 | 120:17,18 | **signing** 181:15 | 123:1,5 134:6,8,14 |
| 176:2 178:25 | **shift** 86:6,8,10,12 | **signs** 94:14 | 135:2,2,6,18,24 |
| **seeing** 7:11 8:24 | 125:8,13 | **simple** 127:19 | 137:2 138:17,23 |
| 89:8,9 92:4 96:1 | **shirt** 104:2 | **single** 147:5 174:3 | 138:24 139:5,6,6 |
| 97:4 110:19 111:6 | **shock** 63:22 | **sir** 6:9 7:6 9:25 | 140:1,2 144:6,8,22 |
| 112:7,9,10 142:18 | **short** 24:21 88:20 | 11:4 12:18 63:8 | 162:16,24 163:16 |
| 171:16 178:10,20 | **shot** 108:22 109:9 | 66:23 74:11 107:2 | 164:5 172:15 |
| 178:22 179:1 | **should've** 57:22 | 107:4 136:16 | 173:6 |
| **seen** 36:16 60:14 | 150:16 | 137:23 139:4 | **sleep's** 136:1 |
| 89:19 94:8,10,11 | **shoulder** 90:10 | 167:14 | **sleepiness** 79:18 |
| 96:11 105:3 124:3 | **show** 105:14 | **sister** 175:5 | 79:21 80:2,3,14 |
| 124:14 125:6 | 113:19 124:8 | **sit** 7:25 10:18 | 138:12 140:7 |
| 158:21 167:25 | 131:10 143:10 | 53:15 142:3 | 155:22 156:6,14 |
| 168:5 171:10 | 145:8 146:12 | **sitting** 36:7 108:2 | 156:15,17,21 |
| 175:24 177:2 | 151:11 155:14,16 | 123:23 | **sleeping** 67:10 |
| 178:16 | 160:20 171:13 | **situation** 125:7 | 78:8,14,18 79:6,10 |
| **selling** 156:25 | **showed** 171:9 | 167:10 170:11 | 79:15 121:13 |
| **send** 101:12 141:4 | **showing** 105:6 | 178:23 | 131:1 140:8 |
| 141:6 184:12,18 | **shows** 127:16 | **situations** 97:16 | 162:11 172:23,24 |
| **sending** 102:2 | 133:20 | **six** 22:25 47:2 | 173:3,5 174:14 |
| 144:14 | **shut** 71:12,13,14 | 119:18 123:6,20 | **sleepy** 104:6 |
| | | 138:23 146:15 | |

EXHIBIT A

Marcus J. Bush                         April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[slept - stuff]                                        Page 26

| | | | |
|---|---|---|---|
| **slept** 67:11,11,15 | 76:21 82:13 85:2 | **spots** 88:15 | **steer** 97:10 |
| 67:20 77:2 78:22 | 87:4 93:11 99:19 | **spouse's** 11:14 | **steps** 53:13 |
| 79:7,7,8 81:11,20 | 113:11 125:1 | **spring** 31:24,24 | **stepsister** 28:21 |
| 81:23 84:10 101:4 | 137:19 142:20 | 32:1 | **stole** 175:9 |
| 123:9,10,11,16 | 147:12,12 149:25 | **standard** 106:4 | **stop** 37:22 59:4 |
| 128:22 163:4 | **soul** 167:5,6 174:6 | 119:18 | 73:3 91:11,17 |
| 164:6 | **sound** 95:16 | **standards** 153:2 | 93:16,19 95:22 |
| **slipped** 53:13 | 154:22 157:23 | **standing** 165:24 | 96:19 98:10 106:4 |
| **slover** 143:12 | 165:15 166:13 | **start** 86:15 90:23 | 107:23 111:2 |
| **slow** 67:13,14 | **sounds** 165:22 | 91:3 122:18 128:8 | 132:13 140:12 |
| 76:14 81:18,20 | **south** 6:14,18 7:4 | 129:24 | **stopped** 91:17 |
| 120:11 128:6 | 7:5,17,18 8:5,7,15 | **started** 8:13 13:16 | 95:10 97:8 107:24 |
| 134:23 135:14 | 8:25 9:14,22 10:2 | 14:9 16:12 20:15 | 108:15 |
| **slowest** 95:6,7,8 | 11:23,24 12:1,6 | 22:18 25:24 46:6 | **stopping** 160:8 |
| 119:6,12 130:4 | 15:6,11,14 16:4 | 49:5 75:18 86:2,4 | **story** 29:10 |
| 168:17 | 18:4,18 20:8 22:9 | 88:4 90:18 91:13 | **straight** 26:24 |
| **small** 6:17 21:4 | 22:23 23:12 25:8 | 91:16 94:5 126:4 | 80:8 89:3,5 109:2 |
| 27:8 108:1 | 25:9,19,21 27:15 | 126:4,5 128:5,5,9 | **strain** 137:2 |
| **smart** 161:19 | 43:2,12 44:4 45:1 | 145:23 150:7 | **street** 2:9,17 32:9 |
| **smarter** 74:2 | 45:4 53:8,9,10 | 151:7 154:20 | 66:15 111:18 |
| **smartphone** 99:12 | 103:15 136:14,19 | 155:9 158:2 | **stress** 27:16 |
| **smith** 2:17 68:14 | **southern** 6:20,21 | 161:16 168:23 | **strips** 96:2 |
| 68:16,17 169:2 | 12:14 39:20,21 | 169:3,4 178:24 | **strive** 153:1 |
| 170:20 171:10 | **space** 69:11 | **starts** 89:1 111:20 | **strong** 152:15,20 |
| **socially** 121:22 | **spartanburg** | 128:25 129:20 | **struggle** 174:4 |
| **sold** 149:10,14 | 60:17 | 132:20 | **stuck** 57:8 |
| **somebody** 33:24 | **specific** 172:22,24 | **state** 5:16 7:7,14 | **students** 170:24 |
| 34:13 41:8 45:5 | **specifically** 106:14 | 10:1 11:1,25 26:6 | **studied** 8:14 9:13 |
| 47:5 102:8 123:3 | 124:12 | 28:18 182:3 183:2 | 9:21 68:23 70:20 |
| 124:24 125:14 | **speed** 50:6 137:13 | **stated** 163:22 | 70:23 136:13 |
| 131:7 140:23 | **speeding** 43:2,3,12 | 164:4 183:5 | **studies** 12:19 13:5 |
| 148:10 165:16 | 43:24 50:5 60:16 | **statement** 47:4 | **study** 9:18 10:21 |
| 166:14 | **spell** 179:8 | 118:10,11 185:8 | 10:23 |
| **something's** 58:21 | **spend** 18:9 | **statements** 136:22 | **stuff** 20:25 32:2 |
| **son** 29:9 74:9 | **spent** 141:24 | **states** 1:1 47:22 | 35:24 41:7 61:19 |
| 161:2 169:1 | 149:9 | 59:3 152:8,25 | 97:1,2,21 98:5 |
| **sonny** 25:2 | **split** 15:8 62:18 | 153:3 159:7 | 104:2 119:23,25 |
| **sorry** 12:22 17:5 | **spontaneously** | **stay** 84:13 121:9 | 120:2 165:15,23 |
| 40:20 41:10 43:21 | 101:1 | 122:19 177:22 | 169:20 175:9 |
| 43:22 52:4,10 | **spot** 20:6 | **stayed** 48:14 77:10 | 177:18 179:15 |
| 54:4 64:3 68:15 | | 78:24 83:25 | |

Veritext Legal Solutions

800.808.4958                                     770.343.9696

EXHIBIT A

Marcus J. Bush                                April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[stupid - texas]                                     Page 27

stupid   26:13
   104:24 174:23
   175:1
subject   153:1
subpoena   143:12
subscribed   186:21
substance   185:7
suelo   6:12
suffer   79:18,21
   80:1,3,14 140:7
suffered   80:15
suffering   139:5
suggest   103:4
suggestions   28:11
suite   2:5,9,13,18
   184:21
summertime
   157:4
sun   115:12
sunday   122:1,2
super   116:7,11
supervisor   26:24
supposed   21:8
   72:11 108:19
   119:7,13,13
   125:14 140:12
   144:3,24 167:21
supposedly   35:3
sure   9:3 11:18
   48:19 59:11,20,24
   72:20 80:11 86:21
   94:8 100:17 106:6
   129:12,16,18,23
   132:23 140:17
   144:11 145:23
   157:19 159:21
   172:25
surprise   144:18,19
surprised   95:1
   143:24 144:13
   162:12,14

surprising   22:9
swear   6:3
swerve   119:5
swerved   92:25
   93:7,25 94:4
swerving   92:19
   93:18,23 94:17
   116:20
sworn   6:5 186:21
sys   23:22
sysco   23:25 24:8,9
   24:10
system   68:14,16
   68:17 169:2
   170:21,24
systems   171:10
sytco   24:7

                t

t   183:1,1
tab   151:18
tailgate   89:16
   161:6
tailgating   89:14
   161:4
taillight   35:4
take   2:22 7:25
   8:10 9:9 10:6,6,19
   18:11,23 27:5
   40:10,14 53:25
   74:6 90:1 98:11
   104:2 105:20
   106:21 107:19
   117:1 121:15
   126:2 130:24
   131:5 140:8,13
   168:3,22 176:1,12
   177:14
taken   40:4 111:24
   169:6 183:5
takes   83:3 84:16

talk   12:4 21:23
   28:10 61:5 68:8
   75:5,19,20 89:9
   101:18 105:10
   106:9,18 116:2,23
   117:7,17 125:22
   136:10 149:20,21
   156:17 163:18
   172:14,18 176:2
talked   30:10 45:17
   88:2 105:16 106:7
   116:3,21 117:8,19
   118:20,21 142:14
   148:7
talking   9:3 26:18
   30:6 61:7 64:4,6
   64:10 66:6 75:15
   83:14 89:20 93:1
   93:22 102:23
   106:11 111:16
   129:10 133:24,25
   135:18 148:24
   149:2 150:9
   151:20 156:20
   158:25 161:3,5
   162:17,21,25
   163:1,11
talks   154:1
tam   2:21 5:13
tandem   52:13 57:8
tardiness   163:23
tasks   137:2
taught   170:23
tech   6:22 13:4,5,6
   13:19 39:21
telephone   59:2
   61:14 143:14
   160:23 180:22,24
tell   8:10 13:18
   30:17 45:13 48:21
   55:17,19 56:1,3,5

   56:8 71:8 75:10
   80:1 81:12 102:11
   105:16,23 106:14
   118:25 122:11
   124:10 144:9
   146:17 151:6
   153:22 158:8
   162:3 168:20
telling   76:1 130:11
   131:7,9 148:10
temporary   74:7
   90:14,16
ten   31:9 146:10
tend   138:12
term   167:12,12
terminal   177:25
   178:3
terminated   42:5
   151:25 152:4
termination
   151:22 152:2,9
terminology   20:17
terms   42:11
terrible   118:19
territory   28:16
terrorist   59:12,21
test   7:10 8:1,7,11
   8:14,21 9:9 10:18
   10:19,20,21,24
   103:16 169:7
   176:24 177:3,6
tested   103:5
testified   6:6
testimony   114:20
   157:11 185:2,7
testing   7:12 8:19
   169:9 171:23
tests   107:19 169:8
texas   11:15,16
   17:11,24,25 18:13
   23:9,11 24:12,21

EXHIBIT A

Marcus J. Bush                                April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[texas - time]                                        Page 28

| | | | |
|---|---|---|---|
| 24:22 26:20 32:14 | 155:18,19 157:6 | 109:16 110:25 | 63:19 |
| 33:20,23 37:2 | 163:5 168:16 | 111:1 115:21 | **throw** 31:2 |
| 48:23 49:16 50:5 | 169:1 170:10 | 116:10,10 117:18 | **thrown** 35:6 36:13 |
| 50:7,12,23 51:14 | 174:18 | 118:3,8,8,24 | 36:16 |
| 51:18 52:6,16,24 | **things** 15:20 18:15 | 136:13 138:17 | **ticket** 22:1 25:8,21 |
| 53:9 99:14 158:9 | 21:4 27:16,21 | 141:1,14,21,22 | 25:23 30:21,22,24 |
| 158:24 | 28:11 40:5 61:20 | 142:7 143:7 | 30:25 31:2 36:14 |
| **text** 4:6 34:6,7,9 | 61:20 64:11 69:16 | 146:22 147:9,9,10 | 43:12,24,25 44:9 |
| 34:13 59:6,19 | 70:6 73:10 85:14 | 148:2 150:16,22 | 50:5 54:16 60:17 |
| 62:21 63:3 99:21 | 86:13 89:9 93:14 | 152:22 154:16,16 | 61:4 |
| 100:21,25 102:2 | 95:20 96:1,6 | 154:18,23 159:25 | **tickets** 21:2 68:1 |
| 143:25 144:2 | 108:20 109:5,16 | 159:25 160:9 | **tiffany** 182:10 |
| 145:1 160:22 | 110:7 111:6 112:6 | 166:4,6,18 167:20 | **tiger** 122:6 |
| **texted** 59:13 60:7 | 124:1 126:18 | 167:21 169:3,20 | **tigerville** 12:6 |
| 60:10 62:25 | 131:11,15 136:11 | 170:5 171:7 173:3 | **tight** 149:8 |
| **texting** 60:4 62:16 | 150:25 156:22 | 173:4 174:8,9 | **tighten** 172:13 |
| 62:18,19 122:8 | 164:15 165:13,20 | 177:15 180:4 | **tightening** 172:13 |
| 144:23 163:11 | 166:4,9 167:10 | **think's** 118:21 | **till** 50:1 78:22 82:3 |
| **texts** 101:12 141:4 | 169:7 170:19 | **thinking** 33:8 | 82:6,12,14,15 85:5 |
| 144:14,15,20 | 171:10 172:5,13 | 37:23 84:2 89:25 | 122:19,25 128:3 |
| 145:3 163:4 | 174:4,23 180:20 | 116:14,14,15,15 | 129:2,2,3,6 131:24 |
| **thereto** 183:6,15 | **think** 13:13 15:8,9 | 116:15 123:14 | 132:22 133:22 |
| **thermal** 13:24 | 15:10 16:22 17:3 | **third** 10:21 | 134:16 146:2 |
| 14:4,8 44:21 | 22:7 23:18 26:12 | **thompson** 115:13 | 167:2 |
| **thing** 13:9 20:14 | 27:21,22,22 28:20 | **thoroughly** 171:4 | **time** 9:4 13:22 |
| 25:18,20 27:3 | 28:24 30:3,4 | **thought** 53:17 | 15:7 18:10 24:17 |
| 36:23 42:24 44:13 | 31:17,18 34:22 | 62:15 92:9 112:4 | 24:21 26:24 30:17 |
| 45:7 46:2 49:4,5 | 35:17,17,18 37:16 | 117:25 127:19 | 30:19,20 31:6,8 |
| 53:16,18 56:12 | 37:22 39:25,25 | 168:24 174:7 | 32:12,14 33:16 |
| 58:3 61:3,16 | 40:3,3 42:11 | **thousand** 18:8 | 34:3,16,21 40:15 |
| 65:11 69:8 71:6 | 47:13,17,17 49:5 | 63:21 | 41:5,17 42:24 |
| 75:23 77:3 80:9 | 55:13 56:10,11 | **threat** 59:12,21 | 55:3 57:22 58:9 |
| 87:23 90:1 94:19 | 57:21 58:21,21 | **three** 23:1 57:22 | 61:11 63:1,4,16 |
| 95:12,18,24 96:7 | 60:21 61:3,7,12 | 62:22 81:21,23 | 67:13,15,16,17,18 |
| 96:11 102:6 117:3 | 64:4 66:6 68:4,4 | 123:5 124:18 | 67:20,21 75:6 |
| 121:2 124:21,23 | 74:8 75:7 80:10 | 141:19 144:2 | 76:15 77:20 79:9 |
| 126:11 127:20 | 81:17,19 84:4 | 146:11 149:21 | 79:12 80:22 81:21 |
| 128:5 130:25 | 87:13,24 89:24 | 152:18 153:6,8,12 | 82:16 83:2,11 |
| 131:3 132:22 | 90:13 92:10 96:4 | 153:13 | 85:9 86:20 87:2,5 |
| 134:8 135:11,21 | 96:5,16 97:8 | **threw** 31:14 36:15 | 88:10,20 91:8 |
| 142:24 154:10 | 99:10 105:15 | 61:16 62:9,14 | 92:11 94:4 95:3 |

EXHIBIT A

Marcus J. Bush
April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

| | | | |
|---|---|---|---|
| 97:24 98:25 99:5 | **timing** 86:19 | **town** 6:17 27:8 | **triples** 138:24 |
| 99:8 100:25 101:5 | **tire** 45:11 | 170:17,18 | **trouble** 78:14 |
| 101:7,14,21 102:6 | **tired** 69:25 71:9 | **toys** 117:3 | 147:3 |
| 102:18,20,24 | 71:12,17 72:5,6 | **tracks** 57:5 | **truck** 13:16 14:6,9 |
| 104:3,19,20,21 | 94:8,18,21 95:1 | **tractor** 90:9 | 14:20 15:1 17:7 |
| 105:1 106:15 | 97:14,19 98:1,6 | **traffic** 48:23 49:15 | 17:18 18:12 24:2 |
| 107:14 108:21,24 | 104:13,16,21 | 55:10 67:25 89:7 | 24:16,24 25:25 |
| 109:1,8 110:8 | 123:21,24,25 | 153:4,11 159:2,8 | 26:21 27:4,9,9 |
| 111:4,9 115:6,7,10 | 126:12,13 161:16 | **trailer** 82:25 83:7 | 39:22 42:3,4,8,8 |
| 115:11 119:11 | 163:7,8,12 | 90:10 | 53:2 64:21 66:15 |
| 120:15,19 121:4 | **tiredness** 137:1 | **trailers** 20:1 | 68:8 69:4,13,25 |
| 121:20,24 122:24 | **tis** 175:13,14,20 | **train** 68:10,12 | 70:3 72:3,23 73:2 |
| 123:8 127:15,18 | **title** 37:7 | **trained** 70:16 | 74:1 87:14 97:22 |
| 128:2,3 129:13,13 | **today** 42:2 64:12 | 94:11 108:19 | 104:7,10,16 |
| 129:24 130:3,15 | 64:15,19 103:19 | 109:3,5,25 111:25 | 112:17 113:9,13 |
| 130:16,19,25 | 122:7,10 123:21 | 112:4,5,12 | 113:19,21 114:14 |
| 131:9,23 134:2,2,5 | 145:13,17 | **trainer** 16:8,11 | 114:23 115:15,18 |
| 134:8 135:2,20 | **today's** 5:3 | 46:13 | 116:17 120:5,5 |
| 136:19 141:3 | **told** 37:15 39:14 | **trainers** 46:14 | 136:3 137:6,22 |
| 142:16 143:18,19 | 40:15 44:9 55:9 | **training** 4:9 10:11 | 138:5 139:3 |
| 144:14,21 145:22 | 55:11 59:18 60:4 | 14:5 40:4 46:9,15 | 148:22 152:11 |
| 147:23 148:25 | 61:9,10 66:4,18 | 72:3 97:22 136:12 | 154:5 178:4 |
| 150:19 154:8 | 79:20 80:13,15 | 168:12,21,24 | **trucking** 14:22 |
| 156:24 158:17 | 87:13 92:25 93:1 | 169:4 170:21 | 16:1 40:21 53:3,6 |
| 159:20 161:10,22 | 93:3,6,24 94:3 | 180:19 | 154:7 |
| 161:22,23 162:2 | 101:3 102:8,14,18 | **transcript** 4:18 | **trucks** 74:25 128:9 |
| 162:10,13,20,21 | 103:6,9 119:2,3 | 183:4,9,12 184:7 | **true** 101:24 144:5 |
| 163:12,18,19 | 121:1 128:20 | 184:12,15 185:2 | 159:8 183:8 |
| 164:6,10 171:25 | 134:6 135:2 | **transferred** 12:13 | **truly** 145:6 |
| 173:14 178:13,20 | 136:13 141:1 | 17:9,11 | **truth** 119:2 130:14 |
| 179:2 184:14 | 147:6,8,14,15,17 | **transport** 49:25 | 131:10 |
| **timeframe** 14:17 | 148:20 156:5,13 | **transportation** 1:7 | **try** 67:22 174:17 |
| 15:2 | 157:9 160:3 | 5:7 6:1 | **trying** 22:7 27:22 |
| **timeline** 161:14 | **tomorrow** 40:14 | **traveled** 156:23 | 28:20 38:14 59:25 |
| **times** 11:12 73:2 | 74:6 167:6 | **triangles** 90:7 | 60:20 62:4 74:9 |
| 73:17 90:2 123:2 | **tons** 48:25 | **tried** 59:3 62:3,7 | 74:11 82:9 97:10 |
| 123:22 133:20 | **top** 46:14 108:7,25 | 62:13 | 105:17 110:6 |
| 134:16 135:17 | **total** 130:13,13 | **trip** 72:4 73:18 | 130:8,9 131:16,17 |
| 138:12 144:20 | **totally** 166:2 171:7 | 130:9 140:1 | 132:10 142:23 |
| 145:2 162:15 | 172:9 | **triple** 168:20 | 154:11 164:1 |
| 163:2,5,14,15 | | | 174:8 |

EXHIBIT A

Marcus J. Bush                    April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[turn - want]                                           Page 30

**turn** 41:5,9,11
45:10 64:23 114:1
114:17 151:18
**turned** 12:1 31:18
66:15 159:16
**turning** 45:25
**tv** 78:9,12,17
**twice** 26:23 27:7
**two** 16:18,19
17:17 27:2,12
30:2 45:16 47:21
60:3 64:4,10
80:19 81:14 83:3
88:18,19 98:23
107:5 124:18
128:6 133:19
134:15 148:13
151:15 153:9,11
164:7,12 173:11
173:17 174:9,19
180:18
**typewriting** 183:7

**u**

**u** 63:7
**u.s.** 5:8
**ugh** 24:5
**ugly** 158:24
**uh** 29:1 44:14 61:1
81:2 85:6 94:13
94:16 100:6
104:14 108:14
109:20,23 110:15
128:7 136:23
150:6 151:5
**ultimate** 64:17,20
64:22
**ultimately** 33:3
**uncle** 30:11
**uncomfortable**
42:4 93:9 176:25

**undergo** 46:8
**undersigned** 185:2
**understand** 11:18
19:17 30:14 49:12
71:22 74:12,12
81:5 82:11 97:25
127:14 131:16
132:11,16 137:20
156:3,7 174:8
**understanding**
73:1 152:10
173:24
**understood**
151:25 159:12
**undocumented**
38:19
**unfortunately**
173:20 174:4
**ung** 24:5
**uniformly** 138:11
**united** 1:1
**university** 6:20,21
6:21 12:14
**unlawful** 34:6,9
34:10,10 35:1
38:7 58:25 59:19
61:14,24 62:1,20
**unpreventable**
168:2,7
**upset** 47:3 120:9
120:13 176:19
**urine** 176:24
177:3,6
**use** 19:5 34:10
61:14 68:12,13
100:16,19 109:3
169:2 172:11
176:21 180:12
185:9
**usual** 182:16

**usually** 76:11
82:17 126:22
147:22 161:18

**v**

**vehicle** 19:21
20:20 24:23 49:22
50:19,23 51:4,22
56:15,22 60:13,21
60:21,22,23 62:18
64:15,18 65:10,10
65:10 66:1 69:9
69:14 91:21,22
92:5 95:10,21
96:18 105:4 107:2
107:11 108:12
109:22 110:3
111:2 112:3 115:2
139:14 153:7
**vehicles** 9:23
69:17,19
**veritext** 182:10
184:10,19
**verizon** 99:10
143:14 150:10,13
150:15
**versus** 5:6
**victoria** 2:21 5:13
**video** 105:3 106:8
107:20,22,24
108:3,15 109:1,8
111:17,20 112:25
113:1 180:8
**videographer** 2:21
5:2,14 6:2 54:3,6
98:8,13,18 106:22
106:25 160:13,16
176:4,7 180:9
**videos** 60:15
169:10 171:8,9
**videotaped** 1:13

**view** 109:19
110:19 112:23,25
113:2 114:2,9
**violated** 73:10
**violation** 43:2
50:22 51:13,18,19
51:21 52:24 61:14
62:6
**violations** 52:1
153:8 159:9,9
**vision** 137:9
**visor** 113:23 114:1
114:17 115:9,14
**visor's** 114:22
**vocational** 12:21
12:24
**volleystrawberr...**
140:22
**vs** 1:5

**w**

**wait** 75:13 82:8
147:11,11 149:24
**waiting** 20:4,5
**wake** 76:18,19
101:2,7,20
**wakes** 72:7
**walk** 117:6
**walked** 38:18
117:12 152:5
**walmart** 16:13
**want** 11:18 21:23
24:25 40:19 42:3
42:10 59:14 68:8
71:20 74:8,18,18
75:5 80:11 89:9
89:10 92:22 98:22
106:13,18 107:22
107:23 121:18
125:22 126:9
129:17,22 130:11
131:18 132:17

EXHIBIT A

Marcus J. Bush
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al
April 23, 2019

| | | | |
|---|---|---|---|
| 136:10,20 141:19 | 134:24 135:9,12 | west  18:12 | 77:5,13 79:17 |
| 143:10,19 147:16 | 135:14,14,15,21 | wheel  104:7 | 80:22,23 81:17,19 |
| 147:17 148:2 | 146:15 147:5 | 137:25 166:22 | 82:22 85:12,13,15 |
| 149:19,19 151:11 | 168:17 | wheeler  96:14 | 85:23,25 99:2 |
| 151:14 152:11 | weekend  177:23 | whew  51:9 | 119:22 120:23 |
| 156:17 160:20 | weekends  122:2 | white  17:19 | 122:10 124:23 |
| 174:2 181:8,10 | weeks  38:18 86:24 | wide  134:24 | 125:7 132:11 |
| wanted  9:16 16:20 | 86:25 87:1 127:10 | wife  18:3,5 167:4 | 133:16 145:7 |
| 19:3 28:17 30:5 | 141:19 145:12 | wife's  29:4 | 146:7 147:2 |
| 30:11 31:1 76:8 | 149:21 | wild  32:1 | 154:25 157:4 |
| 79:23 123:11 | weigh  102:11,15 | wilson  1:18 5:12 | 164:2 168:17 |
| 166:9 | 102:18 | window  27:13 | 170:25 178:3 |
| wanting  93:19 | weighed  102:24 | wise  81:7 | worked  13:20,22 |
| warning  20:19 | weight  80:7 103:7 | wish  48:13 145:6 | 14:10 17:2,7,9,16 |
| 36:14 51:25 | 121:3,18 | withdrawn  183:10 | 17:22 19:18 22:25 |
| warnings  20:14,16 | weird  163:16 | witness  6:3 12:23 | 23:1 24:17,19 |
| 21:4,15 22:1,2,5,6 | welcome  152:19 | 30:9 38:14 41:11 | 26:19,19 27:23 |
| 22:20,21 49:1 | went  7:17 8:16 | 43:9 49:9,20 | 42:23,24 50:1 |
| watch  107:22 | 9:15 10:10 14:1,9 | 50:13 52:10 54:25 | 64:1 81:21,22,23 |
| 169:10 | 14:10,12 16:19,25 | 60:23 64:8,13 | 82:3,3,5 117:18 |
| water  24:22 25:1,4 | 17:14,14,15,15 | 65:1,6 68:16 | 128:20 146:1,2,5 |
| 27:25 28:6 42:16 | 18:18,21,21,23,24 | 73:25 76:22 82:14 | 147:2 165:22 |
| watkins  2:12 5:21 | 20:2 27:17 33:11 | 86:7 88:1 90:13 | working  7:15 |
| 5:21 | 33:13 37:9 39:15 | 92:24 93:12,24 | 13:15 16:12 18:15 |
| way  7:12 8:20 | 39:16,18,22 40:25 | 94:3 99:20 113:12 | 27:8 28:12 47:16 |
| 25:12,13 42:25 | 45:11 46:22 54:6 | 141:23 142:13,21 | 51:8 58:11 82:19 |
| 49:14 51:13 86:13 | 54:19 62:1,8,10 | 147:12 148:9 | 85:18,23 86:2,16 |
| 86:19 88:4,12,13 | 63:25 66:16 67:12 | 149:25 155:25 | 102:22 119:15 |
| 112:13 125:24 | 75:11 77:6,18 | 156:3,11 158:21 | 120:9,10,12,13 |
| 132:18 156:19 | 79:1 81:18 83:25 | 170:8 172:18 | 122:5 126:1 127:9 |
| 157:8 165:21 | 84:2 85:3 97:9 | 175:8 177:10 | 128:8 131:2 147:3 |
| 183:19 | 103:10,11,15 | 179:17 181:3,16 | 154:14,19,21 |
| ways  172:23 | 121:1 128:20,21 | woke  101:16 | workout  84:17 |
| we've  20:9 54:1 | 129:7 133:16 | 123:12 | works  53:19 61:19 |
| 148:24 158:13 | 134:12,12,14 | women  164:7,13 | world  74:7 120:7 |
| 167:25 | 143:23,23 144:5,7 | wondered  123:15 | worrying  178:24 |
| weather's  122:17 | 148:21 150:20 | wondering  125:5 | worst  96:11 |
| week  81:16,16 | 158:10 164:2 | words  109:3 | worth  144:2 |
| 95:6,7,8 119:6,12 | 171:3,6 172:1 | wore  147:22 | would've  27:10 |
| 120:10 130:4,4 | 177:21 | work  15:3 16:10 | wreck  64:21 68:1 |
| 131:12 133:10 | | 20:11 44:20 55:14 | 75:5,20,21,25 |

EXHIBIT A

Marcus J. Bush                                April 23, 2019
Roberts, Callie D. v. AAA Cooper Transportation, Inc. et al

[wreck - zx]                                              Page 32

| | | | |
|---|---|---|---|
| 80:22 81:8 85:19 | 41:14 43:9,9,10,10 | 130:8 133:4 134:7 | 120:7,16 153:6,8 |
| 87:2,5,17 91:1,5 | 44:7,7,11,14,19,19 | 134:18,18,18,21 | 153:12,13 168:25 |
| 95:23 102:25 | 44:23 47:9 48:3,3 | 134:21 135:4,5 | **yep**   37:18 40:17 |
| 115:7,10 120:15 | 48:3,7,7 50:3,14 | 136:2 137:4 139:1 | 40:17,17,17,18 |
| 120:20 124:4,18 | 50:17,20 51:23 | 139:1 141:6,7 | 45:15 60:20 75:1 |
| 127:13 136:19 | 52:7,8,15,17,22,22 | 143:1,3,22 145:20 | 144:15 159:14 |
| 141:1 150:10 | 52:22 53:2,5 | 145:20,20 146:3,3 | 162:18,18,18 |
| **wrist**   25:10,19 | 54:19 55:13,13 | 146:3,3 147:10 | **yield**   51:13 |
| **write**   46:22 61:4,4 | 57:6,6,6,6,6 58:20 | 149:4 150:16,16 | **young**   104:24 |
| 82:10 137:19 | 58:20 59:6,8,8,8,8 | 151:2,2,8,8,8,8,8,8 | 167:3 |
| 160:6 | 59:8,8,8,11 60:18 | 151:21 152:22 | **youth**   12:1 |
| **writing**   91:20 | 62:21 63:4,4,4,16 | 153:25 155:3,7,7,7 | **z** |
| **written**   8:7,10 | 63:19 64:7 65:18 | 155:7,11,11,20 | **zero**   22:10,11 |
| 46:11 | 65:21,21,22,24,24 | 159:3,5,14,14,14 | 129:21 |
| **wrong**   22:11 40:18 | 67:22 68:7 71:7 | 159:14,17 160:10 | **zx**   43:10 |
| 41:5,8,11,13 46:20 | 76:7,10 77:2,2,7 | 161:5,8,14 162:8 | |
| 53:2 166:19 167:8 | 77:14 78:9,19 | 162:14 163:3,4,24 | |
| **wrote**   46:20,20,22 | 79:13,17 82:21 | 163:24,24,24 | |
| 160:4 | 84:11,16 85:10,10 | 164:10 169:9,18 | |
| **y** | 85:10,13,17 88:12 | 170:5 171:3,9,10 | |
| **y'all**   106:18,20 | 89:4,4,13 90:8,8,8 | 174:25,25 175:5 | |
| 125:5 127:19 | 90:8,19,21 94:10 | 175:15,23,23,23 | |
| 142:9 169:19 | 94:10 95:2 96:4 | 176:23,25 177:23 | |
| **yard**   141:18 | 96:20,20,20,21 | 178:5 179:7 | |
| **yawned**   123:22 | 97:8 98:7 99:1 | **year**   9:2 10:15 | |
| **yawning**   79:16 | 100:4,9,9,11,14,14 | 12:9,10,15,16 | |
| **yeah**   7:9 8:18 9:16 | 100:22 101:10,14 | 13:23 14:2,3 | |
| 13:13,13,14,17 | 101:16,17 103:17 | 16:17 17:3 18:8 | |
| 15:25 16:15,22 | 103:20 104:11,19 | 21:18 23:16 25:23 | |
| 17:2 18:1 19:11 | 106:19 108:4,6,10 | 31:19 32:6,14 | |
| 19:23,23,24,24,24 | 108:10 111:8 | 34:15 35:9,10 | |
| 19:24,24 20:6,11 | 112:4,18 113:10 | 43:23 50:10 51:12 | |
| 20:23 21:22,22,22 | 113:22,22,25 | 53:22 56:11 61:4 | |
| 21:22 23:10 24:9 | 114:6,7,16,24 | 146:11 159:2,16 | |
| 24:11,13 26:12 | 116:1,18,18,18,18 | 172:12 | |
| 28:7 29:18 31:21 | 116:22 119:2 | **years**   6:18 15:16 | |
| 32:11,20 33:14 | 121:23,23 122:2 | 16:18,19 17:17,18 | |
| 34:1,1,19,24 35:1 | 122:23,23,23 | 17:20 18:1 27:17 | |
| 35:1,1,13,13,13 | 123:23 124:15 | 31:20 33:12,13 | |
| 36:2,2,5,5,5 38:1,6 | 125:15 127:5,5,7 | 36:8,11 87:22 | |
| 39:13 40:17,17,17 | 128:23 129:18 | 90:3 104:8 107:12 | |

Veritext Legal Solutions

EXHIBIT A

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

**EXHIBIT A**

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT A

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

EXHIBIT A

635 Ronald Reagan Dr
Evans, Georgia 30809
706-922-5056

# CENTER FOR OCCUPA✛IONAL MEDICINE

2215 Tobacco Rd, Ste F
Augusta, Georgia 30906
706-396-1140

## MEDICAL WORK STATUS REPORT

Patient Name _Maray Bush_   Date _4-30-13_

Time In _1:45_   Time Out _2:40_   Birthdate ████   S# (Last 4) ████

Company Name _A H A Cooper Transputation_   Phone Number _____

Position/Title _____   Fax Number _____

**Stop (for office use only)**

Treatment Authorized by _____   Phone Number _____

**EXAMINATION RESULTS**

| | | |
|---|---|---|
| ____Post Offer/Pre-hire | ____Controlled Substance Testing | ____Pass ____Fail |
| ____Annual Exam | ____PFT | ____Pass____Fail |
| ____Work Fitness | ____Fit Test | ____Pass____Fail |
| ____Hazmat | ____Lift Test (____Lbs) | ____Pass____Fail |
| ✓DOT Exam | ____Respirator Clearance | ____Pass____Fail |
| ____Periodic Surveillance for _____ | Class____ for 1 year | |

✓Approved   ____Deferred pending results of _____
✓Not Approved
✓Remarks _Dr. Certificate expires 04/29/2015_

**WORK STATUS**

____Return to regular work on _____   Return to restricted work on _____
____Type of restriction
   ____No heavy lifting: weight limit_____ lbs   ____Limit standing, bending (ie sit down work)
   ____Keep clean and dry   ____Other _____

Diagnosis _____
Referred to _____
Next appointment Date _____   Time _____

Patient signature _Maray Bush_   Date _4-30-13_

Healthcare Provider _Dothe Peloquin_ ms  Date _04/30/2013_
                                                DRP

AAA Cooper 000001

EXHIBIT 10
Kales
9/25/19 SN
PENGAD 800-631-6989

EXHIBIT A

# Medical Examination Report
## FOR COMMERCIAL DRIVER FITNESS DETERMINATION

**1. DRIVER'S INFORMATION** Driver completes this section.

Driver's Name (Last, First, Middle)

Bush, Marcus

| | | | | |
|---|---|---|---|---|
| Age | Sex | New certification | Date of Exam | |
| 40 | ☑ M ☐ F | ☐ Recertification | 04/30/2013 | |
| | | ☐ Follow Up | | |

Address

Work Tel: (706) 796-6167

City, State, Zip Code  SC  29841  Belvedere

Home Tel: (803) 624-2392

Driver License No.
404-26-22

License Class: ☑ A ☐ B ☐ C ☐ D ☐ Other

State of Issue: SC

**2. HEALTH HISTORY** Driver completes this section, but medical examiner is encouraged to discuss with driver.

| Yes | No | |
|---|---|---|
| | ☑ | 1. Any illness or injury in last 5 years? |
| | ☑ | 2. Head/Brain injuries, disorders or illnesses |
| | ☑ | 3. Seizures, epilepsy |
| | | medication: |
| | ☑ | 4. Eye disorders or impaired vision (except corrective lenses) |
| | ☑ | 5. Ear disorders, loss of hearing or balance |
| | ☑ | 6. Heart disease or heart attack; other cardiovascular condition |
| | | medication: |
| | ☑ | 7. Heart surgery (valve replacement/bypass, angioplasty, pacemaker) |
| | | medication: |
| | ☑ | 8. High blood pressure |
| | | medication: |
| | ☑ | 9. Muscular disease |
| | ☑ | 10. Shortness of breath |

| Yes | No | |
|---|---|---|
| | ☑ | 11. Lung disease, emphysema, asthma, chronic bronchitis |
| | ☑ | 12. Kidney disease, dialysis |
| | ☑ | 13. Liver disease |
| | ☑ | 14. Digestive problems |
| | ☑ | 15. Diabetes or elevated blood sugar controlled by: ☐ diet ☐ pills ☐ insulin |
| ☑ | | 16. Nervous or psychiatric disorders, e.g., severe depression medication: |
| | ☑ | 17. Loss of, or altered consciousness |

| Yes | No | |
|---|---|---|
| | ☐ | Fainting, dizziness |
| | ☐ | Sleep disorders, pauses in breathing while asleep, daytime sleepiness, loud snoring |
| | ☐ | Stroke or paralysis |
| | ☐ | Missing or impaired hand, arm, foot, leg, finger, toe |
| | ☐ | Spinal injury or disease |
| ☑ | | Chronic low back pain |
| ☑ | | Regular, frequent alcohol use |
| | ☐ | Narcotic or habit forming drug use |

For any YES answer, indicate onset date, diagnosis, treating physician's name and address, and any current limitation. List all medications (including over-the-counter medications) used regularly or recently.

I certify that the above information is complete and true. I understand that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate.

_M Bush_  Driver's Signature

_4/30/13_  Date

**Medical Examiners Comments on Health History** (The medical examiner must review and discuss with the driver any "yes" answers and potential hazards of medications, including over-the-counter medications, while driving.)

PMH/Surgery — Ø

Smoking — Ø  ∴ chewing tobacco.

EtOH — occas.  Diabetic — Øntula

Wedges — Ø

ROS — Ødaytime sleepiness

AAA Cooper 000002  Page 1 of 3

**EXHIBIT A**

## TESTING (Medical Examiner completes Section 3 through 7)

Driver's Name (Last, First, Middle): Bush, Marcus

### 3. VISION

**Standard:** At least 20/40 acuity (Snellen) in each eye with or without correction. At least 70° peripheral in horizontal meridian measured in each eye. The use of corrective lenses should be noted on the Medical Examiner's Certificate.

**INSTRUCTIONS:** *When other than the Snellen chart is used, give test results in Snellen-comparable values. In recording distance vision, use 20 feet as normal. Report visual acuity as a ratio with 20 as numerator and the smallest type read at 20 feet as denominator. If the applicant wears corrective lenses, these should be worn while visual acuity is being tested. If the driver habitually wears contact lenses, or intends to do so while driving, sufficient evidence of good tolerance and adaptation to their use must be obvious. Monocular drivers are not qualified.*

Numerical readings must be provided.

| ACUITY | UNCORRECTED | CORRECTED | HORIZONTAL FIELD OF VISION |
|--------|-------------|-----------|----------------------------|
| Right Eye | 20/ | 20/ 25 | Right Eye ___° |
| Left Eye | 20/ | 20/ 25 | Left Eye ___° |
| Both Eyes | 20/ | 20/ 25 | |

Complete next line only if vision testing is done by an ophthalmologist or optometrist.

Applicant can recognize and distinguish among traffic control signals and devices showing standard red, green, and amber colors?  ☑ Yes  ☐ No

Applicant meets visual acuity requirement only when wearing:
☑ Corrective Lenses

Monocular Vision:  ☐ Yes  ☑ No

_____
Signature

Date of Examination ___ Name of Ophthalmologist or Optometrist (print) ___ License No./State of Issue ___ Tel No. ___

### 4. HEARING

**Standard: a)** Must first perceive forced whispered voice ≥ 5 ft, with or without hearing aid, or b) average hearing loss in better ear ≤ 40 dB

☐ Check if hearing aid used for tests.  ☐ Check if hearing aid required to meet standard.

**INSTRUCTIONS:** *To convert audiometric test results from ISO to ANSI, −14 dB from ISO for 500 Hz, −10 dB for 1,000 Hz, −8.5 dB for 2,000 Hz. To average, add the readings for 3 frequencies tested and divide by 3.*

a) Record distance from individual at which forced whispered voice can first be heard.   Right Ear 5 Feet   Left Ear 5 Feet

| | Right Ear | | | Left Ear | | |
|--|-----------|--|--|----------|--|--|
| b) If audiometer is used, record hearing loss in decibels. (acc. to ANSI Z24.5-1951) | 500 Hz | 1000 Hz | 2000 Hz | 500 Hz | 1000 Hz | 2000 Hz |
| | Average: | | | Average: | | |

### 5. BLOOD PRESSURE / PULSE RATE

Numerical readings must be recorded. Medical Examiner should take at least two readings to confirm BP.

| Blood Pressure | Systolic | Diastolic |
|----------------|----------|-----------|
| | 132 | 65 |

Driver qualified if ≤ 140/90.

| Pulse Rate | 57 | Regular ☑ / Irregular ☐ |
|------------|----|-----|

| Reading | Category | Expiration Date | Recertification |
|---------|----------|-----------------|-----------------|
| 140-159/90-89 | Stage 1 | Certified for one year | 1 year if 140/90 or less. One-time certificate for 3 months if 141-159/91-99. |
| 160-179/100-109 | Stage 2 | One time certificate for three months | 1 year from date of exam if 140/90 or less. |
| 180/110 or greater | Stage 3 | 6 months from date of exam if <140/90 | 6 months if 140/90 or less. |

### 6. LABORATORY AND OTHER TEST FINDINGS

Numerical readings must be recorded.   URINE SPECIMEN

**Urinalysis is required.** Protein, blood or sugar in the urine may be an indication for further testing to rule out any underlying medical problem.

Other Testing (*Describe and record*)

| SP. GR. | PROTEIN | BLOOD | SUGAR |
|---------|---------|-------|-------|
| 1.025 | 30↑ | Neg | Neg |

AAA Cooper 000003
Page 2 of 4

EXHIBIT A

**7. PHYSICAL EXAMINATION**     Height 6 73/4 (in.)     Weight 232 (lbs)     Driver's Name (Last, First, Middle): Bush, Marcus

The presence of a certain condition may not necessarily disqualify a driver, particularly if the condition is controlled adequately, is not likely to worsen or is readily amenable to treatment. Even if a condition does not disqualify a driver, the medical examiner may consider deferring the driver temporarily. Also, the driver should be advised to take the necessary steps to correct the condition as soon as possible particularly if the condition, if neglected, could result in more serious illness that might affect driving.

Check YES if there are any abnormalities. Check NO if the body system is normal. Discuss any YES answers in detail in the space below, and indicate whether it would affect the driver's ability to operate a commercial motor vehicle safely. Enter applicable item number before each comment. If organic disease is present, note that it has been compensated for.
See Instructions To The Medical Examiner for guidance.

| BODY SYSTEM | CHECK FOR: | YES | NO |
|---|---|---|---|
| 1. General Appearance | Marked overweight, tremor, signs of alcoholism, problem drinking, or drug abuse. | | X |
| 2. Eyes | Pupillary equality, reaction to light, accommodation, ocular motility, ocular muscle imbalance, extraocular movement, nystagmus, exophthalmos. Ask about retinopathy, cataracts, aphakia, glaucoma, macular degeneration and refer to a specialist if appropriate. | | X |
| 3. Ears | Scarring of tympanic membrane, occlusion of external canal, perforated eardrums. | | X |
| 4. Mouth and Throat | Irremediable deformities likely to interfere with breathing or swallowing. | | X |
| 5. Heart | Murmurs, extra sounds, enlarged heart, pacemaker, implantable defibrillator. | | X |
| 6. Lungs and chest, not including breast examination. | Abnormal chest wall expansion, abnormal respiratory rate, abnormal breath sounds including wheezes or alveolar rales, impaired respiratory function, cyanosis. Abnormal findings on physical exam may require further testing such as pulmonary tests and/or xray of chest. | | X |

| BODY SYSTEM | CHECK FOR: | YES | NO |
|---|---|---|---|
| 7. Abdomen and Viscera | Enlarged liver, enlarged spleen, masses, bruits, hernia, significant abdominal wall muscle weakness. | | X |
| 8. Vascular system | Abnormal pulse and amplitude, carotid or arterial bruits, varicose veins. | | X |
| 9. Genito-urinary system. | Hernias. | | X |
| 10. Extremities - Limb impaired. Driver may be subject to SPE certificate if otherwise qualified. | Loss or impairment of leg, foot, toe, arm, hand, finger. Perceptible limp, deformities, atrophy, weakness, paralysis, clubbing, edema, hypotonia. Insufficient grasp and prehension in upper limb to maintain steering wheel grip. Insufficient mobility and strength in lower limb to operate pedals properly. | | X |
| 11. Spine, other musculoskeletal | Previous surgery, deformities, limitation of motion, tenderness. | | X |
| 12. Neurological | Impaired equilibrium, coordination or speech pattern; paresthesia, asymmetric deep tendon reflexes, sensory or positional abnormalities, abnormal patellar and Babinski's reflexes, ataxia. | | X |

**\* COMMENTS:**

---

**Note certification status here.** See Instructions to the Medical Examiner for guidance.

| X | Meets standards in 49 CFR 391.41; qualifies for 2 year certificate |
|---|---|
| | Does not meet standards |
| | Meets standards, but periodic evaluation required. |
| | Due to _____ driver qualified only for: |

| 3 months | 1 year |
|---|---|
| 6 months | Other |

| | Temporarily disqualified due to (condition or medication): |
|---|---|

Return to medical examiner's office for follow up on

| X | Wearing corrective lenses |
|---|---|
| | Wearing hearing aid |
| | Accompanied by a _____ waiver/exemption. Driver must present exemption at time of certification. |
| | Skill Performance Evaluation (SPE) Certificate |
| | Driving within an exempt intracity zone (See 49 CFR 391.62) |
| | Qualified by operation of 49 CFR 391.64 |

Medical Examiner's Signature   Certificate expires   09/29/2015

Da Te Pelgrim

Medical Examiner's Name (print)   Linda A. Willoughby, MD    DOTTIE KPELOWNA

Address  2215 Tobacco Rd, Suite F                              Augusta, GA  30906

Telephone Number  (706) 396-1140

CFR 391.43(h). (Driver must carry certificate when operating a commercial vehicle.)

**EXHIBIT A**

**MEDICAL EXAMINER'S CERTIFICATE**

I certify that I have examined _Marol Bush_ in accordance with the Federal Motor Carrier Safety Regulations (49 CFR 391.41-391.49) and with knowledge of the driving duties, I find this person is qualified; and, if applicable, only where:

- ☑ wearing corrective lenses
- ☑ wearing hearing aid
- ☐ accompanied by a _____ waiver/exemption
- ☐ driving within an exempt intracity zone (49 CFR 391.62)
- ☐ accompanied by a Skill Performance Evaluation Certificate (SPE)
- ☐ qualified by operation of 49 CFR 391.64

The information I have provided regarding this physical examination is true and complete. A complete examination form with any attachment embodies my findings completely and correctly, and is on file in my office.

| SIGNATURE OF MEDICAL EXAMINER | TELEPHONE | DATE |
|---|---|---|
| Dorthe Peloquin MD | | 5/30/13 |

| MEDICAL EXAMINERS NAME (PRINT) | | |
|---|---|---|
| DORTHE R. PELOQUIN | ☑ MD ☐ DO ☐ Chiropractor ☐ Physician Assistant ☐ Advanced Practice Nurse | |

MEDICAL EXAMINERS LICENSE OR CERTIFICATE NO. / ISSUING STATE
GA #026015

| SIGNATURE OF DRIVER | DRIVER'S LICENSE NO. | STATE |
|---|---|---|
| M J Bush | 004042629 | SC |

ADDRESS OF DRIVER
627 Seymour Dr N. Augsta SC

MEDICAL CERTIFICATE EXPIRATION DATE
04/29/2015

**DRIVER COPY**

AAA Cooper 000005

EXHIBIT A

**Concentra Medical Centers (GA)**
4223 Hwy 42  CONLEY, GA 30288
Phone: (404) 366-2900    Fax: (404) 366-2994

Service Date: 05/14/2016
Patient Name: Bush, Marcus J.
SSN: ▮▮▮▮▮▮

**Medical Examination Report**
**FOR COMMERCIAL DRIVER FITNESS DETERMINATION**

Urinalysis is required. Protein, blood or sugar in the urine may be an indication for further testing to rule out any underlying medical problem.

Other Testing  *(Describe and record)*

| URINE SPECIMEN | SP. GR | PROTEIN | BLOOD | SUGAR |
|---|---|---|---|---|
| | 1.010 | Ø | Ø | Ø |

---

| **7.  PHYSICAL EXAMINATION** | Height | 68 | (in.) | Weight | 224 | (lbs) | BMI | 34.5 | Neck Circ | 17.0 | (in) |

The presence of a certain condition may not necessarily disqualify a driver, particularly if the condition is controlled adequately, is not likely to worsen or is readily amenable to treatment. Even if a condition does not disqualify a driver, the medical examiner may consider deferring the driver temporarily. Also, the driver should be advised to take the necessary steps to correct the condition as soon as possible particularly if the condition, if neglected, could result in more serious illness that might affect driving.

Check YES if there are any abnormalities. Check NO if the body system is normal. Discuss any YES answers in detail in the space below, and indicate whether it would affect the driver's ability to operate a commercial motor vehicle safely.  Enter applicable item number before each comment.  If organic disease is present, note that it has been compensated for.

See *Instructions To The Medical Examiner* for guidance.

| BODY SYSTEM | CHECK FOR: | YES* | NO | BODY SYSTEM | CHECK FOR: | YES* | NO |
|---|---|---|---|---|---|---|---|
| 1.  General Appearance | Marked overweight, tremor, signs of alcoholism, problem drinking, or drug abuse. | | ✓ | 7.  Abdomen and Viscera | Enlarged liver, enlarged spleen, masses, bruits, hernia, significant abdominal wall muscle weakness. | | ✓ |
| 2.  Eyes | Pupillary equality, reaction to light, accommodation, ocular motility, ocular muscle imbalance, extraocular movement, nystagmus, exophthalmos. Ask about retinopathy, cataracts, aphakia, glaucoma, macular degeneration and refer to a specialist if appropriate. | | ✓ | 8.  Vascular | Abnormal pulse and amplitude, carotid or arterial bruits, varicose veins. | | ✓ |
| | | | | 9.  Genito-urinary | Hernias. | | ✓ |
| 3.  Ears | Scarring of tympanic membrane, occlusion of external canal, perforated eardrums. | | ✓ | 10.  Extremities - Limb impaired. Driver may be subject to SPE certificate if otherwise qualified. | Loss or impairment of leg, foot, toe, arm, hand, finger. Perceptible limp, deformities, atrophy, weakness, paralysis, clubbing, edema, hypotonia. Insufficient grasp and prehension in upper limb to maintain steering wheel grip. Insufficient mobility and strength in lower limb to operate pedals properly. | | ✓ |
| 4.  Mouth and Throat | Irremediable deformities likely to interfere with breathing or swallowing | | ✓ | | | | |
| 5.  Heart | Murmurs, extra sounds, enlarged heart, pacemaker, implantable defibrillator. | | ✓ | 11.  Spine, other musculoskeletal | Previous surgery, deformities, limitation of motion, tenderness. | | ✓ |
| 6.  Lungs and chest, not including breast examination | Abnormal chest wall expansion, abnormal respiratory rate, abnormal breath sounds including wheezes or alveolar rales, impaired respiratory function, dyspnea, cyanosis. Abnormal findings on physical exam may require further testing such as pulmonary tests and/or xray of chest. | | ✓ | 12.  Neurological | Impaired equilibrium, coordination or speech pattern; paresthesia, asymmetric deep tendon reflexes, sensory or positional abnormalities, abnormal patellar and Babinski's reflexes, ataxia. | | ✓ |

* COMMENTS: (explain all YES answers):

---

Note certification status here. See *Instructions to the Medical Examiner* for guidance.

☑ Meets standards in 49 CFR 391.41; qualifies for 2 year certificate
☐ Does not meet standards
☐ Meets standards, but periodic evaluation  required.

Due to _____ driver qualified only for:
☐ 3 months   ☐ 6 months   ☐ 1 year
☐ Other _____

☐ Temporarily disqualified due to (condition or medication): _____
     Return to medical examiner's office for follow up on _____

☑ Wearing corrective lenses
☐ Wearing hearing aid
☐ Accompanied by a _____ waiver/exemption. Driver must present exemption at time of certification. Exemption explanation (if Other) _____
☐ Skill Performance Evaluation (SPE) Certificate
☐ Driving within an exempt intracity zone. (See 49 CFR 391.62)
☐ Qualified by operation of 49 CFR 391.64

Address ___4223 Hwy 42  CONLEY, GA 30288___
Telephone Number ___(404)366-2900___

If meets standards, complete a Medical Examiner's Certificate according to 49 CFR 391.43(h). (Driver must carry certificate when operating a commercial vehicle.)

| SIGNATURE OF MEDICAL EXAMINER | *[signature]* | MEDICAL CERTIFICATE EXPIRATION DATE  5/14/17 | ☐ Intrastate Only |
|---|---|---|---|
| MEDICAL EXAMINER'S NAME (PRINT) | JUDITH CHABOT, FNP-C | ☐ MD   ☐ Physician Assistant | ☐ Chiropractor |
| | | ☐ DO   ☑ Advance Practice Nurse | ☐ Other Practioner |
| MED EXAMINER'S LICENSE OR CERT NO / ISSUING STATE | RN132549 / GA | NATIONAL REGISTRY NO  8948668961 | |

---

☐ Update to previously transmitted exam          **UPDATES / FOLLOW UP**

| DATE | COMMENT | MED EXAM CERT EXPIRATION DATE | EXAMINER |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

© 1996 -2015 Concentra Operating Corporation All Rights Reserved.

Evaluation - DOT    Page 2 of 2

AAA Cooper 000028
Revision Date: 08/12/2014

**EXHIBIT A**

**Concentra Medical Centers (GA)**
4223 Hwy 42 CONLEY, GA 30288
Phone:  (404) 366-2900     Fax:  (404) 366-2994

Service Date: 05/14/2015
Patient Name: Bush, Marcus J.
SSN: ▮▮▮▮▮▮▮

## Medical Examination Report
### FOR COMMERCIAL DRIVER FITNESS DETERMINATION

### 1. DRIVER'S INFORMATION   Driver completes this section

Date of Exam   05/14/2015

| Driver's Name (Last, First, Middle) | Age | Sex | | New Certification | License Class |
|---|---|---|---|---|---|
| Bush, Marcus J. | 42 | ☒ Male ☐ Female | | ☒ New Certification ☐ Recertification ☐ Follow Up | ☐ A ☐ B ☐ C ☐ D ☐ Other ☒ CDL |

| Address: | City, State, ZIP Code  NORTH AUGUSTA, SC 29841 | Work Tel: | Driver's License No. | State of Issue |
|---|---|---|---|---|
| - - | | Home Tel: (803) 624-367▮ | 004042622 | SC |

### 2. HEALTH HISTORY   Driver completes this section, but medical examiner is encouraged to discuss with driver.

Yes No
- ☐☒ Any illness or injury in last 5 years?
- ☐☒ Head/Brain injuries, disorders or illnesses
- ☐☒ Seizures, epilepsy - If Yes, list medications:
- ☐☒ Eye disorders or impaired vision (except corrective lenses)
- ☐☒ Ear disorders, loss of hearing or balance
- ☐☒ Heart disease or heart attack; other cardiovascular condition
     If Yes, list medications:
- ☐☒ Heart surgery (valve replacement/bypass, angioplasty, pacemaker)
- ☐☒ High blood pressure - If Yes, list medications:
- ☐☒ Muscular disease

Yes No
- ☐☒ Shortness of breath
- ☐☒ Lung disease, emphysema, asthma, chronic bronchitis
- ☐☒ Kidney disease, dialysis
- ☐☒ Liver disease
- ☐☒ Digestive problems
- ☐☒ Diabetes or elevated blood sugar controlled by:
     ☐ diet ☐ pills ☐ insulin
- ☐☒ Nervous or psychiatric disorders, e.g., severe depression
     If Yes, list medications:
- ☐☒ Loss of, or altered consciousness
- ☐☒ Surgery

Yes No
- ☐☒ Fainting, dizziness
- ☐☒ Sleep disorders, pauses in breathing while asleep, daytime sleepiness, loud snoring
- ☐☒ Stroke or paralysis
- ☐☒ Missing or impaired hand, arm, foot, leg, finger, toe
- ☐☒ Spinal injury or disease
- ☐☒ Chronic low back pain
- ☐☒ Regular, frequent alcohol use
- ☐☒ Narcotic or habit forming drug use

For any YES answer, indicate onset date, diagnosis, treating physician's name and address, and any current limitation.  List all medications (including over-the-counter medications) used regularly or recently.

I certify that the above information is complete and true.  I understand that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate.
I authorize Concentra Health Services Inc., its subsidiaries, divisions and related entities (collectively "Concentra") to provide all or any of my medical records to my employer and release Concentra, its employees, physicians, nurses, technicians and other employees from any and all liabilities, claims, or causes of action that may result from this authorization.

_Driver's Signature_     Date  5-14-15

Medical Examiner's Comments on Health History  (The medical examiner must review and discuss with the driver any "yes" answers and potential hazards of medications, including over-the-counter medications, while driving. This discussion must be documented below.)

PmtHx: Negative

### Testing (Medical Examiner completes Section 3 through 7)

### 3. VISION   Standard: At least 20/40 acuity (Snellen) in each eye with or without correction.  At least 70° peripheral in horizontal meridian measured in each eye.
The use of corrective lenses should be noted on the Medical Examiner's Certificate.

INSTRUCTIONS: When other than the Snellen chart is used, give test results in Snellen-comparable values.  In recording distance vision, use 20 feet as normal.  Report visual acuity as a ratio with 20 as numerator and the smallest type read at 20 feet as denominator.  If the applicant wears corrective lenses, these should be worn while visual acuity is being tested.  If the driver habitually wears contact lenses, or intends to do so while driving, sufficient evidence of good tolerance and adaptation to their use must be obvious.Monocular drivers are not qualified.
Numerical readings must be provided.   Contacts

| ACUITY | UNCORRECTED | CORRECTED | HORIZONTAL FIELD OF VISION | | | |
|---|---|---|---|---|---|---|
| Right Eye | 20/ | 20/ 25 | Right Eye | 85 | Applicant can recognize and distinguish among traffic control signals and devices showing standard red, green, and amber colors? | ☒ Yes ☐ No |
| Left Eye | 20/ | 20/ 30 | Left Eye | 85 | Applicant meets visual acuity requirement only when wearing: | ☒ Corrective Lenses |
| Both Eyes | 20/ | 20/ 30 | | | Monocular Vision: ☐ Yes ☒ No | |

Complete next line only if vision testing is done by an ophthalmologist or optometrist

| Date of Examination | Name of Ophthalmologist or Optometrist (Print) | Tel No. | License No/State of Issue | Signature |
|---|---|---|---|---|

### 4. HEARING   Standard: a) Must first perceive forced whispered voice >= 5 ft., with or without hearing aid,  or b) average hearing loss in better ear <= 40 dB
☐ Check if hearing aid used for tests        ☐ Check if hearing aid required to meet standard.

INSTRUCTIONS:   To convert audiometric test results from ISO to ANSI,  -14 dB from ISO for 500Hz, -10 dB for 1,000Hz, -8.5 dB for 2,000HZ.
To average, add the readings for 3 frequencies tested and divide by 3.
Numerical reading must be recorded.

| a) Record distance from individual at which forced whispered voice can first be heard. | Right Ear  5  \ Feet | Left Ear  5  \ Feet | b) If audiometer is used, record hearing loss in decibels. (acc. to ANSI Z24.5-1951) | Right Ear | | | Left Ear | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 500 Hz | 1000 Hz | 2000 Hz | 500 Hz | 1000 Hz | 2000 Hz |
| | | | Average: | | | | Average: | | |

### 5. BLOOD PRESSURE / PULSE RATE   Numerical readings must be recorded.   Medical examiner should take at least 2 readings to confirm blood pressure.

| Blood Pressure | Reading | | Category | Expiration Date | Recertification |
|---|---|---|---|---|---|
| | Systolic 128 | Diastolic 71 | Stage 1 | 1 year | 1 year if <= 140/90  One-time certificate for 3 months if 141-159/91-99 |
| Driver qualified if <= 140/90 | 140-159/90-99 | | | | |
| Pulse Rate: ☒ Regular ☐ Irregular | 160-179/100-109 | | Stage 2 | One-time certificate for 3 months | 1 year from date of exam if <= 140/90 |
| Record Pulse Rate: 68 | >= 180/110 | | Stage 3 | Disqualified  6 months from date of exam if <= 140/90 | 6 months if <= 140/90 |

### 6. LABORATORY AND OTHER TEST FINDINGS   Numerical reading must be recorded.

AAA Cooper 000029

Evaluation - DOT        Page 1 of 2

© 1996 -2015 Concentra Operating Corporation All Rights Reserved.

Revision Date:  08/12/2014

## EXHIBIT A

**MEDICAL EXAMINER'S CERTIFICATE**

I certify that I have examined _____ in accordance with the Federal Motor Carrier Safety Regulations (49 CFR 391.41-391.49) and with knowledge of the driving duties, I find this person is qualified, and, if applicable, only when:

☒ wearing corrective lenses
☐ wearing hearing aid
☐ accompanied by a _____ waiver/exemption

☐ driving within an exempt intracity zone  (49 CFR 391.62)
☐ accompanied by a Skill Performance Evaluation Certificate (SPE)
☐ qualified by operation of 49 CFR 391.64

The information I have provided regarding this physical examination is true and complete. A complete examination form with any attachment embodies my findings completely and correctly, and is on file in my office.

| SIGNATURE OF MEDICAL EXAMINER | TELEPHONE 404-366-2900 | | DATE 5/14/16 |
|---|---|---|---|
| MEDICAL EXAMINER'S NAME (PRINT) JUDITH CHABOT, FNP-C | ☐ MD ☐ DO ☐ Physician Assistant | ☐ Chiropractor ☒ Advanced Practice Nurse ☐ Other Practitioner | |
| MEDICAL EXAMINER'S LICENSE OR CERTIFICATE NO./ISSUING STATE RN132549 / GA | NATIONAL REGISTRY NO. 8948668961 | | |

| SIGNATURE OF DRIVER | INTRASTATE ONLY | CDL | DRIVER'S LICENSE NO. | STATE |
|---|---|---|---|---|
| | ☐ YES ☒ NO | ☒ YES ☐ NO | 004042632 | SC |
| ADDRESS OF DRIVER 627 Seymour Dr. N. Augusta SC 29841 | | | | |
| MEDICAL CERTIFICATION EXPIRATION DATE 5/14/17 | | | | |

CMCDOTCARD

AAA Cooper 000030

EXHIBIT A



H|B|S   HALL BOOTH SMITH, P.C.

**Hana Barrott**          191 Peachtree St. NE, Suite 2900
P: (678) 539-1590         Atlanta, Georgia 30303-1775
E: hbarrott@hallboothsmith.com   W: www.hallboothsmith.com
                         P: (404) 954-5000   F: (678) 539-1628

June 4, 2019

Stefanos Nikolaos Kales, MD, MPH, FACP, FACOEM
c/o Christopher D. Glover, Esq.
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
4200 Northside Parkway, NW
Building One, Suite 100
Atlanta, Georgia 30327

RE:   **Callie D. Roberts v. AAA Cooper Transportation, Inc. and Marcus J. Bush**
      In the United States District Court, Northern District – Gainesville Division
      CAFN: 2:17-cv-00232-RWS

Dear Records Custodian:

       Enclosed you will find a subpoena and a verification page for certain records requested in
relation to the above referenced matter.  Pursuant to Federal Rules of Civil Procedure 34(c) and
45(a)(1), you are hereby requested to produce the documents listed on the subpoena for
inspection and copying by Defendants' attorneys at Hall Booth Smith, P.C., 191 Peachtree Street
NE, Suite 2900, Atlanta, Georgia 30303.

       **Please note that in lieu of attending the document production on July 3, 2019, you
may mail or deliver these copies to our office on or before July 3, 2019.** We are willing to
reimburse you for the reasonable charges involved in photocopying and certifying the requested
information.  However, in the event this amount exceeds $100.00, I would appreciate you faxing
me a pre- payment request at (678) 539-1628 in advance of sending the records.

       If you should have any questions or comments, please do not hesitate to contact me.

                                   Very truly yours,

                                   **HALL BOOTH SMITH, P.C.**

                                   Hana Barrott, Paralegal
                                   From the office of Sean B. Cox

Enclosures
cc:   E. Brian Watkins, Esq.; Charles D. Graham, Esq.



EXHIBIT 71
Kales
9/25/19



USLAW

**EXHIBIT A**

RE:   **Callie D. Roberts v. AAA Cooper Transportation, Inc. and Marcus J. Bush**
In the United States District Court, Northern District – Gainesville Division
CAFN: 2:17-cv-00232-RWS

Date:   June 4, 2019

## STATEMENT OF COMPLIANCE WITH HIPAA REQUIREMENTS

The enclosed Request for Production of Documents is in compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and HIPAA's implemented regulations under Title 45, Parts 160 and 164 of the Code of Federal Regulations for the following reason(s):

__x__   We have made a good faith attempt to provide written notice to the individual, or, if the individual's location is unknown, notice was mailed to the individual's last known address, or if represented by counsel, notice was mailed to the individual's attorney; the notice included sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court in twenty (20) days. Please see 45 C.F.R. §164.512(e)(1)(iii).

_____   This Request for Production of Documents is in response to an order of the above referenced court, and the protected health information requested is expressly authorized by the order. A copy of which is attached for your assurance. Please see 45 C.F.R. §164.512(e)(1)(i).

_____   The Request for Production of Documents is subject to a qualified protective order* agreed upon by the parties to this dispute and such protective order has been presented to the above referenced court. A copy of which is attached for your assurance. Please see 45 C.F.R. §164.512(e)(1)(iv)(A).

_____   The Request for Production of Documents is subject to a qualified protective order* requested by us from the above referenced court. A copy of which is attached for your assurance. Please see 45 C.F.R. §164.512(e)(1)(iv)(B).

_____   The individual whose health information is requested has provided an Authorization for the disclosure and the Authorization complies with 45 C.F.R. §164.508. A copy of the Authorization has been enclosed for your records.

_____
* A qualified protective order means, with respect to the protected health information requested, an order of the above referenced court or a stipulation by the parties to the litigation that: (A) prohibits the parties from using or disclosing the protected health information for any purpose other than the litigation or proceeding for which such information was requested; and (B) requires the return to the covered entity or destruction of the protected health information at the end of the litigation or proceeding. Please see C.F.R. § 164.512(e)(1)(v).

**EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

| | |
|---|---|
| **CALLIE D. ROBERTS,** | |
| **PLAINTIFF,** | **CIVIL ACTION FILE NO.** |
| | **2:17-cv-00232-RWS** |
| v. | |
| **AAA COOPER TRANSPORTATION, INC., and MARCUS J. BUSH, Individually and Jointly,** | |
| **DEFENDANTS.** | |

## AFFIDAVIT OF RECORDS

I, the undersigned, being the duly authorized custodian of records for **STEFANOS NIKOLAOS KALES, MD MPH, FACP, FACOEM** and being duly sworn, do affirm and state upon my oath as follows:

1.

The records attached hereto, numbering a total of _____ pages, are true and correct copies of redacted/unredacted (circle one) records pertaining to the expert file of **CALLIE D. ROBERTS**.

2.

The records were made at or near the time of the acts, events, conditions, opinions, or diagnoses described therein.

3.

The records were made by, or from information transmitted by, a person with personal knowledge and a business duty to report.

4.

The records were kept in the course of regularly conducted activity.

5.

It was the regular practice of that activity to make these records.

[SIGNATURE PAGE FOLLOWS]

**EXHIBIT A**

This _____ day of _____, 2019.


_____
(Signature)


_____
(Printed name and title)


Sworn to and subscribed before me
this _____ day of _____, 2019.

_____
NOTARY PUBLIC

My commission expires: _____

**EXHIBIT A**

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of Georgia

| | |
|---|---|
| Callie D. Roberts | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   2:17-cv-00232-RWS |
| AAA Cooper Transportation, Inc. and Marcus J. Bush, Individually and Jointly | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Stefanos Nikolaos Kales, MD, MPH, FACP, FACOEM
c/o Christopher D. Glover, Esq.; 4200 Northside Parkway, NW, Building One, Suite 100, Atlanta, Georgia 30327

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:    See attached Exhibit "A"

| Place: Hall Booth Smith, P.C. | Date and Time: |
|---|---|
|      191 Peachtree Street, NE, Suite 2900 Atlanta, GA 30303 | 07/03/2019 5:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    06/04/2019

*CLERK OF COURT*

OR

_____      _____
   *Signature of Clerk or Deputy Clerk*        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    AAA Cooper Transportation, Inc. and Marcus J. Bush, Individually and Jointly _____ , who issues or requests this subpoena, are:
Sean B. Cox, 191 Peachtree Street, NE, Suite 2900, Atlanta, GA 30303 404-954-5000 scox@hallboothsmith.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## EXHIBIT A

EXHIBIT "A"

1.

A copy of your current curriculum vitae.

2.

All correspondence (whether by way of letter, fax, or e-mail) between Plaintiff's counsel or their office and you or anyone on your behalf.

3.

The most recent reports you have prepared, executed, or signed regarding this matter, and any draft reports you may have prepared.

4.

Any and all memoranda, summaries, synopses, treatises, authorities, correspondence, statements, depositions, rules, regulations, and/or statutes, or any other documents of any kind provided to you by Plaintiff, Plaintiff's attorneys, or any other person, which form a basis for your opinions in this case.

5.

Any and all memoranda, summaries, synopses, regulations, treatises, authorities, correspondence, statements, depositions, or any other documents of any kind which you have provided to Plaintiff or Plaintiffs' attorneys, or have been provided to you, which are in any way related to your opinions in this case.

6.

Copies of all drafts of the affidavits (whether reduced to printed form or in a word processor or computer) which you have signed in this case.

**EXHIBIT A**

7.

All medical records, depositions, documents, photographs, videos, rules, regulations, and/or statutes, or other materials of any kind which you have reviewed in conjunction with this case.

8.

All notes you have created in conjunction with your review of this case.

9.

Copies of any and all records of time you have spent on this matter and invoices that you have prepared in conjunction with your work in this case.

10.

Your **entire file** in relation to this matter.

11.

Copies of all data, publications, periodicals, treatises, papers, research, rules, regulations, and/or statutes, or other materials that you relied on, referred to, or reviewed in any way in relation to this matter and your opinions in this matter.

12.

A list of all cases wherein you have given expert testimony.

13.

A copy of any retention, employment, or payment agreement related to this matter.

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

CALLIE D. ROBERTS,

     PLAINTIFF,

v.

AAA COOPER TRANSPORTATION,
INC., and MARCUS J. BUSH, Individually
and Jointly,

     DEFENDANTS.

CIVIL ACTION FILE NO.
2:17-cv-00232-RWS

<u>**CERTIFICATE OF SERVICE**</u>

     I HEREBY CERTIFY that I have this date served a copy of the within and foregoing **NON-PARTY REQUEST FOR PRODUCTION OF DOCUMENTS** upon the following by depositing a copy of same in the United States Mail in a properly addressed envelope with adequate postage affixed thereto, addressed as follows:

Charles D. Graham, Esq.
The Graham Law Firm
191 Roswell Street, Suite 200
Marietta, Georgia 30060

E. Brian Watkins, Esq.
191 Roswell Street, Suite 200
Marietta, Georgia 30060

Christopher D. Glover, Esq.
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
4200 Northside Parkway, NW
Building One, Suite 100
Atlanta, Georgia 30327

This 4<u>th</u> day of June, 2019.

[SIGNATURE PAGE FOLLOWS]

**EXHIBIT A**

HALL BOOTH SMITH, P.C.

_____

SCOTT H. MOULTON
Georgia State Bar No. 974237
SEAN B. COX
Georgia State Bar No. 664108
*Counsel for Defendants*

191 Peachtree Street NE
Suite 2900
Atlanta, GA  30303-1775
T:  (404) 954-5000
F:  (678) 539-1628

EXHIBIT A